# EXHIBIT A

1   HEATHER E. WILLIAMS, #122664
    Federal Defender
2   BENJAMIN D. GALLOWAY, #214897
    Chief Assistant Federal Defender
3   RACHELLE BARBOUR, #185395
    Assistant Federal Defender
4   OFFICE OF THE FEDERAL DEFENDER
    801 I Street, 3rd Floor
5   Sacramento, CA  95814
    Tel: 916-498-5700/Fax: 916-498-5710
6
    Attorneys for
7   OMAR AMEEN

8

9                 IN THE UNITED STATES DISTRICT COURT

10               FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12  IN THE MATTER OF THE          )  Case No.  2:18-mj-152 EFB
    EXTRADITION OF OMAR           )
    ABDULSATTAR AMEEN TO THE      )  MOTION TO COMPEL GOVERNMENT TO
13  REPUBLIC OF IRAQ,             )  PRODUCE EVIDENCE
                                  )
14                                )  Judge: Hon. Edmund F. Brennan

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Table of Contents

I.      INTRODUCTION ........................................................................................................ 1

II.     THE EXTRADITION REQUEST ARISES OUT OF AN INVESTIGATION BY THE
        UNITED STATES GOVERNMENT ........................................................................... 2

III.    GIVEN THE U.S. GOVERNMENT'S PRIMARY ROLE IN THE INVESTIGATION OF
        THIS OFFENSE, DUE PROCESS REQUIRES PRODUCTION OF ALL FAVORABLE
        INFORMATION AND DOCUMENTATION ................................................................ 7

IV.     THIS MOTION REQUESTS PRODUCTION OF MATERIAL THAT IS
        "FAVORABLE TO THE ACCUSED" AND MUST BE DISCLOSED UNDER BRADY
        ................................................................................................................................... 13

V.      THE BURDEN TO PRODUCE FAVORABLE EVIDENCE EXTENDS TO THE U.S.
        GOVERNMENT AS A WHOLE, NOT ONLY THE DEPARTMENT OF JUSTICE .... 18

VI.     THE GOVERNMENT'S BURDEN TO PRODUCE FAVORABLE INFORMATION
        EXTENDS TO IRAQI GOVERNMENT DOCUMENTS AND STATEMENTS BY
        IRAQI LAW ENFORCEMENT OBTAINED BY THE U.S. GOVERNMENT ............. 20

VII.    THE CIRCUMSTANCES OF                    IDENTIFICATION OF MR. AMEEN ARE
        CRITICAL TO THE COURT'S CONSIDERATION AND MUST BE DISCLOSED TO
        THE DEFENSE ........................................................................................................... 21

VIII.   THE UNITED STATES GOVERNMENT MUST PRODUCE EVIDENCE IN ITS
        POSSESSION THAT WOULD OBLITERATE PROBABLE CAUSE IN THIS CASE
        BY PROVING THAT MR. AMEEN WAS IN TURKEY IN JUNE 2014 ..................... 26

   A.   The Government Must Produce its Independent Statement Corroborating Mr. Ameen's
        Presence in Turkey in June 2014 ...................................................................................... 26

   B.   The U.S. Must Produce Any Evidence of Mr. Ameen's Presence in Turkey in the Summer
        of 2014 Obtained During Surveillance ............................................................................. 27

IX.  DOCUMENTS THAT REBUT CLAIMS AT PAGE 71 OF THE EXTRADITION
     PACKET AND ELSEWHERE IN GOVERNMENT FILINGS MUST BE PROVIDED TO
     THE DEFENSE ........................................................................................................... 29

X.   CONCLUSION ............................................................................................................ 35

**Table of Authorities**

**Supreme Court Opinions**

Arizona v. Fulminante,
    499 U.S. 279  (1991) .............................................................................................. 14, 16

Brady v. Maryland,
    373 U.S. 83 (1963) ...................................................................................................... 8

Fare v. Michael C.,
    442 U.S. 707 (1979) ............................................................................................ 15, 16

Gallegos v. Nebraska,
    342 U.S. 55 (1951) ..................................................................................................... 16

Harris v. South Carolina,
    338 U.S. 68 (1949) .............................................................................................. 15, 16

Leyra v. Denno,
    347 U.S. 556  (1954) ................................................................................................. 14

Lynumn v. Illinois,
    372 U.S. 528 (1963) ................................................................................................. 15

Neil v. Biggers,
    409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) ............................................. 23

Payne v. Arkansas,
    356 U.S. 560 (1958) ................................................................................................. 14

Reck v. Pate,
    367 U.S. 433 (1961) ................................................................................................. 16

Under Giglio v. United States,
    405 U.S. 150 (1972) ................................................................................................. 18

United States ex rel. Touhy v. Ragen,
    340 U.S. 462 (1951) ................................................................................................. 14

United States v. Balsys,
    524 U.S. 666 (1998) ................................................................................................. 36

Wearry v. Cain,
    136 S. Ct. 1002 (2016) (per curiam) .................................................................. 28, 29

**Federal Court Opinions**

2010 U.S. Dist. LEXIS 1563, *8 .................................................................. 11

Demjanjuk v. Petrovsky,
    10 F.3d 338 (6th Cir. 1993) ............................................... 8, 9, 18

Dennis v. Sec'y, Pa. Dep't of Corr.,
    834 F.3d 263 (3d Cir. 2016) ..................................................... 28

Dent v. Holder,
    627 F.3d 365 (9th Cir. 2010) .................................................... 12

In re Burt,
    737 F.2d 1477. (7th Cir. 1984) .................................................... 8

In re Drayer,
    190 F.3d 410 (6th Cir. 1999) ........................................... passim

In re Extradition of Bonilla, No. 1:
    13-MJ-62, 2014 WL 934903 (E.D. Tex. Mar. 4, 2014) ........................ 13

In re Extradition of Cervantes Valles,
    268 F. Supp. 2d 758 (S.D. Tex. 2003) ........................................ 24

In re Extradition of Chavez,
    408 F. Supp. 2d 908 (N.D. Cal. 2005) ........................................ 24

In re Extradition of Contreras,
    800 F.Supp. 1462 (S.D.Tex. 1992) ........................................ 24, 25

In re Extradition of Gonzalez,
    52 F. Supp. 2d 725 (W.D. La. 1999) ......................................... 24

In re Extradition of Handanovic,
    826 F. Supp. 2d 1237 (D. Or. 2011) .......................................... 10

In re Extradition of Kraiselburd,
    786 F.2d 1395 (9th Cir. 1986) ................................................ 21

In re Extradition of Singh,
    123 F.R.D. 108 (D.N.J. 1987) ................................................... 8

In re Extradition of Singh,
    2005 U.S. Dist. LEXIS 42969 at *126 (E.D. Cal. 2005) ........................ 24

In re McMullen,
    1988 U.S. Dist. LEXIS 7201 (S.D.N.Y. 1988) ................................. 21

In re Monroy,
    2006 U.S. Dist. LEXIS 65815 (E.D. Cal. Aug. 30, 2006) .................... 25-26

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 5 of 44

In re Singh,
   170 F. Supp. 2d 982 (E.D. Cal. 2001) ............................................................. passim

In re Strunk,
   293 F.Supp.2d 1117 (E.D. Cal. 2003) ........................................................................ 26

Lanuza v. Love,
   899 F.3d 1019, 1025 n.2 (9th Cir. 2018) .................................................................... 12

Mainero v. Gregg,
   164 F.3d 1199 (9th Cir. 1999) .................................................................................... 25

Manta v. Chertoff,
   518 F.3d 1134 (9 Cir. 2008) ................................................................................. 23-24

Martinez v. United States,
   828 F.3d 451 (6th Cir. 2016) (en banc) ...................................................................... 10

Nuckols v. Gibson,
   233 F.3d 1261 (10th Cir. 2000) .................................................................................. 11

Pavlik v. United States,
   951 F.2d 220, 224 n.5 (9th Cir. 1991) ....................................................................... 12

Petition of Geisser,
   627 F.2d 745 (5th Cir. 1980) ..................................................................................... 7-8

Plaster v. United States,
   720 F.2d 340 (4th Cir. 1983) ....................................................................................... 7

Prasoprat v. Benov,
   421 F.3d 1009 (9th Cir. 2005) .................................................................................... 10

Quinn v. Robinson,
   783 F.2d 776, 817 n.41 (9th Cir. 1986) ................................................................... 8, 25

Republic of France v. Moghadam,
   617 F. Supp. 777 (N.D. Cal. 1985) ........................................................................ 17, 21

In re Munoz Santos
   228 F.Supp.3d 1054 (C.D. Cal. 2017) ........................................................................ 25

Santos v. Thomas,
   830 F.3d 987 (9th Cir. 2016) (en banc) ................................................................ passim

Smith v. Black,
   904 F.2d 950 (5th Cir. 1990) ...................................................................................... 11

Sperry v. Hutchinson Co. v. FTC,
   256 F.Supp. 136 (S.D.N.Y. 1966) .............................................................................. 12

United States v. Auten,
   632 F.2d 478 (5th Cir. 1980) ...................................................................................... 19

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 6 of 44

United States v. Bararia,
　　2013 U.S. dist. LEXIS 93563 at *14 (D. Nev. 2013) ........................... 17

United States v. Bryce,
　　208 F.3d 346 (2d Cir. 1999) ........................................................... 27

United States v. Burnside,
　　824 F.Supp. 1215 (N.D. Ill. 1993) .................................................. 19

United States v. Carter,
　　313 F. Supp. 2d 921 (E.D. Wis. 2004) ............................................. 17

United States v. Ebel,
　　856 F.Supp.2d 764 (E.D.N.C. 2012) ................................................ 12

United States v. Edwards,
　　777 F. Supp.2d 985 (E.D.N.C. 2011) ............................................... 12

United States v. Froman,
　　355 F.3d 882 (5th Cir. 2004) .......................................................... 13

United States v. Gamez-Orduno,
　　235 F.3d 453 (9th Cir. 2000) .......................................................... 11

United States v. Holstrom,
　　246 F. Supp. 2d 1101 (E.D. Wash. 2003) ...................................... 10-11

United States v. Kin-Hong,
　　110 F.3d 103 (1st Cir. 1997) ............................................................ 7

United States v. Kojayan,
　　8 F.3d 1315 (9th Cir. 1993) ........................................................... 36

United States v. Linson,
　　88 F. Supp. 2d 1123 (D. Guam 2000) ............................................. 21

United States v. Napier,
　　518 F.2d 316 (9th Cir. 1975) .......................................................... 27

United States v. Olsen,
　　704 F.3d 1172, 1183 n. (9  Cir. 2013) ............................................ 17

United States v. Safavian,
　　233 F.R.D. 12 (D.D.C. 2005) ......................................................... 17

United States v. Singleton,
　　125 F.3d 1097 (7th Cir. 1997) ........................................................ 27

United States v. Sudikoff,
　　36 F. Supp. 2d 1196 (C.D. Cal. 1999) ............................................ 17

United States v. Tingle,
　　658 F.2d 1332 (9th Cir. 1981) ........................................................ 15

Case 2:18-mj-00152-EFB Document 127-2 Filed 04/24/19 Page 7 of 44

Valenzuela v. United States,
    286 F.3d 1223 (11th Cir. 2002) ................................................................ 7

Wang v. Reno,
    81 F.3d 808 (9th Cir. 1996) .................................................................... 10

**State Cases**

People v. Steger,
    16 Cal.3d 539 (1976) ............................................................................. 15

People v. Trout,
    54 Cal.2d 576 (1960) ............................................................................. 15

Smith v. United States,
    666 A.2d 1216 (D.C. 1995) .................................................................... 11

**Other**

Department of Justice, Criminal Resource Manual

§ 2052 ................................................................................................ 18, 19

§ 601-622 .................................................................................................. 19

28 Code of Federal Regulations ............................................................... 14

European Asylum Support Office, Report: Iraq, Internal Mobility at p. 17 (February 2019)
available at www.justice.gov/eoira/page/file/1132771/download .................................... 5

Harrison, "Probe of Nazi War Criminal Case Raises Ethics Questions: Government: A former
Justice Dept. attorney said he resigned over handling of possibly exculpatory evidence
concerning the accused" LA Times (Nov. 13, 1992) available at http://articles.latimes.com/1992-
11-13/news/mn-290_1_nazi-war-criminal-case ................................................................... 8

Smothers, "Lawyer Recalls No Doubt on Nazi Guard," NY Times (Jan. 15, 1993) available at
www.nytimes.com/1993/01/15/us/lawyr-recalls-no-doubt-on-nazi-guard.html .......................... 8

"Grassley Seeks Answers on ISIS Member Admitted to U.S. as Refugee" (Aug. 20, 2018)
available at www.grassley.senate.gov/news/news-releases ....................................................... 9

Thompson & Watson, "Ex-ISIS fighter entered U.S. as refugee, officials say," Assoc. Press
(Aug. 16, 2018) (connecting case with current criticism of
"Obama-era resettlement program.") ................................................................................... 9

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 8 of 44

Ben Taub, Iraq's Post-ISIS Campaign Of Revenge, December 24, 2018 available at
https://www.newyorker.com/magazine/2018/12/24/iraqs-post-isis-campaign-of-revenge...........14

Poitras, et al. "A Two-Faced Friendship: Turkey is 'Partner and Target' for the NSA,"
Spiegel Online, Aug. 31, 2014 available at www.spiegel.de.......................................................28

Lewis, "Snowden documents show NSA gathering 5bn cell phone records daily," The Guardian
Dec. 5, 2013 available at www.theguardian.com ........................................................................28

Department of Defense press release archive.defense.gov/news/newsarticle.aspx?id= Global
Terrorism Database available at www.start.umd.edu/gtd/ .................................................30

Empirical Studies of Conflict (ESOC), Iraq Dataset available at esoc.princeton.edu/country/Iraq
.....................................................................................................................................................31

Homeland Security Digital Library, available at www.hsdl.org/c/; Cordesman, "Iraq's Sectarian
and Ethnic Violence and the Evolving Insurgency," Center for Strategic and International
Studies (Dec. 14, 2006)31710........................................................................................................31

Orton, Governing the Caliphate: Profiles of Islamic State Leaders, The Henry Jackson Society
(2016); Zeidel, "The Dawa'ish: A Collective Profile of IS Commanders" Perspectives on
Terrorism, Vol. 11, No. 4 (2017) ............................................................................................. 33

Fishman, The Master Plan: ISIS, Al-Qaeda, and the Jihadi Strategy for Final Victory (2016) ...34

Naylor, Relentless Strike; Glenn, "Al Qaeda v. ISIS: Leaders & Structure" The Wilson Center
(Sep. 28, 2015) ...............................................................................................................................34

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 9 of 44

HEATHER E. WILLIAMS, #122664
Federal Defender
BENJAMIN D. GALLOWAY, #214897
Chief Assistant Federal Defender
RACHELLE BARBOUR, #185395
Assistant Federal Defender
OFFICE OF THE FEDERAL DEFENDER
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax: 916-498-5710

Attorneys for
OMAR AMEEN

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATTAR AMEEN TO THE REPUBLIC OF IRAQ, | Case No.  2:18-mj-152 EFB<br><br>MOTION TO COMPEL GOVERNMENT TO PRODUCE EVIDENCE<br><br>Judge: Hon. Edmund F. Brennan |

## I.    INTRODUCTION

In 2016, the United States Government began investigating Mr. Ameen in connection with a request to adjust his immigration status.  This investigation intensified and shifted focus in March of 2017, just as the Trump administration sought support for its Muslim Ban.  The limited disclosure provided to defense counsel so far, along with the Government's filings in the record, and its sealed search warrant affidavits, demonstrate a multi-year investigation involving several U.S. Government agencies, including the Federal Bureau of Investigation.  The defense knows that the FBI interviewed witnesses across the United States and in Iraq.  The U.S. investigation into this offense started well before any involvement by Iraqi authorities.

As discussed below, the U.S. Government bears the burden of producing favorable material to the defense in this case.  Because of the circumstances of this case, that burden is extensive.  Any evidence held by the U.S. Government that corroborates Mr. Ameen's presence in Turkey in June, July, or August 2014, and that therefore rebuts the sole purported eyewitness in this case, must be produced to the defense.  Further, three close members of the victim's

1    family have all given statements to the defense that Mr. Ameen had nothing to do with the

2    victim's death.

3          This strong evidence of Mr. Ameen's innocence requires the Government to produce all

4    information concerning the circumstances of the interview of the purported eyewitness in which

5    an alleged identification of Mr. Ameen was made.  Information given by the victim's family

6    indicates the likelihood that coercion or compulsion was employed to obtain the purported

7    eyewitness's statement.  All evidence of compulsion or coercion must be provided as discussed

8    below.  The defense moves the Court to compel such disclosure.

9    **II.      THE EXTRADITION REQUEST ARISES OUT OF AN INVESTIGATION**
            **BY THE UNITED STATES GOVERNMENT**
10

11         In a typical extradition case, the United States Government plays merely a ministerial

12   role, relaying information the requesting government has gathered through its own investigation.

13   In re Drayer, 190 F.3d 410, 414 (6th Cir. 1999).  However, this proceeding involves a U.S.

14   Government investigation, carried out in the United States and Iraq, in which the allegation of an

15   Iraqi crime, made to an FBI Agent in Iraq, was then referred to the Republic of Iraq for filing.  It

16   is this crime that has returned to the U.S. through an extradition request.

17         The Iraqi extradition packet bases the arrest warrant on the testimony of one purported

18   eyewitness.  (Doc. 22-1, pp. 43-44.)  That section of the extradition packet is almost fully

19   redacted in the public record, and will be the subject of a future motion to unredact it prior to the

20   extradition hearing.  (Doc. 108, p. 2 [setting date for motion to unredact].)

21         The defense understands that the Court has access to a fully unredacted extradition packet

22   containing the purported eyewitness's statement.[1]  To comply with the protective order in this

23   case, and consistent with                                                              the

24

25

26   [1]      The copy of the Extradition Packet filed unredacted with the Court is an uncertified
     English-language translation of the original Arabic.  The Government has filed the Arabic
27   version with the Court at Document 1, Exhibit 1, pages 3 through 66.  (See Doc. 4, p. 2,
     explaining what was filed under seal in Doc. 1, Exh. 1.)  The defense requests that the
28   Government file a copy in the public record as well, redacted in the same manner as Document
     22-1.

                                                2

1    defense will refer to that person as

2                              allegedly gave a statement to the Iraqi court on April 15, 2018, about a crime

3    that occurred in Rawa, Iraq, on June 22, 2014, almost four years prior  (Doc. 1, p. 2; Doc. 22-1,

4    p. 43.) That statement recounts an attack on the victim outside the victim's home in Rawa, Iraq,

5    at 7:00 p.m. (Doc. 1, p. 2.) The statement first indicates that          was in the house where

6    the victim was killed.  The victim went outside and engaged in a gun battle with members of

7    ISIS. (Doc. 1, p. 2.) After the shooting stopped,          claimed that he/she went outside the

8    home and observed Mr. Ameen fire at the victim while he was on the ground.  Id.

9            The statement claims that          was shown several photographs of individuals

10   working for ISIS and identified Mr. Ameen.  The statement is not explicitly sworn by

11   although the inquiry judge indicates that the witness "took the legal oath."  Although no

12   photograph is attached to the statement in the extradition packet, there is a photograph of Mr.

13   Ameen later in the packet that appears to be the one referred to in the statement.  See Doc. 22-1,

14   pp. 61-63.  It follows an "identification report" dated April 15, 2018, by the Central Inquiry

15   Court, Office of the Judicial Investigator, which indicates that          identified Mr. Ameen as

16   one of the militants "who killed the victim (Ihsam Abdulhafiz) and the kidnapping of the victims

17   (Ra'Fat, Ghassan, and Muhammad)." (Doc. 22-1, p. 61.)  The extradition packet contains

18   photographs of two other men at Doc. 22-1, pages 64 through 67.  There is no indication in the

19   packet who these men are.  The photographs of the men are digitally imprinted with a date at the

20   bottom right: 22.05.2018 (May 22, 2018).  (Doc. 22-1, pp. 64-67.)

21           The Arabic version of          statement covers two pages in the original packet,

22

23

24

25

26   ————————————

27

28

3

which has not been filed with the Court.[3]  In the Arabic version, which is the one purportedly

signed on each page by          the narrative of the statement is typewritten.  Both the Arabic

version, and English translation, document changes in the narrative between first-person in the

words of the judge, and first person in the purported words of          .

          The Arabic version shows that the supposed signatures of          on the two pages do

not match.  There is absolutely no indication in the statement or elsewhere in the packet that

          was asked for any identification in connection with making this statement.

          The Extradition Packet does not include the information that          spoke with the FBI

first, approximately six months before giving this statement to the Court.  Accordingly, for the

Court's consideration, the FBI report of the interview of          from October 23, 2017 is

attached as Exhibit B.[4]  The copy of the FBI report provided to the defense is heavily redacted of

information well beyond the identity of          which is already known to the defense.

Redactions include information such as the place of the interview, the name of the interviewing

agent, and numerous sentences in the report.  Entire paragraphs and sentences are redacted as

well.  The defense has requested an unredacted copy, and moves for the Court to compel the

Government to produce an unredacted copy of this statement to the defense.

          This FBI report makes it clear why a full accounting of the U.S. Government's role in

investigating Mr. Ameen is appropriate under <u>Brady</u>.  The October 2017 interview of          in

---

[3]      The defense requests that the Arabic original be filed with the Court so that the Court can view these details for itself.

[4]      To comply with the Protective Order, the defense has requested that the Court seal Exhibits B, C, and J, with the agreement of the Government.  Given that the identity of the witness is redacted in the filed document, the defense does not believe that the Exhibits B, C, and J independently qualify for sealing based on the information therein.  The Government will review its redactions to determine if the documents may be filed in Pacer, and, if so, the defense will submit a proposed order to unseal them, or provide documents with additional redactions for filing in the record.  The defense also is filing a Motion to Modify the Protective Order concurrently that, if granted, will permit the filing of these Exhibits under seal.

4

Iraq was not a routine witness interview.  It could not have been, given the circumstances.  ISIS still controlled Rawa and other parts of Anbar Province in October 2017.  Travel in Iraq was (and continues to be) extremely dangerous and filled with multiple checkpoints controlled by various armed militias.  European Asylum Support Office, Report: Iraq, Internal Mobility at p. 17 (February 2019) available at www.justice.gov/eoira/page/file/1132771/download.  The FBI was conducting an investigation in a foreign country, at war.  The FBI simply could not have interviewed this witness anywhere but a secured compound.  Further, the FBI through Iraqi security forces would have had to enable this witness's travel within Iraq to meet the FBI.  Id., ("it has become impossible to move around in the country unless your paperwork is in order").

Additional information strongly suggests that the October 2017 interview of occurred at Al Assad Air Base in Iraq.  Another interview was done the same day of another witness from Rawa:          [5] (Exhibit C.)  That interview is also redacted as to the place of interview and name of the FBI Agent, but the size of those redactions indicates that the two witnesses were interviewed at the same place and by the same agent.                interview was interpreted by a Department of Defense Arabic translator, another indication that it occurred in a secured military location. (Exh. C.)  An FBI interview two months later, on January 23, 2018, of is unredacted as to the place of interview, which was at Al Assad Air Base, and translated by a Department of Defense Arabic translator.  (Exh. D.)  Taking these three statements together, it appears that          was interviewed at Al Assad Air Force Base as well.

The FBI must have taken considerable steps to enable          to enter Al Assad Air Base for his/her interview on October 23, 2017.  The base was an extremely secure environment the size of Boulder, Colorado, with several mini-bases within it, containing U.S. and Iraqi troops.

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 14 of 44

1    It has a 21-kilometer security perimeter including security towers and barbed wire.  ISIS

2    militants tried to overrun the base in February 2015, disguised as Iraqi soldiers, after taking

3    control of most of Baghdadi, a town less than five miles from the base.  Morris, "Islamic State

4    tries to attack base where hundreds of U.S. troops are stationed" Wash. Post (Feb. 13, 2015).

5
6    October 23, 2017 fell squarely within the most heated battles to push ISIS out of Anbar Province

7    in Iraq.  Notably, it fell approximately three weeks before Iraqi forces forced ISIS out of Rawa

8    on November 17, 2017.  BBC News, "Iraqi forces recapture final IS-controlled town, Rawa"

9    Nov. 17, 2017 available at www.bbc.com/news/world-middle-east-42026801.

10         Further, the defense has obtained evidence from reliable witnesses that            has

11   current close ties with at least one ISIS militant and may have been suspected by the Iraqi

12
13   Government of involvement with ISIS when he/she spoke with the FBI.  Full information about

14   the U.S. Government's involvement with and knowledge of            must be provided to the

15   defense.  The very extent of U.S. Government involvement in investigating Mr. Ameen is itself

16   favorable to the defense, as the extent of disclosure may depend on that involvement.

17         As the information above shows, the U.S. Government's involvement in the investigation

18   of the Iraqi crime was direct.  The U.S. Government took the first known statement from

19
20   .  As far as the defense knows, this is the first claim that Omar Ameen had anything to do with

21   the victim's death.  The U.S. Government knows how it found            The U.S. Government

22   knows the connections between      ..      and the other Iraqi witnesses it has spoken with

23   regarding Mr. Ameen, including witnesses to whom it has given immigration benefits and who

24   are current or prior members of Iraqi security forces.  See Exhibit A.

25         The U.S. Government knows how it referred            to the Iraqi Government and the

26
27   steps involved in          purportedly going to the Iraqi court six months later to give his/her

28   statement.  The U.S. Government has the FBI special agent's raw notes regarding

     initial interview.  The U.S. Government knows if            brought            to meet with the

FBI.  The U.S. Government knows if           was subjected to any coercion or offered any

benefits in exchange for talking with the FBI in October 2017.  The U.S. Government would

know if           was suspected of involvement with militants.  All of these facts are favorable

and must be provided to the defense.

Additional examples of the U.S. Government's primary role in investigating Mr. Ameen

are discussed below with respect to various items of favorable evidence sought by the defense.

There can be no doubt that the United States was involved in the investigation of Mr. Ameen for

this very offense.  Before addressing the specific evidence sought by the defense, this Motion

addresses the extent of the Government's <u>Brady</u> obligation, and the requirement that the

Government seek out evidence from beyond the Department of Justice.

### III.   GIVEN THE U.S. GOVERNMENT'S PRIMARY ROLE IN THE INVESTIGATION OF THIS OFFENSE, DUE PROCESS REQUIRES PRODUCTION OF ALL FAVORABLE INFORMATION AND DOCUMENTATION

Courts have unanimously held that the government is bound by principles of due process

in its conduct of extradition proceedings.  <u>Valenzuela v. United States</u>, 286 F.3d 1223, 1229

(11th Cir. 2002) ("[T]he judiciary must ensure that the constitutional rights of individuals subject

to extradition are observed.") (granting habeas on a due process claim arising from the

government's introduction of evidence in violation of a confidentiality agreement); <u>United States</u>

<u>v. Kin-Hong</u>, 110 F.3d 103, 106 (1st Cir. 1997) (finding that "[t]here is the ultimate safeguard

<u>that extradition proceedings before the United States courts comport with the Due Process</u>

<u>Clause of the Constitution.</u>");  <u>Plaster v. United States</u>, 720 F.2d 340, 348 (4th Cir. 1983)

(remanding for consideration of a due process claim based on the government's violation of

immunity agreement); <u>Petition of Geisser</u>, 627 F.2d 745, 750 (5th Cir. 1980) (agreeing that

noncompliance with a plea bargain is a valid constitutional claim that may be raised to challenge

extradition proceedings and that "a purported treaty obligation of the United States government

cannot override an individual constitutional right").  This Motion challenges the constitutionality

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 16 of 44

1   of the conduct of the United States and its agents. In re Burt, 737 F.2d 1477, 1484 (7th Cir. 1984)

2   ("It is well settled … that the United States government must, in carrying out its treaty

3   obligations, conform its conduct to the requirements of the Constitution, and that treaty

4   obligations cannot justify otherwise unconstitutional governmental conduct.").

5       As discussed in detail below with respect to specific issues, due process requires that this

6   Court order the Government to disclose information favorable to the defense.  The defense also

7   requests evidence that the Government has already cited against Mr. Ameen, but has refused to

8   provide.  The Court has the "inherent power" to order disclosure in this case "as law and justice

9   require." Quinn v. Robinson, 783 F.2d 776, 817 n.41 (9th Cir. 1986) (citations and internal

10  quotations omitted).  "[T]here may be circumstances under which specific discovery must be

11  afforded as a matter of due process."  In re Extradition of Singh, 123 F.R.D. 108, 126 (D.N.J.

12  1987) (emphasis omitted).  "[A] habeas court can determine whether the magistrate's decision to

13  deny discovery constituted an abuse of discretion that deprived the accused of due process."

14  Quinn, 783 F.2d at 817 n.41.

15      The Demjanjuk-Drayer line of cases in the Sixth Circuit lays out the Government's

16  obligations and has been approvingly cited by the Ninth Circuit.  In Demjanjuk v. Petrovsky, 10

17  F.3d 338, 353 (6th Cir. 1993), the Sixth Circuit held that Brady v. Maryland, 373 U.S. 83 (1963),

18  applies to "denaturalization and extradition cases where the Government seeks denaturalization

19  or extradition based on proof of alleged criminal activities of the party proceeded against."  The

20  Sixth Circuit did so for two reasons that apply equally here.  It reasoned that "[t]he consequences

21  of denaturalization and extradition equal or exceed those of most criminal convictions."  It also

22  held that Government attorneys committed a fraud on the court when they did not turn over

23  exculpatory material, acting "with reckless disregard for the truth and for the Government's

24  obligation to take no steps that prevent an adversary from presenting his case fully and fairly."

25  Id. at 353-354; see also Harrison, "Probe of Nazi War Criminal Case Raises Ethics Questions:

26  Government: A former Justice Dept. attorney said he resigned over handling of possibly

27  exculpatory evidence concerning the accused" LA Times (Nov. 13, 1992) available at

28  http://articles.latimes.com/1992-11-13/news/mn-290_1_nazi-war-criminal-case; Smothers,

1     "Lawyer Recalls No Doubt on Nazi Guard," NY Times (Jan. 15, 1993) available at

2     www.nytimes.com/1993/01/15/us/lawyr-recalls-no-doubt-on-nazi-guard.html.

3         In <u>Demjanjuk</u>, the U.S. Government sought to extradite the defendant based on

4     allegations that he committed mass murder as a Nazi guard during the Holocaust.  The Court

5     noted that the pressure on the Department of Justice created a "win at any cost" attitude that

6     caused prosecutors to fail to provide exculpatory evidence.

7         Here, the Government seeks to extradite Mr. Ameen based on allegations that he is an

8     ISIS terrorist who committed a murder and then obtained refuge in the United States.  There can

9     be no doubt this is an important case with political implications.  "Grassley Seeks Answers on

10     ISIS Member Admitted to U.S. as Refugee" (Aug. 20, 2018) available at

11     www.grassley.senate.gov/news/news-releases; Thompson & Watson, "Ex-ISIS fighter entered

12     U.S. as refugee, officials say," Assoc. Press (Aug. 16, 2018) (connecting case with current

13     criticism of "Obama-era resettlement program.")

14         The members of the Department of Justice who appear before the Court are prosecutors,

15     seeking extradition for a crime.  Like the government attorneys in <u>Demjanjuk</u>, the prosecutors

16     here have "a constitutional duty" to produce all evidence favorable to Mr. Ameen.  Demjanjuk,

17     10 F.3d at 354, citing Brady, 373 U.S. at 87, 83 S. Ct. at 1196.  Even in an extradition case, the

18     Government has an obligation to "take no steps that prevent an adversary from presenting his

19     case fully and fairly."  <u>Id</u>.  Further, the prosecutors should not "recklessly assume" Mr. Ameen's

20     guilt, thereby failing to "observe their obligation to produce exculpatory materials" requested by

21     the defense.  <u>Demjanjuk</u>, 10 F.3d at 353-54.

22         Following <u>Demjanjuk</u>, the Sixth Circuit reaffirmed its holding in <u>In re Drayer</u>, 190 F.3d

23     410 (6th Cir. 1999).  The <u>Drayer</u> court noted that the Government's obligations in <u>Demjanjuk</u>

24     also stemmed from the fact that "the United States had conducted its own investigation of the

25     offense underlying the request for extradition and uncovered exculpatory material in the

26     course of that effort."  <u>Id</u>. at 414. Yet the court held that in <u>Drayer</u>, which did not involve a U.S.

27     investigation, "[i]n accordance with <u>Demjanjuk</u>, the United States was obliged to turn over any

28     exculpatory materials in its possession that would undercut a finding that there was probable

1    cause to believe that petitioner committed the murder with which Canada had charged him."

2    Id. In 2016, the Sixth Circuit again reaffirmed that Brady applies to extradition proceedings in

3    Martinez v. United States, 828 F.3d 451, 470 (6th Cir. 2016) (en banc).

4         The Ninth Circuit has not had occasion to decide whether Brady applies in an extradition

5    where, as here, the U.S. Government has undertaken its own investigation and likely has

6    favorable evidence.  Defense counsel is not aware of any such case in this Circuit. Yet Ninth

7    Circuit courts have shown support for Demjanjuk's application of Brady to extradition

8    proceedings, while distinguishing it in particular cases.  Prasoprat v. Benov,  421 F.3d 1009,

9    1015 (9th Cir. 2005)(distinguishing Demjanjuk where the sought material related to the death

10   penalty in the requesting state, not the probable cause determination); In re Extradition of

11   Handanovic, 826 F. Supp. 2d 1237, 1239-1240 (D. Or. 2011)(distinguishing Demjanjuk because

12   no independent U.S. investigation).

13        In contrast to Prasoprat, the favorable material Ameen seeks relates solely to probable

14   cause.  The U.S. Government has extensively investigated Ameen as discussed below. Further,

15   defense counsel is aware of the existence of favorable material in the possession of the

16   Government, has requested such material, and believes that other such evidence remains

17   undisclosed.

18        The Ninth Circuit has also favorably cited Demjanjuk in a civil case involving

19   international issues. In Wang v. Reno, 81 F.3d 808, 820-821 (9th Cir. 1996), a Ninth Circuit

20   panel found the federal Government violated due process where it brought a prosecution witness

21   to the U.S. in "reckless disregard of the real possibility that his inculpatory testimony was false

22   and that, if he told the truth, he would face torture and possible execution upon his return to the

23   PRC."  The court analogized the case to Demjanjuk, and agreed with the Sixth Circuit's

24   characterization of the Government attorneys' conduct: "prosecuting attorneys engaged in

25   prosecutorial misconduct when they recklessly disregarded their obligation to provide

26   information specifically requested by detainee, thereby endangering detainee's defense." Id. at

27   821; see also United States v. Holstrom, 246 F. Supp. 2d 1101, 1111 (E.D. Wash. 2003) (the

28   Demjanjuk decision reflects "[t]he obligations of all parties, counsel and the courts in the search

Case 2:18-mj-00152-EFB   Document 126   Filed 04/24/19   Page 19 of 44

1    for the truth," and "the proper concern for the rule of law and the application thereof, regardless

2    of the consequences.").

3         In 2010, a District of Columbia magistrate judge in In re Extradition of Zhenly Ye Gon,

4    noted the rarity of extraditions in which the United States undertakes its own investigation,

5    stating that "in the ordinary extradition case, the United States has no information other than

6    what has been provided by the demanding state.  Independent prosecution by the requested state

7    is rare, and it appears that there are only two reported cases in American legal history in which

8    such a prosecution has occurred." 2010 U.S. Dist. LEXIS 1563, *8.  Because the United States

9    had independently investigated the relator in the case, the magistrate applied Demjanjuk and

10   Drayer, sharply rejecting arguments from O.I.A. attorneys to the contrary.  In determining what

11   information to provide the defense, the Government should "resolve doubts in favor of the

12   respondent." Zhenly Ye Gon, 2010 LEXIS 1563 at *12-13.

13        Support for the application of Brady here comes from the U.S. Government's Brady

14   obligation in a range of contexts beyond exculpatory evidence for a criminal trial.  Brady applies

15   to the potential suppression of evidence.  United States v. Gamez-Orduno, 235 F.3d 453, 461

16   (9th Cir. 2000)(holding that Brady obligations included disclosure of a report that was material

17   to defendants' standing to pursue a Fourth Amendment suppression motion); Smith v. Black, 904

18   F.2d 950, 965-66 (5th Cir. 1990) (nondisclosure of Brady information may have affected fact

19   finder's findings at the suppression hearing).  Brady applies to the admissibility of a confession.

20   Nuckols v. Gibson, 233 F.3d 1261, 1266 (10th Cir. 2000) (finding a Brady violation where

21   prosecution withheld evidence that was material to the admissibility of defendant's confession).

22   Brady applies to the reliability of a Government witness's statement.  Smith v. United States, 666

23   A.2d 1216, 1224-25 (D.C. 1995) (witness statement should have been disclosed under Brady

24   because it called into question whether prosecution's evidence could be admitted as a

25   "spontaneous utterance").

26        Courts have also found Brady to apply in civil contexts when sufficiently serious interests

27   are implicated.  See EEOC v. Los Alamos Constructors, Inc., 382 F.Supp. 1373, 1383 n.5

28   (D.N.M.1974) (applying Brady in favor of defendant in a civil case brought by the Government);

11

Case 2:18-mj-00152-EFB   Document 117-2   Filed 04/24/19   Page 20 of 44

1    Dent v. Holder, 627 F.3d 365, 374-75 (9th Cir. 2010) (requiring Government to provide A-file to

2    enable immigrant "opportunity to fully and fairly litigate his removal and his defensive

3    citizenship claim"); Pavlik v. United States, 951 F.2d 220, 224 n.5 (9th Cir. 1991) ("Brady v.

4    Maryland applies in the context of a NOAA [National Oceanic and Atmospheric Administration]

5    civil penalty proceeding"); accord Sperry v. Hutchinson Co. v. FTC, 256 F.Supp. 136, 142

6    (S.D.N.Y. 1966) ("In civil actions, also, the ultimate objective is not that the Government 'shall

7    win a case, but that justice be done.'"). In United States v. Edwards, 777 F. Supp.2d 985

8    (E.D.N.C. 2011), a district court extended Brady requirements to civil commitment hearings

9    because "[a]t issue is not a claim for damages or equitable relief[;] [i]nstead, the issue is whether

10   someone will be locked away." Edwards, 777 F.Supp.2d at 994; accord United States v. Ebel,

11   856 F.Supp.2d 764, 766 (E.D.N.C. 2012). The Edwards court analogized to Demjanjuk and

12   reasoned that, like denaturalization and extradition proceedings, civil commitment hearings hold

13   consequences similar to, or worse than, criminal trials. Id. at 997.  The Ninth Circuit recently

14   analogized to Brady due process requirements in immigration proceedings.  Lanuza v. Love, 899

15   F.3d 1019, 1025 n.2 (9th Cir. 2018) (stating in immigration Fifth Amendment due process

16   Bivens case, "[i]f remedies are available to punish Brady violations in a criminal proceeding

17   where liberty is at stake, they should also be available in the context of immigration proceedings

18   to determine removability—a deprivation of liberty that can be as consequential.") (emphasis

19   added)).

20        Based on compelling precedent applying Brady v. Maryland to extradition cases, defense

21   counsel requests the Court order the U.S. Government to provide evidence already in the hands

22   of the prosecution team, and to search for and disclose exculpatory, favorable, and impeachment

23   materials in the Government's possession, custody, or control.  Specific items of evidence are

24   discussed below, and listed in Exhibits I and J.

25        In addition to requests for specific evidence that the defense knows exists, the defense

26   seeks from the Government all material including, but not limited to, material supporting alibi,

27   and information relating to reliability and competency of witnesses.  Defense also seeks evidence

28

12

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 22 of 44

documenting the extent of cooperation and evidence sharing between Iraq governmental authorities and the United States Government in this unprecedented matter.

## IV.   THIS MOTION REQUESTS PRODUCTION OF MATERIAL THAT IS "FAVORABLE TO THE ACCUSED" AND MUST BE DISCLOSED UNDER BRADY

This Court has already recognized that although no individual piece or smaller subset of the defense's evidence might do so alone, the Court considers the "totality of the circumstances," or the entire body of evidence at an extradition hearing in determining whether to certify extradition. See e.g., In re Extradition of Paberalius, No. 10M275, 2011WL 2144065, at *13 (N.D. Ill. May 31, 2011) (weighing evidence brought by the Government against evidence presented by defendant to deny extradition request); see also United States v. Froman, 355 F.3d 882, 889 (5th Cir. 2004) (explaining a similar standard as in Paberalius); In re Extradition of Bonilla, No. 1:13-MJ-62, 2014 WL 934903, at *5 (E.D. Tex. Mar. 4, 2014) (explaining magistrate must reach a common-sense conclusion); accord In re Singh, 170 F. Supp. 2d 982, 1023 (E.D. Cal. 2001) ("On the totality of the circumstances, the…. affidavit of Rattan Singh is credible. It destroys the competence of the evidence and obliterates probable cause[.]").

To date, the defense has focused in Court on the issue of Mr. Ameen's presence in Turkey at the time of the Iraqi crime. That issue is a critical one, and if the Government has evidence to show that Mr. Ameen was in Turkey, or to corroborate his presence in Turkey, it must turn it over under Brady. Likewise, evidence that Mr. Ameen was not in Rawa in June 2014 is favorable and must be turned over.

However, the defense has also been investigating the Iraqi crime as well. That investigation has led the defense to speak with three members of the victim's family, all of whom were in the home during the victim's killing. One of those people was looking out the window and saw the killing. All of those close family members have told the defense investigator that Mr. Ameen had nothing to do with the victim's killing. Their statements to a defense investigator are attached as Exhibits D, E, and F. For the purpose of public filing, and out of an excess of caution, the defense has redacted the witness names from their statements.

1   Unredacted copies will be provided to the Court.  The defense is seeking a protective order to

2   enable it to provide unredacted copies to the Government.

3            Accordingly, the defense has obtained evidence of Mr. Ameen's innocence from both

4   sides: his presence in a completely different country at the time of the Iraqi offense, and reliable

5   statements indicating his lack of involvement in the offense by those who witnessed it.  These

6   two areas of favorable investigation lead naturally to the next issue:  Why would              the

7   only witness who claimed to have seen the murder, bear false witness?

8            The victim's family members have indicated that          did not witness the killing.

9   The circumstances of          initial statement to the FBI are therefore critical to the defense,

10  and must be disclosed.  <u>Santos v. Thomas</u>, 830 F.3d 987, 1004 (9th Cir. 2016)(en banc).  The

11  defense must obtain that information, and be prepared to present it in Court, including, if

12  necessary, by testimony of the FBI Agent involved.  Accordingly, that name must be disclosed

13  so that the defense may follow the appropriate procedure to obtain that testimony.  <u>See</u> 28 CFR

14  Subpart B;1-6.300 et seq. (procedure under <u>United States ex rel. Touhy v. Ragen</u>, 340 U.S. 462

    (1951)).

15           The victim's family members have provided the defense with leads to help determine

16  why          would have lied to investigators about Mr. Ameen.  They have indicated that

17            has a close family tie to a member of ISIS who is currently in Iraqi custody.

18  may have been compelled to speak to Iraqi or U.S. investigators out of fear that he/she would be

19  implicated with ISIS through his/her close family member.  Ben Taub, Iraq's Post-ISIS

20  Campaign Of Revenge, December 24, 2018 <u>available at</u>

21  <u>https://www.newyorker.com/magazine/2018/12/24/iraqs-post-isis-campaign-of-revenge</u>

22  (discussing guilt by association of family members of ISIS militants)(Attached as Exhibit M);

23  <u>Leyra v. Denno</u>, 347 U.S. 556, 559-560  (1954)(involuntary statement extracted by promises of

24  leniency).

25           Promises of protection from violence would also render          statement compelled.

26  <u>Payne v. Arkansas</u>, 356 U.S. 560 (1958)(statement compelled by offer to protect declarant from

27  outside threat); <u>Arizona v. Fulminante</u>, 499 U.S. 279  (1991)(statement compelled by offer to

28  protect declarant in prison).

1      Given his close family member in the custody of Iraqi security forces,         was

2   likely compelled to speak to obtain benefits for his/her imprisoned family member. Lynumn v.

3   Illinois, 372 U.S. 528 (1963)(statement compelled by threat to children); Harris v. South

4   Carolina, 338 U.S. 68 (1949)(statement compelled by threat to arrest mother); United States v.

5   Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981)(statement compelled by promise of benefit to child);

6   see also People v. Trout, 54 Cal.2d 576 (1960)(statement compelled by promise of leniency to

7   wife); People v. Steger, 16 Cal.3d 539, 550 (1976)(threat by police to arrest or punish a close

8   relative, promise to free the relative in exchange for a statement, works to compel the statement).

9      No lesser an authority than the U.S. State Department has concluded that Iraqi security

10  forces use torture to obtain statements from detainees. U.S. Dept. of State, 2018 Human Rights

11  Report, Iraq at pp. 2, 4 available at www.state.gov/j/drl/rls/hrrpt/. The 2018 Human Rights

12  Report credited numerous reports that "government officials employed torture and other cruel,

13  inhuman, or degrading treatment or punishment, and that courts routinely accepted forced

14  confessions as evidence, which was often the only evidence in ISIS-related counterterrorism

15  cases." Id., at p. 4, 15. The State Department found evidence that Iraqi entities involved in this

16  case, including the Federal Police and the Iraqi National Security Service abused and tortured

17  individuals – particularly Sunni Arabs. Id. "[T]he country's judges frequently failed to

18  investigate credible allegations that security forces tortured terrorism suspects." Id., at p. 6; see

19  also, id. at p. 12. The FBI did not happen to find      the day it took his/her statement.

20      was provided to the FBI by some branch of the Iraqi authorities. The United States

21  must provide this information to the defense so that it can continue investigation and determine

22  what compelled      false statements.

23      Evidence of compulsion is clearly relevant and "explanatory." Santos v. Thomas, 830

24  F.3d 987, 1021 (9th Cir. 2016)(en banc).. All circumstances of the statements are relevant to the

25  issue of whether the statements were compelled. Fare v. Michael C., 442 U.S. 707, 725 (1979).

26  None of these circumstances have been provided to the defense. As Exhibit B makes clear, the

27  report of the first statement has been redacted to remove information regarding the circumstances

28  of the statement.

      The U.S. Government is in possession of information regarding benefits, coercion, or

compulsion provided to witnesses against Mr. Ameen. The defense knows that one witness,

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 24 of 44

1

2

3

4

5

6

7      Other witnesses are current or previous members of the Iraqi security services, military,

8  or police forces.  See Exh. A.  The Taub article details the modus operandi of the Iraqi security

9  services with respect to interrogations, especially of those suspected of a person or family

10 connection to ISIS.  Exh. M (detailing brutal torture by security services, and compulsion of

11 inculpatory and accusatory statements regarding ISIS affiliation.)  The witness's family has

12 indicated that he has worked as an informant for the security services, including against his very

13 family.  As detailed in the chart in Exhibit A, the U.S. Government has not provided the

14 statements from members of the                                        to the defense,

    despite the defense's request and the Government's citation of those interviews in its filings.

15     If those witnesses, members of the                         were in contact with

16 and in the position to compel his/her statement, whether by promising to withhold prosecution or

17 punishment for          bad acts, by protecting or providing benefits to a family member of

18      or by providing benefits for          statements, that would undoubtedly be evidence

19 favorable to the defense.  As discussed below, all the circumstances and context regarding

20          statements must be disclosed.

21     These circumstances include information about          himself.  The defense has begun

22 to try to understand          motives to fabricate evidence by speaking to family members.

23 However, evidence of          motives, as well as personal characteristics that would explain

24 his/her susceptibility to coercion, must be disclosed.  His/Her "age, experience, education,

25 background, and intelligence" are all relevant and favorable to the defense.  Michael C., 442 U.S.

26 at 725; Fulminante, 499 U.S. at 286, n. 2; Reck v. Pate, 367 U.S. 433, 441 (1961); Harris v.

27 South Carolina, 338 U.S. 68, 70 (1949); Gallegos v. Nebraska, 342 U.S. 55 (1951).

28     The defense's understanding of this case is growing day by day.  With that understanding

   comes the increasing number of areas in which the U.S. Government holds evidence that is

16

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 25 of 44

favorable to the defense and must be disclosed.  At this prehearing stage, the Government cannot know what the rest of the record will show or what evidence defense counsel will adduce; at best, it can only speculate as to the hearing record.  Accordingly, "Brady requires disclosure of exculpatory information that is either admissible or is reasonably likely to lead to admissible evidence." United States v. Sudikoff, 36 F. Supp. 2d 1196, 1200 (C.D. Cal. 1999); see also United States v. Olsen, 704 F.3d 1172, 1183 n. 3 (9th Cir. 2013)(citing Sudikoff favorably); United States v. Bararia, 2013 U.S. dist. LEXIS 93563 at *14 (D. Nev. 2013) (noting favorable cite in Olsen to Sudikoff); United States v. Peitz, 2002 LEXIS 2338 at *7-8 (N.D. Ill. Feb. 13, 2002) (following Sudikoff); United States v. Carter, 313 F. Supp. 2d 921, 924 (E.D. Wis. 2004) (agreeing with Sudikoff and Peitz); United States v. Safavian, 233 F.R.D. 12, 16 (D.D.C. 2005).

Extradition magistrates routinely consider evidence of motive, bias, inconsistency, and other such "impeachment" material in determining the reliability and competency of evidence. See, e.g., Republic of France v. Moghadam, 617 F. Supp. 777, 782-84 (N.D. Cal. 1985) (examining motives, facts and circumstances in evaluating reliability of statement and its recantation); Singh, 170 F. Supp. 2d at 1020 ("It is unlikely that Jaswinder, whose father and brother were allegedly murdered by Barapind would lie.... "); id. at 1023 ("Rattan has a bias against India because he has suffered at the hands of the police."); Eain v. Wilkes, 641 F.2d 504, 511 (7th Cir. 1981) (considering conditions under which statement was given). Such evidence should certainly be admitted and considered where it will aid in obliterating or negating probable cause. See Singh, 170 F. Supp. 2d at 994; Sandhu v. Burke, 2000 U.S. Dist. LEXIS 3584, at *20, 52-55 (S.D.N.Y. Feb. 10, 2000).

Because the Court considers the totality of circumstances at the hearing, and neither the Government nor the Court can know in advance of the hearing whether any particular piece of evidence will combine with the rest to obliterate probable cause, defense counsel asks the Court to adopt the prudent application of Brady such that all evidence favorable to Ameen be disclosed. The determination will remain with the Court at the hearing as to which evidence is explanatory and which is contradictory, and whether or not probable cause has been satisfied or obliterated in the totality of the circumstances.

//

17

Case 2:18-mj-00152-EFB   Document 126   Filed 04/23/19   Page 26 of 44

1

2    **V.    THE BURDEN TO PRODUCE FAVORABLE EVIDENCE EXTENDS TO**

3    **THE U.S. GOVERNMENT AS A WHOLE, NOT ONLY THE**
     **DEPARTMENT OF JUSTICE**

4
        The Government's press release in the case credits the Department of Justice's Criminal

5    Division's Office of International Affairs, the U.S. Department of State, the FBI, and ICE-

6    Homeland Security Investigations with work in this case prior to Mr. Ameen's arrest.

7    www.justice.gov/opa/pr/iraqi-national-wanted-murder-iraq-arrested-california (Aug. 15, 2018).

8    U.S. Government filings make it clear that the FBI or prosecutors also cooperated with the U.S.

9    military to further its investigation.  Under <u>Giglio v. United States</u>, 405 U.S. 150 (1972), "the

10   prosecution cannot escape its disclosure obligation by compartmentalizing information or failing

11   to inform others in the office of relevant information[,]" as it "is responsible as a corporate entity

12   for disclosure." <u>Demjanjuk v. Petrovsky</u>, 10 F.3d 338, 353 (6th Cir. 1993) at 353-354.

13       In determining whether the U.S. Government has favorable evidence, the defense has

14   requested that the U.S. Attorney's Office request a prudential search of the U.S. Intelligence

15   Community in this case.  This is the type of investigation in which a prudential search was

16   always appropriate.  There is reason to believe that the Intelligence Community (IC) has

17   exculpatory material regarding Mr. Ameen.  As set forth in section 2052(A) of the Department of

18   Justice Criminal Resource Manual, a prudential search is a search of Intelligence Community

19   files for pre-existing intelligence information.  A prosecutor must search for <u>Brady</u> material

20   within IC files when the IC is involved in an investigation.  It appears that the IC was involved in

21   the investigation of Mr. Ameen.  Section 2052(B)(1) states that "alignment likely exists where an

22   intelligence agency has provided information to a law enforcement agency or to the prosecution,

23   which information serves independently as a factual element in support of a search warrant,

24   arrest warrant, indictment, etc."  The IC has been involved in this case in providing information

25   that has been relied upon for the search warrants, and that the Government is citing in support of

26   Mr. Ameen's detention.

27       Section 2052 indicates that Mr. Ameen's investigation should have been "proactively

28   reviewed for a possible nexus to the IC."  If the objective articulable facts that the Government

     has asserted against Mr. Ameen are true (see Document 6), the IC would have information in its

Case 2:18-mj-00152-EFB    Document 126-2    Filed 04/03/19    Page 27 of 44

files on him.  Several courts have held that the prudential query must "extend to sources that are readily available to the government and that, because of the known facts and nature of the case, should be searched as a function of fairness to the defendant."  CRM, Sec. 2052(B)(2), <u>citing</u> <u>United States v. Perdomo</u>, 979 F.2d 967, 970-71 (3rd Cir. 1991); <u>United States v. Auten</u>, 632 F.2d 478, 481 (5th Cir. 1980); <u>United States v. Burnside</u>, 824 F.Supp. 1215 (N.D. Ill. 1993).

Further, the Government has repeatedly conceded, now on the record, that the IC has exculpatory evidence corroborating Mr. Ameen's alibi.  This constitutes "direct or reliable knowledge of potential Brady and/or other discovery material in the possession of the IC." CRM, Sec. 2052(B)(2)(a)(1).  Moreover, there are many reliable indications (as discussed below) that the "IC possesses evidence that meets the Brady case law standard of materiality."  Id. at subd. (2).

The Criminal Resource Manual is clear: "a positive answer to either of these questions means that the prosecutor 'needs to know' and must conduct a suitable search of the IC files." (Emphasis added.)  This is even in the absence of a request for specific discovery, which has previously been made informally and is being reiterated in this Motion.

The Government may argue that a prudential request is not applicable in an extradition case.  First, the Government has asserted on the record that it continues to investigate Mr. Ameen for violations of U.S. criminal law, so the rules apply on their terms to a pre-indictment investigation.  Second, even though an extradition case is not subject to the Rules of Criminal Procedure, it is still fundamentally a criminal case, being prosecuted by the Criminal Division of the U.S. Attorney's Office, and subject to the Criminal Resource Manual and the ethical and Due Process rules regarding favorable evidence.  Third, the rules regarding extradition are contained in the U.S. Attorney's Manual in Title 9 (Criminal) at 9-15.000, with foreign extraditions discussed at 9-15.700.  Likewise, procedures discussing extradition are set forth in the Criminal Resource Manual starting at 601 through 622.  As stated in section 601, "[T]he extradition scheme is functionally equivalent to all other preliminary criminal proceedings."

With respect to Mr. Ameen, IC information rebutting claims that he is an ISIS or Al-Qaeda in Iraq terrorist, and any information rebutting the Iraqi filing at Doc. 22-1, page 71, are clearly exculpatory.  If the IC has no information to show that Mr. Ameen is a member of ISIS or

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/23/19   Page 28 of 44

an Al-Qaeda in Iraq terrorist, that is likewise exculpatory, and the defense requests a statement to

that effect, a stipulation, or a certificate of no record.

## VI.   THE GOVERNMENT'S BURDEN TO PRODUCE FAVORABLE INFORMATION EXTENDS TO IRAQI GOVERNMENT DOCUMENTS AND STATEMENTS BY IRAQI LAW ENFORCEMENT OBTAINED BY THE U.S. GOVERNMENT

The FBI investigation documents numerous contacts with various branches of Iraqi

security apparatus.  The FBI appears to have spoken with members of the police, security

service, and Iraqi military in the course of investigating Mr. Ameen.  As set forth in Exhibit G,

the FBI obtained documents from those agencies.  It is unclear from the information received by

the defense whether these contacts were in the course of obtaining witness statements

or rather in the context of two law enforcement

agencies both investigating Mr. Ameen for the Iraqi crime.  In any case, evidence of

inconsistencies in claims against Mr. Ameen between various branches of Iraqi law enforcement

are favorable to Mr. Ameen, especially with respect to page 71 of the Extradition Packet, which

is presented in an attempt to establish probable cause that this offense was committed on behalf

of ISIS.

The primary U.S. investigation into Mr. Ameen became intermingled with an Iraqi

investigation at some point.  In the course of the U.S. investigation, the FBI appears to have

spoken with at least four witnesses from various branches Iraqi law enforcement.  The FBI has

statements and documents provided by Iraqi law enforcement, including reports that the

Government acknowledges were forgeries.  See Exhibit H.  None of these statements, reports, or

documents have been provided to the defense, despite repeated requests.  They must all be

provided.  See In re Drayer, 190 F.3d 410, 415 (6th Cir. 1999)(noting that in ministerial case with

no independent U.S. investigation "all documents received by the United States from Canadian

authorities were, in fact, turned over".)

Even the Extradition Packet bears signs of the prior U.S. investigation.  Notably, in

presenting Mr. Ameen's photographs to Iraqi witnesses, the Iraqi government used photographs

provided by the FBI: from Mr. Ameen's A-file, which is a protected U.S. Government record

and not in the custody of the Iraqi Government (Exh. K-6); and Mr. Ameen's Facebook Profile

1    photograph, which the FBI used to question Iraqi Witnesses and provided to the Iraqi

2    Government as well (Exh. K-3.)  The Extradition Packet makes clear that the Iraqi Government

3    did not use any of its own, numerous photographs of Mr. Ameen in obtaining the arrest warrant.

4         It is clear that the U.S. should provide the defense with favorable evidence in its

5    possession, even if that evidence originally derived from Iraqi law enforcement.  Further, the

6    Court has the authority to order the United States to obtain exculpatory evidence from Iraqi law

7    enforcement, which was allied with the U.S. Government in investigating Mr. Ameen, or to

8    order the Iraqi Government to produce such evidence itself.  United States v. Smyth (In re

9    Smyth), 61 F.3d 711, 717 (9th Cir. 1995)(District Court ordered the U.K. to provide favorable

10   documents to defense); In re Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir. 1986)

11   (magistrate judge "ordered Argentina to produce the following documents.... "); Republic of

12   France v. Moghadam, 617 F. Supp. 777, 780 (N.D. Cal. 1985)(court ordered U.S. Government to

13   refer matter to French officials for authentication of recantation letter); In re McMullen, 1988

14   U.S. Dist. LEXIS 7201, at *25 (S.D.N.Y. 1988)(requiring British government to articulate

15   position regarding political nature of charged offense); United States v. Linson, 88 F. Supp. 2d

16   1123, 1125 (D. Guam 2000)(continuing extradition hearing and ordering U.S. Government to

17   obtain further information from requesting government).  Failure to produce such material may

18   result in remedies that include the application of presumptions for Mr. Ameen at the extradition

19   hearing.  Id.

20   **VII.   THE CIRCUMSTANCES OF                    IDENTIFICATION OF MR.
            AMEEN ARE CRITICAL TO THE COURT'S CONSIDERATION AND
            MUST BE DISCLOSED TO THE DEFENSE**

22        Evidence of witness compulsion is "explanatory" and therefore admissible in an

23   extradition hearing.  Santos v. Thomas, 830 F.3d 987, 990 (9th Cir. 2016)(en banc).  In Santos,

24   the magistrate judge erred by excluding witness recantations that included evidence that the

25   original inculpatory statements were given under compulsion.  The en banc Ninth Circuit flatly

26   held that the "extradition court should have considered evidence of coercion because a coerced

27   statement is not competent evidence and cannot support probable cause."  Santos, 830 F.3d at

28   1001.  Coercion goes directly to the "*competence* of the government's evidence" of probable

1 | cause. <u>Santos</u>, 830 F.3d at 1003.

2 |     Accordingly, the circumstances surrounding      first known identification of Mr.

3 | Ameen as an alleged perpetrator in this Iraqi crime are critical. The defense has requested that

4 | the Government provide information regarding these circumstances, but the Government has

5 | refused. Especially given that the first statement was given to the FBI, this refusal violates due

6 | process. The defense moves the Court to order the Government to produce an unredacted copy

7 | of      statement.

8 |      identification in October 23, 2017 is additionally suspicious for the following

9 | reasons. The FBI 302 from that date does not contain any information regarding an

10 | identification from a photo (however, the last section of that report is completely redacted.) The

11 | defense asked the Government what photograph of Mr. Ameen was shown on that date, if any,

12 | and the Government provided the photo attached as Exhibit K-2 and indicated that it was the

13 | photo shown by the Special Agent to      in October 2017.      then went to the Iraqi

14 | court on April 15, 2018. He/She was ostensibly shown an array of photos that are included in the

15 | Extradition Packet. However, two of those photos of men other than Mr. Ameen are imprinted

16 | with the date, May 20, 2018, over a month *after* they were supposedly shown to      (Doc.

17 | 22-1, pp. 64-67.)

18 |     Several days after the date imprinted on those photos, the FBI produced a new report.

19 | This report purports to memorialize the October 23, 2017 interview of      It is not

20 | expressly noted to be a supplement, and there is no indication why the FBI created it six months

21 | later, *after*      testified to the Iraqi court. That FBI 302 is attached as Exhibit J and was

22 | drafted by the FBI on May 24, 2018, and entered on May 25, 2018, over a month after

23 | went to court in Iraq. It claims that      was shown multiple photographs of different

24 | individuals in October 2017, and that      identified Omar Ameen as the person in the

25 | photograph in front of the snow. If so, those photographs were not produced to the defense when

26 | it asked for the items shown to      on that day.

27 |     These circumstances further support the need to determine the circumstances of the initial

28 | identification of Mr. Ameen to the FBI. In addition, the defense seeks to obtain testimony from

1     the Special Agent regarding those circumstances and              inconsistent statements in that

2     interview.

3                      original statement is inconsistent in many different ways from his/her second

4     statement to the Court.  Importantly, in              first statement, he/she states that he/she saw

5     Omar Ameen among the ISIS militants, but *heard* gun shots and multiple men yelling "Here is

6     your American dog."  (Exh. B.)  Further, he/she identified a completely different set of

7     accomplices in the first statement, than in the second.  He/She also claimed that an "Ahmed

8     Ameen" was Omar's brother and was present at the crime.  (There is no Ahmed Ameen, as

9     shown in the Extradition Packet at page Doc. 22-1, p. 89.)  He/She also claimed that Omar

10    committed crimes in the past with his brother "Wasam," yet another Ameen who does not exist.

11    See id.  Finally,              claimed that Omar had "shoulder length hair" in June 2014.  As the

12    photographs attached at Exhibit J make clear, Omar has never matched that description.

13                      also told the FBI that Mr. Ameen committed a crime with Abu Enis Al

14    Shami (likely a mistranslation or misspelling for Abu Anas Al-Shami)  Abu Anas Al-

15    Shami was a senior leader in Jama'at al-Tawhid wal Jihad starting in approximately

16    2003.  He was killed by an American airstrike in approximately September 2004.  He

17    could not have been involved in the Iraqi crime.

18                      also told the FBI that Mr. Ameen was a "very close friend/associate" to

19    Abu Bakr Al-Baghdadi, and that they went out in public in Rawa together giving away

20    money.  Al-Baghdadi is also one of the most hunted men on the planet to this day.  There

21    is an $25 million dollar bounty on his head.  He is the caliph of the Islamic State.

22       claims that al-Baghdadi visited with Omar Ameen twice in July and August 2014, a

23    time when Mr. Ameen was documented to be in Turkey.  If the U.S. Government has no

24    information documenting a connection between Omar Ameen and Baghdadi, that would

25    be extremely exculpatory, and prove the lack of reliability of              statement.

26                Accordingly, even the heavily redacted version of              statement in October 2017

27    bears numerous indications of unreliability.  The reliability of any identification must be

28    determined under the "totality of circumstances," even in an extradition hearing.  Neil v. Biggers,

      409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); Manta v. Chertoff, 518 F.3d 1134,

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 33 of 44

1    1146 (9ᵗʰ Cir. 2008)(citing <u>Biggers</u> in extradition case); <u>In re Extradition of Singh</u>, 170

2    F.Supp.2d 982, 1014 (E.D. Cal. 2001)(applying Biggers); <u>In re Extradition of Singh</u>, 2005 U.S.

3    Dist. LEXIS 42969 at *126 (E.D. Cal. 2005)(same); <u>In re Extradition of Chavez</u>, 408 F. Supp.

4    2d 908, 913-14 (N.D. Cal. 2005) (applying Biggers); <u>In re Extradition of Cervantes Valles</u>, 268

5    F. Supp. 2d 758, 774 (S.D. Tex. 2003) (same); <u>In re Extradition of Gonzalez</u>, 52 F. Supp. 2d

6    725, 737 (W.D. La. 1999) (same).

7         The circumstances already known to the defense are already suspicious – an Iraqi person

8    with links to ISIS is interviewed by the FBI, likely at a military Air Base, during ISIS's reign in

9    Al-Anbar Province. Many, many details are redacted from the FBI's report, itself suspicious.

10   (Exh. B.) A new FBI report is generated over six months later that purports to shore up

11   identification. (Exh. J.) All three witness statements in the Extradition Packets are pre-

12   written, typed statements, that only required the witness' signature. <u>See Doc. 1</u>, Exh. 1

13   (unredacted packet) and Arabic Extradition Packet. Two of the statements in that packet, for

14   Witnesses A and B, are word-for-word the same. <u>See e.g.</u>, <u>In re Extradition of Contreras</u>, 800

15   F.Supp. 1462, 1468 (S.D.Tex. 1992). Likewise, the signatures on the statements by A and B

16   suffer from the same problem as        statement in the Extradition Packet – the signatures

17   on pages one and two of each statement do not appear to match.

18        The defense has unearthed reliable evidence that a close family member of      is

19   currently being held in custody by the Iraqi Security Services as an ISIS militant. The defense

20   expects that prior to meeting with      in October, the FBI would have done some

21   background investigation and determined his/her ties to ISIS, especially since ISIS was still

22   occupying large portions of Iraq. The U.S. Government's clear connections with the Iraqi

23   security forces, including the ability to demand documentation and obtain reports, would have

24   also given U.S. investigators information about      ties to ISIS. Those ties to ISIS, or any

25   other facts that would have caused      to fear law enforcement and want to divert attention

26   to Mr. Ameen are critical and must be disclosed. Given well-established methods used by the

27   Security Services to obtain confessions and inculpatory statements,      statements were

28   likely coerced by his/her fear of being inculpated as an ISIS militant or by his/her fear for his/her

1   close family member in Iraqi custody.

2        The defense has requested additional information from the Government in support of this.

3   Evidence possessed by the U.S. Government supporting the investigation into          or his/her

4   close family member as a member of ISIS or any other terrorist organization explains his/her

5   inconsistent statements.  Evidence that          statement was procured through coercion

6   renders that statement unreliable and incompetent.  Santos, 830 F.3d at 1003-04.  "The use of

7   coerced [statements], whether true of false, is forbidden because the method used to extract them

8   offends constitutional principles."  Id., citing Lego v. Twomey, 404 U.S. 477, 485 (1972).  If

9          statement was "obtained by coercion in violation of the principles in the Due Process

10  Clause of the Fifth Amendment, the statements are not competent and cannot support probable

11  cause."  Santos, 830 F.3d at 1004.  It is "explanatory" and "undermines the process by which the

12  evidence was obtained. . . ."  Id.

13
        In Singh, the Court looked to the parties to "provide[] evidence about the totality of
14
    circumstances under which the original statements were taken from each eye-witness."  The
15
    court also wanted a "foundational description of the basis for the civilian eye-witness' knowledge
16
    of [the defendant]."  Singh, 170 F.Supp.2d at 1017.  As in Singh, the only evidence linking Mr.
17
    Ameen to the crime is an eyewitness statement.  Assessment of the reliability and competency of
18
    that statement is paramount.  Id.; see also Contreras, 800 F.Supp. at 1469 (no evidence to support
19
    probable cause except unreliable statements).
20
        Accordingly, evidence that undermines the credibility of the original statements, or that
21
    supports the reliability of current statements by witnesses who say Omar Ameen had nothing to
22
    do with the crime, must be disclosed to the defense.  Such evidence is explanatory and material.
23
    Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986) ("the credibility of witnesses and the
24
    weight to be accorded their testimony is solely within the province of the extradition
25
    magistrate.");  Mainero v. Gregg, 164 F.3d 1199, 1205-06 (9th Cir. 1999) (quoting Quinn);
26
    Singh, 170 F. Supp. 2d at 1023 ("[T]he extradition judge makes credibility determinations as to
27
    the competence of the evidence supporting probable cause.");  In Re Muñoz Santos, 228 F. Supp.
28
    3d at 1054 (quoting Singh); In re Monroy, 2006 U.S. Dist. LEXIS 65815, at *10 (E.D. Cal. Aug.

Case 2:18-mj-00152-EFB   Document 126   Filed 04/23/19   Page 34 of 44

30, 2006) (quoting Singh); In re Strunk, 293 F.Supp.2d 1117, 1126-1140 (E.D. Cal. 2003)

(denying extradition after reviewing the Government's evidence and finding it "so inconsistent

and conflicting that it provides little competent evidence" supporting extradition).

## VIII. THE UNITED STATES GOVERNMENT MUST PRODUCE EVIDENCE IN ITS POSSESSION THAT WOULD OBLITERATE PROBABLE CAUSE IN THIS CASE BY PROVING THAT MR. AMEEN WAS IN TURKEY IN JUNE 2014

### A. The Government Must Produce its Independent Statement Corroborating Mr. Ameen's Presence in Turkey in June 2014

The defense has spoken with a witness, known to the Government, who has indicated that

Mr. Ameen was with him on a daily basis in Mersin, Turkey during June 2014. That witness

does not live in the United States. Based on information suggested by the Government's prior

filings, the witness is extremely unlikely to obtain a visa to testify in this case, even if the

defense could arrange to fly him to Court to testify. The defense will attempt to obtain and

present his evidence in the most reliable manner possible. Undoubtedly, the Government will

argue at the hearing that this witness lacks credibility. It will argue to the Court that this

credibility issue means that the Court should exclude this statement. It will argue that the

witness is "uncorroborated." This is a strong reason to obtain clear corroboration from the

Government.

The Government possesses a corroborating statement by the witness that possesses

indicia of reliability, because it would appear to have been made when the witness was unaware

that he was being surveilled. See Doc. 24, lines 25-26; Doc. 26 (concession on surveillance); see

also Doc. 104, p. 2 (concession that Government possesses independently obtained statement on

alibi); United States v. Bryce, 208 F.3d 346, 351 (2d Cir. 1999)(taped wiretap statement had high

degree of trustworthiness, because declarant was not aware he was being taped); United States v.

Singleton, 125 F.3d 1097 (7th Cir. 1997) cert. denied 522 U.S. 1098 (1998)(taped conversation

with confidential informant very trustworthy). Other circumstances of the statement might

further increase its reliability. See e.g., United States v. Napier, 518 F.2d 316, 317 (9th Cir.

1975) (excited utterance).

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/03/19   Page 35 of 44

It would appear that the Government can place the witness in Mersin, Turkey in June 2014. The witness remembers this time clearly this because he is from Mosul, Iraq, which was being overrun by ISIS in June 2014. He remembered seeing Mr. Ameen daily to discuss the political situation in Iraq and to express their fears for family and their communities. Mr. Ameen often used the witness's laptop computer to access his Facebook and other social media at the witness's house, as a means of connecting with family who were living in the middle of a war zone. A prior consistent statement made by the witness should be admissible at this hearing to show that the witness is not manufacturing a statement to the Court.

The Government has argued that it has no obligation under Brady to provide this information if the defense has independently spoken with the witness. (Doc. 92, p. 2.) To the contrary, the U.S. Government must provide this evidence to corroborate other defense alibi evidence. See Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 285-96 (3d Cir. 2016)(rejecting government's argument that it could legally withhold "independent documentary corroboration of a key witness" for an alibi defense); Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016) (per curiam)(holding that Brady was violated where newly revealed evidence undermined confidence in conviction).

To obtain this corroborating statement, the defense does not need the Government to provide classified evidence. Rather, the defense has sought a stipulation by the Government containing the information. The Government has refused. Accordingly, the defense pursues this motion.

**B. The U.S. Must Produce Any Evidence of Mr. Ameen's Presence in Turkey in the Summer of 2014 Obtained During Surveillance**

In June 2013, Edward Snowden, a former CIA employee and federal contractor, leaked highly classified information from the National Security Agency. In pertinent part, the leaked information disclosed global surveillance programs run by the NSA and others with the cooperation of international telecommunications companies. The documents leaked by Snowden are contained in online archives available to anyone with an Internet connection.[6] They have been extensively analyzed by researchers and journalists.

---

[6]     Although the Snowden archives are publicly available, they have never been declassified. Accordingly, defense counsel cites to articles discussing the documents in lieu of attaching and discussing the documents

27

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 36 of 44

1    Ironically, in this case, the defense welcomes the idea of widespread surveillance in

2   Turkey during the Summer of 2014.  Such surveillance could show that Mr. Ameen was in

3   Mersin, Turkey at the time of the crime.  The Snowden documents indicate that the NSA

4   participated in surveillance in Turkey.  Der Spiegel, a German newspaper, analyzed the Snowden

5   documents on spying in Turkey, and links to them at the end of its article.  Poitras, et al. "A

6   Two-Faced Friendship: Turkey is 'Partner and Target' for the NSA," Spiegel Online, Aug. 31,

7   2014 available at www.spiegel.de.  The Snowden documents show that as a partner to NSA,

8   Turkey surveilled counter-terrorism targets such as "radical Islamic terrorist elements" and

9   passed that information onto the United States.  In February 2014, the Turkey government

10   responded to protests by passing a law requiring that ISPs collect data on users' activities for up

11   to two years and provide authorities with this data on demand.  Yesil and Sozeri, Online

12   Surveillance in Turkey, Surveillance and Society 15 (3/4/) at 545.  Local Turkish counsel has

13   indicated that the Turkish Government, through its Bureau of Telecommunications (BTK), keeps

14   cell phone surveillance and location data.  The Court has authorized a Letter Rogatory for this

    evidence.

15    As discussed in the Guardian, the NSA was collecting almost 5 billion cell phone records

16   a day, obtaining "highly personal data about the precise whereabouts of individuals, wherever

17   they travel in the world."  Lewis, "Snowden documents show NSA gathering 5bn cell phone

18   records daily," The Guardian Dec. 5, 2013 available at www.theguardian.com.  This was verified

19   by a "senior collection manager" who was given permission by the NSA to confirm that the

20   agency is "'getting vast volumes' of location data from around the planet by tapping into cables

21   that connect mobile networks globally."  Id.  The NSA also used tools called "Co-Traveler" to

22   enable the NSA to search for possible associates of intelligence targets.  Id.  The NSA told

23   journalists that these tools were intended to focus on "foreign targets," not people in the United

24   States.

25    The defense is happy to provide Mr. Ameen's Turkish cell phone information to the

26   Government, to enable the Government to find in its records the location tracking of his cell

27   phone in Turkey during the Summer of 2014.  The defense is aware from involvement in United

28   _____

themselves.

28

States v. Aws Mohammed Al-Jayab, 2:16-cr-MCE, that Government has the documented ability to obtain and use electronic communications records of Internet Protocol (IP) addresses when it seeks to inculpate a defendant.  The defendant in that case was alleged to have traveled to Syria in 2013 and 2014 to provide material support for terrorists.  In paragraph 11(e) of the Al-Jayab Complaint, the affiant FBI Special Agent wrote:

> I have reviewed electronic communications records of Internet Protocol (IP) addresses that Al-Jayab utilized to connect to the internet to access social media and email accounts during his travel to Syria. Analysis of those IP addresses and other information establishes that Al-Jayab accessed the internet in the time period at issue through a satellite that covered both eastern Turkey and areas of northern Syria.

Docket No. 1.  Such an analysis in this case will provide similarly strong evidence of Mr. Ameen's location on and around June 22, 2014.  If the Government has already conducted such an analysis, it must provide it to the defense.  Otherwise, the defense is happy to provide Mr. Ameen's cell phone information to the Government so that it can undertake this analysis and, in so doing, provide the Court with competent evidence.

## IX. DOCUMENTS THAT REBUT CLAIMS AT PAGE 71 OF THE EXTRADITION PACKET AND ELSEWHERE IN GOVERNMENT FILINGS MUST BE PROVIDED TO THE DEFENSE

The Government has tried to restrict the range of the extradition hearing by repeatedly trying to hold the Court to only the allegations in the Extradition Packet.  The report provided by the Iraqi Operations and Intelligence Support Department, at page 71 of the extradition packet (available in English at Document 22-1, page 71) asserts that Mr. Ameen was one of the founders of al-Tawhid Wa al-Jihad.  That is an organization that was founded by Abu Musab al-Zarqawi.  The intelligence report claims that Mr. Ameen was a "close associate" of Zarqawi.

Zarqawi was one of the most hunted men on the planet in the early 2000s.  Zarqawi was killed by an airstrike on June 7, 2006.  The U.S. Government has significant information about Zarqawi's actions and associates during this time.  U.S. forces busted safe houses that Zarqawi used; the CIA was hot on his trail.  Associates were arrested and cooperated with law enforcement, providing information about Zarqawi's associates and actions during this time.

The defense has extensively researched Zarqawi's associates and publicly available documentation of the founding of AQI.  It has found nothing that connects Mr. Ameen to

Zarqawi, much less as a "close associate." If he was a "close associate," it is inconceivable that the U.S. Government has no evidence of Mr. Ameen's alleged connection and role. If he was not a "close associate," the Government should be compelled to state so.

Similarly, page 71 of the Extradition Packet claims that Mr. Ameen in 2007 worked "under the Emir for Al-Qa'idah in Al-Anbar, the terrorist (Ghassan Muhammad Ameen al-Rawi)" his cousin. Ghassan Amin was arrested April 26, 2005 in Iraq as noted by the Government in Document 6, page 19, line 11. He has remained continuously in custody since then. A Department of Defense press release indicates that Ghassan Amin had "provided key information on the recent insurgent activities." See

archive.defense.gov/news/newsarticle.aspx?id=31710

Ghassan Amin is publicly credited with giving critical information on AQI as stated in that press release, including information that led to the capture and killing of other AQI leaders and planners, including Abu al Abbas (who was captured May 5, 2005, right after Ghassan), Abu Dua (who was killed October 26, 2005), and Zarqawi himself (who was killed June 7, 2006). If Ghassan identified people other than Omar as the "financial officer" for AQI in Al-Anbar, or the head of the military leadership in Al-Qa'im and Rawah, or failed to provide any information about Omar when listing associates, that is exculpatory evidence. It is also exculpatory that Ghassan was in custody in 2007, when Omar Ameen is claimed to have worked for him in Anbar.

(SW affidavit at p. 12.)                                    The Coalition knew of Ghassan and his associates, and been on his tracks at that time. They were watching him. He was arrested in April 2005, outside Rawa, in a daring raid on his farm conducted by the Joint Special Operations Command.[7]

Likewise, in the search warrant affidavit, at page 12, the

---

[7]      That raid is recounted in Sean Naylor's <u>Relentless Strike: The Secret History of Join Special Operations Command</u> (2015) at page 267. The book documents the extent of information about Ghassan Amin and Zarqawi known at the time.

1    Ghassan Amin was actually arrested in 2005 and has remained in

2    custody ever since.  Accordingly, the statement of

3    It is clear that Iraqi witnesses sought to damn Mr. Ameen with

4    clearly false allegations regarding Ghassan Amin.  To the extent that the United States has

5    evidence and statements from the pursuit, investigation, and interrogation of Ghassan Amin that

6    contradict those statements on page 71 of the Extradition Packet that is exculpatory evidence and

7    must be provided to the defense.

8    The same Iraqi intelligence report in the extradition packet claims that Mr. Ameen in

9    2006 launched two armed attacks against the army headquarters in Al-Karablah area in Al-

10   Qa'im.  In one, he is accused of taking soldiers prisoner and executing them.  In the other,

11   several soldiers were killed.  The defense has attempted to search every publicly available and

12   comprehensive English-language database of terrorist activities in Iraq during the relevant time.

13   See e.g., Global Terrorism Database available at www.start.umd.edu/gtd/; Empirical Studies of

14   Conflict (ESOC), Iraq Dataset available at esoc.princeton.edu/country/Iraq; Homeland Security

15   Digital Library, available at www.hsdl.org/c/; Cordesman, "Iraq's Sectarian and Ethnic Violence

16   and the Evolving Insurgency," Center for Strategic and International Studies (Dec. 14, 2006).

17   None of them corroborate either 2006 incident recounted in the Extradition Report.  The defense

18   has also searched Arabic-language media and U.S. military websites.  It cannot find any

19   evidence that such attacks ever happened.  If they did in fact happen, the U.S. government would

20   have proof that they had occurred and may have an investigation related to them.  If the attacks

21   did occur, and others were deemed responsible, that is exculpatory information.  If no such

22   attacks occurred, that is likewise exculpatory.

23   Most of the inflammatory accusations against Mr. Ameen are from          a witness

24   for whom the Government has not provided a statement.

27   (SW affidavit at p. 11.)  There is no indication that the FBI or the

28   U.S. Attorney's Office was able to corroborate this with U.S. military records.

31

1    are exculpatory and support other defense

2    evidence regarding false statements by Iraqi witnesses.

3         The witness statements in the Extradition Packet place at least one actual ISIS member at

4    the scene of the crime. The name of Abu-Anas al-Samirra'I was not provided in the first

5    statement by            which discussed a different set of attackers. Abu Anas was hunted by the

6    U.S. and the Iraqi Security Forces because he was an extremely high-level militant in ISIS and

7    had been identified as the governor of the Euphrates Province.

8         At least one online source indicates that al-Samarra'I was killed in June 2014 near

9    Ramadi. Other sources indicate he was killed or injured and captured later, in December 2014,

10   or that he was killed or injured and captured in April 2016. Clearly proof that al-Samarra'I was

11   dead before the date of the crime is exculpatory as he could not have participated. Likewise,

12   proof that al-Samarra'I was in a battle far away from Rawa during the time would also be

     exculpatory.

13        Likewise, Muhammad 'Abid Manaf (aka Muhammad 'Abbud al-Suri) appears to be a

14   known member of ISIS at the time. He was not mentioned by            in that person's first

15   statement. However, he does seem to have been mentioned by            in that Person's later

16   statement in January 2018 (as Muhammad Abud).          then added this supposed

17   accomplice in his/her statement to the Iraqi court in April 2018. The U.S. Government, through

18   its various intelligence agencies, tracks ISIS fighters. Contradicting information about these two

19   ISIS fighters would be exculpatory.

20        The witness statements in the Extradition Packet identify Ahmad Shihad Ahmad Badir al-

21   Rawi as an accomplice and a "member of the People Mobilization's Free Iraqis Force." (

22        first statement did not place Mr. Badir at the scene.) The People Mobilization's Free Iraqis

23   Force is a force opposed to ISIS and other jihadis. It is a member of the Iraqi security apparatus.

24   It makes no sense for a member of the PMF to join ISIS at Rawa at that time in killing a former

25   police officer. It makes absolutely no sense that Badir would both be a PMF member and a

26   "prominent member in the Terror Organization of ISIS."

27        The defense has received information from Iraqis that Ahmad Badir is the true killer of

28   the victim in this case. Multiple Rawans have told the defense that Badir's brother, Saddam

1    Badir, had been killed by the victim when the victim was a police officer.  Evidence held by the

2    U.S. regarding Badir would be exculpatory.

3        The witness statements in the extradition packet tie Mr. Ameen to the kidnapping of three

4    of the victim's brothers: Muhammad, Ghassan, and Ra'Far.  This allegation is repeated several

5    times in the packet, including by the Iraqi authorities.  (Doc. 22-1, pp. 44-47, 61, 99.)  The

6    kidnapping is alleged to have happened November 20, 2016, well after Mr. Ameen moved to the

7    United States, and when he could not have returned to Iraq.  (Doc. 22-1, p. 99 (noting date of

8    kidnapping).)  This is yet another example of the lack of credibility of the witness statements.

9    Information held by the U.S. Government regarding that kidnapping being claimed against Mr.

10   Ameen would be exculpatory, as it would should additional false statements by witnesses.

11       The Government's filings also indicate statements given by an Iraqi witness on which the

12   Government must provide the defense any exculpatory information.  On pages 18-19, Document

13   6 alleges that the Ameen family is "one of five native Rawah families that founded AQI in the

14   region."  It also alleges that the Ameen family helped install AQI in Rawah, and that Omar's

15   dad, Abdulsattar Ameen Hussein supported Abu Musab al-Zarqawi in founding AQI in Rawah.

16   Document 6 also indicates that on December 24, 2017, the Hit Inquiry Court charged Omar

17   Ameen with violation of Counterterrorism law.  Further, Document 6 recounts that Omar was

18   supposedly detained by Iraqi Army infantry brigade (28th Bridge, 7th Division), but that the

19   documents about the arrest were claimed to be forgeries.  The fact that members of the Iraqi

20   security apparatus would forge documents is extremely exculpatory given the weakness of the

21   probable cause, and the expected strong evidence that Mr. Ameen was in Turkey and had

22   nothing to do with this offense.

23       The Government has provided the defense Mr. Ameen's A-file, which is extensively

24   redacted to remove evidence of the vetting to which Mr. Ameen was subject, and which he

25   passed.  That extensive vetting would have revealed any information that Mr. Ameen was

26   involved with terrorism.  This information is not secret.  Multiple agencies have compiled

27   hierarchies of AQI/ISIS.  Omar is not in any of them.  See Orton, Governing the Caliphate:

28   Profiles of Islamic State Leaders, The Henry Jackson Society (2016); Zeidel, "The Dawa'ish: A

     Collective Profile of IS Commanders" Perspectives on Terrorism, Vol. 11, No. 4 (2017)  The

     Iraq War since the fall of Saddam Hussein has been extensively covered in reports, articles,

books, and U.S. Government press releases. See, e.g., Fishman, The Master Plan: ISIS, Al-Qaeda, and the Jihadi Strategy for Final Victory (2016); Naylor, Relentless Strike; Glenn, "Al Qaeda v. ISIS: Leaders & Structure" The Wilson Center (Sep. 28, 2015). The pages redacted from Mr. Ameen's own A-file would show that the U.S. Government had no evidence that he was involved in AQI or ISIS.

The Department of Homeland Security's own report on the "Refugee Case Processing and Security Vetting" details the multiple databases used for the program that Mr. Ameen went through. DHS/USCIS/PID-068. USCIS officers use LiveScan to collect prints and photographs of applicants at the time of interview. Id., at p. 5. Applicants go through biographic and biometric background checks. Id. USCIS "closely coordinates" with federal law enforcement and the intelligence community in this process. Id., at p. 6. Biographic checks are run through at least five systems, including the Department of State (DOS) Consular Lookout and Support System (CLASS), DOS Security Advisory Opinion (a "biographic check conducted by the FBI and intelligence community partners"), Interagency Check (multiple checks with intelligence community partners); the National Counterterrorism Center (which "serves at the central and shared knowledge bank on known and suspected terrorists and international terror groups, as well as their . . . networks of contacts and support"); and a Social Media Review conducted by the USCIS Fraud Detention and National Security Directorate. Id., at pp. 6-7. Biometric checks are run through at least three law enforcement reviews as well: Department of Homeland Security, FBI, and Department of Defense. Id. at p. 8.

The immigration file provided to the defense has been scrubbed of all documentation that nothing was found on Mr. Ameen in all these checks. That information is critical, and Mr. Ameen requests that the missing pages be provided to the defense. The defense has found nothing that would corroborate any claim that Omar Ameen was in ISIS or AQI, much less that he was a high-ranking leader with access to Zarqawi and Baghdadi. It appears that the U.S. Government likewise found nothing in 2014 that would corroborate its secret witnesses. It must produce this information to the defense.

The defense requests that the Court order production of all the documents and evidence discussed in the Government's filing at Document 6, including all of the statements taken by the

Case 2:18-mj-00152-EFB   Document 127-2   Filed 04/24/19   Page 43 of 44

1    FBI from Iraqi witnesses.  The Government relied on Government 6 to have the Court detain Mr.

2    Ameen.  It sent a strong message about what it believed was the strength of this extradition

3    proceeding.  Documents produced by the Government began to undermine that message.

4    Defense investigation has done that even more.  The Court should also order the Government to

5    produce to the defense the documents it cited and relied on in Document 6.  A chart at Exhibit H,

6    lays out all the items cited by the Government in that document that have never been given to the

7    defense, despite a defense request.

8         **X.   CONCLUSION**

9         The defense hopes that the Court will order the Government to "serve truth and justice

10    first."  United States v. Kojayan, 8 F.3d 1315, 1323-24 (9th Cir. 1993) (noting it is "the easiest

11    thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply

12    to win" and citing examples of prosecutorial misconduct).  The truth here is that Omar Ameen is

13    innocent of the crime charged in Iraq.  The Government should not be allowed to hold back

14    evidence, from any source, that would undermine its extradition case.  The Government has

15    carefully noted that it does not have alibi evidence "as a result of its criminal investigation or in

16    the context of these extradition proceedings."  Doc. 104, p. 1.  It has never stated that it holds no

17    exculpatory evidence.  Much of the explanatory evidence discussed above may fall outside the

18    Government's narrow view of its ethical and due process duty.  The defense has put all its cards

19    on the table regarding Mr. Ameen's innocence, and expects to obtain more and more evidence of

20    such to present at this hearing, attach to its Reply, and present at an extradition hearing.  As

21    Justice Breyer has noted, "experience suggests that the possibility of Governmental abuses in

22    cases like this one – where the United States has an admittedly keen interest in the later, foreign

23    prosecution – is not totally speculative."  United States v. Balsys, 524 U.S. 666, 716 (1998)

24    (Breyer, J., dissenting) (citing Demjanjuk).

25         Mr. Ameen seeks to exercise his right as an accused person "to present reasonably clear

26    cut proof which would be of limited scope and have some reasonable chance of negating a

27    showing of probable cause."  Singh, 170 F. Supp.2d at 994 (quotation and citation omitted).

28    / / /

     / / /

1    Given that the Government has rejected many requests for the production of critical evidence,

2    the Defense turns to the Court for an Order compelling it to do so.

3    DATED: April 8, 2019                          Respectfully submitted,

4
                                                   HEATHER E. WILLIAMS
5                                                  Federal Defender

6                                                  /s/ Benjamin D. Galloway
7                                                  BENJAMIN D. GALLOWAY
                                                   Chief Assistant Federal Defender
8
                                                   /s/ Rachelle Barbour
9
10                                                 RACHELLE BARBOUR
                                                   Assistant Federal Defender
11                                                 Attorneys for OMAR AMEEN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28