1

2

3

4

5

6

UNITED STATES DISTRICT COURT

7

FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9

IN THE MATTER OF THE
EXTRADITION OF OMAR
ABDULSATTAR AMEEN TO THE
REPUBLIC OF IRAQ

No.  2:18-mj-152-EFB

10

11

MEMORANDUM AND ORDER

12

13    Omar Abdulsattar Ameen[1] ("Ameen") has, through his counsel, filed: (1) a motion for the

14    production of search warrants (ECF No. 111); (2) a motion for protective order (ECF No. 112);

15    and (3) a motion to compel (ECF No. 116).  The government has filed an opposition addressing

16    each motion (ECF No. 120) and Ameen has filed a reply thereto (ECF No. 123).[2]  The court, for

17    the reasons stated hereafter, denies the motion to compel and motion for production of search

18    warrants.  The motion for protective order is granted in part.[3]

19    /////

20    /////

21    /////

22

23      [1] The Republic of Iraq seeks Ameen's extradition based on his alleged participation in a
      June 2014 murder committed in the town of Rawah.  ECF No. 22-1 at 21.

24

25      [2] Having reviewed the motions, the court finds that each is appropriate for submission
      upon the record.  Accordingly, the hearing set for May 7, 2019 is vacated.

26

27      [3] The government moves to strike portions of the motion to compel and one exhibit
      thereto.  ECF No. 127.  The court will address that motion by a separate order.  However, the
      motion to strike is necessarily denied in part with respect to any information explicitly referenced

28    in this order – all of which the court considers essential to its analysis.

1

Motion to Compel

I.     <u>Background</u>

    A.     <u>Ameen's Position</u>

In his motion, Ameen identifies various categories of material that he contends is favorable to his defense and must be disclosed by the government pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).[4]  Those alleged categories are as follows:

    1.     <u>Person A</u> [5]

First, Ameen requests that the government provide information regarding the circumstances under which a statement was given by an individual – whom the court will refer to as "Person A" [6] – to the Federal Bureau of Investigation ("FBI").  He contends that his own investigative efforts indicate that this witness may have been compelled or coerced into giving statements regarding Ameen's involvement in the murder.  ECF No. 116 at 22.  Specifically, Ameen claims that this witness may have a "close family tie" to a member of ISIS in Iraqi custody.  *Id.*  Ameen surmises that Person A "may have been compelled to speak to Iraqi or U.S. investigators out of fear that he/she would be implicated with ISIS through his/her close family member."  *Id.*  He argues that the government is in possession of information indicating what benefits, coercion, or compulsion were brought to bear on this witness.  *Id.* at 23-24.

Ameen also states that a complete understanding of the circumstances of Person A's initial FBI interview is critical to contextualizing subsequent investigative discrepancies.  *Id.* at 30.  He

/////

/////

---

[4] In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.

[5] This individual claimed to have witnessed the murder for which Iraq now seeks to extradite Ameen.  ECF No. 22-1 at 43-44.  In his motion, Ameen argues that this witness bore "false witness" against him.  *E.g.*, ECF No. 116 at 22.

[6] The court uses this reference, rather than the one adopted in the motion itself, because of the concerns raised in the government's motion to strike.

points out that the FBI 302[7] from October 23, 2017 – the date the FBI interviewed Person A in Iraq – contains no mention of photographic identification. *Id.* Ameen's counsel asked the government what photograph, if any, was shown to Person A in the October 23, 2017 interview. *Id.* The government indicated a specific photograph was shown to the witness, and Ameen has reproduced that photograph as an exhibit to the current motion. ECF No. 116-1 at 28 (Exhibit K, line 2).

In April of 2018, Person A went to an Iraqi court and was shown an array which contained photographs of Ameen and other men. ECF No. 116 at 30. Those photographs were reproduced in the extradition request where, Ameen notes, two of the photographs of other men are dated May 2018 – one month after the alleged identification in the Iraqi court. *Id.*; ECF No. 22-1 at 64-67. Also in May of 2018, the FBI produced a new report which memorialized Person A's October 23, 2017 interview. ECF No. 116 at 30. Ameen questions why the report was composed months later and only after the witness testified in the Iraqi court. *Id.* The report states, for the first time, that the witness was shown multiple photographs in October 2017 and picked Ameen out of an array (the photograph the witness chose is the same one identified *supra* in Exhibit K). *Id.* Ameen states that the other array photographs used by the FBI have never been produced to the defense. *Id.*

Finally, Ameen argues that Person A's statement to the FBI in October of 2017 is, in many respects, inconsistent with their later statement to the Iraqi court. *Id.* at 31. The court finds it unnecessary to reproduce all of the alleged discrepancies here. Suffice it to say, Ameen believes Person A's October 2017 statement is wholly unreliable. *Id.* He re-emphasizes his theory that Person A gave the statements under some form of coercion. With that predicate, Ameen argues that "[e]vidence possessed by the U.S. Government supporting the investigation into [Person A] or their close family member as a member of ISIS or any other terrorist organization explains his/her inconsistent statements." *Id.* at 33.

---

[7] "An FBI 302 report is a typed transcription of the notes of an FBI agent's interview with a witness, usually prepared for testimony of a witness who may be presented at trial." *United States v. O'Keefe*, 128 F.3d 885, 888 n.1 (5th Cir. 1997).

## 2.    Prudential Search

Second and more broadly, Ameen demands that the government – represented in this case by the United States Department of Justice – request a "prudential search"[8] of the United States Intelligence Community ("IC"). *Id.* at 26. He claims that "[t]here is reason to believe that the Intelligence Community (IC) has exculpatory material regarding Mr. Ameen." *Id.* Ameen goes on to assert that "the government has repeatedly conceded, now on the record, that the [intelligence community] has exculpatory evidence corroborating Mr. Ameen's alibi."[9], [10] *Id.* at 27. In specific terms, Ameen seeks:

> IC information rebutting claims that he is an ISIS or Al-Qaeda in Iraq terrorist, and any information rebutting the Iraqi filing are clearly exculpatory. If the IC has no information to show that Mr. Ameen is a member of ISIS or an Al-Qaeda in Iraq terrorist, that is likewise exculpatory, and the defense requests a statement to that effect, a stipulation, or a certificate of no record.

*Id.* at 27-28.

---

[8] The motion defines this term in accordance with the United States Department of Justice Criminal Resource Manual ("Manual"). ECF No. 116 at 26. In Section 2052(A) of the Manual, a "prudential search" is defined as:

> A search of Intelligence Community (IC) files, usually prior to indictment, for pre-existing intelligence information undertaken because the prosecutor and the Department have objective articulable facts justifying the conclusion that the files in question probably contain classified information that may have an impact upon the government's decision whether to seek an indictment and, if so, what crimes and defendants should be charged in that indictment. A prudential search should include a search for *Brady* material and other information that would be subject to the government's post-indictment discovery obligations. Upon an appropriate threshold showing of necessity by the prosecutor, a prudential search *may* include a narrowly drawn request for specific investigative leads to assist the prosecutor to reduce or eliminate the relevance of classified information to his/her case.

U.S. Department of Justice, Criminal Resource Manual § 2052(A) (updated April 2018), available online at: https://www.justice.gov/jm/criminal-resource-manual-2052-contacts-intelligence-community-regarding-criminal-investigations (last accessed on April 26, 2019).

[9] Ameen's alibi is that he was in Turkey at the time of the murder. *See, e.g.*, ECF No. 116 at 31.

[10] For its part, the government states that "it does not possess evidence that would negate probable cause that Ameen committed the alleged murder." ECF No. 120 at 10.

4

### 3. Iraqi Government Material

Third, Ameen contends that the government's burden to produce favorable information extends to any documents it has obtained from the Iraqi government or Iraqi law enforcement. *Id.* at 28. He argues that the government's investigation into him is "intermingled" with the Iraqi investigation. *Id.* Ameen claims that the FBI spoke with "at least four witnesses from various branches [of] Iraqi law enforcement" in the course of its own investigation. *Id.* He also claims that the FBI received "statements and documents" relevant to this matter which were generated by Iraqi law enforcement. *Id.* Finally, Ameen argues that, even if the government does not currently possess exculpatory information derived from the Iraqi state, this court has the authority to order the government to obtain it. *Id.* at 29.

### 4. Government Evidence that Ameen was in Turkey in June 2014

Ameen states that his argument against a finding of probable cause will rest, in part, on a witness who will testify that he was in Mersin, Turkey at the time of the murder. *Id.* at 34. Ameen anticipates that the government will argue that this witness (who, owing to visa issues, is unlikely to testify in-person in this matter) lacks credibility. *Id.* He also anticipates that the government will, based on the foregoing credibility attack, move to exclude the witness testimony as "uncorroborated." *Id.* As a consequence, Ameen argues that the government must provide any clear corroborative material in its possession. Specifically, Ameen contends that "[t]he Government possesses a corroborating statement by the witness that possesses indicia of reliability, because it would appear to have been made when the witness was unaware that he was being surveilled." *Id.*

Ameen also requests any other evidence of Ameen's presence in Turkey during the relevant time-period. He references "global surveillance run by the [National Security Agency] and others with cooperation of international telecommunications companies" and contends that this surveillance could prove Ameen's presence in Turkey at the time of the murder. *Id.* at 35-36. To that end, Ameen states that he would gladly provide the government with his Turkish cell phone number to facilitate a search for records that would place him in Turkey on the date of the murder. *Id.* at 36.

5.    Documents that Rebut Page Seventy-One of the Extradition Request

The extradition request, at page seventy-one, asserts that Ameen is a founding member of al-Tawhid Wa al-Jihad – an organization whose founding is ultimately attributed to Abu Musab al-Zarqawi.  ECF No. 22-1 at 71.  The request further states that Ameen was a "close associate" of Zarqawi.  *Id.*  Ameen notes that defense investigations have failed to uncover any evidence linking him to Zarqawi.  ECF No. 116 at 37-38.  Ameen states that, if he was in fact a close associate of Zarqawi (who was one of the most wanted men in the world prior to his death in 2006), it is "inconceivable" that the government would have no evidence of that association.  *Id.* at 38.  He argues that, if the government does not have such evidence, it should be compelled to state as much.  *Id.*

Ameen also notes that the same page of the extradition request alleges that he worked under the terrorist leader Ghassan Muhammad Ameen al-Rawi in 2007.  ECF No. 22-1 at 71.  He argues that this information is obviously suspect insofar as al-Rawi was arrested in 2005 and has been in custody since that date.  ECF No. 116 at 38.  And al-Rawi has, since entering custody, provided information leading to the capture and killing of other insurgents.  *Id.*  Ameen argues that, if al-Rawi has failed to provide any information confirming their affiliation, that is exculpatory information and must be disclosed.  *Id.*

Finally, Ameen points to the extradition request's claim[11] that, in 2006, "he launched an armed attack against the army headquarters in Al-Karablah Area in Al-Qa'im, where he took soldiers as prisoners and executed them at the same time."  ECF No. 22-1 at 71.  The request also alleges that "in the same year [2006], he launched an armed attack against the army headquarters where several soldiers were killed."  *Id.*  He claims that, despite the sensational nature of these alleged terrorist operations, the defense has been unable to uncover any evidence that either actually occurred.  ECF No. 116 at 39.  Ameen argues that "[i]f [the attacks] did in fact happen,

---

[11] The relevant form in the request is titled "Intelligence report about the accused fugitive (Omar Abdullsattar Ameen Husayn)" and was initially submitted to the Judicial Investigator of the Al-Karkh Inquiry Court.  ECF No. 22-1 at 71.

the U.S. government would have proof that they had occurred and may have an investigation related to them. If the attacks did occur, and others were deemed responsible, that is exculpatory information. If no such attacks occurred, that is likewise exculpatory." *Id.*

### 6. Person B

Ameen states that "[m]ost of the inflammatory accusations against [him] are from an individual who will be referred to herein as "Person B," who allegedly received immigration benefits from the government in exchange for their statements.[12] *Id.* at 39. This witness alleged that Ameen was, in the mid-2000s and in Iraq, often seen in the company of a known terrorist. *Id.* at 38. Person B also alleged that Ameen's family had numerous terrorist connections that pre-dated the 2014 murder. *Id.* But Ameen's counsel could find no indication that there was any government evidence corroborating the foregoing. *Id.* at 39-40. As best the court can discern, the motion seeks any exculpatory material the government possesses with respect to accusations by this witness.

### 7. Whereabouts of Abu-Anas al-Samirra'I and Muhammad 'Abid Manaf

Ameen states that the information in the extradition request potentially places two confirmed ISIS members at the scene of the murder. *Id.* at 40.

Abu-Anas al-Samirra'I ("al-Samarra'I") was a high-level ISIS militant. *Id.* Ameen references conflicting, unidentified sources which offer differing accounts of al-Samarra'I's fate: (1) he was killed in June of 2014 near Ramadi; (2) he was killed or injured and captured at some point in December of 2014; or (3) he was killed or injured and captured in April of 2016. *Id.* Ameen reasons that, if the first account is true and confirmable by the government, that information would be exculpatory insofar as it would contradict the extradition request.

Ameen states that Muhammad 'Abid Manaf was also a known ISIS member. *Id.* Person A mentioned 'Abid Manaf as an accomplice to the murder in his/her statement to the Iraqi court

---

[12] The substance of this witnesses' claims against Ameen are known to the defense only by way of a sealed search warrant affidavit which Ameen's attorneys have been made aware of. ECF No. 116 at 39.

in April 2018.  *Id.*   Ameen argues that the government tracks the movements of ISIS fighters and

must disclose any information it possesses which would rule out the presence of 'Abid Manaf (or

al-Samarra'I) at the scene of the murder.  *Id.*

### 8.    Information Concerning Ahmad Badir

Ameen claims that his own investigation by his defense team points to another man as the

killer – Ahmad Badir.[13]  *Id.* at 40-41.  He asserts that his investigation has also revealed a possible

motive – Badir's brother was purportedly killed by the victim.  *Id.*  Ameen demands that the

government provide any evidence it possesses regarding this individual and his possible

involvement in the murder.  *Id.* at 41.

### 9.    Kidnapping of the Victim's Brothers

The extradition request contains allegations tying Ameen to the kidnapping of three of the

victim's brothers.  ECF No. 22-1 at 61.  Ameen notes that the kidnappings are alleged to have

occurred in November of 2016 (ECF No. 116 at 41) – after he had relocated to the United States.

He argues that this obvious discrepancy underscores a general lack of credibility of the statements

in the extradition request.  ECF No. 116 at 41.  He requests any information held by the

government concerning the kidnappings.

### 10.    Ameen's A-File

Ameen's counsel were provided with an "extensively redacted" copy of Ameen's

immigration A-file.  *Id.*  He argues that, among the redacted information, is evidence of vetting

which would undercut any contention that he was involved in terrorist activity.  *Id.*  Ameen states

that production of the redacted pages is necessary because they "would show that the U.S.

Government had no evidence that he was involved in AQI or ISIS."  *Id.* at 42.

/////

/////

/////

---

[13] Ameen also contends that the extradition request contains inherently conflicting information regarding this individual insofar as it lists him as both an accomplice to the murder (and thus ISIS affiliated) and as a member of the People's Free Iraqis Force – an anti-ISIS organization.

11. All Documents Discussed in the Government's Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings

Ameen requests all documents and evidence discussed, cited, or relied upon in the government's Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings (ECF No. 6), including all statements taken by the FBI from Iraqi witnesses. ECF No. 116 at 42-43. He states that "[t]he Government relied on Government 6 [i.e., ECF No. 6] to have the Court detain Mr. Ameen. It sent a strong message about what it believed was the strength of this extradition proceeding. Documents produced by the Government began to undermine that message. Defense investigation has done that even more." *Id.* at 43.

B. The Government's Position

The government argues that Ameen's discovery requests amount to an attempt to improperly convert this extradition proceeding into a criminal trial. ECF No. 120 at 8. As discussed further below, it also contends that the scope of his requested discovery is unprecedented, legally insupportable, and risks exposing sensitive information. *Id.* at 7-8. The government also asserts is not in possession of the sort of alibi-supportive information as Ameen contends.

1. Alibi Evidence

The government states that it has reviewed the materials in its possession and, having done so, "ma[kes] the representation that it has no additional evidence related to the claim that Ameen has an alibi. Specifically, the United States has represented that it has no evidence in its possession as a result of its criminal investigation that would prove Ameen was in Turkey at the time of the alleged murder, nor any evidence that would prove Ameen has an alibi for the alleged murder." *Id.* at 14.

The government also specifically states, with respect to Ameen's request that it geo-locate him by using his cell-phone number, that the FBI searched fourteen cellular phones, one iPad, and one laptop it obtained during a search of Ameen's residence. *Id.* The FBI obtained a "voluminous amount of data" therefrom. *Id.* It thoroughly analyzed that data in "an attempt to

geolocate Ameen while these devices were in use," but could not geolocate Ameen during the relevant time frame. *Id.* at 14-15. The government also notes that it was not able to geolocate Ameen in Turkey during the pertinent time based on IP address data linked to his Facebook account. *Id.* at 15.

### 2. Torture or Coercion Evidence

The government states that it has no information which would indicate that any of the statements provided by witnesses in Iraq were obtained by way of torture or coercion. *Id.*

## II. Analysis

### A. The Government's Obligation Under *Brady*

Ameen's motion to compel rests on the premise that *Brady* is applicable to this extradition proceeding. In *Merino v. United States Marshal*, the Ninth Circuit held that *Brady* is not applicable to international extradition hearings like the one at bar. 326 F.2d 5, 13 (9th Cir. 1963) (citation omitted), *cert. denied*, 377 U.S. 997 (1964) (noting that appellant cited *Brady* in support of his contention that he was denied due process of law in an adverse extradition decision and concluding "[i]n our view the principles set forth in the cases relied upon are not applicable to a preliminary examination in an international extradition case."). Undeterred, Ameen argues that these extradition proceedings fall within the ambit of *Brady* and points to the Sixth Circuit's holding in *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993).

In *Demjanjuk*, the Sixth Circuit extended *Brady* to "cover denaturalization and extradition cases" and held that a government attorney's failure to disclose exculpatory information violated due process. *Id.* at 353-54. Subsequently, the Sixth Circuit decided *In re Extradition of Drayer* where it explained that *Demjanjuk* involved the "unusual set of circumstances" in which "the United States had conducted its own investigation of the offense underlying the request for extradition and uncovered exculpatory material in the course of that effort." 190 F.3d 410, 414 (6th Cir. 1999). The *Drayer* court then rejected the petitioner's contention that *Demjanjuk* obligated authorities from the requesting country to turn over exculpatory materials.[14] *Id.* at 415.

---

[14] Following that logic, the *Drayer* court held that "[t]he United States does not have any obligation or authority to obtain [materials from the requesting nation] on behalf of the

10

Ameen concedes that this circuit has never formally adopted the *Brady* expansion announced in *Demjanjuk*. ECF No. 116 at 18 ("The Ninth Circuit has not had occasion to decide whether *Brady* applies in an extradition where, as here, the U.S. Government has undertaken its own investigation and likely has favorable evidence. Defense counsel is not aware of any such case in this Circuit."). And *Demjanjuk* is in tension with the Ninth Circuit's holding in *Merino* (articulated *supra*). Nevertheless, Ameen argues that the Ninth Circuit has shown support for *Demjanjuk*, in two decisions – *Wang v. Reno*, 81 F.3d 808, 820-21 (9th Cir. 1996) and *Prasoprat v. Benov*, 421 F.3d 1009, 1015 (9th Cir. 2005). ECF No. 116 at 18. But neither decision offers dispositive authority on *Brady*'s application to this case.

In *Wang*, the government arranged for the parole of a Chinese citizen ("Wang") to the United States in order that he might serve as a prosecution witness in a drug conspiracy trial. *Wang*, 81 F.3d at 811. Wang changed his testimony at trial, however, and revealed that Chinese authorities had coerced him into giving false testimony against one of the defendants. *Id.* He subsequently moved for asylum and indicated that, in light of his public renunciation of his coerced testimony, he faced possible execution upon return to China. *Id.* at 811-12. The asylum request was denied, parole was revoked, and Wang was placed in exclusion proceedings. *Id.* at 812. In the district court, Wang argued, *inter alia*, that the government violated his substantive due process rights under the Fifth Amendment. *See Wang Zong Xiao v. Reno*, 837 F. Supp. 1506, 1547 (N.D. Cal. Oct. 6, 1993). The district court agreed and held that the conduct of the relevant government officials "shocked the conscience" insofar as they knew of and disregarded the obvious predicament Wang would face: testify falsely or tell the truth and face terrible consequences upon return to China. *Id.* at 1551. The district court found that the only relief adequate to cure the violation of Wang's rights was a permanent injunction enjoining defendants from taking any action to remove him from United States jurisdiction or to return him to Chinese custody. *Id.* at 1563-64. The Ninth Circuit affirmed that decision and briefly cited *Demjanjuk* as an example of prosecutorial misconduct. *Wang*, 81 F.3d at 820-21. The Ninth Circuit's opinion

petitioner." 190 F.3d at 415.

in *Wang* did not discuss, much less announce a formal adoption of the *Demjanjuk's* expansion of *Brady*.[15]

The Ninth Circuit's discussion of *Demjanjuk* in *Prasoprat v. Benov* is similarly brief. 421 F.3d 1009, 1015 (9th Cir. 2005). Therein, a United States citizen, who was due to be extradited to Thailand for drug offenses, appealed the district court's denial of his § 2241 habeas petition. *Id.* at 1011. One of his arguments concerned the district court's denial of a discovery motion seeking information about the Thai government's use of the death penalty for drug offenses. *Id.* at 1012-13. Petitioner relied on *Demjanjuk* in contesting that denial, and the Ninth Circuit rejected his argument, reasoning:

> The evidence sought by *Demjanjuk*, however, related to whether he was in fact the individual who had committed the extraditable offense and thus concerned the probable cause determination. . . . By contrast, in the case at bench, the information sought by Prasoprat does not relate to an issue within the scope of the magistrate judge's authority to examine. When the offense for which extradition is sought is punishable by death, the question of whether to refuse extradition on that basis is within the authority of the executive branch, not the judicial branch.

*Id.* at 1015-16. The Ninth Circuit, in distinguishing *Demjanjuk*, gave no indication as to whether the Sixth Circuit's holding ought to have broader applicability in this circuit.

The court recognizes that Ameen's contentions raise an issue that was not present in *Demjanjuk*. He does not only allege that the government pursued its own independent, investigation of the alleged crime which produced exculpatory material; he claims that the government is the moving force behind the extradition request itself. *See* ECF No. 123 at 2 ("This is not the usual extradition case. The U.S. Government is not in a merely ministerial role –

---

[15] The Ninth Circuit decided *Wang* in 1996. In the intervening years, courts have continued to cite *Merino* for the proposition that *Brady* does not apply in international extradition proceedings. *See Mackenzie v. Cal. AG*, No. SACV 12-432 VBF(JC), 2016 U.S. Dist. LEXIS 129227, at *55 n. 17 (C.D. Cal. April 11, 2016); *In re Extradition of Aguasvivas*, No. 17-mj-4218-DHH, 2018 U.S. Dist. LEXIS 125979, at *26-27 (D. Mass. July 27, 2018).

And the Ninth Circuit's decision in *Caplan v. Vokes*, handed down after *Merino*, appears to reaffirm the principle that the protections of *Brady* do not apply in extradition proceedings like the one at bar. 649 F.2d 1336, 1342, n.10 (9th Cir. 1981) (holding that, in extradition proceeding, "the accused has no absolute right to introduce exculpatory evidence and the government has no duty to do so.") (internal citation omitted) (citing *Charlton v. Kelly*, 229 U.S. 447, 456 (1913)).

it is the protagonist."); *id.* at 11 ("[T]he U.S. Government appears to have elected to launder its evidence through the Iraqi authorities for prosecution to avoid having to bring charges beyond a reasonable doubt in the United States . . .").  This allegation is serious and unproven.  The extradition request contains various documents indicating that this matter is, in fact, a priority for the Republic of Iraq and that it, not the U.S. Government, is the prime and sincere[16] mover in this action.  *See*, *e.g.*, ECF No. 22-1 at 4, 15-16.  Ameen's theory, of course, sits within the realm of possibility.  This court, based on the record evidence, cannot conclusively discount it.  But an extradition court is not obligated to weigh, investigate, and discount every possible[17] theory of illicit action[18] between our government and other sovereign actors prior to fulfilling its function. Doing so would almost certainly involve significant judicial intrusion into matters of diplomacy and statecraft – areas that the Supreme Court has repeatedly stated are the province of other, co-equal branches of government.  *See, e.g., Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.  Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.  They are delicate, complex, and involve large elements of prophecy.  They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil.  They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.").  And our government, by virtue of its global presence, will often be engaged in the exercise of power – diplomatic, military, intelligence-gathering – abroad.  Forcing an extradition court to hold those

[16] By use of the word "sincere," the court does not imply a conclusion that the extradition request is necessarily truthful in all respects – that question is not currently before this court.  The sincerity to which the court refers is more fundamental – this court has no reason to believe that the Republic of Iraq does not, *as a matter of its own state policy*, wish to see Ameen extradited to stand trial for a murder that Iraq alleges he participated in.

[17] Obviously, there exists a scenario in which the evidence of 'sham' proceedings is so strong that it cannot be ignored.  That scenario is not present here, however.

[18] Ameen's theory necessarily implies illicit coordination between the two nations.  If the United States is the "protagonist," it could only hide that fact with the Republic of Iraq's assent.

13

activities up to judicial scrutiny every time it is suggested, without definitive evidence, that either the government or the requesting nation has not been entirely forthcoming would put the judiciary in an untenable position.

Nonetheless, it remains unclear whether *Demjanjuk*'s expansion of *Brady* is applicable in this circuit. However, the court need not decide that question. As discussed below, the court finds that the government has met its obligations under the *Demjanjuk* and *Drayer* analysis.

In its opposition to Ameen's motion, the government is unequivocal: "[t]he government does not possess evidence that would negate probable cause that Ameen committed the charged murder."[19] Accepting that representation, it follows that the government has discharged any obligation imputed to it by *Demjanjuk* and *Drayer*. In *Drayer*, the Sixth Circuit held that *Demjanjuk* obliged the government "to turn over any exculpatory materials in its possession that would undercut[20] a finding that there was probable cause to believe that petitioner committed the

---

[19] This statement is consistent with previous ones made by the government in this action. ECF No. 104 at 1-2.

[20] The court recognizes the potential semantic distinction between the government's use of the term "negate" and the *Drayer* court's use of "undercut." Conceivably, a piece of evidence could undercut probable cause but fall short of negating it. But Ameen has not, by way of his reply, raised any argument that these terms are legally distinct for the purposes of this proceeding. Nor is this court aware of any subsequent decision (either within the Sixth Circuit or elsewhere) that has assigned a legally specific meaning to "undercut."

Ameen *does* argue that "[the government] has never stated it holds no exculpatory evidence. Much of the explanatory evidence discussed [in the motion to compel] may fall outside the Government's narrow view of its ethical and due process duty." ECF No. 116 at 43. The court interprets this argument as invoking a broader definition of "exculpatory" which encompasses more than evidence that would actually serve to negate probable cause. Otherwise, Ameen could not reasonably claim that the government has never denied having such evidence. *See* ECF No. 120 ("The government does not possess evidence that would negate probable cause . . ."). The court reads *Drayer* as standing in consonance with the bedrock principle that "explanatory evidence" – that is, evidence which "explains away" probable cause - is admissible in an extradition hearing and evidence which merely controverts, or raises a defense (i.e., so called "contradictory evidence") is not. *See Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999). It would make little sense, in light of *Brady*'s requirement that a violation is shown only where the claimant was prejudiced by the withholding of favorable material, *see United States v. Wilkes*, 662 F.3d 524, 535 (9th Cir. 2011), that the Sixth Circuit intended its expansion of *Brady* to cover material other than admissible, explanatory evidence. Thus, the government's contention that it does not have evidence negating probable cause is sufficient to satisfy its *Brady* obligation

14

murder with which [the country requesting extradition] had charged him." 190 F.3d 410, 415

(6th Cir. 1999). Axiomatically, the government cannot be obliged to turn over what it does not

possess. And *Brady* does not require the government to seek out and disclose exculpatory

material to the defendant that is not currently known to it, either by requesting such material that

may be in the Republic of Iraq's possession (an argument that *Drayer* itself explicitly rejected)[21]

or by seeking out new material that is not currently in its possession. *See United States v.*

*Marashi*, 913 F.2d 724, 734 (9th Cir. 1990) (rejecting claim that "government had a constitutional

obligation to compile *Brady* material"); *Carriger v. Stewart*, 132 F.3d 463, 492 (9th Cir. 1997)

("*Brady* does not require the prosecutor to direct a counter-investigation to destroy its own

case."); *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002) (holding that *Brady* does not

require "a prosecutor to seek out and disclose exculpatory or impeaching material not in the

government's possession."); *see also Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000)

("*Brady* does not require a prosecutor to turn over files reflecting leads and ongoing

investigations where no exonerating or impeaching evidence has turned up.").

In his reply, Ameen argues that the government, contrary to its statements in the

opposition, *does* possess favorable evidence[22] and is attempting to justify that refusal by citing a

need for secrecy. ECF No. 123 at 2. The court is not persuaded. The government is on record

stating that it does not possess the type of material that would be subject to disclosure under

*Demjanjuk* and *Drayer* – the cases which Ameen relies on. ECF No. 116 at 16. Speculation to

the contrary does not create an obligation under *Brady*. *See United States v. Lopez-Alvarez*, 970

(assuming that such an obligation applies in this matter).

---

[21] "Accordingly, to the extent that petitioner's motion for discovery included requests for materials in the possession or control of Canada, it was properly denied. The United States does not have any obligation or authority to obtain these materials on behalf of petitioner." *In re Drayer*, 190 F.3d at 415.

[22] Ameen states that the government has evidence that he and another individual were in Turkey at the time of the murder. If the government actually had such evidence (that is, evidence that conclusively places Ameen in Turkey at the time the victim was killed) it would necessarily render its oppositional statements false. This charge, although made implicitly, is a serious one. Nothing in the record convinces the court that the government or its counsel have made such material misrepresentations.

F.2d 583, 598 (9th Cir. 1992) (holding that there was no *Brady* violation where the existence of the information defendant requested was "purely speculative"); *see also Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.") (quoting *United States v. Croft*, 124 F.3d 1109, 1124 (9th Cir. 1997)).

The court is also concerned that unfounded attacks on the credibility of the government and its representatives, like the one Ameen undertakes in his reply, open the door to a conspiratorial morass. In refusing to accept the government's representation to the court that it possesses no evidence that would negate probable cause, Ameen invites this court to issue rulings based on the theory – again, unsupported by the record – that the government is simply proceeding in bad-faith and that its representatives have shirked their duty, as officers of the court, to be truthful in their filings. A natural consequence of accepting this theory is that no government denial would ever be sufficient – the government's repeated protestations that it had no evidence negating probable cause would be read only as further indication of its attempt to conceal the same. The court recognizes the value of zealous representation and does not raise this point lightly. But counsel for Ameen has repeatedly - and, in the court's view, improperly - imputed ill-intent to the government and its representatives in these proceedings.[23]

/////

/////

/////

---

[23] *See e.g.,* ECF No. 76 at 13 ("Whether the Government is prepared to acknowledge it or not, it is clear that some part of the U.S. Government possesses evidence that shows that Mr. Ameen was in Turkey at the time of the offense. It has tried to hide the existence of this evidence from the press and public."); ECF No. 103 at 2 ("It is not justice to seek to extradite Mr. Ameen to Iraq when the U.S. Government holds evidence proving that he could not have committed the crime of which he is charged."); *Id.* at 4 ("As in *Demjanjuk*, the Government's zealousness to extradite Mr. Ameen brings it close to committing fraud on this Court."); ECF No. 123 at 11 ("[B]ased on facts already known to the defense, the U.S. government appears to have elected to launder its evidence through the Iraqi authorities for prosecution to avoid having to bring charges beyond a reasonable doubt in the United States . . . [s]uch a possibility should shock the conscience of the Court . . .").

**B.**     Scope of Discovery

The scope of discovery in matters of extradition also counsels against granting Ameen's motion. "[D]iscovery in an international extradition hearing is limited and lies within the discretion of the magistrate." *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1399 (9th Cir. 1986). The Ninth Circuit has noted that, "[i]n exercising discretion, the magistrate should consider both the well-established rule that extradition proceedings are not to be converted into a dress rehearsal trial and whether resolution of the contested issue would be appreciably advanced by the requested discovery." *Quinn v. Robinson*, 783 F.2d 776, 817 n.41 (9th Cir. 1986). Here, the scope of Ameen's discovery request is expansive and would risk turning these proceedings into a rehearsal trial. Many of Ameen's discovery requests concern evidence that is necessarily contradictory rather than explanatory. For instance, he requests government information on ISIS fighter movements to show that ISIS fighters Abu-Anas al-Samirra'I and Muhammad 'Abid Manaf were not – as the extradition request alleges – present at the scene of the murder. ECF No. 116 at 40. Even if such evidence were found and produced, it would not negate the witness statements relied upon by the extradition petition. Similarly, Ameen requests evidence establishing that a known terrorist never mentioned him as a close associate, also contradicting the extradition request. *Id.* at 38-39. This too, if proved, would not negate probable cause.[24]

/////

_____

[24] These requests are hardly exceptions. Ameen also requests, *inter alia*, contradictory evidence which would establish that the extradition request inaccurately: (1) referred to him as a "close associate" of Abu Musab al-Zarqawi (ECF No. 116 at 37-38); (2) alleges that Ameen launched attacks against Iraqi army headquarters in Al-Karablah in 2006 (*id.* at 39); (3) tie Ameen to the kidnapping of the victim's brothers (*id.* at 41); and (4) alleges that Ameen's family helped install Al-Qaeda in Iraq in Rawah (*id.*). Ameen's request for his A-file also seeks information that is contradictory insofar as he avers that it would contain vetting information indicating that he was not, as the extradition request suggests, affiliated with ISIS. *Id.* at 42.

The court recognizes that Ameen also requests evidence of coercion or torture being employed to obtain a witness statement. ECF No. 116 at 32-33. Such evidence would be admissible pursuant to the Ninth Circuit's decision in *Santos v. Thomas*, 830 F.3d 987, 1005-06 (9th Cir. 2016). The government, however, has represented that it "possesses no information as a result of its criminal investigation that any of the witnesses who provided statements in Iraq were tortured or coerced." ECF No. 120 at 15.

1  Thus, the court concludes that the requested discovery would not appreciably advance resolution

2  of the contested issue – whether probable cause exists.

3      III.    <u>Conclusion</u>

4      For all of the foregoing reasons, Ameen's motion to compel is denied.

5  <u>Motion for Production of Search Warrants</u>

6      Ameen requests, pursuant to the Federal Rules of Criminal Procedure and his Fourth

7  Amendment pre-indictment rights, (1) all search warrants executed against him; (2) all search

8  warrant inventories for search warrants executed against him; (3) all supporting affidavits for

9  search warrants executed against him; and (4) any oral testimony or other materials relied upon

10 by the magistrate judge in issuing search warrants issued against him.  ECF No. 111 at 2.  In its

11 opposition, the government represents that it "now makes available to the defense all Rule 41

12 search warrants, affidavits, and inventories, still subject to the terms of the protective order."

13 ECF No. 120 at 18.  It also states that "[n]o oral testimony was provided to any magistrate judge

14 for obtainment of any Rule 41 search warrant."  *Id.*  Based on that production and representation,

15 the court denies this motion as moot.[25]

16 <u>Motion for Protective Order</u>

17     Ameen requests that the current protective order in this matter be modified to allow: (1)

18 the entire defense team – including investigators and his Iraqi attorney – reasonable access to the

19 unredacted extradition request (ECF No. 112 at 4); and (2) the filing of FBI reports – which have

20 been redacted and already provided to the defense – on the public record (*id.* at 4-5).  He also

21 requests various items, listed *infra*, which he claims implicate only his own privacy rights.  *Id.* at

22 5.

23     Ameen argues that the legal standard that governs this motion is the one announced in

24 Federal Rule of Criminal Procedure 16(d)(1) which states that "the court may, for good cause,

25 deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  ECF No. 112 at

26 2. But the rules of criminal procedure are inapplicable to extradition proceedings.  *See Santos*,

27

28        [25] Ameen's reply provides no indication that he considers this issue to remain in dispute.

830 F.3d at 1042 ("The Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply in the extradition context.").  It is unclear what standard should apply when a party moves to modify a protective order in an extradition case.[26]  *See United States v. Kirby (In re Kirby)*, 106 F.3d 855, 867 (9th Cir. 1996) (Noonan dissenting) ("Extradition proceedings are not criminal proceedings, as is agreed by all parties; no guilt or innocence is determined in them. Nor are extradition proceedings civil as the term is used in our rules, so that they are not governed by the Federal Rules of Civil Procedures."); *In re Gohir*, No. 2:14-mj-314-CWH, 2014 U.S. Dist. LEXIS 69769, at* 18 (D. Nev. May 21, 2014) ("Foreign extraditions are *sui generis* in nature, neither civil nor criminal in nature, and set forth their own law.").  The court notes, however, that precedent broadly supports the principle that it has wide latitude in deciding whether to modify a protective order it has entered in this matter.  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984) ("The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery. The unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders."); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 789 (3d. Cir. 1994) ("Discretion should be left with the court to evaluate the competing considerations in light of the facts of individual cases.  By focusing on the particular circumstances in the cases before them, courts are in the best position to prevent both the overly broad use of [confidentiality] orders and the unnecessary denial of confidentiality for information that deserves it . . . .") (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 492 (1991)).  In light of the absence of a clear standard and the wide latitude afforded this court, it concludes that relevant issue is, as Ameen suggests, whether good cause exists to continue applying the current terms of the protective order to the items in question.

/////

/////

/////

---

[26] The government's opposition does not indicate what standard it believes should apply to this issue.

I.      Statements in the Extradition Request

Ameen complains that the protective order, as it currently stands, prevents his counsel from telling him the names of the witnesses testifying against him.  ECF No. 112 at 4.  Additionally, he claims that the protective order's prohibition on disclosing the identities and statements of complainants in the extradition request to "third persons" precludes his defense team – including investigators and his Iraqi attorney – from knowing the identities of key witnesses.  *Id.*  As such, they are unable to "review their purported statements with them to determine whether they are accurate or, as the defense strongly suspects, they were altered to implicate Mr. Ameen without knowledge or agreement of some witnesses."  *Id.*

For its part, the government argues that concerns over witness safety militate in favor of maintaining the current protective order.  ECF No. 120 at 19-20.  It also notes that the stated purpose behind disseminating the currently protected information is to generate evidence related to witness credibility – which would not be admissible in these proceedings.  *Id.* at 20.

As expressed previously at hearings in this case, the court takes seriously the issue of witness safety.  And there are undeniable risks in expanding the number of individuals to whom witnesses' identifying information is known.  *See*, *e.g. Hamdan v. United States Dep't of Justice*, 797 F.3d 759, 770 (9th Cir. 2015) ("[W]e are also aware that it is in the nature of intelligence data that disclosure of small pieces of a puzzle may be aggregated and considered in context by an adversary . . . .").  The government has represented that "[t]he threat of ISIS retribution was clear to the United States in its investigation [and] was communicated by representatives of the Republic of Iraq in the transmission of the extradition request . . . ."  ECF No. 120 at 20.  The court is ill-positioned to second-guess either government on this issue and, thus, elects not to.

Additionally, the likely utility to these proceedings of lifting the protective order on this information does not outweigh the potential risk to the witnesses.  As noted *supra*, Ameen states that he intends, through his defense team, to review statements with witnesses to determine their accuracy.  ECF No. 112 at 4.  He suspects that the statements were altered to implicate him without the witnesses' consent.  *Id.*  Assume, for the sake of argument, that Ameen succeeds in

securing new testimony from witnesses which adheres to his theory.  He presents[27] this testimony

at his hearing – likely in the form of a new affidavit which disavows the older testimony.  Now,

the court is faced with a question of credibility that will almost certainly prove impossible to

resolve without a trial.  This hypothetical situation is not unlike the one faced by the extradition

court in *In re Extradition of Singh*, 170 F. Supp. 2d 982 (E.D. Cal. Aug. 27, 2001).  There, a

witness for the requesting nation disavowed his previous statement by way of a new affidavit.  *Id.*

at 1025 ("Kulwant now asserts he never gave any such statement to the police in 1991 and has

refused to give an affidavit to police because he never made such a prior statement. . . . Without a

trial it is impossible to resolve the credibility dispute between Kulwant's new 2001 affidavit and

the alleged identification he made in 1991.").

In light of the foregoing, risk to witness safety and the fact that resolution of the question

of probable cause would, in all likelihood, not be appreciably advanced by the proposed

discovery, the court declines to modify the protective order to allow disclosure of this information

to "third persons."

II.     <u>FBI Reports</u>

Ameen contends that FBI summaries already provided to him, which are redacted with

respect to witness identifying information, should be exempted from the protective order so that

they may be filed on the public record.  ECF No. 112 at 4-5.  The government opposes such

exemption and argues that the information contained therein is inadmissible in this matter and

"[p]rotecting sensitive materials in an ongoing criminal investigation is a legitimate reason for the

use of a protective order . . . ."  ECF No. 120 at 21.

Ameen states his desire to file these FBI reports on the public docket, but offers no reason

why public disclosure of documents – even redacted documents – related to an on-going criminal

investigation is necessary at this juncture.  The court previously denied Ameen's motion to unseal

/////

---

[27] Assume also, for the purposes of this hypothetical, that the evidence is ruled admissible. It goes without saying that nothing herein should be taken as an indication of how the court would rule on the admissibility question were it presented.

1   other information related to an on-going criminal investigation.  ECF No. 107.  It does so here as

2   well.

3          At a previous motion hearing, the court informed Ameen's counsel that, if they found it

4   necessary to rely on documents related to an on-going investigation during litigation, they could

5   refer to it by line and page (if the document is in the court's possession or is submitted to

6   chambers).  The court also noted that, if it determined that further argument was necessary, it

7   could hold an *in-camera* hearing if an appropriate basis were established for doing so.  As before,

8   the court recognizes the importance and value of maintaining public access to as much of the case

9   docket as is feasible and practical.  However, as the Supreme Court has held, documents not

10  normally within the public purview – like FBI records in an active investigation – are not

11  transformed into a matter of public record merely because of their involvement in the discovery

12  process.  *See Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("It has generally been held that the

13  First Amendment does not guarantee the press a constitutional right of special access to

14  information not available to the public generally."); *see also United States v. Anderson*, 799 F.2d

15  1438, 1441 (11th Cir. 1986) ("Discovery is neither a public process nor typically a matter of

16  public record.  Historically, discovery materials were not available to the public or press.").

17         III.    Ameen's Own Records and Property

18         Ameen lists various items which he contends either belong to or only relate to him.  He

19  claims that they implicate only his privacy rights and, thus, should be exempted from the

20  protective order.  ECF No. 112 at 5.  They are: (1) his own A-file; (2) a recording of his video

21  interview with the FBI; (3) a recording of his jail call and written translation of the same; (4)

22  property taken from his home that the defense was allowed to view at the FBI office; (5) his

23  Facebook and all other social media information seized by the Government pursuant to a search

24  warrant or by looking at public pages; and (6) the inventory sheet from the search of his home.

25  *Id.*  The government has agreed that several of these items – the property seized from Ameen's

26  home, Ameen's social media postings, and the inventory sheet – are not subject to the terms of

27  the protective order.  ECF No. 120 at 21.  Thus, the only items still in contention are Ameen's A-

28  file, the jail call and written translation thereof, and the FBI interview.

22

With respect to the A-file, the government argues that it understands that the defense has requested the file via the Freedom of Information Act ("FOIA") process from the administrative agency[28] and that agency is "the better source for that information."  In his reply, Ameen states that his FOIA request produced only "a few pages of the A-File scrubbed of the relevant vetting information" and argues that "[t]he Government has Ameen's complete A-file, and it must provide the information sought to the extent that it is favorable as set forth in the Motion to Compel."  ECF No. 123 at 13.  Those arguments concern production of the A-file, however, rather than whether it should remain subject to the protective order.  It is the latter question that is before the court.  The government has not stated that the A-file – in the redacted state which Ameen possesses – reveals sensitive information that would be inappropriate for the public docket.  Thus, the court will grant modification of the protective order to exempt Ameen's A-file.[29]

The court will not order modification of the protective order with respect to Ameen's FBI interview.  It denies modification for the same reasons identified *supra* in the discussion of other FBI documents related to an ongoing criminal investigation.

The final issue – Ameen's jail call – was inadequately briefed by both parties.  The pleadings, as best the court can discern, are entirely lacking in contextual details as to this item.  Indeed, the government's opposition makes no mention of this item.  ECF No. 120 at 21 (Discussing the other items in this section, but omitting any mention of the "jail call.").  Absent some indication that it contains sensitive information, the court is inclined to grant modification of the protective order as to this item.

IV.     *The Sacramento Bee*'s Joinder

On May 1, 2019, the *Sacramento Bee* ("the *Bee*") filed a partial joinder (ECF No. 133) to Ameen's motion to modify the protective order (ECF No. 112).   The *Bee* expresses two primary

---

[28] Ameen states that he has requested and received a file from United States Customs and Immigration Service.  ECF No. 123 at 13.

[29] In the event that Ameen subsequently obtains an unredacted A-file, the parties should confer as to the applicability of the protective order to that document.  In the event they cannot reach an agreement, they may bring the matter before the court.

concerns. First, it notes that its counsel spoke with government counsel and sought "a written stipulation that the protective order is insufficient on its own to justify excluding the press and the public from the extradition hearing." ECF No. 133 at 1 n. 1. The government declined to enter such a stipulation. Second, and more broadly, the *Bee* argues that the current protective order "improperly reverses" the standards for sealing material insofar as it "makes secrecy the rule, and transparency the exception . . . ." *Id.* at 2-3. The *Bee* argues that the protective order must be "harmonized" with the First Amendment, the common law, and this court's local rules. *Id.* at 3. By way of a solution, the *Bee* argues that the following language should be added to the protective order:

> This protective order does not alter or alleviate the burden on the government, the defense, or any third party to prove that the First Amendment and common law prerequisites for filing materials under seal or closing the courtroom have been met in order to file records under seal or close these proceedings. This protective order is without prejudice to any challenge to sealing or closure by the press or the public.

*Id.* at 4.

The *Bee*'s concern that the extradition hearing will be closed to the public and press is not ripe for adjudication. No party has requested that the hearing be closed (in whole or in part) and if that changes, the court will permit the *Bee* to be heard and to challenge any such request.

With respect to the *Bee*'s broader concerns about the protective order and its proposed language, the court notes that the protective order does not in any way alter the law of this circuit, which requires a party seeking to file documents under seal to show "compelling reasons" for doing so. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136 (9th Cir. 2003)) ("Those who seek to maintain the secrecy of documents attached to dispositive motions must meet the high threshold of showing that 'compelling reasons' support secrecy."). The requirement to show "compelling reasons" applies even where the parties have implemented a generalized protective order. *See Foltz*, 331 F.3d at 1136 ("[T]he presumption of access is not rebutted where, as here, documents subject to a protective order are filed under seal as attachments to a dispositive

/////

motion. . . . [the] 'compelling reasons' standard continues to apply.").  Thus, the additional language proposed by the *Bee* is unnecessary to safeguard the public access.

Conclusion

For the reasons stated above, it is hereby ORDERED that:

1.  Ameen's motion for production of search warrants (ECF No. 111) and motion to compel (ECF No. 116) are DENIED;

2.  Ameen's motion for protective order (ECF No. 112) is GRANTED in part.  The redacted A-file he possesses and the jail call (and transcript of same) are no longer subject to the protective order.  The motion is DENIED in all other respects.

DATED:  May 6, 2019.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE