HEATHER E. WILLIAMS, #122664
Federal Defender
BENJAMIN D. GALLOWAY, #214897
Chief Assistant Federal Defender
RACHELLE BARBOUR, #185395
Assistant Federal Defender
OFFICE OF THE FEDERAL DEFENDER
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax: 916-498-5710

Attorneys for
OMAR AMEEN

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATTAR AMEEN TO THE REPUBLIC OF IRAQ | )<br>)<br>)<br>)<br>)<br>) | Case No.  2:18-mj-152 EFB<br><br>DECLARATION OF ZAID HYDARI<br><br>Judge: Hon. Edmund F. Brennan |

I, Zaid Hydari, declare as follows:

1.      Since August 2014, I have been the Executive Director of the Refugee Solidarity Network in New York City.  In that position, I oversee our partnership with an Istanbul-based association, Refugee Rights Turkey, which offers free legal services for refugees and training on refugee law for lawyers.

2.      From September 2011 to August 2014, I worked for the Helsinki Citizens Assembly – Refugee Program, in Istanbul, Turkey, as its co-coordinator of the Refugee Status Determination (RSD) Unit.  In that position, I monitored our incoming and active caseload comprised mostly of individuals who had been rejected by the UNHCR at first-instance, oversaw the legal team, and coordinated with the United Nations High Commissioner for Refugees (UNHCR) country office and UNHCR headquarters on refugee issues.  I also delivered workshops for asylum-seekers in satellite cities in Turkey as part of a U.S. State Department-funded project.  Before becoming a co-coordinator of the RSD Unit, I was a legal advisor for the unit from September 2010 to

Declaration of Zaid Hydari – US v. Ameen

EXHIBIT 11

September 2011.  I obtained my J.D. at the Fordham University School of Law in New York, New York in May 2009.  I am a member of the New York State Bar.  I have written and spoken on refugee issues in the United States and abroad.  I am attaching my CV to this declaration as Exhibit A.

3.      I have reviewed documents related to Mr. Ameen as discussed more specifically below.  I declare the following in my personal capacity, and not on behalf of my current employer.  I have based my analysis and opinions on the documents I have reviewed, my experience working in the refugee system in Turkey during the time Mr. Ameen was in Turkey pursuing that process, and my knowledge of that system and the laws at the time.

3.      I do not have any personal knowledge of the facts surrounding the United States' detention of Omar Ameen or the extradition packet submitted by the Republic of Iraq.  I submit this Declaration to explain the laws and procedures that applied to Mr. Ameen when he was a refugee in Turkey from April 2012 to November 2014, to discuss the various organizations and agencies he interacted with, and to explain the documents produced by those agencies, including the United States Department of State and the United States Department of Homeland Security. I attach particularly relevant documents relating to Mr. Ameen to this declaration for the Court's review.[1]

4.      Mr. Ameen was issued a Turkish entry visa by the Turkish Consulate in Erbil, Iraq on March 18, 2012 according to his passport.  (Exh. B, at OA_000040.)  On March 31, 2012, his passport reflects a Kurdish exit stamp at Zakho, Iraq, an Iraqi exit post on the border with Turkey.  Id.  Turkey stamped his entry on April 1, 2012, at its corresponding border post.  Id. This Iraqi passport is contained in several of Mr. Ameen's official files, including his immigration file produced by the U.S. Department of Homeland Security and provided by the Government as disclosure.  (Exh. B at  OA_00011(certificate).)

5.      The Turkcell contract at Exhibit C indicates that the next day, April 2, 2012, in Ankara, Turkey, Mr. Ameen purchased a Turkish cell phone with the phone number of 05 34 068 52 80.

---

[1]      Documents with a bates-number beginning with OA_ were provided to the defense by the U.S. Government as disclosure in this case.  Regarding documents from other sources, defense counsel has provided certification of the source and indicated the source in the exhibit page number.

2

EXHIBIT 11

Declaration of Zaid Hydari – US v. Ameen

He provided his Iraqi passport as identification for its purchase.

5.      Under the Turkish refugee system in 2012, an incoming asylum-seeker had to register his or her arrival and obtain legal residence with the Turkish authorities while also registering a parallel case with UNHCR Turkey.  I have reviewed documents from Mr. Ameen's Turkish immigration file in Mersin, Turkey, which was provided to defense counsel with an apostille directly by the Turkish government.[2]  (Exh. D.)  In 2012, the Turkish Government assigned refugees to live in one of various "satellite cities," which were cities spread across the country. When Mr. Ameen approached the UNHCR in Ankara, they informed him that he was assigned to Mersin, Turkey as his satellite city and that he should go there to register himself with the Turkish Government as an asylum-seeker.  As instructed, on April 30, 2012, Mr. Ameen registered his presence in Turkey with the government agency in Mersin responsible for refugees.  (Exh. E MERSIN 18.)  A document produced by the U.S. Government indicates that Mr. Ameen completed his registration with the UNHCR as an asylum-seeker on May 29, 2012. (Exh. G at OA_000182.) This sequence of events was characteristic of asylum-seekers at that time.

6.      After going through a status determination procedure with UNHCR, Mr. Ameen's refugee status was recognized by the UNHCR on August 29, 2013, and on September 11, 2013, he received his UNHCR Refugee Certificate in Turkey.  (Exh. H (original in evidence at FBI).) This signified that Mr. Ameen's procedure for determining the credibility of his claim for international protection was complete and that he was recognized as a refugee and no longer as a pending asylum-seeker. This document was then presented to the police and the immigration authorities in Mersin, Turkey two days later on September 13, 2012.  (Exh. D MERSIN 6.)  Mr. Ameen then obtained his temporary residency permit on September 26, 2012.  (Exh. I (Kimlik) at OA_000210.)  Documents also indicate that Mr. Ameen's wife and children all registered and received their certificates along with him.[3]

---

[2]      A more complete and legible copy of the file was provided to defense counsel without an apostille and documents from that file are attached as Exhibit E with translations.
[3]      In light of the privacy concerns of Mr. Ameen's wife and children, their documents from the various files are not being attached.  The Government has copies of these documents, which confirm that all members of the family underwent the same process and attended the same interviews, appointments, and orientation as Mr. Ameen.

EXHIBIT 11

6.      Having been recognized as a refugee, Mr. Ameen then became eligible for third-country resettlement. The UNHCR played the role of arranging recognized refugees resettlement placements in third-countries such as the US. This process is also lengthy and involves a number of steps with both the Turkish Government, the UNHCR, and a number of other agencies. I will first discuss the Turkish process, and then the UNHCR process, which ultimately resulted in Mr. Ameen's resettlement to the United States.  It is important to note that Mr. Ameen had continuous, ongoing contact with Turkish Government agencies in connection with his claim.

7.      Importantly, the Turkish refugee system imposed considerable obligations on Mr. Ameen.  In 2014, the Turkish refugee system was administered at the local level by the Foreigner's Police branch of the General Directorate for Security.  The system has changed somewhat since then, and the local level is now administered by the General Directorate for Migration Management, through Provincial Directorates; in this case, the Provincial Directorate for Migration Mersin Office.  This unit provided the documents at Exhibits D and E.  I have reviewed these documents with respect to Mr. Ameen.  English translations of critical documents are attached to Exhibit E.  The documents from Mr. Ameen's immigration file in Mersin, Turkey reflect the obligations he was under as a refugee during 2014.  The UNHCR's process of finding a third-country resettlement placement for recognized refugees was dependent on refugees' compliance with these obligations.

8.      The Turkish Government required Mr. Ameen to abide by a number of strict rules in connection with his refugee status.  Violation of those rules could result in his application for resettlement being considered withdrawn, including the rule to remain in his satellite city.  A list of those rules was signed by Mr. Ameen in Mersin, and is present in the notarized documents provided by the Mersin Immigration Office.  It has been translated for the Court's review.  (Exh. E, MERSIN 23-25)

9.      The Turkish Government required that Mr. Ameen carry out "signature duty" on a weekly basis whereby he would physically need to present himself to authorities and sign his name. This process is outlined and confirmed by a Turkish Government official at Exhibit E MERSIN 1-2. I have reviewed the documents provided by the Provincial Directorate for

Declaration of Zaid Hydari – US v. Ameen

EXHIBIT 11

Migration Mersin and the manner in which they were obtained at Exhibit T. It appears these sheets correspond to Mr. Ameen's signature duty in June 2014. He was also required to register any changes of address with it, and obtain an amendment in his Turkish residency card.  He did so on May 21, 2013, as reflected in his Kimlik at Exhibit I at OA_000211.

10.    Similarly, Mr. Ameen's registration as a refugee allowed him to access various social services, including health insurance (Exh. J) and a 200 Turkish Lira stipend every three months which was deposited directly into an account for his use (Exh. K).

12.    During this entire time, Mr. Ameen's Iraqi passport would have been surrendered by him to the Mersin Foreigner's Police, and would only have been provided to him for onward travel to the United States if he was in compliance with all of his obligations to that office in Mersin, Turkey.  Refugees were not free to travel outside their satellite cities in Turkey at the time without permission from the Foreigner's Police.  Emails received from the ICMC indicate that it needed to request police travel permits for Mr. Ameen's two trips to Istanbul for his USCIS interview and medical appointment/cultural orientation.  (Exh. F, ICMC 2, 21.)  An email obtained from the IOM pursuant to subpoena indicates that the IOM would send "exit permission letters" for approved resettlement to the Director General of Migration Management, to notify that agency of the imminent departure of a refugee.  (Exh. L IOM 4.)

11.    The Provincial Directorate for Migration Management Mersin Office has provided a notarized letter with an apostille indicating that Mr. Ameen stayed compliant with his obligations, including his sign-in obligations at their office.  He was required to provide identification and sign-in with that office every Thursday, and the office has confirmed that he did so.  (Exh. D, MERSIN 2-3; Exh. E, MERSIN 1-2; Translated at Exh. E, MERSIN 3-4.)

11.    Mr. Ameen was referred by the UNHCR to the International Catholic Migration Commission (ICMC) and its Resettlement Support Center (RSC) for the processing of his resettlement to a third country, namely the U.S.. Refugee agencies that interact with the U.S. Department of State use a computer system called WRAPS (which stands for Worldwide Refugee Admissions Processing System) to input information that can be viewed by various agencies.  However, those agencies also keep paper files, and the defense has obtained such files

Declaration of Zaid Hydari – US v. Ameen

EXHIBIT 11

1    from the International Organization on Migration (IOM) and the U.S. Conference of Catholic

2    Bishops (USCCB), which were also involved with various aspects of Mr. Ameen's refugee

3    resettlement processing.  Files from the U.S. State Department and the IOM and the USCCB

4    include information from the WRAPS system, as well as documentation held independently by

5    each of these agencies, including contact logs, documents signed by and/or submitted by Mr.

6    Ameen, and communications between the agencies.  There is some overlap between the various

7    files, because of the coordination of these agencies with the processing of Mr. Ameen's case.

8    The presence of the attached documents in the files where I would expect to see them confirms

9    that they are true and accurate documents generated and/or held by the various agencies in the

10   normal course of processing Mr. Ameen's refugee claim.

11   10.     Mr. Ameen's case was received by the ICMC on November 14, 2013.  (Exh. M. STATE

12   DEPT. 2.)  On February 27, 2014, Mr. Ameen was in Istanbul, Turkey, for an interview at the

13   ICMC office at which he provided information to complete a U.S. Department of Homeland

14   Security I-590 form registering his biographical information and his refugee claim details.  (Exh.

15   M, STATE DEPT. 2-3.)

16   11.     On May 22, 2014, Mr. Ameen went back to the ICMC for an interview by a USCIS

17   refugee officer in connection with his claim.  (Exh. M, STATE DEPT. 4-6.)  The decision was

18   made to approve Mr. Ameen's application (Exh. M, STATE DEPT. 7-8), and a printout of Mr.

19   Ameen's case summary in WRAPS reflects that Mr. Ameen's Classification as a Refugee by the

20   U.S. Government was approved on June 5, 2014.  (Exh. M, STATE DEPT.13.)

21   12.     That same printout from the WRAPS system indicates that an eligibility letter was sent to

22   Mr. Ameen on June 12, 2014.  (Exh. M, STATE DEPT. 13.)  An illegible copy of that letter was

23   provided by the State Department at Exhibit M at page 9.  A copy of the same letter from Mr.

24   Ameen's Department of Homeland Security, United States Citizenship and Immigration Services

25   (USCIS) file, is attached at Exhibit N (OA_000175.)  It is undated, but consistent with the

26   WRAPS system maintained by the Department of State, it was sent to Mr. Ameen in Mersin,

27   Turkey, on June 12, 2014.  Notably, that letter informs Mr. Ameen of his conditional approval,

28   and that "[f]inal approval is conditioned upon successful completion of any remaining clearances

EXHIBIT 11

1    that are required in the screening process." Conditional refugee status in the United States was

2    also approved for Mr. Ameen's wife and three children. The letter notified Mr. Ameen, "Every

3    refugee applicant must complete a medical examination." The letter told Mr. Ameen that he

4    would be contacted by a U.S. Refugee Program participating organization to arrange for the

5    required medical exams. (Exh. N.)

6    13.    I have reviewed the documents provided to the defense from the ICMC regarding Mr.

7    Ameen. The ICMC notified the defense that Mr. Ameen's hard copy file was transferred to the

8    IOM on September 25, 2014, in preparation for his travel. That file is not contained in the IOM

9    records provided by that agency in response to the defense subpoena.

10   14.    ICMC records are attached as Exhibit F. I note that, due to the original file being

11   transferred, most of the ICMC records consist of emails documenting case processing steps

12   engaged in by the ICMC. The file also contains documentation regarding Mr. Ameen's and his

13   family's travel back and forth to Istanbul for required appointments and interviews arranged

14   through the ICMC. With respect to the critical months of June and July 2014, the ICMC

15   documentation shows that USCIS notified ICMC of Mr. Ameen's approval on Wednesday, June

16   11, 2014, with a follow up email about the approval on June 16, 2014. These documents show,

17   consistent with the State Department and USCIS documents, that approval was granted on June

18   5, 2014. (Exh. F, ICMC 23-25, 26.) The next step for the ICMC was scheduling the medical

19   appointments and cultural orientation for the group of refugees who had their applications

20   granted. On June 25, 2014, ICMC confirmed that Mr. Ameen and his family were expected for

21   medical appointments in Istanbul on July 7, to be followed by the cultural orientation through

22   July 10, 2014. (Exh. F, ICMC 1.) The next day, June 26, 2014, the screening and orientation

23   had been scheduled, and the ICMC sent an email to a redacted recipient requesting that the

24   recipient inform Mr. Ameen of the scheduled date and request travel permits. (Exh. F, ICMC 2-

25   3.) The next day, June 27, 2014, an ICMC caseworker sent an email confirming the medical

26   appointment for the Ameen family on July 7, 2014. (Exh. F, ICMC 4.)

27   15.    Based on my work in Turkey from 2011 to 2014 with the processing of refugee claims, I

28   am of the opinion that phone calls would have been made to Mr. Ameen by Arabic-speaking

Declaration of Zaid Hydari – US v. Ameen

EXHIBIT 11

1   caseworkers at the ICMC, the UNHCR, or another agency, after June 5, 2012 to notify him of

2   the conditional approval of his application for resettlement in the United States.  This was the

3   regular course of practice and I heard from many of my own refugee clients at that time that they

4   received such phone calls. This method was also used because the mail service in Turkey was

5   not very reliable in 2014, and Mr. Ameen's approval letter would have had to be sent from

6   Istanbul to Mersin, Turkey where Mr. Ameen was living.  The Department of State document at

7   Exhibit M, page 25, indicates that the only phone number for Mr. Ameen and his family at the

8   time was the Turkish number also reflected in his Turkcell cellphone contract at Exhibit C.[4]  The

9   ICMC records show that Mr. Ameen was contacted on or soon after June 26, 2014, to notify him

10  of the upcoming appointments and need to come to Istanbul.  The name of that person is

11  redacted, and defense counsel has requested more information to verify who was in contact with

12  Mr. Ameen at the time.

13  12.      The ICMC records clearly indicate that on July 5, 2014, Mr. Ameen went to the Mersin

14  Bus Station to purchase five bus tickets for Istanbul that would leave Mersin the next day at

15  18:00.  (Exh. F, ICMC 5-7.)  He provided these tickets to the ICMC for reimbursement, and

16  copies are in the ICMC file.  "Duzenleme Tarihi" on the ticket means date of purchase, which

17  was late on July 5, 2014.

18  13.      Similarly, the ICMC reserved rooms for the Ameen family at a hotel in Istanbul, and that

19  information is in the documents provided by the ICMC.  A date stamp on the left side of those

20  documents indicate that the hotel reservation was made and funds allocated on July 4, 2014 (04-

21  Tem-2014).  (Exh. F, ICMC 8-9.)

22  12.      I note that Mr. Ameen and his family members all attended their medical appointments in

23  connection with their resettlement on July 7, 2014, in Istanbul.  Mr. Ameen's attendance at the

24  appointment is reflected in the official State Department documents attached as Exhibit M at

25  pages 10 through 12, which show that Mr. Ameen was present in Istanbul on that date, and was

26  examined, had a chest X-ray, and gave blood for lab tests.[5]  The ICMC paid for the screening

27

28

_____

[4]      The only other phone number in the WRAPS system is the U.S. cell phone Mr. Ameen obtained after his resettlement in Utah in November 2014.

[5]      These documents were received with redactions from the U.S. Department of State.

1   after Mr. Ameen underwent it.  (Exh. F, ICMC 20.)  Given the short timeline between the

2   approval of the refugee claim on June 5, 2014, and the July 7, 2014 medical tests, there must

3   have been considerable coordination between the ICMC, another agency or person who is

4   redacted in the records, and Mr. Ameen in mid-to-late-June 2014.  The ICMC would not have

5   scheduled the appointments until it had assured itself that the Ameen family was able to travel.

6   Moreover, July 7, 2014, fell during Ramadan that year, a time of year during which it is very

7   challenging to travel in a Muslim country like Turkey.  Staff would have ensured that the Ameen

8   family was able to take their three young children on a long bus ride to Istanbul.  The

9   documentation indicates that all members of the Ameen family appeared for their medical

10  appointments and underwent the required tests.

11  11.     Further, official documents establish that the Ameen family, including Omar Ameen,

12  participated in a cultural orientation through the ICMC on July 8, 9, and 10th, which culminated

13  in the issuance of the attached certificate to Mr. Ameen on July 10, 2014.  (Exh. O.)  I am

14  familiar with these orientations and have had clients participate in them.  They last three full

15  days.  As discussed above, the ICMC arranged and paid for lodging and transportation for the

16  Ameen family for their time in Istanbul for the medical appointments and the cultural

17  orientation.  The certificates that I have reviewed indicate that the Ameen family participated in

18  all three days of this course.

19  13.     The officials with whom Mr. Ameen interacted with respect to his USCIS interview on

20  May 22, 2014, his medical appointment on July 7, 2014, and his cultural orientation on July 8

21  through 10, 2014, would have verified his identity at each stage.  This is to ensure that the same

22  person appears at all required steps of the process: to make an initial refugee claim with

23  UNHCR; to attend an intake/pre-screening interview at ICMC; to appear for the USCIS

24  interview with the Refugee Officer; and to complete the required medical appointment and

25  orientation.  It is critical for the various agencies to verify identity at every stage, because a

26  successful refugee petition will result in the resettlement of the refugee in the receiving country.

27  Accordingly, photographs are repeatedly taken, and identification is checked at those

28  appointments.  Further, Mr. Ameen's photograph is consistent on each document from these

Declaration of Zaid Hydari – US v. Ameen                              EXHIBIT 11

various meetings, and his signature was obtained by various officials during those interactions.

14.     I note that the Refugee Officer who interviewed Mr. Ameen in Istanbul on May 22, 2014 was required to confirm that his appearance was unchanged from his past interview and photograph at ICMC in February 2014.  The Department of Homeland Security's Privacy Impact Assessment of Refugee Case Processing and Security Vetting notes, "Biographic and biometric checks occur at multiple stages throughout the process, including before and after USCIS interview, immediately before a refugee's departure to the United States, and upon arrival in the United States."  DHS/USCIS/PIA-068 (July 21, 2017).

13.     I have reviewed the documents that defense counsel obtained from the IOM, which was responsible for scheduling travel to the United States for Mr. Ameen and his family.  Their documents indicate that Mr. Ameen's family was cleared for referral to the IOM on July 17, 2014.  (Exh. L, IOM 1.)  The Department of State record indicates that an assurance was requested from the USCCB on that date.  (Exh. M, STATE DEPT. 13.)  The ICMC case summary information sheet indicates that the assurance was received on August 5, 2014.  (Exh. M, STATE DEPT. 2.)  Although the ICMC has indicated to defense counsel that it provided its paper file to the IOM, and an email and memo at Exhibit F, ICMC 18-19 confirms this, the IOM did not provide the ICMC file in its possession to defense counsel.

14.     I have also reviewed the documents that defense counsel obtained from the USCCB, which coordinated with the IOM to provide Mr. Ameen and his family a travel loan that they have repaid in installments since they came to the United States.  The USCCB also coordinated various facets of the Ameen family's resettlement in the United States.  A housing case worker from USCCB contacted Mr. Ameen on August 4, 2014, when he was still in Turkey, to discuss housing needs in the United States.  (Exh. P, USCCB 1.)  That same day the USCCB issued the Assurance Form discussed above.  (Exh. P, USCCB 5.)  The note in the log from August 4, 2014, indicates that Mr. Ameen answered the phone when the worker called and requested help with housing in the U.S.  (Exh. P, USCCB 1.)  The caseworker then found housing in Salt Lake City, which was available when Mr. Ameen and his family arrived.  The rest of the contact log shows Mr. Ameen's cooperation with the entire resettlement process.  All of the documentation I

Declaration of Zaid Hydari – US v. Ameen

EXHIBIT 11

have reviewed shows that Mr. Ameen readily answered calls and attended meetings with each agency involved in his case.  In both Turkey and in the United States, he completed all the obligations he owed.

15.     I understand that UNHCR records from Turkey have been subpoenaed by defense counsel.  Because the process moved from the UNHCR, to the ICMC, to the IOM, to the USCCB, and given gaps in the records identified above, I expect that UNHCR records will directly address the time from February 2014 through and after July 7, 2014.  It is clear from the ICMC record that that agency was referring client contact to another agency or person.  The name of the agency or person is redacted in the ICMC records, and I understand that defense counsel has requested additional information.  An email with ICMC regarding Mr. Ameen's May 22, 2014 interview suggests that UNHCR was in charge of contacting applicants and confirming contact with the ICMC.  (Exh. F, ICMC 21.)  The documentation and information from the person or agency that contacted Mr. Ameen would be critical in documenting specific dates and times of that contact in June and July 2014.  Nonetheless, having worked in the refugee process in Turkey in 2014, and having reviewed all of the files discussed herein, it is my expert opinion that members of those organizations must have contacted Mr. Ameen either in person or by phone between June 12, 2014 and July 5, 2014, in order to communicate the approval of his petition to him, to notify him of his upcoming obligations, to arrange a travel permit for him and his family to Istanbul, to discuss the need for him to buy bus tickets for Istanbul on July 6, 2014 for his entire family, and to communicate with him the need to stay in Istanbul through July 10, 2014.  The documentation of those steps by the various agencies demonstrates that such contact necessarily occurred during the critical period of time.  The fact that Mr. Ameen bought bus tickets to Istanbul and attended his required appointments in July 2014, also demonstrates that those contacts occurred.

13.     I note that Mr. Ameen previously applied for refugee status through UNHCR in Syria in Damascus, and that a photocopy of that file from archives was provided to defense counsel from UNHCR.  The UNHCR file includes photocopies of two passports for Mr. Ameen and one passport for his wife.  This file helps document Mr. Ameen's presence in Syria as a refugee from

EXHIBIT 11

1      2006 through 2010.

2      14.     Mr. Ameen went to the UNHCR in Damascus on October 31, 2007, and obtained a

3      registration appointment for March 31, 2008.  (Exh. Q, p. 18.)  The Ameen family attended that

4      appointment and registered with the UNHCR as refugees on March 31, 2008 in Syria.  (Exh. Q,

5      p. 16-17.)  They fled Iraq "because of the unstable security situation only."

6      15.     Mr. Ameen's passports show multiple residency stamps for Syria during that period of

7      time.  His earlier passport, numbered S2942331, which begins at page 19 of Exhibit Q, was

8      issued in Damascus on November 19, 2007, by the Embassy of the Republic of Iraq.  It was valid

9      for four years, until November 18, 2011.  A stamp on the following page by the Iraqi consul

10      indicates it was issued that day to replace a prior passport number 386085 that had been issued in

11      Anbar province on October 30, 2000.  (Exh. Q, UNHCR SYRIA 20.)  Stamps on page 21 of this

12      exhibit show that Mr. Ameen was granted temporary residency in the Damascus area from

13      October 27, 2007 to October 26, 2008 by the Syrian residency department, and that this was

14      stamped into the replacement passport on November 27, 2007.  An entry stamp for Syria on

15      March 5, 2007 was stamped onto the right side of this passport as well.[6]  Unfortunately, the

16      UNHCR file produced to defense counsel does not contain all pages of this earlier passport.

17      16.     Mr. Ameen's more recent passport, issued on May 13, 2008, number G1975150, contains

18      numerous residency and other stamps for Syria during this time.  (Exh. B, OA_000032 et seq.)

19      Mr. Ameen was given Syrian residency March 5, 2007. (Exh. B, OA_000035.)  That date is

20      reflected as the date of entry into Syria on Mr. Ameen's March 31, 2008 UNHCR refugee

21      certificate as well.  (Exh. Q, UNHCR SYRIA 17.)  Syrian residency was granted and extended in

22      April 2009 (Exh. B, OA_00036).

23      17.     The passport of Mr. Ameen's wife, Khansaa Sabri, which is attached as Exhibit R, is

24      more complete and likewise discloses residency stamps for Syria for the Ameen family starting

25      in early 2006 and continuing through 2007, 2008, and 2009.

26      18.     Mr. Ameen's son was born in Syria on January 16, 2008 (Exh. R, KS Passport 0010;

27      Exh. Q, UNCHR Syria 24.)  Because he was born in Syria to Iraqi immigrants, the Iraqi

28

---

[6]      See English translation at Exh. Q, UNHCR SYRIA 27.

Declaration of Zaid Hydari – US v. Ameen

EXHIBIT 11

government issued him an Iraqi birth certificate on February 10, 2008 (Exh. R, KS Passport 0007) and two days later the baby was given a Syrian residency card in Damascus (Id. at p. 10.) On March 31, 2008, Mr. Ameen registered his wife and two children with the UNHCR as refugees as well, noting that his son was born in Syria.  (Exh. Q, UNHCR Syria 17.)  Matching stamps in both Mr. Ameen's and Ms. Sabri's passports continue to show residency in Syria through 2008 and 2009.  (Exh. B; Exh. R.)  Further indicating the family's residency in Syria, Ms. Sabri's passport was renewed at the Iraqi embassy in Damascus, Syria on October 21, 2008. (Exh. R, KS Passport 0005.)  Stamps in both passports indicate occasional trips back to Iraq, usually with an immediate return at the border.

19.      It appears that Ms. Sabri returned to Iraq in May 2009 with two children.  The couple's third child was born in Iraq on May 10, 2009.  (Exh. Q UNHCR 2.)  A month later, Ms. Sabri returned to Syria with the three children.  (Exh. R, KS Passport 0015.)  Mr. Ameen registered his new child with the UNHCR in Syria on July 9, 2009 and renewed the refugee status for his family.  (Exh. Q, UNHCR SYRIA 1-2.)  The stamps in the passports indicate that Mr. Ameen and his family returned to Iraq in early November 2009, and there are no further entries to Syria at that point.  (Exh. B, OA_000038; Exh. R, KS Passport 0010.)

20. The Republic of Iraq is a country that requires numerous forms of identification to be kept updated at all times.  The documents produced by the various refugee agencies show that Mr. Ameen kept his Iraqi identification cards updated, and always used a consistent version of his true name, his correct date of birth, and other identifiers on all documentation, including his application for refugee resettlement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on  14 May 2019                      at   Brooklyn, NY                                      .

_____                   _____
ZAID HYDARI

zaid.hydari@gmail.com · 202-602-7748
167 Devoe St. #2B Brooklyn, NY 11211

**Bar Admissions**- Admitted to the New York State Bar

<u>**EXPERIENCE**</u>

**Refugee Solidarity Network,** New York, NY                                   Aug 2014 - present
*Executive Director*
- Develop strategic plan, lead fund-raising efforts, incl. drafting literature and managing donor relations
- Supervise paid staff, volunteers, interns and oversee the execution of project commitments
- Manage & oversee project in partnership with Istanbul-based association Refugee Rights Turkey, offering free legal services for refugees and training on refugee law for lawyers
- Author policy papers; develop organizational advocacy agenda; represent organization in global advocacy forums

**Helsinki Citizens Assembly - Refugee Program,** Istanbul, Turkey                 Sept 2011 – Aug 2014
*Co-coordinator of Refugee Status Determination (RSD) Unit*
- Continued maintenance of caseload, focusing on challenging cases involving extreme vulnerabilities, exclusion, cancellation
- Oversaw legal team; screened & assigned cases to legal advisers/fellows; held weekly case meeting
- Interviewed and selected fellowship applicants from almost ten different countries; provided training
- Liaised with UNHCR country office and UNHCR headquarters on RSD & Protection issues and policy position and formulation, in part through international legal aid networks
- Drafted requests for interim measures to ECtHR to prevent refoulement
- Designed and delivered know-your-rights workshops for unaccompanied refugee minors, asylum-seekers in satellite cities, as part of US State Department-funded project

*Legal Adviser/James E. Tolan Fellow*                                          Sept 2010 – Sept 2011
- Provided legal assistance to clients navigating parallel government-UNHCR RSD procedure by conducting client interviews, assessing credibility, drafting testimony and legal submissions, and offering detailed counseling, generally at appeals stage
- Co-developed and co-supervised Spring 2011 Fordham Leitner Human Rights Clinic project
- Co-edited position paper presented to UNHCR Ankara on adjudication of religion-based claims

**Refugee Solidarity Network**                                                Feb 2012 – May 2014
*Co-Founder, Chair of Board of Directors*
- Oversaw law student assistance and lead board through incorporation process
- Prepared tax-exemption application, approved Dec 2013; Initiated first fund-raising efforts

**Leitner Center for International Law and Justice**, New York, NY               Sept 2009 – July 2010
*Co-Director of Clinic Project, Dean's Fellow*
- Co-supervised student clinic team in semester-length project that culminated in a legal publication addressing US deportation of refugees
- Oversaw the research and writing process by directing weekly assignments, holding feedback meetings and organizing week-long field work in Cambodia
- Served as primary editor of report released June 2010 and organized launch events for publication, including Congressional visits

**International Commission for Labor Rights**, New York, NY                    Nov 2009 – July 2010
*Staff Attorney*
- Drafted submissions to ILO Committee on Freedom of Association, Inter-American Commission on Human Rights, and NAALC, on government actions against unions
- Co-authored statement to Senate Committee on U.S. domestic implementation of ICCPR obligations

EXHIBIT A

**Outten & Golden LLP**, New York, NY                                        Spring & Fall 2008, Spring 2009
*Law Clerk*
- Researched and drafted legal memoranda pertaining to workplace discrimination and wage & hour disputes

**Walter Leitner International Human Rights Clinic**, New York, NY                    Spring 2009
*Student Intern*
- Conducted international human rights training workshop for prison guards and police in Malawi
- Visited prisons; conducted interviews with prisoners experiencing prolonged pre-trial detention
- Submitted individual petitions to the United Nations Working Group on Arbitrary Detention

**Center for Constitutional Rights**, New York, NY                              Summer 2008
*Ella Baker Fellow*
- Assisted lawyers on government misconduct, corporate accountability, and international human rights cases brought in federal courts using innovative methods

## EDUCATION

**Fordham University School of Law,** New York, NY                            May 2009
*Juris Doctorate*
Honors:        Stein Scholars Program for Public Interest; Dean's List 2007-2008
               Archibald R. Murray Public Service Award – Summa Cum Laude
Activities:    South Asian Law Students Association – Public Relations Coordinator
               Immigration Advocacy Project – Advocated on behalf of V.A.W.A. petitioner

**The University of Texas at Austin**, Austin, TX                              Aug 2005
*Bachelor of Arts in History, Government (Dual Degree)*
Honors:        Dean's Honors List (Overall GPA: 3.83)
Activities:    KVRX 91.7 FM – Conducted weekly program for student-run radio station

## VOLUNTEER EXPERIENCE

- CUNY Citizenship Now!, City-wide call-in, TPS event for Haiti, TPS for Nepal (2010, 2015)
- CLINIC BIA Pro bono Project, Volunteer attorney in removal case of Franco-Gonzalez class member (2015)

## PUBLICATIONS & SPEAKING ENGAGEMENTS

- Speaker, UNHCR/Asylum Access/HIAS, *Strategic Litigation Roundtable* (Geneva, May 2016)
- Author, Huffington Post, *Understanding the EU-Turkey Deal* (April 2016)
- Speaker, Cardozo Journal of Law and Gender Symposium, *Legal Hurdles and Comprehensive Responses to the Global Refugee Crisis: Women Refugees and Unaccompanied Children* (Nov 2015)
- Author, Foreign Policy in Focus, *Turkey Brings Refugees Out of the Shadows* (May 2013)
- Author, Foreign Policy in Focus, *Afghanistan's Forgotten Refugees* (January 2013)
- Speaker, ABA Section of Int'l Law, The Syrian Refugee Crisis: Perspectives from the US, UN, and Civil Society (teleconference, March 2013)
- Speaker, ASTRA, *Migratory Movements and Human Trafficking in the Context of EU Integration from NGO perspective* (Belgrade, March 2013)
- Co-author, Fahamu Refugee Legal Aid Newsletter, *Update: Syrian Refugees in Turkey* (April 2012)
- Primary editor, *Removing Refugees: U.S. Deportation Policy and the Cambodian-American Community* (July 2010)
- Co-author, AllAfrica.com, *Malawi: Insufficient Resources No Excuse for Torture* (July 2009)

## LANGUAGE & AFFILIATIONS

- **Language**: Fluent Urdu-Hindi; basic Turkish; familiar with Modern Standard Arabic, Spanish
- **Member**: American Immigration Lawyers Association (AILA)

EXHIBIT A



21

EXHIBIT B

OA_000032



المحتويات

على جميع المسافرين العراقيين الاتصال بأقرب قنصلية
عراقية أو ممثلية عند وصولهم الى البلد الذي يقصدونه وذلك لتسهيل
مغادرتهم البلد المذكور. كما على جميع المقيمين العراقيين في الخارج
مراجعة قنصليتهم أو ممثليتهم مرة كل ستة أشهر وعند تغيير عناوينهم
في حالة المغادرة.

**NOTE**

ALL IRAQI TRAVELLERS ARE REQUIRED
TO CONTACT THE NEAREST IRAQI CON-
SULATE ON ARRIVAL IN THE COUNTRY
OF DESTINATION IN ORDER TO LEAVE
THEIR NAMES AND ADDRESSES. ALL
IRAQI RESIDENTS ABROAD SHOULD
OBSERVE THIS EVERY SIX MONTHS, IN
CASE OF CHANGE IN ADDRESSES OR
DEPARTURE.

G1975150

جمهورية العراق

**REPUBLIC OF IRAQ**

وزارة الداخلية
MINISTRY OF INTERIOR

مديرية الجوازات
DEPARTMENT OF PASSPORTS

بأسم السيد وزير الخارجية نطلب من السلطات المختصة جميعها
ان تقدم لحامل هذا الجواز كل عون ومساعدة ممكنين عند الحاجة

IN THE NAME OF THE MINISTER OF FOREIGN AFFAIRS
GREETINGS

ALL COMPETENT AUTHORITIES ARE REQUESTED TO ACCORD
BEARER OF THIS PASSPORT PROTECTION AND TO GIVE
HIM/HER ALL POSSIBLE ASSISTANCE IN CASE OF NEED

بأسم السيد رئيس الجمهورية

EXHIBIT B

OA_000033

OA_000034

あ
あ



24

EXHIBIT B

OA_000035



25

EXHIBIT B