1  HEATHER E. WILLIAMS, #122664
   Federal Defender
2  BENJAMIN D. GALLOWAY, #214897
   Chief Assistant Federal Defender
3  RACHELLE BARBOUR, #185395
   Assistant Federal Defender
4  OFFICE OF THE FEDERAL DEFENDER
   801 I Street, 3rd Floor
5  Sacramento, CA  95814
   Tel: 916-498-5700/Fax: 916-498-5710
6
   Attorneys for
7  OMAR AMEEN

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12  IN THE MATTER OF THE          )  Case No.  2:18-mj-152 EFB
    EXTRADITION OF OMAR           )
    ABDULSATTAR AMEEN TO THE      )  DECLARATION OF BELKIS WILLE
13  REPUBLIC OF IRAQ              )
                                  )  Judge: Hon. Edmund F. Brennan
14  _____ )

15

16  I, Belkis Wille, declare as follows:

17  1.      I am the senior Iraq researcher in the Middle East and North Africa division of Human

18  Rights Watch ("HRW").  My job at HRW includes conducting fact-finding investigations into

19  human rights violations in Iraq, including state authorities' abuses of suspected members or

20  supporters of the Islamic State in Iraq and the Levant ("ISIS").  Previously, I was the Yemen,

21  Qatar and Kuwait researcher for HRW for three and a half years and conducted similar fact-

22  finding investigations in those countries.  Before starting work at HRW, I worked at the World

23  Organization Against Torture, carrying out advocacy and trainings on torture prevention in

24  Libya.

25

26  2.      I received my bachelor's degree from Harvard University, my graduate diploma in law

27  from City University London, and my LLM in human rights and humanitarian law from the

28  University of Essex.  A true and correct copy of my resume is attached as Exhibit A to this

1

Declaration of Belkis Wille – US v. Ameen

EXHIBIT 45

1   declaration.

2   3.      HRW is a nonprofit, nongovernmental human rights organization made up of

3   approximately 470 staff members. HRW's staff consists of country experts, lawyers, journalists,

4   and academics. Since its establishment in 1978, HRW has documented human rights violations

5   in countries throughout the world. It publishes its findings in hundreds of reports and briefings

6   each year and meets with governments and institutions around the globe to advance respect for

7   and adherence to international human rights standards.

8   4.      At HRW, I have conducted investigations into human rights violations in Iraq, including

9   state authorities' abuses of suspected members or supporters of the Islamic State in Iraq and the

10  Levant ("ISIS"). My conclusions are informed by: seventeen fact-finding missions to Iraq from

11  December 2015 through April 2019; direct observations of judicial proceedings and detention

12  conditions in Iraq; visits to police stations and other law enforcement sites across the country;

13

14  interviews with dozens of senior government and law enforcement officials from the

15  Government of Iraq and the Kurdistan Regional Government, the official ruling body of the

16  predominantly Kurdish region of Northern Iraq; interviews with dozens of former detainees and

17  others who report suffering abuse or torture in Iraq; meetings and ongoing communications with

18  representatives of embassies and consulates in Erbil and Baghdad, the United Nations Assistance

19  Mission in Iraq (UNAMI) and a range of other UN agencies, a broad range of humanitarian

20

21  actors that are active in Iraq; and the review of reports of governmental, inter-governmental, and

22  non-governmental organizations ("NGO").

23  5.      I do not have any personal knowledge of the facts surrounding the United States'

24  detention of Omar Ameen or the extradition packet submitted by the Republic of Iraq. I submit

25  this Declaration to describe how the Iraqi authorities generally treats suspected members or

26  supporters of ISIS, including family members of ISIS suspects.

27  6.      Under Iraq's federal system, the Iraqi and Kurdistan governments are each responsible

28  for the administration of criminal justice within their respective territory.  I understand that this

2

EXHIBIT 45

1    matter concerns a case within the Iraqi system.  The Iraqi government contains specialized

2    criminal courts or chambers that handle counterterrorism cases under its counterterrorism law,

3    including cases involving suspected ISIS fighters and affiliates ("ISIS suspects").

4    7.    The Iraqi and Kurdistan government forces, supported by the United States and other

5    countries, have fought since 2014 to defeat ISIS in a military campaign to retake areas controlled

6    by ISIS in Iraq. During the course of this campaign, the Iraqi and Kurdistan forces have detained

7    thousands of ISIS suspects, most if not all of whom are charged only with membership in ISIS

8    and with no other offense.

9    8.    HRW has documented serious problems with and flaws in the current screening,

10   detention, treatment, and prosecution of ISIS suspects.  The quality of the incriminating

11   information and the opacity of the process used to identify individuals as ISIS-related can result

12   in the misidentification and detention of individuals who have no ties to ISIS and who are fleeing

13   the conflict in ISIS-held territory. It can also result in the detention of individuals who

14   unwillingly joined ISIS under threats of violence and death or who carried out civilian activities

15   supported by ISIS, including providing medical assistance. Iraqi and Kurdistan government

16   forces have detained individuals with little real evidence or grounds, in some cases relying only

17   on their identification as ISIS members by community members and without any additional

18   evidence being presented. Human Rights Watch researchers received numerous allegations from

19   families of detained ISIS suspects that neighbors or other individuals had proposed the addition

20   of individuals to one of the "wanted lists" simply because of tribal, familial, land, or personal

21   disputes.

22   9.    As a result, wrongfully accused individuals may spend prolonged periods in mass

23   arbitrary detention in overcrowded, inhuman, and dangerous conditions of confinement that

24   violate basic international standards and that have led to deaths in custody. HRW has

25   documented at least four prisoners' deaths in cases that appear to be linked to lack of proper

26   medical care and poor conditions, and two prisoners' legs have been amputated, apparently

27   because of lack of treatment for treatable wounds.

28   10.   Authorities for the Iraqi government have systematically violated the due process rights

EXHIBIT 45

1   of ISIS suspects, including by denying them prompt access to a judge, access to a lawyer during

2   interrogations, and any opportunity to contact or communicate with their families.  Iraqi security

3   forces frequently engage in torture during interrogations of ISIS suspects to extract confessions.

4   Iraqi judges often do not intervene to prevent the use of torture or other coercive interrogation

5   methods and they routinely allow the use of evidence obtained through those methods to secure

6   convictions. In cases I have witnessed in court, Iraqi judges have not even ordered a medical

7   examination for detainees who have alleged torture.  These findings are supported by the U.S.

8   Department of State's Iraq 2018 Human Rights Report, attached at Exhibit B; Amnesty

9   International's 2017/2018 Report on Human Rights, with the pages regarding Iraq attached at

10   Exhibit C; and the U.N. Assistance Mission for Iraq (UNAMI) Report on Human Rights in Iraq,

11   attached at Exhibit D.[1]  The State Department notes in its report that "as in previous years, there

12   were credible reports that government forces, including Federal Police, National Security Service

13   ("NSS"), PMF, and Asayish, abused and tortured individuals. . . during arrest, pretrial detention,

14   and after conviction."  (Exh. B, at p. 6.)

15   11.    I have documented incidents of widespread torture and ill-treatment of detainees through

16   beatings, hangings, stress positions for extended periods of time, and holding detainees in

17   overcrowded and degrading conditions sometimes leading to deaths in detention.[2]  In my

18   _____

19   [1]    U.S. Department of State's Iraq 2018 Human Rights Report, available at ; Amnesty
20   International's 2017/2018 Report on Human Rights, available at
     https://www.amnesty.org/download/Documents/POL1067002018ENGLISH.PDF; U.N.
21   Assistance Mission for Iraq (UNAMI) Report on Human Rights in Iraq, available at
     https://www.refworld.org/docid/5a746d804.html.
22   [2]    See HRW, *Iraq: Displacement, Detention of Suspected "ISIS Families"* (Mar. 5, 2017)
23   available at https://www.hrw.org/news/2017/03/05/iraq-displacement-detention-suspected-isis-
     families; Exhibit C (Amnesty Report) at 203 (discussing routine torture while in detention);
24   HRW, *Iraq: Intelligence Agency Admits Holding Hundreds Despite Denials* ( Jul. 22, 2018),
     available at https://www.hrw.org/news/2018/07/22/iraq-intelligence-agency-admits-holding-
25   hundreds-despite-previous-denials (discussing overcrowding, and months of torture resulting in
     one prisoners death); HRW, *Flawed Prosecution of ISIS Suspects Undermines Justice for*
26   *Victims* (Dec. 5, 2017), available at https://www.hrw.org/news/2017/12/05/iraq-flawed-
     prosecution-isis-suspects (discussing overcrowding, inhumane conditions, and torture); HRW,
27   *Iraq: Investigate Abuses In Hawija Operation* (Sep. 28, 2017), available at
     https://www.hrw.org/news/2017/09/28/iraq-investigate-abuses-hawija-operation (discussing
28   PMF detention and torture); HRW, *Iraq: New Abuse, Execution Reports of Men Fleeing Mosul*,
     (June 30, 2017), available at  https://www.hrw.org/news/2017/06/30/iraq-new-abuse-execution-

Declaration of Belkis Wille – US v. Ameen

EXHIBIT 45

1    experience, torture is an integral part of the interrogation system with judges routinely ignoring

2    claims by defendants that they were tortured and in some instances even encouraging the abuse.[3]

3    In recent months, one court, in Mosul, Nineveh governorate in northern Iraq, has implemented

4    some changes, including imposing a higher evidentiary standard to only issue an arrest warrant

5    based on evidence in ISIS documents, or on detailed and credible allegations from witnesses.

6    However, there is no indication that these standards are being used consistently in proceedings in

7    other Iraqi courts.[4]

8    12.    There is a wide pattern of arbitrary arrests in Iraq.  Thousands of men and boys have been

9    arrested and held in the context of the military operations against ISIS, including the operation to

10   retake Fallujah from May to June 2016, leaving at least 643 men missing from Saqlawiya and 70

11   from Karma, and Mosul from September 2016 to July 2017. In a December 2017 report, Flawed

12   Justice: Accountability for ISIS Crimes in Iraq, Human Rights Watch documented the authorities

13   in Mosul holding at least 7,374 individuals on charges of affiliation with ISIS, largely without

14   notifying their families, many of whom tried to obtain information about them, and without

15   letting them communicate with their families, amounting to wide-scale enforced disappearances.[5]

16   Researchers estimated that the detention numbers were far greater, a concern supported by an

17   Associated Press article published on March 21, 2018, based on its review of leaked ministry of

18   interior documents on the prison system and other government sources.

19   13.    Being a family member of an ISIS suspect, puts one at risk of arrest and detention.

20   _____

21   reports-men-fleeing-mosul (discussing witnesses accounts of detention and murder at counter
22   terrorism checkpoint); HRW, *Iraq: Scores of Men Imprisoned in Schoolhouse* (May 22, 2017),
     available at https://www.hrw.org/news/2017/05/22/iraq-scores-men-imprisoned-schoolhouse
23   (discussing detainee's stories of torture and terror); HRW, *Iraq: Hundreds Detained in*
     *Degrading Conditions* (Mar. 13, 2017), available at https://www.hrw.org/news/2017/03/13/iraq-
24   hundreds-detained-degrading-conditions (discussing 4 deaths and 2 amputated legs as a result of
     poor conditions and apparent failure to treat wounds).
25
     [3]    HRW, *Iraq: Judges Disregard Torture Allegations* (July 31, 2018),
26   https://www.hrw.org/news/2018/07/31/iraq-judges-disregard-torture-allegations.

27   [4]    HRW, *Iraq: Key Courts Improve ISIS Trial Procedures* (March 13, 2019)("with time the
     court has become much more sensitive to individuals using ISIS allegations as a form of personal
28   revenge"), https://www.hrw.org/news/2019/03/13/iraq-key-courts-improve-isis-trial-procedures.
     [5]    HRW, *Flawed Justice: Accountability for ISIS Crimes in Iraq* (Dec. 5, 2017),
     https://www.hrw.org/report/2017/12/05/flawed-justice/accountability-isis-crimes-iraq.

Declaration of Belkis Wille – US v. Ameen

EXHIBIT 45

1   Since December 2015, I have visited more than a dozen camps used to hold families of ISIS
2   suspects against their will. Since the fall of ISIS, many families with perceived ISIS affiliation
3   have been told by their communities, tribal leaders, government offices, and even Iraq's army
4   that they are not welcome to return home, and these camps are being used to enforce such
5   policies. Iraqi federal authorities, security personnel, and local leaders have routinely placed
6   severe restrictions on family members of suspected ISIS members, particularly their right to
7   freedom of movement, holding them against their will in camps for long periods. Accordingly,
8   these camps, which were originally set up for humanitarian purposes, have become de facto
9   prisons for these families. Simply being a family member of an ISIS suspect, or someone
10  convicted of being involved with ISIS, brings government suspicion and risks ensnaring the
11  family member in the system of arrest, detention, torture, conviction, and punishment.

12  14.     In early 2019, Iraq's Implementation and Follow Up National Reconciliation Committee
13  proposed that the Iraqi government confine all spouses, children, siblings, and parents of alleged
14  ISIS members, whether the member is dead, disappeared, or in detention.[6] It is estimated by the
15  Iraqi Interior Ministry that the plan could affect up to 250,000 people.

16  15.     Security officers have told me that when ISIS began taking territory, many Iraqi families
17  fled those areas, and when they first came into contact with Iraqi or Kurdistan Regional
18  Government security, military and intelligence officials, gave them names of neighbours who
19  they accused of taking up arms with ISIS. These names went on wanted lists held by the
20  authorities. These parts of the security apparatus are detaining, holding and interrogating
21  persons whose names are on wanted lists – in some cases without much coordination between
22  agencies. This can lead to several possible re-arrests of people already cleared by one agency for
23  release. Iraqi authorities have been using these lists to hold people, including in unofficial places
24  of detention, and prosecute them, sometimes based on confessions extracted through torture.

25  16.     Lawyers, as well as judges, to whom Human Rights Watch has spoken across Iraq, say
26  these lists create inherent problems because of the prevalence of common names - for example, a

27
28

---

[6]     HRW, *Iraq: Confining Families with Alleged ISIS Ties Unlawful* (May 7, 2019) available
at https://www.hrw.org/news/2019/05/07/iraq-confining-families-alleged-isis-ties-unlawful.

Declaration of Belkis Wille – US v. Ameen

6

EXHIBIT 45

1   name like Muhammad Ahmed. If such a name is flagged, it can lead to anyone in Iraq with that

2   name getting arrested, sometimes multiple times.  "Same name" cases have swollen prison and

3   court numbers, according to senior judges in courts in Nineveh and Baghdad. Staff at several

4   local companies and organisations have told me about recent internal disputes, where an

5   employee has threatened to add a fellow employee to one of these wanted lists as a way of taking

6   out revenge because of a work dispute.

7   17.    The families of people - most of them men or boys - on the wanted lists, whether rightly

8   or wrongly identified as ISIS affiliated, routinely are denied security clearance (an administrative

9   measure that governs all engagements and services between citizen and state in Iraq), particularly

10  if they are unwilling to pay bribes to officials. Some are threatened with arrest, sometimes to lure

11  in a relative on the list who is not yet in custody.  A senior judge I interviewed in Mosul and a

12  lawyer working at an international organisation told me that the Interior Ministry had issued an

13  order stating that in order for these families to obtain security clearance, they must appear in

14  court to provide information about their suspected relative's whereabouts and activities and

15  "denounce" them - both of them saw this order.

16  18.    I have conducted many interviews with former detainees in Iraq, arrested by a range of

17  security, military and intelligence actors including the National Security Service and the Popular

18  Mobilization Forces (forces under the command of the prime minister also known as the PMF).

19  I detailed these interviews and findings in a Human Rights Watch report issued in September

20  2018.[7]  My research disclosed the following abusive practices in the work of the National

21  Security Service and other Iraqi law enforcement authorities: arbitrary arrests, enforced

22  disappearances, torture and other forms of ill-treatment, detention in unofficial places of

23  detention, threats made to extract information including a confession, and demands for bribes in

24  connection with release of detainees.  Specifically, I documented twelve enforced disappearances

25  by the NSS.  My research indicates that in the context of counterterrorism operations since 2014,

26

27

---

28  [7]    September 2018: "Life Without a Father is Meaningless" Arbitrary Arrests and Enforced
    Disappearances in Iraq 2014-2017 available at
    https://www.hrw.org/sites/default/files/report_pdf/iraq0918.pdf.

Declaration of Belkis Wille – US v. Ameen

EXHIBIT 45

1  most of the persons enforcedly disappeared have been Sunni males, suspected for ISIS affiliation

2  in some cases simply because of family or tribal name or area of origin.  I have interviewed

3  many families from Anbar Province who had loved ones who had been disappeared.  All of the

4  families of detainees who I spoke with in Iraq were so scared of retaliation by the security forces

5  that they refused to speak unless promised with anonymity.

6  19.     Anyone tried under Iraqi and Kurdistan government counterterrorism laws, which is what

7  a suspected ISIS fighter would necessarily be tried under, automatically faces the death penalty,

8  although the Kurdistan regional government has a partial moratorium on the death penalty in

9  place.  Persons suspected of ISIS affiliation in Iraq are subject to a system in which they can be

10  tried, convicted, and sentenced, possibly to death, in a proceeding that violates internationally

11  recognized fair trial standards.  There is a real likelihood that such a person would be subjected

12  to torture or other abuse during their detention and that statements coerced through those

13  methods would be used to convict them or target others.

14

15  I declare under penalty of perjury under the laws of the United States of America that the

16  foregoing is true and correct to the best of my knowledge and belief.

17

18  Executed on May 9, 2019 at 6 pm in London, UK.

19

20

21  BELKIS WILLE

22

23

24

25

26

27

28

Declaration of Belkis Wille – US v. Ameen

**EXHIBIT 45**

## Contact

www.linkedin.com/in/belkis-wille-2aa9bb5b (LinkedIn)

## Top Skills

Litigation

Legal Research

Legal Writing

# Belkis Wille

Senior Iraq Researcher at Human Rights Watch

Iraq

## Experience

**Human Rights Watch**
senior Iraq & Qatar Researcher
June 2016 - Present

**Human Rights Watch**
Yemen & Kuwait Researcher
January 2013 - Present

**The World Organization Against Torture (OMCT)**
Human Rights Officer (Middle East & North Africa)
February 2012 - December 2012 (11 months)

———

## Education

**Harvard University**
Bachelor of Arts (BA), Government · (2004 - 2008)

**City University London**
Graduate Diploma in Law, Law · (2009 - 2010)

**University of Essex**
Master of Laws (LLM), Human Rights and Humanitarian Law · (2010 - 2011)

EXHIBIT A

# IRAQ 2018 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Iraq is a constitutional parliamentary republic.  The 2018 parliamentary elections, while imperfect, generally met international standards of free and fair elections and led to the peaceful transition of power from Prime Minister Haider al-Abadi to Adil Abd al-Mahdi.

Civilian authorities did not maintain effective control over some elements of the security forces, particularly certain units of the Popular Mobilization Forces (PMF) that were aligned with Iran.

Violence continued throughout the year, largely fueled by the actions of ISIS.  The government declared victory over ISIS in December 2017 after drastically reducing the group's ability to commit abuses and atrocities, but members of the group continued to carry out deadly attacks and kidnappings.  The government's reassertion of federal authority in disputed areas bordering the Iraqi Kurdistan Region (IKR), after the Kurdistan Region's September 2017 independence referendum, resulted in reports of abuses and atrocities by the security forces, including those affiliated with the PMF.

Human rights issues included reports of unlawful or arbitrary killings by some members of the Iraq Security Forces (ISF), particularly Iran-aligned elements of the PMF; forced disappearances; torture; arbitrary detention; harsh and life-threatening prison and detention center conditions; arbitrary or unlawful interference with privacy; restrictions on free expression, the press, and the internet, including censorship, site blocking, and criminal libel; legal restrictions on freedom of movement of women; widespread official corruption; unlawful recruitment or use of child soldiers by Iran-aligned elements of the PMF that operate outside government control; trafficking in persons; criminalization of lesbian, gay, bisexual, transgender, and intersex (LGBTI) status or conduct; violence targeting LGBTI persons; threats of violence against internally displaced persons (IDPs) and returnee populations perceived to have been affiliated with ISIS; and restrictions on worker rights, including restrictions on formation of independent unions and reports of child labor.

The government, including the Office of the Prime Minister, investigated allegations of abuses and atrocities perpetrated by the ISF, but it rarely made the results of the investigations public or punished those responsible for human rights

EXHIBIT B

abuses.  The Kurdistan Regional Government (KRG) High Committee to Evaluate and Respond to International Reports reviewed charges of Peshmerga abuses, largely against IDPs, and exculpated them in public reports and commentaries, but human rights organizations questioned the credibility of those investigations. Impunity effectively existed for government officials and security force personnel, including the ISF, Federal Police, PMF, Peshmerga, and KRG Asayish internal security services.

ISIS continued to commit serious abuses and atrocities, including killings through suicide bombings and improvised explosive devices (IEDs).  The government continued investigating and prosecuting allegations of ISIS abuses and atrocities and, in some instances, publicly noted the conviction of suspected ISIS members under the 2005 counterterrorism law.

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

**a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings**

There were numerous reports that some government forces, including the PMF and Asayish, committed arbitrary or unlawful killings, as did ISIS and other terrorist groups (see section 1.g.).  During the year the security situation remained unstable in some areas, due to:  regular raids and attacks by ISIS and their affiliated cells, particularly in remote areas; sporadic fighting between the ISF and ISIS holdouts in remote areas; the presence of militias not fully under the control of the government, including certain PMF units, in many liberated areas; and sectarian, ethnic, and financially motivated violence.  From January 1 to August 31, the UN Assistance Mission for Iraq (UNAMI) reported more than 700 civilians killed in the country.

Government security forces reportedly committed extrajudicial killings.  The government rarely made public its identification and prosecution of specific perpetrators of abuses and atrocities.  Human rights organizations reported that both Ministry of Interior and Ministry of Defense personnel tortured detainees to death.  For example, Human Rights Watch (HRW) reported in August that at least three individuals died from torture in the Mosul police station and Faisaliya Prison in east Mosul.  The August report details the experiences of "Mahmoud," who reportedly was detained and tortured at Faisaliya Prison from January to May and who recounted the death of a cousin of another detainee named "Ammar." "Mahmoud" reportedly heard screams as prison officers beat "Ammar's" cousin

EXHIBIT B

unconscious on two consecutive nights.  After the second night, "Mahmoud" recounted taking off the man's clothes to care for him, finding he had two big bruises to his waist on either side, green bruises on his arms, and a long red burn down the length of his penis.

Security forces fired upon and beat demonstrators protesting unemployment and poor public services related to water and electricity in Basrah Governorate and elsewhere in southern Iraq between July and September.  HRW reported that the security forces, largely from the Ministry of Interior, used excessive and unnecessary lethal force in controlling protests that at times turned violent. Nongovernmental organizations (NGOs) and media reported at least eight deaths related to the protests in July.  On September 5, at least seven died in clashes with security forces during protests in Basrah.  Some demonstrators also turned to violence and set fire to government buildings, the Iranian Consulate, and the offices of pro-Iran militias and political parties.  Local and international human rights organizations accused ISF, including Asaib Ahl al-Haq (AAH) PMF units, of using excessive force, including live ammunition, against the protesters and called for the government to conduct an investigation into the deaths and violence during the protests.

In response to the protests, Prime Minister Abadi dismissed the head of Basrah's military operations.  As of October, the government had not reported any progress in investigating the killing of the protesters.

In 2017 the Office of the Prime Minister announced the establishment of a committee to investigate allegations of ISF abuse during the operation to retake Mosul from ISIS.  It stated the government had arrested, and planned to prosecute, several ISF officers.  HRW reported in April that the government disposed of evidence of a potential war crime committed against members of ISIS, removing an estimated 80 bodies from a damaged house in Mosul and burning the house. HRW added that at least one of the bodies appeared to have its legs bound, that there was no indication that the government was collecting evidence, and that government officials refused to tell its researchers where they were taking the bodies.  As of October the government had not published specific information on judicial proceedings against any members of the security forces.

Human rights organizations reported that Iran-aligned PMF militia groups engaged in killing, kidnapping, and extortion throughout the country, particularly in ethnically and religiously mixed governorates.  Media reported that in April members of the Peace Brigades PMF militia and Federal Police killed Brigadier

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

General Shareef Ismaeel al-Murshidi, a brigade commander whose forces were tasked with protecting the prime minister and Baghdad's Green Zone, as well as two of his guards at a PMF checkpoint in Samarra, Salah al-Din Governorate. Media reported in August that members of the Banu al-Khazraj tribe in Dujail, Salah al-Din Governorate, alleged that AAH kidnapped and killed three tribal sheikhs in August the week after clashes between the two groups.

Civil society activists said Iran-aligned militias, specifically AAH, were also responsible for several attacks against prominent women.  Human rights organizations reported that militia groups and their supporters posted threats on social media against specific female activists participating in protests in Basrah in September, and on September 25, activist Suad al-Ali was shot and killed in Basrah.  Human rights activists stated they believed AAH was responsible, although police were also investigating the woman's former husband.  On September 27, armed gunmen shot and killed Iraqi social media star and model Tara Fares in Baghdad.  Civil society groups said they believed an Iran-aligned militia, most likely AAH, killed Fares as well as the owners of three beauty centers in August and October (see section 6, Women).

Terrorist violence continued throughout the year, including ISIS attacks (see section 1.g.).

Unlawful killings by unidentified gunmen and politically motivated violence frequently occurred throughout the country.  For example, in May police reported two unknown masked gunmen killed three people in a drive-by shooting in Basrah, and unidentified attackers shot and killed the mayor of Hammam al-Alil, near Mosul, as he left his home.

Ethnic and sectarian-based fighting continued in mixed governorates, although at lower rates than in 2017.  While minority advocacy groups reported threats and attacks targeting their communities, it was difficult to categorize many incidents as based solely on ethnic or religious identity because religion, politics, and ethnicity were often closely linked.

On July 23, three gunmen, whom KRG authorities said had links to a terrorist group, forcibly entered a government building in central Erbil and killed a Christian employee.  Authorities stated they believed the attackers, whom police eventually killed, targeted the victim because of his religion.

EXHIBIT B

## b. Disappearance

There were frequent reports of enforced disappearances by or on behalf of government forces, including ISF, Federal Police, PMF, Peshmerga, and Asayish, as well as by nongovernment militias and criminal groups.  ISIS, however, was responsible for most attributable disappearances.  The International Commission on Missing Persons estimated 250,000 to a million persons remained missing from decades of conflict and human rights abuses.

Many suspected members of ISIS and individuals close to them were among those subject to forced disappearance.  In April Amnesty International alleged that government forces (both central government and KRG) were responsible for the forced disappearance of thousands of men and boys since 2014.  Amnesty reported that, in and around Mosul, the majority of arbitrary arrests and enforced disappearances originated at screening sites near battle front lines overseen by government forces, including the ISF, PMF, and Peshmerga, and lacked safeguards and due process.  A September HRW report documented 74 specific cases of men and four additional cases of boys reportedly forcibly disappeared by government forces between April 2014 and October 2017.  HRW attributed responsibility for 28 disappearances to the Iran-aligned terrorist PMF group Kata'ib Hezbollah (KH), 14 to the "Prime Minister's Special Forces," and 12 to the National Security Service (NSS).

In its September report, HRW detailed a case in which a man from al-Qaim said his sons' wives told him that KH detained his sons at al-Razzazza checkpoint in Karbala Governorate in 2016 as they were traveling with their families to Baghdad.  The man said KH released the women but provided no reason for detaining the two men, who remained missing.

Individuals, militias, and organized criminal groups carried out abductions and kidnappings for personal gain or for political or sectarian reasons.  Media reported that on June 8, unknown gunmen reportedly abducted a retired army officer who was working in the market in Mahaweel, Babil Governorate.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit such practices, neither defines the types of conduct that constitute torture, and the law gives judges full discretion to determine whether a defendant's confession is admissible.  There were numerous

EXHIBIT B

reports that government officials employed torture and other cruel, inhuman, or degrading treatment or punishment, and that courts routinely accepted forced confessions as evidence, which was often the only evidence in ISIS-related counterterrorism cases.

As in previous years, there were credible reports that government forces, including Federal Police, NSS, PMF, and Asayish, abused and tortured individuals--particularly Sunni Arabs--during arrest, pretrial detention, and after conviction. Former prisoners, detainees, and international human rights organizations documented cases of torture and other cruel, inhuman, or degrading treatment or punishment in Ministry of Interior-run facilities and to a lesser extent in Ministry of Defense-run detention facilities, as well as in facilities under KRG control.

In an August report, HRW documented details of torture and other cruel, inhuman, or degrading treatment or punishment of detainees in custody in facilities run by the Ministry of Interior in the Mosul area.  These included the Mosul police office and the Intelligence and Counter-Terrorism Office's Faisaliya Prison in east Mosul as well as Qayyarah Prison, which reportedly consisted of a group of three abandoned and dilapidated houses south of Mosul.  According to HRW, one interviewee reportedly witnessed or experienced repeated torture during interrogations at Faisaliya Prison from January to May, including:  hanging from the hands bound behind the back; beatings with plastic and metal pipes and cables, including on the soles of the feet; burning of the penis and testicles with a hot metal ruler; hanging by a hook and tying a one-quart water bottle to the penis; and kneeling with the hands tied together behind the back.  The May report also cited a man who reportedly saw other men returning from interrogations with physical signs of abuse during his year in detention at Qayyarah and Faisaliya Prisons. HRW stated the government's failure to investigate the reports properly led to a culture of impunity among security forces.  In September the government reported it had started an investigation committee to look into the accusations.

Denial of access to medical treatment was also a problem.  Local human rights organizations reported that government forces in Basrah Governorate prevented hospitals from treating people injured in protests against the government in September.

In May a video circulated among local human rights civil society organizations (CSOs) in which Rayan al-Kildani, leader of the Iran-aligned Babylon Brigade PMF group, cut off the ear of a handcuffed detainee.

EXHIBIT B

Instances of abusive interrogation also reportedly occurred in some detention facilities of the KRG's Asayish internal security unit and the intelligence services of the major political parties--the Kurdistan Democratic Party's (KDP) Parastin, and the Patriotic Union of Kurdistan's (PUK) Zanyari.  According to local and international human rights organizations, mistreatment of prisoners and detainees in the KRG typically occurred before their arrival at official detention facilities.

The Independent Human Rights Commission of the Kurdistan Region (IHRCKR) reported in September that the KRG held 56 boys in an Erbil juvenile detention facility on ISIS-related accusations, of whom 42 were convicted of crimes and 14 were still awaiting trial.  Most of the boys alleged both PMF and KRG security forces subjected them to various forms of abuse, including beatings.  In August, HRW reported that virtually all of the abuse alleged by these boys occurred between their arrest and their arrival at long-term detention facilities, rather than at the detention facilities themselves.

## Prison and Detention Center Conditions

Prison and detention center conditions were harsh and life threatening due to food shortages, gross overcrowding, physical abuse, and inadequate sanitary conditions and medical care.

Physical Conditions:  Overcrowding in government-run prisons was a systemic problem exacerbated by an increase in the number of alleged ISIS members detained during the year.  In addition three of the 24 correctional facilities managed by the Iraqi Corrections Service, the government entity with legal authority to hold persons after conviction, were not operational due to the security situation.

Al-Nasiriyah Central Prison, also known as al-Hoot Prison, in Dhi Qar Governorate, was designed to hold 2,400 prisoners, but Iraq High Commission for Human Rights (IHCHR) observers reported in July that the prison held approximately 9,000 prisoners.

Overcrowding exacerbated corruption among some police officers and prison administrators, who reportedly took bribes to reduce or drop charges, cut sentences, or release prisoners early.

Authorities separated detainees from convicts in most cases.  Prisoners facing terrorism charges were isolated from the general detainee population and were

EXHIBIT B

more likely to remain in Ministry of Interior or Ministry of Defense detention for longer periods.

Although the government held most juvenile pretrial detainees and convicts in facilities operated by the Ministry of Labor and Social Affairs, there were reports that Ministry of Justice-administered prisons, Ministry of Interior police stations, and other Ministry of Interior detention facilities held some juveniles in separate facilities or mixed with adult prisoners.

The Ministry of Justice reported there were no accommodations for inmates with disabilities, and a previously announced ministry initiative to establish facilities for such detainees was not fully implemented as of August.

Inmates in government-run prisons and detention centers often lacked adequate food, potable water, sanitation, ventilation, lighting, and medical care.  Some detention facilities did not have an onsite pharmacy or infirmary, and authorities reported that even when they existed, pharmacies were often undersupplied and government officers reportedly withheld medication or medical care from prisoners and detainees.  Women's prisons often lacked adequate child-care facilities for inmates' children, whom the law permits to remain with their mothers until age four.  Limited and aging infrastructure worsened sanitation, limited access to potable water, and led to preparation of poor-quality food in many prison facilities. Authorities reportedly kept prisoners confined in their cells for long periods without an opportunity for exercise or use of showers or sanitary facilities.

HRW reported in July that NSS admitted detaining more than 400 individuals (many unlawfully) in a secret detention facility in east Mosul.  The facility was a two-story house next to the NSS office in al-Shurta neighborhood.  There appeared to be no legal mandate for this facility, and its existence previously was denied. After being detained there in April, Faisel Jeber told HRW that he was one of almost 80 detainees in a room 13 feet by 16 and a half feet with one window and a small ventilator.  According to Jeber, half the prisoners were standing and the other half sitting because there was not enough room for everyone to sit at the same time.  Jeber said that on his first night, someone died from torture and another had an epileptic seizure but received no medical attention.  Some bribed guards to communicate with their families indirectly, but reportedly no one was allowed a family visit even after two years in detention.  HRW reported conditions in al-Shurta were similar to facilities in Qayyarah and Hammam al-Alil, facilities HRW visited in 2017.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

According to UNAMI the KRG's newer detention facilities in major cities were well maintained, although conditions remained poor in many smaller detention centers operated by the KRG Ministry of Interior. In some KRG Asayish detention centers and police-run jails, KRG authorities occasionally held juveniles in the same cells as adults. An IHRCKR report stated that authorities housed more than 40 minors, with ages ranging from six months to 12 years, in Erbil prisons with their convicted mothers, as of November. UNICEF funded a separate annex to the prison for these minors, but they continued to lack access to education. After reports of poor quality food in prisons, the mayor of Erbil replaced the companies contracted to provide food services in Erbil prisons and ensured new contracts included strict quality standards.

Administration: The central government reported it took steps to address allegations of mistreatment in central government facilities, but the extent of these steps was not known. Several human rights organizations stated that the country's judges frequently failed to investigate credible allegations that security forces tortured terrorism suspects and often convicted defendants based (often solely) on allegedly coerced confessions.

Prison and detention center authorities reportedly sometimes delayed the release of exonerated detainees or inmates due to lack of prisoner registration or other bureaucratic issues, or they extorted bribes from prisoners for release at the end of their sentence. International and local human rights groups reported that authorities in numerous instances denied family visits to detainees and convicts. Guards allegedly often demanded bribes or beat detainees when detainees asked to call their relatives or legal counsel. A Ninewa Governorate official said PMF released arrestees and detainees suspected of having ISIS ties after they paid bribes.

The KRG had no uniform policy for addressing allegations of abuse by KRG Ministry of Interior officers or the Asayish. In a March report on prison conditions across the IKR, the IHRCKR stated some prisons failed to maintain basic standards and to safeguard the human rights of prisoners. The report emphasized the need for new buildings and for laws to protect the rights and safety of inmates, such as separating drug dealers and drug users. In May, seven inmates were killed and 18 injured in a fire set during a riot inside Zarka Prison in Duhok Governorate.

Independent Monitoring: Iraqi Corrections Service prisons allowed regular visits by independent nongovernmental observers. The International Committee of the Red Cross (ICRC) reported the Ministries of Justice, Interior, Defense, and Labor

EXHIBIT B

and Social Affairs largely permitted them access to prisons and detention facilities. Authorities also granted UNAMI access to Ministry of Justice prisons and detention facilities in Baghdad.  There were reports of some institutional interference in prison visits, and in some cases institutions required advance notification to wardens and prison officials for outside monitor visits.  The government denied the existence of some secret detention centers but admitted the existence of an NSS detention center in al-Shurta, east Mosul, despite previous denials, and permitted monitoring of a replacement facility.

The KRG generally allowed international human rights NGOs and intergovernmental organizations to visit convicted prisoners and pretrial detainees, but occasionally authorities delayed or denied access to some individuals, usually in cases involving terrorism.  The United Nations and the ICRC had regular access to IKR prisons and detention facilities.  Local CSO Kurdistan Human Rights Watch (KHRW) reported that, although they were previously able to access any IKR prison without notice, they increasingly had to request permission in advance to gain access.  They usually received permission, but typically at a higher rate and more quickly at Ministry of Social Affairs prisons than those run by the Asayish. KHRW also stated the Asayish sometimes denied holding prisoners to avoid granting independent organizations access to them.  KHRW stated in July they had evidence that two Kurdish youth arrested in March on suspicion of drug trafficking remained in Asayish custody without trial, but Asayish authorities denied any knowledge of their cases.

## d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention and provide for the right of any person to challenge the lawfulness of his or her arrest or detention in court.  Despite such protections, there were numerous reports of arbitrary arrests and detentions, predominantly of Sunni Arabs, including IDPs.

## Role of the Police and Security Apparatus

Numerous domestic security forces operated throughout the country.  The regular armed forces and domestic law enforcement bodies maintained order within the country.  The PMF, a state-sponsored umbrella military organization composed of approximately 60 militia groups, operated throughout the country.  Some PMF groups, however, such as AAH and KH, often appeared to operate independently from Iraqi authorities and answer to Iranian authorities.  They sometimes undertook operations independent of political leaders or military commanders and

EXHIBIT B

discounted the authority of commanders during sanctioned operations.  Most PMF units were Shia Arab, reflecting the demographics of the country.  Shia Arab militia operated across the country, while Sunni Arab, Yezidi, Christian, and other minority PMF units generally operated within or near their home regions.  The Peshmerga, including militias of the KDP and PUK, maintained order in the IKR.

The ISF consists of security forces administratively organized within the Ministries of Interior and Defense, the PMF, and the Counterterrorism Service.  The Ministry of Interior is responsible for domestic law enforcement and maintenance of order; it oversees the Federal Police, Provincial Police, Facilities Protection Service, Civil Defense, and Department of Border Enforcement.  Energy police, under the Ministry of Oil, are responsible for providing infrastructure protection.  Conventional military forces under the Ministry of Defense are responsible for the defense of the country but also carry out counterterrorism and internal security operations in conjunction with the Ministry of Interior.  The Counterterrorism Service reports directly to the prime minister and oversees the Counterterrorism Command, an organization that includes three brigades of special operations forces.  The NSS intelligence agency also reports directly to the prime minister.

In March the prime minister issued a decree formalizing inclusion of the PMF in the security forces, granting them equivalent salaries and subjecting them to military service laws.  While limited by law to operations in the country, in some cases units reportedly supported the Assad regime in Syria, acting independently of the Iraqi government's authority.  The government did not recognize these fighters as PMF even if their organizations were part of the PMF.  All PMF units officially report to the national security advisor and are under the authority of the prime minister, but several units in practice were also responsive to Iran and Iran's Islamic Revolutionary Guard Corps.  The prime minister, national security advisor, and ISF did not demonstrate consistent command and control over all PMF activities, particularly units aligned with Iran.  Actions by disparate PMF units exacerbated security challenges and sectarian tensions, especially in diverse areas of the country such as Ninewa and Kirkuk Governorates.

The two main Kurdish political parties, the KDP and the PUK, each maintained an independent security apparatus.  Under the federal constitution, the KRG has the right to maintain internal security forces, but the PUK and KDP separately controlled additional Peshmerga units.  The KDP and PUK likewise maintained separate Asayish internal security services and separate intelligence services, nominally under the KRG Ministry of Interior.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

KRG forces detained suspects in areas the regional government controlled. Poorly defined administrative boundaries and disputed territories between the IKR and the rest of the country led to confusion over the jurisdiction of security forces and the courts.

Government forces made limited efforts to prevent or respond to societal violence, including ethnosectarian violence that continued to flare in Kirkuk and Ninewa Governorates during the year.

Civilian authorities did not maintain effective control over some elements of the security forces, particularly certain Iran-aligned PMF units. Impunity was a problem. There were reports of torture and abuse throughout the country in facilities used by the Ministries of Interior and Defense, as well as PMF groups and the NSS. According to international human rights organizations, abuse took place primarily during detainee interrogations while in pretrial detention. Other problems persisted, including corruption, within the country's provincial police forces. The military and Federal Police recruited and deployed soldiers and police officers on a nationwide basis, leading to complaints from local communities that members of the army and police were abusive because of ethnosectarian differences.

Investigators in the Ministry of Interior's office of the inspector general were responsible for conducting investigations into human rights abuses by security forces, with a preliminary report due within 30 days. The minister of interior or the prime minister can also order investigations into high-profile allegations of human rights abuses, as occurred following reports of ISF abuses during September protests in Basrah. The government rarely made the results of investigations public or punished those responsible for human rights abuses.

The IHRCKR routinely notified the Kurdistan Ministry of Interior when it received credible reports of police human rights violations. The KRG High Committee to Evaluate and Respond to International Reports reviewed charges of Peshmerga abuses, largely against IDPs, and exculpated them in public reports, but human rights organizations questioned the credibility of those investigations.

**Arrest Procedures and Treatment of Detainees**

The law prohibits the arrest or remand of individuals, except by order of a competent judge or court or as established by the code of criminal procedures. The law requires authorities to register the detainee's name, place of detention, reason

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

for detention, and legal basis for detention within 24 hours of the detention--a period that may be extended to a maximum of 72 hours in most cases. For offenses punishable by death, authorities may legally detain the defendant as long as necessary to complete the judicial process. The Ministry of Justice is responsible for updating and managing these registers. The law requires the Ministries of Defense and Interior and the NSS to establish guidelines for commanders in battlefield situations to register detainees' details in this central register. The law also prohibits any entity, other than legally competent authorities, to detain any person.

Human rights organizations reported that government forces, including the ISF, Federal Police, NSS, PMF, Peshmerga, and Asayish, frequently ignored the law. Local media and human rights groups reported that authorities arrested suspects in security sweeps without warrants, particularly under the antiterrorism law, and frequently held such detainees for prolonged periods without charge or registration. The government periodically released detainees, usually after concluding that it lacked sufficient evidence for the courts to convict them, but many others remained in detention pending review of other outstanding charges. In July HRW reported that the NSS admitted detaining more than 400 individuals (many arbitrarily or unlawfully) for prolonged periods up to two years, despite not having a legal mandate to do so (see section 1.c.).

According to NGOs, detainees and prisoners whom the judiciary ordered released sometimes faced delays from the Ministry of Interior or other ministries to clear their record of other pending charges and release them from prison.

The law allows release on bond for criminal (but not security) detainees. Authorities rarely released detainees on bail. The law provides for judges to appoint paid counsel for the indigent. Attorneys appointed to represent detainees frequently complained that insufficient access to their clients hampered adequate attorney-client consultation. In many cases, detainees were not able to meet their attorneys until their scheduled trial date. There were numerous reports that defendants did not have access to legal representation during the investigation phase, appointed lawyers lacked sufficient time to prepare a defense, and that courts failed to investigate claims of torture while in detention.

In a July report, private defense attorneys told HRW that in terrorism cases they never seek permission to represent their clients at the initial investigative hearing out of concern that security forces and judges at the investigative court would label them "ISIS lawyers," subjecting them to arrest. They instead wait for the court to

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

appoint a lawyer and only step in after the case is transferred to the felony court, where the risk of harassment and threats is significantly lower.  Private defense attorneys did not represent any of the terrorism defendants in the 18 felony trials HRW observed in Baghdad and Ninewa, and the state-appointed defense attorneys reportedly did not actively mount a defense or seek investigations into torture claims.  A member of Iraq's Bar Association in Baghdad told HRW that the government pays state-appointed defense attorneys 25,000 Iraqi dinars ($21) per case, regardless of the amount of time they spend, giving lawyers no incentive to meet their client before the investigative hearing, study the case file, or continue to represent them in subsequent hearings.  Lawyers said this lack of representation leaves defendants more vulnerable to abuse.

Government forces held many terrorism-related suspects incommunicado without an arrest warrant and transported detainees to undisclosed detention facilities (see section 1.b.).

Arbitrary Arrest:  There were numerous reports of arbitrary or unlawful detention by government forces, including ISF, Federal Police, NSS, PMF, Peshmerga, and Asayish.  There were no reliable statistics available regarding the number of such acts or the length of detentions.  Authorities often failed to notify family members of the arrest or location of detention, resulting in incommunicado detention if not enforced disappearance (see section 1.b.).  Humanitarian organizations also reported that, in many instances, central government forces did not inform detainees of the reasons for their detention or the charges against them.  Most reports of arbitrary or unlawful detention involved suspected members or supporters of ISIS and their associates and family members.  Individuals arbitrarily or unlawfully detained were predominantly Sunni Arabs, including IDPs.  There were reports of Iran-aligned PMF groups also arbitrarily or unlawfully detaining Kurds and Turkmen in Kirkuk and Christians and other minorities in western Ninewa and the Ninewa Plain.  A Ninewa-based CSO reported that the proliferation of intelligence, police, and security agencies, including the PMF, making arrests in Mosul complicated the ability of detainees' families to determine which agencies held their relatives.  There were also reports that security forces beat suspects, destroyed their houses, and confiscated property and food rations during operations to detain those with tenuous family ties to ISIS.

A September HRW report detailed the experiences of a man who reportedly was arbitrarily detained by KH for four months in 2014 and whose son remained missing.  The man said that he, his son, and their taxi driver were arrested by KH at a checkpoint in Hilla and held for three days in a nearby house used as an

EXHIBIT B

unofficial detention center.  KH reportedly released the driver but accused the man and his son of being sympathetic to ISIS.  The man described how KH frequently beat him and his son with sticks, metal cables, and their hands.  KH reportedly moved the two men to a larger unofficial detention facility where they met 64 other detainees, most belonging to the same tribe.  After more than four months in squalid conditions, the man said KH dumped him and two older men on a Baghdad highway after a doctor who visited them told KH the men would likely die.  The man stated that, as far as he knows, the same facility still held his son.

Pretrial Detention:  The Ministries of Justice, Defense, Interior, and Labor and Social Affairs are authorized by law to hold pretrial detainees, as is the NSS in limited circumstances for a brief period.  Lengthy pretrial detentions without due process or judicial action were a systemic problem, particularly for those accused of having ties to ISIS.  There were no independently verified statistics, however, concerning the number of pretrial detainees in central government facilities, the approximate percentage of the prison and detainee population in pretrial detention, or the average length of time held.

The lack of judicial review resulted from several factors, including a large number of detainees, undocumented detentions, slow processing of criminal investigations, an insufficient number of judges and trained judicial personnel, authorities' inability or reluctance to use bail or other conditions of release, lack of information sharing, bribery, and corruption.  Overcrowding of pretrial detainees remained a problem in many detention centers.

Lengthy pretrial detentions were particularly common in areas liberated from ISIS, where the large number of ISIS-related detainees and use of makeshift facilities led to significant overcrowding and inadequate services.  There were reports of both detention beyond judicial release dates and unlawful releases.  The destruction of official detention facilities in the war against ISIS led to the use of temporary facilities; for example, the Ministry of Interior reportedly held detainees in homes rented from local residents in Ninewa Governorate.

The government did not publish comprehensive statistics on the status of the more than 1,400 non-Iraqi women and children it detained during military operations in Tal Afar, Ninewa Governorate, in August 2017.  In February and June HRW reported problems relating to the detention and trial of those foreign women and children.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

Authorities reportedly held numerous detainees without trial for months or years after arrest, particularly those detained under the antiterrorism law.  Authorities sometimes held detainees incommunicado, without access to defense counsel, presentation before a judge, or arraignment on formal charges within the legally mandated period.  Authorities reportedly detained spouses and other family members of fugitives--mostly Sunni Arabs wanted on terrorism charges--to compel their surrender.

KRG authorities also reportedly held detainees for extensive periods in pretrial detention.  According to IKR judicial officials, IKR law permits extension of pretrial detention of up to six months under court supervision.  According to local CSOs and the IHRCKR, however, some detainees were held more than six months without trial, and the IHRCKR was tracking the cases of four detainees held for at least four years.

Detainee's Ability to Challenge Lawfulness of Detention before a Court:  The constitution and law grant detainees the right to a prompt judicial determination on the legality of their detention and the right to prompt release.  Despite the 2016 reform law concerning rights of detainees, NGOs widely reported that detainees had limited ability to challenge the lawfulness of detention before a court and that a bribe was often necessary to get charges dropped unlawfully or gain release from arbitrary detention.  While a constitutional right, the law does not allow for compensation for a person found to have been unlawfully detained.

Amnesty:  In December 2017 the Iraqi Kurdistan Parliament (IKP) issued an amnesty reducing the sentence of prisoners on death row to 15 years in prison, except in cases of terrorism, threatening national security, or killing women in so-called honor killings.  While some NGOs protested that such a crosscutting amnesty undermined the justice system, the IHRCKR said that the IKP consulted them and incorporated all of the commission's recommendations for the law.

**e. Denial of Fair Public Trial**

The constitution provides for an independent judiciary, but certain articles of law restricted judicial independence and impartiality.  The country's security situation and political history left the judiciary weak and dependent on other parts of the government.  The Federal Supreme Court rules on issues related to federalism and constitutionality, and a separate Higher Judicial Council manages and supervises the court system, including disciplinary matters.

EXHIBIT B

Corruption or intimidation reportedly influenced some judges in criminal cases at the trial level and on appeal at the Court of Cassation.

Numerous threats and killings by sectarian, tribal, extremist, and criminal elements impaired judicial independence.  Judges, lawyers, and their family members frequently faced death threats and attacks.  For example, in April a group of armed individuals shot and wounded a judge in Maysan Governorate.  The judge reportedly was overseeing the investigation of several official corruption complaints.  Also in April, media reported that an IED killed the vice president of Diyala Governorate's Court of Appeals.

Lawyers participated in protests demanding better protection from the government against threats and violence.  In July a group of lawyers in Basrah Governorate protested the killing of a fellow lawyer who had been defending people involved in demonstrations demanding clean water and electricity.  The lawyers demanded the government provide them better protection.  In September, HRW reported that government forces threatened and arrested lawyers working in and around Mosul, Ninewa Governorate, whom the government forces perceived to be providing legal assistance to suspected members or supporters of ISIS and their associates and family members.

HRW reported in February and June that the government conducted rushed trials of foreign women and children on charges of illegal entry into the country and membership in or assistance to ISIS.  Defense attorneys stated they rarely had access to their clients before hearings and were threatened for defending them.  HRW alleged that judicial officials did not sufficiently take into account the individual circumstances in each case or guarantee the defendants a fair trial.  Many of the foreign women received the death penalty or were sentenced to life in prison, and children older than age eight in some cases received sentences of up to five years in prison for ISIS membership and up to 15 years in prison for participating in violent acts.  As of August at least 23 non-Iraqi women--including 17 from Turkey, two from Kyrgyzstan, two from Azerbaijan, and two from Germany--had received death sentences during the year for violating the counterterrorism law.

The Kurdistan Judicial Council is legally, financially, and administratively independent from the KRG Ministry of Justice, but the KRG executive reportedly influenced politically sensitive cases.

**Trial Procedures**

EXHIBIT B

The constitution and law provide all citizens the right to a fair and public trial, but the judiciary did not enforce this right for all defendants.  Some government officials, the United Nations, and CSOs reported trial proceedings fell short of international standards.

By law accused persons are innocent until proven guilty.  Judges in ISIS-related cases, however, sometimes reportedly presumed defendants' guilt based upon presence or geographic proximity to activities of the terrorist group, or upon a spousal or filial relationship to another defendant, as indicated by international NGOs throughout the year.  The law requires detainees to be informed promptly and in detail of the charges against them and of their right to a fair, timely, and public trial.  Nonetheless, officials routinely failed to inform defendants promptly or in detail of charges against them.  Trials were public, except in some national security cases.  Numerous defendants experienced undue delays in reaching trial.

Defendants' rights under law include the right to be present at their trial and the right to a privately retained or court-appointed counsel, at public expense, if needed.  Defendants' insufficient access to defense attorneys was a serious defect in investigative, trial, and appellate proceedings.  Many defendants met their lawyers for the first time during the initial hearing and had limited to no access to legal counsel during pretrial detention.  This was particularly true in counterterrorism courts, where judicial officials reportedly sought to complete convictions and sentencing for thousands of suspected ISIS members quickly, including through mass trials.

Defendants also had the right, under law, to free assistance of an interpreter, if needed.  The qualifications of interpreters reportedly varied greatly.  Sometimes foreign consulates provided translators when their nationals were on trial, HRW reported in June; in other cases, the court found an ad hoc solution, for instance by asking a journalist in attendance to interpret for a defendant from Trinidad and Tobago.  When no translator was available, judges reportedly postponed proceedings and sent the foreign defendants back to jail.

Judges assemble evidence and adjudicate guilt or innocence.  Defendants and their attorneys have the right, under law, to confront witnesses against them and present witnesses and evidence.  They may not be compelled to testify or confess guilt.  Nevertheless, defendants and their attorneys were not always granted access to evidence, or government officials demanded a bribe in exchange for access to the case files.  In numerous cases judges reportedly relied on forced or coerced

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

confessions as the primary or sole source of evidence in convictions, without the corroboration of forensic evidence or independent witness testimony.

In a July report, HRW described how judges routinely failed to investigate and punish security forces alleged to have tortured suspects, particularly those accused of terrorism and affiliation with ISIS. Instead, judges frequently ignored allegations of torture and reportedly convicted defendants based on forced or coerced confessions. In some cases judges convicted defendants without a retrial even after medical examinations revealed signs of torture. Legal experts noted that investigative judges' and police investigators' lack of expertise in forensics and evidence management also contributed to their reliance on confessions.

The law provides the right to appeal, although there is a statute of limitations for referral; the Court of Cassation reviews criminal cases on appeal. The law provides for retrials of detainees convicted due to forced or coerced confessions or evidence provided by secret informants, and the Ministry of Justice reported authorities released almost 7,900 detainees from government custody between the law's enactment in 2016 and July 31. Appellate courts sometimes upheld convictions reportedly based solely or primarily on forced or coerced confessions.

KRG officials noted that prosecutors and defense attorneys frequently encountered obstacles in carrying out their work and that prisoners' trials were unnecessarily delayed for administrative reasons. According to the IHRCKR, detainees have remained in KRG internal security service facilities for extended periods even after court orders for their release. Lawyers provided by an international NGO continued to have access to and provide representation to any juvenile without a court-appointed attorney.

**Political Prisoners and Detainees**

The government did not consider any incarcerated persons to be political prisoners or detainees and stated that all individuals in prison or detention centers had been either convicted or charged under criminal law or were detained and awaiting trial while under investigation. It was difficult to assess these claims due to lack of government transparency; prevalence of corruption in arrest procedures; slow case processing; and extremely limited access to detainees, especially those held in counterterrorism, intelligence, and military facilities. Political opponents of the government alleged the government imprisoned individuals for political activities or beliefs under the pretense of criminal charges ranging from corruption to terrorism and murder.

EXHIBIT B

There were isolated reports of political prisoners or detainees in the KRG. According to a human rights CSO in the IKR, in May KDP-aligned Asayish arrested and held for three months a former Peshmerga commander and prominent KDP member who had defected to an opposition party.  In July the former mayor of Alqosh, Ninewa Governorate, claimed the Asayish detained, beat, threatened, and then released him to prevent him from reporting to work.

Niaz Aziz Saleh, convicted in 2012 of leaking KDP party information related to electoral fraud, remained in a KRG prison, despite the completion of his sentence in 2014.

**Civil Judicial Procedures and Remedies**

Individuals and organizations may seek civil remedies for, or cessation of, human rights violations through domestic courts.  Administrative remedies also exist.  The government did not effectively implement civil or administrative remedies for human rights violations due in part to the overwhelming security focus of the executive branch, coupled with an understaffed judiciary dependent on the executive.

Unlike federal law, KRG law provides for compensation to persons subject to unlawful arrest or detention; the KRG Ministry of Martyrs and Anfal Affairs handles such cases.  The IHRCKR reported that, while approximately 5,000 cases (many historical) received approval for compensation consisting of a piece of land, 10 years' salary, and college tuition for one family member, the government could not pay compensation due to budget constraints.  The ministry stated there were 13,000 unlawful arrests pending compensation decisions.

**Property Restitution**

The constitution and law prohibit the expropriation of property, except for the public benefit and in return for just compensation.  Some government forces and officials, however, forced suspected ISIS members and supporters from their homes in several governorates, confiscating homes and property without due process or restitution.

HRW reported in April that some police and judicial officials in Ninewa Governorate believed the counterterrorism law allowed legal expropriation and transfer of a home or property if it is registered in the name of an individual ISIS

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
EXHIBIT B

member.  The compensation commission of Mosul, Ninewa Governorate, stated that families of ISIS members could receive compensation if they obtain a security clearance to return home from the NSS, but HRW reported that all families of ISIS suspects were being denied clearance.  According to the April report, there were 16 expropriations of homes registered to ISIS suspects or their relatives in Mosul, Ninewa Governorate, by PMF, Federal Police, or local police, or other families; in each case, the owners or their relatives were unable to retake the property, even when they sought judicial redress.  Several local officials in Ninewa Governorate admitted that government forces were occupying or confiscating homes illegally in this manner.

Some home and property confiscations appeared to have ethnic or sectarian motives.  For example, the 30th Shabak Brigade, an Iran-aligned PMF group operating east of Mosul, reportedly detained and harassed Christians and Kaka'i, including a Kaka'i man who was detained in July until he agreed to sell his house to a PMF leader.  NGOs reported that judges and local officials often took bribes to settle such property disputes.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution and law prohibit such actions, but there were numerous reports that the government failed to respect these prohibitions.

Government forces often entered homes without judicial or other appropriate authorization.

There were numerous reports that government forces and local authorities punished family members of suspected ISIS members and supporters.  In some instances local community leaders reportedly threatened to evict these family members from their homes forcibly, bulldoze the homes, and either injure or kill these relatives.  International NGOs stated that PMF groups forcibly displaced hundreds of families, destroyed or confiscated some of their homes, forced some parents to leave their children, stole livestock, and beat some of the displaced persons.  There were also regular reports of government forces, particularly the PMF but also the Federal Police and local police, refusing to allow IDPs to return to their homes, sometimes despite the IDPs having the necessary security clearances from the government allowing them to do so.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

## g. Abuses in Internal Conflict

Killings:  From January 1 to August 31, UNAMI reported more than 700 civilians killed and almost 1,300 injured, a decrease from approximately 2,800 killed and more than 3,700 injured during the same period in 2017.  It was unclear how many were intentionally targeted.

Despite its territorial defeat in December 2017, ISIS remained the major perpetrator of abuses and atrocities.  These abuses were particularly evident in Anbar, Baghdad, Diyala, Kirkuk, Ninewa, and Salah al-Din Governorates, where ISIS routinely killed and abducted civilians and attacked security forces. Throughout the year ISIS detonated vehicle-borne IEDs and suicide bombs.

On January 15, ISIS carried out a pair of suicide bomb attacks that killed at least 27 persons in Tayaran Square, an area in Baghdad where laborers gather to find work.  ISIS also claimed responsibility for a May 23 suicide attack in Baghdad that killed at least four individuals and wounded 15.  In August, ISIS suicide bombers attacked an al-Hal political party building in Heet, Anbar, killing three ISF and wounding nine civilians, including a female electoral candidate.  On September 12, a suicide bomber killed at least six persons and injured 42 others at a restaurant near Tikrit, Salah al-Din; security personnel believed ISIS to be responsible.  In addition, IEDs reportedly left by ISIS before its territorial defeat and other explosive remnants of war continued to cause civilian casualties.

In May the UN secretary-general appointed Karim Khan as special adviser and head of the Investigative Team for the Accountability of Daesh (ISIS), established pursuant to UN Security Council resolution 2379 to support domestic efforts to hold ISIS accountable.  The Investigative Team--which was tasked with collecting, preserving, and storing evidence in Iraq of acts that may amount to war crimes, crimes against humanity and genocide committed by ISIS--formally began its work in August.

Abductions:  There were frequent reports of enforced disappearances by or on behalf of government forces, including ISF, Federal Police, PMF, Peshmerga, and Asayish, as well as by nongovernment militias and criminal groups.  ISIS was responsible for most attributable disappearances and abductions, and frequently targeted government forces.  The Mosul Police reported approximately 11,000 civilians were still missing in the city from the time of ISIS occupation and liberation.

EXHIBIT B

**IRAQ**                                                                    23

ISIS claimed responsibility for a March 20 attack at a fake checkpoint on the highway between Baghdad and Kirkuk in Sarha District, Diyala Governorate, in which the attackers abducted eight Federal Police officers.  ISIS published a video of their execution several days later.

As of September authorities reported more than 3,200 Yezidis, mainly women and children, remained in ISIS captivity in and outside the country, where they were subject to sexual slavery and exploitation, forced marriage, and other abuses. According to the KRG Ministry of Endowments and Religious Affairs, as of October more than 3,300 additional Yezidis had escaped, been rescued, or were released from ISIS captivity.  As of August the KRG Yezidi Rescue Office, established by KRG Prime Minister Nechirvan Barzani, had spent more than $10 million since 2014 to rescue captive Yezidis from ISIS.

In July the *New York Times* reported that a 16-year-old Yezidi girl named Souhayla had recently escaped from three years of ISIS imprisonment and sexual slavery in Iraq after an airstrike killed her captor.

IKR-based CSOs reported ISIS and organized criminal gangs had trafficked some captured Yezidi women and children internationally, primarily to Syria and Turkey, but also to Egypt, Saudi Arabia, the Gulf States, Europe, Afghanistan, Pakistan, and Russia's Chechen Republic.  This reportedly included organ trafficking as well.

The IHCHR reported in August that 600 Turkmen kidnapped by ISIS, including more than 120 children, remained missing, while a Turkmen CSO reported more than 1,300 Turkmen were still missing.  The CSO claimed to have evidence that ISIS had trafficked Turkmen women to Turkey, Syria, and Russia's Chechen Republic.

The KRG Ministry of Endowments and Religious Affairs also reported in October that 250 Christians had escaped, been rescued, or were released by ISIS, leaving an estimated 150 missing.  According to the KRG Ministry of Peshmerga, more than 60 Peshmerga taken hostage during the fighting with ISIS remained missing.

Physical Abuse, Punishment, and Torture:  Reports from international human rights groups stated that government forces, including Federal Police, National Security Service, PMF, and Asayish, abused prisoners and detainees, particularly Sunni Arabs.  Followings its territorial defeat in December 2017, ISIS' ability to capture prisoners was dramatically reduced.

EXHIBIT B

<u>Child Soldiers</u>:  There were no reports that the central government's Ministries of Interior or Defense conscripted or recruited children to serve in the security services.  The government and Shia religious leaders expressly forbid children younger than age 18 from serving in combat.  Unlike in previous years, there was no evidence on social media of children serving in combat positions.  The central government faced challenges, however, in exercising complete control over certain units of the PMF, limiting its ability to address and prevent the recruitment and use of children by these groups, including some units of the Iran-aligned AAH, Harakat Hezbollah al-Nujaba (HHN), and KH militias.  In May the UN Task Force on Children and Armed Conflict reported concerns that in 2017 the government failed to prevent PMF units in southern Iraq, including Najaf and al-Qadisiyah Governorates, from engaging in child recruitment and sponsoring military training camps for high school students, which included some children younger than age 18.  The UN Task Force on Children and Armed Conflict verified 10 incidents affecting 19 boys throughout the country during the first quarter of the year, which included five recruitments in Ninewa Governorate, four killings, and 10 other injuries resulting from explosive materials in Ninewa, Kirkuk, and Salah al-Din Governorates.  Antitrafficking in persons NGOs reported that some PMF groups, including AAH and HHN, continued recruiting males younger than age 18 to fight in Syria and Yemen.

As of early 2018, multiple sources reported the Kurdistan Worker's Party (PKK) People's Defense Forces (HPG) and Shingal Resistance Units (YBS) Yezidi militia, operating in Sinjar, Ninewa Governorate, and the IKR, continued to recruit and use children.  According to Yezidi NGO Yazda, of approximately 400 Yezidi children younger than age 18 recruited as child soldiers by PKK and YBS militias, an estimated 100 remained with the militias as of November, with many of the rest having subsequently returned to their families.

In previous years ISIS was known to recruit and use children.  Due in part to ISIS' territorial defeat in 2017, little information was available on its use of children in the country during the year.

In February the *Washington Post* reported the experience of one boy in Ninewa Governorate who was recruited by ISIS at age 17 to cook for fighters.  A few months later, an uncle in the PMF reportedly recruited him to spy on ISIS and offered him three million Iraqi dinars ($2,514).  ISIS reportedly imprisoned the boy after catching him taking photographs.  The boy eventually escaped, only to be

EXHIBIT B

caught by KRG forces and reportedly sentenced to detention in a juvenile reformatory, where he remained.

Also see the Department of State's annual *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

Other Conflict-related Abuse:  Conflict disrupted the lives of hundreds of thousands of persons throughout the country, particularly in Baghdad, Anbar, and Ninewa Governorates.

Government forces, including the ISF, PMF, and Peshmerga, established or maintained roadblocks that impeded the flow of humanitarian assistance to communities in need, particularly in disputed territories such as Sinjar, Ninewa Governorate.  The KRG, specifically KDP-run checkpoints, also restricted the transport of food, medicines and medical supplies, and other goods into some areas.

ISIS reportedly targeted civilian infrastructure, including several attacks on electricity and water infrastructure in Kirkuk and other governorates.

## Section 2. Respect for Civil Liberties, Including:

## a. Freedom of Expression, Including for the Press

The constitution provides for the right of free expression, including for the press, that does not violate public order and morality, express support for the banned Baath Party, or advocate altering the country's borders through violent means.  The primary limitation on the exercise of this right was self-censorship due to credible fear of reprisals by the government, political parties, ethnic and sectarian forces, terrorist and extremist groups, or criminal gangs.

Freedom of Expression:  Despite the constitutional protection for freedom of expression, central government and KRG oversight and censorship sometimes interfered with media operations, at times resulting in the closure of media outlets, restrictions on reporting, denying access to public information, and interference with internet service.  Individuals were able to criticize the government publicly or privately but not without fear of reprisal.

EXHIBIT B

Central government and KRG forces arrested and detained protesters and activists critical of the central government and of the KRG, respectively, according to statements by government officials, NGO contacts, and press reporting.

In May residents of al-Nasiriya, Dhi Qar Governorate, protested the reported May 8 disappearance of a civil society activist who had written articles highlighting alleged corruption and criticizing political parties.  Protesters called on the local government and security forces to investigate and publish their findings.

In July the Iraqi Media Network (IMN) fired the editor secretary of the *IMN Magazine* after he criticized the government on his personal social media account and expressed support for protesters in Basrah.  In September al-Hurra television station received threats of violence after broadcasting stories perceived to convey anti-Iranian perspectives.  Some online critics of the government operated under aliases to avoid persecution from the government and armed groups affiliated with elected officials.  For example, on March 26 and 27, KRG forces prevented news crews from several IKR TV news outlets from covering demonstrations by teachers and public employees over salary delays in various locations in Erbil and Duhok Governorates.  On May 26, Duhok Governorate security forces detained freelance journalist Mustafa Salih Bamarnee for 10 days for criticizing the KRG on social media.

Press and Media Freedom:  Media were active and expressed a variety of views, largely reflecting the owners' political viewpoints.  Media also self-censored to comply with government restrictions against "violating public order" and because of a fear of reprisal by political parties, militias, terrorist groups, criminal organizations, and private individuals, including political figures.  Those media outlets unable to cover operating costs through advertising revenue frequently relied upon funding from political entities, leading to biased reporting.  Political parties strongly influenced, or controlled outright, most of the several hundred daily and weekly print publications, as well as dozens of radio and television stations.

Local NGOs reported that independent media outlets in the IKR decreased due to their inability to compete with the large media outlets founded and funded by political parties and officials.  Party-affiliated outlets recruited and attracted journalists away from independent media, further weakening them, according to local media experts.  On June 5, independent Kurdish news outlet Awene ceased printing its newspaper due to financial shortfalls.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

The KDP and PUK, the IKR's main political parties, gave prioritized access to the outlets they owned.  In KDP strongholds, Kurdistan Television, Rudaw, and K24 had access to all public places and information, while in PUK-dominated Sulaimaniya Governorate, Kurdsat News, and GK TV enjoyed the same privilege.  Conversely, outlets belonging to opposition parties or lacking party affiliation had limited access to public information in the IKR.

On March 27, Erbil Airport security reportedly prevented Nalia Radio and Television and Payam TV crews from covering a press conference with the Erbil Airport director.  On July 5, the KRG prime minister's office reportedly prevented Kurdish News Network Television from covering the prime minister's press conference in Erbil.

Government forces sometimes prevented journalists from reporting, citing security reasons.  Some media organizations reported arrests and harassment of journalists, as well as government efforts to prevent them from covering politically sensitive topics, including security issues, corruption, and government failure to provide adequate services.

In June police arrested a reporter in Fallujah, Anbar Governorate, who was investigating the involvement of Fallujah city hall leaders in a real estate scandal.  According to Reporters Without Borders (RSF), police did not inform the journalist of the reason for his arrest and released him without charge three days later.

Multiple press freedom advocacy groups reported numerous violations of press freedom by the KRG, including physically blocking journalists' access to story locations and press conferences.  In March, IKR authorities shut down news outlets and detained journalists for reporting on local demonstrations calling for basic government services.  On March 26 and 27, security forces reportedly detained a Payam TV crew and Speda reporter Akar Fars for several hours, allegedly for covering demonstrations.  Kurdish police shut down Khakbeer TV and seized broadcasting equipment of NRT from television crews.

Violence and Harassment:  According to the Committee to Protect Journalists (CPJ), as of October no journalists were killed in the country.

Reporting from areas liberated from ISIS control remained dangerous and difficult.  Journalists covering armed clashes involving government forces, militias, and ISIS

EXHIBIT B

remnants faced serious threats to their safety.  Military officials, citing safety considerations, sometimes restricted journalists' access to areas of active fighting.

Media workers often reported that politicians, government officials, security services, tribal elements, and business leaders pressured them not to publish articles critical of them.  Journalists reported accounts of government or partisan violence, intimidation, death threats, and harassment.

In July police reportedly used electroshock weapons against, threatened, and detained for three hours three journalists covering protests at the airport in Najaf Governorate.  According to RSF, all three were clearly identifiable as journalists when the police attacked them.  The CPJ reported that between July 14 and September 6 at least seven journalists were assaulted or detained by police and PMF while covering protests over government corruption and the lack of basic services in several cities across the country, and the offices of two local media outlets were set afire by protesters.

Throughout the IKR, there were reports of beatings, detentions, and death threats against media workers.  In some cases, the aggressors wore KRG military or police uniforms.  Press freedom CSOs accused IKR authorities of unlawful detention of news outlet employees, intimidation by physical violence, and torture in connection with March arrests of journalists reporting on local protests.  According to a local NGO, on March 27, security forces attacked and beat a Kurdsat TV crew in Akre, Duhok Governorate, injuring reporter Dilbrin Ghazi, and detaining him for two hours.  On May 24, Sarkawt Kuba, a senior official in the KRG political party Gorran, and his guards reportedly beat journalist Sabah Ali Qaraman for criticizing Gorran officials.

Censorship or Content Restrictions:  The law prohibits producing, importing, publishing, or possessing written material, drawings, photographs, or films that violate public integrity or decency.  The penalties for conviction include fines and imprisonment.  Fear of violent retaliation for publishing facts or opinions critical of political factions inhibited free expression.  The Ministry of Culture must approve all books published in or imported into the country, thereby subjecting authors to censorship.

Public officials reportedly influenced content by rewarding positive reporting with bribes, providing money, land, access to venues, and other benefits to journalists, particularly to members of the progovernment Journalists' Syndicate.  These

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

restrictions extended to privately owned television stations operating outside of the country.

During national parliamentary elections in May, the government restricted media access at polling stations and held news conferences only for state-owned media and a pan-Arab news outlet.  The NGO Journalist Freedoms Observatory (JFO) criticized the Independent Higher Electoral Commission (IHEC) for its lack of transparency during the democratic process.

The KRG placed additional scrutiny on texts containing what it perceived to be religious extremism.  A KRG-appointed committee that screens books for publication and printing licenses rejected several books for this reason.  While in 2017 the KRG reportedly banned 200 books from around the world from sale at the Erbil International Book Fair, the KRG banned fewer than 40 books--all from the IKR--during this year's book fair.

Libel/Slander Laws:  Criminal and civil law prohibits defamation.  Many in media asserted that defamation laws prevented them from freely practicing their profession by creating a strong fear of prosecution, although widespread self-censorship and financial reliance on political patronage impeded journalistic performance as well.  Public officials occasionally filed libel charges that sometimes resulted in punitive fines on individual media outlets and editors, often for publishing articles containing allegations of corruption.  When cases went to court, judges usually found in favor of the journalists, according to local media freedom organizations.  Libel is a criminal offense under KRG law, and courts may issue arrest warrants for journalists on this basis.

Nongovernmental Impact:  Nongovernmental and quasi-governmental actors, including militias outside of state control, terrorist groups, and criminal organizations reportedly threatened journalists with violence for reporting on sensitive subjects.  Specifically, Iran-aligned PMF groups reportedly sent death threats and other threats of violence to journalists and civil society members covering protests in Basrah Governorate in September.

**Internet Freedom**

The government restricted or disrupted access to the internet and censored online content, and there were reports the government monitored private online communications without appropriate legal authority.  Government restrictions on access to the internet were overt, but the government denied that it monitored

EXHIBIT B

private online communications without appropriate legal authority.  Despite restrictions, political figures and activists used the internet to criticize politicians, mobilize protesters for demonstrations, and campaign for candidates through social media platforms.

The government acknowledged it interfered with internet access in some areas of the country, reportedly due to the security situation and ISIS' disruptive use of social media platforms.  There were reports government officials attempted unsuccessfully to have pages critical of the government removed from Facebook and Twitter as "hate speech."

On July 16, the JFO issued a press release criticizing the government for cutting internet services and blocking social media sites throughout the country in what JFO considered an attempt to limit protests over the lack of adequate public services that erupted in southern and central Iraq.  The government denied blocking internet services during the unrest and blamed the interruption on infrastructure issues, even though virtual private networks (VPNs) continued to work properly.

In a July report, Amnesty described how government forces assaulted peaceful protesters after purposefully disabling internet access in Baghdad and the southern portion of the country.  Witnesses told the NGO that the government shut off internet access at strategic times to mask the government forces' displays of excessive and unnecessary force against civilians, including the use of live ammunition, which resulted in the death of eight individuals in July (see section 2.b.).

The government sporadically instructed internet service providers to shut down the internet for two to three hours a day during school exams, reportedly to prevent cheating on standardized national exams.  In September the NGO AccessNow reported that the Ministry of Communications cut online communications for 10 days for two hours per day for this reason.

According to the International Telecommunication Union, 49 percent of individuals used the internet and 59 percent of households had internet access at home in 2017.

**Academic Freedom and Cultural Events**

EXHIBIT B

There were government restrictions on academic freedom and cultural events. Social, religious, and political pressures significantly restricted the exercise of freedom of choice in academic and cultural matters.  In all regions, various groups reportedly sought to control the pursuit of formal education and the granting of academic positions.

Academic freedoms remained restricted in areas of active conflict with ISIS.

NGOs in the IKR reported that senior professorships were easier to obtain for those with links to the traditional KDP and PUK ruling parties.

## b. Freedoms of Peaceful Assembly and Association

The government sometimes limited freedoms of peaceful assembly and association.

### Freedom of Peaceful Assembly

The constitution provides for freedom of assembly and peaceful demonstration "regulated by law."  Regulations require protest organizers to request permission seven days in advance of a demonstration and submit detailed information regarding the applicants, the reason for the protest, and participants.  The regulations prohibit all "slogans, signs, printed materials, or drawings" involving "sectarianism, racism, or segregation" of citizens.  The regulations also prohibit anything that would violate the constitution or law; encourage violence, hatred, or killing; or prove insulting to Islam, "honor, morals, religion, holy groups, or Iraqi entities in general."  Provincial councils traditionally maintained authority to issue permits.  Authorities generally issued permits in accordance with the regulations.

The government largely respected the right of its citizens to freedom of peaceful assembly.  In July and August in Baghdad, demonstrators staged peaceful protests to demand better services, jobs, and an end to government corruption.

In some cases the government used force against protesters.  During protests in Basrah Governorate and other areas of southern Iraq over corruption and poor public services related to water and electricity between July and September, at least 15 persons died in clashes with government forces, according to media reports. Local human rights organizations reported that government forces in some cases prevented the injured from receiving treatment at hospitals and detained members of civil society investigating the government's response to the protests.

EXHIBIT B

On March 28, KRG forces arrested more than 80 protesters demonstrating against poor public services and government salaries in the IKR.

**Freedom of Association**

The constitution provides for the right to form and join associations and political parties, with some exceptions. The government generally respected this right, except for the legal prohibitions against groups expressing support for the Baath Party or Zionist principles. The penal code stipulates that any person convicted of promoting Zionist principles, association with Zionist organizations, assisting such organizations through material or moral support, or working in any way to realize Zionist objectives, be subject to punishment by death. There were no known cases of individuals charged with violating this law during the year.

The government reported it took approximately one month to process NGO registration applications. NGOs must register and periodically reregister in Baghdad. The NGO Directorate in the Council of Ministers Secretariat reported approximately 3,500 registered NGOs as of September. International organizations such as the ICRC and the International Commission on Missing Persons continued to operate in a legal gray area, given a gap in government registration regulations.

The IKR requires separate registration in Erbil. The first half of the year witnessed continuing fallout from the September 2017 KRG independence referendum in that the KRG and central government did not mutually recognize NGO registration. As a result, many NGOs that were registered only in Baghdad could not operate in the IKR for the first half of the year, while NGOs registered only in Erbil could not operate outside the IKR and KRG-controlled disputed territories until the issue was resolved.

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement**

The constitution and law provides for the freedom of internal movement, foreign travel, emigration, and repatriation, but the government did not consistently respect

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

these rights.  In some instances authorities restricted movements of displaced persons, and authorities did not allow some IDP camp residents to depart without specific permission, thereby limiting access to livelihoods, education, and services. Many parts of the country liberated from ISIS control suffered from movement restrictions due to checkpoints of PMF units and other government forces.  In other instances local authorities did not always recognize security permits of returnees nor comply with the central government's orders to facilitate, but not force, returns.

The government generally cooperated with the Office of the UN High Commissioner for Refugees (UNHCR), the International Organization for Migration (IOM), and other humanitarian organizations in providing protection and assistance to IDPs, refugees, returning refugees, asylum seekers, stateless persons, or other persons of concern.  The government did not have effective systems to assist all of these individuals, largely due to funding shortfalls and lack of capacity.  Successful efforts by the government to regain control of areas previously held by ISIS allowed many returns to take place.  Returnees, however, grappled with the destruction of homes, lack of services and livelihoods, and continued concerns for security due to the prevalence of PMF groups that, in some cases, led to secondary displacement.

Security considerations, unexploded ordnance, destruction of infrastructure, and official and unofficial restrictions sometimes limited humanitarian access to IDP communities.  Insecurity caused by the presence of ISIS and PMF groups hindered the movement of international staff of humanitarian organizations, restricting their ability to monitor programs for a portion of the year.

In-country Movement:  The law permits security forces to restrict in-country movement pursuant to a warrant, impose curfews, cordon off and search areas, and take other necessary security and military measures in response to security threats and attacks.  There were numerous reports that government forces, including the ISF, Peshmerga, and the PMF, selectively enforced regulations, including for ethnosectarian reasons, requiring residency permits to limit entry of persons into areas under their control.

During the year the ISF decreased the number of checkpoints in many parts of the country.

Humanitarian agencies frequently reported evictions of IDPs from camps and informal displacement sites due to closures and consolidations, which reportedly

EXHIBIT B

were often not coordinated with humanitarian actors and which caused some sudden, involuntary displacements.  Some political actors promoted camp closures in advance of May parliamentary elections, and authorities reportedly used coercive measures during eviction notifications.  IDP camp managers reported government officials did not always give IDPs at closed camps the choice of returning to their areas of origin or displacement to another site.  Some families in camps near Baghdad expressed a desire to integrate locally, having found informal employment, but local government authorities reportedly denied requests.

There were numerous reports that IDPs, particularly those suspected of ISIS affiliation, faced hostility from local government officials and populations, as well as expulsion.  In liberated areas of Anbar, Duhok, Kirkuk, Ninewa, and Salah al-Din Governorates, humanitarian agencies reported movement restrictions for families with relatives suspected of ISIS affiliation.  In June, HRW reported government forces blocked the return of IDPs with suspected ISIS affiliation in Anbar, even though they had obtained permission from camp security forces and were returning to areas of origin with government transportation.  Tribal leaders and humanitarian actors reported that fabricated accusations of ISIS affiliation led to stigmatization of IDPs and de facto restrictions on in-country movement.  They also expressed concerns of collective punishment against certain communities for their perceived ties to ISIS.  For example, according to UNHCR, 150 returnee families faced discrimination in Rutba, Anbar Governorate, based on their perceived ISIS affiliation.  Tribal pacts called for punishing false accusations of ISIS affiliation, but they also prohibited legal defense for those affiliated with ISIS.  IDPs were also often the targets of stigmatization or discrimination because of familial rivalries or economic reasons, rather than affiliation with ISIS.  Anbar authorities reportedly made efforts to stop these practices and to work toward post-ISIS reconciliation.

Multiple international NGOs reported that PMF units and Peshmerga prevented civilians, including Sunni Arabs and ethnic and religious minorities, from returning to their homes after government forces ousted ISIS (see section 6, National/Racial/Ethnic Minorities and Other Societal Violence or Discrimination).  For example, UNHCR reported that local armed groups barred returns to certain areas of Baiji, Salah al-Din Governorate.  Similarly, Christian CSOs reported that certain PMF groups, including the 30th Shabak Brigade, prevented Christian IDP returns and harassed Christian returnees in several towns in the Ninewa Plain, including Bartalla and Qaraqosh.

EXHIBIT B

There were reports some PMF groups harassed or threatened civilians fleeing conflict zones or returning to liberated areas and targeted civilians with threats, intimidation, physical violence, abduction, destruction or confiscation of property, and killing.

Syrian refugees continued to have restrictions on residence and movement outside the IKR.

KRG and central government forces closed roads and restricted movement in disputed territories between the central government and the IKR.  For example, Peshmerga, ISF, and PMF checkpoints closed many roads from KRG-controlled territory to central government-controlled areas, including the roads from Erbil to Kirkuk, Duhok to Sinjar, Badria to Mosul, al-Qosh to Tal Kayf, Sheikhan to Mosul, and Hawler to Mosul.  The closure of these roads hampered the return home of IDPs, slowed economic recovery in areas affected by ISIS, and separated populations from access to schools, medical facilities, and markets.  By November all but the Duhok-Sinjar road had been opened for civilian traffic.

The KRG restricted movement across the areas it administered.  Authorities required nonresidents to obtain permits that authorized limited stays in the IKR. These permits were generally renewable.  Citizens who sought to obtain residency permits for KRG-controlled areas required sponsorship from a resident in the region.  Humanitarian actors described the sponsorship program as effective in enabling the return of thousands of IDPs.  Citizens of all ethnosectarian backgrounds, including Kurds, crossing into the IKR from central or southern regions were obligated to cross through checkpoints and undergo personal and vehicle inspection.  The government imposed similar restrictions on IDPs from Ninewa Governorate and the disputed territories.

KRG authorities applied restrictions more stringently in some areas than in others. The United Nations and international humanitarian organizations stated that restrictiveness of entry for IDPs and refugees seeking to return depended upon the ethnosectarian background of the displaced individuals and the area to which they intended to return.  There were also reports that authorities sometimes closed checkpoints into the region for extended periods, forcing IDPs to wait.  Officials prevented individuals whom they deemed security threats from entering the region. KRG officials generally admitted minority IDPs into the IKR, although security checks reportedly were lengthy on occasion.  Entry reportedly was often more difficult for men, particularly Arab men traveling without family.

EXHIBIT B

<u>Foreign Travel</u>:  The government required exit permits for citizens leaving the country, but the requirement was not routinely enforced.

**Internally Displaced Persons (IDPs)**

According to the IOM Displacement Tracking Matrix, fewer than 1.9 million persons remained internally displaced in the country as of October, predominantly in Erbil, Duhok, and Ninewa Governorates.  Almost 4.1 million persons had returned to areas of origin across the country since those areas were liberated from ISIS.  In August the IOM reported 12 percent of IDPs lived in shelter arrangements that did not meet minimal safety or security standards, 29 percent lived in IDP camps and settlements, and 48 percent resided in private accommodations, including host family residences, hotels, motels, and rental housing.

The constitution and national policy on displacement address IDP rights, but few laws specifically do so.  The government and international organizations, including UN agencies and local and international NGOs, provided protection and other assistance to IDPs.  Humanitarian actors provided support for formal IDP camps and implemented community-based services for IDPs residing outside of camps to limit strain on host community resources.  In December 2017 the United Nations lowered the designation of the country's humanitarian crisis from a level three to a level two emergency.

In March the government and the United Nations jointly announced the *Government's Plan for Relief, Shelter and Stabilization of Displaced People* and the *Humanitarian Response Plan* (HRP).  The government's plan strengthened the provision of legal protection to IDPs, provided relief items and services in camps, and supported safe returns.  The HRP outlined the projects and funding required to meet the needs of 3.4 million of the most vulnerable persons in Iraq and included provisions for protection.  It also strengthened mechanisms with government authorities to support voluntary, safe, and sustainable returns of IDPs.

In some areas violence, insecurity, and long-standing political, tribal and ethnosectarian tensions hampered progress on national reconciliation and political reform, complicating the protection environment for IDPs.  The government forced large numbers of IDPs to return to their places of origin to vote in parliamentary elections in May.  Thousands of families faced secondary displacement due to economic and security concerns.  Forced displacements, combined with unresolved problems caused by the uprooting of millions of Iraqis in past decades, strained the capacity of local authorities.

EXHIBIT B

Some government forces, including PMF, reportedly forcibly displaced individuals due to perceived ISIS affiliation or for ethnosectarian reasons. For example, HRW reported that in January government forces, including the PMF, forcibly displaced at least 235 families of people with alleged ties to ISIS and sent them to IDP camps in Kirkuk Governorate. In a report published in February, individuals interviewed by HRW said local police working in the camp confiscated their identity papers and prevented them from leaving.

Government assistance focused on financial grants, but payments were sporadic. Faced with large movements of IDPs across the country, the government provided food, water, and financial assistance to many, but not all IDPs, including in the IKR. Many IDPs lived in informal settlements without access to adequate water, sanitation, or other essential services. The UN Education Cluster reported that out-of-camp IDP populations had the poorest school attendance and highest dropout rates amongst IDPs, refugees, and host communities. The UN Education Cluster also found displaced children in out-of-camp settings lacked civil documents at higher rates than those in camps.

All citizens were eligible to receive food under the Public Distribution System (PDS), but authorities implemented the PDS sporadically and irregularly, with limited access in recently liberated areas. Authorities did not distribute all commodities each month, and not all IDPs could access the PDS in each governorate. Low oil prices reduced government revenues and further limited funds available for the PDS. There were reports of IDPs losing access and entitlement to PDS distributions and other services due to requirements that citizens could only redeem PDS rations or other services at their registered place of residence.

Throughout the year UNICEF criticized Ministry of Education decisions in January and April to close some IDP schools in the IKR. In August the IHCHR called on the central government's Ministry of Heath to resume deliveries of food and medicine to the IDP camps in the IKR.

Local authorities often determined whether IDPs would have access to local services. Through the provision of legal aid, the United Nations and other humanitarian organizations assisted IDPs in obtaining documentation and registering with authorities to improve access to services and entitlements. Humanitarian agencies reported some IDPs faced difficulty with registration due to lack of required civil documentation and administrative delays. Many citizens who

EXHIBIT B

previously lived in ISIS-controlled areas did not have civil documents, increasing the difficulty of obtaining identification and other personal documents.

Households with perceived ties to ISIS faced stigma and were at increased risk of being deprived of their basic rights, as reported by Amnesty in April.  Government officials frequently denied security clearances for displaced households with a perceived ISIS affiliation to return to areas of origin.  Because of this perceived affiliation, these households faced challenges in obtaining civil documentation and had limited freedom of movement, including to seek medical treatment, due to the risk of arrest or inability to reenter the camp.  Humanitarian organizations reported that female heads of household in multiple IDP camps struggled to obtain permission to move and were subject to verbal and physical harassment, including rape and sexual assault and exploitation, by government forces and camp residents.

IKR-based NGOs documented numerous cases of women forced by ISIS to marry fighters who became widows with children, but lacked marriage and birth certificates required to obtain legal documentation for their children.  These women and children were stigmatized because of their association with ISIS, leaving them at heightened risk of suicide, retaliation, and sexual exploitation. Honor killings remained a risk, although some communities issued edicts and took steps to absolve women of any perceived guilt associated with their sexual exploitation by ISIS fighters.  Communities generally did not accept children born to ISIS fighters, however, and they were frequently abandoned or placed in orphanages, as reported by Yezidi NGOs and media.

Central government authorities and governors took steps to close or consolidate camps, sometimes in an effort to force IDPs to return to their areas of origin.  In many cases forced returns from camps resulted in secondary or tertiary displacement, often to out-of-camp settings.  Reuters reported that between November 2017 and January ISF forcibly returned between 2,400 and 5,000 IDPs from camps in Amriyat al-Falluja, Anbar Governorate.  Aid workers told media that military trucks arrived at camps unannounced and commanders read out lists of people, who had one hour to pack their belongings and go.  Reuters reported in January that five camp residents said they were forced to leave by ISF but had to turn back because checkpoints manned by Iranian-aligned PMF units demanded bribes of up to approximately 500,000 Iraqi dinars ($419) to let people through, a sum none could afford.

Humanitarian organizations regularly criticized the government for returning IDPs to unsafe areas.  In January, Reuters detailed the experiences of Saleh Ahmed,

EXHIBIT B

whose family ISF evicted from a camp in Amriyat al-Falluja, Anbar Governorate, in November 2017 and forced to return to their home town of Betaya.  Ahmed reportedly refused because contacts at home told them the area was filled with booby traps left by ISIS and that their houses had been destroyed, but a local commander assured them the area was safe.  Upon return an explosive went off, killing Ahmed's wife, burning his daughter over much of her body, and injuring Ahmed.

IDPs returning to towns and areas in the Ninewa Plain reported that ISIS had destroyed temples, houses of worship, cemeteries, and schools.  Local authorities reported that, as of September 18, more than 7,400 Christian families from a pre-ISIS population of 19,000 families had returned to the Ninewa Plain, compared with only 200 as of September 2017.  Christian IDPs and returnees in villages and towns in the Ninewa Plain under PMF control reported the PMF imposed arbitrary checkpoints and detained civilians without legal authority to do so.  West Mosul, Ninewa Governorate, along with the historically Christian town of Batnaya north of Mosul, remained in ruins and almost completely uninhabited.  Most Christian IDPs refused to return to the nearby town of Tal Kayf, citing fear of the PMF 50th Babylon Brigade that occupied it.  According to a June report by the Yezidi NGO Nadia's Initiative, more than 64,000 persons out of a precrisis population of more than 126,000 had returned to the eight collectives in north Sinjar, Ninewa Governorate.  Southern Sinjar remained in ruins and almost uninhabited.

**Protection of Refugees**

Access to Asylum:  The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.  Syrians made up the vast majority of the refugee population, and almost all refugees resided in the IKR.  The government generally cooperated with UNHCR and other humanitarian organizations to provide protection and assistance to refugees in the country.

Employment:  Refugees and asylum seekers are legally entitled to work in the private sector.  Palestinian refugees, however, faced job insecurity in the public sector due to their ambiguous legal status; the government did not recognize their refugee status nor allow them to obtain citizenship.  Syrian refugees were able to obtain and renew residency and work permits both in refugee camps and in the IKR, although not in the rest of the country.  Authorities arrested refugees with IKR residence permits who sought work outside of the region and returned them to the IKR.  A UNHCR survey of Syrian refugees in the IKR between April and June

EXHIBIT B

showed that 83 percent of the refugee families had at least one family member regularly employed in some form of livelihood activity.

Durable Solutions:  There was no large-scale resettlement or integration of refugees in central and southern Iraq.  Ethnic Kurdish refugees from Syria, Turkey, and Iran generally integrated well in the IKR, although economic hardship reportedly plagued families and prevented some children, especially Syrians, from enrolling in formal school.  For the 2018/19 school year, the KRG Ministry of Education began teaching all first- and second-grade classes for Syrian refugees outside refugee camps in Sorani Kurdish in Erbil and Sulaimaniya Governorates and Badini Kurdish in Duhok Governorate instead of the dialects of Kurmanji Kurdish spoken by Syrian Kurds, while offering optional instruction in Sorani and Badini to those inside refugee camps.

**Stateless Persons**

UNHCR estimated there were more than 47,000 stateless individuals in the country as of August.

Absent a countrywide, consistent plan to document children of Iraqi mothers and ISIS fathers, some of those children are at risk of statelessness.  The government enforced a law requiring any non-Muslim women who bore children of Muslim men to register children as Muslim, no matter the circumstances of the child's conception or the mother's religion.  The Yezidi community frequently welcomed back Yezidi women but not Muslim children fathered by ISIS fighters.  The Yezidi community frequently forced women to give up such babies and minor children to orphanages under threat of expulsion from the community.  The ICRC provided shelter referrals to some Yezidi women and, in some cases, assisted mothers in finding forcibly abandoned children.  As a result, some such children are without parents, identification, clear country of birth, or settled nationality.

As of 2006, the latest year for which data was available, an estimated 54,500 "Bidoun" (stateless) individuals, living as nomads in the desert in or near the southern governorates of Basrah, Dhi Qar, and Qadisiyah, remained undocumented and stateless descendants of individuals who never received Iraqi citizenship upon the state's founding.  Prolonged drought in the south of the country forced many individuals from these communities to migrate to city centers, where most obtained identification documents and gained access to food rations and other social benefits.  Other communities similarly at risk of statelessness included the country's Romani (Dom) population; the Ahwazi, who are Shia Arabs of Iranian

EXHIBIT B

descent; the Baha'i religious minority; inhabitants of the southern marshlands; members of the Goyan and Omariya Turkish Kurdish tribes near Mosul; and nationals of South Sudan.

Stateless persons faced discrimination in employment and access to education. Many stateless persons were not able to register for identity cards, which prevented them from enrolling in public school, registering marriages, and gaining access to some government services. Stateless individuals also faced difficulty obtaining public-sector employment and lacked job security.

## Section 3. Freedom to Participate in the Political Process

The constitution and law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage. Despite violence and other irregularities in the conduct of elections, citizens were generally able to exercise this right.

## Elections and Political Participation

Recent Elections:  In May the IHEC conducted elections for the Council of Representatives (COR)--the national parliament. International and local observers monitored the elections. Although observers declared the elections peaceful, allegations of fraud prompted parliament to order a recount of ballots in areas of Anbar, Kirkuk, Baghdad, and the IKR. Allegations of fraud included manipulation of electronic ballot tallies, ballot stuffing, and voter intimidation. The International Crisis Group reported in May on allegations in Kirkuk Governorate, noting that the Kurdish PUK party won in several non-Kurdish areas with historically low PUK support, and turnout in Kurdish areas was low compared both to past elections and to turnout in Turkmen and Arab areas. After the four main KRG opposition parties rejected the results of the May election, an armed force reportedly loyal to the PUK attacked the headquarters where top officials of the four parties were meeting in Sulaimaniyah Governorate. In June authorities arrested three police officers and an IHEC employee in connection with a fire that damaged IHEC warehouses in Baghdad where ballots and equipment from the May elections were stored. IHEC concluded its recount in August with no major changes to the initial results, and the Federal Supreme Court certified the results the same month.

Due to challenges in obtaining or replacing civil documentation, as well as last-minute changes to IHEC identification requirements, many IDPs were disenfranchised during the May elections.

EXHIBIT B

IRAQ

The Kurdistan Independent High Electoral Commission held elections in September for the Iraqi Kurdistan Parliament (IKP).  Most observers witnessed only minor irregularities and saw no evidence of systemic fraud, but opposition parties alleged voter intimidation and systemic fraud, such as ballot stuffing and falsification of documents--without providing specifics--by the KDP and PUK.

Political Parties and Political Participation:  Political parties and coalition blocs tended to organize along either religious or ethnic lines, although some parties crossed sectarian lines.  Membership in some political parties, particularly KDP and PUK in the IKR or major parties in central government-controlled territory, conferred special privileges and advantages in employment and education.

Participation of Women and Minorities:  No laws limit participation of women or members of minorities in the political process, and they did participate.

The constitution mandates that women constitute at least 25 percent of parliamentary and provincial council membership.  In parliamentary elections during the year, 19 women received sufficient votes to win seats in the 329-seat COR without having to rely on the constitutional quota, compared with 22 in 2014.  Sixty-five additional women were awarded seats based on the quota, raising the total number of seats women held to 84.  Nonetheless, political discussions often reportedly marginalized female members of parliament.  One woman was appointed to the cabinet formed during the fall.

As electoral candidates, women faced gender-based intimidation and abuse (see section 6, Women).  For example, Intidhar Ahmed Jassim withdrew from the race after a sex video was circulated on social media purporting to show her in bed with a man.  Local and international press reported similar social media incidents in April and May, including sex tapes and photos allegedly showing women candidates kissing, posing in underwear, or dancing in revealing outfits.

Of the 329 seats in parliament, the law reserves nine seats for minorities:  five for Christian candidates from Baghdad, Ninewa, Kirkuk, Erbil, and Duhok Governorates, respectively; one Yezidi; one Sabean-Mandaean; one Shabak; and, following a parliamentary decision in February, one for Faili Kurds in Wasit Governorate.  One Christian was appointed to the new cabinet.

Following complaints by Yezidi activists, the Federal Supreme Court ruled in January that the Yezidi minority must have more seats in the country's parliament,

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

reflective of the size of the community, but the decision was not implemented during the year.  The Yezidi member of parliament welcomed the decision, stating to local media that this meant there should be five Yezidi representatives in the parliament, as the minority numbered more than 500,000 in the country and the court ruled that there should be one seat per 100,000 population.

The KRG reserves 30 percent of parliamentary and provincial council membership for women.  Female candidates won 34 of 111 seats in the IKP in the 2018 elections, compared with 33 in the 2013 IKP elections.

Of 111 seats in the IKP, the law reserves 11 seats for minorities along ethnic, rather than religious lines:  five for (predominantly Christian) Chaldo-Assyrian candidates, five for Turkmen candidates, and one for Armenian candidates.  No seats are reserved for self-described groups whom the KRG considers ethnically Kurdish or Arab, such as Yezidis, Shabak, Sabean-Mandaeans, Kaka'i, and Faili Kurds.

Major political parties partnered with, or in some cases created, affiliated minority political parties in both the central government and IKR elections and encouraged other Iraqis to vote for allied minority candidates for quota seats in the COR and IKP.  Minority community activists complained that this process disenfranchised them, and they advocated for electoral reform to limit voting for minority quota seats to voters of the relevant minority, as well as for additional quota seats in the COR and IKP.

**Section 4. Corruption and Lack of Transparency in Government**

The law provides criminal penalties for corruption by officials, but the government did not implement the law effectively.  The law allowed some individuals convicted of corruption to receive amnesty upon repaying money they had obtained by corruption, which had the effect of allowing them to keep any profits from stolen funds.  Officials frequently engaged in corrupt practices with impunity. There were numerous reports of government corruption during the year.

Corruption:  According to the parliamentary transparency commission, corruption over the past 15 years caused at least $320 billion to go missing from the state treasury, mostly because of corrupt or phantom contracts.  Bribery, money laundering, nepotism, and misappropriation of public funds were common at all levels and across all branches of government.  One politician told AFP journalists in December 2017 that stolen sums of less than $60 million "can be seen as honest;

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

from there upwards, we can speak of corruption." Family, tribal, and ethnosectarian considerations significantly influenced government decisions at all levels and across all branches of government. Investigations of corruption were not free from political influence.

Anticorruption efforts were hampered by a lack of agreement concerning institutional roles and political will, political influence, lack of transparency, and unclear governing legislation and regulatory processes. Although anticorruption institutions increasingly collaborated with civil society groups the effect of expanded cooperation was limited. Media and NGOs attempted to expose corruption independently, but their capacity was limited. Anticorruption, law enforcement, and judicial officials, as well as members of civil society and media, faced threats, intimidation, and abuse in their efforts to combat corrupt practices.

In 2016 the International Monetary Fund's Executive Board approved a three-year 6.22 trillion Iraqi dinars ($5.34 billion) stand-by arrangement that called for the government to take measures through June 2019 to combat corruption, in addition to completing a fiscal rationalization program. The Commission of Integrity (COI) is undertaking a *National Strategy to Combat Corruption (2015-19)* that aims to increase training and development of staff of the inspectors general office and the COI. In August the COI issued a summary of the commission's biannual report, finding the commission filed more than 4,500 corruption cases and issued more than 1,000 arrest warrants. There were almost 500 convictions, including four ministers and almost 30 senior officials, although they were not named. The report stated that the law allowed more than 400 convicts amnesty upon repaying money they had obtained by corruption.

The Central Bank leads the government's efforts to combat money laundering and terrorist financing. Through the Offices of Banking Supervision and Financial Intelligence, the Central Bank worked with law enforcement agencies and the judiciary to identify and prosecute illicit financial transactions. The investigatory capacity of authorities remained extremely limited, although they were successful in prosecuting money-laundering cases linked to ISIS. The COI, which prosecutes money-laundering cases linked to official corruption, suffered from a lack of investigatory capacity.

The Council of Ministers Secretariat has an anticorruption advisor, and the COR has an integrity committee. The Council of Ministers secretary general led the Joint Anticorruption Council, which also included agency inspectors general.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

According to IHEC, in May the previous prime minister fired five local election officials on charges of corruption during the parliamentary elections. The officials included the heads of election offices in Salah al-Din, Kirkuk, and Anbar Governorates and those who oversaw expatriate voting in Jordan and Turkey.

Border corruption was also a problem. In June the Center for International Private Enterprise reported that although the law mandates governorates receive 50 percent of border revenues, Wasit Governorate had not received its share of funding since 2011.

Between July and September, waves of largely youth-led protests occurred in Basrah and other southern governorates, with protesters condemning corruption and calling for better governance, more entry-level jobs, and reliable public services, including clean water and electricity. In August former prime minister Abadi responded by ordering the formation of a committee to investigate corruption in response to the widespread protests.

In September the Criminal Court sentenced a former deputy general secretary at the Ministry of Defense to six years in prison for fraud in procuring military equipment for the ministry during his tenure with the Iraqi Transitional Government from 2005 to 2006.

The KRG maintained its own COI, which issued its first report in 2017. The COI lacked the resources and investigators needed to pursue all potential corruption cases, according to one specialist on the issue.

In late March, KRG civil servants protested across the IKR for unpaid wages. The Carnegie Endowment for International Peace assessed in April that after three years of unpaid salaries and rising public debt to local creditors, KRG civil servants and the general Kurdish population were vocally opposing government corruption and frustration with the ruling Barzani and Talabani families.

In August the KRG formally launched *Xizmat* ("services"), a government reform program to document and provide more efficient and transparent government services to citizens in the IKR using an online portal. Elements of the overall program included taxation, payroll, budget planning, budget execution, and other economic reform priorities. The central government made limited progress implementing a similar, but narrower, program.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

<u>Financial Disclosure</u>:  The law authorizes the COI to obtain annual financial disclosures from senior public officials, including ministers, governors, and parliamentarians, and to take legal action for nondisclosure.  Penalties range from fines to imprisonment.  A unified system for enforcing annual financial disclosures does not exist.  The COI has no jurisdiction over the IKR, but Kurdish members of the central government were required to conform to the law.  The law obligates the COI to provide public annual reports on prosecutions, transparency, accountability, and ethics of public service.  According to the COI's semiannual report, only one third of MPs and only two of 15 governors submitted their financial information.

The Kurdistan Commission on Public Integrity is responsible for distributing and collecting financial disclosure forms in the IKR.  There was no information available indicating that public officials faced penalties for financial nondisclosure.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A number of domestic and international human rights groups operated in most cases with little government restriction or interference, investigating and publishing their findings on human rights cases.  Government officials were somewhat cooperative and responsive to their views.

Due to the ISIS-driven humanitarian crisis, the majority of local NGOs focused on assisting IDPs and other vulnerable communities.  In some instances these NGOs worked in coordination with central government and KRG authorities.  Still, a number of NGOs also investigated and published findings on human rights cases.  There were some reports of government interference with NGOs investigating human rights abuses and violations involving government actors.  For example, NGOs reported that police detained some of their staff in September for covering protests in Basrah Governorate; police released them several days later.

NGOs faced capacity-related challenges, did not have regular access to government officials, and did not systematically serve as bulwarks against failures in governance and human rights abuses.  Domestic NGOs' lack of sustainable sources of funding hindered the sector's long-term development.  The government rarely awarded NGOs contracts for services.  While the law forbids NGOs from engaging in political activity, political parties or sects originated, funded, or substantially influenced many domestic NGOs.

NGOs were prevented from operating in certain sectors (see section 6, Women).

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

Many NGOs registered only in Baghdad could not operate in the IKR for the first half of the year, while NGOs registered in Erbil could not operate outside the IKR and KRG-controlled disputed territories (see section 2.b.).

The IKR had an active community of mostly Kurdish NGOs, many with close ties to and funding from the PUK and KDP political parties. Government funding of NGOs legally is contingent upon whether an NGO's programming goals conform to already-identified KRG priority areas. The KRG NGO Directorate established formal procedures for awarding funds to NGOs, which included a public description of the annual budget for NGO funding, priority areas for consideration, deadlines for proposal submission, establishment of a grant committee, and the criteria for ranking proposals.

As with the central government, there were some reports of KRG interference with NGOs investigating human rights abuses and violations involving KRG actors. In January the Academy of Democratic Thoughts, an Erbil-based NGO, reported that the Asayish closed the organization's offices in Erbil Governorate and shut down the organization's cultural and anticorruption events, claiming that the themes of the events were not consistent with its status as a NGO.

The United Nations or Other International Bodies: The government and the KRG sometimes restricted the access of the United Nations and other international organizations to sensitive locations, such as Ministry of Interior-run detention facilities holding detainees suspected of terrorism.

Government Human Rights Bodies: The IHCHR is constitutionally mandated. The law governing the IHCHR's operation provides for 12 full-time commissioners and three reserve commissioners with four-year, nonrenewable terms; in 2017 new commissioners assumed duties. The law provides for the IHCHR's financial and administrative independence and assigns it broad authority, including the right to receive and investigate human rights complaints, conduct unannounced visits to correctional facilities, and review legislation. Some observers reported the commissioners' individual and partisan political agendas largely stalled the IHCHR's work.

The IHRCKR issued periodic reports on human rights, trafficking in persons, and religious freedom in the IKR. The commission reported KRG police and security organizations generally had been receptive to human rights training and responsive to reports of violations. Both the IHRCKR and local NGO Kurdistan Human

EXHIBIT B

Rights Watch conducted human rights training for Peshmerga, although the latter group reported it was unable to obtain permission for a similar program for the Asayish.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

### Women

Rape and Domestic Violence:  The law criminalizes rape and sexual assault of women, men, and children, but not specifically spousal rape, and permits a sentence not exceeding 15 years, or life imprisonment if the victim dies.  The rape provisions of the law do not define, clarify, or otherwise describe "consent," leaving the term up to judicial interpretation.  The law requires authorities to drop a rape case if the perpetrator marries the victim, with a provision protecting against divorce within the first three years of marriage.  The victim's family sometimes agreed to this arrangement to avoid the social stigma attached to rape.  There were no reliable estimates of the incidence of rape or information on the effectiveness of government enforcement of the law.

Humanitarian protection experts assessed that conditions in IDP camps were highly conducive to sexual exploitation and abuse.  Amnesty reported in April that women in IDP camps with alleged ties to ISIS were particularly vulnerable to abuse, including rape by government forces and other IDPs (see sections 1.c. and 2.d.).

Although the constitution prohibits "all forms of violence and abuse in the family," the law does not specifically prohibit domestic violence but stipulates that men may discipline their wives and children "within certain limits prescribed by law or by custom."  The law provided reduced sentences for violence or killing if the perpetrator had "honorable motives" or if the perpetrator caught his wife or female relative in the act of adultery or sex outside of marriage.  Domestic violence remained a pervasive problem.

The government made some progress on implementation of its 2016 joint communique with UNAMI on the Prevention and Response to Conflict-related Sexual Violence in 2016, but human rights organizations reported that the criminal justice system was often unable to provide adequate protection for women.

Likewise, NGOs reported that the government made minimal progress in implementing UN Security Council Resolution 1325 on women, peace, and

EXHIBIT B

security despite an implementation plan launched in 2016.  The KRG High Council of Women's Affairs reported that neither the central government nor the KRG had allocated a budget for implementing this resolution.

Harassment of legal personnel who sought to pursue domestic violence cases under laws criminalizing assault, as well as a lack of trained police and judicial personnel, further hampered efforts to prosecute perpetrators.

The government and KRG also struggled to address the physical and mental trauma endured by women who lived under ISIS rule.  In September, UNHCR reported almost 30 suicides, most by Yezidi women, in six IDP camps in Duhok Governorate since the beginning of the year, a number UNHCR believed to be underreported.

While the law does not explicitly prohibit NGOs from running shelters for victims of gender-based crimes, the law allows the Ministry of Labor and Social Affairs to determine if a shelter may remain open, and the ministry did not do so.  As a result, only the Ministry could operate shelters in central government-controlled territory.  NGOs that operated unofficial shelters faced legal penalties for operating such shelters without a license (see section 5).  NGOs reported that communities often viewed the shelters as brothels and asked the government to close them; on occasion, shelters were subject to attacks.  In order to appease community concerns, the ministry regularly closed shelters, only to allow them to reopen in another location later.

The Ministry of Interior maintained 16 family protection units under police authority around the country, located in separate buildings at police stations around the country, designed to resolve domestic disputes and establish safe refuges for victims of sexual or gender-based violence.  These units reportedly tended to prioritize family reconciliation over victim protection and lacked the capacity to support victims.  NGOs stated that victims of domestic violence feared approaching the family protection units because they suspected that police would inform their families of their testimony.  Amnesty's April report details similar concerns from women in IDP camps.  Some tribal leaders in the south reportedly banned their members from seeking redress through police family protection units, claiming domestic abuse was a family matter.  The family protection units in most locations did not operate shelters.

In December the BBC visited secret shelters for domestic violence victims in the country, reporting a call for help from one woman who claimed to be imprisoned

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

**IRAQ**

in Mosul, Ninewa Governorate, by family members and physically abused on a daily basis during a three-year period.

KRG law criminalizes domestic violence, including physical and psychological abuse, threats of violence, and spousal rape.  The KRG implemented the provisions of the law and maintained a special police force to investigate cases of gender-based violence and a family reconciliation committee within the judicial system, but local NGOs reported that these programs were not effective at combating gender-based violence.

In the IKR one privately operated shelter and four KRG Ministry of Labor and Social Affairs-operated shelters provided some protection and assistance for female victims of gender-based violence and human trafficking.  Space reportedly was limited, and service delivery reportedly was poor.  NGOs played a key role in providing services, including legal aid, to victims of domestic violence, who often received no assistance from the government.  Instead of using legal remedies, authorities frequently mediated between women and their families so that the women could return to their homes.  Other than marrying or returning to their families, which often resulted in further victimization by the family or community, there were few options for women accommodated at shelters.

As of September authorities reported more than 3,200 Yezidis, mainly women and children, remained in ISIS captivity, where they were subject to sexual slavery and exploitation, forced marriage, and other abuses.

Female Genital Mutilation/Cutting (FGM/C):  NGOs and the KRG reported the practice of FGM/C persisted in the IKR, particularly in rural areas of Erbil, Sulaimaniyah, and Kirkuk Governorates, and among refugee communities, despite a ban on the practice in IKR law.  Rates of FGM/C, however, reportedly continued to decline.  FGM/C was not common outside the IKR.

A 2016 study (the most recent data available) by UNHCR, the KRG, and the international NGO Heartland Alliance, found almost 45 percent of women surveyed had been subject to FGM/C in the IKR, a decrease from previous years. NGOs attributed the reduction in FGM/C to the criminalization of the practice and sustained public outreach activities.  For example, in April media reported on the efforts of activists like Kurdistan Rasul, a victim of FGM/C who encouraged men and women in IKR villages to end the practice.

EXHIBIT B

<u>Other Harmful Traditional Practices</u>:  The law permitted honor as a lawful defense in violence against women, and so-called honor killings remained a serious problem throughout the country.  A provision of the law limits a sentence for conviction of murder to a maximum of three years in prison if a man is on trial for killing his wife, girlfriend, or a female dependent due to suspicion that the victim was committing adultery or sex outside of marriage.  UNAMI reported that several hundred women died each year from honor killings.  Some families reportedly arranged honor killings to appear as suicides.

In August media reported that a bridegroom returned his bride to her parents the day after their wedding, complaining that she was not a virgin.  A family member then reportedly beat her to death.  Media reported that police arrested a male relative, but the motive remained a subject of public debate as of November.

During the year the KRG began prosecuting murders of women, including by honor killings, as homicides, meaning culprits convicted of honor killings were subject to penalties up to and including the death penalty.  The KRG Ministry of Interior Directorate General of Combating Violence against Women confirmed that sentences in such cases sometimes reached 20 years.  The ministry reported 14 cases of honor killings occurred in the IKR during the year, as of September.

There were reports that women and girls were sexually exploited through so-called temporary marriages, under which a man gives the family of the girl or woman dowry money in exchange for permission to "marry" her for a specified period. Destitute IDP families living in camps reportedly were especially vulnerable to this type of exploitation, as detailed in an April Amnesty report.  NGOs reported some families opted to marry off their underage daughters in exchange for dowry money, believing the marriage was genuine, only to have the girl returned to them, sometimes pregnant, only months later.

Government officials and international and local NGOs also reported that the traditional practice of *fasliya*, whereby family members, including women and children, are traded to settle tribal disputes, remained a problem, particularly in southern governorates.

<u>Sexual Harassment</u>:  The law prohibits sexual relations outside marriage, including sexual harassment.  Penalties include fines of up to only 30 dinars (2.5 cents) or imprisonment or both not to exceed three months for a first-time offender.  The law provides relief from penalties if unmarried participants marry.  The law prohibits sexual harassment in the workplace.  No information was available regarding the

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

effectiveness of government enforcement, but penalties were very low.  In most areas there were few or no publicly provided women's shelters, information, support hotlines, and little or no sensitivity training for police.  Refugees and IDPs reported regular sexual harassment, both in camps and cities in the IKR.

In the absence of shelters, authorities often detained or imprisoned sexual harassment victims for their own protection.  Some women, without alternatives, became homeless.

Female political candidates suffered harassment online and on social media, including posting of, often fake, nude or salacious photos and videos meant to harm their campaigns (see section 3).

Coercion in Population Control:  There were no reports of coerced abortion or involuntary sterilization by government authorities.  Unlike previous years, there were no reports of coerced abortion by ISIS or other armed groups of pregnancies of Yezidi captive women.

Discrimination:  The Council of Ministers' Iraqi Women Empowerment Directorate is the lead government body on women's issues.  Although the constitution provides for equality between men and women, the law does not provide for the same legal status and rights for women as for men.  Criminal, family, religious, personal status, labor, and inheritance laws discriminate against women.  Women experienced discrimination in such areas as marriage, divorce, child custody, employment, pay, owning or managing businesses or property, education, the judicial process, and housing.

For example, in a court of law, a woman's testimony is worth half that of a man in some cases and is equal in other cases.  The law generally permits women to initiate divorce proceedings against their spouses, but the law does not entitle a divorced woman to alimony other than child support or two years financial maintenance in some cases; in other cases the woman must return all or part of her dowry or otherwise pay a sum of money to the husband.  Under the law the father is the guardian of the children, but a divorced mother may be granted custody of her children until age 10, extendable by a court up to age 15, at which time the child may choose with which parent he or she wishes to live.

All recognized religious groups have their own personal status courts responsible for handling marriage, divorce, and inheritance issues, and discrimination toward women on personal status issues varies depending on the religious group.  The

EXHIBIT B

government's interpretation of sharia is the basis of inheritance law for all citizens except recognized religious minorities.  In all communities, male heirs must provide financial support to female relatives who inherit less.  If they do not, women have the right to sue.

The law provides women and men equal rights in owning or managing land or other property, but cultural and religious norms impeded women's property rights, especially in rural areas.

Law and custom generally do not respect freedom of movement for women.  For example, the law prevents a woman from applying for a passport without the consent of her male guardian or a legal representative (see section 2.d.).  Women could not obtain the Civil Status Identification Document--required for access to public services, food assistance, health care, employment, education, and housing--without the consent of a male relative.

In March media reported on the work of the Shahrazad Center to fight gender discrimination.  One female journalist, Israa Tariq, went to the center for legal assistance after the television station she worked for, al-Nahar, did not pay her salary for three months.  Another woman, "Houda," went to the center for legal assistance after her husband left her to raise their two children without paying legally required child support.

NGOs also reported cases in which courts changed the registration of Yezidi women to Muslim against their will because of their forced marriage to ISIS fighters.

Although the KRG provided some additional protections to women, in most respects, KRG law mirrors federal law, and women faced discrimination.  Beginning in May, public prosecutors in Kurdistan began accepting the testimony of women in court on an equal basis with that of men.  KRG law allows women to set as a prenuptial condition the right to divorce her husband, beyond the limited circumstances allowed by Iraqi law, and provides a divorced wife up to five years alimony beyond childcare.

The KRG maintained a High Council of Women's Affairs and a Women's Rights Monitoring Board to enforce the law, and prevent and respond to discrimination.

**Children**

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

<u>Birth Registration</u>:  The constitution states that anyone born to at least one citizen parent is a citizen.  Failure to register births resulted in the denial of public services such as education, food, and health care.  Single women and widows often had problems registering their children.  Although in most cases authorities provided birth certificates after registration of the birth through the Ministries of Health and Interior, this was reportedly a lengthy and at times complicated process.  The government was generally committed to children's rights and welfare, although it denied benefits to noncitizen children.  Humanitarian organizations reported a widespread problem of children born to members of ISIS or in ISIS-held territory failing to receive a government-issued birth certificate.

<u>Education</u>:  Primary education is compulsory for citizen children for the first six years of schooling--and until age 15 in the IKR; it is provided without cost to citizens.  Equal access to education for girls remained a challenge, particularly in rural and insecure areas.  Recent, reliable statistics on enrollment, attendance, or completion were not available.

In January, UNICEF reported that children comprised almost one-half of Iraqis displaced by conflict.  Displacement limited access to education; at least 70 percent of displaced children missed a year of school.  In February, UNICEF reported that one-half of all schools in Iraq required repairs following the territorial defeat of ISIS and that more than three million children have had their education interrupted.

<u>Child Abuse</u>:  Although the constitution prohibits "all forms of violence and abuse in the family," the law does not specifically prohibit domestic violence but stipulates that men may discipline their wives and children "within certain limits prescribed by law or by custom."  The law provides protections for children who were victims of domestic violence or were in shelters, state houses, and orphanages, including access to health care and education.  Violence against children reportedly remained a significant problem, but recent, reliable statistics on the extent of the problem were not available.  Local NGOs reported the government made little progress in implementing its 2017 *National Child Protection Policy*.

KRG law criminalizes domestic violence, including physical and psychological abuse and threats of violence.  The KRG implemented the provisions of the law, but local NGOs reported these programs were not effective at combating child abuse.  The KRG's Ministries of Labor and Social Affairs, Education, and Culture and Youth operated a toll-free hotline to report violations against, or seek advice regarding children's rights.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

<u>Early and Forced Marriage</u>:  The legal minimum age of marriage is 18, but the law allows a judge to permit children as young as age 15 to marry if fitness and physical capacity are established and the guardian does not present a reasonable objection.  The law criminalizes forced marriage but does not automatically void forced marriages that have been consummated.  The government reportedly made few efforts to enforce the law.  Traditional early and forced marriages of girls, including temporary marriages, occurred throughout the country.

In July the Ledia Organization, a local NGO, released a report finding a significant increase in early marriage due to conflict and economic instability, as many families arranged for girls to marry cousins or into polygamous households to prevent forced marriages to ISIS fighters.  Others gave their daughters as child brides to ISIS or other armed groups as a means to ensure their safety, access to public services in occupied territories, or livelihood opportunities for the entire family.

In the IKR the legal minimum age of marriage is 18, but KRG law allows a judge to permit children as young as age 16 to marry under the same conditions applied in the rest of the country.  KRG law criminalizes forced marriage and suspends, but does not automatically, void forced marriages that have been consummated.  According to the KRG High Council of Women's Affairs, refugees and IDPs in the IKR engaged in child marriage and polygamy at a higher rate than IKR residents.

<u>Sexual Exploitation of Children</u>:  The law prohibits commercial sexual exploitation, sale, offering or procuring for prostitution, and practices related to child pornography.  Child prostitution was a problem, as were temporary marriages, particularly among the IDP population.  Because the age of legal criminal responsibility is nine in the areas administered by the central government and 11 in the IKR, authorities often treated sexually exploited children as criminals instead of victims.  Penalties for commercial exploitation of children range from fines and imprisonment to the death penalty.  No information was available regarding the effectiveness of government enforcement.

<u>Child Soldiers</u>:  Certain PMF units, including AAH, HHN, and KH, reportedly recruited and used child soldiers, despite government prohibition.  The PKK HPG and YBS Yezidi militias also reportedly continued to recruit and use child soldiers. ISIS was known to recruit and use child soldiers (see section 1.g.).

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

<u>Displaced Children</u>:  Insecurity and active conflict between government forces and ISIS caused the continued displacement of large numbers of children.  Abuses by government forces, particularly certain PMF groups, contributed to displacement.  Due to the conflict in Syria, children and single mothers from Syria took refuge in the IKR.  UNICEF reported that almost one-half of IDPs were children.

<u>International Child Abductions</u>:  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html.

**Anti-Semitism**

A very small number of Jewish citizens lived in Baghdad.  According to unofficial statistics from the KRG Ministry of Endowments and Religious Affairs, there were approximately 430 Jewish families in the IKR.  There were no reports of anti-Semitic acts in the country during the year.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**Persons with Disabilities**

The constitution states the government, through law and regulations, guarantees the social and health security of persons with disabilities, including through protection against discrimination and provision of housing and special programs of care and rehabilitation.  Despite constitutional guarantees, no laws prohibit discrimination against persons with physical, sensory, intellectual, or mental disabilities.  Persons with disabilities had limited access to education, employment, health services, information, communications, buildings, transportation, the judicial system, or other state services.

Although the Council of Ministers issued a decree in 2016 ordering access for persons with disabilities to buildings and to educational and work settings, incomplete implementation limited access.  Local NGOs reported many children with disabilities dropped out of public school due to insufficient physical access to school buildings, a lack of appropriate learning materials in schools, and a shortage

EXHIBIT B

of teachers qualified to work with children with developmental or intellectual disabilities.

The minister of labor and social affairs leads the Independent Commission for the Care of People with Disabilities.  Any Iraqi citizen applying to receive disability-related government services must first receive a commission evaluation.  The KRG deputy minister of labor and social affairs leads a similar commission, administered by a special director within the ministry.  In July a group of persons with disabilities burnt their wheelchairs in front of the IKP office in Sulaimaniya in protest, alleging that the KRG commission arbitrarily denied benefits to those who qualified.

There is a 5 percent public-sector employment quota for persons with disabilities, but employment discrimination persisted, and observers projected that the quota would not be met by the end of the year (see section 7.d.).  Mental health support for prisoners with mental disabilities did not exist.

The Ministry of Health provided medical care, benefits, and rehabilitation, when available, for persons with disabilities, who could also receive benefits from other agencies, including the Prime Minister's Office.  The Ministry of Labor and Social Affairs operated several institutions for children and young adults with disabilities.  The ministry maintained loans programs for persons with disabilities for vocational training.

**National/Racial/Ethnic Minorities**

The country's population included Arabs, Kurds, Turkmen, and Shabaks, as well as ethnic and religious minorities, including Chaldeans, Assyrians, Armenians, Yezidis, Sabean-Mandaeans, Baha'i, Kaka'i, and a very small number of Jews.  The country also had a small Romani (Dom) community, as well as an estimated 500,000 citizens of African descent who reside primarily in Basrah and adjoining governorates.  Because religion, politics, and ethnicity were often closely linked, it was difficult to categorize many incidents as based solely on ethnic or religious identity.

The law did not permit some religious groups, including Baha'i, Zoroastrian, and Kaka'i, to register under their professed religions, which, although recognized in the IKR, remain unrecognized and illegal under Iraqi law.  The law forbids Muslims to convert to another religion (see sections 2.d. and section 6, Children).

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

Government forces, particularly certain PMF groups, and other militias targeted ethnic and religious minorities, as did remaining active ISIS fighters.

For example, following the return of central government control in Kirkuk in October 2017, Kurds, Turkmen, Kaka'i, Christians, and other minorities faced discrimination, displacement, and in some cases, violence from government forces, particularly Iran-aligned PMF groups.  Media outlets carried numerous reports of PMF groups invading, looting, and burning the houses of Kurds, Sunni Turkmen, Sunni Arabs, and other ethnic minorities in Kirkuk Governorate.  Kurds faced similar violence in Khanaqin, a majority Kurdish city in Diyala Governorate that also passed from KRG to central government control in October 2017. Discrimination continued to stoke ethnosectarian tensions in the disputed territories throughout the year.  In August, four Kurds, including a Peshmerga, were beheaded by unknown attackers.  The Kaka'i community in Daquq, Kirkuk Governorate, continued to suffer threats, attacks, and assassinations, which Kaka'i civil society groups claimed accelerated under PMF occupation of the area.

Many persons of African descent, some stateless, lived in extreme poverty with high rates of illiteracy and unemployment.  They were not represented in politics, and members held no senior government positions.  Furthermore, they stated that discrimination kept them from obtaining government employment.  Members of the community also struggled to obtain restitution for lands seized from them during the Iran-Iraq war.

There were reports of KRG authorities discriminating against minorities, including Turkmen, Arabs, Yezidis, Shabaks, and Christians, in the disputed territories.  For example, courts rarely upheld Christians' legal complaints against Kurds regarding land and property disputes.

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

While the law does not criminalize consensual same-sex sexual conduct between adults per se, authorities used public indecency or prostitution charges to prosecute such conduct.  Authorities used the same charges to arrest heterosexual persons involved in sexual relations with anyone other than their spouse.  The constitution and law do not extend antidiscrimination protections to LGBTI individuals based on their sexual orientation.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

**IRAQ**

Despite repeated threats and violence targeting LGBTI individuals, specifically gay men, the government failed to identify, arrest, or prosecute attackers or to protect targeted individuals.

LGBTI persons often faced abuse and violence from government and nongovernmental actors that the government did not effectively investigate. In June LGBTI advocacy NGO IraQueer reported 96 percent of surveyed LGBTI individuals experienced threats or violence between 2015 and June. IraQueer reported in June that more than 220 LGBTI individuals were killed in 2017 and stated that the government had not taken steps to prosecute those responsible. In October a video circulated on social media showing a 14-year-old boy dying after being stabbed in an apparent homophobic attack in central Baghdad. In the video the attackers taunted the victim, asking who his boyfriend was and telling him his guts were coming out of his body. In addition to targeted violence, LGBTI persons remained at risk for honor crimes. For example, in July media reported that a father had killed his 12-year-old son because he was playing with his friends in Hamza al-Sharqi, al-Qadisiyah Governorate, but some commentators claimed he was killed for same-sex sexual conduct with his friends.

Local contacts reported that certain PMF groups, including specifically AAH, drafted LGBTI "kill lists" and executed men perceived as gay, bisexual, or transgender, as did ISIS when it still retained territorial control.

LGBTI individuals also faced intimidation, threats, violence, and discrimination in the IKR. In June IraQueer reported the experience of Rawa, a 26-year-old gay man from Duhok Governorate who said he was unable to keep his job because of sexual harassment and violence. Rawa told IraQueer, "I was raped by my boss when I was working as a barista. He then threatened that he would report me to the police if I said anything. I had no choice but to escape." An IKR-based human rights NGO director reported that otherwise-dedicated members of his staff refused to advocate for LGBTI human rights based on their misperception that LGBTI persons are mentally ill.

**Other Societal Violence or Discrimination**

Because religion, politics, and ethnicity were often closely linked, it was difficult to categorize many incidents as based solely on ethnic or religious identity.

Media reported criminal networks and some PMF groups seized Christian properties in Baghdad, as well as areas of Anbar, Babil, Basrah, Diyala, Kirkuk,

EXHIBIT B

Ninewa, and Wasit Governorates, with relative impunity, despite pledges by the Prime Minister's Office to open investigations into the seizures. Yezidis likewise complained about property seizures, intimidation, threats, abuses, and discrimination by certain Iran-aligned PMF groups operating in and around Sinjar, Ninewa Governorate.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The constitution states that citizens have the right to form and join unions and professional associations. The law, however, prohibits the formation of unions independent of the government-controlled General Federation of Iraqi Workers and in workplaces with fewer than 50 workers. The law does not prohibit antiunion discrimination or provide reinstatement for workers fired for union activity. The law allows workers to select representatives for collective bargaining, even if they are not members of a union, and affords workers the right to have more than one union in a workplace. In June the government ratified International Labor Organization Convention 87, Freedom of Association and Protection of the Right to Organize.

The law also considers individuals employed by state-owned enterprises (who made up approximately 10 percent of the workforce) as public-sector employees. CSOs continued to lobby for a trade union law to expand union rights.

Private-sector employees in worksites employing more than 50 workers may form workers committees--subdivisions of unions with limited rights--but most private-sector businesses employed fewer than 50 workers.

Labor courts have the authority to consider labor law violations and disputes, but no information was available concerning enforcement of the applicable law, including whether procedures were prompt or efficient. Strikers and union leaders reported that government officials threatened and harassed them.

The law allows for collective bargaining and the right to strike in the private sector, although government authorities sometimes violated private-sector employees' collective bargaining rights. Some unions were able to play a supportive role in labor disputes and had the right to demand government arbitration.

EXHIBIT B

Media reported that 3,000 contract workers in the electrical industry formed a union in late 2017 after the government failed to pay five months of wages.  After the Ministry of Electricity fired 100 union leaders following initial protests in March, thousands of workers reportedly organized sit-ins at power plants. Protesters reportedly demanded the government reinstate the fired workers, include electrical contract workers in the pension and social security system with the same benefits as permanent workers, and pay them a minimum monthly wage of 400,000 dinars ($335).  In May the government acquiesced to these demands and agreed to include all 150,000 public-sector contract workers in the pension and social security system.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits all forms of forced or compulsory labor--including slavery, indebtedness, and trafficking in persons--but the government did not effectively monitor or enforce the law.  Penalties were not sufficient to deter violations.

Employers subjected foreign migrant workers--particularly construction workers, security guards, cleaners, repair persons, and domestic workers--to forced labor, confiscation of travel and identity documents, restrictions on movement and communications, physical abuse, sexual harassment and rape, withholding of wages, and forced overtime.  There were cases of employers withholding travel documents, stopping payment on contracts, and preventing foreign employees from leaving the work site.

Employers subjected women to involuntary domestic service through forced marriages and the threat of divorce, and women who fled such marriages or whose husbands divorced them were vulnerable to social stigma and further forced labor. Female IDPs, single women, and widows were vulnerable to economic exploitation and discriminatory employment conditions.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**c. Prohibition of Child Labor and Minimum Age for Employment**

The constitution and law prohibit the worst forms of child labor.  In areas under central government authority, the minimum age for employment is 15.  The law limits working hours for persons younger than age 18 to seven hours a day and prohibits employment in work detrimental to health, safety, or morals of anyone

EXHIBIT B

younger than age 18.  The labor code does not apply to juveniles (ages 15 to 18) who work in family-owned businesses producing goods exclusively for domestic use.  Since children employed in family enterprises are exempt from some protections in the labor code with regard to employment conditions, there were reports of children performing hazardous work in family-owned businesses.

The law mandates employers bear the cost of annual medical checks for working juveniles (ages 15-18).  Children between ages 12 and 15 were not required to attend school, but also not permitted to work; thus, they were vulnerable to the worst forms of child labor.  Penalties include imprisonment for a period of 30 days to six months and a fine of up to one million dinars ($838), to be doubled in the case of a repeated offense.  Data on child labor was limited, particularly with regard to the worst forms of child labor, a factor that further limited enforcement of existing legal protections.

Child labor, including in its worst forms, occurred throughout the country.  For example, 12-year-old Mohammed Salem told AFP in July that, since his father was killed by ISIS, he has supported his mother and himself by selling tissues for 15 hours a day on the street in eastern Mosul.  The Iraqi Observatory for Human Rights documented cases of displaced children forced to migrate with their families and subsequently engaged in child labor (see sections 2.d. and 6, Children).

The Ministry of Labor and Social Affairs was charged with enforcing the law prohibiting child labor in the private and public sectors, and labor law enforcement agencies took actions to combat child labor.  Gaps existed within the authority and operations of the ministry that hindered labor law enforcement, however, including an insufficient number of labor inspectors and a lack of funding for inspections, authority to assess penalties, and labor inspector training.  Inspections continued, and resumed in liberated areas, but due to the large number of IDPs, as well as capacity constraints and the focus on maintaining security and fighting terrorism, law enforcement officials and labor inspectors' efforts to monitor these practices were ineffective.  Penalties for violations did not serve as a deterrent.

In the IKR education is mandatory until age 15, which is also the minimum age for legal employment.

In September a Kurdish human rights group found almost 500 children begging in Sulaimaniyah Governorate, and approximately 2,000 children begging in Erbil Governorate, with the majority of these being IDPs and refugees.  The group had

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

no data from Duhok Governorate.  The majority were from IDP or refugee families.  The KRG Ministry of Labor and Social Affairs estimated that 1,700 children worked in the IKR, often as street vendors or beggars, making them particularly vulnerable to abuse.  The KRG Ministry of Labor and Social Affairs operated a 24-hour hotline for reporting labor abuses, including child labor; the hotline received approximately 200 calls per month.

Local NGOs reported that organized gangs also recruited children to beg.  The Ministry of Labor and Social Affairs continued a grants program to encourage low-income families to send their children to school rather than to beg in the streets.

Also, see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings.

**d. Discrimination with Respect to Employment and Occupation**

The constitution provides that all citizens are equal before the law without discrimination based on gender, race, ethnicity, origin, color, religion, creed, belief or opinion, or economic and social status.  The law prohibits discrimination based on gender, race, religion, social origin, political opinion, language, disability, or social status.  It also prohibits any forms of sexual harassment in the workplace. The government was ineffective in enforcing these provisions.  The law does not prohibit discrimination based on age, sexual orientation or gender identity, HIV-positive status, or other communicable diseases.  The law allows employers to terminate workers' contracts when they reach retirement age, which is lower by five years for women.  The law gives migrant Arab workers the same status as citizens but does not provide the same rights for non-Arab migrant workers, who faced stricter residency and work visa requirements.

Discrimination in employment and occupation occurred with respect to women, foreign workers, and minorities (see section 6).  Media reported in February and June that the availability of foreign workers willing to accept longer hours and lower pay in unskilled positions has increased Iraqi unemployment to approximately 30 percent and led foreign workers to commandeer certain undesired industries such as janitorial services and the food industry, resulting in social stigmatization.  Economic analyst Anas Morshed told media in February, "For example, Bangladeshis are most favored for cleaning work, whereas trades and shopping centers prefer to hire Syrians and other Arab nationalities."

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor

EXHIBIT B

At the beginning of this year, there were seven unions in the IKR, all led by all-male executive boards.  In response, the Kurdistan United Workers Union established a separate women's committee, reportedly supported by local NGOs, to support gender equality and advance women's leadership in unions in the IKR.

**e. Acceptable Conditions of Work**

The national minimum wage, set by federal labor law, increased to 350,000 dinars ($293) per month.  The law limits the standard workday to eight hours, with one or more rest periods totaling 30 minutes to one hour, and the standard workweek to 48 hours.  The law permits up to four hours of overtime work per day and requires premium pay for overtime work.  For industrial work, overtime should not exceed one hour per day.  The government sets occupational health and safety standards.  The law states that for hazardous or exhausting work, employers should reduce daily working hours.  The law provides workers the right to remove themselves from a situation endangering health and safety without prejudice to their employment but does not extend this right to civil servants or migrant workers, who together made up the majority of the country's workforce.

The Ministry of Labor and Social Affairs has jurisdiction over matters concerning labor law, child labor, wages, occupational safety and health topics, and labor relations.  The ministry's occupational safety and health staff worked throughout the country, but the government did not effectively enforce regulations governing wages or working conditions.

The legal and regulatory framework, combined with the country's high level of violence and insecurity, high unemployment, large informal sector, and lack of meaningful work standards resulted in substandard conditions for many workers.  Workplace injuries occurred frequently, especially among manual laborers.  A lack of oversight and monitoring of employment contracts left foreign and migrant workers vulnerable to exploitative working conditions and abusive treatment.  Little information was available on the total number of foreign workers in the country, although some observers reported that large groups of migrant workers, many of them in the country illegally, lived in work camps, sometimes in substandard conditions.

EXHIBIT B



# AMNESTY INTERNATIONAL REPORT 2017/18

## THE STATE OF THE WORLD'S HUMAN RIGHTS

AMNESTY INTERNATIONAL

EXHIBIT C

# AMNESTY INTERNATIONAL

Amnesty International is a global movement of more than 7 million people who campaign for a world where human rights are enjoyed by all. Our vision is for every person to enjoy all the rights enshrined in the Universal Declaration of Human Rights and other international human rights standards. We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and public donations.

First published in 2018 by Amnesty International Ltd

Peter Benenson House, 1, Easton Street, London WC1X 0DW United Kingdom

© Amnesty International 2018

Index: POL 10/6700/2018

ISBN: 978-0-86210-499-3

A catalogue record for this book is available from the British Library.

Original language: English

Except where otherwise noted, content in this document is licensed under a CreativeCommons (attribution, non-commercial, no derivatives, international 4.0) licence.
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode

For more information please visit the permissions page on our website: www.amnesty.org

amnesty.org

This report documents Amnesty International's work and concerns through 2017.

The absence of an entry in this report on a particular country or territory does not imply that no human rights violations of concern to Amnesty International have taken place there during the year. Nor is the length of a country entry any basis for a comparison of the extent and depth of Amnesty International's concerns in a country.

EXHIBIT C

assessments of their "maturity" at the time of the crime.

The death penalty was maintained for vaguely worded offences such as "insulting the Prophet", "enmity against God" and "spreading corruption on earth".

In August, spiritual teacher and prisoner of conscience Mohammad Ali Taheri was sentenced to death for the second time for "spreading corruption on earth" through establishing the spiritual group Erfan-e Halgheh; in October the Supreme Court quashed the death sentence. He remained in solitary confinement.

Prisoner of conscience Marjan Davari was sentenced to death in March for "spreading corruption on earth" in connection with her membership of the religious group Eckankar and for translating their materials. The Supreme Court subsequently quashed the death sentence and sent the case back to the Revolutionary Court in Tehran for retrial.

The Islamic Penal Code continued to provide for stoning as a method of execution.

Some consensual same-sex sexual conduct remained punishable by death.

# IRAQ

**Republic of Iraq**
Head of state: **Fuad Masum**
Head of government: **Haider al-Abadi**

**Iraqi and Kurdish forces, paramilitary militias, coalition forces and the armed group Islamic State (IS) committed violations of international humanitarian law, war crimes and gross human rights abuses in the armed conflict. IS fighters forcibly displaced thousands of civilians into active conflict, used them as human shields on a mass scale, deliberately killed civilians fleeing the fighting, and recruited and deployed child soldiers. Iraqi and Kurdish forces and paramilitary militias extrajudicially executed captured fighters and civilians fleeing the conflict and destroyed homes and other civilian property. Iraqi and Kurdish forces as well as government authorities arbitrarily detained, forcibly disappeared and tortured civilians suspected of being affiliated with IS. Courts subjected IS suspects and other individuals suspected of terrorism-related offences to unfair trials and sentenced them to death on the basis of "confessions" extracted under torture. Executions continued at an alarming rate.**

## BACKGROUND

By December, the Iraqi government, Kurdish forces, paramilitary militias and US-led coalition forces had recaptured the territory and population centres held by IS, including east Mosul in January, west Mosul in July, Tel Afar in August and Hawija in October. By November, more than 987,648 people in Nineveh governorate had been internally displaced as a result of the military operation to recapture Mosul and surrounding areas. More than 3 million people remained internally displaced across Iraq.

On 25 September the Kurdish Regional Government (KRG) held a referendum on independence in the Kurdistan Region of Iraq (KR-I) as well as in the "disputed areas" of Iraq, including areas in the governorates of Nineveh, Kirkuk, Salah al-Din and Diyala. Preliminary results showed that approximately 93% of votes were cast in favour of independence. The government of Iraq declared the referendum illegal and unconstitutional. Following the referendum, Iraqi government forces and pro-government forces including the Popular Mobilization Units (PMU) retook control of Kirkuk governorate as well as areas of Nineveh, Salah al-Din and Diyala governorates.

## ABUSES BY ARMED GROUPS

IS committed gross human rights abuses and serious violations of international humanitarian law, some of which amounted to war crimes. It forcibly displaced thousands of civilians into zones of active hostilities in an attempt to shield their own fighters. IS deliberately killed civilians who were trying to flee the fighting and hanged their bodies in public areas as a warning to others who were

EXHIBIT C

contemplating escape. It carried out execution-style killings which targeted opponents, and recruited and deployed child soldiers. In Mosul, IS regularly denied medical care to civilians, and its fighters occupied several medical buildings and hospitals to avoid being targeted by Iraqi and coalition forces.

IS killed and injured civilians across Iraq in suicide bombings and other deadly attacks that deliberately targeted civilians in markets, Shi'a religious shrines and other public spaces. On 2 January, bombings by IS in the predominantly Shi'a neighbourhood of Sadr City in the capital, Baghdad, killed at least 35 people and injured more than 60. Suicide attacks on 30 May outside an ice-cream parlour and a government building in Baghdad killed at least 27 people and wounded at least 50. An IS attack on a restaurant frequented by Shi'a pilgrims in Nasiriya on 14 September killed at least 84 people and injured 93.

The UN reported in October that as many as 1,563 Yazidi women and children remained in IS captivity in Iraq and Syria. They were subjected to rape and other torture, assault and enslavement. Those who managed to escape or were freed after their relatives paid ransoms did not receive adequate remedies, including the necessary care and support required to help rebuild their lives. The UN stated in August that at least 74 mass graves had been discovered in areas previously controlled by IS in Iraq.

## ARMED CONFLICT – VIOLATIONS BY GOVERNMENT FORCES, COALITION FORCES AND MILITIAS

Government forces, paramilitary militias and coalition forces committed repeated violations of international humanitarian law, some of which may amount to war crimes. In west Mosul, Iraqi and coalition forces launched a series of disproportionate or otherwise indiscriminate attacks. In one such attack, on 17 March in Mosul al-Jadida neighbourhood, at least 105 civilians were killed by a US air strike targeting two IS snipers.

In west Mosul, Iraqi forces consistently used explosive weapons with wide-area effects, such as improvised rocket-assisted munitions (IRAMs), which cannot be precisely targeted at military objectives or used lawfully in populated civilian areas. In east Mosul, hundreds of civilians were killed in air strikes launched by the coalition and Iraqi forces on their homes or places where they sought refuge as they followed Iraqi government instructions not to leave during the battle.

Iraqi and Kurdish government forces and paramilitary militias carried out extrajudicial executions of men and boys suspected of being affiliated with IS. In the final weeks of the Mosul battle between May and July, consistent reports emerged that Iraqi forces, including the Emergency Response Division, Federal Police and the Iraqi Security Forces, had detained, tortured and extrajudicially executed men and boys who were fleeing the fighting.

## ARBITRARY ARRESTS AND DETENTIONS

Thousands of men and boys considered to be of fighting age (roughly 15 to 65) fleeing territories controlled by IS were subjected to security screenings by Iraqi security forces, Kurdish forces and paramilitary militias at temporary reception sites or in makeshift detention facilities. Men suspected of affiliation with IS were held for days or months, often in harsh conditions, or transferred onward. Iraqi forces, Kurdish forces and paramilitary militias, including the PMU, arrested thousands more alleged "terrorism" suspects without judicial warrant from their homes, checkpoints and camps for internally displaced people (IDPs).

### TORTURE AND ENFORCED DISAPPEARANCES

Men and boys suspected of being members of IS were subjected to enforced disappearance – cut off from their families and the outside world – in facilities controlled by the Iraqi Ministries of the Interior and Defence, the KRG and in secret detention centres. Detainees were interrogated by security officers without lawyers present and were routinely tortured. Common forms of torture included beatings on the head and

EXHIBIT C

body with metal rods and cables, suspension in stress positions by the arms or legs, electric shocks, and threats of rape of female relatives. Detainees faced limited access to medical care, which led to deaths in custody and amputations. They also endured harsh conditions, including severe overcrowding, poor ventilation and lack of access to showers or toilets.

## UNFAIR TRIALS

The criminal justice system in Iraq remained deeply flawed. Defendants, in particular "terrorism" suspects, were routinely denied the rights to adequate time and facilities to prepare a defence, to not incriminate oneself or confess guilt, and to question prosecution witnesses. Courts continued to admit "confessions" that were extracted under torture as evidence. Many of those convicted after these unfair and hasty trials were sentenced to death.

Between July and August, the Iraqi authorities issued arrest warrants for at least 15 lawyers who were defending suspected IS members, accusing the lawyers of being affiliated with IS. These arrests caused concern among other lawyers that they could be arrested simply for defending IS suspects.

## INTERNALLY DISPLACED PEOPLE

More than 3 million people remained internally displaced across Iraq. The displaced sheltered in host communities, IDP camps, informal settlements and buildings under construction. By November, more than 987,648 people in Nineveh governorate had been displaced as a result of the Mosul military operation. Humanitarian agencies reported significant shortfalls in international funding.

Civilians in IDP camps experienced shortages of food, water, medicine and other basic needs. Freedom of movement in IDP camps was severely limited, and camp residents reported that civilians, including children, were recruited from camps by paramilitary militias – sometimes forcibly – and that family members had been forcibly disappeared from public areas in the camps

and from their tents. Families were separated for days or months due to screening procedures carried out at temporary reception centres. Women heads of households who sheltered in IDP camps – particularly those whose male relatives were suspected of affiliation with IS – reported being subjected to rape and other sexual abuse and exploitation and systematic discrimination, including having inadequate and unequal access to food, water and other basic supplies.

### FORCED DISPLACEMENT AND DESTRUCTION OF PROPERTY

In the context of the armed conflict involving IS, Iraqi government forces and paramilitary militias forcibly displaced civilians and destroyed their homes on a mass scale. For example, early in the year Sunni tribal militias within the PMU known as the Hashad al-Ashari, alongside Iraqi government forces, forcibly displaced at least 125 families from Salah al-Din governorate perceived to be affiliated with IS, following a decree issued by local authorities authorizing their displacement. The families were then held against their will in an IDP camp functioning as a detention centre near Tikrit.

## ARMS TRADE

Factions of the PMU, which had committed war crimes and other serious violations across central and northern Iraq since 2014, benefited from transfers of arms from a range of countries, including the USA, Russia and Iran. The transferred weapons included armoured vehicles and artillery as well as a wide range of small arms. Poor management of weapons stocks and a thriving in-country and cross-border illicit trade led to the arming of militia groups, further undermining security.

## FREEDOM OF EXPRESSION – KURDISTAN REGION OF IRAQ

Journalists and online activists in the KR-I were subject to arbitrary arrest, beatings, surveillance, death threats, and smear campaigns intended to damage their reputations or the reputations of their family

EXHIBIT C

members. This trend of interference in the freedom of expression of journalists and online activists appeared to escalate in the run-up to the independence referendum in the KR-I; Amnesty International documented 12 cases of arbitrary arrests, beatings and intimidation of journalists and online activists between June and September.

On 14 March, security forces, including anti-riot police belonging to the KR-I and Syrian fighters under the command of the KRG ("Rojava Peshmerga"), used tear gas canisters and fired live ammunition to disperse Yazidi protesters. The protesters were calling for the Rojava Peshmerga forces to leave the area, following clashes between members of the Rojava Peshmerga and Sinjar Resistance Unit earlier that month. Protesters and witnesses reported that Nazeh Nayef Qawal, a Yazidi woman, was killed during the violent dispersal of protesters.

## IMPUNITY

In response to allegations of serious violations of international humanitarian law and war crimes committed by Iraqi forces and pro-government militias – such as torture, extrajudicial execution and enforced disappearance – the Iraqi authorities established committees to evaluate the available evidence and launch investigations. Such committees consistently failed to release any findings publicly or to communicate their findings to international or national NGOs. More than a year since 643 men and boys from Saqlawiya in the Anbar governorate were abducted and forcibly disappeared by PMU militias, a committee established by the Office of the Prime Minister on 5 June 2016 had failed to publicly release any findings.

On 21 September the UN Security Council passed a unanimous resolution aimed at ensuring accountability for war crimes and human rights abuses committed by IS. However, the resolution crucially failed to include any provisions to ensure accountability for crimes committed by Iraqi forces, paramilitary militias such as the PMU, the US-led coalition and others responsible for grave violations of international law, including war crimes, during the conflict.

## DEATH PENALTY

Iraq remained one of the world's most prolific users of the death penalty. Scores of people were sentenced to death by courts after unfair trials and executed by hanging. The death penalty continued to be used as a tool of retribution in response to public outrage after attacks claimed by IS. In January, dozens of men were hanged for their alleged role in the killing of 1,700 Shi'a cadets at Speicher military camp near Tikrit in 2014. The men, whose "confessions" were extracted under credible allegations of torture, were convicted following deeply flawed and hasty trials. These mass executions followed a similar mass execution in August 2016, also in relation to the Speicher massacre. On 25 September, dozens of men were executed on "terrorism" charges. This mass execution took place 11 days after an IS suicide attack in Nasiriya on 14 September that killed at least 84 people.

# IRELAND

Ireland
Head of state: **Michael D. Higgins**
Head of government: **Leo Varadkar (replaced Enda Kenny in June)**

**Historical abuses against women and girls were not adequately addressed. Access to and information about abortion remained severely restricted and criminalized. Concerns remained about "direct provision" accommodation provided to asylum-seekers.**

## WOMEN'S RIGHTS

In March, the CEDAW Committee published its concluding observations on Ireland's sixth and seventh reports. It expressed concern at Ireland's abortion laws, measures to combat violence against women, including funding cuts to non-governmental support services, and the impact of austerity measures on the funding for women's NGOs.

EXHIBIT C

# Report on Human Rights in Iraq

# January to June 2017



"©UNMAS"
Female student between classes at Mosul University in East Mosul, Iraq. This university recently reopened after being cleared of explosives by UNMAS implementing partners.
About 900 students are currently studying at the university, but much of it is destroyed and needs to be rebuilt or have equipment replaced. (UNMAS/Cengiz Yar)



United Nations Assistance Mission
for Iraq (UNAMI)
بعـثـة الأمـم المتـحـدة لمسـاعدة
العـراق (يـونـامي)
http://uniraq.org



United Nations
**Human Rights**

OFFICE OF THE HIGH COMMISSIONER FOR HUMAN RIGHTS

EXHIBIT D

Table of Contents

1. INTRODUCTION .................................................................................................................... 1

2. METHODOLOGY ................................................................................................................... 1

3. PROTECTION OF CIVILIANS ................................................................................................ 1

    3.1. CIVILIAN CASUALTIES ................................................................................................ 3

    3.2. CHILD CASUALTIES .................................................................................................... 3

4. RULE OF LAW AND CRIMINAL JUSTICE/ADMINISTRATION OF JUSTICE............................ 3

    4.1. DUE PROCESS ............................................................................................................ 4

    4.2. ACCOUNTABILITY ..................................................................................................... 5

    4.3. ILL-TREATMENT AND TORTURE................................................................................ 6

    4.4. DETENTION STANDARDS ........................................................................................... 6

    4.5. KURDISTAN REGION OF IRAQ.................................................................................... 7

        4.5.1. Legislative Framework ................................................................................... 7

        4.5.2. Due process .................................................................................................... 8

        4.5.3. Ill-Treatment and Torture ............................................................................. 9

        4.5.4. Detention Standards ...................................................................................... 9

        4.5.5. Women and Juveniles in detention ................................................................ 9

5. DEATH PENALTY ............................................................................................................... 10

    5.1. KURDISTAN REGION OF IRAQ.................................................................................. 10

6. RIGHTS OF WOMEN .......................................................................................................... 11

    6.1. LEGAL AND POLICY FRAMEWORK ........................................................................... 11

    6.2. VIOLENCE AGAINST WOMEN .................................................................................. 11

    6.3. SHELTERS ................................................................................................................ 12

    6.4. THE DRAFT FAMILY PROTECTION LAW ................................................................... 13

    6.5. KURDISTAN REGION OF IRAQ.................................................................................. 14

        6.5.1. Legal and Policy Framework ....................................................................... 14

EXHIBIT D

6.5.2. *Violence against Women* ........................................................................... *14*

6.5.3. *Shelters* .................................................................................................... *15*

7. RIGHTS OF ETHNIC AND RELIGIOUS GROUPS ............................................................. 15

   7.1. KURDISTAN REGION OF IRAQ ........................................................................... 16

8. SEXUAL MINORITIES/LGBTI ..................................................................................... 17

9. RIGHTS OF PERSONS WITH DISABILITIES (PWD) ........................................................ 17

   9.1. KURDISTAN REGION OF IRAQ ........................................................................... 18

10. FREEDOM OF OPINION AND EXPRESSION, AND FREEDOM OF PEACEFUL ASSEMBLY/ASSOCIATION 18

   10.1. FREEDOM OF OPINION AND EXPRESSION ......................................................... 19

   10.2. FREEDOM OF ASSEMBLY AND ASSOCIATION .................................................... 19

   10.3. FREEDOM OF EXPRESSION BILL .................................................................... 19

   10.4. KURDISTAN REGION OF IRAQ ........................................................................ 19

11. CAPACITY DEVELOPMENT ACTIVITIES ..................................................................... 21

   11.1. KURDISTAN REGION OF IRAQ ........................................................................ 21

12. NATIONAL HUMAN RIGHTS INSTITUTIONS AND UPR ACTION PLANS ........................... 22

   12.1. SUPPORT TO THE IRAQI HIGH COMMISSION FOR HUMAN RIGHTS ................... 22

   12.2. UPR ACTION PLANS .................................................................................... 23

EXHIBIT D

## Recommendations

### Recommendations for the Government of Iraq

#### *Protection of Civilians*

- Investigate effectively, promptly, thoroughly, and impartially all allegations of violations or abuses of international human rights law and violations of international humanitarian law by all parties to the conflict and, where appropriate, prosecute those who are found responsible for such acts. Ensure that the findings of such investigations are made public.

- Ensure that arrests and detention of individuals in connection with the ongoing conflict are carried out on legal grounds only and supported by credible and sufficient evidence, and that all due process rights and fair trial rights guaranteed by the Constitution of Iraq and international law are fully respected.

- Ensure the protection of mass graves, along with appropriate care and measures to excavate such sites and exhume and identify the mortal remains, and to preserve evidence of crimes committed; including any that may lead to the identification of perpetrators. Conduct independent, public coronial inquiries into each mass grave, to identify the victims, collect evidence of wrongdoing, and fully investigate and determine the circumstances that led to the deaths of the individuals concerned; ensure that family members of victims and missing persons are provided with all available information and adequate and timely financial, material and other assistance.

- Ensure that survivors of human rights violations, particularly of sexual and gender-based violence, receive adequate support, including psycho-social support and medical care.

- Ensure the rights of all victims to an effective remedy, including the right to equal and effective access to justice and adequate, effective, and prompt reparation for the harm suffered.

- Ensure that individuals and families with allegedly ISIL-affiliated relatives are not subjected to threats and forced evictions, which may amount to collective punishment and are in clear contravention of the Constitution of Iraq and international human rights law and international humanitarian law binding on Iraq, including the International Covenant on Civil and Political Rights ratified by Iraq in 1971.

- Ensure that, as soon as practicably possible after liberation of areas from ISIL control, responsibility for law and order is restored to civilian control, and that measures are taken to ensure the human rights of people are protected and basic humanitarian needs of civilians residing in those areas or voluntarily returning are met. Additionally, conduct operations to mark and clear unexploded ordnance from contested areas immediately after retaking the areas from ISIL.

- Introduce amendments to the Iraqi Criminal Law to allow international crimes committed in Iraq to be prosecuted as such in domestic courts..

- Accede to the Rome Statute of the International Criminal Court. As an immediate step, accept the

EXHIBIT D

exercise of the Court's jurisdiction with respect to the specific situation faced by the country, pursuant to Article 12(3) of the Rome Statute.

### *Rule of Law and Administration of Justice*

- Undertake comprehensive criminal justice reforms, including a review of the Iraqi Criminal Code no. 111 of 1969, the Iraqi Criminal Procedures Code no. 23 of 1971, and the Anti-Terrorism Law no. 13 of 2005 to ensure their provisions comply with international human rights law and the Constitution of Iraq, including with regard to rights of due process and fair trial.

- Allocate sufficient resources to training police and investigators on due process and fair trial standards, and on appropriate techniques for investigating crimes, including the gathering of forensic and other evidence.

- Ensure compliance by all State officials and their representatives with Iraq's Constitutional and international legal obligations, including in relation to the full implementation of the Convention against Torture. Ensure that all allegations of torture and other cruel, inhuman or degrading treatment or punishment (ill-treatment) are promptly, thoroughly, impartially and independently investigated, that perpetrators are charged and tried according to law, and that victims are appropriately and adequately compensated, including by providing appropriate medical, social and other assistance.

- Establish an independent oversight body, such as an ombudsman or police disciplinary tribunal, to investigate allegations of abuse of authority or breach of professional standards by police.

- Establish a judicial police service responsible for bringing detainees from police detention to hearings with the investigative magistrate. Also ensure defendants who have been before the investigative magistrate are not returned to police custody and are released on bail or transferred to Ministry of Justice facilities.

- Conduct prompt, independent, impartial and thorough investigations of cases of alleged enforced disappearances.

- Ensure that judges' and lawyers' security and safety are guaranteed.

### *Detention Standards*

- Address concerns raised by UNAMI/OHCHR through its monitoring of detention facilities regarding detention conditions through long-term solutions, and allow UNAMI/OHCHR to conduct confidential interviews with detainees.

- Resume literacy classes and vocational trainings by the Ministry of Education for detainees to fulfil the rehabilitation aspect of imprisonment, and conduct regular courses for detainees to counter extremism and radicalization.

EXHIBIT D

- Resume, with the support of UNAMI/OHCHR, external training for security sector employees including on compliance by prison staff with human rights standards.

### *Death Penalty*

- Declare an immediate moratorium on the use of the death penalty in accordance with United Nations General Assembly resolutions 62/149 (2007), 63/168 (2008), 65/206 (2010) and 67/176 (2012), 69/186 (2014), and 71/187 (2016); review the Iraqi Penal Code Law No. 111 of 1969 and the Criminal Procedure Code Law No. 23 of 1971 with a view to abolishing the death penalty or limiting its potential application to only the most serious crimes; and consider acceding to the Second Optional Protocol to International Covenant on Civil and Political Rights (ICCPR) aimed at abolishing the death penalty.

- Implement international standards that provide safeguards of the rights of those facing the death penalty, as set out in the annex to Economic and Social Council resolution 1984/50 of 25 May 1984, until the death penalty is abolished in Iraq.

- Establish a special judicial oversight body to monitor trials that may lead to the death penalty to ensure respect for due process and fair trial standards.

- Issue a directive to judges stating that a conviction of an accused person solely on the basis of a confession or evidence obtained under duress, particularly where there are allegations of torture and/or ill-treatment during the investigation, or based on the testimony of secret informants amounts to a human rights violation.

### *Women's human rights*

- Revise the draft Family Protection Law to ensure that it includes measures to prevent sexual and gender-based violence (SGBV), offers protection to the survivors of SGBV, and ensures accountability of the perpetrators of such violence, in compliance with international standards, and ensure its earliest adoption.

- Implement the commitments made in the Joint Communiqué of the Republic of Iraq and the United Nations on Prevention and Response to Conflict-related Sexual Violence dated 23 September 2016, including full implementation of the National Strategy on Combatting Violence against Women.

- Review relevant legislation, including the Iraqi Penal Code No. 111 of 1969 to ensure full compliance with international human rights obligations in relation to promoting and protecting women's rights. Priority should be given to removing 'honour' as a mitigating factor in the commission of crimes of violence against women and family members, as well as provisions of criminal law that permit individuals accused of rape or sexual assault to quash criminal cases against them by marrying victims.

- Provide adequate resources for psycho-social and medical support, including establishment of shelters, for victims of domestic or other forms of violence.

EXHIBIT D

- Issue directives that require officials responsible for law enforcement and administration of justice to promptly, thoroughly, independently and impartially investigate all allegations of violence against women, in particular suspected "honour crimes," to ensure that the perpetrators of such acts are held accountable.

- Provide appropriate capacity-building activities to law enforcement personnel on gender issues, particularly on violence against women.

### Rights of ethnic, religious, and other groups

- Adopt the draft Law on the Protection of the Rights of Religious and Ethnic Minority Groups as proposed by Iraqi civil society organisations, ensuring that the law contains: an appropriate and inclusive definition of minorities; a mechanism by which minority groups can claim protection for cultural, religious, linguistic and heritage rights; cross-references to other legislation, removing any uncertainty about its primacy; and mechanisms for implementation capable of making binding decisions.

- Adopt the draft Law on Protection of Diversity and Prohibition of Discrimination put forth by Iraqi civil society organisations, which aims to eliminate discrimination based on race, colour, sex, language, religion, political or other opinion, national or social origin, disability, birth, or other status.

- Strengthen the capacity of the Office on Minorities Issues, which works within the National Reconciliation Committee and reports to the Office of the Prime Minister. Ensure that the Ministry of Education takes appropriate action on specific incidents of discrimination in education.

### Rights of Persons with Disabilities

- Review and amend the Law No. 38 of 2013 on the Care of Persons with Disabilities and Special Needs to ensure it is fully compliant with the Convention on the Rights of Persons with Disabilities (CRPD) and relevant international human rights norms and standards.

- Strengthen the legal framework for the promotion and protection of the rights of persons with disabilities to address prevailing attitudinal and physical barriers that prevent the full and equal participation of persons with disabilities in society.

- Ratify the Optional Protocol to the CRPD.

- Extend an invitation to the Special Rapporteur on the Rights of Persons with Disabilities to visit Iraq.

### Right to freedom of expression and opinion

- Undertake a review of all existing laws and policies (including the draft Law on Freedom of Expression, Assembly, and Peaceful Protest) to ensure that they provide for and protect the right to freedom of expression and opinion of all persons in accordance with international human rights standards.

EXHIBIT D

- Ensure that all prospective legislation respects and protects the rights of all individuals to receive and impart information freely and without hindrance, subject to certain restrictions as necessary in accordance with Iraq's obligations under international human rights law. Ensure journalists and media workers are protected against harassment and violence in the performance of their profession, that all allegations are promptly and thoroughly investigated, and those responsible are held accountable according to law.

### *Right to freedom of assembly*

- Ensure that the right of individuals to demonstrate peacefully is fully respected by relevant authorities in line with applicable international human rights norms.

- Conduct training courses for police and other law enforcement officials on management of public assemblies in compliance with international standards.

- Undertake public education campaigns aimed at creating awareness of individuals' rights, special duties, and responsibilities, particularly in relation to the rights to freedoms of expression, opinion and assembly.

### **Recommendations for the Kurdistan Regional Government**

### *Protection of Civilians*

- Ensure that the structure and lines of command of all security forces operating under the control the Kurdistan Regional Government are properly legislated, including defining a clear accountability system for those who commit violations of international humanitarian law and international human rights law.

### *Rule of Law and Administration of Justice*

- Ensure full respect for the right to a fair trial for all detainees, including persons who have engaged in hostilities and who are being detained by or handed over to the Kurdistan Regional Government. This includes that they are promptly informed of the charges, they have access to independent legal counsel, and they are brought before a court to be tried within a reasonable time.

- Release immediately or prosecute and bring to trial all detainees held for prolonged periods of time without charge.

- Without exception, transfer any juveniles being held in adult detention facilities to the Women and Juveniles Reformatories and ensure that they are accorded all fair trial rights and protections as required by international law applicable to juveniles subject to the criminal justice system.

EXHIBIT D

- Establish the legal age of criminal responsibility at 13 years and institute alternatives to detention and imprisonment of juveniles. Make detention and imprisonment of juveniles applicable only as an exception, if and when no other measures are deemed effective.

### Detention Standards

- Develop strategies that consider a full range of criminal justice policy and practice options, for the short, medium and long-term reduction of overcrowding in detention facilities.

### Death Penalty

- Reinstate and make official the moratorium on the death penalty, including in relation to current convicts sentenced to death in the Kurdistan Region of Iraq (KR-I).

### Women's human rights

- Amend the Act of Combatting Domestic Violence to extend its scope so that all forms of violence against women, not only domestic violence, are covered.

- Strengthen the capacity of police, investigators, judges and prosecutors, including through training courses, to ensure cases of domestic violence are handled in an appropriate and sensitive manner that prioritises the safety of the victim(s).

- Approve the shelter by-law drafted by the Ministry of Labour and Social Affairs (KR-I), which clarifies the role of relevant government ministries in relation to shelters for women seeking refuge from domestic violence and violence against women.

- Develop programmes to assist women leaving shelters to lead a normal life, including, for example, employment initiatives, workforce training courses, and opportunities for continuing (adult) education.

### Rights of ethnic, religious, and other groups

- Strengthen the school curriculum and public education on human rights principles and fundamental freedoms to foster universal values, equal opportunities, respect for diversity and non-discrimination, including by implementing the proposal to mainstream key human rights principles submitted by UNAMI/OHCHR to the Ministry of Education (KR-I) in December 2016.

- Undertake measures to resolve the land disputes alleged by the Assyrian community and ensure that judicial decisions ordering the return of lands to Assyrians are enforced.

### Rights of Persons with Disabilities

- Amend the Rights and Privileges of Disabled Persons and those with Special Needs Law No. 22 of 2011 to ensure it complies with the CRPD, and that it is fully implemented.

EXHIBIT D

*Right to freedom of expression and opinion*

- Ensure the unrestricted work of media professionals; take measures to prevent violations and protect journalists from harassment and violence in the performance of their profession; and conduct prompt and transparent investigations into all violations against media outlets and media workers.

- Pursue an effective investigation in relation to the killing of journalist Widad Hussein.

*KRI Regional Human Rights Institutions*

- Support the independence of the Independent Board of Human Rights and provide adequate funding to ensure the successful implementation of its mandate.

*Engagement with International Human Rights Mechanisms: Universal Periodic Review*

- Adopt the draft Regional Human Rights Action Plan aiming at facilitating the effective implementation of relevant recommendations of the second cycle of the Universal Periodic Review for Iraq.

## Executive Summary

This report, published by the Human Rights Office of the United Nations Assistance Mission for Iraq (UNAMI) in cooperation with the Office of the United Nations High Commissioner for Human Rights (OHCHR), covers the period 1 January to 30 June 2017.

The overall human rights situation in Iraq remained precarious. The ongoing armed conflict between the Government of Iraq and pro-Government forces and the Islamic State of Iraq and the Levant ('ISIL' also known as 'Daesh') has exacerbated violence and terrorism in Iraq and further eroded a range of human rights, including those pertaining to the rule of law and administration of justice, the care and protection of women and children from sexual and gender-based violence (SGBV) and conflict-related sexual violence (CSRV) and accountability for perpetrators, the respect and protection of the rights of minority ethnic and religious and other communities, protection of sexual minorities, and the rights of persons with disabilities, and the respect for the rights of freedom of expression and freedom of assembly. In addition to serious human rights abuses and the destruction of private and public property, many Iraqis also continue to have limited access to essential services and economic opportunities.

The majority of civilian casualties that occurred during the reporting period were the result of a sustained and deliberate policy of ISIL directly targeting civilians. From 1 January 2017 to 30 June 2017, there were a reported 5,706 civilian casualties resulting from the ongoing violence. This figure includes 2,429 persons killed and 3,277 wounded. Cumulatively, from  1 January 2014 to 30 June 2017, UNAMI/OHCHR recorded 82,750 civilian casualties (29,104 killed and 53,646 wounded) from armed conflict, terrorism and violence throughout Iraq. These figures should be considered as an absolute minimum.

EXHIBIT D

Indiscriminate attacks by ISIL demonstrated a complete disregard for the impact on civilian lives. ISIL deliberately used civilians as human shields to protect its fighters, bases and strategic locations from attacks by forces under the control of the Government of Iraq and its allies and to increase civilian casualties. As Government-led military operations re-took larger areas from ISIL in and around Mosul, Tal Afar and other areas, ISIL retaliated by intensifying attacks against civilians attempting to flee areas unders its control in addition to targeting civilians for not supporting ISIL *takfiri* doctrines. ISIL targeted civilians delibertively; religious and community leaders, members of the Iraqi government, Iraqi security forces, and media, medical, education, and other professionals, particularly female professionals were all targets of their attacks.  ISIL also continued to subject women and children from minority ethnic and religious communities to conflict related sexual violence (CRSV), including rape and other forms of sexual violence of comparable gravity.

UNAMI/OHCHR recorded instances of alleged violations and abuses of human rights allegedly involving ISF members, but conclusive information could not be obtained. In other cases, alleged incidents were filmed on videos that were posted on social media. UNAMI/OHCHR advocated with the Government of Iraq and other authorities for prompt and thorough investigations to be carried out and for those responsible to be brought to justice.

Airstrikes also claimed civilian lives and damaged civilian property and infrastructure in areas under the control of ISIL during the period covered by this report. In many investigations, UNAMI /OHCHR was not able to determine the exact nationality of the aircraft  involved in the specific airstrikes mentioned below.

With respect to the rule of law and the administration of justice, conditions in prisons and other detention facilities throughout Iraq remain inadequate. The most pressing challenge is overcrowding, also attributable to the closure of facilities and the transfer of detainees to secure facilities in southern Iraq. Conditions for women and children in prisons and reformatories remain equally dire; children have limited access to education, medical and social services specific to their needs.

At present, Iraq does not have adequate legislative frameworks to prevent or protect women and children from domestic, sexual and gender-based violence or provide safe spaces to survivors of such violence. There is a lack of financial or in-kind support to shelters or other safe spaces where women and children can safely escape domestic violence or other life threatening situations. Many of these women are unjustly incarcerated as "prostitutes" or threatened with honour killings by members of their own families. Additionally, there are no accountability mechanisms in place for the perpetrators of domestic and sexual violence against Iraqi women. UNAMI/OHCHR remains troubled by the lack of movement in the Council of Representatives to push through domestic violence legislation that is in accordance with international human rights norms and standards. The draft Family Protection Law remains stalled in Parliament, as the current iteration of the draft law prioritises family reconciliation over justice and protection of survivors of abuse. The draft law also fails to offer long-term protection for victims, penalise offenders, or establish obligations for police and prosecutors to respond to domestic violence incidents.

Minority ethnic and religious communities continue to suffer large-scale displacement and subsequent destruction of communities as a result of the protracted armed conflict. In many cases, minorities are directly targeted based on religion, culture or other differences. In addition to societal discrimination,

x

EXHIBIT D

Persons with Disabilities (PwD) or other special needs continually face barriers to employment and economic opportunities to achieve their full potential in political, social and economic life.

Discrimination and attacks against sexual minorities/LGBTI persons intensified over the reporting period with reports of increased threats, physical attacks, kidnappings, and in some cases, killings due to sexual orientation and gender identity, whether perceived or real. Threats and harassment on social media escalated in some cases to attacks, abductions, torture, mutilation and killings.

Respect for and protection of the rights of freedom of expression and freedom of assembly was under constant threat throughout the reporting period. UNAMI/OHCHR received several reports of intimidating, threatening, beating, abducting and in some cases, the killing of journalists. Many Iraqis did not enjoy the freedom to peaceful assembly and there were several documented incidents of security forces employing rough, and at times disproportionate, responses to public gatherings. Of particular concern to UNAMI/OHCHR, the Draft Law of Freedom of Expression, Assembly, and Peaceful Protest was presented to the Council of Representatives with many provisions that do not conform to Constitutional or international standards.

UNAMI/OHCHR continued to support the capacity of national human rights institutions and civil society to promote respect for and protection of human rights and the rule of law. However, UNAMI/OHCHR remains concerned regarding the selection process by the Committee of Experts for the new commissioners for the Iraqi High Commission for Human Rights (IHCHR). A number of civil society and other actors had expressed their concerns to UNAMI/OHCHR regarding; the politicization of the process, the promotion of certain candidates based on their affiliation, and the circulation of a list of those who would be selected months before the process was officially to start (with candidates divided amongst political blocks). As a result, UNAMI/OHCHR chose to not be involved in any manner with the selection of the new commissioners.   Subsequently, UNAMI/OHCHR was removed by amendment of the applicable law as a voting member of the Committee of Experts to that of an observer. This resulted in a number of civil society organizations issuing statements criticizing the politicization of the selection process. Two civil society representatives resigning from the Committee of Experts due to concerns regarding the process.

UNAMI/OHCHR carried out a variety of capacity building activities for Iraqi ministries on  human rights and rule of law issues. UNAMI/OHCHR continued to work with a variety of civil society organizations throughout Iraq to help them identify gaps in the respect for and protection of human rights and the rule of law, to formulate strategies and to encourage the implementation of solutions. UNAMI/OHCHR also supported civil society advocacy for anti-discrimination, sexual and gender based violence legislative reforms, and other initiatives.

## Kurdistan Region of Iraq

The Parliament of the Kurdistan Region of Iraq (KR-I) continues to be in recess due to political strife within the Kurdistan Region. Accordingly, the legislative authority is not functioning, and its crucial role of enacting laws, monitoring the executive power and representing the public is not exercised.

One of the consequences of the legislative impasse is the continued application of the KR-I Anti-Terrorism Law No.3 of 2006, which does not respect the human rights obligations of Kurdistan Regional Government under international human rights law, namely the Convention Against Torture

EXHIBIT D

(CAT) and ICCPR. This Law expired on 18 July 2016, as the legislative impasse prevented its amendment or replacement. It continues to be applied to cases of terrorism, covering the vast majority of crimes committed by ISIL while the law was in force. UNAMI/OHCHR has serious concerns arising from the application of the Criminal Procedure Code, including in proceedings based on terrorism charges, including long delays in bringing detainees before a judge, restrictions on or denial of access to lawyers, or prolonged detention without trial. The criminal justice system largely relies on confessions to found convictions, and does not ensure redress mechanisms to investigate allegations of torture and other ill treatment raised by the defendants before the courts. To address relevant due process issues, UNAMI/OHCHR initiated the establishment of a multi-sectoral Task Force on the Rule of Law and Justice, which is to assist the Kurdistan Regional Government in complying with international human rights standards on administration of justice.

UNAMI/OHCHR access to the Anti-Terrorism Detention Centre in Erbil has not been restored. Since October 2016, UNAMI/OHCHR has not been able to visit this centre to monitor individual cases and general conditions. Further, there has been no progress in the case of Walid Younis, discussed in previous reports, who remains detained, apparently arbitrarily, in this facility.

With the progress of military operations to dislodge ISIL from Ninewa, the KR-I has experienced a large influx of detainees suspected of conflict-related crimes. The gap in criminal legislation with regard to processing gross abuses of human rights and breaches of international humanitarian law has to be urgently addressed. Kurdistan Region Government counterparts are duly represented in the Task Force on Accountability and Justice, established by UNAMI/OHCHR to guide the process of drafting a law or laws, complimentary to Iraqi legislation, with a view to providing jurisdiction for Iraqi courts at the federal and KR-I levels over international crimes committed in Iraq.

In May 2017, UNAMI/OHCHR requested the Kurdistan Regional Government stay the execution of three men whose orders of execution were signed by President Barzani despite an informal moratorium on executions. No executions took place in the reporting period.

Journalists and media continuously report intimidation and limitations on the operation of media channels in KR-I. Restrictions have been imposed on journalists and the media without strict consideration of the applicable international and national legal frameworks. UNAMI/OHCHR remains concerned at the lack of progress in the investigation of the death of Mr. Widad Hussein, a correspondent with Rozh News, whose body was found on 13 August 2016 near Dohuk with physical marks on his body that indicate that he might have been tortured prior to his death. The General Directorate of the Police (KR-I) established a committee to investigate the murder. However, as of the date of reporting, UNAMI/OHCHR has not been informed of any progress in the investigation.

The Kurdistan Regional Government has yet to endorse its draft regional human rights action plan for the implementation of the UPR recommendations that apply to the KR-I. UNAMI/OHCHR provided technical assistance to support and facilitate the work of the Steering Committee, which duly prepared a draft plan.

EXHIBIT D

## 1. Introduction

The human rights situation in Iraq remained fragile, primarily owing to the ongoing armed conflict between the Government of Iraq and pro-Government forces and ISIL. Armed conflict, violence and terrorism continue to have a corrosive effect on a range of human rights, including those pertaining to the rule of law and administration of justice, the care and protection of women and children from sexual and gender-based violence (SGBV) and conflict-related sexual violence (CSRV) and accountability for the perpetrators of such violence, the respect and protection of the rights of minority ethnic and religious and other communities, protection of sexual minorities, as well as the rights of persons with disabilities, and the respect for the rights of freedom of expression and freedom of assembly. Lack of access to basic services and economic opportunities remain serious challenges for many of Iraq's people.

## 2. Methodology

The information contained in this report is based, where possible, on direct monitoring and testimonies obtained directly from the victims, survivors, or witnesses of human rights violations and abuses and/or violations of international humanitarian law. UNAMI/OHCHR continued to conduct interviews with internally displaced persons (IDPs) who had relocated to the KR-I, Anbar, Baghdad, Diyala, Kirkuk, and Ninewa governorates, and other areas of Iraq, as well as with other victims, survivors, and witnesses of incidents.[1] Information was also obtained from a variety of sources,[2] including Government and non-governmental organizations, and United Nations entities. Unless specifically stated, all information presented in this report has been corroborated and verified using independent, credible, and reliable sources. The ongoing security situation in Iraq has affected the capacity of UNAMI/OHCHR to undertake direct monitoring and verification of allegations of human rights violations and abuses and violations of international humanitarian law in some areas of the country, particularly in conflict-affected areas and in areas under ISIL control. In some cases, victims, survivors and witnesses were reluctant to speak to UNAMI/OHCHR due to threats, intimidation, and/or fear of reprisals. Where reports of incidents have not been cross-checked or verified, they have not been included in this report. The incidents cited below are emblematic of the main human rights concerns, but are not exhaustive.

## 3. Protection of Civilians

The ongoing-armed conflict, violence and terrorism in Iraq continued to have a terrible impact on civilians in terms of deaths, injuries, loss of personal property, destruction of essential infrastructure, impairment of livelihoods, access to essential services, and destruction of places of religious and cultural significance. ISIL continued to directly target civilians, carry out indiscriminate attacks irrespective of the impact on civilians, and exploit civilians as shields to protect its fighters, bases and

---

[1] As of 30 June 2017, UNAMI had conducted 994 interviews with IDPs, witnesses and survivors of human rights violations and abuses in areas where they have concentrated. UNAMI also conducts telephone interviews with victims and witnesses of human rights violations and abuses, and civilians who remain trapped in ISIL-controlled areas or who have fled to other areas of Iraq but are not directly accessible.

[2] These include Government officials and institutions, local and international media, local non-governmental organizations, human rights defenders, tribal leaders, religious leaders, political figures, and civil society actors, as well as United Nations entities operating in Iraq.

EXHIBIT D

strategic locations from attack or to ensure civilian casualties in the event of attack. As ISIL progressively lost control of territory in Mosul and surrounding areas, the prevalent trend was a shift away from the killing of persons suspected to be opposed to ISIL *takfiri* doctrines or control, and towards the deliberate killing of civilians attempting to flee from areas under ISIL control.

UNAMI/OHCHR recorded instances of alleged violations and abuses of human rights allegedly involving ISF members, but conclusive information could not be obtained. In other cases, alleged incidents were filmed on videos that were posted on social media or published, such as the case with an article in *Der Spiegel* claiming ISF were involved in violations. UNAMI/OHCHR advocated with the Government of Iraq and other authorities for prompt and thorough investigations to be carried out and for those responsible to be brought to justice.  On 17 August, Iraqi authorities announced on social media that, after completing their investigations, including into the *Der Spiegel* article, they determined that some alleged violations occurred and those accused have been referred to the judiciary.  Prime Minister al-Adabi further added on 16 September that violations during the Mosul campaign were carried out by individuals, not systematic, and that those responsible were being held accountable.

Airstrikes also claimed civilian lives and damaged civilian property and infrastructure in areas under the control of ISIL during the period covered by this report. In many investigations, UNAMI /OHCHR was not able to determine the exact nationality of the aircraft involved in the specific airstrikes mentioned in this report.

UNAMI/OHCHR also documented instances of threats to, and forced evictions of, families alleged to have ISIL-affiliated members. In some cases, unidentified groups made the threats through so-called night letters ordering people to leave or face dire consequences. In other cases, local authorities took the lead or in other instances have followed the wave of resentment amongst certain segments of the population and disregarding respect for the rule of law.

Women, children, people with disabilities, aged persons, and members of Iraq's diverse ethnic and religious communities suffered disproportionately from the impact of armed conflict, violence and terrorism. Many individuals belonging to 'at risk' and vulnerable groups have been subjected to sexual and other forms of violence, including sexual slavery, and children reportedly continued to be subjected to indoctrination by ISIL and exploited to serve as fighters, to carry out suicide bombings, and to perpetrate other horrendous acts including beheadings. Such persons are in desperate need of basic services to assist them, including appropriate medical, psycho-social, financial and other forms of support. Of particular concern is the need for reintegration of women and children—who may have been subjected to sexual and other forms of violence—into their families and communities. Particularly vulnerable are; women and girls who were forcibly married to ISIL fighters, or enslaved and subjected to rape and other sexual and physical violence,  and children who may have resulted from such violence.

In mid-October 2016, the Government of Iraq commenced military operations in Ninewa and eventually Mosul city. At the beginning of the campaign and on a number of subsequent occasions, the Government reiterated its position that the protection of civilians would remain paramount for the conduct of its operations against ISIL and that any individual, including members of the ISF and forces operating in support, would be held accountable for any violations or crimes that they may

EXHIBIT D

commit. To support this commitment, UNAMI/OHCHR presented a document to the Government of Iraq and the Kurdistan Regional Government entitled "Principles for the Conduct of Security Screening of Internally Displaced Persons Fleeing ISIL controlled Territories." The document contained directives in line with international norms, as guidance to the authorities, of the standards that should be applied consistently and without any discrimination or arbitrary treatment in security screening operations of persons displaced into areas retaken by ISF and forces operating in support.

### 3.1.  Civilian casualties

From 1 January 2017 to 30 June 2017, a minimum of 5,706 civilian casualties resulted from the ongoing violence, including at least 2,429 persons killed and 3,277 wounded. From 1 January 2014 to 30 June 2017, UNAMI/OHCHR recorded at least 82,750 civilian casualties (29,104 killed and 53,646 wounded) as a result of the armed conflict, terrorism and violence in Iraq. These figures should be considered as absolute minimums.

Ninewa was the worst affected governorate during the first half of 2017, with a minimum of 2,334 civilian casualties (1,357 killed and 977 wounded). Baghdad followed with 1,978 civilian casualties (495 killed and 1,483 wounded), while Anbar recorded the third highest rate of civilian casualties with 583 (202 killed and 381 wounded).[3]

### 3.2.  Child casualties

Armed conflict and violence continued to impact the lives of children during the reporting period. Incidents were tracked through the Monitoring and Reporting Mechanisms established pursuant to Security Council Resolution 1612. According to the Country Task Force on Children and Armed Conflict, 390 incidents of grave violations affecting 2,291 children were recorded. Of those, 310 incidents were verified, affecting 604 children. In 316 of these incidents (252 verified), 257 children were reportedly killed (211 verified) while another 547 were injured (343 verified). Most child casualties were in Ninewa, as a result of active hostilities. There were reports of 348 boys being recruited and used by parties to the conflict, with 37 of these reports being verified. Fourteen attacks on schools and another three on hospitals were verified, while the use for military purposes of six schools  and one hospital  were verified. Eight children were verified to have been abducted. [4]

### 4.   Rule of Law and Criminal Justice/Administration of Justice

Iraqi criminal law contains some provisions ensuring due process and fair trial rights. However, this legal framework lacks additional guarantees to uphold a wide range of political and civil rights as

---

[3] For a detailed account of civilian casualties and protection of civilians concerns resulting from the campaign to retake Mosul and surrounding areas from ISIL, please see UNAMI/OHCHR "Report on the Protection of Civilians in the Armed Conflict in Iraq: The Ninewa Operations and the retaking of Mosul City, 17 October 2016 – 10 July 2017". This report presents a summary of incidents investigated and verified by UNAMI/OHCHR involving violations and abuses of international human rights and violations of international humanitarian law linked to the non-international armed conflict between the Iraqi Security Forces and affiliated armed groups, and ISIL.

[4] Figures and information provided by the Country Task Force on Children and Armed Conflict, 30 June 2017.

EXHIBIT D

required under Iraq's international human rights obligations. The criminal law continues to contain provisions that are discriminatory against women and children (such as provisions accepting "honour" as mitigation for crimes of violence against family members), or that criminalise certain acts (such as criminal libel and defamation) that may be exploited to affect the legitimate enjoyment of certain rights. The Anti-Terrorism Law No. 13 of 2005 is vague in its application and does not include due process and fair trial guarantees. Its application remains of particular concern.

### 4.1. Due process

UNAMI/OHCHR remains concerned at the lack of consistent adherence to due process and fair trial requirements,[5] in particular, i) the frequent failure to inform persons upon arrest of the reasons for arrest and the charges being brought against them, ii) prolonged pre-trial detention, iii) lack of regular or appropriate access to legal counsel, and iv) delays in carrying out review of the detainees' legal status by competent judges. In practice, it is difficult to ascertain whether warrants and detention orders are issued as required by relevant laws, since accused persons are not usually furnished with copies of these documents.

UNAMI/OHCHR remains concerned about complaints received from a significant number of detainees and individuals subsequent to their release, that they were not told the reasons for their arrest or detention, and not provided with the details of the actual charges for which they had been arrested. UNAMI/OHCHR also continues to be concerned regarding complaints that access to lawyers and legal counsel is not provided or denied to detainees during investigation proceedings. On occasions that access to lawyers was permitted, this was usually during the trial phase when the court would appoint a lawyer to act on behalf of the accused after investigations had been completed.

UNAMI/OHCHR has recorded many instances where accused persons have been held beyond time limits prescribed by law; and many detainees complained that they had not been brought before an investigative judge at all during the period of their detention. Where defendants were brought before an investigative judge, the proceedings were often perfunctory, merely to confirm the identity of the defendants. The latter were then returned to their cells without being informed of the process that would then be applied to them or clarification of the charges being brought against them.

To address these rule of law concerns, UNAMI/OHCHR has continued to recommend and advocate for legal reforms to ensure that due process and fair trial standards are fully compliant with international human rights standards. UNAMI/OHCHR is also proposing better equipping of police, investigators and judges to enable forensic investigations and trials that comply with constitutional and international standards. Likewise, UNAMI/OHCHR continues to conduct training for law enforcement officials on human rights standards to be complied with in the conduct of their duties, and has shared with the Ministry of Interior booklets and information cards for police on standards of conduct. Consultations are ongoing on the adoption of the booklets and their dissemination to all serving police personnel. In addition, UNAMI/OHCHR is in the process of developing a revised

---

[5] For a comprehensive overview of powers of arrest and due process requirements under Iraqi law, see UNAMI/OHCHR, 2010 Report on Human Rights in Iraq, section 4.5 p.20, January 2011, available online at http://www.uniraq.org/index.php?option=com_k2&view=item&task=download&id=43_cc04be363b73c2922 5e79d7ae57e87f2&Itemid=650&lang=en. [accessed on 30 June 2017].

EXHIBIT D

curriculum on human rights and civilian policing standards for the Iraqi and KR-I police training academies. It is anticipated that this curriculum, if adopted, will be institutionalized and become a regular feature of the  training programme for police officers in Iraq.

### 4.2. Accountability

Ensuring justice and accountability remains crucial if community and national reconciliation is to succeed in post-ISIL Iraq. While the international community is considering initiatives that aim to promote accountability for international crimes committed in Iraq, UNAMI/OHCHR has undertaken work with a range of partners to promote mechanisms at the national level to ensure accountability of individuals who have allegedly committed crimes and human rights abuses. These mechanisms must also ensure the appropriate care and protection of the victims and survivors of those crimes and violations. It is also essential to ensure that human rights violations and abuses are properly documented to support possible prosecutions where perpetrators can be identified, and to support the referral of victims and survivors to appropriate medical, psycho-social and other forms of support. UNAMI/OHCHR has been working with partners to promote appropriate documentation of crimes and support services for victims and survivors, particularly for women and children who have been the victims of sexual and other forms of violence, and children in armed conflict who have been subjected to indoctrination and radicalization by ISIL.

Iraq is not a State Party to the Rome Statute of the International Criminal Court (ICC), and has not accepted the jurisdiction of the ICC in relation to the conflict under article 12 of the Rome Statute. Presently, Iraqi courts do not have jurisdiction over international crimes committed in the country, and judicial capacity to appropriately investigate, document, charge and try perpetrators of such crimes remains extremely limited.

Given the scale of serious violations that have been committed in Iraq, UNAMI/OHCHR is pursuing a strategy at the national level with a view to allowing domestic courts to have jurisdiction over international crimes. This would include legal reforms to introduce definitions of international crimes and penalties into legislation and the establishment of a specialized court with a national jurisdiction to try perpetrators in conformity with principles of international criminal law. To that end, UNAMI/OHCHR established a Task Force on Accountability and Justice, comprising national and international legal experts to guide the process of drafting a proposed law, complimentary to Iraqi legislation, with a view to providing Iraqi courts with jurisdiction over international crimes.

UNAMI/OHCHR has also monitored judicial decisions issued pursuant to the Amnesty Law No. 27 of 2016,[6] which permits persons sentenced to death or imprisonment to be granted amnesty for certain crimes. As discussed in the previous UNAMI/OHCHR six monthly report covering July to December 2016, a wide range of serious crimes are excluded from the operation of the Amnesty Law. On 25 February 2017, the Ministry of Justice announced on its website that a total of 756 inmates had been released under the Amnesty Law since its publication. In November 2016, 174 inmates were released from the Ministry's prisons under amnesty, and 194 were released in December 2016, making a total of 368 amnesty releases in 2016. In January 2017, 347 inmates were released under amnesty and a

---

[6] Adopted by the Council of Representatives on 25 August 2016 and published in official Gazette number 4417 issued on 26 September 2016.

EXHIBIT D

further 41 during February 2017. According to the Ministry of Justice website announcement, monthly statistics on the number of inmates released under amnesty will continue to be released to the media.[7]

### 4.3. Ill-Treatment and Torture

Despite the Constitution and laws of Iraq and international human rights laws, which unequivocally prohibit torture, UNAMI/OHCHR continued to receive a number of complaints from detainees, prisoners, and defendants during court proceedings, or individuals subsequent to their release, alleging that they had been subjected to torture and ill-treatment to provide confessions during investigation. For example, on 3 May 2017, Husain Mazen (a juvenile) and three companions were arrested by Iraqi Police at al-Hindiya checkpoint in south-eastern Karbala after one of Mazen's companions allegedly failed to produce identification documentation. While in custody, the four detainees were allegedly beaten by four to five Iraqi police. As a result, Mazen reportedly lost consciousness and was taken by Iraqi police to al-Hussein Hospital in Karbala where he was reportedly pronounced dead on arrival and an autopsy performed. The Ministry of the Interior reportedly established a committee to investigate this incident and recommended that any members of the Iraqi police whose actions may have contributed, materially or otherwise, to the juvenile's death be held accountable. On 9 May, UNAMI/OHCHR wrote to the General Prosecutor and the Ministry of the Interior to express that all those responsible for the tragic death of Husain Mazen should be held accountable according to the law. No response has been received to date.

### 4.4. Detention Standards

UNAMI/OHCHR monitored places of detention administered by the Ministry of Justice and provided technical advice to prison directors and relevant ministries through recommendations on compliance with international standards on detention.

Physical conditions in many detention facilities and prisons remain poor. Overcrowding has strained already poorly maintained or out-dated infrastructure, including water, sewerage, ventilation, and other services. The situation has been exacerbated by; ongoing military operations and the resulting increase in the number of detainees, and the transfer of detainees and prisoners from insecure locations to facilities that are already over-capacity and poorly resourced. Rehabilitation programmes exist in some prisons, and include literacy and computer classes, vocational and work schemes. However, there are very few structured programmes, particularly in minimum security prisons, aimed at countering radicalization for inmates who had previously been subjected to extremist indoctrination.

On 26 April, UNAMI/OHCHR conducted a monitoring visit to Taji detention and prison facility in Baghdad that operates under the authority of the Ministry of Justice to monitor conditions of accommodation and treatment of inmates. UNAMI/OHCHR met with the facility warden and other staff and briefly inspected the facility, including the dormitories, the medical facility, visiting area, and vocational training facility. UNAMI/OHCHR was not allowed to conduct confidential interviews with

---

[7] http://www.moj.gov.iq/view.3010/ [accessed on 30 June 2017].

EXHIBIT D

detainees and prisoners. As during a previous visit to the facility,[8] it was observed that the prisoners and detainees were in overcrowded conditions with limited access to natural light and an absence of beds was noted. UNAMI/OHCHR also noticed poor standards of hygiene in storage and preparation of food. According to the senior management of the facility, vocational training and education has been suspended since a fatal bombing attack in 2013 on a vehicle carrying medical staff home.

On 22 June, UNAMI/OHCHR carried out a monitoring visit to al-Adala II prison in Baghdad. Until recently, al-Adala II housed detainees on terrorism-related charges but by the time of the visit they had been transferred to other detention facilities several months earlier. Al-Adala II now only accommodates convicts serving sentences of 15 years of imprisonment or more. UNAMI/OHCHR was not permitted to speak with them alone in order to conduct confidential interviews and it was noted that the prisoners were in overcrowded conditions. UNAMI/OHCHR examined two cells from the outside and found that they lacked natural light and that instead of beds, only matrasses were provided to inmates. During the visit, UNAMI/OHCHR was told that the Medical Facility lacked a range of medicines and equipment. UNAMI/OHCHR recommended, *inter alia*, that vocational training be re-instituted and emphasized the critical importance of rehabilitation of prisoners, both for the individuals and society at large.

### 4.5.  Kurdistan Region of Iraq

#### 4.5.1. Legislative Framework

The Parliament of the KR-I remains in recess due to internal political strife in the Kurdistan Region. This has hindered the functioning of the legislative authority, including the performance of its crucial role of enacting laws, representing the public and monitoring the executive.

UNAMI/OHCHR continues to be concerned with the application of the Anti-Terrorism Law No.3 of 2006 (KR-I). The law was previously renewed every two years since its adoption, but expired on 18 July 2016. UNAMI/OHCHR welcomed the non-extension of the Law, but remains concerned that the law is still applied with respect to crimes allegedly committed before the law expired. The Law does not include a comprehensive definition of terrorism yet criminalizes terrorist acts, penalization of such acts, and fulfilment of the duty of KR-I to protect individuals within its jurisdiction. The Law imposes mandatory death sentences for a number of crimes[9] including those that do not amount to the most serious crimes under international law. The Law also includes a provision[10] that could be interpreted to go beyond the legitimate limitations that may be imposed on the right to freedom of expression as provided for in ICCPR. Finally, and of significant concern, the Law does not impose an absolute prohibition on the use of torture or ill-treatment, and considers that confession extracted under duress may be admissible in judicial proceedings if supported by other lawfully obtained evidence.[11] This provision also breaches Article 37, paragraph 1 (c) of the Iraqi Constitution, which categorically prohibits torture for any reason and prohibits evidence obtained through torture to be relied on in

---

[8] UNAMI/OHCHR carried out its first monitoring visit to Taji prison in Baghdad on 15 May 2013.
[9] Article 2 of the Anti-Terrorism Law.
[10] Article 4, Para. 4 of the Anti-Terrorism Law.
[11] Article 13 of the Anti-Terrorism Law.

EXHIBIT D

judicial procedures. UNAMI/OHCHR continues to follow up with authorities on due process issues pertaining to counter-terrorism issues.

### 4.5.2. Due process

UNAMI/OHCHR continues to observe breaches in the application of the Criminal Procedure Code (KR-I), in particular in proceedings relating to terrorism charges, including long delays in bringing detainees before a judge, restrictions on or denial of access to legal counsel, or prolonged periods of detention without trial. There remains a general perception among some law enforcement officials that confessions are the ultimate form of evidence, which once obtained means that forensic and other types of evidence to establish guilt of an accused person are unnecessary to obtain a conviction.

In light of such concerns, in December 2016, UNAMI/OHCHR approached the Kurdistan Regional Government to establish a mechanism to address due process and administration of justice issues. In January 2017, Mr. Nechirvan Barzani, the Prime Minister of KR-I, established a Task Force on the Rule of Law and Justice under the auspices of the High Committee to Evaluate and Respond to International Reports and the assistance of UNAMI. The Task Force comprises representatives of relevant ministries, civilian and military lawyers, criminal investigators, judges, the Independent Board of Human Rights, and UNAMI/OHCHR. The objectives of the Task Force include assisting the Kurdistan Regional Government in ensuring full compliance of rule of law and administration of justice with international human rights obligations; and guaranteeing that security measures employed while countering terrorism are in full conformity with human rights laws. It will also respond to immediate needs related to allegations of human rights violations, while also laying a foundation for capacity development of  various institutions in the KR-I.

UNAMI/OHCHR continues to follow the case of Mr. Ahmad Walid Younis, discussed in previous reports, whose continued detention has been qualified as arbitrary by the UN Working Group on Arbitrary Detention. UNAMI/OHCHR has repeatedly requested access to Mr. Younis. The relevant Asayish authorities have not responded positively to these requests, nor provided any additional information as to the basis of Mr. Younis' continued detention.[12]

---

[12] Mr. Ahmad Walid Younis was arrested in 2000 and kept in detention without charge or trial for nearly ten years, including several months of solitary confinement. In August 2010, he was officially charged under the KR-I Anti-Terrorism Law with "sending orders and instructions from prison" to carry out terrorist attacks in Dohuk in 2009. In convicting and sentencing Mr. Younis, the court only took into account time served from when he was charged in 2010, refusing to include the ten years prior to this that he had been imprisoned without charge. On 19 September 2011, his sentence was upheld by the Court of Cassation. Mr. Younis was due for release in March 2015, but he was kept in detention for no apparent reason. While not informed about the reason for his continuing detention, he was brought before the court again to answer other charges. UNAMI/OHCHR monitored the Criminal Court proceedings held on 25 February 2016, where Mr. Younis was acquitted by the presiding judge. His case was then transferred to the Cassation Court in Erbil for review. On 27 April 2016, the United Nations Working Group on Arbitrary Detention adopted an Opinion on the case of Mr. Younis noting that the deprivation of his liberty is arbitrary and requesting the Government of Iraq to immediately release him and provide him with full reparation. As of the end of June 2017, Mr. Younis was still in detention and his case remained pending.

EXHIBIT D

### 4.5.3.Ill-Treatment and Torture

UNAMI/OHCHR remains concerned by allegations that detainees are subjected to torture and/or other ill-treatment during the interrogation phase in order to force them to make confessions. UNAMI/OHCHR has previously noted that detainees are reluctant to report torture and/or other ill-treatment for fear of reprisals or difficulties in the legal procedures. It appears that there is no uniform and effective policy in place to deal with allegations of torture and other ill-treatment raised by the defendants before the courts.

### 4.5.4.Detention Standards

Detention facilities in the KR-I are managed by several authorities within the Kurdistan Regional Government: the Ministry of Interior (KR-I) for detention relating to general criminality; the Asayish for terrorism, organized crime and drug-related offences; and the Ministry of Labour and Social Affairs (KR-I) for juvenile and female detainees and adult convicts. In Erbil and Duhok Governorates, additional detention facilities are maintained by the General Directorate of Counter-Terrorism for crimes relating to security and terrorism. UNAMI/OHCHR can access all detention facilities, subject to certain notice requirements, with the exception of those run by the General Directorate of Counter-Terrorism in Erbil.

A request by UNAMI/OHCHR to the relevant ministries in the KR-I for the number of detainees and prisoners held during the reporting period remains outstanding. In 2016, UNAMI/OHCHR carried out a mapping exercise of conditions across all detention facilities and prisons in the KR-I with a focus on compliance with the United Nations Standard Minimum Rules for the Treatment of Prisoners, which "sets out principles and practices in the treatment of prisoners and the management of institutions."[13] It was noted that, while conditions are generally acceptable in larger detention facilities run by the Ministry of the Interior (KR-I), conditions remain poor in many smaller Ministry detention centres. UNAMI/OHCHR continues to be concerned about overcrowding in Asayish facilities, particularly in Erbil Governorate, and in the Anti-Terrorism Directorate facility in Erbil. In addition, the lack of or absence of beds in Asayish facilities is also of concern. The escalation of the conflict since June 2014 has caused a significant increase in the number of detainees being held in these facilities, with a significant number being held on suspicion of terrorism. Detainees also include a number of IDPs who have been arrested or otherwise detained by security forces.

### 4.5.5.Women and Juveniles in detention

During previous visits to Asayish-run facilities, UNAMI/OHCHR encountered several juveniles held with adults.[14] UNAMI/OHCHR has continued to advocate for the juveniles to be immediately transferred to the Ministry of Labour and Social Affairs (KR-I) juvenile reformatory as the practice of holding them alongside adults in detention is contrary to international human rights law, in particular

---

[13] Standard Minimum Rules for the Treatment of Prisoners, 13 May 1977 (revised on 17 December 2015), paragraph one of preliminary observations.
[14] UNAMI/OHCHR addressed the issue through the High Committee to Evaluate and Respond to International Reports in regular meetings and calling upon authorities that all persons who have unlawfully engaged in hostilities and who are being detained by Kurdistan Regional Government be charged promptly according to the law and be informed of the charges, and due process and fair trials must be ensured.

EXHIBIT D

the Convention on the Rights of the Child[15] and ICCPR.[16] UNAMI/OHCHR has also intervened with authorities of the Kurdistan Regional Government to clarify that detainees may not be held as "prisoners of war" as this status does not exist in international humanitarian law applicable to non-international armed conflicts such as the current conflict in Iraq.

## 5. Death Penalty

UNAMI/OHCHR continued to conduct advocacy on the abolition of the death penalty with both the Government of Iraq and the Kurdistan Regional Government to impose a moratorium on the death penalty with a view to its eventual abolition.  Since 2015, the federal Ministry of Justice has not responded to repeated requests by UNAMI/OHCHR for information regarding the implementation of the death penalty, particulary how many persons have been sentenced to death, and the time and location of executions. UNAMI/OHCHR has reiterated to the Government of Iraq that executions and death sentences implemented pursuant to judicial proceedings are a matter of public interest, which requires that such decisions be implemented in a transparent manner with full public disclosure.

However, reports of executions are sometimes reported on the social media accounts of the Minister of Justice or on the Ministry of Justice website. With regard to executions in the first half of 2017, in a statement released on the Facebook page of the Minister of Justice and on the website of the Ministry of Justice on 6 July, it was reported that 14 executions were carried out in June after confirmation was received that none of the 14 persons qualified for amnesty under the Amnesty Law.[17] No details were provided about the identity of those executed or the crimes for which they had been sentenced.

On 23 August, local media quoting a security source reported that three Iraqis (two from Baghdad and one from Babil Governorate), sentenced to death for crimes committed under the Anti-terrorism Law 13 of 2005, were executed in Nassiriya Central Prison on the same day. Reports were received by UNAMI/OHCHR that on 23 August three convicts were executed, adding that four others had been executed on an undetermined date between the end of June and 23 August. No information regarding these alleged executions was posted on the website of the Ministry of Justice or in the social media profiles of the Minister of Justice as of 9 September.

### 5.1. Kurdistan Region of Iraq

As noted in previous reports, in 2015 and 2016 the Kurdistan Regional Government breached its moratorium on the death penalty that has been in place since 2008. The moratorium is based on an instruction from the President of the KR-I, Masoud Barzani, indicating that death sentence warrants are not to be processed. In May, UNAMI/OHCHR received information that President Barzani had signed orders of execution for three of six men sentenced to death for a murder in 2015. UNAMI/OHCHR advocated with authorities that these and all pending executions be stayed and the strict moratorium be reinstated. UNAMI/OHCHR also requested authorities take all available measures to ensure that trials involving the death penalty adhere strictly to international standards of

---

[15] Convention on the Rights of the Child, Article 37 (c).
[16] ICCPR, Article 10 (b).
[17] http://www.moj.gov.iq/view.3280/ [accessed on 19 July 2017].

EXHIBIT D

fairness and due process and that Kurdistan Regional Government take steps with a view to abolishing the death penalty in law. UNAMI/OHCHR is not aware of any executions that have taken place in the reporting period in the KR-I.

### 6.  Rights of Women

Women in Iraq continue to face discrimination, which adversely impacts on their ability to fully and equally participate in the political, social and economic life of Iraq. Throughout the ongoing armed conflict in Iraq, women and children continue to be subjected to violence of all forms, including in particular sexual and gender-based violence. There are currently no effective legal or policy frameworks which prevent sexual and gender-based violence or protect the survivors of violence, or laws that ensure accountability for the perpetrators of violence.

#### 6.1.  Legal and Policy Framework

The National Strategy to Eliminate Violence against Women (2014-2017) remains under-implemented. Civil society organizations have continued to call for its implementation alongside other existing frameworks. However, with regard to the Joint Communiqué on Prevention and Response to Conflict-Related Sexual Violence (CRSV), the UN and the Government of Iraq have commenced implementation.  As required by the agreement, both the Government of Iraq and the Kurdistan Regional Government  have appointed high level focal points on CRSV, and workshops have taken place at both high and technical levels on the Joint Communique to kickstart the process. Authorities from both governments are expected to develop implementation plans by autumn 2017, with the support of UNAMI. Furthermore, both parties agreed to cooperate on priority areas such as legislative and policy reform to strengthen protection from sexual violence crimes and to facilitate documentation of such crimes. Both parties also agreed to ensure accountability for sexual violence by strengthening the capacity of national and regional authorities to document, investigate and prosecute sexual violence crimes according to applicable national laws, and to ensure support for survivors of rape. UNAMI/OHCHR has conducted several meetings with the Government advocating to ensure that survivors of human rights violations or abuses, particularly sexual violence survivors, receive adequate support, including psycho-social support and medical care.

As described below, the draft Family Protection Law has remained stalled before the Council of Representatives for over four years, and many of its provisions do not comply with international standards.

Combating crimes of violence committed against women and children remains problematic because Article 409 of the Iraqi Penal Code No. 111 of 1969 permits "honour" as mitigation for crimes of violence committed against family members. There is also reluctance among law enforcement agencies to effectively, promptly, thoroughly, independently and impartially investigate such crimes or to hold perpetrators accountable.

#### 6.2.  Violence against Women

Combating crimes of violence committed against women and girls remains particularly problematic. UNAMI/OHCHR continues to advocate for the passage of the draft Family Protection Law (with appropriate revisions as discussed below) and ensure its earliest adoption including measures to

EXHIBIT D

prevent sexual and gender-based violence, offer protection to survivors of SGBV, and ensure accountability of perpetrators of violence, in compliance with international standards, including the Convention on the Elimination of All Forms of Discrimination against Women and other international laws that safeguard women's rights. Unfortunately, the draft Family Protection Law has remained stalled before the Council of Representatives for more than four and a half years. Moreover, in its current iteration, the draft law is designed to protect the family as a whole, rather than the victim of domestic violence. Many provisions in the draft law must be amended to ensure compliance with international standards.

Following UNAMI/OHCHR consultations with women's rights groups and civil society organisations in late 2016, in March 2017 UNAMI/OHCHR proposed amendments to the Council of Representatives to bring the law into compliance with international standards and incorporate relevant comments received from civil society.

Whilst Iraq's Penal Code No. 111 of 1969 includes provisions on physical assault; it lacks *explicit* reference to domestic violence. Though sexual assault is criminalised in the Penal Code, Article 398[18] provides that charges may be dropped if the assailant marries the victim. Defenders of this provision argue that it protects the interests of the victim because it allows the act of marriage to restore honour to the family and thus prevent the risk of an "honour crime" against the victim by her family or community. However, the provision institutionalises the shame and stigma associated with rape and can jeopardise the safety and life of the victim by requiring her to remain married for a minimum of three years to a man who sexually assaulted her. UNAMI/OHCHR is also concerned by Article 41 of the Penal Code, which permits domestic violence by allowing the punishment of a wife by her husband "within certain limits prescribed by law or by custom."

UNAMI/OHCHR provided support to the visit of the Special Representative of the Secretary-General on Sexual Violence in Conflict to Iraq from 25 February to 3 March. During this visit, the mechanisms for implementation of the Joint Communiqué on the prevention and response to conflict-related sexual violence signed by the Special Representative and the Government of Iraq were discussed.

### 6.3. Shelters

On 2 June, the Special Rapporteur on violence against women, its causes and consequences, Ms. Dubravka Šimonović, released her latest report.[19] The Special Rapporteur noted that "shelters and protection orders are survival tools which protect women whose lives are at risk."[20] She also noted the importance of shelters in rebuilding lives and said that shelters should not be impacted by austerity policies. She also addressed the importance of protection orders and the need to treat violence against

---

[18] As outlined in Article 398 an assailant accused of rape or sexual assault may be cleared of his crime if he marries the victim. In the absence of any contrary provision, this mechanism can even be implemented if the victim is a minor.
[19] Report of the Special Rapporteur on violence against women, its causes and consequences, 2 June 2017 (Advance Unedited Version), A/HRC/35/30, available at
http://www.ohchr.org/EN/HRBodies/HRC/RegularSessions/Session35/Pages/ListReports.aspx.
[20] OHCHR, Press release, "States must provide shelters as 'survival tool' for women victims of violence - UN expert," at http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=21724&LangID=E.

EXHIBIT D

women as a serious crime. She added that "women have the right to live free from violence. When that right is denied, the full exercise of their other rights is limited."[21]

UNAMI/OHCHR continued to monitor and advocate for shelters for women who are subjected to domestic and sexual violence. However, there continues to be limited funding or resources to publicly fund shelters for women across Iraq. Further, as described above, Iraqi women have insufficient legal protection mechanisms to safeguard them from domestic violence.

With regards to shelter, and as part of the draft Family Protection Law, UNAMI/OHCHR has emphasised that the government should allow civil society organizations with recognized expertise to establish and run not-for-profit shelters, subject to government licensing and supervision. To date, some Iraqi civil society/not-for-profit organisations are running shelters without government support, relying on private funding and depending on a handful of dedicated volunteers to serve a growing number of women fleeing violence. There are now some shelters in Kirkuk to provide protection for women from Hawija and small initiatives to aid women fleeing ISIL. In Basra, a shelter offers refuge to the victims of sex trafficking who were unjustly incarcerated as "prostitutes" and threatened with "honour killings" upon release by their own families.

### 6.4.  The draft Family Protection Law

UNAMI/OHCHR remains concerned by the draft Family Protection Law.[22] The first draft of the Law appears to prioritise family reconciliation over justice and protection for the victims of abuse. It does not provide sufficient penalties for offenders, establish obligations for police and prosecutors to respond to domestic violence incidents, or offer long-term protection for victims. The current draft does not go far enough to protect victims and, in fact, could put them in danger if forced to return to family to reconcile. Additionally, the draft law makes no reference to the types of evidence that can be admissible for domestic violence cases.

UNAMI/OHCHR continued to engage with the Council of Representatives, Iraqi ministries, and Iraqi civil society representatives to ensure the draft Law is in accordance with international human rights standards. The draft Law had its second reading in January 2017[23] but progress then stalled. In March, UNAMI/OHCHR submitted written comments on the draft Law to the Speaker of the Council of Representatives, the Women and Children's Committee (WCC), the Human Rights Committee, the Legal Committee and the Head of the Women Empowerment Directorate in the Office of the Prime Minister. UNAMI/OHCHR also conducted a briefing for the WCC and a training session in an inter-ministerial workshop on international law standards related to domestic violence. In May, UNAMI/OHCHR provided technical support to Iraqi civil society organizatons in a series of governorate-level consultations that reviewed the draft Law and provided recommendations. The WCC has still to provide an updated draft Law.

---

[21] Ibid.

[23] The first reading took place in March 2015.

EXHIBIT D

### 6.5.  Kurdistan Region of Iraq

#### 6.5.1. Legal and Policy Framework

A draft amendment to the Law for Combatting Domestic Violence in KR-I No.8 of 2011 was submitted to the Parliament of the KR-I in September 2015. However, no further action has been taken with respect to the amendment due to the deadlock in the KR-I Parliament. The draft amendment would strengthen the current law by including a robust definition of acts of domestic violence, and increasing the penalties and punishments for these crimes. UNAMI/OHCHR, in coordination with civil society actors and duty bearers, has provided comments to ensure that the draft amendment is strengthened in accordance with international human rights law, in particular with respect to penalties and in relation to requirements for marital "reconciliation."

The second reading of the draft law on Combatting Human Trafficking in the KR-I has not been scheduled due to the impasse in the Parliament.[24]

#### 6.5.2. Violence against Women

Violence against women, including domestic violence, remains of concern throughout the KR-I due to traditional practices and attitudes concerning the role of women within the family and in society. Women and girls are subjected to many types of violence and discrimination including physical abuse, "honour" based killings, self-immolation, sexual violence and harassment, as well as inequality and social exclusion.

In March 2017, the General Directorate of Combatting Violence against Women (GDCVAW) released the violence against women (VAW) statistics for November and December 2016 on its website. With the final statistics for 2016, a decrease is observed in the number of cases from 2015 (8,002) to 2016 (7,123). This comes after a general increase between 2013 and 2015. It is not known whether this reflects a decrease in the incidence of violence or only a decrease in reporting. The total of 7,123 VAW cases for 2016 covers the six Directorates of Combatting Violence against Women (Erbil, Sulaymaniyah, Dohuk, Raparin, Garmian, and Soran). This figure includes 119 cases of killing and suicide, 317 cases of burning and self-immolation, 6,579 cases of verbal or physical abuse, and 108 cases of sexual violence. Notably, statistics for January-May 2017 (the most recent available) show an increase in the number of VAW cases (3,789 cases) compared to the same period in 2016 (2,642 cases).[25]

In early 2017, UNAMI/OHCHR learned of a change in the procedure to investigate killings of women – the responsibility to investigate killings of women was transferred back to the Anti-Crime Directorates of the Ministry of Interior (KR-I), from the Office of Combatting Violence against Women (CVAW), which lacked resources and capacity to carry out these investigations promptly.[26] It

---

[24] The first reading took place in April 2015.
[25] The official site of General Directorate of Combatting Violence against Women: http://bgtakrg.org/index.php/statics [accessed on 30 June 2017].
[26] Prior to 2015, murders of women were investigated by Anti-Crime Directorates as general criminality. In February 2015, the KR-I MoI transferred the investigation of killings of women from the Anti-Crime Directorates to the Offices of Combatting Violence against Women (CVAW), which are connected to the

EXHIBIT D

is hoped that the greater resources and expertise of the Anti-Crime Directorates will lead to prompt and robust investigations into the killings of women.

### 6.5.3. Shelters

As of early 2017, a by-law drafted by the Ministry of Labour and Social Affairs (KR-I) that defines the role of relevant government ministries in relation to women's shelters was still pending approval by the Council of Ministers of the Kurdistsan Regional Government. The by-law is supposed to supplement the implementation of the Shelter for Women under Threat Instruction No. 2 of 2014, which sets out the minimum standards for the establishment and management of all women's shelters in KR-I.

The financial crisis in the KR-I continues to have a negative impact on the allocation of resources to expand and improve shelters. For example, a newly constructed shelter in Dohuk started to operate in December 2016 after being partially furnished with the help of UN Women and UNHCR. However, furniture and fuel are still lacking. Generally, all shelters complain of a lack of financial resources.

## 7.   Rights of ethnic and religious groups

Iraq's diverse ethnic and religious communities in Iraq continue to face substantial challenges, which threaten their security and undermine their full enjoyment of political and social rights. Throughout the protracted conflict, ISIL continually exposes Iraqi ethnic and religious communities to widespread and systematic attacks, their ultimate aim being the permanent suppression, expulsion or complete destruction of these communities in whole or in part. Such methodical, premediated and intensified attacks against these communities may constitute war crimes, crimes against humanity and possibly genocide, in particular against the Yezidi community.[27] Many communities remain displaced. Ensuring their return to their places of origin, in full dignity and security and respect for their rights according to international humanitarian principles, and restoring and rebuilding these communities, will be essential to restoring trust between communities and thereby supporting a truly inclusive and enduring national reconciliation in Iraq.

UNAMI/OHCHR continued to advocate for and provide technical support to legislative reform on minority rights issues. On 26 April, UNAMI/OHCHR supported the Iraqi Council of Representatives' Human Rights Committee in conducting a public hearing that discussed potential amendments to the draft Law on the Protection of Diversity and the Prevention of Discrimination (the Anti-Discrimination Bill) as part of its regular technical support to Parliament. Members of Parliament,

---

Domestic Violence Investigation Court (DVIC) established by the Domestic Violence Law. It was observed that the Offices of CVAW lacked resources and capacity to carry out these investigations promptly. In April 2016, the DVIC pointed out to the Judicial Council that the Domestic Violence Law does not provide for such investigations. Specifically, the DVIC is limited to investigating domestic violence crimes for which the penalty is three years imprisonment or less,[26] whereas murder could incur the death penalty under the Iraqi Penal Code.[26] In response, on 31 July 2016, the Judicial Council issued an order, based on a sample murder case, transferring responsibility to investigate killings of women back to the Anti-Crime Directorates.

[27] Report of the FFM (A/HRC/28/18) submitted to Human Rights Council in March 2015, and the report  A Call for Accountability and Protection: Yezidi Survivors of Atrocities Committed by ISIL: http://www.ohchr.org/Documents/Countries/IQ/UNAMIReport22Aug2017_EN.pdf

EXHIBIT D

representatives of civil society, judges from the Shura Council and the Parliamentary Human Rights and Legal Committee attended the event. Participants emphasised that, in its current iteration, the draft Anti-Discrimination Law requires further clarification through amendments with the aim of including diverse viewpoints and avoiding discriminatory language. Participants provided suggestions for the consideration of the Parliamentary Human Rights Committee, which is tasked with collecting a variety of viewpoints and making recommendations for amendments to the draft bill.

The Parliamentary Human Rights Committee announced that it will deliberate upon the notes and suggestions from this session and reflect these in the second draft of the Anti-Discrimination Bill as appropriate. UNAMI/OHCHR continues to engage with relevant Iraqi civil society groups and the Government of Iraq regarding the final text of the Anti-Discrimination Bill to ensure that it is consistent with international standards.

UNAMI/OHCHR also continues to advocate for a stronger Office on Minorities Issues under the National Reconciliation Committee, reporting to the Office of the Prime Minister. During the reporting period, the Office on Minorities Issues piloted a series of consultations with Christian, Yezidi, Shabak, Turkmen and other groups to identify and assess the diverse needs and concerns affecting groups across Iraq. Based on the outcomes of the consultations, the Office on Minorities Issues then made a series of recommendations to the Prime Minister, who then tasked the Ministry of Education with following up on specific incidents of discrimination in education. To date, UNAMI/OHCHR has not received an update on progress.

### 7.1. Kurdistan Region of Iraq

The KR-I is home to a number of communities such as the Christian, Yezidi, Shabak, Assyrian, Kaka'i and Turkomen. The influx of IDPs fleeing ISIL has increased their numbers, as well as the number of Sunni Arabs who have fled from Anbar, Ninewa, and other governorates to seek safety from the continuing conflict.

UNAMI/OHCHR has highlighted the importance of education for children and youth as part of post-conflict reconstruction. In May 2016, UNAMI/OHCHR launched a human rights education plan with the Ministry of Education (KR-I) consisting of curriculum reforms and capacity building of teachers and instructors, in particular in relation to humanity studies with a view to integrating definitions of all religions that are officially recognized in the KR-I. The Ministry has launched programming proposed by UNAMI/OHCHR to mainstream key human rights principles of equality and non-discrimination in its humanities' curriculum, and to launch a series of specialized training courses for teachers in Erbil, Dohuk, Halabja, Garmian and Sulaymaniyah.

The adoption of the Law of Protection of the Rights of the Components of the Kurdistan Region of Iraq No. 5 of 2015 was a positive development in ensuring protection of ethnic and religious groups in KR-I. However, UNAMI/OHCHR continues to express concerns that the Law does not criminalize acts such as inciting or committing hate crimes against members of ethnic and religious communities, and does not establish a mechanism or body to ensure implementation of the rights specifically protected by the Law.

EXHIBIT D

### 8. Sexual minorities/LGBTI

Members of the lesbian, gay, bisexual, transgender and intersex (LGBTI) community continue to face severe discrimination, threats, physical attacks, kidnappings, and in some cases, killings due to their actual or perceived sexual orientation or gender identity. Throughout the reporting period, UNAMI/OHCHR monitored the situation of the LGBTI community and engaged with the Government of Iraq to promote the protection of LGBTI rights and to investigate incidents of violence against the community.

On 13 January, the body of a man was found at a dumpsite in Binouk neighbourhood in Baghdad. The body bore stab wounds to the stomach and genitals. The victim was allegedly killed because of his perceived sexual orientation. On 28 January, the body of a 22-year-old man was also found with stab wounds in Suq al-Shiyoukh district, 30 km southeast of Nasiriya. Information received by UNAMI/OHCHR indicated that he had also been killed because of his perceived sexual orientation. On 28 February, a tribal leader was shot and killed by unidentified gunmen in Al-Zubair district, Basra, near al-Zubair Bridge. The victim was shot several times in the head. The killing followed the posting on social media of a video that allegedly showed the victim engaged in sex with another man. The man seen in the video with the victim allegedly fled Al-Zubair district after his house was burned by unknown persons.

On 19 March, two youths were killed by unknown perpetrators in the Khamsameel area of Basra city, allegedly for their perceived sexual orientation. The two males, both about 17 years old, were found with gunshot wounds to the head. A letter was allegedly found at the scene that stated, "To Basra's people, we will kill all men who have long hair and dress like women." On 10 April, the body of a 22-year-old man was found in Maysan, al-Qadisya quarter, Amara city. The body had multiple stab wounds and had been mutilated, including the genitals. The nature of the injuries and other information received suggest that the man was killed due to his sexual orientation, whether real or perceived.

### 9. Rights of Persons with Disabilities (PWD)

UNAMI/OHCHR continued to engage with disability rights civil society organizations and the Government of Iraq to promote respect for and protection of the rights of persons with disabilities in two key areas: 1) ensuring State compliance with the Covention on the Rights of Persons with Disabilities (CRPD) and other relevant international instruments; and 2) advocating for an independent Commission to ensure compliance with the provisions of the CRPD. However, persons with disabilities (PWD) in Iraq continue to face significant challenges, including social, economic, and political discrimination, all of which are detrimental to the full enjoyment of their rights as Iraqi citizens.

In addition to lacking adequate opportunities and protection, PWDs continue to face a wide array of societal discrimination. The prevailing perception among the public is to treat persons with disabilities as charity rather than as productive members of society. This often leads to isolation of persons with

EXHIBIT D

disabilities and exacerbates negative psychological effects. The Government of Iraq ratified CRPD[28] in January 2012, and adopted the Law No. 38 of 2013 on the Care of Persons with Disabilities and Special Needs,[29] which establishes a Commission to promote the respect for and protection of the rights of persons with disabilities. To date, the Government has not implemented appropriate measures as required by Article 33 of the CPRD.[30] At a minimum, the Government should guarantee protection of and respect for the rights of PWDs and address discrimination and other obstacles to their well-being.

Problematically, the Commission as recognised by the Law continues to operate under the fiscal and administrative authority of the Ministry of Labour and Social Affairs and does not have the impartiality required by Article 33 of the CPRD. Perhaps more concerning is the lack of representation on the Commission of people with disabilities.

### 9.1.  Kurdistan Region of Iraq

On 19 April 2016, the Ministry of Labour and Social Affairs (KR-I) issued instructions in accordance with the Law on the Rights and Privileges of Persons with Disabilities and Those with Special Needs No.22 of 2011, to provide guidance on who is entitled to receive benefits based on their disability. The instructions also set out new percentages for determining the allowances received, although these are less than those set out in the Law. In May 2017, Ministry officials informed UNAMI/OHCHR that 107,983 people were registered with Kurdistan Regional Government as having disabilities.[31] However, approximately 25,000 of these people would lose their monthly benefits because they did not report for medical examinations or otherwise failed to meet the conditions for payment.[32] An amendment proposed by a group of NGOs to strengthen the Law in conformity with human rights obligations had its first reading in the KR-I Parliament on 23 December 2014. However, due to the impasse in the Parliament, no further reading of the amendment has been scheduled.

### 10.  Freedom of opinion and expression, and freedom of peaceful assembly/association

During the reporting period, there were significant challenges to freedom of opinion and expression, as well as freedom of association and assembly. Journalists, media professionals and protestors were intimidated, abducted and in some cases, killed while carrying out their duties. UNAMI/OHCHR received reports that media professionals and protestors were allegedly subjected to attacks by Iraqi security forces, armed groups and unidentified perpetrators, while working or reporting on or participating in demonstrations.

---

[28] See UN News Centre 'UN welcomes Iraqi ratification of pact on rights of persons with disabilities' at http://www.un.org/apps/news/story.asp?NewsID=41081#.WWdhN4SGPeY [accessed on 30 June 2017].
[29] See International Labour Organization http://www.ilo.org/dyn/natlex/docs/ELECTRONIC/96874/114689/F18984083/96874.pdf [accessed on 30 June 2017].
[30] Article 33 requires state parties to put in place structures for the implementation and monitoring of the Convention at the national level. This includes: designating focal points and, if required, coordination mechanisms; designating or establishing independent mechanisms, and; guaranteeing the participation of civil society.
[31] UNAMI/OHCHR discussion with a senior representative in the Ministry of Labour and Social Affairs.
[32] http://www.rudaw.net/mobile/english/kurdistan/060520173 [accessed on 30 June 2017].

EXHIBIT D

### 10.1.  Freedom of opinion and expression

On 24 January, a female reporter and a male photographer were allegedly beaten by members of the Iraqi Army's 11th Division to prevent them from reporting on the bombing of central Baghdad's al-Nhada Zone on the same day. On 30 April, a journalist from Diwaniya was shot by unknown armed men at his house. The motive for the shooting is not known, however, there is speculation that a previous posting on social media about armed groups had incited public anger and protests.

### 10.2.  Freedom of assembly and association

On 11 February, three protesters were stabbed and killed at Tahrir Square in Baghdad by unidentified persons wearing black uniforms. An Iraqi anti-riot police officer was also reportedly shot and killed by the perpetrators. At least 25 other protestors were wounded in a stampede that ensued. Nine private guards were allegedly arrested, accused of having killed the riot police officer. Protestors were demonstrating to demand an overhaul of the Iraqi electoral system.

On 8 May, unknown gunmen driving three four-wheel drive vehicles abducted seven males including students, workers, and civil activists from their home in Bataween, central Baghdad, and took them to an unknown location. Two of those abducted are reportedly members of the communist party and active at al-Qadisiya University. One abductee is reportedly a freelancer at Tareeq al-Sha'ab newspaper. The remaining abductees were reportedly working in Karrada, Baghdad, with no civil rights involvement. At least some of the abductees are purported to be human rights activists who participate regularly in demonstrations in Tahrir Square. The abductees were allegedly beaten before being released on 9 May following a call by the President of Iraq to security authorities to investigate the incident and to take all necessary action to discover the fate of the abductees. The Iraq Communist Party and civil society activists also conducted an advocacy campaign to search for the abductees.

### 10.3.  Freedom of Expression Bill

UNAMI/OHCHR continued to advocate for amendments to bring the draft Law on Freedom of Expression, Assembly and Peaceful Protest into compliance with international legal standards that are binding on Iraq. UNAMI/OHCHR has reviewed the draft Law and shared recommendations with the Speaker of the Council of Representatives, the heads of the parliamentary political blocs, and the parliamentary committees.

### 10.4.  Kurdistan Region of Iraq

UNAMI/OHCHR continues to receive reports of intimidation of a number of media professionals and limitations on the operation of media channels in the KR-I. UNAMI/OHCHR notes that restrictions have been imposed on journalists and the media without strict consideration of the law and the applicable international and national legal framework. UNAMI/OHCHR will continue to advocate for the unrestricted operation of media.

EXHIBIT D

Freedom of expression in KR-I is underpinned primarily by the Journalism Law No. 35 of 2007.[33] The Journalism Law establishes the role of the Kurdistan Journalists Syndicate in the accreditation of journalists and provides for certain protections and immunities for journalists in their work.[34] In consultation with media and government actors, it has been noted that the mandate of the Syndicate in the Journalism Law only applies to print media. This means that journalists working in other forms of media (especially electronic media) are neither protected by the Law nor subject to its ethical standards for responsible journalism. As a temporary measure, the Shura Council of the KR-I has issued a "Decision to authorize Kurdistan Journalism Syndicate for registering Electronic Newspapers" on 14 February. UNAMI/OHCHR is developing a project to advise on the possible amendment of the law, once Parliament is reactivated, to bring it fully in line with international standards.

On 11 October 2016, the Kurdistran Regional Government Council of Ministers adopted a Regulation on the implementation of the 2013 KR-I Law on Access to Information, as requested by Article 21 of this Law. This Regulation has to be approved by the Shura Council, and will enter into force following its subsequent publication in the Official Gazette, which has not yet occurred.

In late 2016 and early January 2017, protests erupted to voice demands for social equity, including payment of salaries of civil servants, particularly in Sulaymaniyah (with others in Garmian, Halabja, and Raparin). The protests were initially composed mostly of striking teachers, but were joined at various times by other public employees. UNAMI/OHCHR received reports of some arrests and violence, including attacks against striking teachers and their leaders. UNAMI/OHCHR also received reports of a spike in the number of complaints from journalists that security personnel were wrongfully interfering with their work, including by seizure and destruction of equipment and physical violence. The teachers' organization suspended the protests on 16 January in light of favorable developments, including the resumption of payment of salaries. Smaller protests were noted in February, including in Halabja by students protesting the lack of fuel and supplies in schools and in Sulaymaniyah by retired Peshmerga personnel relating to delays in their salary payments.

UNAMI/OHCHR remains concerned at the lack of progress in the investigation of the alleged murder of Mr. Widad Hussein. Mr. Hussein, a correspondent with Rozh News agency in Dohuk Governorate was abducted by unknown individuals on 13 August 2016. His body was found the same day at a roadside near Dohuk with physical  marks on his body that indicate that he was tortured prior to his death. The General Directorate of the Police (KR-I) established a committee to investigate. However, as of the date of reporting, UNAMI/OHCHR has not been informed of any progress in the investigation.

---

[33] Other applicable laws and by-laws include the Access to Information Law No. 11 of 2013, Publication Law No. 10 of 1993, Kurdistan Regional Government Regulations for facilitating the implementation of Access to Information Law No. 11 of 2013, Kurdistan Regional Government Ministry of Culture Regulation for organizing the work of TVs and Radios in Kurdistan Region, Kurdistan Journalist's Retirement Law No. 13 of 2001, Code of Ethics of the International Federation of Journalists, and Kurdistan Journalists Syndicate Law No. 40 of 2004 as amended.
[34] For example, Article 7 stipulates that any intimidation or attack against a journalist shall be punished. Article 8 states that no arrest or interrogation shall be made of any journalist, nor his/her work premises or private residence searched without a court decision.

EXHIBIT D

## 11.  Capacity Development Activities

During the reporting period, UNAMI/OHCHR conducted a number of training sessions and consultations on human rights and rule of law issues aimed at a  variety of participants, including human rights activists, members of the Iraqi High Commission for Human Rights (IHCHR), senior judicial officials  and officials from various Government ministries, members of Iraq's diverse ethnic, religious and linguistic communities, women's rights activists, and academics. The main objective of these activities was to promote respect for and protection of human rights and the rule of law and strengthen skills of officials from Government ministries and members of civil society to apply human rights principles. A selection of the activities undertaken is presented below.

From 2 to 4 May, UNAMI/OHCHR held a two-day training with the Office of IHCHR in Maysan, al-Muthana Governorate in Southern Iraq. Topics included human rights concepts, principles, monitoring and reporting mechanisms. The training aimed to increase the understanding of human rights principles and monitoring for IHCHR staff members and Community Police Officers in Maysan. Topics included; basic human rights concepts, principles and commitments of the Iraqi state; the human rights framework (origin, important conventions, UN bodies and mechanisms); and ways to use the UN mechanisms (filing petitions, preparing shadow reports etc.). Other sessions covered Iraq's international obligations and mechanisms for monitoring human rights violations. The training also addressed the role of Community Police in protecting human rights and drafting reports of human rights violations.

On 21 May, UNAMI/OHCHR, in collaboration with the U.S. Consulate General in Basra, conducted a training on human rights and human trafficking in Basra for members of civil society groups and officials from the Government. The training addressed the human rights framework on fighting human  trafficking. The outcome was the establishment of a network consisting of members of civil society groups and officals from Government to promote the awareness of trafficking.

### 11.1.  Kurdistan Region of Iraq

In January and February, UNAMI/OHCHR presented a training on human rights principles in eight sessions for approximately 470 new recruits and senior officials at the Asayish Academy in Erbil. Topics included the history and evolution of human rights, major human rights instruments, and best practices relating to law enforcement and counter-terrorism.

On 30 January, UNAMI/OHCHR supported a specialized training course on "Proposal Writing" in Sulaymaniyah for representatives of civil society organizations and representatives of the IBHR. The training course aimed to build the capacity of participants to devise, draft and submit human rights project proposals for potential funding and other support.

From 1 to 7 March, UNAMI/OHCHR held four training sessions for students of the Faculty of Law and International Relations of Cihan University in Erbil. Under the title "United Nations mechanisms for the protection of human rights in time of peace and conflict." The sessions focused on United Nations human rights mechanisms of protection, including in armed conflict, and child rights. Ten female and ten male students participated in the training.

EXHIBIT D

On 1 April, UNAMI/OHCHR delivered a presentation on "The role of law students in protecting and promoting human rights" for 60 students of the Faculty of Law and Political Sciences of Raparin University in Sulaymaniyah Governorate.

From 2 to 5 April, UNAMI/OHCHR delivered a four-day training course for 680 police officers under the auspices of the Directorate of Training and Rehabilitation in the General Directorate of Police in Sulaymaniyah. The course aimed at reinforcing the understanding of law and order, human rights and fundamental freedoms, how to deal with demonstrations, and respect for the principles of legality, necessity, and non-discrimination.

On 16 April, UNAMI/OHCHR held a seminar for students of the Faculty of Law, Diplomacy and International Relations of Human Development University in Qaradagh District, Sulaymaniyah on "United Nations mechanisms for the protection of human rights and the role of UNAMI/OHCHR in the Promotion and Protection of Human Rights." The seminar was attended by 23 female and 28 male students.

Throughout the reporting period, UNAMI/OHCHR distributed more than 6275 booklets of the nine core International Human Rights Treaties in the Kurdish language to civil society actors, academic institutions, government bodies, and other partners.

12. National Human Rights Institutions and UPR Action Plans

12.1. Support to the Iraqi High Commission for Human Rights

From January to March, as was the case with the selection of the first group of Commissioners concluded in 2012, UNAMI/OHCHR provided technical support to the Committee of Experts tasked with selecting a new batch of commissioners for the Iraqi High Commission for Human Rights (IHCHR). As a voting member of the Committee, UNAMI/OHCHR attended regular meetings and provided guidance on the selection process, within the framework of national and international standards, and provided technical assistance to the Secretariat of the Committee.

On 26 January, at a meeting of the Committee of Experts, several members of the Committee objected to UNAMI/OHCHR's role as a voting member and asserted that UNAMI/OHCHR's presence was in violation of Law No.53 of 2008, which established the IHCHR. Shortly afterwards, on 02 February, in response to this development, civil society representatives meeting with UNAMI/OHCHR raised their concerns regarding the selection process, and the sharing of a list of proposed candidates supported by various political blocs in the Council of Representatives. Their concerns were that the process of selection had become politicized and has compromised the impartiality and independence of possible future commissioners. UNAMI/OHCHR decided to suspend its participation on the Committee on 12 March as several members of the Committee would not permit UNAMI/OHCHR to exercise its responsibilities as a full voting member according to law.

In response to the claim that the presence of UNAMI/OHCHR on the Committee of Experts was illegal, the States' Shura Council issued a statement of legal opinion in favour of the UNAMI/OHCHR position and reconfirming that it had equal and full voting rights in the Committee of Experts.  However, the Council of Representative voted on 29 April in favour of amending Law No.53 of 2008 and remove UNAMI/OHCHR from its position as a full member of the Committee and

EXHIBIT D

limited UNAMI/OHCHR's future role within the Committee to general monitoring, consultation and technical support.

Nevertheless, UNAMI/OHCHR continued to support the IHCHR as an institution by providing technical assistance to the Parliamentary Committee tasked with re-organizing the IHCHR Secretariat. In January, an expert consultant hired in collaboration with the United Nations Office of Project Services (UNOPS) began assessing the IHCHR as an institution with a view to identifying changes to increase its capacity. Thirty-six  meetings were held with the IHCHR staff and other interlocutors in Baghdad, Najaf, Basra, Maysan, Thi-Qar, Samawa, Kirkuk and Ninewa (Ninewa and Kirkuk meetings were held in Erbil) to collect information on the structure of the IHCHR, roles and responsibilities of various IHCHR staff members, and gaps in skill sets. The consultant is compiling a report containing findings and recommendations on ways to re-structure the IHCHR Secretariat. The final report will be presented to the Parliamentary Committee tasked with re-structuring the IHCHR Secretariat.

### 12.2.  UPR Action Plans

On 10-11 May, UNAMI/OHCHR, in collaboration with the Ministry of Justice, held a two-day consultation to review the draft National Action Plan (NAP) based on recommendations from the 2014 Iraq Universal Periodic Review (UPR) session in the United Nations Human Rights Council. Thirty-five representatives from Iraqi ministries and civil society organizations participated in the consultation. During the consultation, working group sessions discussed the NAP, which was drafted by the Ministry of Justice. Each working group reviewed and debated the NAP and presented recommendations and comments on the NAP in the plenary session. These comments and recommendations will be compiled by the Ministry and incorporated into the draft NAP.

In the concluding recommendations, the Ministry of Justice requested that UNAMI/OHCHR continue its support during the entire process of implementation of the NAP and to be a part of the inter-ministerial committee to oversee its implementation. On 23 May, the Council of Ministers approved the NAP. On the same date, an inter-ministerial committee was formed with UNAMI/OHCHR as an observer and provider of technical assistance to the committee.

On 6 June, UNAMI/OHCHR held a meeting with the Deputy Minister of Justice to discuss steps towards the implementation of the NAP. The Deputy Minister requested that technical support and training be provided to members of the inter-ministerial committee for effective implementation of the NAP. UNAMI/OHCHR will continue providing technical assistance and necessary training to committee members.

In the KR-I, a Steering Committee, co-chaired by the Kurdistan Regional Government and the Independent Board of Human Rights (IBHR) and comprising representatives of civil society, developed (in late 2016) a regional human rights action plan (RHRPA) for the implementation of the UPR recommendations relevant for KR-I. UNAMI/OHCHR provided technical assistance to support and facilitate this process. The draft RHRPA prepared by the Steering Committee is yet to be endorsed by the Kurdistan Regional Government.

EXHIBIT D

1   HEATHER E. WILLIAMS, #122664
    Federal Defender
2   BENJAMIN D. GALLOWAY, #214897
    Chief Assistant Federal Defender
3   RACHELLE BARBOUR, #185395
    Assistant Federal Defender
4   OFFICE OF THE FEDERAL DEFENDER
    801 I Street, 3rd Floor
5   Sacramento, CA  95814
    Tel: 916-498-5700/Fax: 916-498-5710
6
    Attorneys for
7   OMAR AMEEN

8

9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11
    IN THE MATTER OF THE              )   Case No.  2:18-mj-152 EFB
12  EXTRADITION OF OMAR               )
    ABDULSATTAR AMEEN TO THE          )
13  REPUBLIC OF IRAQ,                 )   Judge: Hon. Edmund F. Brennan
                                      )
14  _____  )

15

16  I, Natiq Abduljaleel, hereby declare as follows:

17      1.  I made this declaration to provide additional information in this case.  As discussed in my

18          first declaration, I am from Rawah, Iraq, and I lived there until November 2017 when I

19          moved to Turkey.  I was in Rawah in June 2014 when ISIS came in, and when the victim

20          was killed.  I was a local mayor in Rawah.  I know many of the families in town, and am

21          very familiar with the history of Rawah.

22
        2.  I know about a big conflict between Omar Ameen's family and the
23
            family, from the El-Obaydi tribe.  More than 25 years ago, that family moved to Rawah.
24
            They were not originally from Rawah, but were from                 i.  A member of that
25
            family,                              made trouble and intervened in the affairs of the
26
            families of Rawah, and it was decided that he needed to be expelled from Rawah.  Omar
27
            Ameen's family and tribe took the lead in expelling them from Rawah, and he moved
28

                                                    1
    Declaration                                                              EXHIBIT 46

1    back to _____ .  This is the town next to the big Iraqi and American Air Base,

2    _____ .

3    3.   There are four brothers, _____ ,

4    _____ in that family, and they

5    all work in high positions with the Iraqi and US security forces at _____ Air

6    Base. If _____ is behind these claims against Omar, that is because of old

7    conflicts between the two families and tribes that Omar personally had nothing to do

8    with.  However, in our culture, such a form of retaliation would be common.

9

10   4.   I also know that _____ , is close friends with a family member of

11   the victim in this case, _____ , who also works at

12   the _____ Air Base.  That family member,

13   _____ , did not grow up mostly in Rawah, but mostly in Mosul, and is much younger than

14   _____ .

15   5.   There is a tendency in our culture to take revenge for real or perceived wrongs.  Often the

16   revenge is not against the person who committed the wrong, but against the person in that

17   family or tribe who has been the most successful.  We call it, "Akhz el-Thaar" (Taking

18   revenge). It is a way of hurting the family or tribe by going after the person who has

19   achieved the most success.  If _____ is involved in this case,

20   then this is an example of that type of revenge.

21   6.    Additionally, it is very common for anyone working closely with Iraqi and US security

22   forces in Iraq seeking promotions or other benefits to offer services as an informant and

23   provide false testimony against certain individuals, fabricating and grossly exaggerating

24   their danger, in order to gain favor with Iraqi and US security forces by seemingly

25   presenting to them "high value" and "very dangerous" elements.

26

27   My native language is Arabic.  I have signed this declaration after having it translated into my
     native language by the interpreter who has signed below.

28   I swear upon my honor and upon all the values and beliefs I consider sacred that this is the truth.

Declaration

2

EXHIBIT 46

(Turkish penalty of perjury language)

I declare under penalty of perjury that the foregoing is true and correct. I swear by God Almighty that this statement is the truth and nothing but the truth.

I know that this sworn declaration could be used in court and that all false declaration on my part exposes me to criminal sanction.

Executed this 10th day of May, 2019, at Istanbul, Turkey.

x NATIQ AHMED

I declare under penalty of perjury: I am an Arabic language interpreter. I have read this declaration to the witness in his native language of Arabic and have witnessed his signature through a video of him signing it in Turkey. The witness has provided me a photograph of his identification prior to signing this declaration.

Dated: 5/11/19 at Sacramento, California, USA.

Ahmed Gawish

Declaration                                    3

EXHIBIT 46

EXHIBIT 47

(UNDER SEAL)

HEATHER E. WILLIAMS, #122664
Federal Defender
BENJAMIN D. GALLOWAY, #214897
Chief Assistant Federal Defender
RACHELLE BARBOUR, #185395
Assistant Federal Defender
OFFICE OF THE FEDERAL DEFENDER
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax: 916-498-5710

Attorneys for
OMAR AMEEN

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATTAR AMEEN TO THE REPUBLIC OF IRAQ | Case No.  2:18-mj-152 EFB |
| | DECLARATION OF AYMENN JAWAD AL-TAMIMI |
| | Judge: Hon. Edmund F. Brennan |

I, Aymenn Jawad Al-Tamimi, declare as follows:

1.      I am widely recognized as a leading analyst on Syria, Iraq and the Islamic State. I have

distinguished myself through, among other things, in-depth translations and analyses of jihadist

primary source texts and materials (including the largest public archive of Islamic State

documents available so far) and multiple research and reporting trips inside of Syria and Iraq.

Further, I have conducted interviews with people on all sides of the conflicts (in contrast to many

analysts and writers who focus on one particular side).  I am fluent in Arabic and English and I

am of Iraqi origin.  A long-standing interest of mine has been the structure of Islamic State (IS)

administration, focusing primary on internal documents.  My CV is attached as Exhibit A.

2.      I do not have any personal knowledge of the facts surrounding the United States'

detention of Omar Ameen or the extradition packet submitted by the Republic of Iraq.  I have

reviewed the publicly-available extradition packet at Document 22-1 of the Court's docket.  I

have also reviewed the U.S. Government's complaint at Document 1 of the Court's docket.  I

Declaration of Aymenn Al-Tamimi – US v. Ameen

EXHIBIT 48

submit this Declaration to explain how modern Iraqi history and government led to the Islamic

State's overthrow of the Iraqi Government in parts of Iraq, including Anbar Province, during the

time period at issue in this case.  This applies to the town of Rawah, which I understand is at

issue in this case, and which ISIS ruled from late-June 2014 to November 2017.

3.      ISIS stands for the Islamic State in Iraq and al-Sham.  Another name for ISIS is ISIL,

which stands for the Islamic State of Iraq and the Levant (al-Sham often used in Arabic to refer

to the Levant region).  Many experts on ISIS simply refer to it as the Islamic State (IS), which is

how the group characterizes itself.  The Islamic State is known world-wide as a terrorist

organization.  However, in addition to terrorism committed by persons affiliated with, or trained

by ISIS, the Islamic State also intended to unite the Sunni Peoples in Iraq and Syria under one

banner, and create a Caliphate for those people that would then expand globally.  It has always

been a large part of the ideology of the Islamic State that it would first liberate the Levant and

create a unified state for the Sunni people, since fighting the local 'apostate' enemy (i.e. those

who have abandoned Islam) in the form of Shi'a, 'Sahwa' forces of Sunnis opposed to the

Islamic State etc. is deemed the priority.

4.      From statements given by civilians in the Islamic State-controlled areas, documentation

of those areas while under the Islamic State, reporting by fact-finders on the ground in Islamic

State-controlled areas, and numerous documents created in the Islamic State and left behind after

its defeat, it is clear that the Islamic State intended to govern its lands, and imposed a significant

bureaucratic structure to enable it to do so.

5.      Since the fall of Saddam Hussein in 2003, relations between the Shia majority and the

Sunni Arab minority in Iraq have been undermined by political and sectarian tensions. These

tensions have destabilized the country.  Hussein's regime had been dominated by Sunni Arabs,

and was widely perceived to have marginalized Shia and Kurds.  After the fall of Hussein, Sunni

Arabs lacked an effective leadership.  Shia and Kurdish political parties gained the lion's share

of power after the fall of Hussein. Members of the Sunni Arab minority, many of whom believed

they were in fact the majority in the country, felt excluded by the new order. There was a wave

of Shia/Sunni sectarian violence that was exploited by the Islamic State's predecessors and

Declaration of Aymenn Al-Tamimi – US v. Ameen

EXHIBIT 48

reached its peak in 2006. Prime Minister Nouri al-Maliki, who initially came to power in 2006 and secured a second term following the 2010 elections, was perceived by many Sunnis to be discriminating against them during his second term. As discussed by Harith Hasan Al-Qarawee, in <u>Iraq's Sectarian Crisis: A Legacy of Exclusion</u>, a paper by the Carnegie Middle East Center, published April 23, 2014:

> A narrative of communal victimhood has come to dominate the Sunni perception of the new Iraq.  This perception was deepened by discriminatory policies enacted by the government of Nouri al-Maliki, such as efforts to target Sunni leaders with accusations of terrorism and mass arrests of Sunni citizens. . . .

6.      Sunni Arabs in Iraq began to demonstrate against the government in 2012-2013. The immediate trigger was the arrest of the bodyguards of the Finance Minister Rafi' al-Issawi. The initial nucleus of the protests was in the province of Anbar. The protestors made a variety of demands such as reforms to de-Ba'athification laws and the releases of detainees. Efforts to pass compromises to address some of these demands through parliament failed. In addition, two incidents led to a surge in violence that culminated in a renewed insurgency by January 2014. The first was the killing of protestors by security forces in the Hawija area of Kirkuk province in April 2013. The second was the crackdown on the protest camp in Ramadi in December 2013 that was ordered by Maliki, despite the fact that the protests were generally fizzling out by that point. The crackdown was ordered on the grounds that the protest camp was a hub for al-Qa'ida in Iraq. The basis of this claim was that ISIS' flag turned up occasionally within the protests in 2013, though that phenomenon by no means represented the majority of the protestors. One cynical interpretation would suggest that Maliki ordered the crackdown knowing that it would provoke an insurgent reaction of some kind, allowing him to portray himself as the figure who could uphold security in the face of the renewed threat.

7.      The renewed insurgency in 2014 began with the fall of Fallujah and parts of Ramadi out of government control. A number of groups were involved in the insurgency, including the neo-Ba'athist Army of the Men of the Naqshbandi Order (JRTN), the Islamic Army of Iraq (a Salafi nationalist group), the Mujahideen Army and the General Military Council for Iraq's

Declaration of Aymenn Al-Tamimi – <u>US v. Ameen</u>

EXHIBIT 48

1    Revolutionaries, which had links to JRTN and another old insurgent group called the 1920s

2    Revolution Brigades.

3    8.      ISIS was a large part of the Sunni insurgency in Iraq due to its financial resources

4    compared to other uprising groups. It had also gained years of experience as its members

5    continued to fight an insurgency even as many members of the other groups decided to give the

6    political process a try. ISIS also had significant resources and manpower from its cross-border

7    involvement in Syria's civil war. While ISIS initially existed alongside the other Sunni insurgent

8    groups in Fallujah, it gradually subsumed and marginalized them. When large parts of Sunni

9    Arab Iraq fell out of government control in summer 2014 (including Rawah in western Anbar),

10   ISIS marginalized other Sunni insurgents even more rapidly. The Islamic State intended to oust

11   the prior political power in the areas that it controlled, including Anbar Province, and create a

12   new state that would be run on behalf of the Sunni people in those areas.  Documents by the

13   Islamic State expressly describe this goal as defeating an oppressive, occupying power over the

14   areas of the Levant and Iraq that were primarily Sunni.  The Islamic State presented itself as the

15   alternative to Shiite-dominated Iraq, in which many Sunnis felt themselves to be second-class

16   citizens. Indeed, in many cases, the group portrayed particular operations as revenge for

17   oppression and atrocities against Sunnis.

18   9.      The Islamic State sought to establish its state initially within the predominantly Sunni

19   Arab areas of Iraq, and then use the territory as a base for forward expansion. It is my

20   understanding that Mr. Ameen absolutely denies having committed this offense or being a

21   member of ISIS.  However, the crime discussed in the extradition packet, and in the U.S.

22   Government's Complaint, is described as being committed on behalf of ISIS the day after ISIS

23   moved into Rawah.  I understand that Mr. Ameen is a Sunni Arab, from the al-Sarhani tribe, and

24   that the offense occurred in his hometown of Rawah, Iraq, in his ancestral homeland.

25   10.     The Islamic State partly attempted to appeal to disenfranchised Sunni Arabs by

26   presenting itself as a trustworthy and efficient alternative to the prejudiced, corrupt, and/or

27   ineffective politicians in Baghdad.  The Islamic State had a rigid hierarchy and organizational

28   structure that it used to take over parts of Iraq and Syria and occupy them.  For example, in July

2016, the Islamic State released a video entitled "Structure of the Caliphate," which detailed the structure of administration and the geographic organization of its state project.  In that video, IS claimed the existence of 35 *wilayas* ("provinces"): 19 inside Syria and Iraq, and 16 elsewhere. IS sought to achieve administration on the ground (Arabic: *tamkeen*) in provinces it claimed. Accordingly, with more recent defeats in Iraq and Syria, IS has reduced the number of provinces it apparently claims in its propaganda. In its current media releases, the Islamic State speaks only of one 'Wilayat al-Iraq' and 'Wilayat al-Sham' in reference to Iraq and Syria respectively. It has applied similar treatment to its presence in Libya and Yemen, while claiming other 'wilayas' in Somalia and East Asia, indicating a rebranding shift towards global jihadi insurgency rather than the state project centered on Iraq and Syria.

11.     With respect to a governing structure, IS uses *diwans*, committees, and offices to conduct its administrative matters.  There are many examples of this in the documentary evidence I have analyzed and translated.  I published an analysis in August 5, 2015, in <u>Perspectives on Terrorism</u>, and have attached it here for the Court's review as Exhibit B.  The documentary evidence indicates that IS has engaged in a large-scale state-building project, using administration as a key part of its order.  My article traces the evolution of the administration of the Islamic State, based on primary IS source documents, many of which are governmental documents.  The section at page 123, "Caliphate and Diwans: Embodying Statehood" describes the emergence of *diwans* in Summer 2014, corresponding with the rapid ISIS advances across northern and western Iraq and the declaration of the Caliphate at the end of June 2014.  *Diwans* are institutions that function as government department or ministries.

12.     Islamic State *diwans* addressed many social needs, such as, education (Diwan al-Ta'lim); public utilities and parks (Diwan al-Khidamat); natural resources and antiquities (Diwan al-Rikaz); religious authorities (Diwan al-Da'way wa al-Masajid); health (Diwan al-Sihha); public security (Diwan al-Amn); a justice system (Diwan al-Qada wa al-Mazalim); and economic issues (Diwan Bayt al-Mal).  There were diwans at the central administration level, but also at the provincial level.  The IS issued a broad range of documents, including regulations on fishing, tax forms for electricity services, licenses for excavation of antiquities, phone subscriptions, fees for

Declaration of Aymenn Al-Tamimi – <u>US v. Ameen</u>

EXHIBIT 48

1   sanitation services, agricultural crop plans, unified Friday sermons, vaccination programs, and

2   rent control.

3   13.       Similar primary source analysis has been done by Laith Alkhouri and Alex Kassirer, with

4   their conclusions published as "Governing the Caliphate: The Islamic State Picture" published in

5   the CTC Sentinel, by the Combating Terrorism Center at West Point, in August 2015, Volume 8,

6   Issue 8.  The authors noted that the "life force" of IS "stems from a side that, although less

7   publicized [than its terrorism], accounts for the majority of the group's activities: a system of

8   governance entailing institutional services, judicial processes, infrastructure work, essential

9   consumer products, recreational activities, and more."  I am attaching this article to my

10  declaration as well at Exhibit C.

11  14.       The New York Times also analyzed thousands of internal IS documents to reach the same

12  conclusions in "The ISIS Files," written by Rukmini Callimachi, and published on April 4, 2018.

13  15.       It is my understanding that the victim of the charged offense was a former police officer

14  under the Iraqi government prior to the Sunni insurgent uprising and ISIS takeover of large parts

15  of Iraq.  A police officer would be viewed by ISIS as an 'apostate' and accordingly ISIS would

16  require such a person to 'repent' of his 'apostasy,' which would entail the issuing of a repentance

17  statement document. The person required to 'repent' would also often be asked to hand over a

18  light weapon such as a Glock pistol. It is my understanding, based on the information in the

19  extradition packet, that the victim was provided a warning and asked to lay down his arms in

20  light of the Islamic State's takeover.  His failure to do so would have meant that he would be

21  viewed as an enemy member of the prior government and executed.

22

23  16.       As discussed above, there was an active Sunni insurgency in Iraq starting in early 2014,

24  which set the stage for ISIS's capture of Rawah, Iraq on June 21, 2014.  According to the

25  documents in this case, and contemporaneous accounts, the crime charged against Mr. Ameen

26  occurred the next day.  There is reference to a Twitter Post in the extradition packet, which states

27  that by killing the victim, the Islamic State intended to "eliminate some rotten heads," an Iraqi

28  expression meaning to get rid of corruption from the old regime.

6

Declaration of Aymenn Al-Tamimi – US v. Ameen

EXHIBIT 48

1

2      I declare under penalty of perjury under the laws of the United States of America that the

3      foregoing is true and correct to the best of my knowledge and belief.

4

5      Executed on _____7 May 2019_____ at _____Cardiff,

6      UK_____.

7

8

9      _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

EXHIBIT 48

## CV

Name: Aymenn Jawad (Al-Tamimi)
Date of Birth: 23rd August 1992
Nationality: UK citizen
Residence: Cardiff, United Kingdom/Oxford, United Kingdom.
Languages: English, French, Spanish, Latin, Ancient Greek, Arabic, Old English.
E-mail: aaj892@hotmail.com

## Education

### University of Oxford

Classics with Oriental Studies (BA)- First-Class Honours
2010 –2014

. Second highest across the university in Honour Moderations in March 2012 with an overall transcript score of 74.5.

. Attained the De Paravicini Prize at Honour Moderations for the Latin Language examination and *proxime accessit* for the Greek Language examination.

. Won a scholarship for achieving a first overall (summa cum laude) in Honour Moderations in third year of study. Scholarship renewed for final year of study.

### St John's College, Cardiff, United Kingdom

GCSEs and A-Levels
2002 – 2010

. Achieved 12 A*s in Latin, Spanish, French, History, Religious Studies, Mathematics, English, English Literature, Biology, Chemistry, Physics, Astronomy.

. 6 As at AS-Level in Latin, Spanish, Mathematics, Chemistry, Physics and Religious Studies.

. 5 A*s at A-Level in Latin, Spanish, Mathematics, Chemistry and Physics.

. ABRSM Pass at Grade 8 in Piano and Trombone.

. Played trombone and percussion in the school orchestra.

. Provided optional tuition in Latin for three years for students aged 12 and above during lunchtime break.

EXHIBIT A

## Experience

Organization: Accadian Ltd (London, UK)
Duration: July 2013-February 2014
Position: Research consultant
Role: Providing consultancy on an ad hoc basis on jihadi groups in Syria as part of a project to develop counter-extremism schemes.

Organization: Uticensis Risk (Kirk Sowell, currently based in Amman, Jordan)
Duration: August 2013 – Present
Role: Part-Time Consultant. Providing analysis on an ad-hoc basis with particular focus on the Islamic State of Iraq and ash-Sham.

Organization: Uticensis Risk (Kirk Sowell, currently based in Amman, Jordan)
Duration: January 2014-Present
Role: Providing at least 4000 words of analysis per month (done on a deadline basis) for the subscription publication *Inside Iraqi Politics*, which provides insight on events in Iraq through Arabic sources.

Employer: Wladimir Van Wilgenburg (freelance journalist)
Duration: June 2013 – Present
Role: Translator and Research Assistant. Providing Arabic-English translations and research assistance on ad hoc basis for Dutch journalist Wladimir Van Wilgenburg, with particular focus on Kurds in Syria.

Organization: Assyrian International News Agency (Chicago, Illinois)
Duration: April 2013 –January 2016
Role: Translator and Research Assistant: monitoring Iraqi media for Arabic news items to be translated into English, with particular focus on the Christian communities of Iraq. In more recent months this has included monitoring of news on Christian communities in Syria.

Organization: Middle East Forum (Philadelphia, Pennsylvania)
Duration: July 2009-January 2012
Position: Intern
Role: Proofreading documents, finding speakers for and writing summaries of conference calls (for a sample of speakers: please see http://www.meforum.org/wires.php), providing research assistance for senior staff (all done on a deadline basis), and writing research articles of my own for publication in media outlets.

Organization: Middle East Forum (Philadelphia, Pennsylvania)
Duration: January 2012-August 2012
Position: Adjunct Fellow
Role: As above, with contribution of one piece to the organization's peer-reviewed Middle East Quarterly on an annual basis.

Organization: Middle East Forum (Philadelphia, Pennsylvania)

EXHIBIT A

Duration: August 2012-June 2014
Position: Shillman-Ginsburg Fellow (http://www.meforum.org/staff.php)
Role: As above, with contribution of two pieces to the organization's peer-reviewed Middle East Quarterly on an annual basis.

Organization: Middle East Forum (Philadelphia, Pennsylvania)
Position: Jihad-Intel Research Specialist
Duration: July 2014-November 2018
Role: Managing a database of jihadist group symbols while producing own research articles.

Organization: Middle East Forum (Philadelphia, Pennsylvania)
Position: Online Editor
Duration: February 2018-August 2018
Role:  Vetting articles by fellows in various publications to be reprinted on the online site. Editing, fact-checking and illustrating articles where necessary.

**Recognition**
. Writing and research's primary focus has been on Iraq and Syria analysis. A complete list of my writings can be found at my website http://www.aymennjawad.org.  My most notable achievements include:

Being the first to reveal the presence of three Moroccan ex-Guantánamo detainees fighting in Syria.

Compiling hundreds of Islamic State administrative documents, including many previously unseen in the public light. This includes the first Islamic State budget to be made public, as well as a 'masterplan' in administration: Principles in the Administration of the Islamic State.

Compiling a database of over 150 jihadist groups with regular intel updates: http://jihadintel.meforum.org/

. Work has been cited in a whole array of international media outlets, including:

- New York Times
-Washington Post
-Los Angeles Times
-Christian Science Monitor
-Reuters
-Associated Press
-USA Today
-Agence France Presse
-BBC
-The Financial Times
-McClatchy
-France 24

EXHIBIT A

-El Mundo
-Foreign Policy

. Consulted by a researcher working for the United Nations on Syria during a meeting in Arbil in June 2013. Further provided consultation for the Foreign Affairs Committee for the U.S. House of Representatives in fall 2013. Also spoken at conferences in Washington DC and Brussels.

. Gave lectures at Foreign Ministries in Japan and Czech Republic on Syria in 2016.

. Briefed the Canadian government on Syrian refugees in late 2015.

. Lectured and gave classes at Franklin Pierce University in New Hampshire in December 2013.

. Testified for the UK House of Commons Defence Committee in October 2014 on ISIS and Iraq, and submitted a briefing for the UK Foreign Affairs Committee in September 2015 on Syria.

EXHIBIT A

# The Evolution in Islamic State Administration: The Documentary Evidence

by Aymenn al-Tamimi

*Abstract*

*This paper traces the development in Islamic State administration from the establishment of the Islamic State of Iraq in 2006 until the present day. The paper draws on rare primary sources to explain the growing sophistication in the group's governance structures. The current bureaucratic system has reached a level of complexity and professionalism that probably makes the Islamic State sustainable, even under containment, provided it maintains control of its strongholds.*

**Keywords:** Jihadism, ISIS, Iraq, Syria, rebel governance, bureaucracy

## Introduction

Since the 1980s, jihadist groups have attempted to govern their territories and provide services to locals. Some proclaimed state entities, most often in the form of an Islamic 'emirate': a localized entity that is supposed to be subordinate to the Caliphate.[1] This paper examines the governance structures of the largest jihadi state-building project to date: the Islamic State (IS). For such an entity to function and survive, administration will be a key part of its order. This has been a prominent theme in the Islamic State's own propaganda and one which came to the forefront during the ISIS era.

Studying the IS administration is important for two main reasons. For one, Islamic State is a prominent case of the general phenomenon of rebel governance, a topic that remains underexplored in the social science literature and that may hold clues to why some insurgent groups perform better than others. For another, this inquiry can shed important light on the organizational structure and long-term viability of the Islamic State, issues that have direct implications for the policy debate about how the international community should deal with IS.[2]

The existing literature has provided descriptive snapshots of the IS administration, but lacks a thorough analysis of its evolution over time.[3] This paper therefore traces the evolution of the administration through its many prior incarnations, beginning with Abu Mus'ab al-Zarqawi's Jamaat al-Tawhid wa al-Jihad (1999), followed by al-Qa'ida in Iraq (*Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn*: AQI, 2004), the Majlis Shura al-Mujahideen (2006), the Islamic State of Iraq (*Dawlat al-Iraq al-Islamiya*- ISI, 2006 post-Zarqawi), the Islamic State in Iraq and al-Sham (*al-Dawla al-Islamiya fil Iraq wa al-Sham*- ISIS: 2013) and finally the Islamic State (IS: 2014 till present). In the course of this evolution, one goes from a mere group (*jamaat*) through to an Islamic emirate in ISI, and finally an entity that is now claiming to be the Caliphate.

This article attempts to answer these questions by relying on primary IS source documents, and mainly those not released in an official capacity by IS' media wings. These are documents that have been released online by pro or anti-IS activists, or sent to this author in a private capacity. Non-officially-released IS documents are useful because they can shed more critical light on the nature of IS administration. The main limitation here is that the total number of documents unearthed thus far is still likely to be only a small fraction of the total number of administrative documents issued by IS in its various state departments, and ever more granular analysis will have to be reserved for future years, particularly if IS is driven out of its key strongholds and outside forces can seize caches of documents for research.

EXHIBIT B

The article is structured chronologically, starting with the first official claim to statehood by ISI in 2006 and continuing right through to the present day. I make two arguments: first, the documentary evidence represents a growing sophistication over time, and second, the current model seems sustainable and resistant to internal collapse if IS control of its strongholds is allowed to continue. In this regard, I dissent from the assessment of Jamie Hansen-Lewis and Jacob Shapiro that "from an economic perspective, Daesh [IS] is extremely unlikely to be sustainable."[4] This is not to portray IS as having a model economy, but rather to say IS can probably sustain control over its territories because the quality of life there was low to begin with.

### ISI and its Ministries: 2007-2011

As noted above in the summary timeline, the transition to ISI in 2006 headed by Abu Omar al-Baghdadi represents a key turning point in self-presentation: from a mere group to an actual state. Concomitant with this change in official image was the establishment of the first cabinet of ministries in April 2007. These ministries were as follows: first ministry, war ministry, public relations ministry, public security ministry, media ministry, oil ministry, Shari'a Committees ministry, martyrs and prisoners ministry, agriculture and fishing ministry, and health ministry.[5]

In keeping with the notion of good governance, an image of technocratic government was presented: thus the oil ministry was headed by "the engineer Abu Ahmad al-Janabi," while the health ministry came under the leadership of "the doctor professor Abu Abdullah al-Zaidi."[6] Further, the names reflected to a large extent the 'Iraqization' trend that tried to move away from the image of an unwelcome, foreign jihadi force: thus both the public relations and oil ministers are Janabis (associated with Iraqi Sunnis), the media minister a Mashhadani (from a Sunni area of north Baghdad), and the martyrs and prisoners an Issawi (from Anbar). [7] The main exception in this regard was Abu Hamza al-Muhajir, the war minister, an Egyptian by origin.

However, it is naturally questionable how far these ministries translated to real administration on the ground. Indeed, ISI seemed to acknowledge as such in a tract entitled "Informing the People About the Birth of the Islamic State," a study released by ISI in 2006-7 under the supervision of Shari'a Committees official Uthman bin Abd al-Rahman al-Tamimi.[8] The treatise cites a number of Islamic texts to justify the necessity of establishing an Islamic state,[9] and claims that: "After more than three years of jihad in Iraq, the mujahideen have by the granting of success from God been able to reach an appropriate level of organizational, military, administrative, economic and media capabilities and preparations that they have not attained before."[10] Yet "despite the fact that we say this, we realize completely that the basis on which the Prophet…relied in the establishment of his first state did not possess the supreme fields of knowledge, worldly specialties, and material capabilities of that time, but rather his enemies were far ahead of him in this regard, but that was not a reason to put a stop to the destiny of the state and its project."[11] That is, ISI was already acknowledging its own limitations in functioning as an actual state but used Islamic precedent to justify the legitimacy of its declaration.[12]

This problem was compounded by the rise of the Sahwa (Awakening Movement) among Iraq's Sunnis, which in coordination with coalition forces played a crucial role in 'rolling back' ISI over the period 2007-2009, though not destroying or defeating the organization entirely. Rather, as Brian Fishman puts it, the net effect of the surge and the Sahwa was that these developments "pushed it out of its former safe-havens and inhibited its ability to hold territory."[13]

In September 2009, ISI announced its second appointment of cabinet of ministers, acknowledging its losses since 2007 in a video release: "After the announcement of the first Islamic government, the Islamic State has been subjected to painful stabs from every side, but has endured over the wounds, has taken heart over the

EXHIBIT B

pains and has recovered, and has arisen on the leg of earnestness for jihad in the path of God and defending the religion of God."[14]

The second cabinet of ministers comprised first and war ministries, Shari'a committees, public relations, prisoners and martyrs, security, health, media, oil and finance. The names of the ministers are different from the first cabinet except for the appointment of Abu Hamza al-Muhajir in combined roles as first and war ministers.[15]

Despite the severe weakening of ISI capabilities, the group remained capable of carrying out deadly terrorist attacks, and reports of ISI entrenching itself in Mosul as a criminal enterprise extorting money from businesses, together with ongoing oil smuggling, were already becoming apparent in 2009.[16] These problems only continued and intensified as Abu Bakr al-Baghdadi became new ISI leader by ISI Shura Council appointment in May 2010 following the deaths of Abu Omar al-Baghdadi and Abu Hamza al-Muhajir[17] and as the U.S. troop presence drew down. In September 2011, the Iraqi-German investigative outlet *Niqash* reported that every pharmacy owner paid between 100 and 200 dollars a month to ISI, while contractors paid 5-10% from every contract assignment to ISI: extortion also came upon hotels, doctors, and shopkeepers.[18]

The pervasiveness of the enterprise readily casts into doubt the central government's real control over Mosul during these years. It is a significant aspect of ISI's deep entrenchment in Mosul and the wider Ninawa province, coming not only at the expense of Baghdad but also ISI's rival insurgents, many of whom also had an established presence in Mosul but lacked ISI's financial resources and operational capabilities. These rivals included the jihadist Jamaat Ansar al-Islam and the Ba'athist Jaysh Rijal al-Tariqat al-Naqshbandia. Though ISI was in no position at the time to subjugate these groups totally, the point about entrenchment partly explains why ISI's successor ISIS so quickly became the dominant power in Mosul following the city's fall in June 2014.

In sum, by 2011 it would still not have made any sense to characterize ISI as an actual state even as Mosul and Ninawa province had clearly emerged as its main hub, but rather its status was akin to a Mafia organization, not yet governing any major towns or territory where it could display the workings of most of its supposed government ministries. The self-presentation as a state is in any case important for understanding an ideological basis for ISI and its successors' disputes with rival groups that did not make claims to being an actual state: since ISI and its descendants already saw themselves as being of a higher status, independent arbitration of disputes and compromise would be impossible in the long run. These problems became much more apparent with the expansion of ISI into Syria and the declaration of ISIS in April 2013, after which the first real signs of proto-governance began to emerge.

### The Syrian Civil War and ISI Expansion

The outbreak of the Syrian insurgency in 2011 provided ample opportunity for ISI to expand and establish a safe haven, which would later prove beneficial to campaigns on the home front in Iraq. From this outlook came the birth of Jabhat al-Nusra sometime in summer 2011 as Abu Muhammad al-Jowlani (of Syrian origin) was dispatched along with a number of ISI operatives into Syria.[19] The question of whether this decision to expand into Syria was made in coordination with al-Qa'ida Central (AQC) remains controversial and part of an ongoing 'war of the narratives': in what is now the Islamic State's telling, it was wholly the work of ISI as there was no allegiance to AQC anyway since 2006, while AQC and its supporters insist that ISI leader Baghdadi had affirmed his allegiance to AQC and authority ultimately lay with AQC leader Ayman al-Zawahiri. Regardless, it is not in the scope of this paper to delve in-depth into this subject.

EXHIBIT B

Unsurprisingly, the route of migration into Syria appears to have been the Ninawa-Hasakah corridor,[20] again reflecting Ninawa's status as ISI's main hub in Iraq. Indeed, it was also used by Jama'at Ansar al-Islam to establish its own Syrian branch, with the al-Qaa'qaa' training camp set up in al-Hewel in Hasakah along the border with Iraq.[21]

However, the strategy of Jabhat al-Nusra was quite different from ISI and did not involve claims to statehood. Instead, the group aimed to intertwine itself with the broader rebellion, coordinating with most other factions. It remained open to power-sharing in areas captured from the regime, while providing services and da'wah outreach to locals. Pursuing this gradualist approach, Jabhat al-Nusra gained widespread legitimacy as a valuable asset to the rebellion, even as U.S. intelligence correctly identified it as originating from ISI, hence the terrorist designation in December 2012.[22] In turn, Jabhat al-Nusra's success in Syria, combined with a desire to prevent the group from seemingly becoming too powerful to stand up for its autonomy, is likely what prompted Baghdadi's calculation to announce unilaterally via al-Furqan Media the merger of ISI and Jabhat al-Nusra to form ISIS in April 2013, although there had probably been a good deal of agitation behind the scenes prior to the audio message.

With the rejection of the merger by Jabhat al-Nusra and AQC, Baghdadi nonetheless persisted with his ISIS project, winning over a number of defecting Jabhat al-Nusra factions to build an ISIS presence in northern Syria. The most significant losses for Jabhat al-Nusra to ISIS were in Raqqa province, but what had clearly emerged as Syria's official al-Qa'ida affiliate retained the loyalty of virtually all its contingent in Deraa province in the far south.

It is at this stage, in the spring of 2013, that the first signs of ISIS administration emerge. It is important to recognise here that the ISIS strategy for expansion also entailed a degree of gradualism, as in the majority of places where ISIS had a presence it was only one among multiple factions. Central to the first stages of an ISIS presence in a given area was the establishment of a da'wah office, which would not only function as a means of social outreach and recruitment of members of the local population, but also as a front for gathering intelligence on ISIS rivals in the local area, plainly with the intention of undermining and destroying them. This approach was recently the subject of an article by Der Spiegel reporter Christoph Reuter, who attributed it to blueprint plans purportedly written by Baghdadi's deputy Hajji Bakr. The plans also envisaged a sophisticated security apparatus in each of ISIS's regions.[23]

Regardless of whether these plans actually guided ISIS strategy, there is no denying the importance of the da'wah office to the growth of ISIS in 2013. Two notable cases are the towns of Raqqa and Azaz. In the former, ISIS co-existed with Ahrar al-Sham, Ahfad al-Rasul (which ISIS expelled in August 2013 while Ahrar al-Sham largely stood by) and Jabhat al-Nusra (which 'returned' in September 2013). Here, ISIS became known for its da'wah office that erected billboards in the city advertising its ideals, such as the need for women to dress modestly, the importance of implementing God's law, not man-made law, and so on.[24] The da'wah office also served as a means to undermine rivals and small protests against ISIS quickly arose in Raqqa to protest the detention of relatives likely linked to rebel factions. Concomitant with the da'wah office and its setting up of billboards was outreach to locals in the mosques, and aiming to give the impression of transparency, ISIS offered to receive complaints about its members' conduct in the Nawawi mosque in Raqqa.

In Azaz, which ISIS entered at the beginning of July 2013, the main rival to contend with was the local Northern Storm Brigade, whereas Abu Obeida al-Masri's jihadi faction Jaysh Muhammad in Bilad al-Sham seems to have been quite sympathetic to ISIS, which established a da'wah office in Azaz that recruited from opponents of Northern Storm. At the same time, ISIS was coordinating with Northern Storm in the siege

EXHIBIT B

of Mennagh airbase, and the local ISIS amir for the Azaz area- Abu Abd al-Rahman al-Kuwaiti initially had friendly relations with Northern Storm leader Samir Amouri.[25]

By September, ISIS felt strong enough to attempt a full-on takeover of the town by force, on the pretext that a German doctor working in Azaz was a spy. Though seeming to accept a ceasefire agreement mediated by Liwa al-Tawhid, ISIS displayed its contempt for independent mediation in violating the agreement and expelling Northern Storm from the town completely, establishing the "Emirate of Azaz" and appointing a local boy – Murad Hallaq – as head of intelligence to hunt down Northern Storm members and supporters who did not repent.[26] The concept of an "emirate" was a key ISIS designation for towns it controlled as strongholds prior to the declaration of the Caliphate, and points to the projection of a forthcoming Caliphate. Quite tellingly, one of the slogans ISIS publicised after the capture of Azaz was: "The promised project of the Caliphate."

Another familiar feature of the ISIS presence in a locality where it co-existed with other factions would be the Virtue and Vice Committee/the Islamic Court. For instance, in the northern border town of Tel Abyad, ISIS co-existed alongside Ahrar al-Sham and other local rebel formations, later working together with them to expel the Kurdish militia presence in August 2013. Here, ISIS established an Islamic Court, issuing an edict in December 2013 detailing restrictions on women's clothing. Where ISIS had a presence alongside other factions, Islamic Court could serve as an alternative form of justice to which residents could address their complaints about individuals or members of ISIS, besides being able to license marriages. This was also the case with Deir az-Zor city, where ISIS established its Islamic Court in October 2013.[27] Of course, ISIS Islamic Courts also existed in places where it had strongholds, such as in Azaz[28] and al-Dana.

However, it would be wrong to suggest that ISIS administration existed as an entirely separate entity from the wider Syrian insurgent milieu and governing bodies in rebel-held areas. On occasion, one can find joint statements issued with other governing bodies: for example, in November 2013, a joint statement was put out by ISIS, the Shari'a Committee, and the "military council" in the name of the "Free Syrian Army," calling on the people of Manbij to strengthen the town and area defences against a potential advance by regime forces. [29] A similar statement can also be found for the town of al-Bab, with joint signatures from ISIS, Ahrar al-Sham and other entities.[30]

Nonetheless, the increasingly assertive state-like behaviour of ISIS, such as its attempts to gain monopolies on the making and supplying of bread in a given town,[31] did not escape the attention of already existing administrative bodies, members of whom might be subject to arrest at the hands of ISIS. In this context came a notification in October 2013 from the Shari'a Committee for the al-Bab area, explicitly affirming: "We do not acknowledge the so-called organization of the Islamic State in Iraq and al-Sham as a state but rather as a fighting faction who are brothers to us. To them is our property and upon them is what is upon us."[32] This reportedly came in response to ISIS' arrest of a judge and five other members of the committee who had been seeking out a wanted person, an individual who had pledged allegiance to ISIS and thus sought protection. [33] Similarly, in Manbij, a number of factions including Liwa al-Tawhid, Liwa Fursan al-Furat, and the "revolutionary and military council" issued a statement in late August 2013, declaring ISIS in the town to be a "military faction like the rest of the factions," forbidding interference in any "civil and service matters" and calling on ISIS to respect the authority of the "revolutionary and military council" by handing over any seized public and private property.[34]

Despite ISIS' increasingly aggressive behaviour in Syria towards other factions through 2013, the evidence does not justify describing ISIS as an actual state at this point. The group certainly controlled some important strongholds near the border with Turkey as 'emirates' in which some services, legal administration and

EXHIBIT B

enforcement of Islamic morality could be provided, but in the majority of places ISIS was only one of a number of factions and had to rely primarily on proselytization to assert itself, while aiming gradually to subvert rival groups. Real territorial holdings tended not to be contiguous and there is no suggestion of a centralized or consistent system of administration to cover the entirety of its areas of control and presence in Syria. The picture was to change with the outbreak of infighting between rebels and ISIS at the start of 2014.

### Infighting and Consolidation of the State

It is evident from ISIS' *modus operandi* in Syria in 2013 that the strategy for expansion and development was considered a slow, step-by-step process premised on the belief that such an approach would avoid a coordinated backlash from Syrian rebels analogous to the Sahwa movement. Initially it worked: After seizing towns such as Jarabulus, Azaz and ad-Dana, ISIS did not face substantial opposition from the rebels as a whole. Frequently, ISIS coordinated with other factions during offensives in Latakia, Qalamoun and Aleppo province, and those of Islamic Front and jihadi orientation in particular were reluctant to turn against ISIS openly, and ISIS sometimes played on notions of 'brotherhood' in holding joint da'wah meetings with Jabhat al-Nusra and Ahrar al-Sham in Aleppo under the auspices of Sheikh Abdullah al-Muhaysini.[35] However, continued ISIS encroachments, coupled with the killing of Abu Rayan—a widely respected figure from Ahrar al-Sham[36]—quickly escalated into widespread infighting across northern and eastern Syria between ISIS and other factions, such that even Jabhat al-Nusra actively fought against ISIS. The only exceptions were localized: the Qalamoun area and (for a brief time) the far north Hasakah province. The infighting also led to the official disavowal by al-Qaida Central of any links with ISIS.

A good deal of exaggeration continues to surround the scale of the infighting. The end result was a redrawing of positions in which ISIS withdrew from Idlib, Latakia, Hama and Deir az-Zor provinces, consolidating its territory around Raqqa city—which would become its de facto capital—as well as southern Hasakah province and eastern Aleppo province. In analytical terms, however, this redrawing of positions should not be viewed as representing significant defeats for ISIS, but rather a shift in strategy focusing on the control of contiguous territory and strongholds, contrasting with the previously thin spread in which ISIS was only one of a number of factions in the vast majority of places it had a presence. The 2013 approach for expansion was now obsolete. The regrouping in Syria also coincided with the beginnings of major expansion in Iraq, where ISIS coordinated with other insurgent groups to seize control of Fallujah. In Fallujah, ISIS adopted the same gradual subversive strategy it had employed in Syria, setting up an Islamic Court in the city and eventually dominating the city through assassinations of rivals, seizures of weapons caches and outreach to locals.[37]

In Syria though, the need to subjugate rivals in the new strongholds demanded first and foremost the securing of loyalty through official demonstrations of repentance, and many of the administrative documents in this period focus on this issue. Together with repentance comes the issue of ideological affinity with ISIS. Thus, for example, we have from a newly developed Diwan al-Awqaf (a department dealing with religious matters: in this case also the 'Diwan Khidamat al-Muslimeen'- Muslims Services Department) in al-Bab a document for the affirmation of faith, declaring rejection of all other religions except Islam, rejection of Assad and rejection of Sufism.[38]

With the consolidation of territory and strongholds also comes the emergence of more state-like institutions. For example, in the realm of education, ISIS began setting up Shari'a Institutes, including for women, appearing to be tied to da'wah offices.[39] Moreover, implementation of Islamic law at a stricter level than in the 2013 era becomes apparent. In March 2014, ISIS in al-Bab issued a statement obliging shops to close during prayer time. Further, in the Manbij area of the eastern part of Aleppo province, ISIS issued a

EXHIBIT B

statement in February 2014 prohibiting gender mixing, particularly in schools, institutes and colleges, giving officials in these bodies a deadline of a week to comply.[40] The signature in this case is that of Abu Luqman, who, as noted by the NGO Raqqa is Being Slaughtered Silently, was appointed by ISIS to manage affairs in eastern Aleppo countryside after the regrouping in the wake of the infighting.[41] The following month, ISIS' Islamic judiciary in al-Bab introduced a list of *hudud* punishments for various crimes, including 80 lashes for consumption of alcohol, the death penalty for blasphemy, amputation of hands for theft, and the possibility of death penalty and crucifixion for highway robbery.[42] The display of these harsh forms of justice first gained notoriety in Raqqa in April 2014 with the killing and crucifixion of men accused of planting IED bombs against ISIS, meriting the punishment of crucifixion according to Qur'an 5:33.[43]

ISIS' ambition to develop public services also becomes more apparent. In Raqqa during 2013, ISIS had more or less left alone the local council that came into being after the fall of the city from regime control to manage the realm of the public services of water and electricity,[44] but with the ISIS takeover of the city, the local council appears to have been subject to co-optation and reformation at the hands of ISIS.[45] They also established Islamic Services Committees to oversee electricity supply, health spending, education, street cleaning, and food provision. Again, reflecting a certain concern for good governance, ISIS opened an office for this committee in April 2014 to which residents in Raqqa could address complaints.[46] In a similar vein, in its Aleppo province stronghold of Jarabulus, ISIS set up a public services administration building in May 2014.[47]

Meanwhile, in Iraq, ISIS' ever growing assertiveness saw da'wah outreach in mosques and in the open to locals in certain parts of the country. Further, a shadowy ISIS "Shari'a Committee" in Mosul issued various political statements, such as the call for residents not to vote in the 2014 parliamentary elections. In August 2013, this committee also issued an injunction against shops selling inappropriate dress for women.[48]

Thus, the aftermath of the infighting with Syrian rebels actually saw the further entrenchment of ISIS and growth in its state-like presentation, moving beyond the heavy focus on da'wah outreach and intelligence subversion and now assuming more characteristics of a real state, with more extensively claimed provision of public services and stricter enforcement of its ideals of morality and public conduct. That said, the extent of service provision was not the same across all ISIS territories, and an element of centralization and coordination seems somewhat lacking. This was to change with the rapid ISIS advances across northern and western Iraq in the summer of 2014, beginning with the fall of Mosul, and the acquisition of significant contiguous territory spanning the borders of Iraq and Syria, ultimately prompting the declaration of the Caliphate at the end of June 2014.

### Caliphate and Diwans: Embodying Statehood

After the declaration of the Caliphate, documentary evidence shows the emergence of various so-called Diwans: institutions corresponding to government departments or ministries. The image of governance presented is accordingly much more comprehensive, pointing to local administrations of various realms of daily life that may also answer to higher central departments whose authority in the issuing of edicts should span the entirety of Islamic State territory. Table 1 represents the various Diwans that can be identified, with a brief description of each Diwan's functions. Beyond the Diwans, there were other government bodies of note, such as the General Supervisory Committee that seems to have the authority to issue general notifications to the various Islamic State provinces, such as a ban on GPS and Apple devices in December 2014.[49]

EXHIBIT B

| Government Department | Function |
| --- | --- |
| Diwan al-Ta'lim | Education |
| Diwan al-Khidamat | Public Services (e.g. electricity, water, street cleaning). Management of public facilities (e.g. parks) |
| Diwan al-Rikaz | Precious resources (two known divisions: fossil fuels and antiquities) |
| Diwan al-Da'wah wa al-Masajid (wa al-Awqaf) | Da'wah activity and control of the mosques |
| Diwan al-Sihha | Health |
| Diwan al-Asha'ir | Tribal outreach |
| Diwan al-Amn (al-Aam) | Public security |
| Diwan Bayt al-Mal | Finances and currency system |
| Diwan al-Hisbah | Enforcement of public morality: Islamic police |
| Diwan al-Qada wa al-Mazalim | Islamic court, judicial matters, marriages |
| Diwan al-Alaqat al-Amma | Public relations |
| Diwan al-Zira'a | Agriculture, environment |
| Diwan al-Ifta' wa al-Buhuth | Fatwas, textbooks for training camp recruits etc. |
| Diwan al-Jund | Military and defence |

*Table 1: Diwans and their Functions*

The Diwan al-Ta'lim perhaps illustrates best the point about notions of a centralized administration with representations at the local (i.e. provincial and regional-provincial) level. The central Diwan al-Ta'lim is currently headed by a figure known as Dhu al-Qarnain, a German citizen of Egyptian origin who was part of the original Abu Mus'ab al-Zarqawi network in Iraq.[50] The decision to outlaw the teaching of certain subjects in schools and other educational institutions across the provinces, as well as the announcement of job opportunities in education across the provinces and the marking of the beginning of the next academic year, all bear his signature in the documentary evidence.[51] The Diwan al-Ta'lim may have to decide at the local level (for example) what the registration fees for schools in a certain area will be, but the question of curriculum has already been definitively determined by Dhu al-Qarnain.

Similarly, the Diwan al-Amn at the central administration level issued the notification to all the provinces calling for the killing and wounding of Jordanian pilots after the advertised burning alive of Muadh al-Kasesbeh,[52] but this Diwan also exists at the provincial level and can make decisions based on the local circumstances. In Ninawa province in Iraq, for example, the Diwan is keen to monitor Internet shop users and has demanded that shop owners seek the four Iraqi ID documents from them and have them verified so they can be presented to the local Diwan on requirement. The ID documents only make sense in the Iraqi context, not spanning the whole Caliphate.[53] Contrasting somewhat with the Diwan al-Ta'lim and the Diwan al-Amn, the Diwan al-Ifta' wa al-Buhuth is by nature a single, centralized body, issuing fatwas for the notification of all inhabitants of the Islamic State, dealing with a variety of questions such as the permissibility of eating meat imported from Turkey and playing table football.

With this structure, the declared Caliphate looks a lot more like a real state than its ISIS predecessor. Indeed, the sheer range of documents that has emerged over the past year covers a broad range of domains, including regulations on fishing, tax forms for electricity services, licenses for excavation of antiquities, phone subscriptions, fees for sanitation services, agricultural crop plans, unified Friday sermons, vaccination programs, and fixing rent rates for property.[54]

EXHIBIT B

Of course, the documents cannot be taken simply at face value and deserve critical analysis on a case-by-case basis. Take the Diwan al-Sihha: the vaccination programs on offer in Syria may seem superficially impressive, but in fact they do not differ from the already existing system under the regime.[55] The Diwan al-Ta'lim-issued exam timetables for Mosul University do not reflect a reinvigorated university system but rather a change of education department label with a shrinking of the university through closure of certain departments. Likewise, when it comes to services offices, the issue is often not so much a complete overhaul at all levels by the Islamic State, but rather the already existing employees of those offices in a given city/town (e.g. Mosul) are compelled to work under threat of confiscation of one's home and thus come under the label of Diwan al-Khidamat.[56] On the other hand, the requirement to work helps win support from local residents unhappy with inefficient public services under the Iraqi government.[57] Even so, IS is helped considerably by the fact that the central government continues to pay the salaries of public employees in IS-controlled areas.[58]

*Conclusions*

Whatever the shortcomings of Islamic State administration, we can see an evolution over time from a criminal organization subsisting on extortion, into a group controlling pockets of territory and primarily relying on da'wah activity and subversion of rivals, and finally becoming an entity controlling large swathes of territory and major towns spanning the Iraq-Syria border with a diverse range of bureaucratic departments. The current situation presents IS' opponents with several challenges to consider.

First, the harsh justice and rigid security apparatus help bring a sense of order to areas in Syria especially that have known little but the chaos of war and competing factions for the past four years. This has severely blunted the prospects of internal opposition undermining the Islamic State's rule from within. Local rivals, such as the Shaitat tribe in Deir az-Zor province, are put down with ruthless efficiency, as the Islamic State's tribal outreach embodied in its Diwan al-Asha'ir can also play off members of the same tribe against each other. In Iraq too, local opposition is not forthcoming: we are no longer in the era of the Iraq War when other powerful insurgent factions existed, many of whose members went on to constitute the Sahwa forces. Instead, through a mixture of coercion and co-optation, those other factions have virtually ceased to exist on the ground.

Second, the extent of state administration provides abundant avenues for revenue, above all in the form of taxation. Whether one considers school registration fees, fines for traffic violations, paying for garbage disposal or jizya taxes in Raqqa, sources of revenue clearly go far beyond the conventional descriptions of a criminal outfit primarily making money through smuggling of oil and antiquities. Indeed, the Islamic State has incorporated the fields of oil and antiquities into its bureaucracy. Thus, disruption of oil infrastructure through airstrikes may reduce Islamic State revenues, but it does not seem to have fatally undermined its finances: rather, it can easily resort to greater taxation to compensate, as recent anecdotal evidence seems to suggest. Seriously hurting IS economically would require one of two things: either a large-scale, casualty-heavy bombing campaign targeting IS infrastructure or alternatively, the complete sealing off of IS from the outside world. Both seem currently unfeasible, the former for political reasons, the second for practical ones, though with regard to the latter, there may be some merit to Shapiro and Hansen-Lewis' suggestion that the Iraqi government should compensate government employees in IS-held areas in "goods which are less liquid than cash" as a way to stifle IS income without virtually depriving the population of its livelihood.

Finally, the evolution in Islamic State administration in Iraq and Syria can provide a model for assessing the development of Islamic State affiliates abroad. That is, one can think of the development of the Islamic State

EXHIBIT B

abroad in three stages: activist support, military presence, and finally administration. The first two stages frequently overlap, but the emergence of Islamic State Diwan institutions abroad may help indicate where the brand is most successful and developed. Thus in Libya, Islamic State Diwans have emerged in Cyrenaica[59] and Tripoli provinces.[60] No other Islamic State affiliate has quite attained this level of sophistication, and it is clear that in some cases the Islamic State has not accepted pledges of allegiance to create new provinces because it does not see any realistic chance of the affiliate developing a state-like presence in its zone of operation. Two cases-in-point here are Gaza and India. In Gaza, a number of very small pro-IS factions exist that have been unable to unite under one banner, and hence are deemed too insignificant by the Islamic State to have their allegiances officially accepted. In India, a small group called Tanzim Ansar al-Tawheed pledged allegiance in October 2014, but lacking any capabilities beyond online activism in so vast a territory, it has not been accepted to form an 'India Province.'[61]

To sum up, IS appears to have set up an administration that is very sophisticated as far as rebel groups go, one that is capable of enduring for years unless subjected to direct military attack. At the same time, it is difficult to see how this bureaucracy can develop much further in Iraq and Syria given the many pressures and constraints on its resources and communications. There is some potential for bureaucratic development in IS's provinces outside of Iraq and Syria, but challenges remain there too. At the moment, then, it would seem that IS bureaucracy is remaining, but not expanding.

*About the author*: **Aymenn Jawad al-Tamimi** *is Shillman-Ginsburg Fellow at the Middle East Forum.*

### Notes

[1] Examples include the Jamaat al-Da'wa that proclaimed an Islamic emirate in Kunar, Afghanistan that lasted from 1989 to 1991, the Taliban's Islamic Emirate of Afghanistan that controlled most of the country from 1996 to 2001, and more recently the Caucasus Emirate project and the 'Emirate of Waqar' set up by al-Qa'ida in the Arabian Peninsula front group Ansar al-Shari'a in Yemen; see Brynjar Lia, "Understanding Jihadi Proto-States," *Perspectives on Terrorism* (2015), ; and "The 'Ansar al-Shari'a' group disposes of the corpse of a man it executed on accusations of betrayal," *Aden al-Ghad*, February 15, 2012 (http://adenghad.net/news/7591/%5cgoldmohurhotel.com#.VZAAUPmqqkp).

[2] Clint Watts, "The U.S. Can't Destroy ISIS- Only ISIS can Destroy ISIS: The Unfortunate Merits of the 'Let Them Rot' Strategy," *FPRI Blog*, September 2014 (http://www.fpri.org/geopoliticus/2014/09/us-cant-destroy-isis-only-isis-can-destroy-isis-unfortunate-merits-let-them-rot-strategy).

[3] E.g. Aaron Zelin, "The Islamic State of Iraq and Syria Has a Consumer Protection Office," *The Atlantic*, June 13, 2014 (http://www.theatlantic.com/international/archive/2014/06/the-isis-guide-to-building-an-islamic-state/372769/).

[4] Jamie Hansen-Lewis and Jacob Shapiro, "Understanding the Daesh economy," *Perspectives on Terrorism* (2015),

[5] "Announcement of Ministry Formation for the Islamic State of Iraq," *al-Furqan Media*, April 19, 2007 (https://archive.org/details/The_Islamic_State_of-Iraq).

[6] Ibid.

[7] Ibid.

[8] Available at http://www.jihadica.com/wp-content/uploads/2014/08/ilam-al-anam.pdf.

[9] Ibid., e.g. pp. 5-7ff.

[10] Ibid., p. 35.

[11] Ibid.

[12] Cf. Brian Fishman and Douglas Ollivant, "State of Jihad: The Reality of the Islamic State in Iraq and Syria," *War on the Rocks*, May 21, 2014 (http://warontherocks.com/2014/05/state-of-jihad-the-reality-of-the-islamic-state-in-iraq-and-syria/). This piece also references the treatise and its acknowledgments of the on-the-ground limitations of ISI as a state at the time.

EXHIBIT B

PERSPECTIVES ON TERRORISM                                                Volume 9, Issue 4

[13] Brian Fishman, "Don't BS the American people about Iraq, Syria and ISIL," *War on the Rocks*, August 20, 2014 (http://warontherocks.com/2014/08/dont-bs-the-american-people-about-iraq-syria-and-isil/).

[14] "Second Ministry Formation for the Islamic State of Iraq," *al-Furqan Media*, September 21, 2009 (https://archive.org/details/Al-Tashkeelah-2-Le-Dwla-Iraq-Islamic).

[15] Ibid.

[16] E.g. Deepa Babington, "Suicide attacks down, extortion up in Iraq's Mosul," *Reuters*, November 27, 2009 (http://www.reuters.com/article/2009/11/27/idUSGEE5AP1ZF). Though ISI is not mentioned by name in this report, it is clear ISI is behind the extortion demands.

[17] "ISI organization names a new leader," *Reuters Arabic*, May 16, 2010 (http://ara.reuters.com/article/topNews/idARACAE64F06S20100516).

[18] "The secret everyone knows: pay the Islamic State or be killed," *Niqash*, September 22, 2011 (http://www.iraqiforum.net/vb/5177.html). Cf. "Mosul businessmen: al-Qa'ida has returned to collect money," *Saut al-Iraq*, October 24, 2011 (http://www.sotaliraq.com/mobile-news.php?id=29294#axzz3cCEhSC2B), citing one doctor as saying that 40% of the money from surgical operations is extorted for the sake of "resistance and jihad." More recent declassified ISI documents suggest the complicity of some Sunni political figures in these ISI extortionist enterprises. See Patrick B. Johnston, Benjamin Bahney and Patrick Ryan, "The Enemy You Know and the Ally You Don't," Foreign Policy, June 23, 2015 (https://foreignpolicy.com/2015/06/23/the-enemy-you-know-and-the-ally-you-dont-arm-sunni-militias-iraq/)

[19] Aaron Zelin, "Al-Qaeda Announces an Islamic State in Syria," Washington Institute for Near East Policy, April 9, 2013 (http://www.washingtoninstitute.org/policy-analysis/view/al-qaeda-announces-an-islamic-state-in-syria).

[20] Rania Abouzeid, "The Jihad Next Door," *Politico*, June 23, 2014 (http://www.politico.com/magazine/story/2014/06/al-qaeda-iraq-syria-108214.html#.VXMEc8-qqko).

[21] Aymenn Jawad Al-Tamimi, "The Life of Abu Muhammad al-Muhajir: A Founder and Commander of Jamaat Ansar al-Islam in Bilad al-Sham," August 30, 2014 (http://www.aymennjawad.org/2014/08/the-life-of-abu-muhammad-al-muhajir-a-founder).

[22] "Terrorist Designations of the al-Nusrah front as an Alias for al-Qa'ida in Iraq," U.S. Department of State, December 11, 2012 (http://www.state.gov/r/pa/prs/ps/2012/12/201759.htm).

[23] Christoph Reuter, "The Terror Strategist: Secret Files Reveal the Structure of the Islamic State," *Der Spiegel*, April 18, 2015 (http://www.spiegel.de/international/world/islamic-state-files-show-structure-of-islamist-terror-group-a-1029274.html).

[24] Aymenn Jawad Al-Tamimi, "The Islamic State of Iraq and ash-Sham Billboards in Raqqa," *Jihadology*, October 22, 2013 (http://www.aymennjawad.org/13960/the-islamic-state-of-iraq-and-ash-sham-billboards).

[25] Aymenn Jawad Al-Tamimi, "Special report: Northern Storm and the Situation in Azaz," *Middle East Review of International Affairs*, January 2015 (http://www.aymennjawad.org/15865/special-report-northern-storm-and-the-situation).

[26] Ibid.

[27] ISIS Statement ('Wilayat Deir az-Zor', before the name change to 'Wilayat al-Kheir'): http://documents.sy/image.php?id=2458&lang=ar.

[28] In Azaz, the Islamic Court was situated in the building that now houses the town's Islamic/Levant Front-affiliated Shari'a Committee. Interestingly, the spokesman for Northern Storm also claimed to this author that ISIS had its own special Islamic court in the same building as its da'wah office prior to the takeover of Azaz.

[29] Joint statement, November 5, 2013 (https://pbs.twimg.com/media/BYVBlp0CEAARW_V.jpg).

[30] Joint statement (https://pbs.twimg.com/media/BcOtKyECQAAyACy.jpg).

[31] E.g. "ISIS fighters have seized the flour mills in the town of Manbij in Aleppo province," *El Dorar*, September 5, 2013 (http://eldorar.com/node/23881).

[32] Statement from "Shari'a Committee for al-Bab and its Countryside," October 24, 2013 (https://pbs.twimg.com/media/BXdEMAiIIAAaQhj.jpg).

[33] "Shari'a Committee in the town of al-Bab in Aleppo announces it does not acknowledge the Islamic State in Iraq and al-Sham," *Halab News*, October 24, 2013 (http://halabnews.net/news/40719).

EXHIBIT B

[34] "'The Revolutionary Military Council in Manbij considers the Islamic State a faction like the rest of the military factions," *Halab News*, August 26, 2013 (http://halabnews.net/news/34583).

[35] E.g. "The brothers Dawla, Jabhat and Ahrar," October 2013 https://twitter.com/ajaltamimi/status/394130767371964417.

[36] "ISIL tortured to death Ahrar al-Sham commander in Aleppo," *Zaman al-Wasl*, January 1, 2014 (https://en.zamanalwsl.net/news/3111.html).

[37] Archive of Islamic State Administrative Documents, Specimen 1N (http://www.aymennjawad.org/2015/01/archive-of-islamic-state-administrative-documents).

[38] Ibid., Specimen P.

[39] Ibid., Specimen 3G.

[40] ISIS Statement in Manbij area, February 27, 2014 (https://pbs.twimg.com/media/Bhk0dd1IYAA07eB.jpg).

[41] "Abu Luqman…changing the name with changing the mission entrusted to him by ISIS," Raqqa is Being Slaughtered Silently, April 13, 2014 (http://www.raqqa-sl.com/en/?p=965).

[42] List of hudud punishments from Shari'a judge for al-Bab area, March 2014 (https://pbs.twimg.com/media/BjmwBGZIIAA3GdI.jpg).

[43] Jacob Siegel, "Islamic Extremists Now Crucifying People in Syria- and Tweeting Out the Pictures," *Daily Beast*, April 30, 2014 (http://www.thedailybeast.com/articles/2014/04/30/islamic-extremists-now-crucifying-people-in-syria-and-tweeting-out-the-pictures.html).

[44] "Civil organizations confront ISIS and are subjected to its infringements," *al-Sharq al-Awsat*, September 4, 2013 (http://archive.aawsat.com/details.asp?section=4&issueno=12699&article=742257#.VXT6eM-qqko).

[45] "After its seizure of the city, the 'state' reforms the local council in Raqqa," *Zaman al-Wasl*, January 16, 2014 (https://zamanalwsl.net/news/45545.html).

[46] ISIS statement, Raqqa city area, April 2014 (https://pbs.twimg.com/media/BlREcahCcAA93Bm.jpg).

[47] "Preparation of the public services administration center in the Jarabulus area," ISIS Wilayat Halab, May 2014 (https://twitter.com/ajaltamimi/status/468837213980332032).

[48] Aymenn Jawad Al-Tamimi, "Aspects of Islamic State Administration in Ninawa Province: Part III," January 23, 2015 (http://www.aymennjawad.org/15961/aspects-of-islamic-state-is-administration-in).

[49] Archive of Islamic State Administrative Documents, Specimen X.

[50] Ibid.

[51] Ibid., Specimens Z and 4O.

[52] Ibid. Specimen 1E.

[53] Ibid. Specimen 4F with explanatory note in the archive.

[54] E.g. Ibid., Specimen 1J.

[55] Ibid. Specimen 1M.

[56] Aymenn Jawad Al-Tamimi, "Aspects of Islamic State Administration in Ninawa Province- Part II," January 20, 2015 (http://www.aymennjawad.org/15952/aspects-of-islamic-state-is-administration-in).

[57] Saleh Elias, "Services improve under IS in Mosul," *Al-Monitor*, May 13, 2015 (http://www.al-monitor.com/pulse/originals/2015/05/iraq-isis-mosul-services-sector-improvement-internet-roads.html).

[58] Thus most recently, salaries for health workers in Ninawa for the months of February and March 2015 (http://justpaste.it/salariesmosul).

[59] E.g. Diwan al-Ta'alaeem in Derna: https://twitter.com/ajaltamimi/status/574555917481418754. However, a concerted push by other Derna rebel factions in June dismantled the IS bureaucracy in the city.

[60] "Da3esh demands teachers in Sirte to repent in the 'Diwan al-Ta'aleem,'" *Afrigatenews*, June 1, 2015 (http://www.afrigatenews.net/content/%D8%AF%D8%A7%D8%B9%D8%B4-%D9%8A%D8%B7%D9%84%D8%A8-%D9%85%D9%86-%D8%A7%D9%84%D9%85%D8%B9%D9%84%D9%85%D9%8A%D9%86-%D9%81%D9%8A-%D8%B3%D8%B1%D8%AA-%D8%A7%D9%84%D8%A3%D8%AA%D8%A7%D8%A8%D8%A9-%D9%81%D9%8A-%D8%AF%D9%8A%D9%88%D8%A7%D9%86-%D8%A7%D9%84%D8%A9%D9%84%D9%8A%D9%85).

EXHIBIT B

# PERSPECTIVES ON TERRORISM

Volume 9, Issue 4

[61] Aymenn Jawad Al-Tamimi, "'The Islamic State and its 'Sinai' Province," *Tel Aviv Notes*, Moshe Dayan Center, March 26, 2015 (http://www.aymennjawad.org/16345/the-islamic-state-and-its-sinai-province).

EXHIBIT B

CTC SENTINEL                    AUGUST 2015, VOL 8. ISSUE 8

# Governing The Caliphate: the Islamic State Picture

By Laith Alkhouri and Alex Kassirer

MORE THAN A year after declaring the Caliphate the Islamic State has control over large swaths of territory in Syria, Iraq, and Libya, where millions of people live under its ironclad rule. As the group has dominated headlines around the world with scenes of its unmatched brutality and military exploits, it has acquired a reputation as a bloodthirsty gang surviving and thriving off of its savagery alone. While the Islamic State's barbarity is undeniable, its life force stems from a side that, although less publicized, accounts for the majority of the group's activities: a system of governance entailing institutional services, judicial processes, infrastructure work, essential consumer products, recreational activities, and more. These activities are transforming the 12-year-old terrorist group into a de facto governing body.

This article builds a picture of Islamic State governance based on a review of thousands of the group's videos and communiqués, released by its so-called ministry of media via the group's official online channels. The propaganda's reliability as a reflection of reality is always under question, so it is important to consider the material in a critical manner. Residents of Syrian and Iraqi towns under Islamic State control have been quoted in several media reports speaking of deteriorating services, rising prices, and shortages of medicines.[1] Islamic State releases often paint a rosy picture, but are often the sole source of information as the group prohibits opposing views or narratives, and they provide a glimpse into the group's real attempts to govern and provide services, efforts which are likely to be more advanced in Islamic State strongholds such as Mosul and

Raqqa than other areas controlled by the group.

## Assessing the Islamic State's Claims

In assessing the Islamic State's claim to have set up a system of governance the key question is not whether services have improved or deteriorated, so much as the degree to which the Islamic State has been able to win acceptance by delivering them at tolerable levels to populations whose expectations have been dampened by years of violence and corruption. The fact that the Islamic State is delivering them at all, and in many areas has a monopoly of delivering them, buttresses its claims to have created a de facto state. It would be far-fetched to believe that all the hundreds of Syrians and Iraqis featured in its videos boasting of enforcement of security measures and provision of services are making such claims under duress.

Recent research, drawing on Islamic State documents not published by the group's media arms, has pointed to growing sophistication in the group's governance structures. For example, a research paper published earlier this month by Aymenn al-Tamimi found that Islamic State documents obtained privately from pro- and anti-Islamic State sources, pointed to a "bureaucratic system [with] a level of complexity and professionalism that probably makes the Islamic State sustainable, even under containment."[2]

## Statebuilding in the Caliphate

By capitalizing on the population's social and political insecurities, the Islamic State has transformed itself into a seemingly indispensable governing entity, providing goods and services, consequently making it more difficult to uproot. With significant funds from the banks and private properties it has

seized, the taxes it is collecting, and the oil it is selling, the Islamic State transformed the way jihadi terrorist groups operate, setting its sights higher than just overthrowing local governments, instead becoming one of them.

The Islamic State's provision of services not only reinforced the group's territorial expansion in the Middle East, it also facilitated the group's recruitment of Westerners, thousands of whom have flocked to join its ranks. The appeal to join is founded in more than just the romanticized rise of an Islamic fighting force. The true attraction lies in the idea of a novel Islamic society, offering a sense of belonging and "citizenship." This has been explicitly communicated by the Islamic State's many foreign fighters. André Poulin, a Canadian national better known as "Abu Muslim al-Canadi," expressed this notion in a September 2014 Islamic State video release:

> You know, there's a role for everybody. Every person can contribute something to the Islamic State…If you cannot fight, then you give money, if you cannot give money then you can assist in technology, and if you can't assist in technology you can use some other skills. [3]

One of the driving forces behind the Islamic State's success and mass appeal has been its ability to provide basic services at a tolerable level. The Islamic State has done this by merging preexisting structures and institutions with newly imported skills and talents. It has restructured local markets by permitting locals and foreign recruits with relevant skill sets to renovate and manage important elements of the service and medical industry. Rather than launch an overhaul, the Islamic State has grafted itself onto pre-existing structures, by compelling employees to stay in their jobs. Hospitals have kept many of their doctors and nurses and utility providers have kept many

---

1 Liz Sly, "The Islamic State is Failing at Being a State," *Washington Post*, December 25, 2014.

2 According to al-Tamimi, "the sheer range of documents that has emerged over the past year covers a broad range of domains, including regulations on fishing, tax forms for electricity services, licenses for excavations of antiquities, phone subscriptions, fees for sanitation services, agricultural crop plants, unified Friday sermons, vaccination programs, and fixing rent rates for property." See Aymenn Al-Tamimi, "The Evolution in Islamic State Administration: The Documentary Evidence," *Perspectives on Terrorism*, 9:4, July 9, 2015.

3 The Islamic State, "Al-Hayat Media Presents: Al-Ghuraba The Chosen Few of Different Lands: Abu Muslim from Canada," distributed via archive.org, July 12, 2014, p. 4.

EXHIBIT C

of their engineers. In Iraq, as others have noted, the Islamic State's ability to keep employees in their jobs has been assisted considerably by the fact that the government in Baghdad has continued to pay the salaries of public employees in areas controlled by the Islamic State.[4]

Simultaneously the Islamic State has helped build up new businesses, such as grocery stores, encouraged locals to reopen factories[5] and purportedly even instituted banking services.[6] The Islamic State's status as a governing entity has also been bolstered by their monitoring of public behavior and daily routines because this provides a constant reminder to the local population that the Islamic State has a monopoly of power.

The Islamic State's large fighting force, expansive territory, and implementation of Sharia has legitimized its declaration of statehood among the global jihadi community. In Syria and Iraq the group's provision of medical, social, policing, and rescue services has appealed to locals and driven recruitment, bridging the gap between hardliners and those on the brink of succumbing to the Islamic State's ideology.

With the Islamic State cementing its position in Sirte, Libya, this model of state-building is now being implemented beyond the borders of Iraq and Syria.[7]

The Islamic State provides services to the populace from local law enforcement to market places. Each division, or department, has an office in every "province," which is a reference to the group's operational territories and strongholds. All provinces, which are governed by Caliph-appointed rulers,

are broken into districts, and districts into cities and villages. Its Zakat Department, for instance, which is responsible for collecting a mandatory fee (or tax), runs offices across Iraq and Syria, where locals are shown in Islamic State propaganda receiving money, food products, and clothing.[8] Thousands of families who lack viable sources of income rely on these handouts.

The fortunes of the local populations have in many areas become intertwined with the Islamic State. The chaotic situation in the region and the lack of alternatives mean that the Islamic State

## "The fortunes of the local populations have in many areas become intertwined with the Islamic State."

is the only provider of vital services in many areas. The group has asphalted roads, filled grain silos, renovated bridges, built traffic circles, and offered medical services (with the exception of sophisticated surgeries).[9] These projects have primarily been documented in Islamic State releases. And some unofficial reports have filtered out from those living under the group's control, most notably via personal social media accounts.[10]

The hospitals it captured in Raqqa and Deir al-Zour have purportedly been cleaned and renovated. They look like they are staffed by medical teams on a 24/7 basis and have functioning equipment.[11] Again, it should be stressed

these services are featured in the Islamic State's official media releases, and verifying the information is difficult. Additionally, it is impossible to be sure if the Islamic State provides the same services to each and every town and district it rules. The likelihood is that it does not, focusing largely on its two main strongholds, Mosul and Raqqa.

This article next discusses a number of the Islamic State's advertised governance and services through the lens of its own propaganda, including its court system, law enforcement, financial and food aid, water and electricity, and education.

*Sharia Justice*
By basing its legislation on radical interpretations of Sharia law, the Islamic State is able to instill fear as a means of garnering obedience. Despite its brutality, the Islamic State's legal system claims to be succeeding in punishing thieves, murderers, rapists, extortionists, and corrupt officials.[12] The group's Sharia Council establishes and runs courts where individuals face charges and, if convicted, are sentenced to severe punishments. Many stories from Islamic State territory in Syria detail such verdicts.[13] Thieves lose their hands and murderers are publicly executed, while extortionists often lose a hand and a foot. All this makes locals nervous about conducting business in

4 Al-Tamimi

5 The Islamic State, "The Media Office in Falluja Province: Construction of Shops," distributed via Shamikh. info, July 6, 2015.

6 The Islamic State, "A Year of Conquest," Accessed via justpaste.it, June 12, 2015.

7 The Islamic State. Media Office in Tripoli Presents Images of Islamic State Guards on Duty in Sirte. distributed via shamikh.info, April 29, 2015; Aaron Zelin, "The Islamic State's Burgeoning Capital in Sirte, Libya," *Policy Watch* 2462, Washington Institute for Near East Policy, August 6, 2015 .

8 The Islamic State, The Media Office in Nineveh, "The Distribution of Zakat," distributed via Nasher.me, February 21, 2015; The Islamic State, The Media Office in Euphrates, "The Distribution of Zakat," distributed via Nasher.me, February 17, 2015.

9 The Islamic State, The Media Office in Aleppo, "Part of the Wheat Harvest," distributed via Shamikh.info, May 26, 2015.

10 The Islamic State, The Media Office in Nineveh, "Images of Mosul City," Accessed via Twitter, August 10, 2015.

11 The Islamic State, The Media Office in Aleppo, "Video Featuring Elderly Turkestani Fighter," Accessed via

drive.google.com, June 02, 2015; The Islamic State, "Health services in the Islamic State," distributed via Archive.org, April 24, 2015; The Islamic State, The Media Office in Raqqa, "Video Featuring Maternity Hospital," distributed via Alplatformmedia.com, January 1, 2015; The Islamic State, The Media Office in Kirkuk, "Images of "Aaesha Mother of the Faithful" Maternity Hospital," distributed via Twitter, November 11, 2014.

12 The Islamic State, The Media Office in Saladin, "The Application of God's Rule to Cut Off the Hand of a Thief," distributed via Shamikh.info, May 4. 2015.

13 The Islamic State, The Media Office in Falluja, "Images of the Execution of Homosexuals," distributed via Shamikh.info, July 1, 2015; The Islamic State, The Media Office in Nineveh, "Images Featuring the Punishment of Thieves," distributed via isdarat.org, February 11, 2015; The Islamic State, The Media Office in Nineveh, "Images Featuring Execution of Alleged Murderers," distributed via justpaste.it, April 30, 2015; The Islamic State, The Media Office in Homs, "Images Featuring Execution of Spies by Machine Gun," distributed via nasher.me, March 19, 2015.

EXHIBIT C

Islamic State territory in any ways that might upset the group's officials.

Fulfilling its role as governing body, the group enforces traffic laws, runs correctional facilities, and empowers its al Hesbah Police Force (also known as the morality police) to detain individuals who commit various offenses.[14] The Sharia Court is essentially the final word in law enforcement. Each town and district under the Islamic State's control has its own black-painted court building, where people can file charges, even, allegedly, against Islamic State officials themselves.

*Al-Hesbah Police*
Al-Hesbah's motto, "enjoining the good and forbidding the evil," is a standard that is determined according to Sharia law.[15] Hesbah is derived from the Arabic verb "*hasaba*," which means "calculated." As a noun, *hesbah* means "accountability," one of the Caliph's main duties—to command the good deeds and forbid the malicious ones, subsequently punishing wrongdoers. Essentially, it is an executive doctrine that provides al-Hesbah with significant power, even over senior commanders or emirs. The Islamic State was reported to have executed a number of its commanders who abused their positions. In November 2014, for instance, the group beheaded and crucified a commander who engaged in extortion, demanding fines from individuals he accused of apostasy.[16]

As its guiding principles are derived from ultraorthodox Sharia laws, many actions that are acceptable in the West are prohibited under the group's rule, including smoking cigarettes, drinking alcohol, having premarital sex, and public indecency—which could lead to a man's public flogging if his wife

is not covered with the full niqab.[17] Furthermore, adulterers are sentenced to death by stoning and homosexuals are thrown from the roofs of buildings as punishment.[18] Many of the Islamic State's verdicts are so grisly, they serve as deterrents against potential rebellions and criminals alike. In one incident, the group sentenced two people to death by crushing their skulls with a brick because they allegedly killed a relative in the same manner.[19]

The group's videos have featured interviews with locals who apparently rejoice in being able to leave their businesses unlocked and sleep with

> **"Many of the Islamic State's verdicts are so grisly, they serve as deterrents against potential rebellions and criminals alike."**

their doors open. This is presumably an attempt to boost recruitment by highlighting claimed security improvements.

*The Rundown on Zakat*
Zakat is a primary pillar of Islam. Under Sharia law, it obligates financially capable Muslims to pay a sum of their money and assets to the Caliph's treasury; a centuries-old practice revived by the Islamic State. Business owners are the primary subjects in the collection process; shop-owners, jewelers, shepherds, landlords, and others must pay. The Islamic State

claims it in turn provides money, food, and clothing to the impoverished.[20]

By providing children and their families with the much-needed aid, the group is able to present itself as a hero of sorts, and potentially even recruit the recipients. Media reports primarily highlight attacks carried out by the group's foreign fighters in Syria, creating the impression that foreigners are the group's keystone. The reality, however, is that Syrian and Iraqi youth play a critical role in the Islamic State's advancement. In Syria, for example, local youth conduct suicide attacks against Kurdish forces, regime soldiers, and rival rebel groups. On July 6, for instance, the group claimed credit for a suicide attack near Ras al'Ayn, purportedly killing more than 50 Kurdish fighters, launched by a child identified as "Abu Khattab al-Ansari," who was allegedly 14 years old.[21] Although some youth have likely joined the group's ranks willingly, many of them were left with no alternative, joining due to their dependence on Islamic State-provided aid, which motivates families to place their children in the Islamic State's custody. The Islamic State purportedly provides salaries to many of its fighters, an attractive proposition for impoverished youngsters in Syria and Iraq alike.

*Health and Food Safety*
One of al-Hesbah's duties is guaranteeing that food products are safe for consumption, essentially assuming the role of a health and safety department. Its inspectors regularly check businesses such as butchers and groceries, and evaluate the products' safety, from checking expiration dates to testing items.[22] Al-Hesbah also cracks down on business owners who manipulate prices, especially those who cheat the scale when selling fruits

---

14 The Islamic State, The Media Office in Nineveh, "A Message from Who Excused to Those Not Excused," distributed via archive.org, March 08, 2015.
15 The Islamic State, The Media Office in Nineveh, " Images of Islamic State Police," distributed via Alplatform-media.com, September 18, 2014.
16 The Islamic State, "[The Islamic State] executed a Commander on Charges of Embezzling Funds from the Financial House of the Islamic State," distributed via thenewkhalij.com, November 16, 2014.

17 The Islamic State, The Media Office in Barqa Province, "Images of Flogging," distributed via manbar.me, February 12, 2015.
18 The Islamic State, The Media Office in Falluja, "Images of Execution of Homosexuals," distributed via Shamikh.info, July 01, 2015.
19 The Islamic State, The Media Office in Nineveh, "Images Featuring Execution of Murderers," distributed via justpaste.it, April 30, 2015.

20 The Islamic State, The Media Office in Anbar, "Images of the Office of Zakat," distributed via ebadalrh-man.net, April 06, 2015.
21 The Islamic State, The Media Office in Raqqa, "Images and Statement of Suicide Attack Using Child Soldier," distributed via Twitter, July 06, 2015.
22 The Islamic State, The Media Office in Aleppo, "Images Featuring Spoiling of Non-Halal Chicken," distributed via Mdwn.me, April 01, 2015.

EXHIBIT C

and vegetables.[23]   Al-Hesbah is also responsible for butchers where cattle are slaughtered for consumption. The cattle must be slaughtered in accordance with strict religious standards; otherwise, it is considered *haram* (forbidden) to eat. The meat received from Islamic State factories is guaranteed, and stamped with its name and price regulated.[24]

The Islamic State claims it has also begun offering polio vaccines, among others, to children at hospitals and makeshift, or external, clinics.[25] The apparent delivery of such services and their marketing bolster the standing of the Islamic State at the local level, offering services that would otherwise be neglected but are nonetheless vital to the population's well-being.

*Education Department*
Demonstrating its apparently comprehensive approach to social services, the Islamic State media releases show it reopening classrooms, hiring teachers, and establishing a department for education affairs. The group offers classes in Sharia studies, Arabic literature, history, geography, math, chemistry, physics, biology, and physical education, in addition to professional and technical schools that offer classes in business, industrial studies, and agriculture.[26] It also appears to run nursing and business administration schools.[27]

The Islamic State recently launched a hiring campaign in its Iraqi stronghold Mosul requiring teachers to be qualified in the subject matter and pass the group's mandatory examination, which

is partly religious.[28] As most teachers under its rule are not loyal adherents to its ideology, let alone learned in religious jurisprudence, the Islamic State offers teachers, as well as other professionals, religious courses prior to reinstituting them.

*Water and Electricity*
Capitalizing on the need for water and electricity, which are now considered luxuries in some Syrian areas, the Islamic State has taken control of these utilities in its territory.[29] The picture that emerges in Islamic State media releases is of the group managing distribution to locals who cannot afford to lose access. As electrical generators and water supplies have been degraded during the ongoing conflict—often because of strikes by Assad regime barrel bombs—the Islamic State claims that construction teams have repaired critical infrastructure that locals now depend on.[30] These claims are difficult to assess. While there have been reports of improved electricity supply in some areas controlled by the Islamic State, there are significant question marks about its sustainability. These concerns also apply to water supply improvements, particularly given depleted water levels in Lake Assad in northern Syria.[31]

*Transportation*
In some areas, the Islamic State offers free bus transportation. In al Zab area between Mosul and Erbil, for instance, there is allegedly a free Islamic State-run bus service for locals, who travel between the group's strongholds in the same province.[32] Similarly, in Raqqa Province, the Islamic State's main Syrian stronghold, modern buses have

been apparently provided for locals travelling in the area between Tal Abyad and Tabqa. The group's supply routes between Deir al-Zour and Homs are now open for locals, who can, for the first time since the Islamic State captured territory in Syria, travel by bus between two different provinces.[33]

**Conclusion**
The Islamic State has provided a semblance of governance over large swaths of territory and millions of people, while facing sustained aerial campaigns. This has bolstered the confidence of its fighters and administrators, further feeding its growth.

The Islamic State's provisions of services are imperfect, but they help many Syrians and Iraqis survive amid the conflicts, and thus ultimately bolster the Islamic State's recruitment. This has been one of the primary drivers behind the group's growth and global following, despite its savagery. In their desperation for sustenance and struggle for survival, much of the population in areas controlled by the Islamic State accepts its largesse even as its agents publicly mutilate, flog, and execute people. Ultimately, the Islamic State's survival as a governing body depends on its continued efforts to provide locals with tolerable levels of security, shelter, and comestibles.

*Laith Alkhouri is the co-founder and Director of Middle East/North Africa Research at Flashpoint, an American organization tracking Jihadi messaging. You can follow him at @MENAanalyst.*

*Alex Kassirer is a Research Analyst on Middle East/North Africa Terrorism at Flashpoint. You can follow her at @FlashpointIntel.*

23 The Islamic State, The Media Office in Raqqa, "Video Featuring Office of Monitoring and Investigation," distributed via archive.org, April 02, 2015.
24 Ibid
25 The Islamic State, The Media Office in Al-Khair, "Images of Vaccination Campaign," distributed via dawaalhaq.com, May 23, 2015.
The Islamic State, The Media Office in Damascus, "Images of Vaccination Campaign," distributed via nasher.me, February 22, 2015.
26 The Islamic State, Forum Posting Featuring Image of Islamic State Textbook," distributed via fidaa.info, July 15, 2015.
27 Raqqa-Sl. "ISIS Nurses Told They Must Speak ENGLISH Under Rules Stricter than NHS," September 4, 2015.

28 The Islamic State, The Media Office in Raqqa, "Images of Teacher Qualification Exam," distributed via Shamikh.info, August 09, 2015.
29 The Islamic State, The Media Office in Al-Khair, "Images of Power and Electric Plant," distributed via Shamikh.info, May 28, 2015.
30 The Islamic State, The Media Office in Al-Khair, "Images of Water Infrastructure Reparations," distributed via Shamikh.info, August 03, 2015.
31 For more see Danya Chudacoff, "'Water War' Threatens Syria Lifeline," al-Jazeera, July 7, 2014.
32 The Islamic State, The Media Office in Dijlah, "Image of Public Transporation," distributed via Shabakataljahad, July 20, 2015.

33 Travelers from outside Islamic State territory who want to visit end up at one of the group's garages, where they are questioned about their visit. Once they pass, they know that the only authorities they will face are Islamic State officials.

EXHIBIT C

1  HEATHER E. WILLIAMS, #122664
   Federal Defender
2  BENJAMIN D. GALLOWAY, #214897
   Chief Assistant Federal Defender
3  RACHELLE BARBOUR, #185395
   Assistant Federal Defender
4  OFFICE OF THE FEDERAL DEFENDER
   801 I Street, 3rd Floor
5  Sacramento, CA 95814
   Tel: 916-498-5700/Fax: 916-498-5710

6
   Attorneys for
7  OMAR AMEEN

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10
   IN THE MATTER OF THE            )  Case No.  2:18-mj-152 EFB
11 EXTRADITION OF OMAR             )
   ABDULSATTAR AMEEN TO THE        )
12 REPUBLIC OF IRAQ,               )  Judge: Hon. Edmund F. Brennan
                                   )
13 _____ )

14

15 I, Ahmed Barakat, swear on my honor the following facts:

16     1.  I am an Arabic language interpreter and live in Istanbul, Turkey.  My native languages

17         are Arabic and Turkish, and I am fluent in English.  I studied English in school and have

18         worked as an interpreter for news agencies, such as Reuters TV.  I am also a medical

           doctor.
19
       2.  I interpreted between Arabic and English for interviews of Hudhayfah Al-Rawi, Majid
20
           Hussein, Natiq Ahmed Abduljaleel, Waleed Ahmed Abduljaleel, and Abdelsalem Altaab
21
           in Istanbul, Turkey on April 28, 2019.  I also interpreted for interviews of Hudhayfah Al-
22
           Rawi, Iyad Mounir, Hasham Ammar, Mahdi Saleh Othman, Aous Mounir Saood, and
23
           Ayman Mounir Saood in Istanbul, Turkey on April 29, 2019.
24
       3.  I faithfully interpreted the declarations of those witnesses to them in Arabic and ensured
25
           that they understood and agreed with those declarations prior to signing.  All of the
26
           witnesses indicated full agreement with the declarations and signed and/or thumbprinted
27
           them in my presence.  Waleed Ahmed Abduljaleel indicated that he is illiterate, so he
28
           does not have a signature, but he applied his thumbprint in my presence.

           //
           //

Declaration                              1

EXHIBIT 50

1

2

4. I signed all of the declarations after the witnesses, confirming that I had accurately translated them into Arabic for them and witnessed their consent.

3

4

I declare under penalty of perjury that the foregoing is true and correct.  I swear by God Almighty that this statement is the truth and nothing but the truth.

5

6

I swear upon my honor and upon all the values and beliefs I consider sacred that this is the truth. (Turkish penalty of perjury language.)

7

8

I know that this sworn declaration could be used in court and that all false declaration on my part exposes me to criminal sanction.

9

Executed this 29 day of April, 2019, at Istanbul, Turkey.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

Declaration

EXHIBIT 50

HEATHER E. WILLIAMS, #122664
Federal Defender
BENJAMIN D. GALLOWAY, #214897
Chief Assistant Federal Defender
RACHELLE BARBOUR, #185395
Assistant Federal Defender
801 I Street, 3ʳᵈ Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax: 916-498-5710

Attorneys for
OMAR AMEEN

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATTAR AMEEN TO THE REPUBLIC OF IRAQ, | ) Case No.  2:18-mj-152 EFB ) ) ) Judge: Hon. Edmund F. Brennan ) ) |

I, Zakaria Zakaria, swear on my honor the following facts::

1. I am an Arabic language interpreter and live in Istanbul, Turkey.  My native language in Arabic, and I studied English at the university level in Syria and am fluent in English.

2. I interpreted between Arabic and English for interviews of ]           , Omar Hamid, Ahmed Azzam, and Yacer Ede in Europe and Turkey in late-April 2019.

3. I faithfully interpreted the declarations of those witnesses to them in Arabic and ensured that they understood and agreed with those declarations prior to signing.  All of the witnesses indicated full agreement with the declarations and signed them in my presence.

//

//

1

Declaration

EXHIBIT 51 - REDACTED

1

2

3

    4.   I signed all of the declarations after the witnesses, confirming that I had accurately

4

        translated them into Arabic for the witnesses.

5

I declare under penalty of perjury that the foregoing is true and correct.  I swear by God
Almighty that this statement is the truth and nothing but the truth.

6

7

I swear upon my honor and upon all the values and beliefs I consider sacred that this is the truth.
(Turkish penalty of perjury language.)

8

I know that this sworn declaration could be used in court and that all false declaration on my part
exposes me to criminal sanction.

9

10

Executed this 1st day of May, 2019, at Mersin, Turkey.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration

2

EXHIBIT 51 - REDACTED