UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATAR AMEEN TO THE REPUBLIC OF IRAQ | No.  2:18-mj-152-EFB<br><br>MEMORANDUM AND ORDER |

The parties have submitted their briefs and exhibit lists for the upcoming extradition hearing.  ECF Nos. 140, 141, & 142.  The government has filed two motions in limine seeking to exclude exhibits and witnesses (described *infra*).  ECF Nos. 152 & 153.  Ameen has filed oppositions to both motions.  ECF Nos. 154 & 155.   For the reasons stated hereafter, the government's first motion *in limine* (ECF No. 152) is granted in part; its second motion *in limine* (ECF No. 153) is denied.

Ameen has also filed a motion for reconsideration (ECF No. 148), to which the government has filed an opposition (ECF No. 157).  That motion is granted in part.

**Motions In Limine**

Background

A.    The Government's Evidence

In its memorandum of points and authorities, the government represents that it will rely on the extradition request transmitted by the Republic of Iraq.  ECF No. 140 at 7.  The government states that it "will not present any additional testimony or documentation as part of its initial presentation of evidence establishing the elements for certification of extradition."  *Id.*

/////

/////

1       **B.**     <u>Ameen's Evidence</u>

2            **1.**     <u>Exhibits</u>

3       Ameen intends to rely on more than fifty exhibits.  ECF Nos. 142-1 – 142-19.[1]  The court

4  will list and offer a brief description of each:

5       Exhibit 1:     Google Maps of the Route Between Mersin, Turkey and Rawa, Iraq.

6       Exhibit 2:     Declaration of Aous Mounir Saood.  This individual resided in Rawa in
7                June of 2014 and states that Ameen was not in the area at that time.  Also
              states (based on first-hand knowledge) that the journey from Turkey to
8                Rawa in 2014 would take several weeks and would present considerable
              difficulties owing to government checkpoints.
9

10       Exhibit 3:     Declaration of Abdelsalem Altaab.  This individual moved to Mersin,
              Turkey in 2013 and, while there, lived near Ameen.  He states that he saw
11                Ameen frequently while the two were in Turkey.  Attached to his
              declaration is a photograph of Altaab and Ameen from May 2014 that was
12                taken in Istanbul.

13       Exhibit 4:     Declaration of Omar Hamid.  This individual met Ameen in Mersin,
              Turkey in 2012.  Met with Ameen frequently in June 2014 (while in
14                Turkey).  Says it's impossible that Ameen travelled to Turkey during June
              2014 as Hamid saw him "almost daily" during that time.
15

16       Exhibit 5:     Mersin Police Report and Court Minutes.  Ameen filed a police report in
              2012 after being swindled by a real estate broker in Mersin.  Ameen
17                subsequently brought a court case against the broker.  The court minutes
              are dated April 12, 2013.
18

19       Exhibit 6:     Declaration of Ahmed Azzam.  Met Ameen in Mersin, Turkey in 2012.
              Was in Mosul, Iraq in June 2014 when ISIS took the city.  Had discussions
20                with Ameen (who remained in Mersin, Turkey) during that time by way of
              Facebook Messenger or Skype.  Azzam claims it was obvious from the
21                video calls that Ameen was in Turkey – the footage captured his wife and
              children.  Other individuals whom he knew to be in Mersin would
22                occasionally appear on Ameen's video call to say hello to Azzam.

23       Exhibit 7:     Declaration of Iyad Mounir. Childhood friend of Ameen since 1995.  States
              that Ameen left Iraq for Turkey in 2012 and did not return to Iraq.  During
24                the relevant period made video calls with Ameen and, based thereon, could
              tell that the latter was in Turkey.
25

26

---

27       [1]Ameen filed an updated exhibit list on May 21, 2019, wherein several new exhibits were
added.  ECF No. 159.  Those newly added exhibits are not included in this summary and the court
28  reserves ruling on their admissibility for a later date.

Exhibit 8:    Declaration of B.I.  Resident of Rawa from 2006 to 2015.  Visited Ameen in Turkey once in 2013.  Was in Rawa in June of 2014 when ISIS took over.  B.I. claims Ameen was not present during that time.  Also claims that there were no issues between the victim and Ameen.  Claims that there are numerous false witnesses in Iraq seeking benefits – either in the form of immigration benefits from U.S. forces or monetary payment.  Finally, states that he overheard someone connected to American forces at al-Assad Air Base state that they would "bring Omar Ameen back to Iraq."

Exhibit 9:    Declaration of Hudhayfah Al-Rawi.  One of Ameen's brothers, now living in Istanbul, Turkey.  Claims that, when he was in Istanbul in June 2014, he got calls regularly from Ameen.  Those calls came from Ameen's Turkish cell phone number.  Ameen's demeanor in those calls was relaxed and normal.  He had no trouble reaching Ameen on his Turkish cell phone during June of 2014.

Exhibit 10:   Certification of evidence by Julie Denny.  Denny is a paralegal with the Federal Defender.  She offers declarations regarding the provenance of certain exhibit documents.

Exhibit 11:   Declaration of Zaid Hydari.   Hydari is the Executive Director of the Refugee Solidarity Network in New York City.  His affidavit is offered "to explain the laws and procedures that applied to Mr. Ameen when he was a refugee in Turkey from April 2012 to November 2014, to discuss the organizations and agencies Ameen interacted with, and to explain the documents produced by those agencies."

Exhibit 11A:  Hydari's CV.

Exhibit 11B:  Images of Omar Ameen's Iraqi Passport and English translation.

Exhibit 11C:  Turkcell Contract.

Exhibit 11D:  Mersin Immigration Office Documents with Apostille[2]

Exhibit 11E:  Mersin Immigration Documents with Translation.  Indicate Mersin Province Immigration Administration Directorate's opinion that "it is clear" Ameen was residing in Turkey between April 1, 2012 and November 4, 2014.

Exhibit 11F:  Documents from ICMC – "International Catholic Migration Commission."

Exhibit 11G:  United Nations High Commissioner for Refugees ("UNHCR") application page for Ameen

---

[2] An "apostille" is "a standard certification provided under the Hague Convention for authenticating documents used in foreign countries."  *United States v. Jaensch*, 665 F.3d 83, 89 n.4 (4th Cir. 2011) (quoting Black's Law Dictionary 112 (9th ed. 2009)).

Exhibit 11H:  UNHCR certificate indicating that Ameen is recognized as a refugee.

Exhibit 11I:  Ameen's Turkish Residency Card

Exhibit 11J:  Ameen Turkish Social Security Document

Exhibit 11K:  Ameen Turkish Bank Document

Exhibit 11L:  International Organization for Migration Documents (corrected at ECF No. 145).

Exhibit 11M:  State Department Records

Exhibit 11N:  United States Citizenship and Immigration Services Notice of Eligibility for Resettlement to Ameen

Exhibit 11O:  ICMC Cultural Orientation certificate awarded to Ameen

Exhibit 11P:  Documents from USCCB – "United States Conference of Catholic Bishops"

Exhibit 11R:  Khansaa Sabri Original Passport Images with English Translation

Exhibit 11S:  Khansaa Sabri Turkish Visa from A-File

Exhibit 11T:  Mersin Immigration Sign-In Sheets for Ameen and Declaration of Chris Chang.  Chang is a London-based investigator who travelled to the Mersin Immigration Office in Turkey.  He examined Ameen's physical file at the office and requested the Ameen sign-in sheets for June 2014.  The sheets in this exhibit are the ones provided by the Mersin Immigration Office.  The sheets are not dated and Chang notes that he is attempting to obtain additional information from the Mersin Immigration Office about the documents.

Exhibit 11.1:  Declaration of Linda Humble.  Humble is an investigator with the Federal Defender.  She interviewed Tallal Al-Gubri via telephone on November 28, 2018.  Al-Gaburi related that he met Ameen in July of 2014 in Istanbul.  Al-Gaburi relates that Omar had very short hair – he was almost bald – in the summer of 2014.

Exhibit 12:  Declaration of Mahdi Saleh Othman.  Native of Rawa, was present in 2014 when ISIS gained control of the town.  Long-time friend of Ameen due to the fact that they went to school together in their youth.  States that Ameen was not in Rawa at the time of the murder.  Notes that Rawa was a small township and he would have known if Ameen had returned. Spoke to Ameen in May of 2014 by way of "Viber."  Ameen was in Mersin at that time.

4

Exhibit 13:    Declaration of Yacer Ede.  Native of Baghdad, now living in Mersin, Turkey. States that he and Ameen were part of a community of Iraqi refugees in Mersin.  The two often saw each other at immigration sign-ins that took place weekly.  Ede claims that Ameen signed consistently and was very concerned about losing his refugee status.  Finally, Ede claims that, in order to travel, refugees had to get permission from the "foreigner's police station" or risk losing refugee status.

Exhibit 14:    Declaration of Natiq Abduljaleel.  Native of Rawa who lived there until November 2017.  Abduljaleel was in Rawa at the time of the murder and claimed that the incident was well known to all inhabitants.  The general understanding of residents was that it was a revenge killing perpetrated by the family of Saddam Badr.  Abduljaleel states that, from 2010 to June 2014 he was mayor of the neighborhood where Ameen's family lived.  He states that Ameen did not return to the township in June of 2014.

Exhibit 15:    Declaration of Waleed Abduljaleel.  Native of Rawa who lived there until "late 2014."  He claims that the victim, in the course of his duties as a police officer, killed Saddam Badr.   Abduljaleel also claims that there was not a great deal of violence perpetrated by ISIS against civilians in Rawa during the relevant period.

Exhibit 16:    Declaration of Majud Hussein.  He worked at Rawa General Hospital and was in the township when the victim was killed.  Hussein states that, based on discussions with other Rawa residents, he understood that the victim had killed an individual in the course of his duties as a police officer.  The family of that individual then took advantage of the lawlessness brought on by ISIS to exact revenge.  He states that Ameen was well-known - both to him and other residents of Rawa - and none believed him to be involved in ISIS.  He also reiterates that Ameen was not present in Rawa in June of 2014.

Exhibit 17:    Declaration of Aymen Muneer Saud.  This individual claims he was in Rawa during June 2014.  He was familiar with Ameen's family and noted that Ameen was not present during that time.

Exhibit 17.1:  Declaration of Linda Humble.  Humble relates that she had a conversation with Osama Aarif Abdualrazaq via telephone on April 29, 2019.  Abdualrazaq is a relative of Ameen and saw the latter daily when both lived in Rawa.  Abdualrazaq never saw Ameen in Rawa in June 2014 or heard of him being in the area.  Abdualrazaq states that the victim was hated by Al-Qaeda because he had killed many of their members.

Exhibit 18:    Declaration of Linda K. Humble.  Humble relates that she had an interview with Musab Basil on November 26, 2018.  Basil was a cousin to Ameen and had not seen him since the mid 1990's.  In 2017, Basil was interviewed by an FBI agent who wanted to know which of Basil's relatives were involved in ISIS or Al-Qaeda.  Basil told the FBI that Ameen was not

involved with either organization.  In 2018, Basil was shown photographs of his cousins by FBI agents.  He informed them that Ameen, his brothers, and his father were not involved in terrorism.

Exhibit 19:       Declaration of Linda K. Humble.  Humble relates that she had a telephonic interview with Dr. Nader Farhan Abdulhameed on November 26, 2018.  In August 2016, Abdulhameed was contacted by an FBI agent in Florida.  The agent asked if Abdulhameed had any recent contact with Ameen.  Abdulhameed told the agent that he was Facebook friends with Ameen and called him in late 2015 or early 2016 to talk about a dental issue.  Abdulhameed stated that he did not know Ameen to be involved in terrorism, but knew that some of his cousins were.

Exhibit 19.1:     Declaration of Omar Hamid.  Hamid attaches a photograph of himself, Ameen, and two others taken in Mersin, Turkey.  The photograph was taken in February 1, 2014.

Exhibit 19.2:     Declaration of Linda K. Humble.  Humble states that she had a telephonic interview with Uday Salih on April 29, 2019.  Salih did not know Ameen personally, but learned of his arrest on Facebook.  Salih states that, from 2007-2010, he worked as a police and counterterrorism officer overseeing Rawa.  He never heard of Ameen's family being involved in terror activity.

Exhibit 20:       Excerpts from Facebook Return on Search Warrant

Exhibit 21:       The defense exhibit list indicates that this is "Reserved."

Exhibit 22:       Iraqi Government Document Relating to Shutdown of Facebook

Exhibit 23:       Documents Related to Turkish IP Address

Exhibit 24:       Twitter Post Purporting to Announce Killing of Victim on Behalf of ISIS

Exhibit 25:       Twitter Return on Defense Subpoena

Exhibit 26:        Documents Related to Iraqi IP Address

Exhibit 27:       Facebook Return on Defense Subpoena for "Flag.Sunna Account"

Exhibit 28:       Certification of no criminal history for Ameen in Turkey

Exhibit 29:       Declaration of Radhya Hamed.  Mother of Omar Hamid (whose declaration is noted *supra*).  Met Ameen through her son in Mersin, Turkey.  She states that her son saw Ameen regularly in Mersin in 2014.

Exhibit 30:       United States tax documents for Ameen.

Exhibit 31:       Ameen's Transcript from American River College

| | |
|---|---|
| Exhibit 32: | Ameen's Correspondence with Congressperson Ami Bera. Ameen wrote to inquire about his green card application. |
| Exhibit 33: | Declaration of Rifaat Ammar. This individual first met Ameen in Iraq in the late 1990's when both were working as truck drivers. In January 2015 they ran into each other in Utah (after Ameen had relocated to America). Claims that Ameen is a "nice man" and "good person." |
| Exhibit 33.1: | Declaration of Talal Nahem. In 2017, he met Ameen at a mechanic shop on Fulton and Marconi in Sacramento. States that "Ameen is the nicest person I have ever met in my life." Ameen has never said or done anything that would lead Nahem to believe he has ISIS involvement. |
| Exhibit 34: | Handwritten declaration of "Witness A." This witness gave a statement included in the extradition request. ECF No. 137-1 at 38. Ameen's counsel states that Witness A's statement is not an eye-witness account of the killing. Instead, Witness A merely related that "Person 5" – the only purported eye-witness- had claimed to see Ameen participate in the killing. The statement to the Iraqi court was not, Ameen's counsel argue, testimony indicating Witness A's belief that Ameen participated in the killing. This exhibit is a hand-written statement from Witness A (given to defense investigators) indicating that: (1) they did not see Ameen participate in the murder: and (2) they believe him to be innocent of the charge. |
| Exhibit 35: | Handwritten Declaration of "Witness B." Identical to the foregoing description of Exhibit 34. |
| Exhibit 36: | Declaration of Linda K. Humble. Humble states that she had a telephone interview with Witness A on March 28, 2019. Witness A states that the victim related that "if anything were to happen to him or his brother that . . . Abu-Anas al-Samirrai and Muhammed Abid Manaf Abbud al-Suri were behind it." Witness A stated that the victim's family does not believe Ameen was involved with the murder. |
| Exhibit 37: | Declaration of Linda K. Humble. On March 28, 2019, Humble interviewed an individual designated "Witness C." This individual related the same information that Witness A did in their interview with Humble. |
| Exhibit 38: | Filed Under Seal. FBI statement by "Person 5." |
| Exhibit 39: | Declaration of Qutaiba Abdulsattar Ameen. One of Ameen's brothers. He states that Ameen was never involved in ISIS or Al-Qaeda. He also confirms that Ameen left Iraq for Turkey in 2012. Ameen's brother offers his belief that the purportedly false claims against Ameen stem from a familial/tribal conflict. |
| Exhibit 40: | Declaration of Linda K. Humble. On March 27 and 28 of 2019, Humble interviewed a tribal leader from Rawa. The tribal leader stated that Ameen |

had left for Turkey in 2011 and had not been seen in Iraq since. The tribal leader offered his opinion that Ameen could not have returned to the area without him knowing about it. This individual states that Ameen had no links to ISIS or Al-Qaeda.

Exhibit 41: Declaration of Taher Abu Alshar. Alshar states that he is a friend of Abdul Mohaiman. Mohaiman owned several rental properties in Turkey and Ameen stayed in his guest apartment for a time in May 2014. When Alshar saw Ameen in May 2014 the latter's hair was short.

Exhibit 41.1: Photographs of Ameen

Exhibit 42: Filed under seal. Handwritten statement by "Person 5" dated September 21, 2017.

Exhibit 43: Filed under seal. Handwritten statement by "Witness A," dated September 21, 2017.

Exhibit 43.1: Filed under seal. Signatures of "Witness A" in the Extradition Packet.

Exhibit 44: Filed under seal. FBI 302 (dated May 24, 2018) regarding October 23, 2017 statement by "Person 5."

Exhibit 45: Declaration of Belkis Wille. Wille is a senior Iraq researcher with Human Rights Watch ("HRW"). Wille states that HRW has documented "serious problems" with Iraq's detention, treatment, and prosecution of ISIS suspects. He states that prisoners accused of ISIS ties spend time in inadequate conditions which, on several documented occasions, have led to death or amputation of limbs due to inadequate medical care.

Exhibit 45A: Wille's CV.

Exhibit 45B: 2018 Human Rights Report on Iraq

Exhibit 45C: Amnesty International Report on human rights conditions in Iraq

Exhibit 45D: United Nations Report on Human Rights in Iraq from January to June 2017

Exhibit 46: Declaration of Natiq Abduljaleel. Abduljaleel lived in Rawa at the time of the murder. He states that Ameen's family had a "big conflict" with the El-Boyadi tribe. Ameen's family "took the lead" in expelling that tribe from Rawa. Now, members of that tribe are using the current allegations against Ameen to strike back at his family.

Exhibit 47: Filed under seal. FBI 302 on "Person 7" dated October 23, 2017.

Exhibit 48: Declaration of Aymenn Al-Tamimi. Al-Tamimi is an analyst on Syria, Iraq, and the Islamic State. His declaration explains how modern Iraqi

history and governance led to the Islamic State's take-over of various parts of Iraq.

Exhibit 48A:   Al-Tamimi's CV.

Exhibit 48B:   Article "Perspectives on Terrorism" authored by Aymenn Al-Tamimi.

Exhibit 48C:   Article "Governing the Caliphate: the Islamic State Picture" authored by Laith Alkouri and Alex Kassirer.

Exhibit 50:    Declaration of Ahmed Barakat. Barakat is an Arabic language interpreter living in Istanbul. He declares that he faithfully interpreted the interviews for various witnesses who have provided declarations supporting Ameen in this case.

Exhibit 51:    Declaration of Zakaria. Zakaria is also an Arabic language interpreter living in Istanbul. He also declares that he faithfully interpreted the interviews for various witnesses who have provided declarations supporting Ameen in this case.

2.    Witnesses

Ameen has identified six specific witnesses he intends to call. They are:

FBI Special Agent 1:   This agent, who has not been identified to Ameen's counsel by name, purportedly received hand-written statements from "Person 5" and "Witness A" in September 2017. They also interviewed "Person 5" in October 2017 and wrote an FBI 302 concerning this witness in May 2018.

FBI Special Agent 2:   This agent, who also has not been identified by name, was also involved in interviewing "Person 5" in October 2017.

FBI Special Agent 3:   This agent, again unidentified, purportedly investigated a possibly forged official document which was referred to in the government's "memorandum of extradition law and request for detention pending extradition proceedings" at ECF No. 6.[3]

_____

[3] In relevant part the memorandum states:

In addition to these outstanding warrants, according to a document provided to the FBI from an individual with access to such records, in or about June 2008, Ameen was detained. According to this document, Ameen was in the custody of an Iraqi Army infantry brigade. The infantry brigade sent another document communicating to the Rawah Police Department a request for further information about Ameen. The FBI interviewed an individual who was formerly the commander of the 28th Brigade, 7th Division, Iraqi Army—the

9

| A Defense Hand-writing Expert: | This expert's testimony will be relevant to the issue of whether witness signatures were forged (discussed *infra*). |
| Facebook Custodian of Records: | The defense notes that this witness may prove necessary because they still have outstanding subpoenas and requests for documents from Facebook. If the defense obtains those records in time for the hearing, it states that this witness will not be necessary. |
| UNHCR Custodian of Records: | The description, noted *supra*, for the Facebook custodian is equally applicable here. |

Finally, the defense notes that it may seek to present witnesses from foreign countries if the court or government desire live or video testimony.

Legal Standards

"Admission of evidence in an international extradition proceeding is within the magistrate's discretion." *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1399 (9th Cir. 1986). Under general United States extradition law, authentication is the only prerequisite for admissibility of evidence.[4] *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406 (9th Cir. 1988). The

---

unit that is identified on the first document. This individual indicated that he/she was familiar with Ameen. This individual was shown both of the documents, and recognized them, stating that original copies of these documents would be located at the battalion headquarters, which had been burned down by ISIS in approximately 2014. This individual left his/her post approximately three months before the date on these documents, and therefore was not the commander of the military unit at the time these documents were drafted. He/she provided the name of his/her successor to the FBI. The FBI is in possession of a written statement by this successor, stating that the first document is a forgery, and that the signature on the document is not his/hers. Because of these contradictory statements about the authenticity of the detention documentation, it is unknowable at this time the circumstances of Ameen's detention by the infantry brigade, whether he was in fact detained by the infantry brigade, and if he was, when and how he was able to secure his release from detention.

ECF No. 6 at 15 n.6.

[4] It bears emphasizing that the Federal Rules of Evidence do not apply in extradition hearings. *See Then v. Melendez*, 92 F.3d 851, 855 (9th Cir. 1996). Thus, as an example, hearsay evidence is admissible in an extradition hearing. *Id.* So too are unsigned translations of witness statements. *Barapind v. Enomoto*, 400 F.3d 744, 748 (9th Cir. 2005). Nonetheless, proper

authentication requirements for documentary evidence are found in 18 U.S.C. § 3190, which provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

The court also looks to the relevant extradition treaty insofar as it contains provisions which bear on the admissibility of evidence. *See Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450 (9th Cir. 1987) (admissibility of evidence governed by "the general extradition law of the United States and the provisions of the [Extradition] Treaty . . . ."). With respect to the treaty in this case, the only relevant provision reads:

> If, however, the fugitive criminal is merely charged with crime, a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and copies of the depositions upon which such warrant may have been issued, shall be produced with such other evidence or proof as may be deemed competent in the case.

ECF No. 137-1 at 10 (Treaty Between the United States of American and Iraq, Article XI).

"Participation by the fugitive at the extradition proceeding is limited; he is not permitted to introduce evidence on the issue of guilt or innocence but can only offer evidence that tends to explain the government's case of probable cause." *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978). In *Santos v. Thomas*, the Ninth Circuit acknowledged the difficulty courts have often faced in distinguishing between "explanatory" and "contradictory" evidence. 830 F.3d 987, 992 (9th Cir. 2016). It offered the following summation of the difference:

> [W]e have generally settled on the principle that 'explanatory' evidence is evidence that 'explains away or completely obliterates probable cause,' whereas contradictory evidence is that which 'merely controverts the existence of probable cause, or raises a defense.'

---

authentication remains a prerequisite.

. . .

> In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof. However, the accused may testify 'to things which might have explained ambiguities or doubtful elements' in the government's case. But he may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government.

*Id.* at 992-93 (internal citations omitted).

Analysis

I.      The Government's First Motion In Limine

The government objects to four categories of exhibit evidence which Ameen intends to introduce at the extradition hearing: (1) alibi evidence; (2) character evidence; (3) impeachment evidence; and (4) forgery evidence. The court, as explained below, grants the motion in part.

A.      Character Evidence

Evidence of Ameen's good character has no direct bearing on the question of probable cause. It is commendable, for instance, that Ameen had no criminal history in Turkey (Exhibit 28) and that he paid his taxes after coming to the United States (Exhibit 30). But these facts only bear on the crime in question, if at all, by way of broad, indirect proposition – if Ameen is generally a good man then it is less likely that he committed a specific bad act. They do not work to "obliterate" probable cause. Other courts have found as much. *See Rios v. United States,* Civil No. 10-2192 (PJS/FLN), 2011 U.S. Dist. LEXIS 26699, at *8-10, 2011 WL 915162 (D. Minn. Feb. 24, 2011) (finding "letters of recommendation attesting generally to Petitioner's good character" to be "more akin to contradictory evidence than explanatory evidence"); *In re Extradition of Aguasvivas*, No. 17-mj-4218-DHH, 2018 U.S. Dist. LEXIS 125979, at *17, 2018 WL 3614137 (D. Mass. July 27, 2018) ("Aguasvivas's character and alleged lack of a criminal record, as well as Aguasvivas's and Frank's movements months after the shooting, are irrelevant to the probable cause question before the Court.").

/////

/////

Based on the foregoing the court will exclude the following exhibits:

- Exhibit 18 (Declaration of Linda K. Humble relating interview with Musab Basil);

- Exhibit 19 (Declaration of Linda K. Humble relating interview with Dr. Nader Farhan Abdulhameed);

- Exhibit 19.1 (Supplemental declaration of Omar Hamid) **IN PART –** the portions of the affidavit attesting to: (1) Ameen's tolerance of other religions and consumption of alcohol; and (2) the length of Ameen's hair[5] will **be excluded**. The portions of the affidavit attesting to Ameen's presence in Turkey in 2014 will **be admitted**;

- Exhibit 19.2 (Declaration of Linda K. Humble relating interview with Udey Salih);

- Exhibit 28 (Ameen's Turkish Criminal History);

- Exhibit 29 (Declaration of Radhya Hamed) **IN PART –** the portion of the affidavit stating that Ameen and his family were "nice people" will **be excluded**. The portions of the affidavit relating to Ameen's presence in Mersin, Turkey in 2014 will **be admitted**;

- Exhibit 30 (Ameen Tax Documents);

- Exhibit 31 (Ameen College Transcripts);

- Exhibit 32 (Correspondence with Congressperson Ami Bera regarding Ameen's green card);

- Exhibit 33 (Declaration of Rifaat Ammar);

- Exhibit 33.1 (Declaration of Talal Najem).

B.    Alibi Evidence

The government correctly notes that, as a general principle, alibi evidence should be excluded from an extradition hearing insofar as it contradicts the government's evidence of

---

[5] The length of Ameen's hair is, the defense argues, relevant insofar as Person 5, a purported eye-witness to the crime, told an FBI interviewer that Ameen had shoulder length hair on the day of the murder. ECF No. 142 at 33-34. But, as discussed in the next section, evidence offered to attack the credibility of government witnesses is properly excluded from extradition hearings.

13

probable cause. *See Santos v. Thomas*, 830 F.3d 987, 993 (9th Cir. 2016). Also fundamental to these proceedings, however, is a fugitive's opportunity to present evidence that "obliterates" probable cause. *See Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) ("[A] fugitive facing extradition can present his own evidence to explain away the requesting government's evidence of probable cause."). In reconciling these principles, the court concludes that alibi evidence that, at best, merely contradicts the government's evidence is properly excluded. On the other hand, alibi evidence that could realistically "obliterate" probable cause should be considered. *See In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 739 (W.D. La. 1999) ("Evidence of an alibi defense is therefore admissible if it negates or obliterates probable cause, but not if it merely controverts the evidence of the requesting country."); *In re Extradition of Valles*, 268 F. Supp. 2d 758, 772 (S.D. Tex., Mar. 31, 2003) ("Respondent's evidence of an alibi defense is therefore admissible if it negates or obliterates probable cause."); *United States v. Andrade*, No. 06-MC-9039, 2006 U.S. Dist. LEXIS 70040, at *10, 2006 WL 2729268 (D. Or. Sept. 25, 2006) (holding that "alibi evidence may be admissible if it absolutely negates or obliterates probable cause.")

There is, of course, a danger[6] in so holding. Every fugitive seeking to offer alibi evidence would be inclined to argue that it is explanatory (or "obliterating") rather than contradictory. But a blanket prohibition on alibi evidence – no matter its strength – is more offensive to notions of justice. It would be manifestly unjust to prohibit a fugitive from presenting evidence that conclusively establishes that he could not have committed the crime he is charged with. To prohibit the introduction of such exonerating evidence would render these proceedings nothing more than a "rubber stamp." *Santos*, 830 F.3d at 1006 ("Our role here is indeed a limited one, but '[t]his is not to say that a judge . . . [in] an extradition proceeding is expected to wield a rubber stamp.'") (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)). At this point, the court cannot say whether Ameen's alibi evidence "obliterates" the government's probable

/////

---

[6] The amelioration of this risk lies with the court and its discretion, in each case, to weigh the particular evidence before ruling on its admissibility.

14

cause. The answer to that question will depend not only on the exhibits themselves, but on the arguments and presentations that accompany them at the extradition hearing.

For the foregoing reasons, the court finds that, in this case,[7] the interests of justice militate in favor of admission of Ameen's alibi evidence.

### C.   Impeachment Evidence

The government moves to exclude evidence offered by Ameen to impeach the witness statements in the extradition request. The impeachment evidence at issue is broken into three categories: (1) recantation evidence; (2) contradictory witness statements; and (3) credibility and bias evidence. The court will address each category separately.

### 1.   Recantation Evidence

The government is correct in arguing that recantation statements – defined as "a later statement that directly contradicts an earlier incriminating statement" - are properly excluded from extradition hearings. *See Santos*, 830 F.3d at 1019 ("To the extent an individual offers a later statement that directly contradicts an earlier incriminating statement, an extradition court cannot consider the later statement, as to do so would place it in the position of weighing the credibility of the two statements and determining which one is more believable.") Nevertheless, the evidence that government characterizes as "recantation evidence" and seeks to exclude in this case is explanatory rather than contradictory.

Ameen seeks to offer evidence that explains that the statements of Witnesses A and B do not purport to be eye-witness accounts and, instead, merely relate what another witness – Person 5 – is alleged to have seen:

> Witnesses A and B's statements to the Al-Karkh Court simply state that Person 5 saw what happened: "A witness was able to see the individual who shot [redacted] (Ihsan) and he was the terrorist (Omar Abdulsattar Ameen Husayn al-Rawi). . . ." Accordingly, although Witnesses A and B were called to the Al-Karkh Court two weeks after Person 5, they did not see the attack or the killing, and at most, merely repeated what Person 5 had claimed.

---

[7] There will be instances in which a fugitive's alibi evidence, on its face, obviously does not rise above the contradictory level. In those cases, the evidence should not be admitted. The categorization of the evidence Ameen offers is not easily undertaken at this stage, however.

. . .

> This is consistent with what Witnesses A and B told defense investigators.

ECF No. 142 at 30-31. The court has reviewed the statements in the extradition packet and finds that Ameen's characterization is essentially correct. Both statements indicate that "[a] witness was able to see the individual who shot [the victim] and he was the terrorist (Omar Abdulsattar Ameen Husayn al-Rawi) . . . ." ECF No. 137-1 at 38, 40. Nothing in the statements indicates that either Witness A or B was the eye-witness in question.[8] Curiously, the statements then appear to represent that both Witnesses A and B picked Ameen out of a photographic array provided by the Iraqi court and identified him as the killer. It is unclear whether this identification was based on a presumption that the eye-witnesses account was correct – in which case the witnesses were merely confirming that they knew Ameen's physical appearance - or based on some other, unmentioned personal knowledge that Ameen was the killer. In light of the substantial uncertainty as to what the accounts in the extradition packet are actually representing, the court finds that the new statements offered by these witnesses in support of Ameen (Exhibits 34, 35, & 36) are more akin to explanatory[9] evidence than "recantation" evidence. Thus, they do not run afoul of *Santos* and will be admitted.

/////

/////

/////

/////

---

[8] Based on the format of the statement, the words "a witness" have obviously been superimposed over some identifying information. ECF No. 137-1 at 40. The court concludes, however, that "a witness" is a reference to some third-party rather than a circuitous manner of self-reference for Witness A or B. If either Witness A or B intended to indicate that they were the eye-witness being referred to, the substitution of a simple "I" (as is employed elsewhere in the same statement) would suffice to both establish identity and safeguard anonymity.

[9] *See Collins v. Loisel*, 259 U.S. 309, 315-316 (1922) (individual whose extradition is being sought is permitted to testify "to things which might have explained ambiguities or doubtful elements in the prima facie case made against him. In other words, he was permitted to introduce evidence bearing upon the issue of probable cause.")

### 2.    Contradictory Witness Statements

The court agrees with the government that Exhibit 37 is contradictory[10] evidence and must be excluded. This exhibit relates an interview with a witness ("Witness C") whose statement is not included in the extradition request. The witness offers an account of the killing identical to the one offered by Witness A in their interview at Exhibit 36. Unlike the account of Witness A, which serves to explain his statement in the extradition request, Witness C's interview statements are purely contradictory and offer only a different account of how the killing occurred. *See Mainero v. Gregg*, 164 F.3d 1199, 1207 n. 7 (9th Cir. 1999) ("[E]vidence that merely controverts the existence of probable cause, or raises a defense, is not admissible.").

### 3.    Credibility and Bias Evidence

The Ninth Circuit has held that evidence attacking the credibility of government witnesses should be excluded. *See Man-Seok Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008) ("Choe further contends that the magistrate judge erred by refusing to allow him to conduct discovery on Ho's credibility, but this wasn't error because any such evidence wouldn't be admissible."); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1218 (S.D. Cal. 1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the

---

[10] In his extradition hearing brief, Ameen argues that his liberty interests as a refugee militate in favor of setting aside the rule of non-contradiction in this extradition hearing. ECF No. 142 at 54. He states that the 1967 United Nations Protocol Relating to the Status of Refugees ("Protocol") – to which the United States has acceded – creates a liberty interest which should permit him to introduce contradictory evidence. *Id.* at 56-59.

The court disagrees for several reasons. First, the court is aware of no authority excepting the rule of non-contradiction in proceedings involving a refugee. Second, as the government persuasively points out, even fugitives who are United States citizens – whom one might expect to possess additional safeguards - are bound by the rule of non-contradiction. *See*, *e.g.*, *Matter of Extradition of Mainero*, 990 F. Supp. 1208, 1212, 1216 (S.D. Cal. 1997). Third, the government also notes that the Protocol states that "[t]he provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that . . . he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee." Art. 1F, T.I.A.S. No. 6577 (1968). Fourth and finally, Ameen's refugee status touches on humanitarian concerns that are more appropriately weighed by the Secretary of State. *See Munaf v. Geren*, 553 U.S. 674 (2008).

For the foregoing reasons, the court declines to set aside the rule of non-contradiction in these proceedings.

credibility of the demanding country's witnesses.").  The government contends that the following exhibits should be excluded on this basis:

- Exhibit 38 (FBI 302 of a statement given by Person 5 that is inconsistent with his allegations in the extradition request)

- Exhibit 44 (FBI 302 which supplements Exhibit 38; explains photographic procedure by which Person 5 identified Ameen in an FBI interview. The photographic evaluation at issue was not part of the Iraqi extradition request);

- Exhibit 42 (Handwritten statement given by Person 5 which predates extradition request.);

- Exhibit 39 (Declaration of Qutaiba Ameen which offers theory that the current accusations against Ameen stem from a long-simmering dispute with a rival family);

- Exhibit 46 (Declaration of Natiq Abduljaleel which reiterates theory offered by Qutaiba Ameen regarding rival family being behind allegations);

- Exhibit 41.1 (Photographs of Ameen offered for the purpose of contradicting a claim by Person 5 – made in an FBI interview rather than the extradition packet – that Ameen had shoulder length hair on the day of the murder);

- Exhibit 45 (Declaration of Belkin Wille which does not bear directly on the allegations at bar.  Instead, Wille (a lawyer with Human Rights Watch) offers the opinion that the Iraqi government targets families of ISIS suspects.  Ameen has previously indicated his belief that Person 5 may have been coerced by the Iraqi government into giving a statement against him due to some familial ISIS connection.);

- Exhibit 47 (FBI 302 relating to a witness – whose testimony is not part of the extradition packet – who claimed that Ameen's home was an ISIS headquarters in Rawa and that Abu Bakr Al Baghdadi once stayed at Ameen's home).

The court agrees with the government and will exclude these exhibits in part.  None of the foregoing exhibits may, at this time, be offered to attack Person 5's credibility.  However, any of these exhibits, to the extent it is relevant, may be offered for the purpose of demonstrating that Person 5's statement in the extradition request is forged or inauthentic.  In so ruling, the court

notes that changing circumstances may give cause to revisit the exclusion of credibility evidence related to Person 5. It may turn out that the existence of probable cause depends on the statement of a single witness. Specifically, if the court ultimately determines that the other witness statements regarding the murder contained in the extradition request do not support probable cause – either because they were forged or because they never purported to have knowledge of Ameen's culpability in the first place – then it appears that probable cause will rest entirely on a single eye-witness statement (that of Person 5). Courts have held that "[t]he statement of a single witness may be sufficient to establish probable cause, provided that *there is some corroboration and no basis for doubting the witness' veracity.*" *In re Sandhu*, No. 90 CR. Misc. 1 (JCF), 1997 U.S. Dist. LEXIS 7314, at * 30, 1997 WL 277394 (S.D.N.Y. May 23, 1997) (emphasis added). If those circumstances arise, the court will order the parties to brief the issue of whether evidence speaking to Person 5's veracity should be admitted for the court's consideration.

### D.     Forgery Evidence

The court declines to exclude exhibits related to evidence of forgery or falsified documents in the extradition request. By way of background, Ameen argues that the government recently provided his counsel with heretofore unseen handwritten statements from Person 5 and Witness A. ECF No. 148 at 2. Ameen contends that the witness signatures in the new hand-written statements raise serious questions of authenticity. *Id.* He claims they do not match the signatures for these witnesses in the extradition request. *Id.* at 2-3. It follows, he argues, that either the newly obtained statements are inauthentic or the witness documents in the extradition request are inauthentic.

The government argues that evidence of forgery or falsification would amount only to conflicting evidence and, thus, should be excluded. But evidence of forgery or falsification runs to the reliability of the statements underlying the extradition request. In *Santos*, the Ninth Circuit cautioned that the court's "function in an extradition hearing is . . . to ensure that *our judicial standard of probable cause* is met by the Requesting Nation." 830 F.3d at 1006 (quoting *United States v. Linson*, 88 F. Supp. 2d 1123, 1128 (D. Guam 2000)) (emphasis added). Our standard of probable cause cannot be met by production of false or forged documents. Instead, it requires

19

presentation of competent evidence.  *In re Mathison*, 974 F. Supp. 2d 1296, 1313 (D. Or. Sept. 25, 2013) ("In making a probable cause determination the district court does not weigh conflicting evidence or make factual determinations, but instead decides only whether there is *competent evidence* to support probable cause for the charged offense.") (emphasis added).  Thus, the court finds that Ameen should be afforded an opportunity to show, if he can, that the documents supporting his extradition are forged.

## II.     The Government's Second Motion In Limine

In the government's second motion, it moves for an order excluding the testimony of all Ameen's proposed witnesses.  ECF No. 153 at 1.

### A.     Custodians of Records for Facebook and UNHCR

As an initial matter, the government states that, to the extent the court admits exhibits 27 and 11 (and its attachments), it does not contest that a custodian of record sponsor their admission.  *Id.* at 8-9.  The court, as noted *supra*, will admit those exhibits.  Thus, it will not exclude the custodians of records (if either proves necessary).

### B.     Handwriting Expert

Next, the court has already found that evidence related to the possible forgery of extradition request documents should be admitted.  Accordingly, it will not exclude Ameen's handwriting expert.   The government contends that "[e]ven to the extent that the handwriting expert's opinion could enhance the Court's understandings of the signatures, that opinion would be inadmissible contradictory evidence."  *Id.* at 8.  But as noted *supra*, the authenticity of the documents impacts their reliability and competency – elements that go beyond contradiction and which must be considered (and answered in the affirmative) if the court is to find probable cause.

### C.     Additional Witnesses from Foreign Countries

The government states that it does not want live or video testimony from any of the witnesses identified by the defense insofar as none would provide admissible evidence.  *Id.* The court, based on its findings with respect to Ameen's exhibits, does not share that broad, exclusionary view.  That being said, at this point the court does not foresee a need for live or video testimony from any of the witnesses who have provided declarations in support of Ameen.

And Ameen has not specifically moved to introduce live or video testimony. He offers it only if the government and court desire it. ECF No. 144 at 1. Thus, this issue is not ripe.

<h4>D.    FBI Special Agents</h4>

The government argues that, because the FBI agents were not involved with the Iraqi extradition request, any testimony they could offer would be irrelevant to the court's determination of probable cause. The court, based on the record before it, cannot adopt such an absolute view. This is not an instance in which a fugitive is engaged in pure speculation. The defense has pointed to evidence which, at the very least, raises the possibility that witness signatures in the extradition request were forged. And, in the face of that evidence, it behooves the court to allow Ameen a full and reasonable opportunity to present his case on that point. The court is aware – and indeed has itself stated on the record – that its role in this matter is limited. It has acknowledged that it is not empowered to preside over a trial on the merits. But any finding of probable cause must comport, at some basic level, with our nation's standards. Those standards dictate that probable cause cannot be based on fabricated evidence.

Counsel for Ameen has suggested, not unreasonably in the court's view, that the activities undertaken by the FBI agents in Iraq might position them to offer relevant testimony on the authenticity of the witness statements in the extradition packet.[11][12] It may be, as the government

---

[11] Ameen argues, with respect to Agents 1 and 2, that:

> Testimony from FBI Special Agents 1 and 2 will be explanatory, both on the issues of the inconsistent signatures, whether the person those agents met in October 2017 was in fact Person 5, how they ascertained that person's identity, whether they have any additional signatures by Person 5, and what identification procedure, if any, was engaged in during that October 2017 interview.

ECF No. 148 at 5.

[12] He argues, with respect to the forger issue of which Agent 3 was made aware:

> This is explanatory evidence for several reasons: (1) it shows a pattern of forged documents in the Iraqi investigation of Mr. Ameen; (2) it may implicate Person 5 in a different forgery (the Government has not disclosed which Iraqi witness provided the forgery to the FBI); and (3) the signature on the forgery may match one of the other forged documents.

suggests, that these agents will have nothing meaningful to add on the issue of forged documents. But the court cannot make that determination at this stage, without knowing what the agents' testimony will be. Thus, it declines to wholly exclude the agents' testimony. Ameen may call[13] the three agents discussed *supra*. His counsel may question these agents on issues related to the possible forgery of documents in the extradition request. At this juncture, the court declines to allow Ameen's counsel to question these agents on issues related solely to Person 5's credibility.

**Motion for Reconsideration**

Ameen moves, based on evidence recently provided to his attorneys by the government, for reconsideration of the court's previous ruling on his motion to compel. ECF No. 148. The government has filed an opposition. ECF No. 157.

<u>Background</u>

Ameen makes this motion based on the government's recent provision of hand-written statements from Person 5 and Witness A. As noted *supra*, Ameen argues that the new statements call the authenticity of the witness statements in the extradition packet into question. He also contends that ambiguities in the photographic identification procedure used by the Iraqi court support his motion. Specifically, Ameen notes that two of the photographs purportedly shown to Person 5 by the Iraqi court are dated May 22, 2018 – five weeks after the identification was supposedly made on April 15, 2018. Ameen states that an FBI report indicates that Person 5 made another identification on October 23, 2017. It is unclear, however, what procedures or photographs were employed in making that identification. Finally, Ameen references the provision of a potentially forged document[14] to the FBI – contextualized above in footnote three.

_____

*Id.* at 6.

[13] In light of this holding, the court will grant Ameen's request for subpoenas. ECF No. 150.

[14] In his motion for reconsideration, Ameen argues that the government has conceded that the document in question was forged. ECF No. 148 at 4. The government states that it has never acknowledged that this document was a forgery. ECF No. 157 at 6. Rather, it contends that the authenticity of the document is "unknowable" based on the current record because the individual who provided a written statement indicating that the document was forged declined to be

22

He notes that the government has not indicated what witness provided this potentially forged document.

Based on the foregoing, Ameen requests that the court direct the government to provide his counsel with: (1) an unredacted FBI 302 of Person 5; (2) the names of FBI Agents 1 and 2; (3) other known signatures of Person 5; and (4) the name of FBI Agent 3 (who investigated the possibly forged document) and other documentary evidence related to the possibly forged document.

Analysis

I.     FBI 302 of Person 5

In its opposition, the government states that it has now provided the defense with a less redacted version of this 302. ECF No. 157 at 5. The recently provided document still contains redactions related to personally identifying information which, the government contends, would endanger witness safety if revealed. *Id.* The government states that it is unredacted as to the pertinent issues, however – photo identifications and signatures. *Id.*

In light of the foregoing representation, the court declines to order further production with respect to this document.

II.    Names of FBI Special Agents 1 and 2

For the reasons stated *supra*, the court is inclined to allow the defense to call these agents as witnesses. Thus, it will order the government to disclose their names to the defense.

III.   Other Known Signatures of Person 5

In its opposition, the government represents that it has not, as part of its criminal investigation, obtained any other signature for Person 5. *Id.* at 6. The court cannot compel the government to produce what it does not possess, and this request is denied on this basis.

IV.    Name of FBI Special Agent 3 and Documentary Evidence

The court has already indicated that it will allow the defense to call this agent as a witness; the government is directed to provide his or her name to Ameen's counsel. The court will also

interviewed. *Id.*

direct the government to provide the relevant documentary evidence to the defense. Ameen's

counsel argues that the documentary evidence could potentially implicate Person 5 in a different

forgery and/or the signature on the forgery may match one of the other documents whose

authenticity has been called into question. The government does not argue that the production of

this evidence would endanger witness safety or compromise national security concerns.[15] Nor

does it argue that the production of this evidence would be overly burdensome in any logistical

sense. Given the gravity of the authenticity concerns raised here, the court will grant this request.

Conclusion

Based on the foregoing, it is ORDERED that:

1.       The government's motion in limine (ECF No. 152) is GRANTED in part:

   a.       As set forth *supra*, Ameen's exhibits numbered: 18, 19, 19.2, 28, 30, 31, 32, 33, 33.1, & 37 are wholly excluded. Exhibits 19.1, 29, 38, 39, 41.1, 42, 44, 45, 46, & 47 are excluded in part as described by this order.

   b.       The motion is denied in all other respects.

2.       The government's motion in limine (ECF No. 153) is DENIED;

/////

---

[15] The government does state, for any potential testimony by the special agents, that:

> [T]heir scope of knowledge extends to areas which cannot be discussed in the open setting of the extradition hearing, including classified information, and nonpublic information from the United States' criminal investigation. Their testimony would be logistically complicated for that reason, and may delay the extradition hearing date as authorizations are obtained for their testimony. Even if such authorizations were obtained for their testimony generally, additional authorization may be required for the disclosure of each answer depending on the nature of the questions asked.

ECF No. 153 at 7-8. The foregoing concerns are not invoked, however, merely by the provision of the documentary evidence to Ameen's counsel. If his counsel seeks to introduce the document into evidence at the hearing, the court will hear argument (if the parties cannot reach agreement) on what redactions are necessary to protect sensitive information.

With respect to the issue of possible delay owing to agent testimony, the court intends to begin taking evidence in this matter on May 28, 2019 as is currently scheduled. To the extent the government requires additional time to produce the agent witnesses, the court may reconvene the hearing at a later date for the purpose of taking their testimony.

3.      Ameen's motion for reconsideration (ECF No. 148) is GRANTED in part:

     a.      The government is directed to provide Ameen's counsel with: (1) the names of FBI Special Agents 1, 2, & 3; and (2) the documentary evidence investigated by Agent 3.

     b.      The motion is denied in all other respects.

4.      Ameen's request for subpoenas for three FBI special agents (ECF No. 150) is GRANTED. The defense is to provide the Clerk's Office with this Order and the draft subpoenas for issuance.

DATED: May 22, 2019.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

25