McGREGOR W. SCOTT
United States Attorney
AUDREY B. HEMESATH
HEIKO P. COPPOLA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700

CHRISTOPHER J. SMITH
Associate Director
REBECCA A. HACISKI
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C. 20530
Telephone: (202) 514-0000

Attorneys for Plaintiff
United States of America

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATTAR AMEEN TO THE REPUBLIC OF IRAQ | CASE NO.   2:18-MJ-152 EFB<br><br>Date:  December 4, 2019<br>Time:  10:00 a.m.<br>Hon. Edmund F. Brennan |

## FURTHER MEMORANDUM IN SUPPORT OF EXTRADITION

## **TABLE OF CONTENTS**

I.   PROCEDURAL POSTURE ....................................................................................7

II.  THE FOUR CORNERS OF THE EXTRADITION REQUEST AND SUPPLEMENT

ESTABLISH PROBABLE CAUSE THAT AMEEN COMMITTED THE MURDER ...............8

    A.   Probable Cause in Extradition Hearings .........................................................9

    B.   Under Oath Witness Statements are Highly Probative Evidence ....................11

    C.   The Testimony of Person 5 is Based on Personal Knowledge and is Self-
        Corroborating. .................................................................................................13

        1.   Contents of the Person 5 Statement ....................................................13

        2.   Citizen Eyewitnesses Are Presumed Reliable ......................................14

        3.   The Witness Statement is Based on Firsthand Knowledge ...................15

        **4.**   The Witness Statement is Detailed. .....................................................16

        5.   The Witness Statement is Corroborated by a Reliable Photo
            Identification. ......................................................................................16

        **6.**   A Single Eyewitness Can Be Sufficient Evidence to Support Guilt
            Beyond a Reasonable Doubt .................................................................18

        7.   *In the Matter of the Extradition of Sandhu* ........................................19

    D.   The Testimony of Witnesses A and B Corroborates the Testimony of Person
        5, Making This a Three-Witness Case .............................................................21

        1.   Contents of Witness A and B Statements ............................................21

        2.   Excited Utterance/Present Sense Impression .......................................24

        3.   The Statements of Witnesses A and B are Critical Corroborating
            Evidence That Must Be Considered .....................................................25

        4.   Reliability of Original Under Oath Statements of Witnesses A and B .....26

        5.   The Original Statements Were Not Forged. .........................................28

    E.   The Remainder of the Investigation Corroborates the Witness Statements .....28

        1.   Death Certificate ................................................................................28

        2.   ISIS Pamphlet ....................................................................................29

        3.   Crime Scene Information .....................................................................29

        4.   Rawah District Commissioner Report ..................................................30

        5.   INSS Intelligence Report ....................................................................30

      F.      Probable Cause That Ameen Willfully Murdered Ihsan With Premeditation ..................31

III.    THE DEFENSE HAS NOT PRESENTED REASONABLY CLEAR-CUT

       EVIDENCE THAT WOULD OBLITERATE THIS PROBABLE CAUSE ...............................31
      A.     Alibi ................................................................................................................33
      B.     Forgery .............................................................................................................34
      C.     Credibility ........................................................................................................35

IV.    THE FBI SPECIAL AGENT AFFIDAVITS ...............................................................36

V.     REMAINING PRONGS MET ....................................................................................37

VI.    CONCLUSION.........................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Barapind v. Enomoto*,
  400 F.3d 744 (9th Cir. 2005) ................................................................. 9, 20, 32, 34

*Barber v. Page*,
  390 U.S. 719 (1968) ........................................................................................... 9

*Bemis v. Edwards*,
  45 F.3d 1369 (9th Cir. 1995) .......................................................................... 25

*Bingham v. Bradley*,
  241 U.S. 511 (1916) ........................................................................................... 9

*Blasko v. Thomas*,
  2019 WL 1081209 (E.D. Cal. Mar. 7, 2019) ................................................. 15

*Caplan v. Vokes*,
  649 F.2d 1336 (9th Cir. 1981) ......................................................................... 10

*Charlton v. Kelly*,
  229 U.S. 447 (1913) ........................................................................................... 9

*Coleman v. Burnett*,
  477 F.2d 1187 (D.C. Cir. 1973) ...................................................................... 10

*Collins v. Loisel*,
  259 U.S. 309 (1922) ...................................................................................... 9, 11

*Eain v. Wilkes*,
  641 F.2d 504 (7th Cir. 1981) ..................................................................... 19, 27

*Ewing v. City of Stockton*,
  588 F.3d 1218 (9th Cir. 2009) ................................................................... 14, 23

*Franklin v. Fox*,
  312 F.3d 423 (9th Cir. 2002) .......................................................................... 31

*Gamez v. Stafford*,
  2012 WL 4471579 (S.D. Cal. Sept. 25, 2012) ............................................... 36

*Grant v. City of Long Beach*,
  315 F.3d 1081 (9th Cir. 2002) ......................................................................... 17

*Hoxha v. Levi*,
  465 F.3d 554 (3d Cir. 2006) ............................................................................ 27

*Idaho v. Wright*,
  497 U.S. 805 ..................................................................................................... 24

*Illinois v. Gates*,
  462 U.S. 213 (1983) .................................................................................. passim

*In re Extradition of Chavez*,
  408 F. Supp. 2d 908 (N.D. Cal. 2005) ........................................................... 33

*In re Extradition of Handanovic*,
  829 F. Supp. 2d 979 (D. Or. 2011) ................................................................. 31

*In re Extradition of Luna-Ruiz*,
  2014 WL 1089134 (C.D. Cal. Mar. 19, 2014) ................................... 33, 35, 36

*In re Extradition of Singh*,
  2005 WL 3030819 (E.D. Cal. Nov. 9, 2005) ........................................... passim

*In re Rodriguez Ortiz*,
  444 F. Supp. 2d 876 (N.D. Ill. 2006) ............................................................. 11

*Manson v. Brathwaite*,
  432 U.S. 98 (1977) ........................................................................................... 17

*Manta v. Chertoff*,
  518 F.3d 1134 (9th Cir. 2008) ......................................................................... 18

*Maryland v. Pringle*,
  540 U.S. 366 (2003) ........................................................................................ 10

*Matter of Extradition of Luna*,
  2017 WL 1036732 (N.D. Cal. Mar. 17, 2017)................................................................ 29
*Matter of the Extradition of Sindona*,
  450 F.Supp. 672 (S.D.N.Y. 1978)........................................................................... 32
*Michigan v. Bryant*,
  562 U.S. 344 (2011)................................................................................................ 24
*Noeller v. Wojdylo*,
  922 F.3d 797 (7th Cir. 2019) ......................................................................... 14, 35
*Quinn v. Robinson*,
  783 F.2d 776 (9th Cir. 1986) .......................................................................... passim
*Ruiz v. Barnes*,
  2012 WL 5878223 (E.D. Cal. Nov. 20, 2012) ........................................................ 26
*Sainez v. Venables*,
  588 F.3d 713 (9th Cir. 2009) .................................................................................. 9
*Sakaguchi v. Kaulukukui*,
  520 F.2d 726 (9th Cir. 1975) ............................................................................ 9, 11
*In the Matter of the Extradition of Sandhu*,
  1997 WL 277394 (S.D.N.Y. May 23, 1997) ...................................................... 19, 20
*Santos v. Thomas*,
  830 F.3d 987 (9th Cir. 2016) ........................................................................... passim
*Sidali v. INS*,
  107 F.3d 191 (3d Cir. 1997) ................................................................................. 10
*Spiegel v. Cortese*,
  196 F.3d 717 (7th Cir. 1999) ................................................................................. 15
*Spinelli v. United States*,
  393 U.S. 410 (1969)................................................................................................ 16
*Taylor v. Maddox*,
  366 F.3d 992 (9th Cir. 2004) .......................................................................... 25, 26
*Texas v. Brown*,
  460 U.S. 730 (1983)................................................................................................ 11
*United States v. Andrade*,
  2006 WL 3628096 (D. Or. Dec. 11, 2006) ............................................................. 34
*United States v. Angulo-Lopez*,
  791 F.2d 1394 (9th Cir. 1986) ............................................................................... 14
*United States v. Ayers*,
  924 F.2d 1468 (9th Cir. 1991) ............................................................................... 28
*United States v. Banks*,
  539 F.2d 14 (9th Cir. 1976) ...................................................................... 13, 16, 18, 29
*United States v. Bishop*,
  264 F.3d 919 (9th Cir. 2001) ........................................................................... 11, 15
*United States v. Estrada*,
  733 F.3d  (1984) ................................................................................................... 11
*United States v. Ginn*,
  87 F.3d 367 (9th Cir. 1996) ................................................................................... 18
*United States v. Hammond*,
  666 F.2d 435 (9th Cir. 1982) ........................................................................... 14, 18
*United States v. Kin-Hong*,
  110 F.3d 103 (1st Cir. 1997)................................................................................... 11
*United States v. Larios*,
  640 F.2d 938 (9th Cir. 1981) ................................................................................. 18
*United States v. Mahler*,
  442 F.2d 1172 ..........................................................................................14, 21, 22
*United States v. McClendon*,
  782 F.2d 785 (9th Cir. 1986) ................................................................................. 18

*United States v. Nick,*
    604 F.2d 1199 (9th Cir. 1979) ................................................................................ 24
*United States v. Potter,*
    830 F.2d 1049 (9th Cir. 1987) ................................................................................ 28
*Zanzanian v. United States,*
    729 F.2d 624 (9th Cir. 1984) ................................................................. 9, 12, 16, 28
*Zelenovic v. O'Malley,*
    2010 WL 3548007 (N.D. Ill. Sept. 7, 2010) ......................................................... 31

**Statutes**

18 U.S.C. § 3184 .......................................................................................................... 7, 37
18 U.S.C. § 3190 ............................................................................................................... 7
U.S.C. § 3184 .................................................................................................................. 37

**Rules**

Fed. R. Evid. 803(1) .................................................................................................. 24, 25
Fed. R. Evid. 803(2) ...................................................................................................... 24

This Court should certify Omar Ameen for extradition at the conclusion of the continued extradition hearing on December 4, 2019.  The Republic of Iraq's extradition request and supporting documentation, combined with the supplement to the extradition request, fulfill the requirements established by the United States-Iraq extradition treaty and applicable U.S. law, including the requirement of probable cause.

## I.   PROCEDURAL POSTURE

This Court has already received into evidence the extradition request and supporting documentation from Iraq.   At the continued extradition hearing, the government will introduce the certified original supplement to the extradition request, which was previously filed electronically.  CR 194-1.

The Court should confine its probable cause determination to the extradition request and the supplement—which are the two documents that meet the statutory authentication requirements for admission, 18 U.S.C. § 3190—pursuant to the mandate set forth in 18 U.S.C. § 3184 that this Court hear and consider the "evidence of criminality."  Within the four corners of the submissions of Iraq is ample evidence to establish probable cause that there was a murder in Rawah, Iraq and that Omar Ameen committed it.

At the May 28, 2019 extradition hearing, the Court also received into evidence various defense exhibits.  The government attaches a table of its understanding of the admitted defense exhibits.  Attachment A.  The Court further ordered the testimony of three FBI Special Agents, over the objection of the United States.  CR 160.  In response to that order, the United States is submitting three affidavits that summarize the relevant knowledge of each of the Special Agents.  The United States respectfully requests an advance ruling on whether the evidentiary issues that prompted the need for Special Agent testimony are satisfied or whether any or all of the Special Agents will be required to attend the hearing in person.

The United States understands the record to be open for the possible admission of additional defense exhibits at the December 4, 2019 continued extradition hearing.  To the extent additional exhibits are admitted, the United States, pursuant to its treaty obligations to Iraq, may seek to admit rebuttal evidence.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    THE FOUR CORNERS OF THE EXTRADITION REQUEST AND SUPPLEMENT ESTABLISH PROBABLE CAUSE THAT AMEEN COMMITTED THE MURDER

The extradition request contains three witness statements, all taken under oath before the Iraqi judge who issued the warrant for Ameen's arrest, and all with knowledge of Ameen's commission of the charged murder.  The eyewitness statement of Person 5 sets forth that this witness personally watched Ameen shoot the victim and provides a level of detail that supports the veracity of the testimony.  This eyewitness account is corroborated by the two additional witness statements of Witnesses A and B.  As is now clear from the supplemental extradition request, Person 5 told Witnesses A and B that the shooter was Ameen contemporaneously with the murder.  This close-in-time identification is strong corroboration of the testimony of Person 5.  Many of the material details of all three witnesses statements are additionally corroborated by the independent investigation undertaken by the Iraqi judicial authorities.

The totality of the evidence in the extradition request and supplement provide more than sufficient probable cause to certify Ameen for extradition.  As set forth below, the extradition request and supplement provide this Court with thirteen indicators of reliability: (1) the statements were taken under oath; (2) one of the witnesses is a citizen eyewitness; (3) the two other citizen witnesses have personal knowledge and knowledge gained contemporaneously from the eyewitness at the time of the murder; (4) the under-oath statements are detailed; (5) the under-oath statements are consistent with each other; (6) the witnesses also participated in an under-oath photo identification; (7) the photo identification procedure used with the eyewitness was not suggestive; (8) the eyewitness photo identification was corroborated by the under-oath single photo identifications by Witnesses A and B.  The witness statements are corroborated by other material facts, including:  (9) a death certificate; (10) a social media post; (11) a crime scene site visit; (12) a local police report; and (13) an intelligence report stating that Ameen is a member of a terrorist organization.  The totality of the evidence set forth in the extradition request and supplement establishes strong probable cause that Ameen murdered Ihsan.  This evidence is sufficient to cause a person of ordinary prudence to entertain a reasonable belief of Ameen's guilt.

8

### A.      Probable Cause in Extradition Hearings

Although extraditions are not criminal proceedings, an extradition hearing involves a probable cause determination akin to a grand jury investigation or a preliminary hearing under Rule 5.1 of the Federal Rules of Criminal Procedure.  *Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913); *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc).[1]  "The magistrate's function is to determine whether there is 'any' evidence sufficient to establish reasonable or probable cause."  *Sakaguchi v. Kaulukukui*, 520 F.2d 726, 730 (9th Cir. 1975); *see also Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986) (extradition judge must have competent evidence before him to support the belief that the accused has committed the charged offenses).

As the Court is well-aware, the Republic of Iraq is neither expected nor required to try its case against Ameen in the extradition court.  "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."  *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) ("While these facts alone might not be sufficient to prove beyond a reasonable doubt that Barapind shared his accomplices' intent to murder Kulwant, they do provide competent evidence for finding probable cause of Barapind's guilt as an accomplice or co-conspirator.").  While a magistrate judge's certification for extradition includes a determination that there is sufficient competent evidence to establish probable cause to believe the accused committed the charged crime, it does not address whether there is sufficient competent evidence to convict the accused.  *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."); *Barber v. Page*, 390 U.S. 719, 725 (1968) ("A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.").

---

[1] However, a fugitive's procedural rights are more limited than those of a U.S. criminal defendant. *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (no right to cross-examination if witnesses testify at the hearing); *Barapind v. Enomoto*, 400 F.3d 744, 750 (9th Cir. 2005) (en banc) (no right to introduce contradictory or impeaching evidence).  Moreover, the proof does not have to be based on "evidence that would be admissible at a preliminary hearing or before a grand jury in the United States." *Zanzanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984).

In the extradition context, as in the context of a preliminary hearings, "[p]robable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir. 1973); *see, e.g.*, *Sidali v. INS*, 107 F.3d 191, 199 (3d Cir. 1997). The requesting country must present some factual support for the charge.

> The probable cause standard is akin to a prima facie standard. Whatever else may be implied, probable cause means that sufficient evidence has been presented to the satisfaction of the court to warrant bringing the relator to trial in accordance with the laws of the requesting state, not simply that he is suspected of criminality with no basis in fact to support it.

M. Cherif Bassiouni, International Extradition 829 (4th Ed. 2002). However, "[t]he [extradition] magistrate does not weigh conflicting evidence and make factual determinations," as that function is reserved for the trial court in the requesting country. *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986).

Rather, a probable cause determination in an extradition proceeding "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Id.* at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)). To that end, as the government has previously explained, an extradition court should treat the evidence submitted in support of the requesting country's extradition request as true for purposes of its probable cause determination. *See* CR 140 at 11 n.1 (citing cases).[2]

The extradition court assesses probable cause using a common-sense approach, evaluating the totality of the circumstances. "The term 'probable cause,' according to its usual acceptation, means les than evidence which would justify condemnation . . . . [and that] [f]inely tuned standards such as proof beyond a reasonable doubt or by preponderance of the evidence, useful in formal trials, have no place in the probable-cause decision." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation and

---

[2] The government has not suggested, as Ameen claimed previously, CR 156 at 2, that "*the Executive's* factual assertions" should "go wholly unchallenged or [be] simply presumed correct." Rather, as the Ninth Circuit has explained, when an extradition court "concludes that it is impossible to determine the credibility of the [requesting country's] allegations without exceeding the scope of [its] limited review" after the fugitive contests those allegations, "[p]robable cause is not undermined, *and the court must certify the extradition.*" *Santos*, 830 F.3d at 1007 (emphasis added).

citation omitted).  As explained in the context of a search warrant, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (announcing the totality-of-the-circumstances probable cause standard in the context of a search warrant affidavit) (internal quotation omitted); *see also United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001) ("Probable cause exists when there is a fair probability or substantial chance of criminal activity.").  Probable cause is thus a "fluid concept which depends on the 'totality of the circumstances.'" *United States v. Estrada*, 733 F.3d 683 (1984) (quoting *Gates*, 462 U.S. at 230).

The existence of "inconsistencies and discrepancies" in the evidence supporting an extradition request is "of no consequence if there exists in those documents 'any' other sufficient competent evidence" to establish probable cause.  *United States ex rel. Sakaguchi v. Kaulukukui*, 520 F.2d 726, 728 (9th Cir. 1975); *see also, e.g.*, *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 893 (N.D. Ill. 2006) ("Providing an air-tight narrative of the events surrounding a crime is not a precondition for granting extradition," and issues regarding alleged inconsistencies in the evidence "are all properly reserved for the eventual trial in [the requesting country].").

Under *Gates*, what is known about a witness's "'veracity,' 'reliability,' and 'basis of knowledge' are weighed together with any other evidence that supports the finding of probable cause.  They are viewed cumulatively, not as independent links in a chain." *Estrada*, 733 F.2d at 685-86.  Probable cause is not a more-likely-than-not standard.  *United States v. Kin-Hong*, 110 F.3d 103, 120-21 (1st Cir. 1997). "[P]robable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730 (1983) (probable cause to search).

### B.  <u>Under Oath Witness Statements are Highly Probative Evidence</u>

All types of foreign evidence can be offered in support of extradition requests in general—police summaries, hearsay accounts dictated to investigators, crime reports.  *See, e.g.*, *Collins*, 259 U.S. at 317

11

("unsworn statements of absent witnesses" may support an extradition court's finding of probable cause); *Zanazanian v. United States*, 729 F.2d 624, 625-27 (9th Cir. 1984) (rejecting fugitive's argument that "multiple hearsay does not constitute competent evidence").   The type of evidence submitted in support of this extradition request is among the most probative:  it is the first-hand accounts of three witnesses—one with personal knowledge, two with a combination of personal knowledge and second-hand knowledge obtained immediately after the event and that corroborate each other—testified to under oath and signed before the investigating judge.  *See, e.g.*, *Zanazanian*, 729 F.2d at 627 (identifying signed witness statements as being particularly reliable).

The extradition request is clear that the testimony of all three witnesses was taken under oath in the presence of the investigation judge.  Extradition Request, CR 137-1 pg. 43-44, 61.  The oath administered in this case was: "I swear by Almighty Allah to say the truth and nothing but the truth." Supplement, CR 194-1, ¶ 7.  In Iraq, just as in the United States, perjury may result in criminal penalties. *See, e.g.*, Articles 251, 252, and 255 of the Iraqi Penal Code.[3]  The judicial investigator prepared written summaries of the sworn oral testimony taken before the investigating judge, which the witnesses then reviewed before signing and imprinting.

The Ninth Circuit has found that such evidence may amply establish probable cause.  For example, in *United States v. Elliot*, a search warrant for the defendant's apartment was based solely on uncorroborated information supplied by a woman who contacted the police to say that the man she lived with was in possession of marijuana and cocaine.  893 F.2d 220, 222 (9th Cir. 1990), *amended by* 904 F.2d 25 (9th Cir. 1990).  She described in detail the quantities of drugs, previous quantities of drugs, and a marijuana grow in the back room.  *Id.*  In finding that probable cause existed, the Ninth Circuit explained: "An informant's description of illegal activity is sufficient to establish probable cause if the totality of the circumstances indicate that the tip is reliable."  *Id.*  The circumstance that the Court found

---

[3] Article 251 proivdes: "False testimony is the intent of a witness, who has taken the legal oath before a civil, administrative or disciplinary court or special court or investigating authority, to make false statements, deny the truth or conceal in whole or in part what he knows of the events that he has witnessed."  Article 252 provides: "Any person who falsely testifies for or against an accused is punishable by detention plus a fine or by one of those penalties.  If the accused is subsequently convicted as a result of that testimony, such person is punishable by the penalty for the offence for which the accused was convicted.. . . ."

most reliable in *Elliot* was the fact that the informant appeared in person before the magistrate judge and testified under oath. *Id.* ("Moreover, unlike *Gates* and many related informer cases, Wilson was not an anonymous tipper. Rather, she appeared in person before the magistrate and testified under oath. This action provides powerful indicia of veracity and reliability."). Here, the under-oath testimony of Person 5 and Witnesses A and B should be afforded the same heavy weight that the Ninth Circuit afforded the under-oath testimony of the single witness establishing probable cause in *Elliot*, particularly where the investigating judge has provided a high level of detail of the under-oath nature of the testimony of the witnesses. Supplement, CR 194-1 ¶ 7.

### C.    The Testimony of Person 5 is Based on Personal Knowledge and is Self-Corroborating.

The testimony of Person 5 is substantial evidence in favor of a finding of probable cause. Not only was the statement given under oath, but it is also a detailed, first-hand account by a citizen eyewitness. It bears all the hallmarks of the most reliable types of witness statements. "A detailed eyewitness report of a crime is self-corroborating: it supplies its own indicia of reliability." *United States v. Banks*, 539 F.2d 14, 17 (9th Cir. 1976); *see also Elliott*, 893 F.2d at 223.

#### 1.    Contents of the Person 5 Statement

On June 21, 2014, the town of Rawah fell to ISIS. Extradition Request, CR 137-1 pg. 43. The murder victim, Ihsan, received a threatening phone call, of which Person 5 had personal knowledge. *Id.* at 43. The caller warned that Ihsan would be beheaded for his background work with security agencies and Iraqi police. *Id.*

The following day, at around 7 o'clock in the evening, while Person 5 was in the house, an ISIS convoy containing four vehicles, which were occupied by large numbers of the terrorist organization, pulled up to the house and started shooting heavily at it. *Id.* Person 5 describes the victim going outside and returning fire using his Kalashnikov rifle, with the firefight lasting approximately 10 minutes. *Id.*

When the shooting stopped, Person 5 went outside, and while he was standing outside the front door, he saw Ihsan on the ground, and Ameen standing over him holding a gun. *Id.* Person 5 heard Ameen say "you are an agent for the Americans and you are an apostate." *Id.* Person 5 saw Ameen fire the gun at Ihsan while he was lying on the ground. *Id.* Person 5 saw several of the armed terrorists

stand next to Ihsan's body before they left.  *Id.*

## 2.      **Citizen Eyewitnesses Are Presumed Reliable**

Citizen eyewitnesses are presumed to be the most reliable reporters of criminal conduct.  Where "an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability"—the Supreme Court has found rigorous scrutiny of the basis of his knowledge unnecessary.  *Gates*, 462 U.S. at 238; *United States v. Hammond*, 666 F.2d 435, 439 (9th Cir. 1982) ("Where the source of police information about a suspect is an eyewitness to the crime, probable cause to arrest the suspect may exist even in the absence of an independent showing of the reliability of the source."); *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) ("Citizen informants . . . require less evidence to establish their veracity than criminal informants.").

Not only have courts held that further proof of reliability is not necessary to buttress citizen eyewitness accounts, citizen eyewitnesses are generally presumed to be reliable.  "First, Shirk was a citizen witness, not an informant, and such witnesses are generally presumed reliable."  *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009); *United States v. Mahler*, 442 F.2d 1172, 1174-75 ("Particularly in a case like this [an extortion case], the nature of the offense, and her personal knowledge of it, are self-corroborating.  She certainly was an 'eye witness' to the crime.").  The Ninth Circuit groups together in this category of presumed-reliable crime victims and crime scene witnesses: "Citizen informants, identified bystanders, victims, and crime scene witnesses may generally be presumed credible by police in a way that professional informants are not."  *Ewing*, 588 F.3d at 1225 (internal quotation and citation omitted); *Mahler*, 442 F.2d at 1174-75 (9th Cir. 1971) ("Nor when the informant is the victim of the crime, need it be shown by other facts, that she is a reliable informant.").

The defense has—through Omar Ameen's brother Qutaiba—attempted to question the motives of Person 5, suggesting that an old tribal grudge is behind the accusation.  Defense Exhibit 39.  As an initial matter, such challenges to Person 5's credibility are misplaced in these extradition proceedings, as this Court has already recognized in excluding this exhibit to the extent it attacks the credibility of Person 5.  CR 160, pg. 18-19; *See, e.g., Noeller v. Wojdylo*, 922 F.3d 797, 807 (7th Cir. 2019) ("Burgos Noeller argues, however, that the magistrate judge was wrong to credit Mexico's evidence.  He argues that the statements from Jacobo Carrillo's family members are inconsistent, unreliable, and subject to

1   undue influence from other family members who are biased against him.  These arguments challenging

2   the credibility of the evidence against him have no place in extradition hearings.").  Regardless, even if

3   that were not the case, and even assuming it were true that there is a tribal grudge between Ameen's

4   family and another tribe in Rawah of which Person 5 is a member, and that Person 5's "action may have

5   been motivated by spite," the Ninth Circuit has made clear that such an allegation alone is not enough to

6   undermine the reliability of a witness even in the context of a U.S. criminal proceeding.  *United States v.*

7   *Bishop*, 264 F.3d 919, 926 (9th Cir. 2001); *see also Spiegel v. Cortese*, 196 F.3d 717, 724-25 (7th Cir.

8   1999) ("Although Spiegel contends that further investigation would have revealed that Cherny's charges

9   were retaliatory, it is well-established that when an officer has received . . . information from some

10  person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling

11  the truth, he has probable cause [to effect a warrantless arrest].").

12              3.      **The Witness Statement is Based on Firsthand Knowledge**

13          The basis of knowledge of Person 5 is also of the highest reliability.  He testified that he

14  personally saw Ameen shoot Ihsan.

15          Basis of knowledge is one of the principle factors courts evaluate in assessing probable cause.

16  *Gates*, 462 U.S. at 234.  An account given based on direct personal observation is entitled to weight.

17  "Even if we entertain some doubt as to an informant's motives, his explicit and detailed description of

18  alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to

19  greater weight than might otherwise be the case." *Gates*, 462 U.S. at 234.  In *Gates*, then, the Supreme

20  Court established that even in the informant context (which this case is not), and even where an ulterior

21  motive might be at play (which has not been established here), direct personal observation in a detailed

22  statement can be enough to overcome what would amount to doubts about bias and the propensity for

23  fabrication.  *Id.*; *see also Blasko v. Thomas*, 2019 WL 1081209 *14 (E.D. Cal. Mar. 7, 2019) ("The

24  witness statements contained in the judgment demonstrate that each witness was present at the incident

25  and was able to hear and observe what occurred demonstrating that the witness spoke based on their

26  personal knowledge of the incident.  This is sufficient to find the witness statements are competent

27  evidence to support a finding of probable cause.").

28          The basis of knowledge factor ensures that the witness actually observed the crime, as opposed

                                                    15

to spreading rumor untethered to personal observations.  Person 5's testimony is grounded in the kind of personal observation that allays the concern of "casual rumor circulating in the underworld or . . . accusation based merely on an individual's general reputation" that courts frown upon.  *Spinelli v. United States*, 393 U.S. 410, 416 (1969).

### 4. The Witness Statement is Detailed

An additional factor that entitles the testimony of Person 5 to weight is the level of detail provided in the written statement.  *Banks*, 539 F.2d at 16 ("That [the informant] was under investigation because he was suspected of being involved in drug traffic is immaterial here.  The details of his statement supported an inference as to the reliability of his information and his credibility."); *Zanzanian*, 729 F.2d at 627 (finding informant reports to be reliable where they were "abundant in detail, containing specifics of time and place, price and quantity").

Some of the details provided by Person 5 include: background information on a phone call received by the victim the day before the murder; the specific day of the murder, anchored to a memorable event—the fall of Rawah; the setting of the crime scene at a home; the time of day of the arrival of the ISIS caravan; the number of vehicles in the caravan; the heavy shooting from the large number of ISIS fighters and the return fire from the victim's Kalashnikov rifle; the final moments of the victim after he was wounded; the words Ameen said to the victim as he stood over him; and Ameen firing the final shot.

### 5. The Witness Statement is Corroborated by a Reliable Photo Identification

At the conclusion of his testimony, Person 5 participated in a photo identification that was also highly reliable and further supports a finding of probable cause.

The extradition request describes the photo identification procedure employed:  Person 5 was shown various photos after he was given the legal oath.  Extradition Request, CR 137-1 pg. 61.  The photos were of Ameen and other male ISIS members.  *Id.*  Person 5 looked at the photos one after the other before identifying Ameen.  *Id.*  The Republic of Iraq included the photos of the other male ISIS members in the extradition request, so that this Court can itself evaluate the photo identification procedure.  *Id.*  The investigating judge confirmed that he presided over the photo identification procedure in the supplemental submission.  Supplement, CR 194-1, ¶ 7.

"[A]lthough [an extradition] magistrate may take the circumstances of an identification into account in assessing its reliability, there is no *per se* rule that specifies which identification procedures are 'competent' for probable cause purposes." *Quinn*, 783 F.2d at 815.  In evaluating the validity of an eyewitness identification for probable cause purposes in U.S. proceedings, a court engages in a sequential, two-part inquiry:  (1) Did the officers employ an identification procedure so impermissibly suggestive as to give rise to a substantial likelihood of misidentification?  And if so, (2) did the witnesses exhibit sufficient indicia of reliability to protect the integrity of their identifications?  *Grant v. City of Long Beach*, 315 F.3d 1081, 1086 (9th Cir. 2002).  In this case, the investigating judge employed a reliable photo identification procedure.  There is nothing in the record to suggest that the photo identification procedure was impermissibly suggestive.  The record indicates that the investigating judge used photographs of other known ISIS members—a fair means of testing Person 5's recognition of Ameen among a pool of other potential wrongdoers.  The record indicates that Person 5 examined each of the photos before identifying Ameen.[4]  There is no basis from this record to infer an impermissibly suggestive photo identification procedure.

Furthermore, Person 5's identification of Ameen in this multi-subject photo array bears indicia of reliability.  *Cf. Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (articulating a five-factor test for reliability of identifications); *Grant v. City of Long Beach*, 315 F.3d 1081, 1087 (9th Cir. 2002), *amended* 334 F.3d 795 (9th Cir. 2002).  Person 5 had the opportunity to view Ameen at the time of the crime, and he identified Ameen by name to Witnesses A and B immediately after the crime.  Moreover, Person 5's statement demonstrates a degree of attention paid to the criminal, as he was able to recall what he saw and what he heard Ameen say before shooting Ihsan.  Even though approximately four years elapsed between the time of the murder and the photo identification, Person 5's identification of Ameen immediately after the murder to Witnesses A and B implies that he knew who Ameen was then.

---

[4] It remains unclear why the photos have dates that are after the date of Person 5's testimony. The answer could be as simple as that the camera's calendar was mis-set.  Or possibly the date reflects the date the photos were actually added to the warrant packet.  What is clear, though, is the investigating judge's description of the photo identification procedure and the use of other pictures of known ISIS members.  Extradition Request, CR 137-1 pg. 43, 61.  This description of the photo identification procedure and certification of the same provides evidence that the procedure used was a reliable, nonsuggestive identification procedure of the type recommended by the case law.

Thus, the balance of factors supports a finding that the photo identification corroborates the oral narrative given by Person 5.  *Hammond*, 666 F.2d at 440 ("We hold both their identifications were reliable under the *Manson* criteria.  The strongest indicia of reliability for both identifications were the women's opportunity to observe the criminal at the time of the crime and their degree of attention."); *compare Manta v. Chertoff*, 518 F.3d 1134, 1144-45 (9th Cir. 2008) (approving of reliance on an identification conducted using a single photograph, which was displayed along with the fugitive's name and other identifying information, eight years after the commission of the alleged crime); *Quinn*, 783 F.2d at 815 (approving of reliance on identification of photo six years after the commission of the alleged crime).

The photograph Person 5 identified as being Ameen is included in the extradition request, and the Court can observe Ameen and conclude he is the same person depicted in the photograph.  *Id.* at 62-63.  *Manta*, 518 F.3d at 1143 ("The magistrate judge observed that the person in court appeared to be the same person that [the witness] had identified in the passport photo [in the extradition request].").

6. **A Single Eyewitness Can Be Sufficient Evidence to Support Guilt Beyond a Reasonable Doubt**

A single eyewitness is sufficient to establish guilt beyond a reasonable doubt in a U.S. criminal trial; it follows that it is also sufficient to establish probable cause.  *United States v. Larios*, 640 F.2d 938 (9th Cir. 1981) ("There was one witness, the Drug Enforcement Administration informant, Baldamar Trevino, whose testimony supported the verdict.  The testimony of one witness, even that of an informant, is sufficient to uphold a conviction.").  This is so even if other evidence contradicts the eyewitness account.  *United States v. McClendon*, 782 F.2d 785, 790 (9th Cir. 1986) (testimony of one eyewitness, even where inconsistent with other evidence, may support a conviction).  "The prosecution is not required to present evidence corroborating the eyewitness identifications.  The testimony of one witness, if solidly believed, is sufficient prove the identity of the perpetrator of the crime."  *United States v. Ginn*, 87 F.3d 367, 369 (9th Cir. 1996) (internal quotation and citation omitted).

The same is true in the extradition context.  In *In re Extradition of Singh*, the decision after the Ninth Circuit remanded *Barapind* back to the district court, the court held that a single eyewitness to a shootout at a police roadblock supported a finding of probable cause.  *In re Extradition of Singh*, 2005

WL 3030819 *46 (E.D. Cal. Nov. 9, 2005).  The witness stated that he recognized the shooter from earlier and was able to see him by torchlight.  *Id.*  The district court held that this statement, combined with a photo identification, is "facially competent evidence sufficient to establish probable cause to believe Barapind is a perpetrator of the charged crimes."  *Id.*; *see also, e.g.*, *Eain v. Wilkes*, 641 F.2d 504, 510-11 & n.5 (7th Cir. 1981) (affirming probable cause determination in extradition case, and observing that "[t]he uncorroborated testimony of an accomplice has been held sufficient to support even the higher reasonable doubt standard necessary for a criminal conviction").  The Court should similarly find that Person 5's eyewitness account and identification establish probable cause to believe Ameen perpetrated the murder for which his extradition is sought.

### 7.  *In the Matter of the Extradition of Sandhu*

This Court has previously cited an extradition case out of the Southern District of New York, *In the Matter of the Extradition of Sandhu*, for the proposition that "[t]he statement of a single witness may be sufficient to establish probable cause, *provided that there is some corroboration and no basis for doubting the witness' veracity.*"  CR 160 pg. 19 (emphasis in original); *Sandhu*, 1997 WL 277394 *10 (S.D.N.Y. May 23, 1997).  The court in *Sandhu* found probable cause based on a single-witness photo identification, noting that the identification was corroborated by other witnesses' description of the fugitive, where there was no basis for doubting the eyewitness' veracity.  *Sandhu*, 1997 WL 277394 *10.  This Court emphasized the "no basis for doubting the witness' veracity" clause of the *Sandhu* opinion, suggesting that the credibility of Person 5 may be of increased relevance if it turned out that Witness A and B lacked personal knowledge of the identity of the shooter.  CR 160 pg. 19.

As discussed more fully below, that scenario has not come to pass.  The investigating judge has clarified that while Witnesses A and B did not personally see Ameen shoot Ihsan, Person 5 told them that Ameen was the shooter at the time of the shooting.  Supplement, CR 194-1.  This declaration by Person 5 at the time of the murder is highly corroborative of the testimony of Person 5.  That Person 5 told at least two people at the time of the shooting that the shooter was Ameen locked in his account.  This contemporaneous statement at the crime scene would be admissible even under our own Federal Rules of Evidence as either an excited utterance or a present sense impression.  It could also be

admissible as a prior consistent statement to rebut a charge of fabrication.[5]  Fundamentally, the contemporaneous statement transforms this case from a single-witness case to a three-witness case on the essential question of Ameen's identity as the murderer.

Moreover, there is no basis for doubting the witness's veracity on the face of the materials in the extradition request.  Just as in the *Sandhu* case itself, "there is no dispute that the crime was committed, [Ameen] was identified on the basis of a photo spread rather than the display of a single mug shot, and the identification was consistent with prior descriptions of one of the assailants."  1997 WL 277394 *10. The *Sandhu* court found the existence of probable cause on the basis of that set of facts.  *Id.*  Here, as in *Sandhu*, the extradition request and supplement provide no basis whatsoever for doubting Person 5's credibility—the extradition request contains the under-oath testimony of a citizen witness who provided a detailed, self-corroborating account of the murder he personally witnessed, supported by a nonsuggestive photo array.  Any basis for doubting the veracity of Person 5 would therefore have to originate outside the four corners of the extradition request.

*Sandhu* does not elaborate on the "basis for doubting the witness' veracity" concept, but surely that concept must be reconciled with the inadmissibility of contradictory evidence.  As explained also in *Sandhu*, "what tends to obliterate probable cause may be considered but not what merely contradicts it. The improbability or the vagueness of testimony may destroy the probability of guilt, but the tendering of witnesses who testify to an opposite version of the facts does not."  1997 WL 277394 *6; *see also Barapind*, 400 F.3d at 752.  The testimony of Person 5 on its face is not inherently improbable, nor is it vague, nor has the defense submitted any clear-cut evidence that would obliterate the credibility of Person 5.  A trial would be required to resolve the types of allegations the defense has suggested it will raise to challenge the credibility of Person 5.  *Barapind*, 400 F.3d at 749-50.  Allegations that merely cast doubt are not enough.  *Singh*, 2005 WL 3030819 *52 (finding probable cause on the basis of a single witness statement even where the defense had challenged the motives, bias, and totality of circumstances of the witness statement).

---

[5] Of course, the Federal Rules of Evidence do not apply in extradition proceedings.  *See Santos*, 830 F.3d at 992.  However, the fact that such evidence would be admissible in a U.S. criminal trial supports the conclusion that the testimony of Witnesses A and B is reliable, corroborative evidence.

The situation this Court was concerned with in citing *Sandhu* is not present.  The under-oath testimony of Person 5 is plausible, detailed, and based on personal knowledge.  It is also corroborated on material points by the testimony of Witnesses A and B and the investigation of the Iraqi authorities.

**D.    The Testimony of Witnesses A and B Corroborates the Testimony of Person 5, Making This a Three-Witness Case**

The supplemental submission by the Republic of Iraq makes clear this is a three witness case, not a single witness case.  Supplement, CR 194-1, ¶ 8.  The testimony of Witnesses A and B is based on a combination of their own personal knowledge as well as knowledge they gained from speaking with Person 5 at the time of the crime.  This is highly corroborative evidence in support of a finding of probable cause.  *Mahler*, 442 F.2d at 1175 ("The corroborating information came from another woman, also identified, who spoke from her own knowledge.  She also gave some hearsay information, but it was detailed, and of such a character as to make it most unlikely that it was fabricated.  The affidavit was more than sufficient.").

1.    **Contents of Witness A and B Statements**

It is now clear from the supplemental submission by the investigating judge that, immediately after the shooting, Person 5 told Witnesses A and B that Omar Ameen was the shooter.  Supplement, CR 194-1, ¶ 8 ("Based on the statements made before me under the legal oath, it was obvious that while the plaintiffs had not personally seen Omar Abdulsattar Ameen committing the murder, they had been informed of his involvement in the crime by the eyewitness *at the time of the offense*.") (emphasis added).

The investigating judge draws the same conclusion that this Court should draw: "their testimonies [are] supportive to the statement of the eyewitness."  Supplement, CR 194-1 ¶ 8.  Their testimony corroborates the testimony of Person 5 on the essential question of Omar Ameen as the shooter.

Witnesses A and B each testified under oath and independently confirmed the material facts set out in the testimony of Person 5:  on June 21, 2014, ISIS seized Rawah.  Extradition Request, CR 137-1 pg. 38-41.  They state the same time, 7 p.m.  *Id.*  They indicate they were inside the house, but were able to see four vehicles, which they described as pickups—same as Person 5.  *Id.*  They also described the

vehicles as occupied by a large number of members of the ISIS terrorist organization.  *Id.*  Both witnesses recalled the same heavy shooting as Person 5.  *Id.*  Both remember Ihsan's going outside the house to return fire.  *Id.*  They testified to the large number of attackers and the intensity of the gun fire.  *Id.*

Both Witnesses A and B testified to Ihsan being hit with bullets and falling in front of the house.  It is unclear as to whether they personally witnessed this portion of the event, but it is unlikely because the supplemental submission of the Republic of Iraq indicates that Witnesses A and B did not personally witness the fatal shooting of Ihsan.  Supplement, CR 194-1.  More likely is that Witness A and B gained their knowledge of this portion of their testimony from what Person 5 told them at the time of the crime.  *Id*.  Indeed, the very next portion of their testimony is that one member came forward and took Ihsan's weapon away and shot him at close range, resulting in him being martyred.  *Id.*  Both witnesses testified that Person 5 was able to see (and thus had personal knowledge of) the individual who shot Ihsan.  *Id.*  Witnesses A and B each testified that that person is Omar Ameen.  They described Ameen as a prominent member of ISIS in the Rawah District, a fact which can be inferred to be based on personal knowledge, given their familiarity with Rawah, Ihsan's status as a police major who fought ISIS, and the relative smallness of the town of Rawah.  Indeed, it appears to be undisputed in this case that Witnesses A and B have known Omar Ameen since his childhood.  Defense Exhibit 35.

Witnesses A and B describe the entrance of the ISIS members into the house following the shootout.  *Id.*  Both witnesses heard the chants of Allah Akbar.  *Id.*  Their testimony contains the names of other perpetrators of the attack.  *Id.*  The testimony of Person 5 does not.  One inference could fairly be that Witnesses A and B personally saw these other men when they entered the house and started chanting.  This interpretation would be consistent with the base of knowledge that Witnesses A and B demonstrated in stating that "I say these terrorists are prominent members in the Terror Organization of ISIS."  *Id*.

After the departure of the ISIS members, Witnesses A and B took Ihsan's body to the hospital.  *Id*.  They testified that they obtained a death certificate from the hospital.  *Id.*  This testimony is corroborated by the death certificate which accompanies the extradition request, confirming a material fact in the testimony: the date and manner of death.

This testimony is fully consistent with the testimony of Person 5, corroborating the nature of the moments immediately preceding the murder of Ihsan.  Witnesses A and B's knowledge is primarily personal, as they were at the very center of the crime scene.  They could see and hear the arrival of the caravan, the shooting, and the response by Ihsan.  It is plausible and logical that Person 5 would tell Witnesses A and B—immediate relatives of the targeted victim—what he saw outside, right after it happened, in the aftermath of the crime.

The under-oath statements of Witnesses A and B bear all the same hallmarks of reliability as the statement of Person 5.  The testimony is based at least in part on personal knowledge.  Supplement, CR 194-1, ¶ 8 ("They were in the house at the time of the murder.  They saw Daesh vehicles approaching the house, heard gunshots, saw some terrorists entering their house, then they took their son's dead body to the hospital."); *Ewing*, 588 F.3d at 1225 ("corroboration is generally not essential when an average citizen reports a crime based on personal observations, and that in such cases reliability may generally be presumed") (citing 2 Wayne R. LaFave, *Search and Seizure* § 3.4(a) (4th ed. 2004)).  Witnesses A and B are citizen witnesses.  The testimony is detailed.  The testimony was given under oath.

The testimony of Witnesses A and B included a photo identification.  Extradition Request, CR 137-1 pg. 38-41.  Unlike the photo array shown to Person 5, Witnesses A and B appear to have been shown a photograph only of Ameen, whom they positively identified.  Although not as probative as Person 5's identification from a photo array, the positive identification of a single photo is additional corroboration of the identity of Ameen as the murderer.  *See Quinn*, 783 F.2d at 815.  It demonstrates that Witnesses A and B have personal knowledge of who Ameen is, bolstering their ability to state that he is a known member of ISIS in Rawah.

Witnesses A and B identified other perpetrators of the attack on the home.  This information is not found in Person 5's statement.  Extradition Request, CR 137-1 pg. 43.  The investigating judge found this testimony of Witnesses A and B reliable enough to support the issuance of an arrest warrant for those additional perpetrators.  This is a further fact in support of the conclusion that each of the three witness statements weighs in favor of a finding of probable cause in this case.

Finally, the testimony of Witnesses A and B is consistent with Person 5's on the material issue of identity:  "The eyewitness told them that Omar Abdulsattar Ameen was among the terrorists and he was

the one who stepped forward and shot the victim."  Supplement, CR 194-1, ¶ 8.  Given the circumstances under which Person 5 made his statement to Witnesses A and B, it is reliable and strong corroboration of Person 5's subsequent account of what happened.

2.    **Excited Utterance/Present Sense Impression**

The statement by Person 5 to Witnesses A and B at the time of the murder is reliable evidence that Ameen was the shooter.  The statement is akin to an excited utterance or a present sense impression, the type of statement our own courts treat as inherently reliable and admissible as probative on the issue of guilt.  Therefore, Person 5's statement is similarly reliable and probative of Ameen's guilt.

An excited utterance is a statement made relating to a startling event or condition, while the declarant was under the stress of excitement that caused it.  Fed. R. Evid. 803(2).  The theory of admissibility of excited utterances "is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication."  Fed. R. Evid. 803(2) advisory committee note.  The circumstances under which the statement was made must indicate a very high degree of reliability and trustworthiness; the statement must be offered as evidence of a material fact; the statement, although not essential for proof of the point for which it is offered, must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;" and the interest of justice will best be served by admission of the statement into evidence.  *United States v. Nick*, 604 F.2d 1199, 1203 (9th Cir. 1979).

Because Person 5 made the statement to Witnesses A and B at the time of the murder he had just witnessed, it can reasonably be assumed that he was in a state of excitement.  Such an excited utterance is "reliable because the declarant, in the excitement, presumably cannot form a falsehood."  *Michigan v. Bryant*, 562 U.S. 344, 361 (2011); *Idaho v. Wright*, 497 U.S. 805, 820 ("The basis for the 'excited utterance' exception . . . is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation. . . . .").  Person 5's statement to Witnesses A and B bears these same traits of having been made under stressful circumstances that would eliminate the likelihood of falsification.

Alternatively, Person 5's statement to Witness A and B at the time of the shooting is reliable as a present sense impression.  *Cf.* Fed. R. Evid. 803(1).  The underlying theory of the present sense

impression exception to the rule against hearsay is that the "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation."  Fed. R. Evid. 803(1) advisory committee note.  The statement of Person 5 at the time of the murder about the perpetrator of the murder, as described by the investigating judge, is "nearly contemporaneous with the incident described and made with little chance for reflection."  *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995).

> ### 3.   The Statements of Witnesses A and B are Critical Corroborating Evidence That Must Be Considered

Witness A and B's testimony about the declaration of Person 5 is critical evidence contained in the extradition request that must be considered.  In *Taylor v. Maddox*, the Ninth Circuit examined the state court's treatment of a lawyer's testimony about a phone call between himself and his client shortly after police interrogation.  *Taylor v. Maddox*, 366 F.3d 992, 1006 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).  The lawyer's testimony about what the client told him is equivalent to Witness A and B's testimony about what Person 5 told them.  Even absent the statement qualifying as a present sense impression or an excited utterance, the Ninth Circuit provided a roadmap for evaluating the reliability of this testimony, finding it to be important corroborating testimony that the state court could not set aside.  *Id.*

First, the Ninth Circuit observed that the details of the client's story "precisely matched" the lawyer's account, "precluding the possibility that [the client] had fabricated those details during the eleven months between his confession and the hearing."  *Id.*  Just as in *Taylor*, there is a gap in time in this case between the murder of Ihsan and Person 5's testimony to the investigating Judge—here, a significant gap.  But Person 5's and Witness A and B's accounts match, tending to preclude in just the same way the possibility that Person 5 had fabricated those details during the intervening period of time.

Second, the Ninth Circuit remarked on the timeframe of the lawyer's testimony.  The lawyer provided the only other "glimpse into the events on the night" of the murder.  *Taylor*, 366 F.3d at 1008.  The phone call to the lawyer—as with what Person 5 told Witness A and B—"locked" the stories soon after the event in question and "thereby foreclosed the opportunity for [the witness] to embellish or fabricate after reflection or based on advice he got from friends [or] relatives."  *Id.*

Third, the Ninth Circuit examined the four corners of the lawyer's testimony, and found that by itself it satisfied the "customary criteria of reliability:  It is direct and precise, internally consistent and plausible."  *Id.* at 1009.  So too are the statements of Witnesses A and B reliable: they are direct and concise, describing what they personally observed, and, as has been clarified in the Supplement, from what was told to them immediately after the shooting.  In their original statements taken under oath, Witnesses A and B did not "back-track or equivocate; [they] did not claim a failure of memory."  *Id.*

Fourth, the Ninth Circuit looked at the consistency between what the client told the lawyer on the night of the event, as compared to the client's later testimony.  *Id.* at 1010.  As in this case, the court found that the story he told the lawyer "was in all material respects the same story" he eventually testified to.  *Id.*

Person 5's statement at the time of the crime to Witnesses A and B was "not a formal statement to law enforcement, a solemn declaration, or made with a primary purpose of creating an out-of-court substitute for trial testimony.  Rather, it was completely spontaneous and made under the extreme distress of having witnessed a murder."  *Ruiz v. Barnes*, 2012 WL 5878223 *7 (E.D. Cal. Nov. 20, 2012).  There is no possibility that, five years ago, in 2014, Person 5 could have anticipated the scenario that has come to pass—that Ameen would eventually be charged with murder and be the subject of extradition proceedings from the United States.  At the time of the statement, Rawah was a war zone, a reality that in all likelihood affected all aspects of daily life, including the ability of local law enforcement to prosecute crimes.  It makes sense that there was a delay in prosecution of this case under these circumstances.  At the time Person 5 made the statement, prosecution was likely difficult to imagine.  Rawah had just fallen to ISIS the day before.  Making any official report to local law enforcement that a particular ISIS member has carried out the attack would seem a foolish risk, particularly considering that the murder victim himself was a member of law enforcement.

In sum, the statement of Person 5 to Witnesses A and B supports a finding of probable cause.

### 4.   Reliability of Original Under Oath Statements of Witnesses A and B

The defense has offered recanted statements obtained from Witnesses A and B.  The Court should exclude those recanted statements.  *See Santos v. Thomas*, 830 F.3d 987, 1003 (9th Cir. 2016) (concluding that recantations are "contradictory" and, therefore, inadmissible in extradition proceedings

because they improperly "contest the credibility of the original statements, presenting a different version of the facts or offering reasons why the government's evidence should not be believed") (emphasis omitted); *see also, e.g.*, *Hoxha v. Levi*, 465 F.3d 554, 561-62 (3d Cir. 2006) (holding that extradition judge "did not abuse his discretion in excluding the recantation evidence" because that evidence "provided an alternative and contradictory narrative that can properly be presented at trial [in the requesting country]").  Moreover, those statements are not as reliable as the original statements by Witnesses A and B, which were made under oath, and which are consistent with each other and with the testimony of Person 5.  The supplemental submission buttresses the reliability of the circumstances of the original testimony.

The most factually analogous case on this point is *Eain v. Wilkes*, where the Seventh Circuit concluded that recantations were properly excluded because they "tend[ed] to contradict or challenge the credibility of the facts implicating [the fugitive]" and, therefore, were "matters to be considered at the trial [in the requesting country], not the extradition hearing."  641 F.2d at 511-12.  Here, as in *Eain*, the three witnesses inculpated Ameen under oath before the investigating judge; the later recantations were made first to private counsel, then apparently later in a court, but not the same court that took the original statements, in violation of correct procedure under foreign law.  641 F.2d at 511; Supplement, CR 194-1 (action of the Iraqi defense attorney in approaching the plaintiffs to obtain statements is contrary to Iraqi legal procedure, and in going to a different court is not recognized by the Al Karkh court, which has jurisdiction over the matter).  There, as here, where the indicia of reliability are on the prior inculpating statements, the subsequent recantation does not negate probable cause.  *Eain*, 641 F.2d at 511-12 (statements made in open court were deemed more reliable than statements to a private attorney).

Even if the recantations of Witnesses A and B were admissible, they should not be credited in light of evidence, via a report by the Iraq National Security Service ("INSS"), regarding "pressures made on the part of Omar Abdulsattar Ameen's family to drop the charges."  Supplement, CR 194-1 ¶ 3.  Pressure from a defendant's family calls into question whether any subsequent statement by a witness is the product of that pressure.  Because the circumstances of the recantations do not bear hallmarks of reliability, those statements do not undermine probable cause in this case.

5.        **The Original Statements Were Not Forged**

The record is also now clear that none of the witness statements presented by the Republic of Iraq in the extradition request is a forgery.  Judge Dhiya personally reviewed the identifications of the witnesses before recording their statements.  Supplement, CR 194-1, ¶ 7.  The witnesses each separately reviewed, signed, and imprinted their written statements.  Supplement, CR 194-1 ¶ 7.  Judge Dhiya then signed and now attests to the authenticity of the witness statements contained in the extradition request.  Supplement, CR 194-1 ¶ 7.

In sum, the combination of the witness statements in this case amply support a finding of probable cause.  "Though corroborating evidence could improve the credibility of [the requesting country's] case, uncorroborated witness statements can by themselves establish probable cause."  *Singh*, 2005 WL 3030819 *42 (citing *Zanazanian*, 729 F.2d at 626-27).

E.        <u>**The Remainder of the Investigation Corroborates the Witness Statements**</u>

There is evidence in this case that corroborates the witness statement.  The further investigation of the Republic of Iraq, as set forth in the extradition request, confirms some of the material allegations in the witness statements.  The fact that the witnesses were right about many of the material facts of the murder, as evidenced by other materials contained in the extradition request, they are also more probably right about the identity of Ameen as the shooter.  *Gates*, 462 U.S. at 244 ("Because an informant is right about some things, he is more probably right about other facts.").  Independent police investigation corroborating the factual elements of a tip is a factor in the court's assessment of probable cause.  *United States v. Ayers*, 924 F.2d 1468, 1478 (9th Cir. 1991).  An informant's detailed, corroborated statements regarding some facts can be used to validate other statements by that informant.  *United States v. Potter*, 830 F.2d 1049, 1052 (9th Cir. 1987).  Here, the Iraqi investigation revealed the following corroborating facts:  the death certificate, the ISIS pamphlet, the crime scene information, the local police report, and the INSS intelligence report.  Extradition Request, CR 137-1, pg. 78.

1.        **Death Certificate**

The death certificate, which was presented to the investigating judge by Witnesses A and B, corroborates the material facts of Ihsan's death as described in the testimony of all three witnesses.  Extradition Request, CR 137-1, pg. 38-41, 102.  In particular, it confirms that the cause of death was

gunshot to the chest, *id.* at 38-41, and thus bolsters probable cause.  *See, e.g.*, *Matter of Extradition of Luna*, 2017 WL 1036732 *6 (N.D. Cal. Mar. 17, 2017) ("Thus, the Court is not here determining whether Ramirez Luna murdered Omar, it merely must find there is enough evidence to conscientiously entertain the reasonable belief that Ramirez Luna committed the crime.  This is not a trial.  The Court finds the government crossed the evidentiary threshold; the combination of the witness statements and the autopsy . . . support a finding of probable cause [that the fugitive committed the murder for which his extradition was sought].").

### 2.    ISIS Pamphlet

The extradition request includes an "ISIS pamphlet," which looks to be a social media post boasting of the murder of Ihsan, which was presented to the investigating judge by Witnesses A and B.  Extradition Request, CR 137-1, pg. 38-41, 101.  It states: "Today is the day to eliminate some rotten heads.  Now in Rawah, the criminal Ihsan Al-Hafiz has been eliminated at the hands of the Mujahidin."  *Id.* at 38-41.  This social media post does not reveal the identity of the killer, but does confirm that Ihsan's murder was targeted—he was one of the "rotten heads."  It thus confirms the material fact that the murder was a targeted ISIS murder.

### 3.    Crime Scene Information

The extradition request provides information from an independent investigation including a sketch of the crime scene.  Extradition Request, CR 137-1, pg. 46.  The investigator detailed the location of the scene, but noted that he found nothing else of evidentiary value at the location.  This result is perhaps not surprising given that the murder occurred approximately four years prior to the investigation by the Al Karkh inquiry court.

Also included are photographic images providing an overhead perspective of the location.  Extradition Request, CR 137-1, pg. 49-56.  This additional independent investigation is corroborative of the testimony of the witnesses.  It demonstrates an examination of the plausibility of the testimony, an effort to recreate the crime scene to the extent possible.  For example, the identification of two plots of vacant land on either side of the home where the crime took place may provide an explanation for why there are no other eyewitnesses to the shooting itself.  It may also explain how a caravan of four ISIS vehicles was able to access the home at once.  Extradition Request, CR 137-1 pg. 46.

Of course, this additional investigation does not shed light on the identity of Ameen as the shooter, but it provides additional corroboration of the knowledge and description given by Person 5.  "It is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduced the chances of a reckless or prevaricating take, thus providing a substantial basis for crediting the [statement]." *Gates*, 462 U.S. at 245.  "[C]orroboration of the major portions of the [witness statement] provides just this probability." *Id.* at 246.

### 4.    **Rawah District Commissioner Report**

The extradition request contains a local police report that confirms that the murder occurred and that it was an ISIS murder.  Extradition Request, CR 137-1 pg. 99.  This report also does not elucidate the identity of the murderer, but is further corroboration of the testimony of the witnesses on those material facts.

Furthermore, the local police report appears to have been provided to the investigating judge by Witnesses A and B at the time of their testimony.  Extradition Request, CR 137-1, pg. 38-41 ("I present to the court a certified copy from the Rawah District Commissioner.").  That Witnesses A and B brought the local police report to the investigating judge corroborates their initial participation in the investigation as voluntary and dedicated to providing the court with the information available to them.

### 5.    **INSS Intelligence Report**

The Republic of Iraq included in the extradition request an intelligence report generated by the INSS providing background on Omar Ameen and other members of the Ameen family.  Extradition Request, CR 137-1, pg. 71.  The report indicates it was prepared based on an inspection of the agency's database.  *Id.*  The report states Ameen's Al Qaeda background, the ties of his brothers to Al Qaeda, and his involvement in other attacks.  *Id*.

The Republic of Iraq repeated this corroborating information in the supplement to its request, reiterating that "Omar Abdulsattar Ameen is one of the many suspects who are known to have joined terrorist groups operating in Iraq since their establishment . . . ."  Supplement, CR 194-1 ¶ 1.

This Court has previously stated that the INSS report was argument rather than evidence.  CR 171 at 14.  It is absolutely correct that the intelligence report is not by itself probative of Ameen's participation in the murder.  However, the intelligence report does corroborate the allegation of the

witnesses that Ameen is a known member of a terrorist group in Rawah.  *See, e.g.*, *Franklin v. Fox*, 312
F.3d 423, 438 (9th Cir. 2002) (corroboration of background information that a suspect was a violent
pedophile who had abused others supports witness testimony about a child murder).

### F.       Probable Cause That Ameen Willfully Murdered Ihsan With Premedition

The evidence in the extradition request further establishes the mens rea of the crime: probable
cause that Ameen willfully murdered Ihsan with premedition.  Extradition Request, CR 137-1 pg. 25
(Article 406(1)(a) of the Iraqi Penal Code).  The terrorist nature of the attack by a convoy of ISIS
fighters, in retaliation for the victim's anti-terrorism work as a police officer, is evidence of deliberate
and premeditated intent to kill.  Extradition Request, CR 137-1, pg. 23.  *In re Extradition of
Handanovic*, 829 F. Supp. 2d 979, 997 (D. Or. 2011) (probable cause that fugitive committed
premeditated murder shown where attack on Croatian village was "well-coordinated and intended to kill
persons living there," where "witnesses have provided a motive for [the killings], thereby providing
evidence of premedition," and where "[the fugitive] personally shot three civilians . . . for apparently
no reason and afterward shot in the head any victim who still showed signs of life").  The social media
post about Ihsan's murder made clear that Ihsan was one of the "rotten heads" whom terrorists had
targeted to be "eliminated at the hands of the Mujahidin."  CR 137-1 at 101.

Further evidence of premedition is found in the fact that Ameen verbally articulated his motive
to murder Ihsan immediately before shooting him in the chest.  Extradition Request, CR 137-1, pg. 43
(Ameen was heard to say that Ihsan was an "agent for the Americans" and "an apostate").  *Handanovic*,
829 F. Supp. 2d at 997 (finding premedition and malice aforethought in in pre-attack statements about
"leav[ing] not even a single 'hen' alive" and that "not a single ear must stay there"); *Zelenovic v.
O'Malley*, 2010 WL 3548007 *6 (N.D. Ill. Sept. 7, 2010) (fugitive's statement "I will kill you and then
the two of them" made prior to murder is evidence of premedition).

### III.      THE DEFENSE HAS NOT PRESENTED REASONABLY CLEAR-CUT EVIDENCE THAT WOULD OBLITERATE THIS PROBABLE CAUSE

At the continued extradition hearing, it is anticipated that the defense will argue that it has
amassed a collection of evidence that, when considered together, obliterates probable cause.

The standard for obliterating probable cause is very high, for good reason.  When an extradition

court finds that probable cause is obliterated, there will be no trial.  There will be no adversarial testing

of the facts as alleged by either side, with the witnesses and other evidence present and accessible.  The

requesting country will have no opportunity to present all of its evidence.

"In admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity

to present reasonably clear cut proof which would be of limited scope and have some reasonable chance

of negating a showing of probable cause."  *In the Matter of the Extradition of Sindona*, 450 F.Supp. 672,

685 (S.D.N.Y. 1978), *aff'd*, 619 F.2d 167 (2d Cir. 1980); *see also Barapind*, 400 F.3d at 749-50.  The

allegations must do more than simply "call into question the credibility of the [requesting] government's

offer of proof."  *Santos*, 830 F.3d at 993.

If a mini-trial is required to present and understand the "obliterating" evidence, it is not

reasonably clear-cut:

> The evidentiary dispute over the motives, bias, and totality of
> circumstances surrounding original statements of Makhan Ram and
> Kulwant Singh, alleged recantations, actual recantations, and coercive
> conditions under which the recantations were taken, cannot be resolved in
> this extradition proceeding. Although substantial doubt is created by the
> contradictory affidavits of Makhan Ram and Kulwant Singh, the
> competence of India's probable cause evidence requires a trial to resolve
> the existing material credibility disputes. Probable cause is not defeated
> under these circumstances.

*Singh*, 2005 WL 3030819 *52 ("A material conflict is presented in which motive, bias, and credibility of

the witnesses must be decided, such disputed facts can only be resolved by a trial. There is probable

cause to believe Barapind should stand trial for the charges"); *see also Santos*, 830 F.3d at 1007 ("The

extradition court does not have to determine which party's evidence represents the truth where the facts

are contested."); *Quinn*, 783 F.2d at 817 n.41 (citing the "well-established rule that extradition

proceedings are not to be converted into a dress rehearsal for trial").

None of the voluminous evidence the defense has assembled thus far is reasonably clear-cut.  It

is three binders worth of inferences and assumptions that the Court must draw, which necessarily require

the Court to assess the credibility of the three witnesses in the extradition request.  If the defense has

identified a new piece of evidence that itself obliterates probable cause, the defense has yet to present it.

Thus far, the defense evidence has centered on three categories, none of which constitutes

evidence obliterating probable cause:  alibi, forgery, and credibility.

**A.     Alibi**

"[A]n individual contesting extradition may not . . . present alibi evidence." *Santos*, 830 F.3d at

993.  Even if Ameen could properly present such evidence, to date, he has advanced only an incomplete

alibi defense.  No witness has established a concrete alibi for Ameen on the specific date of the murder,

nor offered any corroborating information to prove the claimed alibi.  An incomplete alibi defense is the

type of defense best judged at a fulsome judicial proceeding—at a trial in the requesting country—where

witness testimony can be tested against that purported alibi.  *Id.* at 991.

For example, some of the defense witnesses say that they saw Ameen "almost daily" in June

2014.  This is precisely the type of claim that cannot be probed in the setting of an extradition hearing,

where the witness is not present to testify.  Just as importantly, the claim creates a conflict of credibility.

The dichotomy of the testimony in the extradition request and the claims in the defense witness

statements cannot be resolved without further questions.  For this reason, the Ninth Circuit correctly

classifies these types of claims as contradictory evidence—inadmissible at an extradition hearing.

*Santos*, 830 F.3d at 991.

The Court has admitted evidence from Ameen's Turkish immigration attorney stating that there

is sign-in activity near, but not on, the date of the murder.  Defense exhibit 11.  This sign-in evidence is

not reasonably clear-cut, nor is it obliterating.  The defense has not presented any sign-in that occurred

on the same date as the murder, June 22, 2014.  Nor can the defense prove—at the obliterating

evidentiary level—that it was Ameen and only Ameen who ever signed the log, and not some other

person signing Ameen's name for him, or that he never backdated his own signature.

The defense's suggestion that the continued extradition hearing would be "all about credibility"

would seem to indicate that the defense concedes that the sign-in logs do not themselves constitute clear-

cut proof that by themselves obliterate probable cause.  *See also In re Extradition of Luna-Ruiz*, 2014

WL 1089134 *16 (C.D. Cal. Mar. 19, 2014) (finding probable cause not negated where fugitive

attempted to establish an alibi consisting of attending school for some period of time in the United States

and obtaining a California driver's license); *In re Extradition of Chavez*, 408 F. Supp. 2d 908, 915 (N.D.

Cal. 2005) ("Accordingly, and despite the temptation, this court will not weigh against the government's

evidence the alibi evidence that the accused has been living in California continuously since 1990, that

33

he has a California drivers license first issued prior to 1997, and that his payroll records as well as a declaration of his then-supervisor say he was at work in California on the day of the murder in Apatzingan in 1997."); *United States v. Andrade*, 2006 WL 3628096 *4 (D. Or. Dec. 11, 2006) ("The evidence of alibi in this case is not clear cut and does not completely negate or obliterate the existence of probable cause. It is, in the first instance, dependent on the finding of time of death contained in the autopsy, a matter that could be rebutted or explained by the government at trial.").

## B. **Forgery**

Next, Ameen advanced a theory that the witness statements of Witnesses A and B were forged. After the first extradition hearing concluded, the Court directed the parties to follow the procedure set forth in *Santos* and request additional information from the requesting country. This has now been done, and the supplemental submission of the Republic of Iraq establishes conclusively that the signatures of Witnesses A and B were not forged. Supplement, CR 194-1, ¶ 7.[6]

The Court deferred deciding the admissibility of the defense exhibits that are the recanted statements of Witnesses A and B. With the supplemental information from the Republic of Iraq, *Barapind*, along with the other cases cited above, dictates that the Court should now exclude those statements.

In *Barapind*, the Ninth Circuit held that a claim of forgery did not destroy probable cause. 400 F.3d at 749. A post-litigation affidavit by a crime victim claimed that he had never identified Barapind. *Id.* He claimed that he had signed a blank sheet of paper, implying that the Indian authorities had filled in the allegation after he signed. *Id.* The district court found that this claim constituted contradictory evidence, and the Ninth Circuit affirmed. *Id.* The conflicting evidence "could not be assessed without a trial." *Id.* The Ninth Circuit reaffirmed that "[b]ecause extradition courts do not weigh conflicting evidence in making their probable cause determinations," the district court properly found probable

---

[6] Ameen has also suggested that there might be a pattern of forgery in the documents in this case. To establish that pattern, the defense cites only to one document outside the extradition request—a detention document that appears to indicate that Ameen was detained in Iraq. As set forth in the proffered affidavit of FBI Special Agent J.P. Butsch, that document has nothing to do with these extradition proceedings, nor with any of the witnesses or individuals involved in the Iraqi investigation of the murder, nor is there any conclusive proof that it was in fact a forgery. There is no evidence demonstrating a pattern of forgery, as alleged, nor any forgery at all in the documents transmitted in the extradition request.

cause on the basis of the original statement, irrespective of the subsequent affidavit.  This would be the same as what is claimed in Defense Exhibit 64, that Witnesses A and B were tricked into signing a declaration containing Omar Ameen's name without their knowledge.  The Court should thus exclude the recanted statements on this basis.

Alternatively, as discussed above, the Court should not rely on the recanted statements because they were obtained under what appear to be coercive and procedurally improper circumstances.  Indeed, a tribal leader related to Ameen came to the home of Witness B, effectively looking over his shoulder as he told Ameen's Iraqi defense attorney that he was recanting his earlier statement.  Defense Exhibit 64.  The recantations contradict the evidence in the extradition request that the witnesses personally appeared before the investigating judge to sign and fingerprint their inculpatory statements.  For all of these combined reasons, the recanted statements, if admitted, should not be credited, and certainly do not rise to the level of obliterating probable cause.

### C.   Credibility

The Ninth Circuit has foreclosed the type of attack on credibility the defense has signaled it intends to launch at the continued extradition hearing.  In *Choe v. Torres*, the fugitive attempted to undermine the credibility of the key witness in a Korean bribery prosecution.  525 F.3d 733, 739-40 (9th Cir. 2008).  The witness's accusation of the fugitive in that case was supported by testimony from another witness and a bank statement.  *Id.*  In light of such corroboration, the witness's "lack of credibility is merely a weakness in Korea's case; it does not completely obliterate the evidence of probable cause."  *Id.*  The Ninth Circuit thus affirmed the magistrate judge's refusal to allow discovery on the witness's credibility because "evidence that merely controverts the existence of probable cause . . . wouldn't be admissible."  *Id.*

Person 5's alleged tribal grudge against the Ameen family "could be [a] fruitful topic[] for cross-examination at trial, but on the record before the Court, [his] statement[] [has] sufficient weight and indicia of reliability to constitute competent evidence supporting the existence of probable cause." *Luna-Ruiz*, 2014 WL 1089134 *16; *see also Noeller*, 922 F.3d at 807 ("These witnesses' potential biases and inconsistencies are surely relevant to the ultimate question of Burgos Noeller's guilt or innocence, but those issues must be addressed in the Mexican criminal justice system, not ours.").  Defense

35

1    evidence that would go to establishing potential bias is for the trial court in Iraq.

2           An allegation of purported inconsistencies in other statements about the murder given by

3    witnesses would also be inappropriate for resolution at the extradition hearing.  As explained by the

4    Central District, "the purported inconsistency between [the] statements may be due to a translation

5    error."  *Luna-Ruiz*, 2014 WL 1089134 *8.  There, as here, "[e]ven if genuine, th[e] inconsistenc[ies] . . .

6    concern collateral details and do not materially detract from the government's probable cause showing."

7    *Id.*  The extradition court in *Luna-Ruiz* emphasized the consistency in the central allegation relating to

8    an argument and the identification of the fugitive as the shooter—just as here there is consistency in the

9    witnesses' identification of Ameen as the shooter and the central allegation that it was an ISIS murder.

10   *See also Gamez v. Stafford*, 2012 WL 4471579 *2 (S.D. Cal. Sept. 25, 2012) (acknowledging that

11   inconsistencies of eyewitness accounts "may create issues in Mexico's pending prosecution of [the

12   fugitive]," but they did not obliterate the reliability of each witness, thus holding that the defense fell

13   short of obliterating probable cause).

14          Where a trial would be necessary to resolve the allegations of a lack of credibility, the

15   extradition court should decline the undertaking and limit its evaluation to the evidence contained in the

16   extradition request.  *Santos*, 830 F.3d at 1007 ("If the court cannot determine the credibility of the

17   allegations (or other evidence) once it has examined them, the inquiry ends."); *Singh*, 2005 WL 3030819

18   *55.

19                     **IV.      THE FBI SPECIAL AGENT AFFIDAVITS**

20          Together with this briefing, the United States is requesting that the Court consider its submission

21   of three affidavits from the FBI Special Agents whom the defense has indicated it seeks to call at the

22   continued extradition hearing.  The defense indicated it sought to hear from these Special Agents

23   because they might have knowledge about the authenticity of the signatures on various documents,

24   including the witness statements in the extradition request.

25          In addition to addressing the signature question, the Special Agents have set forth their

26   unclassified knowledge of matters relating to their interactions with Person 5, Witness A and Witness B.

27   The United States has listed these three affidavits on its exhibit list, but does not request to admit the

28   affidavits unless the Court admits certain defense exhibits, in which case the affidavits may become

relevant as rebuttal evidence.  The United States requests to state its position on the admission of the affidavits at the time of the continued extradition hearing; if the Court admits certain defense exhibits, the United States would argue that the affidavits should be considered.

## V.  REMAINING PRONGS MET

In addition to having established probable cause in the extradition request and supplement, the remaining prongs required for certification for extradition are met.  The Court has authority over these proceedings.  18 U.S.C. § 3184; Local Rule 302(b)(8).  The Court has jurisdiction over Ameen because he was found within the judicial boundaries of the Eastern District of California.  18 U.S.C. § 3184.  The extradition treaty between the United States and the Republic of Iraq is in full force and effect.  18 U.S.C. § 3184.  And finally, the charged crime, murder, is covered by the treaty.  CR 137-1 pg. 6; CR 140 pg. 8-9.

## VI.  CONCLUSION

The extradition request and supplement thereto establish ample probable cause that the victim died as a result of a brutal premeditated ISIS murder, and that Ameen committed that murder.  The supplemental submission from Iraq strengthens the probable cause in the extradition request, making clear that Person 5 has identified Ameen as the murderer since the time of the murder in 2014.  Nothing the defense had submitted obliterates this probable cause, and the promise of a continued extradition hearing all about credibility would be more of the same, inadmissible, contradictory allegations.

For these reasons, the United States requests that the Court certify this case for extradition.

Dated:  October 29, 2019

McGREGOR W. SCOTT
United States Attorney


By:  */s/ Audrey B. Hemesath*
AUDREY B. HEMESATH
HEIKO P. COPPOLA
Assistant United States Attorneys

CHRISTOPHER J. SMITH
Associate Director
REBECCA HACISKI
Trial Attorney
Office of International Affairs