McGREGOR W. SCOTT
United States Attorney
AUDREY B. HEMESATH
HEIKO P. COPPOLA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

CHRISTOPHER J. SMITH
Associate Director
REBECCA A. HACISKI
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C. 20530
Telephone: (202) 514-0000

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF<br>THE EXTRADITION OF OMAR<br>ABDULSATTAR AMEEN TO THE<br>REPUBLIC OF IRAQ | CASE NO. 2:18-MJ-152 EFB<br><br>UNITED STATES' EXHIBITS AND REQUEST TO CONSIDER AFFIDAVITS IN LIEU OF LIVE TESTIMONY<br><br>Honorable Edmund F. Brennan<br><br>Hearing Date: December 4, 2019<br>Time: 9:00 a.m. |

The United States hereby files the attached sworn affidavits by FBI Special Agents Phillip Coonfield ("SA Coonfield"), Emerson Lopez-Fuentes ("SA Lopez-Fuentes"), and J.P. Butsch ("SA Butsch"), and requests that the Court accept these affidavits in lieu of requiring those three individuals to testify at the continued extradition hearing for fugitive Omar Ameen ("Ameen") scheduled to be held on December 4, 2019.

///

1

## I. INTRODUCTION

The United States respectfully provides the attached sworn affidavits in response to the Court's Memorandum and Order dated May 22, 2019, in which it permitted Ameen to call the three special agents to testify at the upcoming extradition hearing. CR 160 at 22.[1] The Court authorized testimony "on issues related to the possible forgery of documents in the extradition request" but "decline[d] to allow Ameen's counsel to question these agents on issues related solely to Person 5's credibility." *Id.* at 22. In so doing, the Court acknowledged that the agents may "have nothing meaningful to add on the issue of forged documents," but concluded that it "cannot make that determination at this stage, without knowing what the agents' testimony will be." *Id.* at 21-22.

The agents have now provided affidavits indicating what their testimony would be. As demonstrated in those affidavits, the agents do not have anything meaningful that would further Ameen's claim that documents in the extradition request may have been forged. To the contrary, they have information rebutting that claim. SA Butsch witnessed Person 5 execute the statement contained in the extradition request; and prior to that, SA Coonfield and SA Lopez-Fuentes interviewed Person 5 and heard his eyewitness account, which is generally consistent with the statement contained in the extradition request on the material facts of his identification of Ameen and the nature of the ISIS murder. In addition, SA Lopez-Fuentes interviewed Person 1, who provided a statement corroborating Ameen's presence in the ISIS convoy en route to the murder. Given these facts, as well as the fact that calling the agents to provide live testimony may create issues relating to their knowledge of classified information, the government requests that the Court now decline to require their live testimony at the extradition hearing, on three grounds: (1) there is no requirement of live testimony in extradition hearings; (2) relevance; and (3) live testimony may pose complications relating to classified information.[2]

---

[1] The Court also granted Ameen's request to subpoena the agents. CR 160 at 22 n.13.

[2] Furthermore, requiring SA Butsch to testify in person would pose the practical challenge of requiring him to travel from his current posting in Israel.

## II.     LIVE TESTIMONY IS UNUSUAL IN EXTRADITION HEARINGS

It is a "well-established rule that extradition proceedings are not to be converted into a dress rehearsal trial . . . ." *Quinn v. Robinson*, 783 F.2d 776, 817 n.41 (9th Cir. 1986) (citations and internal quotation marks omitted).  Extradition treaties do not require or even anticipate the testimony of live witnesses at the hearing because to do so "would defeat the whole object of the treaty." *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *see also Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986).  A contrary rule might compel the "demanding government to produce all its evidence . . . both directing and rebutting, in order to meet the defense thus gathered from every quarter." *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).  Hearsay evidence is admissible at extradition hearings and fully supports a court's findings leading to a certification under 18 U.S.C. § 3184.  *Collins*, 259 U.S at 317; *Artukovic*, 784 F.2d at 1356.  Nothing more is required, and typically nothing more is provided.  *See, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 & 1226-29 (S.D. Cal. 1997) (written statements of co-conspirators and other witnesses sufficient in extradition to Mexico); *In re Extradition of Martinelli Berrocal*, No. 17-22197-CIV, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) ("A certification of extradition is generally based entirely on the authenticated documentary evidence provided by the requesting government.").

## III.     THE TESTIMONY OF THE AGENTS WOULD NOT AID IN THE COURT'S CERTIFICATION DECISION

Live testimony is particularly unwarranted when it is of limited relevance to the issues before the Court.  *Cf., e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 462 (1913) (extradition court did not exceed its authority by excluding evidence relating to an insanity defense, which is an "objection which should be taken before or at the time of . . . trial," and not in an extradition proceeding); *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005) (affirming the denial of discovery about the use of the death penalty in Thailand in an extradition to that country because the issue "was outside the purview" of the extradition court).  The special agents' live testimony is unwarranted in this case for similar reasons.

3

Ameen sought the agents' testimony in support of his claim that "several of the statements in the Extradition Packet are forgeries."  CR 148 at 3.  In particular, Ameen sought testimony on:

- Person 5's signature: "the issues of the [allegedly] inconsistent signatures [of Person 5], whether the person those agents met in October 2017 was in fact Person 5, how they ascertained that person's identity, whether they have any additional signatures by Person 5, and what identification procedure, if any, was engaged in during that October 2017 interview," *id.* at 5;
- Dates of the photographs: "how photographs with a May 22, 2018 stamped date found their way into the Extradition Packet, and what connection those photographs have with [a] . . . report . . . about a multi-photograph identification procedure supposedly engaged in on October 23, 2017, with Person 5, that is not documented in the October 23, 2017 report," *id.*; and
- Detention document not a part of the extradition request:  the possible forgery of an Iraqi government document showing that Ameen was arrested in 2008, which may "show[] a pattern of forged documents in the Iraqi investigation of Mr. Ameen; . . . implicate Person 5 in a different forgery . . .; and [contain a signature that] may match one of the other [allegedly] forged documents," *id.* at 5-6.

On none of these three issues do the Special Agents have knowledge that would constitute explanatory evidence that would be admissible at the continued extradition hearing.  Rather, their knowledge corroborates the authenticity of the evidence presented in the extradition request and supplement.  Because the Special Agents do not have knowledge that would be admissible explanatory evidence, their testimony would be of limited relevance at the continued extradition hearing.

    **A.**    **The Signature and Identity of Person 5**

The knowledge of the Special Agents only rebuts any argument of an irregularity in the testimony of Person 5.  SA Butsch, in his capacity as Assistant Legal Attaché, and at the invitation of the investigating judge, was present when Person 5 testified at the Al Karkh court on April 15, 2018.  SA Butsch personally watched the photo identification procedure and saw Person 5 positively identify a photograph of Ameen as the person who shot the victim.  SA Butsch further observed Person 5 review the statement prepared by a judicial investigator based on his testimony before Judge Dhiya, and sign and affix his thumbprint to that document, which is contained in the extradition request.

4

Neither SA Coonfield nor SA Lopez-Fuentes had any involvement in the extradition request. Both left Iraq prior to when Iraq began preparing the request. Prior to that departure, as part of the FBI's separate criminal investigation, in September 2017, SA Coonfield received handwritten statements describing the murder, signed by Person 5, Witness A, and a third individual, referred to in the United States' search warrant materials as Person 1. SA Coonfield received these handwritten statements from a known member of the Iraq Tribal Mobilization Forces, "TMF Member 1." As set forth more fully in the affidavit, the Tribal Mobilization Forces is an organization of Sunni Arab Tribal Fighters, sanctioned by the Iraqi government, that is a frontline force in the fight against ISIS. TMF Member 1 has provided reliable information to the FBI and U.S. forces for several years covering a large range of counterterrorism issues in the region. TMF Member 1 showed SA Coonfield a statement signed and fingerprinted by Person 5, along with statements by Witness A and Person 1. TMF Member 1 indicated that the statements were going to be taken to an Iraqi court for certification. SA Coonfield did not witness the statements being signed, fingerprinted, or certified, nor was he provided with certified copies of those statements.

Approximately one month later, in October 2017, SA Coonfield and SA Lopez-Fuentes together conducted an in-person interview of Person 5, again as part of the FBI's criminal investigation. Person 5 presented identification to enter the interview space, but was not asked to sign or fingerprint anything. The substance of the interview with Person 5 is consistent with Person 5's testimony before the Iraqi investigating judge: he described the threatening phone call, the fall of Rawah, ISIS caravan, the location of the attack, the shooting, and his identification of Ameen based on firsthand knowledge. The agents conducted a photo identification with Person 5, in which Person 5 identified Ameen from a series of photos shown to him on a smart phone.

Neither SA Coonfield nor SA Lopez-Fuentes has any personal knowledge of Person 5's signature. The agents did not discuss Person 5's handwritten statement with him, nor did they show the statement to Person 5 during the in-person interview.

None of the Special Agents has ever met Witness A or Witness B, nor do they have any personal knowledge of their signatures. SA Butsch was invited to observe Witnesses A and B give testimony to the investigating judge, as with Person 5, but he was unable to arrange the requisite security detail in

time to be able to attend. The investigating judge later described Witness A and B's statements to SA Butsch, and what the investigating judge described was consistent with the statements contained in the extradition request.

### B. Dates of the Photographs in the Extradition Request

None of the Special Agents has any knowledge of why the dates on the photographs in the extradition request post-date the day of Person 5's testimony before the investigating judge.

Ameen has speculated that the FBI provided the photographs in the photo array conducted by the Iraqi investigating judge: that is not true. SA Butsch personally watched Person 5 complete the photo identification process in the presence of the investigating judge, as described in the extradition request.

SA Coonfield and Lopez-Fuentes, using the smart phone of TMF Member 1, conducted their own photo identification procedure with Person 5 at the conclusion of their in-person interview. The photograph in this photo identification procedure was different from the photo of Ameen used by the Iraqi investigating judge in his photo array.

Finally, to the best knowledge of SA Butsch, TMF Member 1 had no role whatsoever in the Iraqi investigation of the murder.

### C. Detention Document (Not Part of Extradition Request)

Finally, the defense sought information related to a detention document that was part of the documents in the FBI's criminal investigation that one Iraqi official said was a forgery and another thought looked authentic. This document is unrelated to the murder and is not a part of the extradition request

SA Butsch communicated with two different Iraqi members of the military regarding this document, and was unable to verify the authenticity of the document. SA Butsch is unaware of any connection between the two members of the Iraqi military, the purportedly forged document, the request for Ameen's extradition, or Person 5, Witness A or Witness B. According to SA Butsch, the signature on the purportedly forged document is illegible.

In sum, the only piece of information that the Special Agents have that is directly relevant to the issue of authenticity is SA Butsch's personal observation of the proceedings before the investigating judge. Because the investigating judge makes those same personal observations in the extradition

request and supplement, SA Butsch's observations are cumulative, and it is not necessary to elicit additional testimony that would only corroborate what is already part of the record before this Court pursuant to 18 U.S.C. § 3190.

## IV. AFFIDAVITS AVOID COMPLICATIONS INVOLVING CLASSIFIED INFORMATION

The United States also respectfully requests that the Court consider accepting the affidavits in lieu of live testimony to avoid any possible problems posed by their knowledge of classified information. According to the agents, further inquiry into their interactions with Iraqi intelligence officers, other than what is set forth in their affidavits, as well as their knowledge of the ongoing criminal investigation of Ameen, may implicate classified information.

The Supreme Court has "long recognized" the executive branch's prerogative to protect classified information that implicates national security concerns. *C. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[The executive branch] has available intelligence services whose reports *are not and ought not* to be published to the world.") (emphasis added). This privilege was codified in 1980 with the enactment of the Classified Information Procedures Act ("CIPA"). Title 18, U.S.C. App III, §§ 1-16 (2000). Congress enacted CIPA "to prevent the problem of 'graymail,' where defendants pressed for the release of classified information to force the government to drop the prosecution." *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988). CIPA, which applies to U.S. criminal proceedings, "creates a pretrial procedure for ruling upon the admissibility of classified information." *Id.* This procedure utilizes *in camera* review, *ex parte* proceedings, and substitution of classified information with summaries so as to avoid the unnecessary disclosure of such information. *See United States v. Sedaghaty*, 728 F.3d 885, 904-05 (9th Cir. 2013); *United States v. Hayat*, No. 2:05-CR-0240 GEB DB, 2017 WL 4517931, at *6 (E.D. Cal. Oct. 10, 2017), *rev'd on reconsideration on other grounds*, No. 2:05-CR-240-GEB, 2018 WL 347792 (E.D. Cal. Jan. 9, 2018). Such means are intended to avoid the potentially grave consequences that may result from the disclosure of even seemingly insignificant classified information. *See, e.g.*, al-Marri v. Pucciarelli, 534 F.3d 213, 309 (4th Cir. 2008), *vacated and remanded sub nom.* al-Marri v. Spagone, 555 U.S. 1220, 129 (2009) (noting that "during the trial of Ramzi Yousef, 'an apparently innocuous bit of testimony in a public courtroom about delivery of a cell phone battery was enough to tip off terrorists still at large that one of their

communication links had been compromised'"). CIPA does not by its terms apply to extradition proceedings, creating an additional layer of potential complication if any area of questioning extends to information that is classified.

In the event the Court denies this request to accept affidavits in lieu of testimony, the United States may request accommodations such as the ability to request pauses in the proceedings for consultation, the attendance of counsel from the FBI's National Security and Cyber Law Division, and the possibility that the Special Agents may decline to answer particular questions in the open setting of the continued extradition hearing.

### V.  CONCLUSION

For the foregoing reasons, the government requests that the Court accept the attached affidavits in lieu of live testimony. In the event that the Court or the defense seeks further information from the Special Agents that is relevant to and admissible in these extradition proceedings, the government is not opposed to providing supplemental affidavits responsive to any such questions.

Dated: October 29, 2019

McGREGOR W. SCOTT
United States Attorney

By: */s/ Audrey B. Hemesath & Rebecca A. Haciski*
AUDREY B. HEMESATH
HEIKO P. COPPOLA

CHRISTOPHER J. SMITH
Associate Director
REBECCA A. HACISKI
Trial Attorney
Office of International Affairs