AFFIDAVIT

I, J.P. Butsch, do swear under penalty of perjury:

### Background

1. I am an FBI Special Agent, and have been ordered by the Court to provide testimony in this case. I hereby submit this affidavit, and request that the Court accept this submission in lieu of testimony.
2. I graduated from the Coast Guard Academy in 2000. I was a Coast Guard Officer for approximately five years before joining the FBI in 2005. Beginning in 2006, I was assigned to the Washington Field Office in both the counterterrorism and counterintelligence units and have received training in both fields.
3. In 2008, I attended an FBI-sponsored Arabic language study program, and I have maintained a conversational level of fluency in Arabic.
4. In 2017, I became the Assistant Legal Attaché (ALAT) in Baghdad, Iraq. Legal Attachés and ALATs are assigned abroad as liaison representatives of the FBI and the Department of Justice. Legal Attachés and ALATs interface regularly with foreign agencies and governments toward the broader end of supporting the FBI mission abroad.
5. While the Legal Attaché office responsibilities abroad primarily involve liaison, the Legal Attaché office is required periodically to conduct active investigations, in concert with the host country and in coordination with the U.S. Department of State, U.S. Embassy, U.S. Department of Justice, FBI headquarters, and, when appropriate, CIA.
6. Legal Attachés and ALATs in Baghdad are expected to be personally acquainted with and make frequent official contacts with high and mid-level personnel in those foreign agencies which cooperatively handle matters of interest to the FBI. The level of liaison must be such that the Legal Attaché can make after-hours contacts when necessary to secure assistance in important cases. The effectiveness of Legal Attachés is measured to a large extent by the effectiveness of these liaison programs.
7. The office of the Legal Attaché in Baghdad may also assist with extradition requests and may work with the Department of State and the Department of Justice to help facilitate treaty requests, inbound or outbound, between the United States and Iraq. Such assistance may take a variety of different forms, and the level of involvement may differ depending on the nature and complexity of the matter, and the applicable requirements of the treaty and domestic law.
8. As the ALAT in Baghdad, I undertook all of these responsibilities and routinely met with members of the Iraqi intelligence agencies and the Iraqi government.
9. I received an award from the FBI's International Operations Division as agent of the year in 2018. I also received an Outstanding Performance Award from the FBI Director for the year 2017.
10. As the ALAT, I received training specialized to the region of my assignment. I received training in Islamic culture, in addition to Arabic language training. I have also received in-service training relating to interrogation and interview techniques. I have completed the FBI's National Crisis Negotiation Course.

11. When I became the ALAT in Iraq, the criminal investigation of Omar Abdulsattar Ameen (Ameen) was already underway in the United States and Iraq. I became aware of the investigation in my capacity as ALAT, and I was informed that it was a high priority FBI investigation in the United States with connections to Iraq.
12. I was not a case agent assigned to the Ameen case, but I interacted regularly with the Ameen FBI case agents and was asked to undertake specific taskings in furtherance of the criminal investigation. I met with various Iraqi intelligence officers on the subject of Ameen and the Ameen family, and had numerous conversations on the same subject by phone.[1]

### Alleged Forgery of an Iraqi Ministry of Defense Document

13. One of the tasks I was given in furtherance of the criminal investigation related to the receipt of a statement that was transmitted to me on or about June 25, 2018. The FBI previously was provided with two documents indicating that Ameen had been detained by the Iraqi Infantry Brigade 28, Band 7 in or around June 2008. Any previous detention of Ameen was of interest in the FBI's criminal investigation of Ameen because Ameen had denied having ever been detained on his U.S. immigration documents. The first document is dated June 12, 2008, and stated that a named Lieutenant within the Infantry Brigade 28, Band 7 had received Ameen in his custody from the Special Task Force Unit assigned to Rawa, Iraq. The Lieutenant named in the document and a Captain within this Brigade both signed this document and each of their names were clearly spelled out in the document. The second document is a letterhead memorandum (LHM) dated June 19, 2008 from the Republic of Iraq Ministry of Defense (MOD), Al-Anbar Operations Headquarters, Infantry Brigade 28, Band 7 addressed to the Rawa Police Headquarters, Information Office. The LHM documents that Brigade 28 requested information from the Rawa Police regarding Ameen, who was being held in Brigade 28's custody while the investigation was taking place. This document was signed by the Brigadier General, Commander of Infantry Division 28, Band 7 on 06/19/2008. The name of the Brigadier General is not listed and the signature is illegible.
14. I interviewed a Brigadier General associated with Iraqi Infantry Brigade 28, and after examining the two documents, he gave background on his awareness of Ameen and the Ameen family connections to terrorism, to include their support and membership in Al Qaeda. The Brigadier General noted no irregularities in the documents, but clarified that he was no longer with that brigade as of the date indicated on the documents. The Brigadier General made a phone call to determine the status of the two individuals listed on the first document and relayed to me that the named Captain had been killed by ISIS in 2014. The Brigadier General noted to me that the original copies of these documents would have been located in the headquarters of the 2nd Battalion of the 28th Brigade, which had been burned down by ISIS in approximately 2014. The Brigadier General provided me with follow-up information for individuals that might have further knowledge of the detention documents. I was responsible for finding and interviewing these individuals to further verify whether Ameen had indeed been detained.

---

[1] I disclose this information to provide an understanding of my background and role, first in the Ameen FBI criminal investigation, and later in the Iraqi government's extradition request. Many of my interactions with, for example, Iraqi intelligence officers, are not a subject I can discuss in detail in an open setting due to the information being classified. For this reason, I request that the Court consider accepting this affidavit in lieu of testimony.

15. I was able to locate and contact via telephone Major General Ra'id Tawfiq Salman Manhal, who confirmed that on June 19, 2008, he was serving in the Iraq MOD as the General in charge of Division 7 of Infantry Brigade 28. Major General Tawfiq confirmed that he was familiar with Ameen and then declined to speak with me without first going through the appropriate military authority. Approximately three weeks later, Major General Tawfiq provided to me via his Iraqi MOD chain of command a written communication claiming that the second detention document issued by the MOD to the Rawa Police Headquarters is a forgery. He denied that the signature on the document was his, stated that his title on the document was incorrect, and questioned the authenticity of the stamps on the document. I was unable to question Major General Tawfiq directly about this written communication. I passed this communication to the Ameen case agents. I never spoke with Major General Tawfiq after his initial declination to speak with me over the telephone.

16. These detention documents were relevant to the FBI's criminal investigation of Ameen for lying on his U.S. immigration documents. I did not discuss this detention document with any representative of the Republic of Iraq as related to the extradition request. To the best of my knowledge, there is no connection between General Tawfiq and the extradition request, and he was not part of any conversations related to extradition. Furthermore, I am not aware of any overlap between the detention document, Major General Tawfiq, Person 5, or Witnesses A and B. The individual referred to elsewhere as TMF Member 1 had no involvement with these detention documents.

### Development of the Extradition Request for Ameen

17. In my role as ALAT, I learned that Ameen and members of his family were known to Iraq investigating agencies, including the Iraq National Security Services (INSS), and that historical warrants for Ameen's arrest on terrorism and murder charges had been issued in 2010, 2011 and 2017, all certified by the Republic of Iraq as being true and valid. I was also notified of historical Iraq arrest warrants for several of Ameen's brothers, to include Qutaiba Abdulsattar Ameen, Huthayfa Abdulsattar Ameen, Ayman Abdulsattar Ameen, Bilal Abdulsattar Ameen, and Suhaib Abdulsattar Ameen for the crimes of terrorism and murder in 2010 and 2011. These warrants were also certified by the Republic of Iraq as being true and valid.

18. I understood that the INSS remained interested in investigating any possible crimes attributable to Ameen. Accordingly, I, along with another FBI Special Agent, passed an investigative lead during a liaison meeting in early April, 2019. We explained that through the course of the FBI's investigation into the activities of Ameen, the FBI had interviewed two eye witnesses who stated that Ameen was directly involved in the murder of Ihsan Abdulhafith Jasim (Ihsan). We provided the names of the witnesses as well as a general summary of the details they had provided in their statements.

19. The INSS explained that they could accept our information as an investigative lead, however prior to initiating any warrant or seeking extradition related to the murder they would need to conduct their own, independent investigation. They indicated that they were going to independently interview the witnesses, conduct on-scene investigations, and seek corroborating documentation. FBI Agents vocalized their agreement with and encouraged independent investigation on the part of the Iraqi government.

20. Following the Iraqi investigation, I provided assistance to the Republic of Iraq in the facilitation of its extradition request for Ameen, as the government of Iraq lacked expertise in United States extradition law and had no experience with fulfilling the requirements of the extradition treaty in place with the United States. In the months preceding the transmittal of the extradition request relating to Ameen, I frequently interfaced with members of the Iraqi government to communicate the requirements of the extradition treaty, to answer inquiries, and share resources as part of the broader liaison mission of the office of the Legal Attaché. While the State Department bears primary responsibility for the transmission and execution of extradition requests, the law enforcement relationships that are unique to the office of the Legal Attaché are regularly relied upon in partnership with the U.S. Embassy.

### Observations Regarding the Extradition Process in Iraq

21. As related to the questions of authenticity of documents that I understand the Court has raised, I have knowledge about the circumstances in which the individual referred to in court papers as Person 5 signed and printed the document that was transmitted as a witness statement in the Extradition Request.
22. In or about the Spring of 2018, I became aware that an investigating judge in the Al-Karkh Inquiry Court Specialized in Terrorism Cases, Judge Dhiya Ja'far, would be interviewing Person 5 in conjunction with his investigation of the murder of Ihsan. I was invited to attend the testimony, accompanied by another FBI Special Agent and an FBI linguist. We accepted the invitation, and attended the court session on April 15, 2018.
23. The court session was held at the Al Karkh Special Inquiry Court, which is a building located outside the green zone in Baghdad, and therefore we were accompanied by a Protective Security Detail (PSD) from the U.S. Embassy, as required by Embassy policy. The security detail did not enter the room where the testimony took place. We were not armed.
24. The testimony took place in Judge Dhiya Ja'far's chambers, or office. The room was small, and the only people present were Judge Dhiya, his judicial investigator, the witness, and the three observers from the FBI, including myself.
25. Prior to the witness entering the room, the Judge spoke to us, the observers, directly and stated that this was his inquiry and we were welcome to watch, but that we should not speak or involve ourselves in the process. We heeded this admonishment.
26. Person 5 was then brought into the room. He was youthful in his appearance, dressed in a T-shirt, sweatpants, and sandals.
27. I observed Judge Dhiya administer the legal oath and Person 5 affirm that oath. Because I have a conversational level of fluency in Arabic, I understood the gist of the proceedings, though I did not fully understand every detail due to the intricacies of the Iraqi dialect.
28. As Person 5 began to give his account of the murder, the judicial investigator took notes on a laptop. It is my understanding that the judicial investigator was not transcribing what was said, but rather beginning a draft of what would become the written statement that Person 5 would sign. It was an interactive process between Judge Dhiya who asked clarifying questions of the witness and then consulted with the judicial investigator. At the end of the interview, the judicial investigator generated a written document.

29. I recall Person 5 becoming very emotional and choked up as he recounted the murder of Ihsan and described Ameen as the person who walked up to Ihsan as he was lying on the ground and shot him in order to "finish him off."
30. I was familiar with Person 5's previous interview with the FBI, and I recall that Person 5's testimony before Judge Dhiya aligned with what Person 5 had previously told the FBI, at least with regard to the broad strokes of the ISIS caravan, the identification of Ameen, and the shooting death of Ihsan. I also spoke with the FBI linguist after the court session had concluded, and his understanding of the content of Person 5's testimony was consistent with my understanding of Person 5's previous statement to the FBI.
31. The duration of the testimony was approximately 45 minutes.
32. I observed Judge Dhiya conduct a photo identification procedure, in which Person 5 was presented with several photos of males unknown to me, plus a photo of Ameen, who was known to me. I was seated close enough that I was able to observe Person 5 positively identify the photo of Ameen.
33. There was then a break in proceedings as a printed copy of the summary of the testimony was produced for Person 5's review. I observed Person 5 review, sign, and affix his thumbprint to the document.
34. At the conclusion of this process, Judge Dhiya stated that the statement of Person 5 was sufficient evidence to continue his investigation of Ameen.
35. I did not speak to and have never spoken to Person 5. At the conclusion of the court proceedings, we were escorted back to the green zone by the security detail.
36. At a slightly later date, we were informed that the individuals referred to in court papers as Witnesses A and B were going to be traveling to the Al Karkh court to provide corroborating witness testimony. As before, Judge Dhiya invited the FBI to attend; however, we were unable to arrange the required protective security detail in time. Judge Dhiya went ahead with his investigation and took the testimony without waiting for our attendance. Shortly thereafter, Judge Dhiya informed us of details of Witnesses A and B's corroborating witness statements, which are consistent with what is contained in the Extradition Request; however, I have no direct knowledge of the statements made by Witnesses A and B. I have also never met Witnesses A and B.
37. I was informed that Witnesses A and B were interviewed together, which is consistent with my understanding of the procedure for female witnesses in the court system in Iraq. I do not have knowledge of the signatures or prints of Witnesses A and B, but having them review and sign their statements after consultation with the investigating judge would be consistent with the practice that I personally observed in the case of Person 5.
38. I was also informed that Witnesses A and B were afraid for their lives. Witnesses A and B told Iraq authorities they had been threatened months ago by unnamed individuals if they provided statements regarding Ihsan's death. That being said, the Iraq authorities worked closely with the head of the family tribe to arrange for obtaining their statements.
39. It is my understanding that Judge Dhiya made the decision to issue a warrant for the arrest of Ameen for the crime of murder after conducting additional investigation, including the corroborating witness testimonies of Witnesses A and B, a site visit, and obtaining photos.
40. Once the INSS communicated its intention to issue a warrant for Ameen's involvement in the murder of Ihsan and pursue Ameen's extradition from the United States to Iraq, I worked

regularly with members of the High Judicial Council and the Iraqi intelligence services to facilitate that process. It was communicated to me several times that completing a successful extradition with the United States government was of the utmost significance to the Iraq Higher Judicial Council as it would signify that their system of justice was respectable and trustworthy and it would demonstrate they are capable of engaging in cooperative, diplomatic exchanges with the west.

41. In May 2018, I was told by Iraq authorities that they had spoken to another corroborating witness. I have been told that this person is referred to in court pleadings as Person 1. The Iraq authorities notified me that Person 1 was too fearful of retribution by terrorists to provide a formal statement to the Iraq Government, and therefore, Person 1's knowledge of Ameen's involvement in Ihsan's murder is not included in the Extradition Request.

42. In December 2018, I left Iraq and returned to the FBI Washington Field Office. I was selected as the FBI ALAT in Jerusalem, Israel, where I am currently located.

I certify that the foregoing is true and accurate to the best of my recollection.

*J.P. Butsch*   10/25/2019

J.P. Butsch