1  HEATHER E. WILLIAMS, #122664
   Federal Defender
2  BENJAMIN D. GALLOWAY, #214897
   Chief Assistant Federal Defender
3  RACHELLE BARBOUR, #185395
   Assistant Federal Defender
4  OFFICE OF THE FEDERAL DEFENDER
   801 I Street, 3rd Floor
5  Sacramento, CA  95814
   Tel: 916-498-5700/Fax: 916-498-5710
6
7  Attorneys for
   OMAR AMEEN
8
               IN THE UNITED STATES DISTRICT COURT
9
            FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11 IN THE MATTER OF THE              ) Case No.  2:18-mj-152 EFB
   EXTRADITION OF OMAR               )
12 ABDULSATTAR AMEEN TO THE          ) DEFENSE SUPPLEMENTAL BRIEFING RE:
   REPUBLIC OF IRAQ,                 ) EXTRADITION HEARING
13                                   )
                                     )
14
15                                    Date: December 4, 2019
                                      Time: 10:00 a.m.
16                                    Judge: Hon. Edmund F. Brennan
17
18
19
20
21
22
23
24
25
26
27
28
                                   i

I.      INTRODUCTION ..................................................................................... 1

II.     MR. AMEEN'S EXTENSIVELY DOCUMENTED PRESENCE IN TURKEY DURING THE PERIOD OF THE OFFENSE COMPLETELY OBLITERATES PROBABLE CAUSE..... 2

III.    EVIDENCE THAT OBLITERATES PERSON 5'S RELIABILITY AS A WITNESS SHOULD BE ADMITTED AND CONSIDERED IN REJECTING CERTIFICATION............. 9

   A.   THE COURT HAS THE ROLE OF EVALUATING WHETHER THE STATEMENT OF PERSON 5 IS RELIABLE, AUTHENTIC, AND COMPETENT TO SUPPORT PROBABLE CAUSE ............................... 10

   B.   PERSON 5'S CLAIM THAT OMAR AMEEN KILLED THE VICTIM STANDS ALONE.................. 12

   C.   PERSON 5'S CLAIM THAT OMAR AMEEN KILLED THE VICTIM IS UNCORROBORATED BY ANYTHING ELSE IN THE EXTRADITION PACKET ......................................................... 12

   D.   THE EXTRADITION PACKET ITSELF UNDERMINES PERSON 5'S RELIABILITY..................... 19

   E.   PERSON 5'S OTHER STATEMENTS – TO THE FBI AND TO THE DEFENSE – UNDERMINE PROBABLE CAUSE .............................................................................................. 23

        1.   The Statement to the FBI Undermines Person 5's Later Statement to the Iraqi Court 23

        2.   Person 5's Conversation with the Defense Also Undermines Person 5's Reliability... 25

   F.   IN ADDITION TO THE INDICIA OF UNRELIABILITY PROVIDED BY THE EXTRADITION PACKET AND PERSON 5'S OWN STATEMENTS, HIS CLAIMS CONFLICT WITH OTHER MORE RELIABLE STATEMENTS ..................................................................................................... 28

   G.   PERSON 5 HAS SHOWN HIMSELF TO BE AN UNRELIABLE NARRATOR ............................... 29

        1.   Person 5 Told the Defense that He Has Suffered Serious Psychological Problems from the Time of the Killing through Present Time...................................................... 29

        2.   Family Statements Support the Unreliability of Person 5 ........................................... 31

        3.   Person 5 Wants Money in Connection with this Case .................................................. 33

        4.   Person 5 Is Scared and Has Received Housing and Protection in Return for His Statement............................................................................................................... 34

        5.   Person 5's Father is in Prison for 20-Years for Supporting ISIS, Giving Him a Strong Motive to Align Himself with the Iraqi Authorities for His Own Protection and to Try to Secure His Father's Release ................................................................................... 35

   H.   THE INVOLVEMENT OF PERSON 4 WITH PERSON 5'S STORY FURTHER UNDERMINES THE RELIABILITY OF HIS STATEMENT ............................................................................... 36

*1.   The Involvement of Person 4 in Setting Up the Case Against Omar Ameen is Undeniably Concerning Due to His Credibility Issues, His Provision of Benefits to Person 5, and His Receipt of Benefits from the American Government* ........................................... 36

*2.   Person 4 Operated to Put Together Proof against Omar Ameen that Would Bring Him Back to Iraq* ................................................................................................. 41

*3.   Person 4 Received Benefits from US Government for his Statements against Omar Ameen; He then Channeled the Financial and Relocation Benefits to Person 5* ................. 44

*4.   Person 4 Has Credibility Issues Noted in the Search Warrant Affidavit* ..................... 45

*5.   Person 5 Has Been Completely Dependent on Person 4 for Several Years* ................. 46

*6.   Person 4's Family Has a Long-Standing Grudge against the Ameen Family* .............. 47

IV.  RECENT CASES CONFIRM THAT THIS COURT SHOULD CONSIDER MR. AMEEN'S REFUGEE STATUS AND AT THE LIKELIHOOD OF PERSECUTION AND TORTURE UPON RETURN IN CONNECTION WITH THE CERTIFICATION DECISION 48

A.   IT IS MORE LIKELY THAN NOT THAT MR. AMEEN WILL SUFFER SEVERE PAIN OR SUFFERING TANTAMOUNT TO TORTURE IF RETURNED TO IRAQ ................................................. 49

B.   GOVERNMENT OFFICIALS AND GOVERNMENT-SANCTIONED PARAMILITARIES WILL INTENTIONALLY INFLICT THE AFOREMENTIONED PAIN AND SUFFERING ON MR. AMEEN FOR PURPOSES PROHIBITED BY THE CAT ....................................................................... 52

C.   THE INDIVIDUALS LIKELY TO INFLICT THE AFOREMENTIONED HARM ARE EITHER PUBLIC OFFICIALS OR INDIVIDUALS THE IRAQI GOVERNMENT ALLOWS TO OPERATE WITH IMPUNITY .. 53

D.   MR. AMEEN CANNOT REASONABLY RELOCATE WITHIN IRAQ TO AVOID HARM. .............. 55

V.    THE POLITICAL OFFENSE EXCEPTION BARS EXTRADITION ................................ 55

VI.  IF AN INDICTMENT IS PENDING AGAINST MR. AMEEN, THE DEFENSE REQUESTS THAT THIS EXTRADITION MATTER BE DEFERRED SO THAT HE MAY DEFEND HIMSELF IN THE CRIMINAL CASE ....................................................................... 55

VII. CONCLUSION ............................................................................................. 56

1

**Table of Authorities**

2

**<u>Federal Cases</u>**

3

*Aguasvivas v. Pompeo,*
4
   (D.RI. Sep. 18, 2019, No. 19-123-JJM-PAS) 2019 U.S. Dist. LEXIS 161172 ...................... 48

5
*Al-Saher v. INS,*
   268 F.3d 1143 (9th Cir. 2001) ....................................................................................... 50, 52

6
*Arizona v. Fulminante,*
7
   499 U.S. 279, n. 2 (1991) ............................................................................................... 11, 35

8
*Barajas-Romero v. Lynch,*
   846 F.3d 351 (9th Cir. 2017) ......................................................................................... 54, 55
9

*Bromfield v. Mukasey,*
10
   543 F.3d 1071 (9th Cir. 2008) ............................................................................................. 54

11
*Choe v. Torres,*
   525 F.3d 733 (9  Cir. 2008) .................................................................................................. 16
12

13
*Collins v. Loisel,*
   259 U.S. 309 (1922) ......................................................................................................... 1, 10

14
*Delgado-Ortiz v. Holder,*
15
   600 F.3d 1148 (9th Cir. 2010) ............................................................................................. 50

16
*Dennis v. Sec'y, Pa. Dep't of Corr.,*
   834 F.3d 263 (3d Cir. 2016) ............................................................................................... 3, 4

17
*Easton v. City of Boulder,*
18
   776 F.2d 1441 (10th Cir. 1985) ....................................................................................... 11, 13

19
*Gallegos v. Nebraska,*
   342 U.S. 55 (1951) ............................................................................................................... 11
20

21
*Gamez v. Stafford,*
   2012 U.S. Dist. LEXIS 138646 (S.D. Cal. Sep. 25, 2012) ................................................... 27

22
*Gill v Imundi,*
23
   747 F.Supp. 1028 (S.D.N.Y. 1990) ................................................................................... 2, 3

24
*Harris v. South Carolina,*
   338 U.S. 68 (1949) ......................................................................................................... 11, 36

25
*In re Extradition of Bonilla, No. 1:*
26
   13-MJ-62, 2014 WL 934903 (E.D. Tex. Mar. 4, 2014) ......................................................... 2

27
*In re Extradition of Cervantes Valles,*
   268 F. Supp. 2d 758 (S.D. Tex. 2003) ................................................................................ 27

28

iv

*In re Extradition of Chavez,*
    408 F. Supp. 2d 908 (N.D. Cal. 2005) ............................................... 27

*In re Extradition of Kraiselburd,*
    786 F.2d 1395 (9th Cir. 1986) ......................................................... 17

*In re Extradition of Luna-Ruiz,*
    2014 U.S. Dist. LEXIS 36928 (C.D. Cal March 19, 2014) .................... 11

*In re Extradition of Paberalius,*
    No. 10M275, 2011WL 2144065, (N.D. Ill. May 31, 2011) ................... 1, 2

*In re Extradition of Singh,*
    2005 U.S. Dist. LEXIS 42969 at *126 (E.D. Cal. 2005) ...................... 27

*In re Gonzalez,*
    52 F.Supp.2d 725 (W.D. La. 1999) ......................................... <u>passim</u>

*In re Lanzani,*
    2010 U.S. Dist. LEXIS 14044 (C.D. Cal. February 18, 2010) .......... 14, 16

*In re Lehming,*
    951 F.Supp. 505 (D.Del. 1996) ....................................................... 16

*In re Mazur,*
    2007 U.S. Dist. LEXIS 52551 (N.D. Ill. July 20, 2007) ...................... 57

*In re McMullen,*
    1988 U.S. Dist. LEXIS 7201 (S.D.N.Y. 1988) ................................... 17

*In re Ntakirutimana,*
    1998 U.S. Dist. LEXIS 221 173 (S.D. Tex. Aug. 5, 1998) .............. 11, 17

*In re Sandhu,*
    1997 U.S. Dist. LEXIS 7314 (S.D.N.Y. May 23, 1997.) ....................... 1

*In re Singh,*
    170 F. Supp. 2d 982 (E.D. Cal. 2001) .......................................... 2, 27

*In re Singh,*
    2005 U.S. Dist. LEXIS 42969 (E.D. Cal. Nov. 8, 2005) ...................... 11

*Kamalthas v. INS,*
    251 F.3d 1279 (9th Cir. 2001) .................................................... 50-51

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ...................................................................... 27

*Leyra v. Denno,*
    347 U.S. 556 (1954) ...................................................................... 36

*Lianhua Jiang v. Holder,*
    754 F.3d 733 (9th Cir. 2014) .......................................................... 50

*Limone v. Condon*,
    372 F.3d 39 (9  Cir. 2004) ........................................................................ 43

*Lynumn v. Illinois*,
    372 U.S. 528 (1963) ................................................................................ 36

*Madrigal v. Holder*,
    716 F.3d 499 (9th Cir. 2013) ................................................................... 54

*Manta v. Chertoff*,
    518 F.3d 1134 (9  Cir. 2008) ................................................................... 27

*Mooney v. Holohan*,
    294 U.S. 103 (1935) ................................................................... 43, 44, 47

*Napue v. Illinois*,
    360 U.S. 264 (1959) ................................................................................ 47

*Neil v. Biggers*,
    409 U.S. 188 (1972) ................................................................................ 27

*Nuru v. Gonzales*,
    404 F.3d 1207 (9th Cir. 2005) ........................................................ 50, 51, 52

*Ornelas-Chavez v. Gonzales*,
    458 F.3d 1052 (9th Cir. 2006) ................................................................. 54

*Payne v. Arkansas*,
    356 U.S. 560 (1958) ................................................................................ 35

*People v. Steger*,
    16 Cal.3d 539 (1976) ............................................................................... 36

*People v. Trout*,
    54 Cal.2d 576 (1960) ............................................................................... 36

*Quijada-Aguilar v. Lynch*,
    799 F.3d 1303 (9th Cir. 2015) ................................................................. 50

*Quinn v. Robinson*,
    783 F.2d 776 (9  Cir. 1986) ............................................................... 11, 13

*Reck v. Pate*,
    367 U.S. 433 (1961) ................................................................................ 11

*Republic of France v. Moghadam*,
    617 F. Supp. 777 (N.D. Cal. 1985) .......................................................... 17

*Reyes v. Lynch*,
    842 F.3d 1125 (9th Cir. 2016) ................................................................. 50

*Ridore v. Holder*,
    696 F.3d 907 (9th Cir. 2012) ............................................................. 52, 53

*Santos v. Thomas*,
   830 F.3d 987 (9th Cir. 2016) ...................................................... 6, 35

*United States v. Blount*,
   123 F.3d 831 (5th Cir. 1997) (en banc) ........................................ 11

*United States v. Bryce*,
   208 F.3d 346 (2d Cir. 1999) ............................................................ 3

*United States v. Froman*,
   355 F.3d 882 (5th Cir. 2004) ........................................................... 2

*United States v. Linson*,
   88 F. Supp. 2d 1123 (D. Guam 2000) ........................................... 17

*United States v. Porumb*,
   *W.D.La. Sep.*25, 2019, No. 6:18-MJ-00010) 2019 U.S. Dist. LEXIS 165908 ........... 48, 49

*United States v. Singleton*,
   125 F.3d 1097 (7th Cir. 1997) ......................................................... 3

*United States v. Tingle*,
   658 F.2d 1332 (9th Cir. 1981) ....................................................... 36

*Wakkary v. Holder*,
   588 F.3d 1049 (9th Cir. 2009) ....................................................... 51

*Zheng v. Ashcroft*,
   332 F.3d 1186 (9th Cir. 2003) ....................................................... 54

## **Federal Regulations**

Code of Federal Regulations,

Title 8

§ 95.1 ........................................................................................... 50

§1158 ........................................................................................... 49

§1208.16 ................................................................................... 51, 55

§1208.18 ......................................................................... 50, 52, 53, 54

§1231 ........................................................................................... 48

Title 22

§ 9.1 ........................................................................................ 54, 55

§ 95.1 ...................................................................................... 49, 50

Federal Rule of Criminal Procedure 6(3)(4) ...................................... 56

Title18 United States Code section 3771 ..................................... passim

Foreign Affairs Reform and Restructuring Act of 1998, Section 2242 ...................... 48

**Articles and Reports**

Liz Sly, "ISIS fighters control much of Iraq's western border after seizing three more towns," Washington Post (June 22, 2014) ................................................................. 4

Lori Hinnant and Paul Schemm, "What it's like trying to leave ISIS" AP (Feb. 3, 2015) ........... 5

Human Rights Watch, Iraq: Campaign of Mass Murders of Sunni Prisoners available at hrw.org/news/2014/07/11/Iraq-campaign-mass-murders-sunni-prisoners; ................................. 6

Al-Jazeera, "Iraqi security accused of executing prisoners" (July 11, 2014) available at www.aljazeera.com. ................................................................................ 6

Lead Inspector General, Report to United States Congress: Operation Inherent Resolve pp. 36-37 (Oct. 1, 2018-Dec. 31, 2018) ................................................................. 16

Philippe Atallah, "The Future of the Iraqi Popular Mobilization Forces," Foreign Policy Research Institute (Aug. 19, 2019) available at fpri.org............................................. 44

U.S. Dept. of State, 2018 Human Rights Report, Iraq at pp. 2, 4 available at www.state.gov/j/drl/rls/hrrpt/.................................................................... 44

United Nations High Commissioner for Refugees Guidance Note on Extradition and International Refugee Protection, April 2008, at 14. (available at https://www.refworld.org/pdfid/481ec7d92.pdf ) ....................................................... 49

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION

The Government argues that the Court should certify extradition despite powerful and uncontradicted evidence of Mr. Ameen's innocence and the clear unreliability of the evidence against him.  There remain several critical issues before the Court at the resumption of the Extradition Hearing on December 4, 2019.  The Court has recognized the centrality of deciding whether reliable, authentic, and competent evidence exists to support probable cause to certify Mr. Ameen's extradition. (Doc. 171, p. 9, line 9, p. 96, line 21, p. 101, line 16,  (May 28, 2019 Transcript);  Collins v. Loisel, 259 U.S. 309 (1922); Extradition Treaty, Article XI (Exh. 80, Collated Extradition Packet, p. 10.))

The Government points to the statement of a single witness, Person 5, in the Extradition Packet to support its request for certification of Omar Ameen for the Iraqi crime.  (Exh. 80, Collated EP, p. 69.)  In its Order at Document 160, the Court noted that, "Courts have held that '[t]he statement of a single witness may be sufficient to establish probable cause, *provided that there is some corroboration and no basis for doubting the witness's veracity*."  (Doc. 160, p. 19 [emphasis by Court] citing In re Sandhu, 1997 U.S. Dist. LEXIS 7314, at *30 (S.D.N.Y. May 23, 1997.))  The Court reiterated this issue in the May 28, 2019 hearing: "The corroboration becomes important.  If it reduces to a single witness to the shooting, then we're looking to other indicia of reliability as to that statement and whether it can constitute probable cause."  (Doc. 171, p. 21, lines 4-7.)

As the Court suspected, this case does "reduce to a single witness to the shooting" without corroboration and with considerable basis for doubting the witness's veracity, as discussed below.  This is especially of concern given the powerful and uncontroverted evidence that Omar Ameen was in Turkey at the time of the offense.

This Court has already recognized that although no individual piece or smaller subset of the defense's evidence might do so alone, the Court considers the "totality of the circumstances," or the entire body of evidence at an extradition hearing in determining whether to certify extradition. See e.g., In re Extradition of Paberalius, No. 10M275, 2011WL 2144065, at *13

1

(N.D. Ill. May 31, 2011) (weighing evidence brought by the Government against evidence presented by defendant to deny extradition request); see also United States v. Froman, 355 F.3d 882, 889 (5th Cir. 2004) (explaining a similar standard as in Paberalius); In re Extradition of Bonilla, No. 1:13-MJ-62, 2014 WL 934903, at *5 (E.D. Tex. Mar. 4, 2014) (explaining magistrate must reach a common-sense conclusion); accord In re Singh, 170 F. Supp. 2d 982, 1023 (E.D. Cal. 2001) ("On the totality of the circumstances, the…. affidavit of Rattan Singh is credible. It destroys the competence of the evidence and obliterates probable cause[.]").

All of the evidence the defense has presented to the Court completely obliterates probable cause.[1]  See In re Gonzalez, 52 F.Supp.2d 725 (W.D. La. 1999) (releasing defendants where they provided extremely strong evidence that they were not at the crime scene, and where eyewitness identifications were highly suspect).

## II.  MR. AMEEN'S EXTENSIVELY DOCUMENTED PRESENCE IN TURKEY DURING THE PERIOD OF THE OFFENSE COMPLETELY OBLITERATES PROBABLE CAUSE

In "the interests of justice," the Court has already admitted all of the prior Defense exhibits proving that Mr. Ameen was in Turkey at the time of the offense and could not possibly have committed it.  (Doc. 160, p. 15.)  The Court has accordingly exercised its "authority and discretion to go beyond the face of the government's affidavits for purposes of determining credibility or reliability."  Gill v Imundi, 747 F.Supp. 1028, 1041 (S.D.N.Y. 1990).  The Defense has submitted several additional exhibits to corroborate Mr. Ameen's innocence and his presence in Turkey, during the period of time of the offense, and requests that the Court admit them as well.  (Exhs. 21[2] [Updated Facebook Exhibit]; 81 [UNHCR Documents]; 85 [Declaration of Zayed Tarek Sadallah].)  As the Court held in Document 160, "It would be manifestly unjust to

---

[1]     Mr. Ameen incorporates by reference all of the arguments made in his prior filings, including his Motion to Compel (Doc. 116) and his Extradition Hearing Brief (Doc. 142).

[2]     This Exhibit has been created from a 1570 page PDF document provided to the defense by the Government pursuant to the Government's search warrant on Facebook.  The Government has possessed this information since approximately November 7, 2018, the date it was generated by Facebook.  Other pages from this PDF were provided to the Court as Exhibit 20.

1  prohibit a fugitive from presenting evidence that conclusively establishes that he could not have

2  committed the crime he is charged with." (Doc. 160, p. 14.)

3      The evidence proves that Mr. Ameen was in Turkey, at a far remove from the location of

4  the crime in Iraq, so close in time to the offense, that he has fully obliterated probable cause.  In

5  face of that compelling evidence, the Government argues for an impossible standard requiring

6  Mr. Ameen to present witnesses or documentary evidence to prove that he was in Turkey at the

7  very minute of the offense at approximately 7:00 p.m. on June 22, 2014.  The Government

8  argues for the Court to ignore the impact of geography, time, and effort required for Mr. Ameen

9  to travel to Iraq and back to Turkey within the timeframe suggested by the Government.  It also

10  argues for the Court to ignore common sense and human psychology.

11      To set up such an impossible task, Government struggles to isolate the murder in time

12  and space and reduce it to just the act itself, removing the context of the ongoing conflict around

13  it.[3]  During the weeks before the murder, ISIS was moving into the area spanning the Iraqi-

14  Syrian border.  The takeover of Rawah, which according to the Extradition Packet occurred on

15  June 21, 2014 (Exh, 80 Collated EP pp. 61, 65, 71), occurred because "Iraqi troops had staged

16

17

18

_____

19  [3]      The Government insists that Mr. Ameen should have produced a witness statement
20  providing that Mr. Ameen was in Turkey at the specific moment of the offense, yet it rejects
    Omar Hamid's statement that he remembers this time distinctly because he is from Mosul and
21  was concerned about his family, and that he saw Mr. Ameen "almost every day during the time."
    (Exh. 4.)  On the days Mr. Hamid did not see Omar Ameen, they would talk on the phone.  Id.
22  The Government urges the Court to ignore this evidence even though it supports a finding that
    Mr. Ameen was seen in Mersin by Mr. Hamid on almost every day during the time of the
23  murder, making it impossible for Mr. Ameen to travel to Rawah and kill the victim.  The
    Government also side-steps its own acknowledgment, intensively litigated before this Court, that
24  it has independent corroborating evidence that Mr. Hamid confirms Mr. Ameen's presence in
    Mersin during the time.  (Exh. 114; Doc. 92); United States v. Bryce, 208 F.3d 346, 351 (2d Cir.
25  1999)(taped wiretap statement had high degree of trustworthiness, because declarant was not
    aware he was being taped); United States v. Singleton, 125 F.3d 1097 (7th Cir. 1997) cert.
26  denied 522 U.S. 1098 (1998)(taped conversation with confidential informant very trustworthy);
    Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 285-96 (3d Cir. 2016)(rejecting government's
27  argument that it could legally withhold "independent documentary corroboration of a key
    witness" for an alibi defense).
28

what they described as a tactical retreat from the western towns of Ana and Rawa[h]."[4]  Liz Sly,

"ISIS fighters control much of Iraq's western border after seizing three more towns,"

Washington Post (June 22, 2014).

The Defense has produced hard evidence that Mr. Ameen was in Mersin, Turkey, on June

19, 2014 (the Thursday before the Saturday takeover and the Sunday offense), and on June 26,

2014 (the Thursday after.)  This evidence comes from the sign-in sheets at the Mersin

Immigration Office, where Mr. Ameen had to sign in every week.  (Exh. 11-T [ECF Doc. 142-

12, pp. 20-23].)  It is corroborated by other members of the Iraqi refugee community in Mersin

who signed in with him.  (Exhs. 4 [Doc. 142, pp. 10-12] [Omar Hamid], 13 [Doc. 142, pp. 4-5]

[Yacer Ede].)  It is further corroborated by the statements of the Turkish Government that Mr.

Ameen would have lost his status had he failed to sign in and therefore must have signed in as

required.  (Exh. 11-D and 11-E [Doc. 143-3, pp. 7-20].)  It is corroborated by Mr. Ameen's other

signatures on official documents, such as his passport (Exh. 11-B, p. OA_000034), his Turkish

immigration documents (Exh. 11-D, pp. 4-9), and his refugee documents (Exh. 11-F – ICMC

11), all of which match the signatures on the sign-in sheets.  It is also corroborated by the

affidavit of Zaid Hydari, the American attorney who worked in Turkey at the relevant time, who

noted Omar's "cooperation with the entire resettlement process."  (Exh. 11, p. 10 [Doc. 142-2, p.

10].)  Mr. Hydari noted, "All of the documentation I reviewed shows that Mr. Ameen readily

answered calls and attended meetings with each agency involved in his case.  In both Turkey and

in the United Sates, he completed all the obligations he owed."  (Id., pp. 10-11.)

Additional unimpeachable evidence firmly places Mr. Ameen in Turkey during the time

period of the offense.  It is clear from U.S. State Department records, that Mr. Ameen would

have been notified of the acceptance of his refugee status by the ICMC no earlier than June 11,

2014, the date that USCIS notified the ICMC and the UNHCR of the June 5, 2014 approval.

(Exh. 11, Dec. at p. 7, para. 14; Exhs. 11-F, 81-2.)  Documents prove that Mr. Ameen was

---

[4]    Person 5 repeatedly claimed in other statements that the murder happened "the day
Rawah fell to ISIS" (Exh. 38, p. 2) and in the transcript at Exhibit 90, p. 1 (ECF Doc. 208-14).
In each of those statements, he said the murder occurred on June 26, 2014, correcting himself in
the phone interview to state June 22, 2014.  (Exh. 90, p. 1)

1    reached on his Turkish phone by refugee workers at the UNHCR on June 26, 2014 (the same day

2    as his sign-in), to confirm the upcoming, mandatory medical appointment and cultural

3    orientation in Istanbul starting on July 7, 2014.  (Exh. 11-F; Exh. 81-5 [UNHCR](noting on June

4    26, 2014 "[redacted] informed them all.  Thanks.").)  This corroborates Mr. Ameen's sign-in and

5    presence in Turkey on that date.  Further actions by the ICMC prove that they received

6    confirmation from the UNHCR that its staff spoke with Mr. Ameen and confirmed the

7    appointment with him on June 26, 2014: the ICMC then booked a hotel room for the Ameen

8    family on July 4, 2014 (Exh.11-F, ICMC 8-9) and authorized Mr. Ameen to purchase bus tickets

9    for Istanbul with the expectation of reimbursement (Exh. 11-F, ICMC 5-7.)  The UNHCR also

10   must have contacted the Mersin Immigration Office to arrange for travel documentation for that

11   date, since the Ameen family needed permission to leave Mersin. (Exh. 81-5 [Doc. 208-5]

12   [UNHCR](request to obtain Ameen travel permits).)  Omar Ameen's presence in Mersin,

13   Turkey, and his compliance with all the various demands of the refugee system, is further

14   supported by the proof that on July 5, 2014, he went to the Mersin bus station to buy the bus

15   tickets for Istanbul for him, his wife, and their three young children.  (Exh. 11-F, pp. 5-7.)  They

16   left the next day, July 6, 2014.  Id.

17        In contrast to Omar's work in Turkey to support the refugee claim, the Extradition Packet

18   posits that he really was acting as a leader of ISIS in the takeover of Rawah.  This type of role is

19   completely inconsistent with the Government's insistence that Omar only appeared in Rawah to

20   commit the murder and then left.[5]  Rather, as Person 5 has told the Defense, Omar would have

21   had to be in Rawah or its environs with ISIS prior to the murder, to plan the takeover and lead

22   ISIS fighters.

23        Everyone agrees that the victim received a phone call – *not from Omar Ameen* –

24   threatening him prior to the murder.  In the Extradition Packet, Person 5 states that the phone call

25   occurred on June 21, 2014.  (Exh. 80, Collated EP 71.)  The victim's wife indicates that a phone

26

27

28   [5]      This also ignores the considerable challenges of extricating oneself from ISIS.  Lori
     Hinnant and Paul Schemm, "What it's like trying to leave ISIS" AP (Feb. 3, 2015)(ISIS kills its
     own members rather than allow them to leave).

call threat was received by the victim on his voicemail from Abu-Anas Al-Sammirai the day

before ISIS entered Rawah.  (Exh. 84-2 [Doc. 208-2].)  This shows that the attack was planned

out ahead of time, which is inconsistent with the Government's tight timeline.

The murder described in the Extradition Packet is presented as a planned activity

involving the sabotage of the victim's electrical supply, multiple vehicles, potentially dozens of

shifting accomplices according to the Government, ISIS clothing and propaganda, and one or

several warning phone calls to the victim by someone else.  Meanwhile, the entire area was a war

zone with many disparate groups of Sunni fighters raging against the Iraqi military.  Adding

danger to the situation, the Iraqi troops were in disarray and attacking anyone suspected to be

involved in the insurgency.  For example, on June 21, 2014, Iraqi security forces executed 25

prisoners just outside Rawah before fleeing.  Human Rights Watch, Iraq: Campaign of Mass

Murders of Sunni Prisoners available at hrw.org/news/2014/07/11/Iraq-campaign-mass-murders-

sunni-prisoners; Al-Jazeera, "Iraqi security accused of executing prisoners" (July 11, 2014)

available at www.aljazeera.com.  No one could have traveled 600 miles, from Turkey to Rawah,

without a passport, within days, and then left safely to return to Turkey, also within days.

Certainly, no one could have counted on making it there and back alive and in one piece, without

getting caught.

Accordingly, even a compressed timeline based only on the Extradition Packet statement

of Person 5 is impossible given the firm proof that Omar was in Mersin within days of the

offense.  However, Person 5 provides a much broader timeline for the Court to consider.  He told

the defense, "[Omar] had, before ISIS entered, he had disappeared for a while.  [Interviewer asks

how long.]  About 2 months. . . He left Rawah and as soon as ISIS came, he came with them."[6]

---

[6]     The Defense urges the Court to consider Person 5's statements placing Omar in Rawah
for approximately 10 months of 2014.  Person 5's statements about Omar's presence in Rawah
can be read together with his Extradition Packet statement and do not contradict it.  They are
helpful and explanatory in assessing the evidence that Mr. Ameen was in Turkey at the time.
These statements are explanatory and clarifying, not impeaching, and therefore should be
considered by the Court.  "The extradition court still has broad discretion to determine the
admissibility of the evidence before it."  Santos v. Thomas, 830 F.3d 987, 1007 (9th Cir. 2016).

(Exh. 90-5 [Doc. 208-14, p. 5].)  However, it is an unassailable fact that Mr. Ameen was in Turkey starting in April 2012, and that he had sustained contact with refugee agencies, the Mersin Immigration Office, and the U.S. Government throughout 2014, including in February 2014 and May 2014.  Facebook location information puts Mr. Ameen in Turkey throughout 2014, until early November 2014, when it switches to the United States, consistent with his travel there on November 4, 2014.  (Exh. 49.)  Omar Hamid has provided the Court with a date-stamped photograph of Omar Ameen in Mersin, Turkey in February 2014.[7]  (Exh. 19.1 [Doc. 142-14, pp. 22-25]].)  Likewise, Exhibit 41.1 (photograph 4) shows Omar with his family at the beach in Mersin on March 23, 2014, as demonstrated by the date at the bottom of that photograph.[8]  (Exh. 122.)  In Exhibit 3, Abdelsalam Altaab confirms that Omar was with him in Istanbul in May 2014, as documented by a photograph taken on a Bosporus River cruise together. (Doc. 142-1, pp. 4-9.)

Likewise, Person 5 tells the interviewer that "Omar Abdulsattar Ameen stayed in Rawah about 6 months" after the murder.  (Exh. 90-6 [Doc. 208-14, p. 6].)  Person 5 explains that in his psychotic state, he broke out of the house months after the murder and saw "with his own eyes" Abu Bakr Al-Baghdadi having lunch at Omar's house.  (Exh. 90-7 [Doc. 208-14, p. 7])  He definitively claimed to have seen Omar twice during the six months after the murder, and that

---

[7]   This Exhibit was partially excluded, perhaps because of Mr. Hamid's statement that the photograph is of Omar Ameen with a Christian and a Shia, demonstrating that he is not a Sunni Islamic jihadist as suggested by the Government.  The Court appears to have admitted it for the purpose of considering the proof of Mr. Ameen's presence in Turkey demonstrated by the date-stamped photograph and Mr. Hamid's declaration.

[8]   The Court excluded the entirety of Exhibit 41.1, on the theory that because it showed that Omar consistently has had extremely short hair, it contradicted the statement of Person 5.  The Defense urges the Court to reconsider that ruling, in light of Person 5's reliability issues.  Person 5's description of the killer to the FBI in October 23, 2017 is one factor for the Court to consider in determining whether Person 5's identification is competent evidence to support probable cause.  In addition, the photograph supports Mr. Ameen's alibi, especially given Person 5's statement that the person he identifies as Omar Ameen was present in Rawah prior to April 2014, two months before the murder.  To enable the Court to consider the photograph from March 23, 2014 as evidence of Omar's presence in Turkey, the Defense has created a new, easier-to-read Exhibit and urges the Court to admit it.  (Exh. 122.)

Omar left Rawah "the 12th month, 2014, at the end of the month, he disappeared from Rawah.  I looked closely for him, following that, I looked closely for him. . . ."  (Exh. 90-7 [Doc. 208-14, p. 7].)  Person 5 told the FBI on October 23, 2017 that Abu Bakr Al-Baghdadi "visited Omar Ameen two times on or about August 2014 and July 2014."  (Exh. 38, p. 3.)  This is also consistent with Person 4's insistence that Abu Bakr Al-Baghdadi had lunch at Omar's house in Rawah in late June or early July 2014, based on what he says a witness reported to him.[9]  (Exh. 92-6 [Doc. 208-16, p. 6].)

It is uncontradictable that Mr. Ameen was in Turkey during this time as well.  Even ignoring all the other proof that Omar was in Turkey, the U.S. Government cannot ignore its own incontestable documents.  The real Omar Ameen was at a USCIS interview on May 22, 2014 in Istanbul.  The real Omar Ameen was at a medical appointment on July 7, 2014, and cultural orientation on July 8 through 10, 2014, in Istanbul with his family.  The real Omar Ameen left Turkey and arrived in the United States with his wife and three young children on November 4, 2014.  (Exh. 11-B, p. OA-00040 [U.S. Entry Stamp].)  As discussed in Exhibit 11 and its attachments, Omar has ongoing and documented contact with refugee and governmental agencies throughout 2014.  Meanwhile Person 5 states that the murderer was in Rawah through December 2014.  Time, space, geography, government records, records from the UNHCR, the ICRC, the IOM, and the Mersin Immigration Office, and 29 affidavits from witnesses who together place Mr. Ameen in Turkey and not in Rawah combine to obliterate probable cause.

In In re Gonzalez, 52 F.Supp.2d 725 (W.D. La. 1999), the court engaged in a similar, realistic analysis.  Each defendant introduced considerable evidence to show that he was nowhere near the robbery alleged in Mexico.  One defendant was in the United States, working,

---

[9]     The Defense has determined from the information it possesses that Person 4 and TMF1 are the same person.  It has previously referred to this person in filings as "Person 4 aka TMF1" (Exh. 92) and AJB (Doc. 142, p. 46).  The Government has not objected to this, or notified the Defense that its identification is incorrect.  The Defense has requested that the Government confirm that Person 4 and TMF1 are the same person.  For consistency throughout this filing, the Defense will use the term "Person 4" to refer to this person.  Person 4 claimed to have spoken with multiple witnesses about the Baghdadi lunch.  He told the defense investigator that other undisclosed eyewitnesses had told him that Omar was not present at this alleged lunch with Al-Baghdadi because he was "in Syria."  (Doc. 208-16, p. 6 [Exh. 92].)

attending church, and leading his normal life, over a 1000 miles away.  The other was in Mexico, working almost 600 miles away.  The court considered all of the evidence, finding that it was critical to understand the geographic distance between the defendants' homes and the scene of the offense in Mexico.[10]  Id., 52 F.Supp.2d at 731.  This type of real world analysis is also essential here.  The timeline given by Person 5 proves that he cannot be correct in identifying Omar Ameen as the killer, and therefore that his identification cannot support probable cause.  The documented presence of Omar Ameen in Turkey throughout all of 2014, until he left for the United States in early November 2014, obliterates probable cause.

### III.     EVIDENCE THAT OBLITERATES PERSON 5'S RELIABILITY AS A WITNESS SHOULD BE ADMITTED AND CONSIDERED IN REJECTING CERTIFICATION

From the beginning of this case, as Mr. Ameen's presence in Turkey became more and more verifiable and unimpeachable, the Defense has investigated the following question: "If Mr. Ameen is innocent, why is someone in Iraq claiming he committed this murder?"  The most recent Exhibits help to answer that question as discussed below.

The Defense first established inconsistencies in the Extradition Packet that undermined the credibility of Person 5, then it analyzed Person 5's prior statements showing that Person 5's in-court statement was not reliable.  Throughout, the Defense tried to determine the process that the U.S. and the Iraqis engaged in while developing the case.  That investigation makes the following clear:  Person 5's statement in the Extradition Packet is undermined by other documents within that packet.  It is undermined by every other statement given by Person 5.  It is undermined by Person 5's mental health issues.  It is undermined by Person 5's complete dependence on Person 4, who is the person who started this investigation and first raised to the FBI a claim that Mr. Ameen killed the victim, by producing forged, handwritten statements to the FBI in September 2017.

This evidence is admissible for several reasons.  Evidence that helps to explain "ambiguities or doubtful elements" in the Government's case is truly "explanatory" evidence.

---

[10]     As discussed below, the witness identifications in <u>Gonzalez</u> were also "highly suspect."

1    Collins, 259 U.S. at 315-316.  As discussed below, the Extradition Packet itself reveals

2    ambiguities and contradictions that beg for explanation.

3            Further, this evidence is admissible to try to explain and understand whether Person 5's

4    statement is competent and reliable evidence to support probable cause.  In the Court's May 22,

5    2019 Order (Doc. 160), the Court noted that "changing circumstances may give cause to revisit

6    the exclusion of credibility evidence related to Person 5." [11]  (Doc. 160, p. 19 of 25, lines 1-2.)

7    The Supplemental Extradition Packet filed by the Government at Document 194-1, confirms

8    what the Court previously suspected regarding the statements of Witnesses A and B: "it was

9    obvious that . . . the plaintiffs had not personally seen Omar Abdul Sattar Ameen committing the

10   murder." (Doc. 194-1, p. 12 of 28.)  The Defense always believed this was clear from the

11   original packet, and the Court appeared to as well.  Accordingly, Witnesses A and B "never

12   purported to have knowledge of Ameen's culpability in the first place."  (Doc. 160, p. 19.)

13           Person 5's identification of Omar Ameen as the killer stands alone.  No one else

14   identifies Mr. Ameen, and in fact, the wife of the victim, who appears to be the only true

15   eyewitness, definitively states that Mr. Ameen did not commit the murder.[12]  (Exh. 84 [Doc.

16   208-8].)  Accordingly, as the Court noted, the question is whether Person 5's statement in the

17   Extradition Packet is a reliable, competent basis for the finding of probable cause.

18           A.    **The Court has the Role of Evaluating Whether the Statement of
19                 Person 5 is Reliable, Authentic, and Competent to Support Probable
                   Cause**

20

21   _____

22   [11]    Accordingly, it held that "at this time" various defense exhibits would not be admitted to
     attack Person 5's credibility, but it left the issue open for reconsideration.  Id., at pp. 18-19.  The
23   Defense requests that the documents that undermine Person 5's credibility: Exhs. 19.1, 38, 39,
     41.1, 42, 44, 45, and 46, be fully admitted for the Court's consideration of this issue.  Additional
24   Exhibits produced by the Defense on November 4, 2019, should also be admitted:  Exhs. 21, 78,
     79, 81-95, 91-123.
25

26   [12]    The Court previously excluded an investigator's declaration regarding the wife's
     statement.  The wife has now given the defense a direct statement and signed it under penalty of
27   perjury.  It contains the wife's summary of the victim's murder, and also has explanatory
     evidence regarding Person 5's statement.  Given the Court's previous concerns about Person 5's
28   credibility when his statement stands alone, the defense requests that the Court admit Exhibit 84
     as explanatory and obliterative of probable cause.

1    Contrary to the Government's arguments, the Court is the sole arbiter of witness

2  reliability in an extradition hearing:  "The credibility of witnesses and the weight to be accorded

3  their testimony is solely within the province of the extradition magistrate."  Quinn v. Robinson,

4  783 F.2d 776, 815 (9th Cir. 1986); In re Singh, 2005 U.S. Dist. LEXIS 42969 (E.D. Cal. Nov. 8,

5  2005).  This means that the Court is "free to determine the weight to be accorded to the various

6  descriptions of the killer."  Id.  Likewise, the Court "may take the circumstances of an

7  identification into account in assessing its reliability. . . ."  Id.  The question for the Court is

8  whether Person 5's statement has "sufficient weight and indicia of reliability to constitute

9  competent evidence supporting the existence of probable cause."  In re Extradition of Luna-Ruiz,

10  2014 U.S. Dist. LEXIS 36928 (C.D. Cal March 19, 2014).  Credibility concerns can render

11  evidence fundamentally unreliable for the purposes of a probable cause assessment.  See In re

12  Ntakirutimana, 1998 U.S. Dist. LEXIS 221 173 (S.D. Tex. Aug. 5, 1998).  In considering this

13  issue, the Court may look at a totality of circumstances, including age, experience, mental

14  ability, and susceptibility to suggestion.  Arizona v. Fulminante, 499 U.S. 279, 286, n. 2 (1991);

15  Reck v. Pate, 367 U.S. 433, 441 (1961); Harris v. South Carolina, 338 U.S. 68, 70 (1949);

16  Gallegos v. Nebraska, 342 U.S. 55 (1951).

17    The Government argues that Person 5 is an "ordinary citizen" who should be presumed

18  reliable.  However, it is clear that Person 5 is not an ordinary citizen.  Cases discussing the

19  ordinary, non-involved citizen who simply observes a crime and reports it to authorities have no

20  relevance to this extraordinary situation.  Moreover, the Government's argument that Person 5

21  should be presumed reliable only applies "absent specific reasons . . . to doubt his or her

22  truthfulness." United States v. Blount, 123 F.3d 831, 835 (5th Cir. 1997) (en banc); Easton v.

23  City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985).  Yet, the Government argues for the

24  Court to exclude from its analysis the specific reasons to doubt Person 5's truthfulness.  Some of

25  those reasons are within the Extradition Packet itself and *must* be considered.  The other reasons

26  to doubt his reliability are detailed below and in the Defense exhibits.

27    As discussed below, Person 5's other statements, especially his October 23, 2017,

28  statement to the FBI, where he says he *heard*, but did not see the murder, give a specific reason

11

to doubt the reliability of the Extradition Packet statement.  Person 5's other statements, including his most recent statement, where he states that victim was shot in Person 5's arms, further undermine the reliability of the Extradition Packet statement.  Person 5's own statements about his severe psychological condition after the murder, resulting in memory loss and hallucinations, provide ample reason to doubt the reliability of the identification.  Moreover, Person 5's mental illness is documented by declarations by family members.  The extensive involvement of Person 4 in setting up this entire case against Mr. Ameen also undermines the statement by Person 5, who he brought to the FBI, and then brought to the Iraqi Court to testify in front of three FBI agents.

### B.    Person 5's Claim that Omar Ameen Killed the Victim Stands Alone

From the beginning of this case, the Defense has pointed to Person 5 as the sole purported eye witness to the murder, and the only person who identifies Omar Ameen as being involved.  The Government initially indicated likewise in its Complaint (Doc. 1, p. 2 ["a witness"]), before pivoting to a theory that there were three eyewitnesses.  It has been forced to walk this back, when confronted with the clear statement in the Supplemental Extradition Packet that "the plaintiffs had not personally seen Omar Abdul Sattar Ameen committing the murder. . . ."  (Doc. 194-1, p. 12.)  Accordingly, the Court's view at the first Extradition Hearing continues to be correct:  the Witness A and B statements in the Extradition Packet do not support probable cause that Omar Ameen killed the victim.  Accordingly, probable cause depends completely on the competence, reliability, and authenticity of Person 5's statement.

### C.    Person 5's Claim that Omar Ameen Killed the Victim is Uncorroborated by Anything Else in the Extradition Packet

The Government attempts to support Person 5's reliability by pointing to various aspects of the Extradition Packet.  (Doc. 205.)  These arguments break down into several types: (1) the victim was actually murdered by ISIS, so this Court should accept Person 5's sole identification of Omar Ameen as the shooter; (2) Person 5 supposedly told Witnesses A and B of the identification at the time; and (3) the Iraqi Court proceeding itself renders his statement reliable.  None of these arguments actually corroborate Person 5 so as to support the reliability of his

12

identification.  Uncontested and public information about the murder of the victim cannot corroborate the identification of Mr. Ameen as the murderer.  That is simply the crux of Person 5's statement, and on this he stands alone, uncorroborated.

The Extradition Packet contains a report by the law enforcement authorities in Rawah. (Exh. 80, Collated EP, p. 160.)  The short report is signed by the six military, law enforcement, and intelligence leaders in Rawah: two military commanders – the Commander of the 1st Regiment, 28th Infantry, and the head of the Intelligence and Security section of the 28th Troop, 7th Division; the head of the local Intelligence and Counterterrorism Service; the Rawah District Commission's Head of Security; the head of the Local Rawah District Committee; and the Commander of the Rawah Police District.  Id.  The report simply documents that the murder occurred, that ISIS did it, and that homes were looted and confiscated.  Notably, it provides no corroboration for Person 5's identification of Omar Ameen as the murderer.  See Quinn, 783 F.2d at 815 (recognizing that even if there is probable cause for the murder, extradition court must find probable cause that defendant committed it).  If there was any evidence in Rawah that Omar had committed this crime, surely these local authorities would have included it in their report.

The Government attempts to make much of the claim in the Supplemental Extradition Packet that Person 5 supposedly told Witnesses A and B that Omar Ameen was the shooter at the time of the offense.  This fails as corroboration for several reasons: (1) The Supplemental Extradition Packet is not competent evidence of this allegation.  The Supplemental Extradition Packet letter is signed by an unidentified person who is identified only as the manager of the Director's Office at the Supreme Judicial Council.  It is not produced by someone who was at the Iraqi Court hearing or who has personal knowledge of what was said there.  It claims to recount answers by Judge Dhiya to questions posed by the United States.  Judge Dhiya did not sign the document, it is not in Judge Dhiya's words, and there is no indication that Judge Dhiya reviewed

1    it or approved it before it was disseminated.  Yet, it purports to add a completely new fact to the

2    sworn statement of Person 5 in the original packet.[13]

3         This failure of Judge Dhiya to provide a statement himself is concerning in light of the

4    Government's repeated arguments that "the best evidence of what happened in the Iraqi

5    proceedings overseas comes from the Iraqi judge himself, because he will be able to indicate

6    what the testimony was in front of him."[14]  (Doc. 171, transcript, p. 42; see also Doc. 194.)  The

7    Office of the President of the Higher Judicial Council has administrative oversight over the Iraqi

8    court system, similar to the Administrative Office of the Courts in the United States.  The letter

9    is not on letter head, surprising given its asserted provenance.  (Doc. 194-1, p. 16.)

10        (2) The additional allegation the Government now relies upon is nowhere in the original

11   Extradition Packet.  Person 5's statement at Exh. 80, Collated EP, p. 71, says nothing about when

12   he told anyone of the identification.  It does not mention Witnesses A and B at all.  Id.  The death

13   certificate says nothing about a shooter being identified.  (Exh. 80, Collated EP, p. 165.)  Iraqi

14   Court statements of Witnesses A and B do *not* say that Person 5 told them at the time who he

15   thought the shooter was.  (Exh. 80, Collated EP, pp. 61, 65.)  Likewise, Person 5's statement to

16   the FBI, in which he stated that he had only heard the shooting and then came back and

17   identified Omar Ameen among the attackers, does not support the claim that he reliably

18   identified Omar Ameen as the shooter at the time.  (Exh. 38.)  Finally, Person 5's statement to

19   the Defense is that the person he identifies as Omar Ameen came into the home right after the

20

21   _____

22   [13]    The Supplemental Extradition Packet attempts to add one other additional fact to bolster

23   the Iraqi Court proceeding.  The Government confirms in Document 205, page 8, at line 20.5, and page 23, at lines 15-21, that Witnesses A and B at best only provided "under-oath *single*

24   photo identifications."  (Emphasis added.)  This is consistent with the original Extradition Packet, where there is no claim that Witnesses A and B were shown more than one photo.

25   However, in the Supplemental Extradition Packet, the unnamed writer of the document claims that Witnesses A and B were shown multiple photographs of "men."  (Doc. 194-1, p. 12.)  The

26   unsupported assertions of the Supplemental Extradition Packet cannot be relied upon.  In re

27   Lanzani, 2010 U.S. Dist. LEXIS 14044 (C.D. Cal. February 18, 2010) (*20-21)(rejecting unsupported allegations).

28   [14]    The Government refers to the Supplemental Extradition Packet as being an attestation by Judge Dhiya, but it is not.  (Doc. 205, p. 28.)

shooting, shouting that he had shot the victim, looting, and breaking Witness B's leg.  (Exh. 90-13 [Doc. 208-14 at p. 13].)  If so, there would have been no reason for Person 5 to tell everyone in the house of the identification.  The Supplemental Extradition Packet is incompetent to add this assertion to the in-court statements.

(3)  The FBI Special Agent who was present in the Iraqi Court did not corroborate that this statement was made at the time.  The agent, who speaks conversational Arabic, but noted that he did have some issues understanding the Iraqi dialect, indicated that he understood Person 5's testimony in large part and confirmed parts with the FBI linguist.  Nowhere does the FBI Special Agent indicate that Person 5 said that he had told Witnesses A and B at the time that Omar Ameen was the shooter.  (Exh. 109, p. 4 [Doc. 208-30].)

(4)  Person 5 told the defense that he suffered from a severe psychological breakdown after the shooting.  He lost his memory.  He had to be confined to the home.  Even if the Court were inclined to believe that he told Witnesses A and B in June 2014, that Omar Ameen committed this offense, that has no more indicia of reliability than Person 5's later, shifting statements, which progressively put him into the center of the action.  An unreliable identification cannot corroborate an earlier or later unreliable identification, especially given Person 5's other claims to have seen Omar Ameen months later with Abu Bakr Al-Baghdadi in Rawah, when it is clear that the real Omar was in Turkey.

Finally, the INSS letter cannot corroborate Person 5's statement.  As already discussed in Court, the defense continues to object to any substantive consideration of this unsworn, unverified document.  (Doc. 171, pp. 82-83.)  The document itself has no indicia of reliability: there is absolutely no indication who prepared it, it is clear that it does not purport to be by anyone with personal knowledge, it is unsworn, and there is no documentation that it comes from reliable sources.

Further, the document contains at least one glaring error.  It claims that Mr. Ameen in 2007 worked "under the Emir for Al-Qa'idah in Al-Anbar, the terrorist (Ghassan Muhammad Ameen al-Rawi)" his cousin.  (Exh. 80, Collated EP 113.)  However, Ghassan Amin was arrested April 26, 2005 in Iraq, as noted by the Government in Document 6, page 19, line 11, and has

1   remained continuously in custody ever since.  Accordingly, Mr. Ameen could not have worked

2   for him in 2007.  Other allegations are simply outlandish, and have resisted any attempts by the

3   Defense to verify them as discussed in Document 116, 37-41.  Clearly these types of associations

4   and actions would have gotten Mr. Ameen flagged as a Known or Suspected Terrorist long ago.

5   Yet we know he was not.  No lesser authority than the Defense Intelligence Agency, which is the

6   "Nation's primary manager and producer of foreign military intelligence," responded to the

7   Defense that it has no information on Mr. Ameen.  (Exh. 86 [Doc. 208-10].)  We know that Mr.

8   Ameen could not have been flagged prior to 2014, because he went through extensive vetting as

9   a refugee to the United States.  In recent remarks, Russell Travers, the head of the National

10  Counterterrorism Center, put to rest concerns that a refugee could have passed through vetting

11  with a known terrorist past.  (Exh. 117.)

12          The INSS document is replete with unsourced accusations, likely based on the claims by

13  Person 4 and Person 5, [15] and cannot be used to bolster Person 5's statement or considered

14  substantively by the Court.[16]  "Accusations are not evidence" in extradition proceedings.  Choe

15  v. Torres, 525 F.3d 733, 738 (9th Cir. 2008)(reversing denial of habeas corpus on certification

16  regarding bribery offense); In re Sauvage, 891 F.Supp.896, 902-03 (S.D. Cal. 1993) (reversing

17  probable cause finding); In re Lehming, 951 F.Supp. 505, 517 (D.Del. 1996) ("unsupported

18  conclusory statements . . . are insufficient to satisfy probable cause.")  In re Lanzani, 2010 U.S.

19  Dist. LEXIS 14044 (C.D. Cal. February 18, 2010) (*20-21)(allegations that recount documents,

20  surveillance and witness interviews but provide no source materials are insufficient.)

21

22

23  _____

24  [15]     Both Person 4 and Person 5 confirmed that they went to the INSS with their claims prior
    to going to the Court.  (Exh. 90, 92 [Docs. 208-14, 208-16].)  The INSS document was produced
    at the request of the Iraqi Court at some point in May 20, 2018, after Person 5 testified.

25
26  [16]     A recent report on Operation Inherent Resolve by the Lead Inspector General noted
    considerable deficiencies in the Iraqi intelligence apparatus: notably, the Iraqis have a weak
27  system for obtaining and analyzing intelligence, and lack procedures to vet intelligence received
    from human sources.  Lead Inspector General, Report to United States Congress: Operation
28  Inherent Resolve pp. 36-37 (Oct. 1, 2018-Dec. 31, 2018)(section entitled "ISF Lack Intelligence
    Gathering and Use Capabilities").

1    The Government argues that the Iraqis conducted an investigation to corroborate Person

2    5, however it is clear from the packet that nothing in the investigation corroborates the claim that

3    Omar Ameen was involved.  A map of Rawah, a Twitter posting that has no connection with

4    Omar Ameen, and a death certificate for the victim, simply do not provide corroboration of the

5    critical probable cause issue here.  Moreover, this supposed investigation by the Iraqis failed to

6    acknowledge that a different man, Nasser Hamid Muhammed, was being investigated,

7    prosecuted, and jailed in Rawah at the exact same time that the INSS was pursuing Mr. Ameen

8    for this killing.  (Exh. 102 [Doc. 208-23].)  Either the Ameen investigation by the Iraqis was as

9    weak as it appears in the Extradition Packet, or the authorities suppressed knowledge of this

10   parallel and completely separate investigation into an entirely different suspect.[17]

11       Person 5's claim that Omar Ameen committed the Iraqi crime is completely

12   uncorroborated.  In contrast, for example, in In re Ntakirutimana, 1998 U.S. Dist. LEXIS 221

13   173 (S.D. Tex. Aug. 5, 1998), three truly "ordinary civilians" gave eye-witness accounts of the

14   defendant killing or ordering the killing of Tutsis during the Rwandan genocide.  A fourth

15   witness confirmed that the defendant furthered the killing by ordering the removal of a church

16   roi to keep Tutsis from hiding there.  Four other witnesses confirmed that the defendant was

---

[17]    The Defense only knows of this parallel investigation because the victim's mother, Witness A, notified them that she had been questioned regarding this other suspect, who was being held in Anbar province for the murder of the victim.  The victim's mother told the authorities that she did not have evidence against this suspect, and eventually he was released for lack of evidence.  (Exh. 102 [Doc. 208-23].)  Of course, the Defense does not have any access to the investigation documents and evidence against this suspect, but surely the Iraqi authorities do. (Although the Iraqi attorney, Layth Madab, obtained the document at Exhibit 102, he was refused access to the case file or other documents.)  The Court has the power to order that the U.S. Government obtain evidence from the Iraqis of this clearly exculpatory, parallel investigation into the murder of the victim.  United States v. Smyth (In re Smyth), 61 F.3d 711, 717 (9th Cir. 1995)(District Court ordered the U.K. to provide favorable documents to defense); In re Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir. 1986) (magistrate judge "ordered Argentina to produce the following documents.... ");  Republic of France v. Moghadam, 617 F. Supp. 777, 780 (N.D. Cal. 1985)(court ordered U.S. Government to refer matter to French officials for authentication of recantation letter); In re McMullen, 1988 U.S. Dist. LEXIS 7201, at *25 (S.D.N.Y. 1988)(requiring British government to articulate position regarding political nature of charged offense); United States v. Linson, 88 F. Supp. 2d 1123, 1125 (D. Guam 2000)(continuing extradition hearing and ordering U.S. Government to obtain further information from requesting government).

present during the offenses, and one stated that he was in the company of the attackers.  Three

witnesses saw him transporting, feeding, and assisting others who were locating and killing

Tutsis.  Other witnesses described seeing the defendant meeting frequently with other attackers,

and some heard him telling victims to go into a complex where he later was witnessed being

involved in the massacre.  The court described 10 witnesses, none of whom had any specific

issues of credibility, and all of whom supported probable cause, including three who viewed the

crimes directly.

In contrast here, Person 5, unsupported by Witnesses A and B, and undermined by the

victim's wife, who actually saw the offense, has given at least three significantly contrasting

statements undermining the reliability of his Extradition Packet statement.  The Defense offers

the evidence in the exhibits to *explain* the statement in the Extradition Packet: Since 2017,

Person 5 has been living with and completely dependent on Person 4, who started the entire

accusation against Omar Ameen by providing forged statements to the FBI.  Likewise, Person 5

was an emotionally troubled teenager when he lived through the trauma of ISIS moving into

Iraq.  He had a complete psychological breakdown and continues to suffer from symptoms.

Person 5 is motivated by his own reasons to curry favor with the Iraqi government and Person 4.

He is desperate for money and is being kept dependent by Person 4, who employs him but does

not pay him a salary.   Person 5's father is serving 20 years for belonging to ISIS, and he told

Witnesses A and B that he wanted to secure his release by giving testimony in this case.  (Exh.

89 [Doc. 208-13].)

Much less has been recognized as rendering witness statements "highly suspect."  In re

Gonzalez, 52 F.Supp.2d 725 (W.D. La. April 5, 1999).  In Gonzalez, three witnesses identified

the defendants as robbers, but they never provided a description of the robbers in advance of the

coordination between Mexican officials and United States authorities.  Rather, U.S. authorities

arrested the codefendants in the US for passing checks taken in a Mexican robbery.  They then

provided their descriptions and photographs to the Mexican authorities, who showed them to the

1  eyewitnesses.[18]  As noted in <u>Gonzalez</u>, "[a]bsent a substantial and independent showing of

2  reliability, the identifications would not meet the standards of probable cause under the

3  Constitution and laws of the United States."  <u>Id</u>., 52 F.Supp.2d at 733.  As in <u>Gonzalez</u>, the

4  circumstances of Person 5's statements, including the first forged document provided by Person

5  4, the contrasting statement given by Person 5 to the FBI with a purported, suggestive

6  identification made by Person 5 from photographs on Person 4's phone that Person 5 had already

7  seen, and Person 5's descriptions of his interactions with Person 4 with respect to this case all

8  should be considered by this Court.  It is clear from the Extradition Packet, the FBI 302, and the

9  images sent by Person 4 to the Defense, that Person 4 obtained Omar's DMV photograph from

10  what had to be an American source.  He then showed photographs of Omar to Person 5.  Person

11  5 then purportedly identified Omar as the killer of Ihsan Jasim.

12          Finally, Omar Ameen has already offered evidence that "blatantly negates the

13  Government's proof."  He was not in Rawah at the time, and he did not commit this act.  Given

14  all of these facts, the Defense urges the Court to admit and consider all the evidence undermining

15  the reliability of Person 5's extradition packet statement.

16                    **D.        The Extradition Packet Itself Undermines Person 5's Reliability**

17          As discussed previously, the Extradition Packet contains signatures that appear to be

18  forged.  At the time of the first extradition hearing, the Defense did not have any confirmed

19  signatures by Person 5.  It now has three of them that match each other.  (Exh. 87 [Doc. 208-

20  11].)  Those signatures do not match the signatures imputed to Person 5 within the packet, at

21  Exhibit 80, Collated EP 69, 70, 96.  The Court has already ruled that exhibits "may be offered for

22  the purpose of demonstrating the Person 5's statement in the extradition packet is forged or

23  inauthentic."  FBI Special Agent J.P. Butsch attempts to address the forgery issue by revealing

24

25

26

27  ───────────────────

28  [18]      The Government has resisted providing full documentation of its coordination of this case
with the Iraqi authorities.  However, it is clear that Person 4 had Mr. Ameen's California DMV
photograph on his phone (Exhs. 100, 104 [Docs. 208-21, 208-25]), an image that he could have
only obtained through cooperation with the U.S. Government. (Exh. 101 [Doc. 208-22].)

that he, along with another FBI agent and an FBI linguist, attended the Iraqi court proceeding on April 15, 2018 at which Person 5 appeared.

The FBI Special Agent's statement that he viewed Person 5 in court sign a document is not determinative of this issue. The FBI Special Agent did not look at what Person 5 signed in the Iraqi Court and does not have a copy of it. (Exh. 109 [Doc. 208-30].) The FBI Special Agent's affidavit suggests that Person 5 signed a one-page statement (Exh. 109, p. 5 [Doc. 208-30 at p. 5] [Person 5 affixed "*a* thumbprint"]), but the document in the Extradition Packet is a two-page statement with identifiable inconsistencies as discussed below.

The FBI Special Agent also never saw an additional document generated as an identification page. (Exh. 109, p. 5 [Doc. 208-30 at p. 5] [*a* "summary" was produced and agent saw Person 5 sign "*the* document."]) However, the packet contains an entirely different document imputed to Person 5, with a wildly different, completely unmatching signature using a different type of pen. (Collated EP 96.) Adding further question about the authenticity of that page, the purported identification document is not co-signed by Judge Dhiya (unlike the other documents) but rather possesses the co-signature of someone else, who is unidentified in the packet.[19] (Exh. 80, Collated EP, p. 96.)

The additional identification document further undermines the authenticity of the Extradition Packet statement. It refers to photos that are dated six weeks later, May 28, 2018. (Exh. 80, Collated EP 103, 106.) This is consistent with the wholesale creation of the identification document at some point prior to providing the packet to the United States. The inquiry documents were deemed complete and forwarded to a different Iraqi Judge for the preparation of an extradition file on May 29, 2018. (Exh. 80, Collated EP 130.) Perhaps the Iraqi Court was notified by the FBI Legal Attaché that it needed to provide documentation of a more robust identification procedure.[20] It is clear that the Iraqis were unfamiliar with the

---

[19]     Judge Dhiya's extremely consistent signature is set forth multiple times in Exhibit 78 (Doc. 208-2) for the Court's comparison to the different co-signature on Exhibit 80, Collated EP, at p. 96.

[20]     The Defense has already briefed the Court on the fact that in Iraq the roles of the investigative court and Public Prosecutor are the reverse of the American legal system. (Doc.

1    standards for international extradition and needed regular contact with the FBI Special Agent to

2    achieve that process.  (Exh. 109, p. 6 [Doc. 208-30].)  Documentation of a weak identification

3    process in the Iraqi Court would have undermined Iraq's ability to "complete a successful

4    extradition with the United States government" an issue of "utmost significance to the Iraq

5    Higher Judicial Council."  (Exh. 109, p. 6 [Doc. 208-30].)

6         Finally, the FBI Special Agent indicates that Person 5 gave a statement to the Iraqi Court

7    that "aligned with what Person 5 had previously told the FBI."  (Exh. 109, p. 5 [Doc. 208-30].)

8    If so, that would mean that Person 5 told the Iraqi Court that he heard the shooting.  However,

9    that is not what was written up in the statement in the Extradition Packet.

10        The Extradition Packet also contains a huge concern centered on allegations by Person 5

11   and others that Omar Ameen participated in the kidnapping of the victim's brothers in 2016, two

12   years after he arrived in the United States.  The document at Exhibit 80, Collated EP, page 97,

13   states that Person 5 identified Mr. Ameen as one of the militants "who killed the victim (Ihsan

14   Abdulhafiz) and the kidnapping of the victims (Ra'Fat, Ghassan, and Muhammad)."  Other

15   witness statements in the extradition packet attempt to tie Mr. Ameen to the kidnapping of three

16   of the victim's brothers: Muhammad, Ghassan, and Ra'Fat, who were also police officers.  This

17   allegation is repeated several times in the packet, including by the Rawah authorities.  (Exh. 80,

18   Collated EP, pp. 62, 66, 71, 97, 160.)  The Rawah authorities state that the kidnapping happened

19   in November 20, 2016, as do witnesses.  (Exh. 80, Collated EP 160; accord pp. 62, 66.)  This

20   was well after Mr. Ameen moved to the United States, and when he could not have returned to

21   Iraq.  This alone proves that Person 5 is unreliable – he purportedly identified Mr. Ameen as

22   committing a kidnapping that he absolutely could not have been involved in, as he was

23   incontestably in the United States at the time.

24

25   _____

26   186, pp. 3-5.)  The investigative court operates as an investigative and prosecutorial agency,
     while the Public Prosecutor has the role to check judicial overbearance.  Id., at p. 3.  The Defense
27   seeks to incorporate those arguments herein to correct the impression that in Iraq the judiciary
     operates as a neutral arbiter of justice.  As confirmed in FBI SA Butsch's affidavit, at Exhibit
28   109, p. 6 [Doc. 208-30], the Iraqi Judiciary has a vested and clearly communicated interest in
     "completing a successful extradition" in this case.

Finally, word-for-word and page-for-page translations supplied by the defense at Exhibits 106 (Witness A), 107 (Witness B), and 108 (Person 5), each reveal obvious and serious irregularities.  The Arabic complaints – purportedly of Witnesses A and B – are virtually identical to each other and consist of two pages each. (Exhs. 106 and 107.)  The first page of each contains a detailed 20-line account of the incident.  Crucially, Mr. Ameen is not mentioned anywhere on the first page of these complaints until the final one and a half lines, which identify Mr. Ameen as the killer and a leader of ISIS. (Exhs. 106-1, 107-1.)  The accusatory final two and a half lines begin with "and" awkwardly following a sentence that would naturally conclude with the word "employees."   In addition, the final two lines are typed into a space between the text and the signature block typically left blank in other Iraqi reports.  The typing format in the final line is distinct from that in the rest of the complaint, with words stretched out to fit and fill the width of the page.  This format is present only in the final line.  Moreover, the word "Husayn" is inserted into Ameen's name, handwritten over a small portion of the page that has been whited-out.  That whited-out portion is located directly above the signatures for Witnesses A and B, strongly suggesting some alteration occurred either to the name of the accused, the signatures of the complainants, or both.  The handwriting has been added in such a way to make it hard to see on the document.  It is clear from Exhibit 106, that the white out and handwriting was added after the signature as the top part of the signature appears to be missing.  Exhibit 116 provides the Court with a reference to understand where the handwriting has been added over whiteout on each of the Witnesses' statements.

Like the purported statements of Witnesses A and B, the first page of Person 5's purported statement details the killing in 17 lines of text. Exh. 108-1.  Once again, Omar Ameen is not mentioned until the final one and a half lines, which are crowded into a space routinely left blank in other official documents.

The second page of each complaint (Exhs. 106-2, 107-2, and 108-2) discusses an attack on the house the following day, but also insinuates that Ameen and others are to blame for a kidnapping in 2016, when Ameen was unquestionably in the U.S.  Finally, as discussed above, the signatures on the second pages of each complaint do not match the first pages.

**E.      Person 5's Other Statements – to the FBI and to the Defense –
Undermine Probable Cause**

**1.   The Statement to the FBI Undermines Person 5's Later Statement
to the Iraqi Court**

The Defense has previously analyzed Person 5's Statement to the FBI, and set forth a

number of ways in which it undermines probable cause.  (Doc. 142, pp, 33-40 [incorporated

herein].)  The Defense will briefly summarize those arguments and urges the Court to admit all

the exhibits referenced therein, including the FBI report of the statement itself at Exhibit 38.[21]

(1) Person 5 told the FBI that he "heard" the shooting.  He explained that he entered the
home at the victim's request after ISIS arrived, *heard* the shooting, and returned
outside to find the victim dead.  Accordingly, he did not see who shot the victim.  As
discussed below, his story evolved considerably by the time he went to the Iraqi
Court, and even more by the time he spoke with the defense.  (Exh. 38, 83 [Doc. 208-
7.)

(2) Person 5 did not tell the FBI that Omar Ameen killed the victim.  Rather, he identified
Omar Ameen as present, and saying insulting things.  His identification of the person
he said was Omar Ameen, however, is inconsistent with what the real Omar Ameen
looked like at the time.  He identified the person he said was Omar Ameen as long-
haired and bearded.  The defense has presented copious, official evidence that Omar
Ameen has never been long-haired and bearded. (Exh. 41.1.)  This evidence helps
*explain* that Person 5 is misidentifying the person he claims is Omar Ameen.

(3) The people that Person 5 told the FBI were present included three of Omar Ameen's
brothers, including a non-existent Ahmed Ameen.  (Exh. 80, Collated EP, p. 145
[correct list of siblings].)  By the time that Person 5 went to Court, he no longer
claimed that the other Ameen brothers were there, and in fact, his statement does not
identify any accomplices.  (Exh. 80, Collated EP, p. 71.)

---

[21]     This FBI 302 continues to be extensively redacted in the record.  (Exh. 38.)  The defense
has repeatedly asked the Government to provide an unredacted copy and the Court to order that
an unredacted copy be provided.  As discussed at Exhibit 83, a "less redacted" copy was made
available to defense counsel to view at the Government's office.  That copy is still heavily
redacted.  The FBI Special Agent who wrote the report has provided a public affidavit about the
interview, as has the second Special Agent who attended it.  Even if the Court believes that the
defense still has no right to view the unredacted 302 regarding Person 5's interview, there is no
reason the Court cannot see an unredacted copy for itself, to determine if additional information
therein addresses its concerns about Person 5's veracity.  The Defense renews its request that the
Court address this issue.

(4) Person 5's other statements about Omar Ameen lack reliability: he claimed to have seen Omar in 2008 committing a crime with his brother "Wassam." Omar does not have a brother Wassam. (Exh. 80, Collated EP, p. 145.) Person 5 claimed that the victim had arrested Omar Ameen. No proof of that arrest has been found or provided, nor is such arrest even referenced in any Iraqi documents. Person 5 would have been 10 years old at the time of such an event.

(5) As discussed extensively above, Person 5 told the FBI that Omar Ameen stayed in Rawah after the murder. He saw the person he misidentifies as Omar Ameen twice with Abu Bakr Al-Baghdadi (itself a claim that should give anyone great pause) in July and August of 2014. There is unimpeachable evidence that Mr. Ameen was in Turkey in July and August of 2014.

In addition to the issues identified in the Defense's first Extradition Brief, additional investigation and the three FBI Special Agent affidavits provide more concern about the October 23, 2017, interview of Person 5.

(1) FBI SA Emerson Lopez-Fuentes states that Person 4 aka TMF1, Person 5's boss and benefactor, personally brought Person 5 to the FBI along with two additional witnesses on that day. (Exh. 111 [Doc. 208-32].) FBI SA Phillip Coonfield confirms that Person 4 was the person who gave the FBI earlier forged statements (provided to the Court at Exhibits 42 and 43) that bear the same signature even though one purports to be from Person 5 and the other from Witness A. (Exh. 110.) It is clear from the verified signatures of Person 5 (Exh. 87 [Doc. 208-11]) and Witness A (Exhs. 77, 88 [Docs. 161-16, 208-12]) that both of those statements were forged.

(2) Person 4 had spoken with Person 5 before the FBI interview about Omar Ameen, had shown Person 5 photographs of Omar Ameen, and had discussed with Person 5 that Omar Ameen was a dangerous terrorist who had successfully come to the US and would pose danger to the Americans. (Exh. 90-16 [Doc. 208-14].)

(3) Person 4's cell phone photographs were used by the FBI in their identification procedure with Person 5. (Exh. 110, p. 2 [Doc. 208-31].) This fact appears to be redacted in the FBI 302s. (Exhs. 38, 44.) These would have been the same photographs that Person 4 and Person 5 told the defense that they viewed and discussed before Person 5 met with the FBI. (Exh. 90-16 [Doc. 208-14].) These are the same photographs that Person 4 provided the defense. (Exhs. 100, 104, 113 [Docs. 208-21, 208-25, 208-34].) One of the photographs from Person 4's cell phone – the "snow picture" (Exh. 104, p. 3) – is in fact the photograph that the FBI claims that Person 5 identified as Omar Ameen. The snow picture and the road picture both come from Omar's public Facebook postings in July 2015. (Exh. 97.) This not a reliable identification.

(4) Person 5 was completely dependent on Person 4 in every way at the time – he was living with him, employed by him, protected by him, and financially supported by him. (Exh. 90-6 [Doc. 208-14].)

(5) Person 4 was central in obtaining not only Person 5's statement, but other persons who could say negative things about Omar Ameen to the FBI. (Exh. 92 [Doc. 208-16].)  Person 4, as discussed below, also is the source of almost a dozen outlandish and unsupported accusations against Omar Ameen.  Person 4 also has been noted by the FBI to have credibility issues.

### 2. Person 5's Conversation with the Defense Also Undermines Person 5's Reliability

Person 5's recent interview with the Defense further erodes the reliability of his statement for the purpose of finding probable cause.[22]  Person 5's story of the offense has shifted and changed over time.  The newest version of the story goes like this:  Person 5 was standing by the door when the victim went to fix the generator.  From a distance Person 5 saw the victim get shot by attackers.  "They said, 'Come receive a weapon' and they advanced towards him and struck him.  He fell."  (Exh. 90-3 [Doc. 208-14].)  "I went and got next to him.  He fell in my arms."[23]

---

[22]     As discussed in prior filings, from independent investigation, defense investigators determined the identity of Person 5.  The victim's parents identified Person 5 as the person they suspected was the eyewitness.  They provided the defense a copy of Person 5's childhood identification document.  (Exh. 69.)  The defense independently found Person 5's Facebook page, which is public.  (Exh. 96.)  In its Extradition Hearing Brief, the defense noted that it had found Person 5's Facebook page and documented Person 5's connection with individuals who have a long-standing grudge against the Ameen family.  (Doc. 142, pp. 46-47.)  In May 2019, the defense contacted Person 5 through Facebook messenger.  (Exh. 93 [Doc. 208-17].)  In that message, the defense identified itself as working on this case in the United States and told Person 5 that it would be happy to speak with him if he ever wanted to respond.  Five months later, Person 5 responded with a thumbs up and a phone number.  The defense verified that the phone number did belong to Person 5, and then engaged in a long, speaker phone conversation with him.  A translated transcript of the conversation is attached for the Court's review.  (Exh. 90 [Doc. 208-14].)  At the end of that conversation, Person 5 provided the phone number of Person 4, who was present during the call, and then called back a few minutes later with Person 4 on the line.  The Defense then spoke with Person 4 for a lengthy interview.  (Exh. 92 [Doc. 208-16].)

[23]     This significantly contrasts with Person 5's claim in the Extradition Request that the victim was armed and engaged in 10-minute gun battle with the ISIS forces, ultimately being hit with several bullets and "falling in front of the house."  (Exh. 80, Collated EP, p. 71.)

1   (Exh. 90-3 [Doc. 208-14].)  Person 5 then told the Defense that two people – the person he

2   identifies as Mr. Ameen, and Ahmed Badr – got out of a vehicle and "continued the attack on

3   him, in my arms. . . He shot him in his chest. . . two shots, and he shot him in his chest.  He

4   continued the attack on him, in his heart.  He hit him in his heart."  (Exh. 90-4 [Doc. 208-14].)

5   Even though the victim had been shot multiple times "in his heart," Person 5 said he took him to

6   the hospital, which told him that the victim had passed away.[24]  (Exh. 90-4 [Doc. 208-14.])

7   Person 5 told the Defense that the terrorists "came back and followed us [to the hospital], to

8   make sure [the victim] was dead.  And all the people of Rawah saw them.  All the people of

9   Rawah saw them."  (Exh. 90-4 [Doc. 208-14].)

10          Later in the interview, Person 5 came back to the actions of the person he identified as

11  Omar Ameen, "When Omar and Ahmed came, a group came with them to the house, and a group

12  stayed outside. . . . [Omar] came to the house and he was shouting and screaming and cussing

13  and shouting 'I killed Ihsan' and in front of, I mean my [other two family members] he was

14  telling them, 'I killed Ihsan.'"  (Exh. 90, pp. 10-11 [Doc. 208-14].)  The person he identifies as

15  Omar Ameen "went inside the house and wrecked the house . . . cursing and insulting and

16  shouting and he took the money and the gold jewelry and the cars, and he hit [Witness B], broke

17  his leg. . ."  (Exh. 90-11 [Doc. 208-14].)

18          Person 5 also confirmed for the defense that he saw the person he identifies as Omar

19  Ameen both two months before the murder and within six months after the murder, leaving

20  Rawah in December 2014.  (Exh. 90-7 [Doc. 208-14].)  This is consistent with the FBI statement

21  he gave, but this allegation is left out of the judicial investigator's write up of the Iraqi Court

22  statement.  Person 5 stated that he saw Abu Bakr Al-Baghdadi come to Omar Ameen's home and

23  have dinner with him during the six month period after the murder.  Person 5 saw Al-Baghdadi

24  with Omar Ameen after he recovered enough mentally to be allowed out of the house, in

25  September 2014.  As the Court knows, Mr. Ameen is documented to have been in Turkey

26

27  _____

28  [24]     This markedly contrasts with the FBI 302 (Doc. 38), in which Person 5 stated he came
    out of the house to see the victim with the following gunshots: to his left and right arm, chest and
    leg.

1   throughout 2014, and left for the United States with his family from Istanbul on November 4,

2   2014, arriving in Miami that same day.

3          The Government will undoubtedly will continue to argue that Person 5's other statements

4   do not matter.  (Doc. 205, p. 20.)  The Government's own argument, grounded in Sandhu itself,

5   requires the Court to consider whether Person 5's "identification was consistent with prior

6   descriptions of one of the assailants."  Id., citing In re Sandhu, 1997 U.S. Dist. LEXIS 7314

7   (S.D. N.Y. May 23, 1997).  Here the prior description of the assailant comes from Person 5

8   himself: an ISIS fighter with shoulder-length hair, a beard, and wearing Afghani clothing.  (Doc.

9   38.)  Person 5's identification of Omar Ameen is not consistent with this prior description.

10          Moreover, "the evolution over time of a given eyewitness's description can be fatal to its

11   reliability. . . ."  Kyles v. Whitley, 514 U.S. 419, 443 (1995).  An eyewitness account may be so

12   inconsistent that it can obliterate the reliability of the witness.  Gamez v. Stafford, 2012 U.S.

13   Dist. LEXIS 138646 (S.D. Cal. Sep. 25, 2012)(recognizing rule but finding witness accounts

14   consistent enough).  Moreover, Person 5's discussion of the process that led to his identification

15   of Mr. Ameen is clearly relevant to whether that identification comports with Due Process and

16   supports probable cause.  The involvement of Person 4, Person 5's own admitted mental frailty

17   and lack of memory, and the method used to obtain the identification constitute impermissibly

18   suggestive procedures that have led to an irreparably mistaken identification.  In re Extradition of

19   Gonzalez, 52 F. Supp. 2d 725, 737-38 (W.D. La. 1999) citing Stovall v. Denno, 388 U.S. 293,

20   302 (1967).

21          The reliability of any identification must be determined under the "totality of

22   circumstances," even in an extradition hearing.  Neil v. Biggers, 409 U.S. 188, 199 (1972);

23   Manta v. Chertoff, 518 F.3d 1134, 1146 (9th Cir. 2008)(citing Biggers in extradition case); In re

24   Extradition of Singh, 170 F.Supp.2d 982, 1014 (E.D. Cal. 2001)(applying Biggers); In re

25   Extradition of Singh, 2005 U.S. Dist. LEXIS 42969 at *126 (E.D. Cal. 2005)(same);  In re

26   Extradition of Chavez, 408 F. Supp. 2d 908, 913-14 (N.D. Cal. 2005) (applying Biggers);  In re

27   Extradition of Cervantes Valles, 268 F. Supp. 2d 758, 774 (S.D. Tex. 2003) (same);  In re

28

Extradition of Gonzalez, 52 F. Supp. 2d 725, 737 (W.D. La. 1999) (same).  The totality of the circumstances here obliterate the reliability of the identification.

> **F.     In Addition to the Indicia of Unreliability Provided by the Extradition Packet and Person 5's Own Statements, His Claims Conflict with Other More Reliable Statements**

At the Extradition Hearing, the Government argued, "it would be nice to have more statements from more witnesses," (Doc. 171, at p. 30 [Transcript]) while urging the Court to exclude the statement from the victim's widow, Ms. Qasim (who has previously been referred to as Witness C). (Defense Exhibit 37.)  The Court did so, and the Defense urges it to reconsider that ruling in its evaluation of Person 5's credibility.  Ms. Qasim is a crime victim under 18 U.S.C. section 3771(e)(2)(b) (Crime Victims' Rights Act), and it is important that her voice be heard in this proceeding.  To ensure that she had the fullest opportunity to have her statement heard in this proceeding, the Defense sent an investigator to Erbil, Iraq, in the Kurdish region, to meet with her and obtain her signed declaration.  That declaration is attached at Exhibit 84.  Ms. Qasim so wants justice done in this case, that she parted with the victim's cell phone, so that the defense could bring it to the United States for forensic analysis to see if it contains evidence pertinent to his murder.[25]

In the statement, Ms. Qasim describes what happened on the day of the offense.  Unlike Person 5, and Witnesses A and B, Ms. Qasim has been living since 2015 in the Kurdish region of Iraq, protected from both ISIS and the Iraqi Security Forces, including the militias and the Iraqi National Security Services.  She has lived there with her brother.  She is not afraid of repercussions for her conversations with the defense investigator.

Ms. Qasim was watching when her husband was killed.  She explains what happened. She was cooking, and the victim's mother was baking bread in an oven that they had inside the garage. At this point, the electricity went out. The victim wanted to go outside to turn on the electric generator, but his wife told him not to go outside because it was very dark. The victim peeked outside and found that the electricity was out only at their house, not the whole

---

[25]     The defense has not yet received a report on whether a forensic examination of the victim's phone was possible.

neighborhood. The victim walked towards the generator.  Ms. Qasim saw a flash of fire followed by a big bang sound, and then she heard a barrage of bullets hitting the house.

After the attackers withdrew, the victim's mother ran outside along with his brother, Mohammed. Ms. Qasim followed them outside to see the victim.  Mohammed held Ihsan in his arms and the victim's eyes opened, but his pupils were turned upward towards his forehead. Ms. Qasim removed the victim's shirt and found one bullet in his heart that penetrated his chest and went through his back. Another bullet went to his hip and the flesh was coming out of it. He also had two bullets in his shoulders.  She describes how family took the victim to the hospital in Rawah, but he was already dead.

Ms. Qasim also indicates that Person 5, a member of her family, "is not to be believed." She said he is "addicted to lying" and "dreams up stories that never took place."  She said that he had this problem with lies since early childhood and his grandmother "tried tirelessly to break [Person 5] from lying."  Ms. Qasim said that Person 5 "was a kid at the time," and he was at his uncle's house across the street.  According to Ms. Qasim, Person 5 is lying if he is stating he ran to Ishan Jasim and held him in his arms while Omar Ameen walked to him and shot him twice in the chest, and it is untrue that he was carrying firearms and fighting at age nine.   Both Ms. Qasim and the parents were very clear that the victim's brother Mohammed (who has since been kidnapped by ISIS) was the one who held the victim after the attackers withdrew.

Witnesses A and B have likewise indicated that they did not see the faces of the attackers. Instead, their son "was killed by a sniper's first shot and then by the opening of heavy fire from a distance."  They confirmed the attackers fled without being identified. (Exh. 89 [Doc. 208-13].) They have stated that they do not believe the attacker could have been Omar Ameen.  Witnesses A and B also confirmed that Person 5 is a liar and a "conman."  Id.

### G.     Person 5 Has Shown Himself to Be an Unreliable Narrator

#### 1.     Person 5 Told the Defense that He Has Suffered Serious Psychological Problems from the Time of the Killing through Present Time

Person 5 was extremely open about an ongoing psychological condition that causes him memory problems, hallucinations, and that made him so ill that he was kept inside the house for

months after the killing.  His own statements about that condition help make sense of the shifting narratives he has given about the killing, as well as why he is so completely dependent on Person 4 to take care of him.  Person 5 told the defense, "I got a shock, a psychological condition.  I lost my memory for a while.  And now it's gotten back to me.  I remember the situation, and I remember that, but when I remember it, how can I say it, I get a psychological condition, it comes back to me."  (Exh. 90-2 [Doc. 208-14,])

Person 5 explained to the Defense that after the killing he "had a psychological condition":  "I would be hitting things I mean, so I wouldn't go out onto the street.  One day I went out, I struck the door and went out of the house, because I had a psychological condition, they wouldn't let me go out, so I went out and was seeing cars at their place, so I saw myself, with my own eyes, I saw Abu Bakr Al-Baghdadi."  (Exh. 90, pp. 6-7 [Doc. 208-14].)  After explaining that he saw Omar Ameen twice after the murder, he again explained "[M]y family would lock me up in the house because I told you I had gotten a psychological condition . . . So I would go out and be screaming and shouting and hitting them, I had gotten a psychological condition, you know."  (Exh. 90-7 [Doc. 208-14].)  Only in September, was he let out of the house: "So my father let me out the 9th month, I got treated and my condition became good." (Exh. 90-7 [Doc. 208-14].)

Person 5 alluded to the "psychological condition" again when he was asked when he reported Omar Ameen for the murder, "I swear by God I don't remember, I swear by God I don't remember.  Because as I told you I had a psychological condition, and my condition was a bit bad.  No work, I would be thinking, you know 5 families, I mean, and I became broke with no money."  (Exh. 90-8 [Doc. 208-14].)

Person 5 acknowledged that the psychological condition "comes back to me sometimes." (Exh. 90-10 [Doc. 208-14].)  He explained, "All my body shivers.  Whenever I remember what happened every now and then, all my body shivers and shakes.  I get irritable.  I get up and start hitting the doors.  Anyone who comes near me I hit him, I mean, things like that."  (Exh. 90-10 [Doc. 208-14].)  He also imagines things, "Yes, I imagine sometimes they are coming and carrying out the same things, the way the cars came, I mean, things like that."  Id.

Person 5 still suffers emotionally.  He cried during his interview with the Defense.  (Exh. 90-8.)  He cried during his interview with the FBI.  (Exhs. 38; 110, p. 2; 111, p. 2 [Docs. 208-31, 208-32].)  He cried in the Iraqi Court.  (Exh. 109, p. 5 [Doc. 208-30].)  He continues to feel dramatically violent about Omar Ameen.  His Facebook post about Omar begins, "Ohhhhh if I drank from your blood it would not soothe my heart."  (Exh. 99 [Doc. 208-20].)  Person 5 was clearly a vulnerable teenager, in a dangerous time, who continues to suffer after the trauma of living through the ISIS takeover of Rawah.  He deserves sympathy, but his statements cannot support probable cause, especially in light of the powerful evidence that Omar Ameen never left Turkey in 2014.

### 2.   Family Statements Support the Unreliability of Person 5

Multiple family members have indicated that Person 5 is unreliable, untrustworthy, and not to be believed.  The victim's wife, Ms. Qasim, states in her declaration, "If [Person 5] is stating that he ran to Ihsan and held him in his arms while Omar Ameen walked to him and shot him twice in the chest, he is not to be believed."  (Exh. 84-3 [Doc. 208-8].)  She goes on, "[Person 5] is addicted to lying.  He has had a problem with lies since early childhood. . . . [Person 5's] grandmother tried tirelessly to break [him] from lying without success.  [Person 5] dreams up stories and events that never took place.  He keeps repeating the same story with different details."  Witness A indicated that Person is a "liar."  Witness B called him a "conman." (Exh. 89, p. 2 [Doc. 208-13].)

Person 5's own statements document this.  They do not simply demonstrate simple inconsistencies in an otherwise consistent story.  They disclose a narrator who progressively puts himself in the middle of the frame, in the final version heroically catching the martyr as he falls and holding him as he is murdered.  (Exh. 90.)  Of course, even if that was Person 5's only statement, it would be inherently unbelievable that the victim would be shot twice at close range while in Person 5's arms and that Person 5 would live, unscratched, to tell the tale.  However, put in perspective against Person 5's other two statements, to the FBI – "I heard it happen," and to the Iraqi Court – "I saw it happen from far away" – this final version clearly undermines the prior two and renders every statement incredible.

31

Person 5 even lied straight to the Defense, to aggrandize himself.  For example, Person 5 claimed he was supporting the martyr Ihsan's family and the families of 4 other martyrs, even though he has no income and is completely financially dependent on Person 4.  (Doc. 208-14, p. 6 [Exh. 90.])  He claimed, "I have 5 families I'm responsible for, and I don't have a salary, and I can't leave him and go work. . . ."  (Exh. 90-6 [Doc. 208-14].)  He certainly is not supporting the family of the victim and Ms. Qasim, who is living in Erbil with her own family.

Person 5 also claimed to have been fighting Al-Qaeda when he was 9-years-old.  "Right, I'm young but I'm as wise as an entire country."[26]  (Exh. 90-10 [Doc. 208-14].)  He claimed to the Defense that in Rawah, after the killing, "I would look closely for that guy, Omar. . . . I worked.  I had important sources in Rawah and I mean, how can I say, I would work against ISIS, with the Americans."  (Exh. 90-7 [Doc. 208-14].)  He was approximately 15 years old at the time, and had just been locked in his own home for months because of his erratic behavior, yet he also portrays himself as key player in the fight against ISIS.

This contrasts markedly with his claim that the Iraqi army arrested him twice because they didn't want him in Rawah because he filed a complaint there against Omar. [27]  (Exh. 90-16 [Doc. 208-14].)  Person 5 said that he was arrested by the Iraqi army in Rawah "two times . . . So they would . . . They would cut me off, thrown me in jail to at least get me to leave Rawah, they don't want me to come to Rawah, the Iraqi army."  (Exh. 90-16 [Doc. 208-14].)  He said that the Iraqi army would "give me money, they would give me money to not go to Rawah, because I would always fight the organization fighters a lot, the organization fighters a lot, they hate me, you understand me?"  (Exh. 90-16 [Doc. 208-14].)

Person 5 also told the defense that his father was set up by Ahmed Badr, with a false accusation that the father was in ISIS.  (Exh. 90-14 [Doc. 208-14].)  He accused Badr of bribing

---

[26]  The victim's widow flatly states, "If [Person 5] says that he was carrying firearms and fighting at age nine, that is not true."  (Exh. 84-3 [Doc. 208-8].)

[27]  No Rawah complaint by Person 5 has ever been provided to the Defense, despite a request for all of his prior statements.

his way into the Popular Mobilization Force in Baghdad.[28]  Person 5 told the defense that his father wanted to expose Badr as a terrorist, so Badr "forged a false accusation against him and they took him and put him in Baghdad, in prison."  (Exh. 90-14 [Doc. 208-14].)  Person 5 stated that Badr, the ostensible complainant, paid for a lawyer for the father, to ensure the conviction.  (Exh. 90, pp. 14-15 [Doc. 208-14].)  In contrast, the family has indicated that Person 5's father was tortured in captivity to force him to confess to involvement with ISIS.  (Exh. 89, p. 2 [Doc. 208-13].)

Moreover, Person 5 lied to the FBI about the interview he gave to the Defense.  He claimed that the Defense offered him money.  It did not.  (Exhs. 90, 93, 94 [Docs. 208-14, 208-17, 208-18.)  He claimed that the Defense pressured him to disclose Person 4's name.  It did not.  Id.  He claimed that the Defense asked him to disclose where he lived.  It did not.  Id.

### 3.  Person 5 Wants Money in Connection with this Case

As discussed below, Person 5 has, through Person 4, obtained financial benefits from the United States for his actions in this case.  Person 5 has received directly benefits from Person 4, including security, a weapon to use during the day, a job (where he draws no salary), a home, and financial support.  Person 5 also told the Defense that he asked the "Americans" directly for money, "Who'll compensate me?  Who'll compensate me?  I implored the Americans, I implored the United States, and they did nothing for me.  I didn't leave anyone without imploring them."[29]  (Exh. 90-8 [Doc. 208-14].)

Person 5 explained that when he filed a complaint with the Iraqi National Security Service, they said "We will help you. . . We will help you, and arrange a monthly salary for you."  (Exh. 90-12 [Doc. 208-14].)   However, he was not given the salary, "I hope, I mean, that

---

[28]     The Defense has confirmed that Mr. Badr is a member of a PMF.  (Exh. 103 [Doc. 208-24].)

[29]     Later, Person 5 walked this back, saying, "I asked [the Americans] to help me a bit in my situation. . . I asked them only for safety. . . I wouldn't ask for those things [money or coming to America] in exchange for working against terrorism."  (Exh. 90-12 [Doc. 208-14].)

they find a solution for me.  I neither have a salary, nor a weapon, so that I may go to Rawah to join my family." Id.

Finally, Person 5 asked the Defense for money on October 18, 2019.  (Exh. 115-1 [Doc. 208-36].)  The Defense believes this may be because he was cut-off by his benefactor, Person 4 after the phone calls in late September.  Person 5's Facebook page documents a fall-out that he experienced with someone close shortly after those phone calls.  (Exh. 96.)[30]  Person 5 told the defense that he needed money for a family member's child who has cancer.  (Exh. 115-2 [Doc. 208-36].)  He directly asked for money, "I don't have the money to treat him, I hope you can secure some money for me, I hope you can respond to me, And there is no one I can ask for assistance from, other than you." Id.  Of course, the Defense refused to provide him with money. Even after that refusal, Person 5 continued to ask, "I am not requesting money from you (personally), I am requesting it from the great American nation, I hope you can respond. . . . If I didn't need money to treat the child I swear by God I wouldn't have requested from you. . ." (Exh. 115- pp. 2-3 [Doc. 208-36].)

### 4.  Person 5 Is Scared and Has Received Housing and Protection in Return for His Statement

The Government has consistently indicated that Person 5 has expressed fears of others connected to his testimony.  Person 5 repeatedly told the Defense of his fears, saying he was scared of:

1.  Rawah: "Every time I go to Rawah, I get struck.  They don't let me live in Rawah." (Exh. 90-1 [Doc. 208-14].)

2.  The Iraqi Army: "[Q: It's the Iraqi army that kicked you out of Rawah?] Yes. . . They want to kick me out of Rawah so that I wouldn't work against them."  (Exh. 90-16 [Doc. 208-14].)

---

[30]     These posts needed to be translated and redacted before being filed in the record as Exhibit 96.  The Defense was monitoring Person 4's Facebook and determined that he unfriended Person 5 at around the time of the first post.  Yesterday, the Defense confirmed that Person 4 has made his Facebook friends private.

3. ISIS: "They struck me 3 times in Rawah." This was "6 months after I joined the army. . ." Omar was not there. It what when "we liberated Al-Anbar and entered Rawah.. . . ." (Exh. 90-13 [Doc. 208-14].)

4. Sleeper cells: "They would strike me, sleeper cell elements… There are many sleeper cells. Most of them fall under Omar." (Exh. 90-13 [Doc. 208-14].)

Person 5 made it very clear that Person 4 has offered him protection. He told the defense, in speaking of Person 4, "he gave me a hiding place with him from the terrorist groups." (Exh. 90-1 [Doc. 208-14, p. 1.]) Promises of protection from violence render Person 5's statement coerced under clear Supreme Court caselaw. Payne v. Arkansas, 356 U.S. 560 (1958)(statement compelled by offer to protect declarant from outside threat); Arizona v. Fulminante, 499 U.S. 279 (1991)(promise of protection coerced statement). Mr. Fulminante was a prisoner in danger of physical harm at the hands of other inmates. An FBI informant offered protection in exchange for a confession. The Arizona State Supreme Court sided with Mr. Fulminante, holding that the promise of protection from others was "extremely coercive," reasoning that "[t]he confession was obtained as a direct result of extreme coercion and was tendered in the belief that the defendant's life was in jeopardy if he did not confess. This is a true coerced confession in every sense of the word." The U.S. Supreme Court also agreed Fulminante's statement was coerced. "As we have said, 'coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition.'" Fulminante, 499 U.S. at 286-287. As the Ninth Circuit recognized in Santos v. Thomas, "a coerced statement is not competent evidence and cannot support probable cause" in an extradition proceeding. 830 F.3d 987. Santos reversed the lower court for legal error in refusing to consider evidence of coercion.

### 5. Person 5's Father is in Prison for 20-Years for Supporting ISIS, Giving Him a Strong Motive to Align Himself with the Iraqi Authorities for His Own Protection and to Try to Secure His Father's Release

Person 5 acknowledged that his father is in prison for being part of ISIS. (Exh. 90, pp. 14-15.) His family confirmed this fact. (Exh. 89, p. 2 [Doc. 208-13] The victim's parents indicate that Person 5 used this fact to get them to go to the Court, by telling them that it would help get Person 5's father out of prison. (Exh. 89, p. 2 [Doc. 208-13].) The accusation of ISIS

activity, and the possibility that authorities could release the father, is a powerful motivator of Person 5's activity.   Ben Taub, Iraq's Post-ISIS Campaign Of Revenge, December 24, 2018 available at https://www.newyorker.com/magazine/2018/12/24/iraqs-post-isis-campaign-of-revenge (discussing guilt by association of family members of ISIS militants).

This motivation further renders his statement unreliable. Leyra v. Denno, 347 U.S. 556, 559-560 (1954)(involuntary statement extracted by promises of leniency); Lynumn v. Illinois, 372 U.S. 528 (1963)(statement compelled by threat to children); Harris v. South Carolina, 338 U.S. 68 (1949)(statement compelled by threat to arrest mother); United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981)(statement compelled by promise of benefit to child); see also People v. Trout, 54 Cal.2d 576 (1960)(statement compelled by promise of leniency to wife); People v. Steger, 16 Cal.3d 539, 550 (1976)(threat by police to arrest or punish a close relative, promise to free the relative in exchange for a statement, works to compel the statement).

### H.    The Involvement of Person 4 with Person 5's Story Further Undermines the Reliability of His Statement

#### 1.    The Involvement of Person 4 in Setting Up the Case Against Omar Ameen is Undeniably Concerning Due to His Credibility Issues, His Provision of Benefits to Person 5, and His Receipt of Benefits from the American Government

The direct involvement of Person 4 in triggering Person 5 to identify Mr. Ameen renders any statement even more suspect.  At the time of his interview, in late September, Person 5 had been living with, and supported by Person 4 for approximately two and a half years.  Person 4 is not a family member of Person 5.  Person 4 is identified by the FBI in its search warrant affidavits as someone who made the most serious and dramatic allegations against Mr. Ameen. Tracing the statements of Person 4 through the Government's various document show the centrality of this individual to the allegations against Mr. Ameen.

The FBI confirms that Person 4 is the source of the two forged, handwritten statements they received in September 2017.[31]  (Exh. 110.)  These include a forged statement by Person 5

---

[31]    As discussed above, the Defense has determined that TMF1 (as discussed in the FBI affidavits) and Person 4 are the same person.  It has asked the Government to confirm this.

1    and a forged statement by Witness A.  (Exhs. 42, 43.)  Each statement is co-signed by someone

2    who is identified as an investigator, and who shows up as one of Person 4's and Person 5's

3    Facebook friends.  (Exh. 98.)  This proves that Person 4 has no compunction about creating

4    evidence against Omar Ameen, involving others in this forgery, and lying to the FBI and the

5    Iraqi authorities.

6         Person 4's essential dishonesty with respect his claims regarding Omar Ameen is borne

7    out by the sheer number and incoherence of those claims.  The Search Warrant affidavit lays out

8    a number of Person 4's whoppers about Omar Ameen:  that Omar financially supported Al-

9    Qaeda, that Omar was in a close, daily relationship with his cousin Ghassan, that Omar collected

10   money with Ghassan for AQI dressed in Afghan-style garb, that Person 4 witnessed Omar plant

11   IEDs, that Person 4 witnessed Omar transporting jihadis and weapons, that Person 4 saw Omar

12   walk the streets with an AK-47, and that his family founded AQI in Al-Anbar.  (Exh. 112, ¶37,

13   ¶45, ¶51, ¶ 52, ¶ 53, ¶ 54, ¶ 72.)  The Government's Extradition and Detention Memorandum

14   (Doc. 6) lays out other extreme allegations, but fails to cite the sources for those allegations.[32]

15   As noted in the search warrant affidavit, the affiant has not included every fact known to her in

16   the investigation, but only those facts that she believes are necessary to support a finding of

17   probable cause.  (Exh. 112, p. 3.)

18        Person 4 spoke at length with the Defense, and laid out even more false accusations

19   against Mr. Ameen.  Chief among them is the accusation that Omar paid three million dollars to

20   the Iraqi government in early 2019 to be released in this case.  "[B]e certain and believe, sir, be

21   certain and believe, this Omar, last year the Americans brought him to hand him over to the Iraqi

22   government.  You know, I have information from inside Baghdad and inside the security

23

24   [32]     The Government has refused to produce Person 4's statements to the Defense or the
25   Court, so the Defense must rely on the Government's allegations to analyze what Person 4 has
     said.  The FBI affidavits indicate that Person 4 has interacted with the FBI at least four times.
26   FBI SA Emerson Lopez-Fuentes indicates he has had contact with him three times, including
     once when Person 4 brought him the purported death certificate for Omar's father.  (Exh. 111.)
27   FBI SA Coonfield documents what appears to be a fourth interaction, when Person 4 provided
     the forged documents.  (Exh. 110.)   It is unclear whether these interactions include his
28   documented contacts with the FBI in connection with the interviews of other witnesses on
     October 23, 2017 and January 23, 2018.

1   agencies, they said the organization sent over, I mean, through people from his family $3 million

2   for his release." (Exh. 92-1, 92-8 [Doc. 208-16].) (The Court knows that Mr. Ameen has been

3   in U.S. custody at the Sacramento County Main Jail since August 15, 2018.) Person 4 stated he

4   wanted to interrogate Omar himself, claiming that Omar struck him "with a car bomb at the Ana

5   intersection" and martyred 18 of his soldiers in 2006. (Exh. 92-2 [Doc. 208-16].) He claimed

6   that Omar was with the "stallions or the horses" at Abu Musab Al-Zarqawi's place and struck the

7   US forces in Ramadi and Fallujah. (Exh. 92-2 [Doc. 208-16].)

8         Person 4 claimed to have a video of Omar with Zarqawi and other high-level terrorists.

9   (Exh. 92-3 [Doc. 208-16].) Person 4 stated that he had a video of Omar Ameen with Abu Bakr

10  El-Baghdadi and Al-Zarqawi, and Ghassan Amin in Rawah in 2006. (Exh. 92-3 [Doc. 208-16].)

11  (Ghassan Amin has been in U.S. custody since 2005.) He repeatedly said he would provide it.

12  (Exh. 92-3 [Doc. 208-16].) He never has. He said that the video came off a laptop that he "got

13  at the time" that showed Omar with Zarqawi, and Al-Masri, and Abu Omar Al-Baghdadi, and

14  Ghassan Muhammed Amin, in Rawah at Omar's house. (Exh. 92-8 [Doc. 208-16].)

15        Person 4 claimed that Omar's right-hand man was the "person . . . who slaughtered the

16  journalist in Syria . . . in 2014." (Exh. 92-5 [Doc. 208-16].) He said that the bulletin he provided

17  to the defense at Exhibit 100 is a "report." (Exh. 92-5 [Doc. 208-16].) He said that Omar is a

18  "security guy" for ISIS, who "carried out many operations and many killings." (Exh. 92-3 [Doc.

19  208-16].) Person 4 claimed that because Omar was the security guy, his specialty was

20  "explosions outside the country, recruitment . . . meaning . . . they get people and tempt people

21  with money." (Exh. 92-8 [Doc. 208-16].) Person 4 claimed that Omar killed a person in a

22  village near Rawah, "killed him in front of his son. . . ." (Exh. 92-3 [Doc. 208-16].) Person 4

23  later came back to this issue, "I had a person whose dad was killed by Omar in front of him, I

24  mean, he's present . . . He can testify. . . He is a boy in Rawah . . . I will send you his phone

25  number, and you can talk with him." (Exh. 92-10 [Doc. 208-16].) He claimed that the killing

26  occurred in 2006 or 2007. He never sent the number.

27        Person 4 claimed that Omar "chose" to come to America instead of some other country

28  like France, Germany, or China, because he wanted to "carry out things and recruit inside the

USA."[33]  (Exh. 92-3 [Exh. 208-16].)  He claimed that an American named Dr. Omar would have all of the files and information against Omar Ameen.  (Exh. 92-5 [Doc. 208-16].)  He claimed he would connect the interviewer to Dr. Omar.  He never did.

All these claims are undermined by the fact that Omar was vetted and accepted into US through the U.S. Government's strict vetting process in 2014.  In fact, the U.S. has provided no independent evidence supporting anything Person 4 is claiming.  In fact, FBI interviews on the issue, including two interviews after Omar's arrest that sought to corroborate Person 4's statements, wound up finding witnesses who rejected the allegation that Omar was a terrorist.  (Exh. 118, 119, 120, 121.)

Person 4 claimed to have videotapes and photographs of Omar Ameen with terrorists.  He sent numerous photographs to the defense team, none of which showed Mr. Ameen with terrorists.  The photos of Omar were the following: (1) the DMV photograph used by the FBI in connection with this case, (2) a photo of Mr. Ameen in Utah on a road, and (3) a photo of Mr. Ameen in Utah on a ski slope.  (Exh. 104 [Doc. 208-25].)  Person 4 also had a home-made bulletin with two photographs of Mr. Ameen – the California DMV photograph and the road photo from Mr. Ameen's Facebook page – along with text making accusations against Mr. Ameen that echo those made in other documents.  (Exh. 100 [Doc. 208-21].)  The accusations on the bulletin are that Omar worked "against the US forces in Iraq at the time of Al-Qaeda, using explosive belts, mortars, grad missiles, booby-trapped explosive cars, and IEDs against the US Army and against unarmed civilian citizens, and against Iraqi security forces."  (Exh. 100 [Doc. 208-21].)

The other photographs sent by Person 4 to the defense were a mix of photographs of actual terrorists, including a publicly available mugshot of Ghassan Ameen, (Exh. 113-4), with

---

[33]     Of course, Omar did not choose in which country to be resettled.  The United States offered him resettlement.  It is up to the resettlement countries to decide who is resettled.  As reflected in their declarations, other Iraqis who were with Omar in Turkey were resettled in Germany, Austria, Belgium, and Canada.  Moreover, Person 4's allegation makes no sense in the story of this case: if ISIS meant to use someone as a sleeper agent, the organization never would have risked that plan by bringing that person back to Iraq in the middle of a war days after the U.S. agreed to accept him as a refugee.

handwritten names, and of other people from Rawah.  For example, one photograph was of a political rally in Rawah.  (Exh. 113-4 [Doc. 208-34].)  Omar Ameen is not in that photograph. Person 4 told the defense that the photographs would document Omar's "groups, his groups, his cell that operates in Al-Qa'im and Rawah" and dated from 2014 and 2015.  (Exh. 92-9 [Doc. 208-16].)  This is while Omar was in Turkey and after he came to the U.S.  Despite promising proof that would document Mr. Ameen with terrorists, Person 4 failed to send anything of the sort.

Person 4 was adamant that he could provide 100 witnesses who saw Mr. Ameen working with terrorist groups.  (Exh. 92-6 [Doc. 208-16].)  "I can bring you more than 100 people, 100 people who saw Omar the criminal, killer, and criminal. . . you know, eyewitnesses. . . ."  (Exh. 92-6 [Doc. 208-16].)  Person 4 claimed to have supplied 70 witnesses against Omar Ameen to another person.  The bulletin claims that "thousands of honorable people" can support the validity of the information against Omar.  (Exh. 100.)  At the end of the interview, Person 4 said that he would videotape 400-1000 people in Rawah about Omar.  (Exh. 92-15 [Doc. 208-16].) Person 4 claimed he arranged for Person 5, Witness A, and Person 1 to give statements against Omar Ameen:  "I videotaped them at the time and sent it to the Americans and they testified. . . ."[34]  (Exh. 92-7 [Doc. 208-16].)  The FBI confirms that Person 4 brought them at least four witnesses.  (Exh. 110, p. 2 [Doc. 208-31] (explaining that Person 4 brought three witnesses on Oct. 23, 2017); Exh. 111, p. 2 [Doc. 208-32] (confirming that Person 4 brought three witnesses Oct 23, 2017, and adding that Person 4 brought one witness on Jan. 23, 2018).

Person 4 also claimed that the Abu Bakr Al-Baghdadi meal with Omar Ameen was several days after the takeover of Rawah and the nearby towns.  (Exh. 92-6 [Doc. 208-16].)  At that point, he says, Omar Ameen was in the area and continued to go back and forth between

---

[34]     No such videos have ever been provided to the Defense.  The Government has indicated to the Defense that it has disclosed all statements it possesses by these three witnesses, accordingly this claim by Person 4 of having provided videotaped statements to the Americans must be a lie.

Syria and Iraq.[35]  (Exh. 92-6 [Doc. 208-16].)  He also said that Ihsan Jasim was killed "in the same 2014 when they first entered Rawah, after 7 days, 5 days, Omar killed him."[36]  (Exh. 92-10 [Doc. 208-16].)

Person 4 told the Defense that Omar Ameen detonated a car bomb in 2004 and killed 18 soldiers.  (Exh. 92-7 [Doc. 208-16].)  Person 4 claimed that Omar Ameen and his cousin Ghassan Amin hit Person 4 with a black Caprice (car).  (Exh. 92-7 [Doc. 208-16].)  Person 4 claimed that Omar Ameen killed multiple people including "my 2 children in Rawah the daughter of Ahmed Khiwayyikh they call him, [Omar] slaughtered her with a knife in front of her mother and in front of her father and [Omar] said to her, 'You are an agent with the Americans. You are working with the Americans.'  Omar and Ghassan Mohammed Ameen, you know?"  (Exh. 92-7 [Doc. 208-16].)

The stories about Omar are easily created and completely unfounded.  The cavalcade of accusations by Person 4 against Omar help explain why Person 4 used Person 5 to achieve his goal – return of Omar to Iraq for execution.

### 2. Person 4 Operated to Put Together Proof against Omar Ameen that Would Bring Him Back to Iraq

Person 4 is the mastermind of this case against Omar.  As shown by his actions and his words, he will stop at nothing to see Omar Ameen executed.  Person 4 told the defense team that Mr. Ameen should be returned directly to him, so that Person 4 could ensure that he was executed.  "Hand him over to me, Hand him over to me, I, I, I, I, I will get reprisal from him.  Hand him over to me, I, I, I will execute him.  I have proof and evidence against him, and, and will bring witnesses against him, and I will perform a trial in front of people, and will do a tribal thing against him and execute him. . . ." (Exh. 92-8 [Doc. 208-16].)

---

[35]    As discussed above, Omar was unquestionably in Turkey throughout 2014.

[36]    This incorrect detail offered by Person 4 may help explain why Person 5 has repeatedly said that the murder occurred on June 26, 2014 (Exh. 38; Exh. 90-1 [Doc. 208-14]) before correcting himself.

1    Person 4 told the Defense that he received a photograph of Omar in the United States

2    from a person in Erbil, who told him, "You know, Omar is one of the targets that we are

3    searching for things on."  (Exh. 92-14 [Doc. 208-16].)  Person 4 said that this person, "he is near

4    me, he is under my command, with me, he was with the police, with the SWAT forces they call

5    them."  (Exh. 92-14 [Doc. 208-16].)  So Person 4 "talked to the Americans about that matter, and

6    the case was opened against him."  Person 4 said, "I told [the Americans] them that, and then we

7    would work on him for information inside Rawah and inside Al-Anbar and inside Iraq and we

8    collected a lot of information about him, I mean, and we gave it to the American forces,

9    information, information about him. . . ."  (Exh. 92-14 [Doc. 208-16].)

10    Person 4's fingerprints are all over the Iraqi case against Omar Ameen, starting from his

11    provision of forged documents to the FBI.  Person 5 confirmed to the Defense that Person 4

12    approached him with a picture of Omar, telling Person 5, "this guy is a terrorist."  (Exh. 90-16

13    [Doc. 208-14].)  Person 4 has a bulletin on his phone that claims that Omar Ameen is a

14    dangerous terrorist.  (Exh. 100 [Doc. 208-21].)  It is clear that Person 4 approached multiple

15    people, including people he had a close relationship with, to develop information against Omar

16    Ameen to take to the FBI.  This information ultimately earned him immigration and financial

17    benefits, further motivating him to develop witnesses and stories against Omar. (Exh. 112, p. 9, ¶

18    30; Doc. 208-33].)

19    Person 4 openly admitted to the Defense his role in obtaining witnesses, claiming he

20    could obtain 70, or 100, or 400-1000 witnesses against Omar Ameen.  Person 4 immediately told

21    the defense that he was the one who arranged for all the witnesses to speak with the FBI for the

22    Omar Ameen case. (Exh. 922, pp. 3-4 [208-16].)

23    It is clear from the FBI Affidavits that Person 4 personally arranged for at least four

24    witnesses to speak with the FBI, going so far as to bring them to the FBI at Al-Assad Air Base

25    for their interviews, wait for them, provide his cell phone photos for identification, and take them

26    home. (Exhs. 109, 110, 111 [Docs. 208-30, 208-31, 208-32].)  He did this repeatedly – it is clear

27    that he met with the FBI in September 2017, October 2017, and January 2018, to provide the

28    forged statements, and 4 of the witnesses.  Id. The witnesses he provided are the only ones who

gave the FBI damning statements against Mr. Ameen with no hard evidence to back them up.[37]
Other witnesses provided rumors, or gave information about Omar's family, but not Omar.

Person 4 indicated that in September 2017 he would be providing the handwritten, forged statements to Iraqi authorities.  It is clear that he took the lead with the INSS and the Iraqi Court as well.  Person 5 told the defense that Person 4 brought him to the FBI and to the INSS. (Exh. 90-8 [Doc. 208-14].)  Person 4 told the defense that he took Person 5 to the Iraqi court and arranged for the witnesses in Baghdad "because they requested them, the Iraqi government, via the Americans, and I sent them and they testified against him. . . ."  (Exh. 92, pp. 4, 10 [Doc. 208-16].)

Person 4's activity shows that he is completely and personally invested in the case and, as indicated by the forged statements he provided, willing to break rules and lie to get Omar Ameen extradited.  Person 4 first demonstrated his willingness to manipulate the system to go after Omar Ameen, when he provided forged documents to the FBI in September 2017. (Exh. 110, ¶ 7 [Doc. 208-31].)

In addition to all the other concerns with probable cause in this case, Due Process protects Omar from being returned to Iraq to face a proceeding where he is being deliberately framed by Person 4, under color of law.  Limone v. Condon, 372 F.3d 39, 45 (9th Cir. 2004)(Due Process protects individual "against deliberate framing under color of official sanction");
Mooney v. Holohan, 294 U.S. 103, 112 (1935).  Person 4 is the head of a paramilitary group who told the Defense that he would convene a tribal court to try Omar Ameen and remove any

---

[37]   In this context, it is important to note that Person 4 also supplied the FBI with Person 1, who has not provided any sworn or competent evidence before the Court.  Person 1 was interviewed by the FBI on January 23, 2018 (Doc. 206-3, p. 2, ¶ 14.).  As the Government acknowledged at the October 7, 2019, hearing, the Court cannot rely on anything outside the Extradition Packet and Supplemental Extradition Packet provided by the Republic of Iraq in assessing probable cause.  This is required by the treaty itself, which requires "depositions" or other competent evidence.  Article XI, Exh. 80, Collated EP, p. 10.).  The U.S. Government has disclaimed any reliance on Person 1's unsworn claims in this proceeding.  (Tx., Oct. 7, 2019, p. 5.)

possibility that the Iraqi Courts would release him. (Exh. 92-8 [Doc 208-16].)[38]  Mobilization

Forces, like the one commanded by Person 4, are officially part of the Iraqi security forces yet

independent from any control over oversight by the Iraqi Defense Ministry.  Philippe Atallah,

"The Future of the Iraqi Popular Mobilization Forces," <u>Foreign Policy Research Institute</u> (Aug.

19, 2019) available at fpri.org.

No lesser an authority than the U.S. State Department has concluded that Iraqi security

forces use torture to obtain statements from detainees.  U.S. Dept. of State, <u>2018 Human Rights</u>

<u>Report, Iraq</u> at pp. 2, 4 available at www.state.gov/j/drl/rls/hrrpt/.  The 2018 Human Rights

Report credited numerous reports that "government officials employed torture and other cruel,

inhuman, or degrading treatment or punishment, and that courts routinely accepted forced

confessions as evidence, which was often the only evidence in ISIS-related counterterrorism

cases."  <u>Id.</u>, at p. 4, 15.  The State Department found evidence that Iraqi entities involved in this

case, including the militias, the Federal Police and the Iraqi National Security Service abused and

tortured individuals – particularly Sunni Arabs. <u>Id.</u>  "[T]he country's judges frequently failed to

investigate credible allegations that security forces tortured terrorism suspects."  <u>Id.</u>, at p. 6; <u>see</u>

<u>also</u>, <u>id</u>. at p. 12.

Person 4's statement that he wants Omar to be returned directly to him, so that he can

convene a tribal proceeding, and ensure that he is executed is terrifying.  His illicit motives, and

his power over Person 5, undermine the reliability of Person 5's statement.

### 3. Person 4 Received Benefits from US Government for his Statements against Omar Ameen; He then Channeled the Financial and Relocation Benefits to Person 5

As discussed in the search warrant affidavit, the U.S. Government is in possession of

information regarding benefits it provided to Person 4, who has completely supported Person 5

since some time in 2017.  The search warrant affidavit indicates that Person 4 received an

immigration benefit and relocation expenses expressly for his statements to the FBI against Mr.

---

[38]  Person 4 has power in Iraq. His Facebook page features a photograph of him with General and former-Secretary of Defense James Mattis.  (Exh. 98-2 [Doc. 208-19].)

Ameen.  (Exh. 112, para. 30.)  Person 4 clearly has travel access to the U.S.. (Exh. 92-13 [Doc. 208-16] ["I came to America.  I came to Washington…. If you want me to come again I don't have any problem."].)  His Facebook page shows him in an American museum.  (Exh. 95-1 [Doc. 208-19].)  It also shows him in a photograph with then-Secretary of Defense James Mattis, posted on September 1, 2017, around the time he began this campaign against Omar Ameen. (Exh. 95-2 [Doc. 208-19].)

Person 4 indicated that he has a multi-entry visa to the United States.  (Exh. 92-13 [Doc. 208-16].)  The Defense cannot know if that is the benefit he obtained for his statements, or if he is waiting for a visa to immigrate to the United States.  Likewise, the United States provided Person 4 relocation expenses. (Exh. 112, p. 9, ¶ 30.)  Despite Defense request, the Government has not disclosed to the defense the amount, however any funds provided to Person 4 clearly redounded to Person 5's benefit, as he was living with and completely financially supported by Person 4.  Person 5 set out his complete dependence on Person 4 as discussed below:  "He is like my father." (Exh. 90, p. 16 [Doc. 208-14].)

### 4.   Person 4 Has Credibility Issues Noted in the Search Warrant Affidavit

In her August 14, 2018 affidavit supporting the government's application for a warrant to search Mr. Ameen's home, FBI Special Agent Buckmiller notes the FBI's inability to verify aspects of Person 4's stories.  "Person 4 indicates that he/she as previously worked as a source providing information to the U.S. military, though the FBI has been unable to definitively confirm that history."   Person 4 likewise told the Defense, "[F]rom 2003, from the entrance of the US forces into Iraq, I have worked with the, with the Americans, with the Marines, with the Special Forces . . . with the Navy Seals. . . ."[39]  (Exh. 92- pp. 5-6 [Doc. 208-16.])

---

[39]     If this was true, then Person 4 clearly never had the evidence he now claims against Omar Ameen in the 2000s, as he surely would have provided this evidence (videos, photos, and events he witnessed) to the Americans at the time.  There can be no valid explanation for why Person 4 would wait until September 2017 to provide this information, if in fact he had proof that Omar was a "security guy" for Zarqawi and then Baghdadi, the two most wanted terrorists, for over ten years prior.  The only conclusion is that Person 4 is lying, both about the information and about his value as a source to the American.

SA Buckmiller goes on to acknowledge that "there are some identified inconsistencies in statements Person 4 has made regarding his/her own personal history, specifically discrepancies between exact dates of certain events." (Exh 112, p. 9.)  Despite these credibility issues, the Buckmiller affidavit cites Person 4 for many of its most outlandish claims. Exh. 112.[40] Curiously, another FBI Special Agent personally vouched for the credibility of Person 4 (aka TMF Member 1), seemingly unaware of the issues SA Buckmiller noted, stating "I am not aware of any instance where TMF Member 1 has fabricated or falsified information or passed on information that the FBI later discovered to be fabricated or falsified." (Fuentes-Lopez Affidavit, Exh. 111.)  This statement also ignores the clear forgeries passed by Person 4 to the FBI in September 2017.

### 5. Person 5 Has Been Completely Dependent on Person 4 for Several Years

Person 5 described his relationship with Person 4 thus:  "[H]e is currently providing for me.  He is like my father, and he is providing almost for my family, and I can't leave him and I can't forsake someone who is devoted and honest very much so, and when you get to know him you will love him."  (Exh. 90, p. 16 [Doc. 208-14].)  He stated that Person 4 "is with the American forces and he is a Regiment Commander in Al-Anbar in the Mobilization.  I am with him in the Mobilization. . . but I don't have a salary, because I am hiding with him from ISIS. . . .What can I do about it?  You know my situation. . . . I am forced to work this work.  I want a weapon.  Because without a weapon, I can't protect myself.  So, I am waiting for an

---

[40]     Exh. 112 ¶37 [financial support for AQI], ¶45 [family wanted by US and Iraqi governments], ¶51 [Ameen in close/daily relationship with Ghassan; personally observed them collecting money for AQI dressed in Afghan-style garb], ¶ 52 [observed Ameen with father soliciting funds in marketplace for mujahidin], ¶ 53 [witnessed Ameen planting IEDs], ¶ 54 [witnessed Ameen transporting mujahidin and weapons and witnessed Ameen walking streets with AK-47], ¶ 72 [Ameen family founders of AQI in the region).  The Buckmiller affidavit notes that some of the information in the document was taken "from draft transcripts of recorded conversations that transpired in English and Arabic and were translated contemporaneously with the assistance of an interpreter."  (Exh. 112, ¶ 8.)  No recordings or transcripts of FBI interviews have been disclosed to the Defense, despite a request for all witness statements.

1   administrative order. . . . I have to be with them.  So I am forced, that means."  (Exh. 90, pp. 5-6

2   [Doc. 208-14].)

3          Person 4 has protected Person 5 from others, including from the Iraqi Army, which

4   Person 5 has indicated has arrested him twice.[41]  (Exh. 90-16 [Doc. 208-14].)  "[Person 4, Person

5   4] got me out. . . . He got me out, he called them.  He has connections and mediators and he got

6   me out."  Id.

7          Benefits given to Person 5, especially by someone as self-interested as Person 4 are

8   clearly relevant to consideration of whether Person 5's statement is reliable.  See Napue v.

9   Illinois, 360 U.S. 264, 265-66 (1959)(due process violation not to reveal benefits given to

10   inculpatory witness).  As discussed above, Person 5 solicited bribes from the Defense team even

11   after falsely accusing the Defense of offering him money.  Since sometime in 2017, Person 5 has

12   been completely supported by Person 4, the militia member who arranged for Person 5 to speak

13   with the FBI, and who has received financial and immigration benefits from the U.S.

14   Government.

15          **6.  Person 4's Family Has a Long-Standing Grudge against the
                   Ameen Family**

16

17          In its Extradition Hearing Brief, the Defense expressed its concern about ties between

18   Person 5 and a family that has a long-standing grudge against the Ameen family.  (Doc. 142, p.

19   46.)  At the time, the defense did not know the identity of Person 4.  It turns out that Person 4 is

20   exactly the person who bragged about bringing Omar Ameen back from America.[42]  Exhibit 39,

21   a declaration from Omar's brother Qutaiba, explains the issue: the Person 4 family moved to

22   Rawah more than 25 years ago from their hometown.  Person 4 "made trouble and intervened in

23   the affairs of the families of Rawah, and it was decided that he needed to be expelled from

24   Rawah."  (Exh. 39, para. 4.)  The Ameen family took the lead in expelling Person 4's family.[43]

25   _____

26   [41]     No prior arrests of Person 5 have been disclosed to the Defense, despite request.

27   [42]     Person 4 is identified by his initials in the brief and by his name in the exhibit, which is
         redacted in ECF.  (Exh. 39.)

28   [43]     The Government's brief confuses this issue.  (Doc. 205, p. 35 [claiming Person 5 has an
         alleged tribal grudge].)  It is not Person 5 or his family who had historic issues with the Ameen

1

**IV.     Recent Cases Confirm that This Court Should Consider Mr. Ameen's Refugee Status and at the Likelihood of Persecution and Torture Upon Return in Connection with the Certification Decision**

2

3        Section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA").

4   FARRA § 2242 provides that "It shall be the policy of the United States not to … extradite …

5   any person to a country in which there are substantial grounds for believing the person would be

6   in danger of being subjected to torture…" and that "the appropriate agencies shall prescribe

7   regulations to implement the obligations of the United States under Article 3 of the United

8   Nations Convention Against Torture ["CAT"]…" 8 U.S.C. 1231 note.

9        The United States has an obligation under international law not to extradite Mr. Ameen to

10   Iraq given the substantial likelihood that he will be tortured and executed.  Congress recognized

11   that obligation as policy in the FARRA.  Unfortunately, the "appropriate agencies" have not

12   prescribed regulations to address this in the extradition context, although they have in the

13   deportation context.  Nonetheless, two recent extradition court have recognized the issue and

14   refused to certify extradition in such cases.

15        In Aguasvivas v. Pompeo, the U.S. State Department took the position that it was free to

16   extradite Aguasvivas despite a BIA order preventing his return based on CAT's prohibition of

17   the return of any individual to a country where he/she will face torture.  The government argued

18   that federal courts had no jurisdiction to interfere with its plans or to consider whether

19   Aguasvivas would be tortured and killed if returned.  The court held, however, "that Mr.

20   Aguasvivas' extradition would violate [CAT]," and therefore denied and dismissed the

21   extradition complaint.  Aguasvivas v. Pompeo (D.RI. Sep. 18, 2019, No. 19-123-JJM-PAS) 2019

22   U.S. Dist. LEXIS 161172, at *2.

23        In United States v. Porumb, the court denied the government's Motion to Certify, finding

24   that the proposed extradition would violate the United States' obligation to abstain from

25

26

27   _____

28   family.  Rather the victim's family and the Ameen family were neighbors and got on well
     together.  Person 4's family, and Person 4 himself, had a serious tribal issue with the Ameen
     family.

refoulement, codified at 8 U.S.C. §1158(c)(1).[44]  <u>United States v. Porumb</u> (W.D.La. Sep. 25, 2019, No. 6:18-MJ-00010) 2019 U.S. Dist. LEXIS 165908, at *16.  The court held, "[e]xtradition is a return of an individual to his country of nationality.  Hence, to extradite one who has been granted asylum back to his native country is to violate a federal statute and the 1967 Protocol and to render the extradition illegal. This Court will not certify an illegal extradition." <u>Id.</u> at *16.

As an asylum-seeker, Mr. Ameen is entitled to the same protection from refoulement. "Asylum-seekers are protected against refoulement by virtue of Article 33(1) of the 1951 Convention and customary international law for the entire duration of the asylum proceedings. The requested State may not extradite an asylum-seeker to his or her country of origin while his or her refugee claim is being considered, including at the appeal stage." UNHCR Guidance Note on Extradition and International Refugee Protection, April 2008, at 14. (available at https://www.refworld.org/pdfid/481ec7d92.pdf ).

### A.      It Is More Likely Than Not That Mr. Ameen Will Suffer Severe Pain or Suffering Tantamount to Torture If Returned to Iraq

Here, it is more likely than not that Mr. Ameen will be detained by the Iraqi government or government-sanctioned paramilitaries, who will inflict severe pain or suffering constituting torture, and such pain and suffering will be inflicted for the purposes of punishment and coercion of a confession by government employees, or else with the consent of the larger Iraqi government.

The FARRA regulations define "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining . . . a confession, [or] punishing him . . . , or intimidating or coercing him . . . , or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." <u>See</u> 22 C.F.R. § 95.1. This definition is verbatim the same regulatory language

---

[44] 8 U.S.C. §1158(c)(1)(A) states: "In the case of an alien granted asylum under subsection (b), the Attorney General shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence[.]"

1    promulgated for purposes of CAT claims in immigration proceedings. See 8 C.F.R.

2    §1208.18(a)(1). Given the similarities between the immigration regulations and the FARRA

3    regulations, the Court should rely on the substantial CAT jurisprudence developed by the Ninth

4    Circuit as persuasive authority.

5         Acts constituting torture "are varied, and include beatings and killings." Reyes v. Lynch,

6    842 F.3d 1125, 1140 (9th Cir. 2016). For example, the Ninth Circuit has concluded that sustained

7    beatings over a one-month period coupled with multiple cigarette burns over an 8 to 10-day

8    period constituted torture. See Al-Saher v. INS, 268 F.3d 1143, 1147 (9th Cir. 2001).

9    Furthermore, the regulations provide that torture includes "the intentional infliction or threatened

10   infliction of severe physical pain or suffering," as well as a "threat of imminent death" or

11   "administration or application, or threatened administration or application, of mind altering

12   substances or other procedures calculated to disrupt profoundly the senses or the personality." 22

13   C.F.R. § 95.1(b)(2)(i)-(iv). Torture does not include pain or suffering "arising only from,

14   inherent in or incidental to lawful sanctions.'" Al-Saher, 268 F.3d at 1147. Lawful sanctions

15   encompass "'judicially imposed sanctions and other enforcement actions authorized by law,

16   including the death penalty,' but only so long as those sanctions do not 'defeat the object and

17   purpose of [CAT] to prohibit torture.'" Nuru v. Gonzales, 404 F.3d 1207, 1221 (9th Cir. 2005)

18        To sustain a CAT claim, the adjudicator must find that "it is more likely than not that the

19   fugitive would be tortured." 8 C.F.R. § 95.1. This preponderance standard is also applied in the

20   immigration context. See Lianhua Jiang v. Holder, 754 F.3d 733, 740 (9th Cir. 2014). To that

21   end, the Ninth Circuit has cautioned that "CAT claims must be considered in terms of aggregate

22   risk of torture from all sources, and not as separate, divisible CAT claims." Quijada-Aguilar v.

23   Lynch, 799 F.3d 1303, 1308 (9th Cir. 2015) (emphasis added).

24        While "generalized evidence of violence and crime" is insufficient to carry an applicant's

25   burden of proof, Delgado-Ortiz v. Holder, 600 F.3d 1148, 1152 (9th Cir. 2010), the Ninth Circuit

26   has held that "country conditions alone can play a decisive role in granting relief under the

27   [CAT]." Kamalthas v. INS, 251 F.3d 1279, 1280, 1283 (9th Cir. 2001) (reopening proceedings

28   for an applicant previous found not credible because "country conditions … confirm that Tamil

males have been subjected to widespread torture" in Sri Lanka). Moreover, the Ninth Circuit has held that "[w]idespread mistreatment of a certain group of people" is probative of whether he is likely to face torture upon return. <u>Wakkary v. Holder</u>, 588 F.3d 1049, 1058 (9th Cir. 2009). Other factors an adjudicator should consider include evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; evidence of gross, flagrant, or mass violations of human rights within the country of removal, where applicable; or other relevant information regarding conditions in the country of removal. <u>See</u> 8 C.F.R. §1208.16(c)(3)(i)-(v); <u>Nuru</u>, 404 F.3d at 1218 (9th Cir. 2005).

Here, the purpose of these proceedings is to return Mr. Ameen to the custody of Iraqi authorities. If this occurs, the evidence shows Mr. Ameen is likely to be tortured, both because of individualized threats of torture and a pattern and practice of torturing similarly-situated Sunni Arab men accused of ISIS membership. <u>See</u> <u>Wakkary v. Holder</u>, 588 F.3d at 1058. As an initial matter, Iraqi authorities regularly torture individuals in their custody, particularly Sunni Arabs like Mr. Ameen. (Exh.45-B, pg. 23.) The U.S. Department of State Report 2018 Human Rights Report for Iraq recognizes that government forces abused and tortured individuals during arrest, pretrial detention, and after conviction. (<u>Id</u>., pg. 6.)  Iraqi courts regularly relied on forced confessions from suspected ISIS militants who bore signs of torture, and there is complete impunity for government-sponsored torture. (<u>Id</u>., pg. 19; Exh. 45-C, pp. 205.)

Moreover, there were numerous reports that government-sanctioned forces committed arbitrary or unlawful killings. (<u>Id</u>., pg. 2; Exh. 45-C, pg. 203, 205.) In this case, Mr. Ameen has been threatened with extrajudicial killing by Person 4, a colonel of the government-sanctioned "Tribal Mobilization Force" militia, who, if Mr. Ameen is released to his custody, vows to "do a tribal thing against [Mr. Ameen] and execute him." (Exh. 92-8.) The fact that Person 4 was a key individual in instigating the proceedings against Mr. Ameen in Iraq and substantially collaborated with the U.S. government in initiating these extradition proceedings shows that he has the means and willingness to take Mr. Ameen into custody and carry out these threats. (Exh. 92-1, 92-13.) This credible death threat falls within the ambit of torture, and its extrajudicial

1    nature is not a "lawful sanction" exempted from protections of the CAT. (See Nuru, 404 F.3d at

2    1221.)

3          Besides extrajudicial killings, country conditions show that Mr. Ameen is likely to be

4    subjected to forms of official torture sanctioned for ISIS suspects. Such mistreatment is

5    pervasive in Iraq. Indeed, Ihsan Abdulhafiz Jasim's parents reported that they have another son

6    was tortured into confessing he was an ISIS member. (Exh. 89-2.) This routine torture of ISIS

7    suspects includes "hanging from the hands bound behind the back; beatings with plastic and

8    metal pipes and cables, including on the soles of the feet; burning of the penis and testicles with

9    a hot metal ruler; hanging by a hook and tying a one-quart water bottle to the penis; and kneeling

10   with the hands tied together behind the back." (Exh. 45-B, pg. 6.) Similarly, in the course of her

11   work as a researcher for Human Rights Watch, Belkis Wille has documented numerous abuses of

12   suspected ISIS fighters "beating, hanging, stress positions for extended periods of time, and

13   holding detainees in overcrowded and degrading conditions sometimes leading to deaths in

14   detention." (Exh. 45, pg. 4.) Such prolonged beatings and mutilative injuries have previously

15   been found to constitute torture for purposes of CAT. Al-Saher, 268 F.3d at 1147.

16         Because all of the touchstones of torture are present, including direct death threats and

17   country conditions showing extrajudicial killings, prolonged and mutilative physical injury, and

18   deplorable conditions that bring about painful and unnecessary death, Mr. Ameen has satisfied

19   this prong of the CAT inquiry.

20           **B.**    **Government Officials and Government-Sanctioned Paramilitaries**

21                  **Will Intentionally Inflict the Aforementioned Pain and Suffering on**
               **Mr. Ameen for Purposes Prohibited by the CAT**

22         To qualify as torture, severe harm must be intentionally inflicted for the purpose of

23   punishment, intimidation, coercion, "or for any reason based on discrimination of any kind." See

24   8 C.F.R. § 1208.18(a)(1); Ridore v. Holder, 696 F.3d 907, 912 (9th Cir. 2012). To that end,

25   detention conditions can be so clearly deplorable that they support an inference that officials

26   specifically intended the torturous conditions. See id. at 917.

27         Here, Person 4 seeks to punish Mr. Ameen by "do[ing] a tribal thing against [Mr. Ameen]

28   and execut[ing] him." (Exh. 92-8.) Meanwhile, Belkis Wille reports that "Iraqi security forces

frequently engage in torture during interrogations of ISIS suspects to extract confessions." (Exh. 45, pg. 4.) Indeed, such forced confessions are often the only evidence presented against a suspected ISIS militant. (Exh. 45-B, pp. 5-6.) Inflicting extrajudicial killings and torture for purposes of punishment and coerced confession are squarely prohibited by the CAT. Ridore, 696 F.3d 907, 912 (9th Cir. 2012). Moreover, the prevailing prison conditions – including "food shortages, gross overcrowding, physical abuse, and inadequate sanitary conditions and medical care" – are so deplorable as to support an inference of specific intent to torture. Ridore, 696 F.3d at 912. To that end, the State Department Human Rights Report notes that "government forces … abused prisoners and detainees, particularly Sunni Arabs." (Exh. 45-B, pg. 23.)

Finally, the evidence shows that Person 4 – as an Iraqi security official -- may have instigated these false accusations against Mr. Ameen because he is a members of the Al-Obaydi tribe, which has a longstanding grudge against Mr. Ameen's family. (Exh. 95, pg, 2.) Weaponizing the government crackdown on ISIS to exact revenge on personal enemies is a common occurrence in Iraq.  Belkis Wille reports that "Human Rights Watch researchers received numerous allegations from families of detained ISIS suspects that neighbors or other individuals had proposed the addition of individuals to one of the "wanted lists" [for ISIS suspects] simply because of tribal, familial, land, or personal disputes." (Exh. 45, pg. 3.) Therefore, inasmuch as Person 4 will cause Mr. Ameen to be tortured and executed as an ISIS suspect to exact personal revenge on his family or tribe, Mr. Ameen faces torture inflicted for the purpose of "discrimination" as well. See 8 C.F.R. § 1208.18(a)(1)

Because Iraqi authorities and paramilitaries will engage in the above-mentioned harm for proscribed reasons of extracting false confessions., inflicting punishment, and vindicating discriminatory animus against Mr. Ameen's family, the "prohibited purpose" prong of the CAT inquiry is satisfied.

### C.    The Individuals Likely to Inflict the Aforementioned Harm Are Either Public Officials or Individuals the Iraqi Government Allows to Operate with Impunity

Both the FARRA and immigration regulations define "acquiescence" as a situation where a public official "the public official, prior to the activity constituting torture, ha[s] awareness of

53

1    such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such

2    activity." Compare 22 C.F.R. 9.1(b)(5) with 8 C.F.R. § 1208.18(a)(7).

3         In the immigration context, a CAT applicant can show that the individual likely to inflict

4    harm is a public official, he has satisfied the official infliction/acquiescence prong of CAT. See

5    Barajas-Romero v. Lynch, 846 F.3d 351, 362 (9th Cir. 2017). This is true even if these

6    individuals are arguably "rogue officials" acting outside the scope of their official duties. Id.

7    Furthermore, an applicant can satisfy this infliction/acquiescence prong by showing "willful

8    blindness" on the part of a government official. See Zheng v. Ashcroft, 332 F.3d 1186, 1197 (9th

9    Cir. 2003). Such "willful blindness" requires only that a public official "could have inferred the

10   alleged torture was taking place, remained willfully blind to it, or simply stood by because of

11   their inability or unwillingness to oppose it." See Ornelas-Chavez v. Gonzales, 458 F.3d 1052,

12   1060 (9th Cir. 2006). An adjudicator must examine the probability of such acquiescence at all

13   levels of government because "if public officials at the state and local level . . . would acquiesce

14   in any torture [a CAT applicant] is likely to suffer, this satisfies CAT's [acquiescence]

15   requirement . . . , even if the federal government . . . would not similarly acquiesce." See

16   Madrigal v. Holder, 716 F.3d 499, 509 (9th Cir. 2013).

17        Finally, country conditions indicating widespread violence, government participation in

18   torture, and official policies related to such harm can show government acquiescence, even

19   without evidence that the applicant will be specifically targeted. See Bromfield v. Mukasey, 543

20   F.3d 1071, 1079 (9th Cir. 2008) (reversing CAT denial where "the Country Report … establishes

21   that selected group are victims of beatings, killings, and other forms of torture" in Jamaica).

22        Here, Mr. Ameen has satisfied the official infliction/acquiescence prong of CAT

23   inasmuch as he faces torture at the hands Person 4, a member of the Iraqi government. See

24   Barajas-Romero, 846 F.3d at 362. Moreover, in criminal trials of ISIS suspects, "judges

25   frequently ignore[] allegations of torture," including in cases where medical examinations

26   showed signed of torture. (Exh. 45-B, pg. 19.) Similarly, Amnesty International reports that,

27   while "the Iraqi authorities established committees to evaluate the available evidence and launch

28   investigations" of torture an extrajudicial killing, "[s]uch committees consistently failed to

1   release any findings publicly or to communicate their findings to international or national

2   NGOs." (Exh. 45-C, pg. 205.) Such inaction creates a "culture of impunity" within both the

3   security forces and the paramilitary groups such as the Tribal Mobilization Force. (Exh. 45-B,

4   pp. 6, 12.)

5        Because Mr. Ameen has shown that government officials will either directly participate

6   in his torture or else stand by while such torture is committed by government-sanctioned

7   paramilitary groups, he has shown that the torture faces will occurs "with the consent or

8   acquiescence of a public official or other person acting in an official capacity." <u>See</u> 22 C.F.R.

9   95.1.

10             **D.**    **Mr. Ameen Cannot Reasonably Relocate within Iraq to Avoid Harm.**

11        A CAT applicant's ability to relocate within the proposed country of return is a factor in

12   determining the overall likelihood of torture, but neither party bears the burden of proof as to

13   relocation. *See* 8 C.F.R. § 1208.16(c)(2); <u>Barajas-Romero</u>, 846 F.3d at 364. Here, Mr. Ameen

14   cannot relocate within Iraq because he will be delivered directly into the hands of his torturers if

15   extradited.  Mr. Ameen requests that certification be denied for the above reasons.

16           **V.**    **THE POLITICAL OFFENSE EXCEPTION BARS EXTRADITION**

17        Omar Ameen remains steadfast that Iraq's allegations against him of murder and

18   involvement with ISIS or any other militant group are bogus.  However, as the Defense argued in

19   Section IV of its Extradition Brief (Doc. 142, pp. 50-54), even if the charge were true, the

20   political offense exception to the extradition treaty bars Mr. Ameen's extradition to Iraq.

21        As noted in Doc. 142, the Defense has met its burden of proof to establish the essential

22   elements of the political offense exception through the allegations in the Government's own

23   pleadings, as well as those in the Iraqi extradition request.  The Government failed to

24   meaningfully respond to this defense because it is unable to prove that the crime charged in the

25   Complaint was not of a political character – one for which the political offense exception in

26   Article III of the treaty bars Mr. Ameen's extradition to Iraq.

27           **VI.**    **IF AN INDICTMENT IS PENDING AGAINST MR. AMEEN, THE**

28                   **DEFENSE REQUESTS THAT THIS EXTRADITION MATTER BE**

**DEFERRED SO THAT HE MAY DEFEND HIMSELF IN THE CRIMINAL CASE**

Defense counsel believe that an indictment may be pending against Mr. Ameen in this Court.  The Court intimated such during the argument on unsealing the search warrant affidavits.  (Doc. 125, p. 8, lines 8-11.)  Defense counsel has requested that the Government tell Mr. Ameen if he is pending indictment – it has refused to do so.  It has certainly not denied it.

If Mr. Ameen is pending indictment in this Court, he asks that this Court defer this proceeding to allow such prosecution to proceed.  Article VI of the Extradition Treaty (Exh. 80, Collated EP at 9) provides:

> If a fugitive criminal whose surrender is claimed pursuant to the stipulations of this Treaty, be *actually under prosecution* . . . for a crime committed in the country where he has sought asylum . . . his extradition may be deferred until such proceedings be determined, and until he shall have been set at liberty in due course of law.  (Emphasis added.)

Due Process, the language of the treaty, and the presumption of openness of court proceedings would all support the unsealing of a pending indictment.  If an indictment has been returned, it may be kept secret under Federal Rule of Criminal Procedure 6(3)(4) "until the defendant is in custody or has been released pending trial."  Mr. Ameen has been in custody since August 15, 2018, so there is no need to keep any such document sealed.

If there is a pending, sealed indictment, then Mr. Ameen should know about it, and be able to request that this matter be deferred in light of that charge.  Especially given the issues highlighted above, it makes sense for any criminal prosecution in this Court to proceed prior to reaching the certification question.  Accordingly, Mr. Ameen asks for notice of that charging document.

## VII.    CONCLUSION

The Court has already admitted evidence of alibi that "could realistically 'obliterate' probable cause."  (Doc. 160, p. 14.)  It has noted its concern that this case may rest on the that statement of a single witness, and indicated that it will focus on corroboration and that witness's

veracity.  (Doc. 160, p. 19.)  The law "does not require the Court to accept, without question, statements that are riddled with admitted lies and are so inconsistent as to be rendered wholly unreliable. If that were the case, the judicial function in extradition cases would be rendered meaningless and this Court would truly be a rubber stamp for the government."  In re Mazur, 2007 U.S. Dist. LEXIS 52551, at *82-84 (N.D. Ill. July 20, 2007) (denying extradition where statements of witness self-serving, inconsistent, and lacking indicia of reliability, and admittedly fabricated in part).

The Defense appreciates the Court's willingness to engage fully with this challenging record.  (Doc. 160, p. 14.)  As discussed above, the evidence provided by the Defense completely obliterates probable cause, both by proving that Mr. Ameen was in Turkey during the period of time of the offense, and by showing that the witness statement is unreliable for a variety of documented reasons.  The Defense urges the Court not to certify the extradition of Mr. Ameen.

Dated:  November 18, 2019

                                        Respectfully submitted,

                                        HEATHER E. WILLIAMS
                                        Federal Defender

                                        /s/ Benjamin D. Galloway
                                        BENJAMIN D. GALLOWAY
                                        Chief Assistant Federal Defender

                                        /s/ Rachelle Barbour
                                        RACHELLE BARBOUR
                                        Assistant Federal Defender
                                        Attorneys for Defendant
                                        OMAR ABDULSATTAR AMEEN