McGREGOR W. SCOTT
United States Attorney
AUDREY B. HEMESATH
HEIKO P. COPPOLA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700

CHRISTOPHER J. SMITH
Associate Director
REBECCA A. HACISKI
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C. 20530
Telephone: (202) 514-0000

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATTAR AMEEN TO THE REPUBLIC OF IRAQ | CASE NO.   2:18-MJ-152 EFB<br><br>Date:  December 4, 2019<br>Time:  10:00 a.m.<br>Hon. Edmund F. Brennan |

REPLY IN SUPPORT OF EXTRADITION

## <u>TABLE CONTENTS</u>

I.    THE COURT MUST ADMIT AND CONSIDER THE SUPPLEMENT, AS IT

SATISIFIES THE STATUTORY REQUIREMENTS FOR ADMISSIBILITY ............................2

II.   NONE OF THE DEFENSE EVIDENCE OBLITERATES PROBABLE CAUSE ........................4

    A.    No Alibi Has Been Established...................................................................6

        1.    **Known Dates Leave a Significant Gap**.................................................6

        2.    **Unsupported Inferences** .....................................................................8

        3.    **Untested Witness Statements** ............................................................9

    B.    Credibility Issues are for Trial ...............................................................11

        1.    **There is No Inconsistency Within the Extradition Request**............12

        2.    **Probable Cause is Not Obliterated by Inconsistent Statements Outside the Extradition Request** ......................................................14

        3.    **None of the Defense Allegations Prove That Person 5 Misidentified Ameen**..............................................................................................16

        4.    **An Allegation of Bias Can Only Be Probed in Iraq**.........................19

        5.    **The Contradictory Narrative of Witnesses A, B, and C is Inadmissible and Unreliable** ............................................................22

    C.    The Claim of Forgery has Been Definitively Rebutted by the Supplement and the FBI Affidavits ........................................................................................24

III.  THE COURT SHOULD CERTIFY AMEEN FOR EXTRADITION BASED ON

THE PROBABLE CAUSE ESTABLISHED IN THE EXTRADITION REQUESTS.................26

    A.    TMF-1 and Person 4 are Not the Same Person, and Neither is a Part of the Republic of Iraq's Extradition Request................................................................27

    B.    The Witness Statements and Corroborating Evidence Establish Probable Cause...........................................................................................................30

    C.    If a Trial is Needed to Resolve an Evidentiary Issue, that Inquiry Should Take Place in Iraq ..............................................................................................31

IV.   NONE OF AMEEN'S OTHER DEFENSES TO EXTRADITION IS AVAILING....................32

    A.    The Alleged Treatment Ameen Would Face Upon His Return to Iraq is Outside the Purview of the Court...............................................................................32

        1.    **The CAT is Not Self-Executing**.........................................................34

        2.    **The FARR Act Does Not Provide for Substantive Judicial Review of CAT Claims in Extradition Cases** ...............................................35

i

3.    **The REAL ID Act Makes Doubly Clear that Courts May Not Review CAT Claims in Extradition Cases** ........................................................36

4.    **The Ninth Circuit and Other Precedent Foreclose Ameen's Claim** ................36

5.    **The Cases Upon Which Ameen Relies Do Not Support His Claim** ................38

B.    The ISIS Murder for Which Ameen's Extradition is Sought is Not Barred Under the Political Offense Exception of the Treaty .........................................................39

C.    Article VI of the Treaty Does Not Provide a Basis for the Court to Defer Extradition ........................................................................................................................42

V.    CONCLUSION ................................................................................................................43

# TABLE OF AUTHORITIES

## CASES

*Aguasvivas v. Pompeo*
  No. 19-123-JJM-PAS, 2019 WL 4456034, at *12 (D.R.I. Sept. 18, 2019) .................................... 38, 39

*Afanasjev v. Hurlburt*,
  418 F.3d 1159 (11th Cir. 2005) ............................................................................................. 3

*Ahmad v. Wigen*,
  726 F. Supp. 389 (E.D.N.Y. 1989) ...................................................................................... 39

*Artukovic v. Rison*,
  628 F. Supp. 1370 (C.D. Cal. 1986) .................................................................................... 3

*Austin v. Healey*,
  5 F.3d 598 (2d Cir. 1993) ..................................................................................................... 15

*Barapind v. Enomoto*,
  400 F.3d 744 (9th Cir. 2005) ................................................................... 11, 23, 25, 31, 32

*Barapind v. Reno*,
  225 F.3d 1100 (9th Cir. 2000) .............................................................................................. 33

*Bingham v. Bradley*,
  241 U.S. 511 (1916) ................................................................................................................ 4

*Blaxland v. Commonwealth Dir. of Pub. Prosecutions*,
  323 F.3d 1198 (9th Cir. 2003) ............................................................................................. 43

*Bovio v. United States*,
  989 F.2d 255 (7th Cir. 1993) ................................................................................ 3, 4, 12, 19

*Bozilov v. Seifert*,
  983 F.2d 140 (9th Cir. 1992) ............................................................................................... 30

*Caplan v. Vokes*,
  649 F.2d 1336 (9th Cir. 1981) ...................................................................................... 24, 31

*Charlton v. Kelly*,
  229 U.S. 447 (1913) .......................................................................................................... 5, 24

*Cheng Na-Yuet v. Hueston*,
  734 F. Supp. 988 (S.D. Fla. 1990) ...................................................................................... 21

*Cheung v. United States*,
  213 F.3d 82 (2d Cir. 2000) ................................................................................................... 42

*Choe v. Torres*,
  525 F.3d 733 (9th Cir. 2008) .......................................................................................... 3, 11

*Collins v. Loisel*,
  259 U.S. 309 (1922) .............................................................................................. 11, 14, 31

*Denham v. Deeds,*
    954 F.2d 1501 (9th Cir. 1992) ............................................................................... 17

*Desmond v. Eggers,*
    18 F.2d 503 (9th Cir. 1927) ..................................................................................... 4

*Eain v. Wilkes,*
    641 F.2d 504 (7th Cir. 1981) ......................................................................... passim

*Emami v. U.S. Dist. Court for the N. Dist. of Cal.,*
    834 F.2d 1444 (9th Cir. 1987) ................................................................... 4, 11, 26

*Escobedo v. United States,*
    623 F.2d 1098 (5th Cir. 1980) ............................................................................ 3, 4

*Extradition of Powell,*
    4 F. Supp. 2d 945 (S.D. Cal. 1998) ...................................................................... 20

*Fernandez v. Phillips,*
    268 U.S. 311 (1925) .................................................................................................. 1

*Gonzalez v. Jacquez,*
    No. 10-65 GAF, 2011 WL 4550151 (C.D. Cal. May 19, 2011) ............................ 23

*Hooker v. Klein,*
    573 F.2d 1360 (9th Cir. 1978) ............................................................................... 11

*Hoxha v. Levi,*
    465 F.3d 554 (3d Cir. 2006) ............................................................................ 33, 37

*Illinois v. Gates,*
    462 U.S 213 (1983) ................................................................................................ 30

*In re Christensen,*
    478 F.2d 1392 (2d Cir. 1973) .................................................................................. 4

*In re Extradition of Azizi,*
    No. 5:14-XR-90282, 2015 WL 1299791 (N.D. Cal. Mar. 20, 2015) ...................... 3

*In re Extradition of Gang-Choon Han,*
    No. 11-cv-2059 DMG, 2012 WL 33201 (C.D. Cal. Jan. 6, 2012) ......................... 21

*In re Extradition of Garcia,*
    825 F. Supp. 2d 810 (S.D. Tex. 2011) .......................................................... 9, 14, 16

*In re Extradition of Gonzalez,*
    52 F. Supp. 2d 725 (W.D. La. 1999) ....................................................................... 9

*In re Extradition of Sainez,*
    No. 07-MJ-177, 2008 WL 366135 (S.D. Cal. Feb. 8, 2008) ................................. 30

*In re Extradition of Shaw,*
    No. 14-CV-81475-WM, 2015 WL 3442022 (S.D. Fla. May 28, 2015) ................. 14

*In re Extradition of Singh*,
    124 F.R.D. 571 (D.N.J. 1987) ................................................................ 21

*In re Extradition of Singh*,
    170 F. Supp. 2d 982 (E.D. Cal. 2001) .............................................. 39, 40

*In re Ryan*,
    360 F. Supp. 270 (E.D.N.Y. 1973) .......................................................... 4

*In re the Extradition of Marzook*,
    924 F. Supp. 565 (S.D.N.Y. 1996) ........................................................... 4

*Lopez-Smith v. Hood*,
    121 F. 3d 1322 (9th Cir. 1997) ................................................................ 3

*Limone v. Condon*,
    372 F.3d 39 (1st Cir. 2004) .................................................................... 20

*Matter of Extradition of Atta*,
    706 F. Supp. 1032 (E.D.N.Y. 1989) ...................................................... 14

*Matter of Extradition of Burgos Noeller*,
    No. 17-cr-644, 2018 WL 1414128 (N.D. Ill. Mar. 21, 2018) ............... 31

*Matter of Extradition of Garcia*,
    890 F. Supp. 914 (S.D. Cal. 1994) ........................................................ 20

*Matter of Extradition of Lara Gutierrez*,
    No. 16-5061 PSG, 2017 WL 8231237 (C.D. Cal. Feb. 22, 2017) ......... 23

*Matter of Extradition of Mainero*,
    990 F. Supp. 1208 (S.D. Cal. 1997) ................................................. 15, 20

*Matter of Extradition of Ricardo Alberto Martinelli Berrocal*,
    No. 17-22197-CIV, 2017 WL 3776953 (S.D. Fla. Aug. 31, 2017) ... 14, 25

*Matter of Extradition of Rodriguez Ortiz*,
    444 F. Supp. 2d 876 (N.D. Ill. 2006) ............................................... 14, 15

*Matter of Extradition of Solis*,
    402 F. Supp. 2d 1128 (C.D. Cal. 2005) ............................. 15, 25, 29, 32

*Matter of Silva-Peralta*,
    15-MJ-3444 WVG, 2016 WL 4987483, 10 (S.D. Cal. 2016) ............... 17

*Matter of Sindona*,
    450 F. Supp. 672 (S.D.N.Y. 1978) ........................................................... 7

*Matter of the Extradition of Acevedo*,
    No. 16-cv-1766, 2017 WL 3491749 (C.D. Cal. Aug. 11, 2017) ........... 32

*Matter of the Extradition of Velasco Hernandez*,
    No. 07-mj-8333, 2008 WL 4567108 (S.D. Cal. Oct. 7, 2008) ............... 20

*Medellin v. Texas*,
   552 U.S. 491 (2008) ............................................................................................ 34, 35

*Meza v. U.S. Atty. Gen.*,
   693 F.3d 1350 (11th Cir. 2012) ................................................................................ 33

*Mironescu v. Costner*
   480 F.3d 664 (4th Cir. 2007) .................................................................................... 37

*Mooney v. Holohan*,
   294 U.S. 103 (1935) .................................................................................................. 20

*Napue v. Illinois*,
   360 U.S. 264 (1959) .................................................................................................. 20

*Neil v. Biggers*,
   409 U.S. 188, 200 (1972) .......................................................................................... 17

*Noeller v. Wojdylo*
   922 F.3d 797, 807 (7th Cir. 2019)) ........................................................................... 32

*Omar v. McHugh*,
   646 F. 3d 13 17 (D.C. Cir. 2011) ............................................................................. 37

*Patterson v. Wagner*,
   785 F.3d 1277 (9th Cir. 2015) .................................................................................. 42

*Perez v. Mims*,
   No. 1:16-CV-01935-SKO HC, 2017 WL 374350 (E.D. Cal. Jan. 26, 2017) ........... 37

*Perry v. New Hampshire*,
   565 U.S. 228 (2012) .................................................................................................. 17

*Quinn v. Robinson*,
   783 F.2d 776 (9th Cir. 1986) ............................................................................. passim

*Sainez v. Venables*,
   588 F.3d 713 (9th Cir. 2009) .................................................................................... 26

*Santos v. Thomas*,
   830 F.3d 987 (9th Cir. 2016) ............................................................................. passim

*Sexton v. Beaudreaux*,
   138 S. Ct. 2555 (2018) .............................................................................................. 17

*Shapiro v. Ferrandina*,
   478 F.2d 894 (2d Cir. 1973) ............................................................................... 12, 15

*Spinelli v. United States*,
   393 U.S. 410 (1969) .................................................................................................. 30

*Trifonov v. Fox*,
   No. C14–0366JLR, 2014 WL 3735419 (W.D. Wash. July 28, 2014) ...................... 42

*Trinidad y Garcia v. Thomas*
    683 F.3d 952 (2012) ............................................................................................... 36

*United States ex rel Sakaguchi v. Kaulukukui,*
    520 F.2d 726 (9th Cir. 1975) ................................................................................. 4

*United States v. Andrade,*
    06-MC-9039, 2006 WL 3628096 (D. Or. Dec. 11, 2006) ..................................... 8

*United States v. Ford,*
    683 F.3d 761 (7th Cir. 2012) .......................................................................... 10, 17

*United States v. Hunte*
    No. 04-M-0721 SMG, 2006 WL 20773, at *8 (E.D.N.Y. Jan. 4, 2006)............... 23

*United States v. Kin-Hong,*
    110 F.3d 103 (1st Cir. 1997)............................................................................ 4, 39

*United States v. Pearson,*
    159 F.3d 480 (10th Cir. 1998) .............................................................................. 10

*United States v. Peterka,*
    307 F. Supp. 2d 1344 (M.D. Fla. 2003)........................................................... 15, 20

*United States v. Perez*
    No. 1:15-MJ-0074 SKO, 2016 WL 931041, at *6 (E.D. Cal. Mar. 11, 2016) ...... 33

*United States v. Porumb*
    No. 6:18-MJ-000106:18-CR-00035-01, 2019 WL 4694141, 11 (W.D. La. Sept. 25, 2019)............... 38

*Valencia v. Limbs,*
    655 F.2d 195 (9th Cir. 1981) ................................................................................ 43

*Venckiene v. United States,*
    328 F. Supp. 3d 845 (N.D. Ill. 2018) .................................................................... 33

*Vo v. Benvo,*
    447 F. 3d 1235, 1246 n. 13 (9th Cir. 2006) .................................................... 40, 42

*Williams v. Florida,*
    399 U.S. 78 (1970) ................................................................................................ 10

*Yin-Choy v. Robinson,*
    858 F.2d 1400 (9th Cir. 1988) ................................................................................ 2

## STATUTES

8 U.S.C. § 1252(a)(4)....................................................................................... 35, 36

18 U.S.C. 3184...................................................................................... 33, 38, 43

18 U.S.C. § 3190.......................................................................................... Passim

28 U.S.C. § 2241.................................................................................................. 38

U.S.C. § 3190 .................................................................................................................. 2

**RULES**

Fed. R. Crim. P. 12.1(a) ................................................................................................. 10

1    The evidence in the Republic of Iraq's extradition request amply establishes probable cause that

2    Omar Ameen committed the murder for which his extradition is sought.  In his response, Ameen fails to

3    present reasonably clear-cut proof obliterating probable cause, and his other defenses to extradition are

4    meritless.  The Court should certify Ameen for extradition at the conclusion of the continued extradition

5    hearing on December 4, 2019.

6    First, this Court should admit the supplement to the extradition request ("supplement"), as it

7    satisfies the evidentiary requirements under the statute.  *See* 18 U.S.C. § 3190.  Admission of this

8    supplement is nondiscretionary, and the Court must consider as part of the evidentiary record the

9    evidence contained therein, which makes clear that this is a three-witness case, not a one-witness case.

10   The supplement equally makes clear that there is no forgery contained in the extradition request.  The

11   presiding Iraqi judge, Judge Dhiya, personally took the testimony of each of the three witnesses, and the

12   witnesses signed and imprinted their statements in front of him.  Those three witness statements

13   establish probable cause in the extradition request.

14   Second, the defense arguments in the pre-hearing brief advancing an alibi defense and attacking

15   the credibility of the eyewitness are misdirected.  They are trial arguments.

16
17   > [O]ut of a natural anxiety to save the [fugitive] if possible from being sent
   > from New Hampshire to Mexico for trial, it has been presented as if this
   > were the final stage and every technical detail were to be proved beyond a
18   > reasonable doubt.  This is not the law.

19   *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).  The Court should apply the law mandating that

20   contradictory evidence may not be considered, decline to engage in the weighing of competing witness

21   statements that the defense invites, and allow the Republic of Iraq to consider the challenges the defense

22   has raised regarding an alleged alibi and their attempts to impeach the eyewitness.

23   Third, the defense is mistaken about the identity of Person 4 and TMF-1.  They are two different

24   people.  Person 4 is discussed in the United States' criminal search warrant affidavit; TMF-1 is not.

25   Person 4 has nothing to do with these extradition proceedings and is not named or referenced anywhere

26   in the extradition request, the supplement, or the FBI Special Agents' affidavits.  This simple mistake

27   and the speculation that arises from it are emblematic of the reason the Court's inquiry is better confined

28   to what the law directs:  a prima facie evaluation of the four corners of the extradition request and

supplement.  The Court need not and should not engage in fact-finding related to either Person 4 or TMF-1.  The Republic of Iraq independently investigated the murder of Ihsan Abdulhafiz Jasim ("Ihsan"), and that investigation resulted in the warrant against Ameen.  The evidence the defense has produced does not rise anywhere close to the level of obliterating probable cause and is thus inadmissible.  The Court should therefore confine its review to the four corners of the extradition request and supplement.

Fourth, Ameen's remaining arguments about the treatment he may face if he is returned to Iraq, the political offense exception to extradition, and his inquiry into whether there is a U.S. criminal indictment pending against him lack merit, are misplaced, and should not deter this Court's certification of his extradition.

## I.    THE COURT MUST ADMIT AND CONSIDER THE SUPPLEMENT, AS IT SATISIFIES THE STATUTORY REQUIREMENTS FOR ADMISSIBILITY

This Court has admitted the extradition request as evidence that has been properly authenticated and otherwise meets the requirements of 18 U.S.C. § 3190.  *See Santos v. Thomas*, 830 F.3d 987, 992 (9th Cir. 2016) (en banc).  This Court should admit the supplement for the same reason.

Pursuant to 18 U.S.C. § 3190, the only requirement for the admissibility of the supplement is that the documents are "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of" Iraq.  *See* 18 U.S.C. § 3190; *Yin-Choy v. Robinson*, 858 F.2d 1400, 1406 (9th Cir. 1988) ("authentication is the only requirement for admissibility of evidence under general United States extradition law").  The documents are accompanied by the requisite "certificate of the principal diplomatic or consular officer of the United States resident in" Iraq.  *See* 18 U.S.C. § 3190; CR 194-1 at 7 (certificate executed by David Ian Hopper, Consul General of the U.S. Embassy in Baghdad, Iraq).  Pursuant to Section 3190, this certificate "shall be proof" that the documents are properly and legally authenticated.  18 U.S.C. § 3190.  Accordingly, pursuant to Section 3190, the documents "*shall* be received and admitted as evidence on [the extradition] hearing for all the purposes of such hearing." 18 U.S.C. § 3190 (emphasis added).[1]

---

[1] The Department of State has also confirmed that the supplement was certified in accordance with Section 3190.  CR 194-1 at 1-5 ¶ 3.

2

The admission of properly authenticated documents such as those in the supplement is mandatory and without exception pursuant to Section 3190.  *See* 18 U.S.C. § 3190; *see also, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) ("In this case, the bill of indictment and the other Lithuanian documents were properly certified by Jonathan Floss, Vice Consul at the American Embassy in Lithuania.  The unsworn indictment, therefore, was admissible, and the magistrate judge was free to consider it in determining whether to certify [the fugitives'] extradition."); *Bovio v. United States*, 989 F.2d 255, 260 (7th Cir. 1993) (noting that "certification is conclusive proof that documents are admissible"); *Escobedo v. United States*, 623 F.2d 1098, 1103 (5th Cir. 1980) ("Since the Mexican Extradition Documents were properly certified by the United States Ambassador to Mexico, they were authenticated, and admissible under section 3190.").  Accordingly, Ameen's claim that the documents do not constitute "competent evidence," CR 216 pg. 13, without any challenge to the authentication of the documents, is unfounded.[2]

Ameen is also incorrect in stating—without any support—that the supplement is not "in Judge Dhiya's words."  *Cf.* CR 216 pg. 13.  While the Director of the President of the Supreme Judicial Council Office (who is a higher-ranking official in Iraq than Judge Dhiya) signed the request, in it he states that "the judge Dhya Jafar illustrated the following:" and then provides a statement written the first person, which is clearly from Judge Dhiya.  *See* CR 194-1 at 11-12 (discussing how "[i]n April 2018, the civil plaintiffs whom I documented their statements referred to their request to press charges against [Ameen]" and "[a]ll statements . . . were recorded by me under oath . . . in my presence").  The fact that Judge Dhiya did not himself sign the request does not render it "incompetent," as Ameen alleges.  *See Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008) (rejecting argument about reliability of

---

[2] Even if the documents somehow did not satisfy Section 3190, the Court should still exercise its discretion to admit them.  *See Santos*, 830 F.3d at 1007 ("The extradition court . . . has broad discretion to determine the admissibility of the evidence before it."); *Bovio*, 989 F.2d 255 at 260 ("While certification is conclusive proof that documents are admissible, it is not the exclusive means of authentication.  Section 3190 does not purport to be the only means by which a document is admissible in extradition proceedings."); *In re Extradition of Azizi*, No. 5:14-XR-90282, 2015 WL 1299791 at *6 (N.D. Cal. Mar. 20, 2015) ("Certification under 18 U.S.C. § 3190, however, is not the only means by which documents may be admitted in extradition proceedings."); *Artukovic v. Rison*, 628 F. Supp. 1370, 1376 (C.D. Cal. 1986), *overruled on other grounds*, *Lopez-Smith v. Hood*, 121 F.3d 1322 (9th Cir. 1997) ("While [18 U.S.C.] § 3190 makes evidence certified as admissible in our courts, it is not true that the Government may introduce evidence *only* by way of such certification.") (emphasis in original).

3

1   Korean prosecutor's summaries of evidence, where evidence was properly authenticated); *United States*

2   *ex rel Sakaguchi v. Kaulukukui*, 520 F.2d 726, 728 (9th Cir. 1975) (extradition court properly admitted

3   evidence pursuant to Section 3190 despite allegations that the documents in the extradition request

4   revealed "inconsistencies and discrepancies"); *see also, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517

5   (1916) (rejecting fugitive's challenge to affidavits obtained *ex parte* based on predecessor to Section

6   3190 because it improperly "savor[ed] of technicality").

7        Moreover, the Court may properly rely on the hearsay contained in the supplement.  It is well-

8   established that "[a] determination of probable cause in an extradition proceeding may rest entirely upon

9   hearsay."  *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y. 1973), *aff'd sub nom. In re Christensen*, 478

10  F.2d 1392 (2d Cir. 1973); *see also Santos*, 830 F.3d at 991 (explaining that an extradition hearing

11  "involves a preliminary examination of the evidence," where "a finding of probable cause may be based

12  upon hearsay in whole or in part") (quotation marks and citation omitted) (quoting *United States v. Kin-*

13  *Hong*, 110 F.3d 103, 120 (1st Cir. 1997)); *Bovio*, 989 F.2d at 259 ("[H]earsay testimony is often used in

14  extradition hearings."); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450-51 (9th

15  Cir. 1987) ("[U]nder the general extradition law of the United States and the provisions of the Treaty,

16  the hearsay statements . . . are competent evidence."); *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.

17  1986) (rejecting fugitive's argument that evidence containing "double hearsay," obtained through

18  alleged "procedural irregularities," meant that it was "unreliable and [could] not be considered

19  'competent'" so as to "support the probable cause finding"); *Escobedo*, 623 F.2d at 1102 n.10 & 1103

20  (upholding extradition magistrate's finding of probable cause, and rejecting fugitive's argument that

21  evidence submitted by the requesting state "constitutes compound hearsay and is untrustworthy"); *In re*

22  *the Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996) (finding probable cause that fugitive

23  committed crimes in Israel despite his argument that the extradition complaint was based "purely upon

24  multiple hearsay").  Accordingly, the Court should both admit and rely upon the supplement.

25  **II.      NONE OF THE DEFENSE EVIDENCE OBLITERATES PROBABLE CAUSE**

26        "All of the authorities agree . . . that matters which are only a defense to a trial on the merits are

27  not admissible." *Desmond v. Eggers*, 18 F.2d 503, 505 (9th Cir. 1927).  Even where the defense

28  amasses "impressive evidence" of a defense that would be admissible in a trial—much beyond what

4

1   Ameen has done here—it is of no moment in an extradition hearing.  *Charlton v. Kelly*, 229 U.S. 447,

2   457 (1913) (fugitive had no right to introduce "impressive evidence" of insanity).

3          Ameen has not presented this Court with clear-cut evidence that conclusively establishes that he

4   was in Turkey, rather than Iraq, at the time of the offense.  Despite searching for fifteen months during

5   the pendency of this case for evidence that would prove—at the obliterating level—that Ameen was in

6   Turkey on June 22, 2014, Ameen has found none.  What is clear based on all the evidence is that there is

7   a gap in time where Ameen's whereabouts are unaccounted for.  Ameen was in Turkey before the

8   murder, and Ameen was in Turkey after the murder, but for approximately one month before and two

9   weeks after the murder, there is no documentary, forensic, immigration, or other evidence that

10  establishes Ameen's whereabouts.  Ameen's purported "alibi" defense raises more questions than

11  answers, and may be advanced only at trial in Iraq.

12         Ameen's additional defense is that Person 5 is not credible, which is also in the heartland of what

13  is beyond the scope of an extradition hearing.  Evidence that Person 5 has been inconsistent on aspects

14  of his account of the evening of the murder, evidence that Person 5 potentially may have had a bias

15  against Ameen, and evidence that Person 5 associates with someone who is motivated to bring evidence

16  against Ameen may be presented as possible impeaching evidence at trial, not in these extradition

17  proceedings.

18         Ameen's alternative defense is that the extradition request contains forged signatures, but this

19  allegation has been definitively rebutted by the supplement, in which the investigating judge personally

20  attests that he listened to the sworn testimony, assisted in the preparation of the witness statements,

21  observed the witnesses signing the approved statements, and observed them give their prints.  The

22  forgery allegation is further fully rebutted by the affidavits of the FBI Special Agent who personally

23  observed the testimony, signature, and fingerprinting by Person 5 in court in Iraq.  In any event,

24  Ameen's various forgery allegations are contradictory to the evidence in the supplement and should be

25  excluded.

26         The Court should decline to admit the majority of Ameen's proposed exhibits for the reasons set

27  forth in the government's Objections thereto (filed separately).  But even if the Court does admit the

28  exhibits, they, along with those previously admitted, fail to undermine probable cause that Ameen

committed the murder for which his extradition is sought.

A.   <u>No Alibi Has Been Established</u>

Ameen has not presented this Court with reasonably clear-cut evidence that conclusively establishes that he was in Turkey at the time of the murder.  All of the evidence Ameen has submitted to the Court requires the Court to make assumptions, make credibility determinations, and weigh statements, in order to contradict the eyewitness testimony that places him in Rawah, Iraq committing murder on June 22, 2014.  This is precisely what extradition courts may not do.  Further, Ameen's briefing overstates the quality and weight of the evidence that he has submitted to this Court.

1.   **Known Dates Leave a Significant Gap**



The only known dates surrounding the June 22, 2014 murder are Ameen's May 22, 2014 interview with United States Citizenship & Immigration Services in Turkey before the murder, and Ameen's July 7, 2014 medical appointment in Turkey after the murder.  Defense exhibit 11-Q.

1    This leaves approximately a month of travel time before the murder and two weeks of travel time after

2    the murder.  The remaining dates are very much in dispute and unknowable on the record before this

3    Court, even if it were to admit the defense's purported alibi evidence.

4         Ameen has attempted to shrink that timeline, arguing principally that four undated entries

5    purporting to be sign-in logs demonstrate weekly check-ins in Mersin, Turkey.  But Ameen has not

6    produced as evidence sign-in logs from the time of the murder.  Defense exhibit 11-T is four undated

7    sign-in logs.  These undated sign-in logs are supplemented by a declaration from a defense investigator

8    explaining how he requested the June 2014 sign-in logs, but only received in response these undated

9    sign-in logs.  Defense exhibit 11-T.  It is not knowable from exhibit 11-T when this log was signed,

10   whether it is actually Ameen signing, on which day he is purportedly signing, and on which day he

11   actually signed, if he signed at all.  The declaration does not constitute reliable evidence that the pages

12   sent from Turkey are the June 2014 sign-in logs, because the investigator did not have the opportunity to

13   view the actual sign-in logbook, and the pages attached to his declaration are undated.  The declaration

14   suggests that additional information from the Mersin Immigration Office might be forthcoming, but that

15   additional information seems to have not materialized in the six months since the declaration was

16   written.  This evidence as a whole does not support the conclusion that Ameen signed in in Mersin,

17   Turkey on the Thursday before the murder and the Thursday after the murder, as the defense urges the

18   Court to deduce.  The sign-in evidence is not "reasonably clear-cut proof which would be of limited

19   scope and have some reasonable chance of negating a showing of probable cause."  *Matter of Sindona*,

20   450 F. Supp. 672, 685 (S.D.N.Y. 1978).  It should be rejected.

21        Even if this Court were to assume that the pages in defense exhibit 11-T are the June 2014 sign-

22   in sheets, and that Ameen signed them, the sign-in dates still do not give Ameen an alibi for the murder,

23   which took place on a Sunday.  A sign-in on a Thursday and a sign-in on the following Thursday do not

24   establish an unassailable alibi that might obliterate probable cause that he committed murder on a

25   Sunday.

26        Ameen also relies on two "notification" dates in a further attempt to shrink the timeline—the

27   June 11, 2014 date that "USCIS notified the ICMC," CR 216 pg. 4, and the June 26, 2014 notification of

28   medical appointment, CR 216 pg. 5.  Neither of these dates is evidence that Ameen was in Turkey to

receive such notification.  The June 11, 2014 date is the date one government agency notified another

agency about Ameen's case, not a date that proves Ameen was in Turkey communicating with any

identifiable person.  The June 26, 2014 date is also the date that one agency informs another agency, and

is after the date of the murder.  At least two possibilities exist: one, this date corroborates the narrative

that Ameen committed the murder and immediately fled Iraq again to avoid detection, returning to

Turkey shortly after the murder; or two, Ameen became aware of the medical appointments on June 26,

2014, giving him reason to return to Turkey promptly so as not to miss the appointment.[3]  The evidence

in the record does not establish how the Ameen family was informed about the appointment, whether it

was by telephone, or whether Ameen's wife took the call.  The record simply states the agency

"informed them all."[4]  Defense exhibit 81-5.  These two notification dates are insufficient to narrow the

timeline of when Ameen was in Turkey.  They are the type of evidence that Ameen may seek to

introduce at trial to try to persuade the finder of fact that there was a narrower timeline, but they are not

obliterating evidence that negates probable cause.

The record before this Court establishes a timeline of an unaccounted-for gap of approximately

six weeks, with the date of the murder falling in the middle of the gap.  The timeline is not proof of an

obliterating alibi defense—if anything, it supports the facts alleged in the extradition request.

## 2.    Unsupported Inferences

The next aspect of Ameen's "alibi" evidence is the theory that because there was activity on the

Omar Ameen Facebook account, and because there may not have been internet availability in the Al

Anbar province at certain times, the Facebook activity proves that Ameen was somewhere other than the

Al Anbar province.  This theory impermissibly requires fact finding at several junctures, on a record that

is ambiguous at best.  *See United States v. Andrade*, 06-MC-9039, 2006 WL 3628096 *4 (D. Or. Dec.

---

[3] Ameen suggests in a footnote that he could not so easily and quickly have left ISIS.  CR 216 pg. 5 n.5.  But no one has alleged that Ameen left ISIS in the sense that he had a change of heart or switched loyalties.  The allegation is that he left Iraq to immigrate to the United States.  The government has no knowledge that Ameen has ever ended his affiliation with ISIS or Al Qaeda.

[4] There is no proof in the record that Ameen was in Turkey communicating with any identifiable person on either date.  The evidence in the record does not establish how the Ameen family was informed about the appointment; the record simply states the agency "informed them all," likely a reference to the long list of families documented (redacted) along with the Ameen family in Defense Exhibit 11-F who were also scheduled to have medical exams.  This list appears to have been attached to the original email from June 11, 2014.

11, 2006) ("The evidence of alibi in this case is not clear cut and does not completely negate or obliterate the existence of probable cause. It is, in the first instance, dependent on the finding of time of death contained in the autopsy, a matter that could be rebutted or explained by the government at trial. It is also dependent upon the credibility of Andrade's family members who place him in Oregon the weekend of January 10 and 11.").[5] Someone else could have had access to the Ameen Facebook account. It is entirely plausible that Ameen left his account logged in and accessible on a shared device with his family members, and that a family member kept up the Facebook activity during the time he was gone. Or, the Republic of Iraq may dispute the notion that there was an internet blackout in Al Anbar around the time of the murder. There may have been moments of limited accessibility. There may have been ways around the blackout, if there was one.

These kinds of rebuttal theories mean that Ameen's "alibi" evidence can be disproven. As such, it is not clear-cut, obliterating proof, and does not establish the kind of alibi that might negate probable cause. "[W]hen alibi evidence would raise more questions than answers and turn the probable cause determination into a full trial on the merits, it does not obliterate probable cause." *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 830 (S.D. Tex. 2011).

### 3.   Untested Witness Statements

The final aspect of Ameen's "alibi" evidence includes witness statements claiming either that Ameen was not in Rawah during the time of the murder, or that Ameen never left Turkey. Ameen represents that there are 29 such statements, which would seem an impressive quantity. But, in reviewing them individually, the conviction that would come with 29 statements of true alibi diminishes

---

[5] Ameen analogizes his case to *In re Gonzalez*, in which a court declined to certify an extradition, citing special circumstances that allowed the court to consider alibi evidence. *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 733–34 (W.D. La. 1999). A critical feature of the court's analysis in that case, however, was the fact that witness identifications of the fugitives were "highly suspect. Absent a substantial and independent showing of reliability, the identifications would not meet the standards of probable cause under the Constitution and laws of the United States." *Id.* Even if that case were rightly decided, its reasoning does not extend to this case, where the witness identification is highly reliable. Person 5 knew Ameen, had a good opportunity to observe him, identified him immediately after the crime, and picked his photograph out of a nonsuggestive photo array. It was the weakness of the probable cause that the magistrate judge determined opened the door to an alibi defense in *Gonzalez*. *Id.* The probable cause in this case is not weak, and the alibi evidence is not clear-cut and requires additional fact-finding. For these reasons, this Court should adhere to the Ninth Circuit precedent and defer consideration of Ameen's alibi defense. Ameen's opportunity to raise the arguments he has presented is at trial, in Iraq.

greatly.  None of the exhibits places Ameen at a particular location with a particular person on the day of

the murder, June 22, 2014.  Nearly all are vague and lacking in a basis of knowledge.  For example, the

most recent such declaration is of Zeyad Tarek Sadallah, who claims that "[i]n 2012, Omar traveled to

Turkey and never returned to Rawah or Iraq after that year."  Defense Exhibit 85.  Nothing in this

conclusory statement provides a basis for this Court to evaluate whether this witness would reliably

know if Ameen had returned to Rawah, what this witness was doing on June 22, 2014, whether he might

have a reason to cover for Ameen, such that the alibi could be tested.  None of the 29 statements

provides any information or documentation or photographic evidence that would narrow the time gap in

a concrete way between May 22 and July 7, 2014.

Indeed, all of Ameen's statements require the Court to make a credibility determination—to

gauge the basis of knowledge of the witness, to discern whether the witness may not in fact have been

with Ameen every single day, to examine whether the witness may be prone to exaggerate a claim about

Ameen's routine in order to help Ameen.  Without this type of analysis, the claims are not reliable

information that Ameen never left Turkey and was not in Iraq.  They simply demonstrate that Ameen

has 29 friends and family members who are willing to say something vaguely helpful to him, immune

from testing and further questioning.

Alibi evidence is treated specially under our own rules of procedure "because an alibi defense is

at once compelling if accepted and easy to concoct . . . ."  *United States v. Ford*, 683 F.3d 761, 764 (7th

Cir. 2012).  Under our own system, a defendant is required to give notice if he is going to pursue an alibi

defense, and the notice must be detailed, including listing witnesses and the specific place the defendant

claims to have been at the time of the offense.  Fed. R. Crim. P. 12.1(a).  This rule is in place because

"the prosecution is justified in wanting an opportunity to investigate [an alibi defense] in advance of

trial."  *Ford*, 683 F.3d at 764 (citing *Williams v. Florida*, 399 U.S. 78, 81 (1970)); *United States v.*

*Pearson*, 159 F.3d 480, 483 (10th Cir. 1998)).

Of course, these extradition proceedings are not a trial, and the investigation and probing of

Ameen's alibi defense is not possible or appropriate at this phase in proceedings.  To require the

Republic of Iraq to present the results of its investigation to counter each of Ameen's alibi witnesses

would indeed convert these proceedings into a dress rehearsal for trial.  The law does not require this of

the requesting country:

> If this were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government, though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties.

*Collins v. Loisel*, 259 U.S. 309, 316 (1922) (internal citation omitted).

Ameen has indeed improperly attempted to gather from every quarter evidence in favor of his alibi defense. The Republic of Iraq is entitled to produce all its evidence—direct and rebutting—that would disprove the existence of any alibi. But the time and place for that presentation of additional evidence is at trial, in Iraq. Iraq has already produced three eyewitnesses that place Ameen in Rawah, Iraq committing murder on June 22, 2014. The evidence Ameen wishes to present in contradiction to that allegation is inadmissible in these extradition proceedings and should be saved for trial. *See Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (extradition court properly excludes evidence of alibi and facts contradicting the government's proof).

## B.   Credibility Issues are for Trial

Ameen cannot impugn the credibility of the three witnesses identifying him as the murderer of Ihsan in these extradition proceedings. His effort to convert the continued extradition hearing into a mini-trial on credibility is foreclosed by precedent. *See Santos*, 830 F.3d at 1002-1003 (defense evidence that poses a "conflict of credibility" is inadmissible contradictory evidence); *Choe*, 525 F.3d at 740 (witness' alleged lack of credibility was "merely a weakness" in the Government's case and did not "completely obliterate the evidence of probable cause"); *Barapind v. Enomoto*, 400 F.3d 744, 749-50 (9th Cir. 2005) (affidavit that contradicted allegations in the extradition request "constituted conflicting evidence, the credibility of which could not be assessed without a trial" and was properly excluded); *Emami*, 834 F.2d at 1452 ("An extradition proceeding is not a trial; the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the

extraditee for trial."); *Quinn*, 783 F.2d at 815 ("The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense."); *see also Bovio*, 989 F.2d at 259 (fugitive has no right to attack the credibility of witnesses at an extradition hearing, as issues of credibility are to be determined at trial); *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981) ("an accused in an extradition hearing has no right . . . to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof."); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) (evidence that would pose conflict of credibility "should properly await trial in Israel").

Each aspect of Ameen's attack on credibility falls under this broad umbrella of impeachment information that must await trial in Iraq.  Ameen's evidence and arguments fall into five categories, each of which is premature, or lacks merit entirely:  (1) an argument that the extradition request contains inconsistent evidence; (2) an argument that evidence outside the extradition request is inconsistent with the extradition request; (3) an argument that Person 5 misidentified Ameen; (4) an argument that Person 5 is biased and had a motive to fabricate evidence against Ameen; and (5) an argument that other witnesses disagree with Person 5's account of the murder.

### 1.     There is No Inconsistency Within the Extradition Request

The extradition request is internally consistent from start to finish.  The sworn statement of Person 5 is both specific and plausible, and is based on personal observations and not conclusory.  The factual assertions in the sworn statement of Person 5 are consistent with the sworn statements of Witnesses A and B.  Witnesses A and B do not have the same level of personal knowledge as does Person 5, but they were also percipient witnesses, and what they state is consistent with what Person 5 states.  Finally, there is no inconsistency between the witness statements and the additional evidence transmitted with the extradition request, including the death certificate, the local police investigation, and the INSS intelligence report.  All aspects of the extradition request are presented together in a way that is coherent and plausible; it tells a narrative of a murder that no party disputes happened.

The supplement is also consistent with the original extradition request.  In the supplement, Judge Dhiya makes clear his understanding that Person 5 told Witnesses A and B that Ameen was the murderer "at the time of the crime."  CR 194-1, pg. 12 ¶ 8.  It is not inconsistent that this information

was not included in the original extradition request—it was a point of ambiguity, which has now been clarified.[6]  Conducting a prima facie evaluation of the extradition request, as the precedent directs be done, leads to the inescapable conclusion that abundant probable cause supports the murder allegation.

Ameen's claim of inconsistency within the extradition request is actually a claim of irregularity—that for some unexplained reason, the Republic of Iraq doctored its own evidence.  CR 216 pg. 22.  From a big-picture perspective, this claim makes no sense.  Having heard testimonial evidence from three witnesses with personal knowledge of the crime implicating Ameen—a fact that has been corroborated by the FBI at least as to Person 5—there is no reason Iraq would have to go back into its own documents at a later time to alter them to implicate Ameen.

A much more plausible explanation for the font or whiteout issues Ameen highlights is that the procedure happened the way Judge Dhiya explained it did in the supplement:  a judicial investigator wrote the statements contemporaneous with their testimony, then each witness had the opportunity to review the statement, had the opportunity to make any corrections, before signing and imprinting the document as final.  CR 194-1, pg. 12 ¶ 7.

The supplement thus forecloses the type of evidence tampering arguments that Ameen advances.  The assurances of Judge Dhiya are conclusive evidence that the three sworn statements were taken personally by him, and documented in the written summaries that were signed and printed by the witnesses—again, personally in front of him.  The defense argument to the contrary is speculation, not just unsupported by the record, but in fact contradicted by the record in this case.  And even if there were some support in the record for the claim of irregularities in the preparation of the extradition request, the Ninth Circuit has declined to consider allegations of "irregularities" in the circumstances surrounding an identification.  *Quinn*, 783 F.2d at 815 (rejecting allegation that a six-year delay in photo identification made an identification unreliable).

---

[6] Ameen challenges the fact that Special Agent Butsch's affidavit does not mention the fact that Person 5 told Witnesses A and B that Ameen was the murderer, but it makes more sense that that piece of information would come from the testimony of Witnesses A and B, whose testimony Special Agent Butsch did not attend.  CR 216 pg. 15.

2.      **Probable Cause is Not Obliterated by Inconsistent Statements Outside the Extradition Request**

As to inconsistency with statements Person 5 made outside the extradition request, those inconsistencies are inadmissible contradictory evidence, and they do not rise to the level of obliterating probable cause.

As an initial matter, what is consistent between Person 5's initial statement to the FBI and his testimony in court in Iraq—indeed, across every account Person 5 has ever apparently given of the murder—are the facts that support the finding of probable cause:  (1) Person 5 was present when Ihsan was murdered; (2) an ISIS convoy arrived on the scene and heavy shooting commenced; (3) Person 5 identified Ameen as the murderer based on his personal knowledge.

"Because an extradition hearing is only preliminary in nature and not a determination of guilt or innocence, the resolution of any inconsistencies in the record is of no consequence as long as sufficient evidence of probable cause remains."  *Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, No. 17-22197-CIV, 2017 WL 3776953, *22 (S.D. Fla. Aug. 31, 2017).  Stripping away the alleged inconsistencies—hearing as opposed to seeing the murder, the length of Ameen's hair—what remains is still Person 5's first-hand account of Ameen shooting Ihsan.  This account is corroborated by the fact that he told Witnesses A and B that Ameen was the shooter close in time to the murder.  That small set of core facts more than adequately supports a finding of probable cause.  *See Matter of Extradition of Rodriguez Ortiz*, 444 F. Supp. 2d 876, 891-93 (N.D. Ill. 2006) (holding that the issue of inconsistencies in witness statements are "properly reserved for the eventual trial in Mexico").

Ameen "overstates the impact" of the inconsistencies between his accounts to the Court's probable cause determination.  *See Garcia*, 825 F. Supp. 2d at 838.  To obliterate probable cause based on an allegation of inconsistency is "a very difficult standard to meet," *In re Extradition of Shaw*, No. 14-CV-81475-WM, 2015 WL 3442022, at *9 (S.D. Fla. May 28, 2015), if not impossible, especially where "[t]he primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination."  *Matter of Extradition of Atta*, 706 F. Supp. 1032, 1051 (E.D.N.Y. 1989) (citing *Collins*, 259 U.S. at 315-16).

Ameen "has no right . . . to pose questions of credibility as in an ordinary trial, but only to offer

evidence which explains or clarifies that proof." *Eain*, 641 F.2d at 511 (citing *Shapiro*, 478 F.2d at 905); *see also Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993) (respondent's challenge to "the reliability and credibility of the evidence is misdirected"); *Rodriguez Ortiz*, 444 F. Supp. 2d at 891-93 (holding that the issue of inconsistencies in witness statements are "properly reserved for the eventual trial in Mexico"); *Matter of Extradition of Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) (holding that respondent could not challenge the veracity or validity of a witness's statement because "a fugitive in international extradition proceedings is not permitted to introduce evidence that contradicts the evidence submitted by the requesting country"); *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003) (at an extradition hearing, "the court shall exclude evidence that is proffered to . . . challenge the credibility of witnesses"); *Matter of Extradition of Mainero*, 990 F. Supp. 1208, 1218 (S.D. Cal. 1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses.").

Whether any of the inconsistencies vitiates Ameen's guilt is an issue appropriately raised at trial. Person 5 is not present before this Court to explain what may be easily explained. For example, the defense has repeatedly pointed out that in his FBI interview, Person 5 described Ameen as having shoulder-length hair, CR 216 pg. 23, and has submitted photographic images of Ameen with short hair. But when the defense called Person 5 and asked him for a physical description of Ameen, Person 5 said the hair was relatively short. Defense exhibit 90 pg. 5. The defense seemingly did not ask Person 5 about the previous shoulder-length description, although that opportunity was certainly there. Possible explanations for the inconsistency include a mistranslation of either description, a misunderstanding of the terminology Person 5 was using to describe Ameen's physical appearance, or some other reason known to Person 5 but unknown on this record because Person 5 is not here to be questioned.

Even with such inconsistencies, there remains probable cause to certify Ameen's extradition. There are sufficient indicia of reliability that Person 5 was an eyewitness to the crime, and Ameen was a perpetrator of the murder. This is what the Court recognized when it ordered the FBI 302 documenting Person 5's interview excluded as inadmissible contradictory evidence. CR 160 pg. 18.

The defense urges the Court to reconsider its ruling, but there is no reason to do so. The crux of the defense argument is that this is a one-witness case, which it is not. The three witnesses combine to

create a foundation of probable cause.  These witnesses may, on examination in Iraq, be able to explain

away the points of inconsistency.  Or it may be revealed that there was no inconsistency in the first

place, just misunderstanding.  *See Garcia*, 825 F. Supp. 2d at 839 ("The Court finds that the witnesses'

statements, while subject to impeachment due to some inconsistencies, are sufficiently reliable to

provide the requisite 'any evidence' establishing probable cause to believe that Respondent committed

the charged crime.").

In line with its prior Order and the precedent requiring the exclusion of contradictory evidence,

this Court should decline to undertake the analysis of inconsistent statements that Ameen urges.  "To do

otherwise would convert the extradition into a full-scale trial, which it is not to be." *Eain*, 641 F.2d at

511.

3.     **None of the Defense Allegations Prove That Person 5 Misidentified Ameen**

Ameen points to two facts that he argues prove that Person 5 misidentified Ameen: the fact that

when the defense recently called Person 5, Person 5 indicated he saw Ameen in Rawah six months after

the murder (when in fact Ameen left for the United States approximately four-and-a-half months after

the murder), and the fact that Person 5 described a kidnapping that happened also well after the murder.

Ameen's theory is that because Ameen was in the United States by this point, those claims could not be

true, and that because those claims are not true, none of Person 5's claims are true.

As with the allegations of inconsistencies, these claims are impossible to probe in these

extradition proceedings.  First, as to Person 5's statement to the defense that he also saw Ameen in

Rawah six months after the murder, there is no way to follow up on that assertion.  Is it possible that

now, five years after the events of the murder, Person 5 is misremembering how long it was before he

saw Ameen again?  Is it possible that Person 5's sense of time is negatively affected by the trauma he

endured as a result of witnessing the brutal murder of his relative?  Is it possible that Person 5 did see

Ameen on a later occasion in Rawah but is mistaken about when it was?  Each of these is a possible line

of inquiry that could rebut the inference that Ameen would have this Court draw from the statement the

defense procured from Person 5 in a partially transcribed phone call between Arabic speakers of two

different dialects.

Even if Person 5 did truly mean six months later, and even if this were a U.S. case, an

16

1  inconsistent subsequent identification is just one factor in the reliability of the original identification.

2  Ninth Circuit Model Criminal Jury Instr. 4.11 (identifying seven factors to be assessed in the reliability

3  of an eyewitness identification: (1) the capacity and opportunity of the witness to observe the suspect

4  based upon the length of time for observation and the conditions at the time of observation, including

5  lighting and distance; (2) whether the identification was the product of the eyewitness's own recollection

6  or was the result of subsequent influence or suggestiveness; (3) any inconsistent identifications made by

7  the eyewitness; (4) the witness's familiarity with the subject identified; (5) the strength of earlier and

8  later identifications; (6) lapses of time between the event and the identification; and (7) the totality of

9  circumstances surrounding the eyewitness's identification.); *see also Sexton v. Beaudreaux*, 138 S. Ct.

10  2555, 2559-60 (2018); *Denham v. Deeds*, 954 F.2d 1501, 1504-05 (9th Cir. 1992) (identification was

11  reliable when robber held victims at gunpoint for length of time, victims were "very close" to robber,

12  positively identified robber from photograph few days later and victims again identified robber at trial);

13  *Neil v. Biggers*, 409 U.S. 188, 200 (1972) (notwithstanding the improper procedure, the victim's

14  identification was reliable as she saw her assailant for a considerable period of time under adequate

15  light, provided police with a detailed description of her attacker, and had no doubt that the defendant

16  was the person she had seen); *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012) (due process clause

17  does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when

18  the identification was not procured under unnecessarily suggestive circumstances arranged by law

19  enforcement).

20       Person 5's original identification of Ameen bears most of these indicia of reliability.  He knew

21  Ameen.  *See Matter of Silva-Peralta*, 15-MJ-3444 WVG, <u>*Matter of Silva-Peralta*</u>, No. 15-MJ-3444-

22  WVG, 2016 WL 4987483, at *10 (S.D. Cal. Sept. 19, 2016) ("Valenzuela's identification of Silva was

23  reliable, as it was based on his familiarity with Silva after he had seen Silva on multiple occasions in the

24  past.  This is not a case of an eye-witness identification of someone the witness had seen only once

25  before.").  He observed him in the daylight (7 p.m. in Rawah in June is still daylight hours).  He

26  identified Ameen in a nonsuggestive photo identification procedure,[7] and the record reflects no

27       _____

28       [7] Ameen suggests the photo identification procedure was tainted by the FBI's earlier
identification procedure using the phone of TMF-1.  But at least the Seventh Circuit has recognized that
a serial photo display is actually superior to a six-pack photo array.  *Ford*, 683 F.3d at 764.  The photo

equivocation in his identification of Ameen.  The strength of these factors combines to outweigh any possible subsequent misidentification.  Particularly because this is an extradition case, in which the Court may not consider contradictory evidence because that evidence has not been subject to adversarial testing, the out-of-the-record statement of Person 5 that he saw Ameen six months later should not be given any weight in this Court's assessment of the identification, to the extent that exhibit is admitted at all.[8]

Second, as to Person 5's mention of the kidnapping of other relatives of his, the defense has distorted the evidence in the extradition request.  CR 137-1.  The mention of the kidnapping in the extradition request is the following statement at the end of Person 5's statement:  "My [relatives] were subject to a kidnapping by unknown individuals, in a separate incident, at the end of the year, 2016 and their fate is unknown to this day and this is my testimony."  It is simply factually inaccurate to suggest that Person 5 implicated Ameen in this kidnapping, when Person 5 explicitly states that the kidnapping was by unknown individuals.  If indeed Person 5 fabricated evidence against Ameen, or was prone to misidentifying him, one might expect that Person 5 would take this additional opportunity to implicate Ameen in a crime, but he does not.

The Republic of Iraq is not seeking extradition of Ameen for this kidnapping.  The inclusion of language about an additional crime in which Ameen is not implicated makes this portion of the witness statement simply irrelevant to the probable cause inquiry in this case.  The Court should decline the defense's invitation to read in a meaning that is flatly contradicted by the text of the witness statement.

---

array the FBI Special Agents conducted was a serial photo display, and Person 5 first identified Ameen in that identification procedure.  Then, in the proceedings at the Al Karkh court, Person 5 identified Ameen in a photo display where he reviewed the photos one after another.

If instead the defense argument is that Person 5 only understood who Ameen was because he had seen him on TMF-1's phone, that assertion is also undercut by the fact that Person 5 must have known who Ameen was in order to identify him to Witnesses A and B.  Seeing a photograph of Ameen is not what enabled Person 5 to identify Ameen; knowing who Ameen was based on his own historic knowledge and then seeing him in the ISIS caravan is what enabled Person 5 to make the identification.  For this reason, Ameen's speculation about when and how TMF-1 obtained a photograph of Ameen is irrelevant to the issue of whether Person 5's identification was reliable.

[8] Ameen sidesteps the many aspects of the defense phone call with Person 5 that confirm the account of the murder that is contained in the extradition request.  For example, his description of the setting before the attack, the arrival of the ISIS convoy, Ameen's participation, and the emotional impact that witnessing the brutal murder of a loved one had on him are all consistent with Person 5's previous accounts of the murder.

1  Far from obliterating probable cause, Person 5's nonimplication of Ameen in the kidnapping supports

2  the reliability of Person 5's identification for the crime in which Ameen is implicated.

3        To admit the exhibits that the defense says impugn the credibility of Person 5 would place this

4  Court into the position of having to resolve credibility issues without the witnesses present for fair

5  adversarial testing.  The Court should continue to exclude the defense exhibits that attack the credibility

6  of the witnesses, and decline to factor this contradictory evidence in its probable cause determination.

7                    4.      **An Allegation of Bias Can Only Be Probed in Iraq**

8        Ameen argues extensively that Person 5 was biased against him, suggesting that that bias may

9  have led him to manipulate the Iraqi legal system to the detriment of Ameen.  Nevertheless, courts have

10  uniformly refused to consider in extradition proceedings the allegation the defense is trying to levy here:

11  that Person 5 lied during the Iraqi investigation.  In *Santos*, the Ninth Circuit en banc discussed the

12  Seventh Circuit case of *Bovio*, in which the defense argued that probable cause was lacking in part

13  because "the major witness on which the government relied had admitted to lying during the

14  investigation."  *Santos*, 830 F.3d at 1002 (citing *Bovio*, 989 F.2d at 259).  The Ninth Circuit quoted

15  approvingly from *Bovio*, "'Bovio [had] no right to attack the credibility of witnesses' because 'issues of

16  credibility are to be determined at trial.'"  *Id.*

17        *Bovio* involved an even more serious allegation than the one the defense has levied in this case.

18  In that case, the fugitive argued that a "major witness" had apparently admitted to lying during the

19  investigation, and still the court upheld the finding of probable cause.  989 F.2d at 259-60.  No similar

20  admission has been made here.  To the contrary, Person 5's testimony bears indicia of reliability:  it is in

21  major respects consistent with the handwritten statement, the FBI interview, and the phone call with the

22  defense.  To the extent that certain aspects of the story were inconsistent, perhaps due to the impact of

23  the trauma Person 5 says he endured, the core allegations have remained consistent.  Person 5 has never

24  wavered in his identification of Ameen.

25        Ameen cites criminal cases for the proposition that he has a due process protection from facing a

26  proceeding where he is "being deliberately framed. . . . under color of law."  CR 216 pg. 43.  The

27  premise that Ameen is being framed under color of law has not been established, under any reading of

28  the evidence Ameen has proffered.  Furthermore, the cases Ameen cites are not extradition cases.  There

is plentiful case law about how courts are to evaluate evidence in an extradition case, and none of those cases borrow on the standards set forth in *Mooney*, *Limone*, and *Napue*.  *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (due process violation where conviction rests on testimony "known to be perjured"); *Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) (summarizing the *Mooney* line of cases); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (*Mooney* extends to the circumstance where the government knowingly fails to correct false testimony when it occurs).  Again, the testimony in this case is not "known to be perjured."  *Cf. Mooney*, 294 U.S. at 112.  The testimony is materially consistent with the handwritten statements, with the FBI interview, and with the defense phone call.  The defense has not come anywhere close to proving perjury, let alone that a state actor knew the testimony to be false.

Moreover, as a general rule, extradition courts recognize the impossibility of attempting to assess credibility in extradition proceedings, without the availability of the witness to observe demeanor, without the opportunity for cross examination or rehabilitation, and without the possibility of a robust examination of motive.  *Mainero*, 990 F. Supp. at 1218 ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses."); *Peterka*, 307 F. Supp. 2d at 1349 (at extradition hearing "the court shall exclude evidence that is proffered to . . . challenge the credibility of witnesses"); *Extradition of Powell*, 4 F. Supp. 2d 945, 958 (S.D. Cal. 1998) (fugitive "foreclosed from presenting evidence as to the unreliability of witnesses because . . . [that would] change an extradition hearing into more than it is meant to be, i.e., a minitrial" and "it is inappropriate to present evidence contradicting that proffered by the Republic of Mexico"); *In the Matter of the Extradition of Velasco Hernandez*, No. 07-mj-8333, 2008 WL 4567108, at *9 (S.D. Cal. Oct. 7, 2008) ("To negate probable cause, it is not enough to attack the credibility and consistency of the witnesses because the extradition magistrate judge does not weigh conflicting evidence and make factual determinations."); *Powell*, 4 F. Supp. 2d at 958 (denying an accused's request to present evidence to show the unreliability of the government's evidence because "[r]ebuttal, presentation of contradictory evidence, and examination or cross examination of witnesses [is] not appropriate in this setting," and denying a duress defense as such evidence would result in a "minitrial"); *Matter of Extradition of Garcia*, 890 F. Supp. 914, 922-23 (S.D. Cal. 1994) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the

credibility of the demanding country's witnesses.  Also, extradition treaties do not contemplate the introduction of testimony of live witnesses by the respondent to contradict the demanding country's proof") (internal citations omitted); *In re Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987) (fugitives were not entitled to go "behind" an affidavit to depose affiants in the expectation of producing evidence bearing on reliability or credibility).

Ameen argues that the Court should consider the plight of Person 5, who the defense says had a motive to assist Iraq with its investigation in order to curry favor to procure the release of his father from prison.  Assuming for the sake of argument that the factual premise is true, the existence of a motive to cooperate does not obliterate probable cause.  Person 5 could want to help his father, and also have observed Ameen murder Ihsan.  One possibility does not rule out the other—it simply means that the inquiry in Iraq may need to be more searching than it otherwise would:

> In order to "negate" Hong Kong's showing of probable cause, Petitioner must discredit the testimony relied upon by Hong Kong to the extent that this Court can find that there is not "any evidence warranting the finding that there was reasonable ground to believe the accused guilty."  Although some doubt as to the credibility of Chan Kam Chuen's version of what actually transpired is cast by the fact that his testimony was provided while he was in prison awaiting sentencing for the very crime in which he was implicating Petitioner, the appropriate acid test for his testimony must take place at a trial on the merits, not on motion for writ of habeas corpus.

*Cheng Na-Yuet v. Hueston*, 734 F. Supp. 988, 996 (S.D. Fla. 1990) (internal citation omitted).  The appropriate acid test for the credibility of Person 5 must await trial in Iraq, where any motivation for his testimony may be probed.  *See also In re Extradition of Gang-Choon Han*, No. 11-cv-2059 DMG, 2012 WL 33201, at *8 (C.D. Cal. Jan. 6, 2012) (declining to consider evidence that an accusing witness was an organized crime gangster).

Even if the Court were to consider the defense theories of the motivations of Person 5, whether it be to help his father, to please TMF-1, to aggrandize his own sense of self, or to be rewarded financially, they must be viewed with some skepticism.  The supplement establishes that Person 5 told Witnesses A and B that the murderer was Ameen immediately after the murder occurred.  If Person 5 were lying, he would have had to concoct that lie immediately after the attack, and then sat on that lie for four years until the investigation commenced in 2018.  This is implausible.  What is much more plausible is that Person 5 did in fact witness Ameen murder Ihsan, told Witnesses A and B that it was Ameen, and then

told the same basic story to anyone who asked him about it.

In any event, the Court should allow the defense theories to be tested at trial by a trier of fact who also has the opportunity to observe Person 5 and determine whether he appears truthful even if bias is affirmatively established.  The allegations that Ameen has levied here against Person 5 come from outside the extradition request, are contradictory to the allegations in that request, and therefore do not bear on the certification of Ameen's extradition.

5.    **The Contradictory Narrative of Witnesses A, B, and C is Inadmissible and Unreliable**

Finally, Ameen argues that the Court should credit what he says are the more reliable narratives of Witnesses A, B, and C.  But the Court has previously correctly excluded the contradictory account of Witness C.  CR 160 pg. 17.  For the same reasons, the Court should exclude the new declaration of Witness C as well as the contradictory recantations of Witnesses A and B.

The supplement makes clear that Witnesses A and B both appeared personally before Judge Dhiya, testified under oath, reviewed their written statements, and then signed and imprinted them.  CR 194-1 pg. 12 ¶ 7.  All of the subsequent statements that the defense has generated since then are contradictory thereto.  As established by the supplement, in their testimony before Judge Dhiya, Witnesses A and B named Ameen based on knowledge they gained immediately after the murder from Person 5, and identified Ameen in a photo identification.

The recanted accounts that the defense has submitted to this Court are diametrically in contrast to the facts established in the supplement.  The defense has submitted numerous different statements generated from the repeated defense contact with Witnesses A and B.  These defense-generated statements cannot be reconciled with the facts in the supplement nor with each other.  For example, in one account Witness A claims that they did not file a claim at all due to fear of ISIS.  Defense exhibit 36.  Witness A also says that they did not see any of the murderers, yet is somehow able to exclude Ameen.  Defense Exhibit 34.  Witness B states no knowledge whether Ameen was among the group or not.  Defense Exhibit 73.  Witness B also disavows ever filing a complaint in any police station.  *Id.* These accounts cannot be reconciled with the information in the supplement and must therefore be excluded.

22

One possible explanation for the shifting accounts is fear, as the witnesses themselves suggested:

> Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. Evidence of possible intimidation would help explain why the witnesses might repudiate earlier truthful statements.

*Gonzalez v. Jacquez*, No. 10-65 GAF, 2011 WL 4550151, at *17 (C.D. Cal. May 19, 2011) (quoting trial testimony). Witnesses A and B have been repeatedly approached by representatives of Ameen, whom, at least at one time, they described as a terrorist. CR 137-1 pg. 38-42. Ameen's contact, through various members of the defense team, has continued for months, and how Witnesses A and B have perceived these visits is not knowable on this record.

The credibility of the resulting recantations cannot be tested without a trial. A witness's recantation does not obliterate a showing of probable cause when the recantation is conflicting evidence, "the credibility of which could not be assessed without a trial." *Barapind*, 400 F.3d at 750; *see Eain*, 641 F.2d at 511 (recantation evidence contradicts requesting country's proofs); *Matter of Extradition of Lara Gutierrez*, No. 16-5061 PSG, 2017 WL 8231237, at *4 (C.D. Cal. Feb. 22, 2017) ("Like the recantation in *Barapind*, Gonzalez's statements are offered to contradict the version of the facts set forth in the statements submitted by the government to establish probable cause. Therefore, by their very nature, evaluating Gonzalez's current statements against her past inculpatory statements would require the Court to weigh conflicting evidence, something expressly precluded by the applicable authority. The Mexican courts are the appropriate venue for Lara's arguments about Gonzalez's statements."). There is no opportunity to probe the reliability of the recantations in this setting. The "recantations have been put before the court by means of affidavits, providing the government no opportunity to question the witnesses or otherwise test the reliability of the recantations." *United States v. Hunte*, No. 04-M-0721 SMG, 2006 WL 20773, at *8 (E.D.N.Y. Jan. 4, 2006).

In this case, the indicia of reliability are in the original statements in the extradition request, before Ameen made contact with the witnesses. The original statements are consistent with each other and with that of Person 5; were made in a non-coercive, formal setting; and were plausible, specific statements recounting what the witnesses saw and heard on the day of the murder.

23

Similarly with the statements of Witness C, there is no means of probing what she saw on the day of the murder, and what Person 5 might have also told her.  Her sharp avowal that Ameen was not there despite the fact that she saw none of the participants is not plausible.  Defense Exhibit 84 pg. 3.  As this Court has previously held, her statement is inadmissible contradictory evidence, and should not be considered at all, let alone factor into this Court's probable cause analysis.

Witnesses A, B, and C also claim Person 5 has a propensity for lying, but this character evidence is inadmissible as well, for it is meant to impeach the statement of Person 5, which is impermissible in these extradition proceedings.[9]  Defense Exhibit 84 pg. 3; Defense Exhibit 89 pg. 2.  It is also worth noting again that the criticisms of Person 5's character were generated only after Ameen made contact with the victim's family.  These sweeping criticisms are not reliable given how the declarations were obtained.

Finally, through Witness A, the defense introduces evidence that law enforcement in Iraq investigated a different person in connection with the murder of Ihsan.  CR 216 pg. 17.  The evidence that Ameen submits about this other investigation is hardly exculpatory, however, since it appears that ultimately the court in Iraq dismissed the case for insufficient evidence.  Defense Exhibit 102.  This dismissal would be consistent with someone else—*i.e.*, Ameen—being the actual murderer.  In any event, the Republic of Iraq is under no obligation to produce exculpatory evidence in these extradition proceedings.  *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981) ("the accused has no absolute right to introduce exculpatory evidence and the government has no duty to do so") (citing *Charlton*, 229 U.S. at 456).

C.   **The Claim of Forgery has Been Definitively Rebutted by the Supplement and the FBI Affidavits**

Ameen is pursuing two defenses that cannot be reconciled with each other.  On the one hand, as discussed above, Ameen argues that Person 5 fabricated his recollection of the murder, for revenge or money or because he has a propensity for lying.  On the other hand, Ameen argues that the documents in

---

[9] The defense also discounts the testimony of Person 5 because he has suffered trauma following his witnessing of the murder.  But that trauma would not affect his identification of Ameen, which occurred immediately after the murder, before any traumatic effects would begin to take hold.

the extradition request and supplement are forgeries.

The forgery allegation makes no sense. If Ameen's claim is that Person 5 intentionally sought to manufacture evidence against him, there would be no reason for Person 5's statement accusing Ameen of murder to have been signed by someone other than Person 5.

Other extradition cases that have alleged forgery issues have centered on allegations that the requesting government fabricated evidence by having witnesses sign blank documents, or that the content of the documents changed after the witnesses signed. *Barapind*, 400 F.3d at 749; *Solis*, 402 F. Supp. 2d at 1131 ("Salazar challenges the statement made by Rosendo Ontiveros inculpating Salazar and argues that Rosendo Ontiveros later stated that he had no idea what he signed, that he was forced to sign the statement, and that he was told that he would be killed if he came to the United States to testify on Salazar's behalf. But a fugitive in international extradition proceedings is not permitted to introduce evidence that contradicts the evidence submitted by the requesting country").

Here, Ameen alleges forgery or alteration of evidence in the extradition request in four instances: (1) on the photo identification page of the extradition request (CR 216 pg. 20); (2) in the sworn statement of Person 5 (CR 216 pg. 22); (3) on the sworn statements of Witnesses A and B (CR 216 pg. 22); and (4) in the supplement, which the defense suggests was prepared by someone other than Judge Dhiya purporting to speak for Judge Dhiya (CR 216 pg. 13-14).

To obliterate probable cause, Ameen would ask this Court to make a factual finding of an extensive conspiracy, in which the investigating judge, Judge Dhiya, other unnamed individuals within the Iraqi judiciary, TMF-1, and Person 5, coordinated their actions not only to manufacture evidence against Ameen, but also to alter that very same evidence in the documentary record. There is absolutely no basis in the extradition request or in the defense proffer to support the allegation. *Martinelli*, 2017 WL 3776953, at *28 (allegation that the judicial official who issued the arrest warrant is a consistent liar is not enough to obliterate probable cause). Any font or whiteout or spacing concerns in the extradition request are much more plausibly explained by something as simple as an issue scanning in the document or a transmission of a low quality image. Or, if not a technical problem, a legal system different from our own, in a country with resources different than our own, may result in documents that are not aesthetically flawless.

1    This case is unusual in that the Court also has substantive reassurance. The FBI was present in

2    the room when Person 5 gave his testimony. The FBI witnessed the photo identification procedure. The

3    observations of the FBI Assistant Legal Attaché are consistent with how Judge Dhiya described his

4    procedure for taking evidence. The recollection of the Assistant Legal Attaché is consistent with the

5    substance of the sworn statement of Person 5.

6    Ameen's allegations of forgery are inadmissible contradictory evidence, but they are also

7    substantively implausible.

8    **III.      THE COURT SHOULD CERTIFY AMEEN FOR EXTRADITION BASED ON THE**

9    **PROBABLE CAUSE ESTABLISHED IN THE EXTRADITION REQUESTS**

10    The evidence submitted by the Republic of Iraq establishes probable cause. "In an extradition

11    proceeding, the magistrate's function is to determine whether there is any evidence sufficient to

12    establish reasonable or probable cause." *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) (internal

13    citation and quotation omitted). "An extradition proceeding is not a trial; the relevant determination is

14    confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the

15    extraditee for trial." *Emami*, 834 F.2d at 1452.

16    Prima facie evidence exists in the extradition request in the form of an eyewitness account,

17    documented in a sworn statement, identifying Ameen as the murderer based on personal observations.

18    The eyewitness knew who Ameen was before the murder.[10] He had the opportunity to observe him at

19    the scene. Just after the murder, the eyewitness told two other witnesses that Ameen was the killer.

20    Those two witnesses also gave sworn testimony. The fact of the murder was corroborated by police

21    investigation. Ameen's affiliation with ISIS is corroborated by Iraqi intelligence services.

22    All of this probable cause exists irrespective of the role an individual the government has

23    referred to as TMF-1 played in identifying witnesses to the crime. TMF-1 was involved in the U.S.

24    criminal investigation—finding witnesses with personal knowledge of Ameen's actions and bringing

25    them to be interviewed by the FBI. He has no role in these extradition proceedings. Nowhere on the

26    record before this Court is there support for the inference Ameen wishes the Court to draw—that TMF-1

27

28    _____

[10] Defense Exhibit 34 and 74 also establish that Witness A has known Ameen since childhood.

26

masterminded the Iraqi judicial proceedings.  There is only evidence to the contrary, that the Iraqi

investigation into the murder was independent and as-described in the extradition request.

To the extent Ameen has identified some questions with respect to the evidence against him, the

precedent is clear: if a trial is needed to resolve an evidentiary issue raised in an extradition proceeding,

the proper resolution is to certify the extradition and allow the foreign proceedings to take up that

inquiry.

A.    **TMF-1 and Person 4 are Not the Same Person, and Neither is a Part of the Republic of Iraq's Extradition Request**

The defense has mistakenly assumed that two different people—Person 4 and TMF-1—are the

same person, and that this hybrid fictional person played a critical part in both the extradition

proceedings and the United States' criminal investigation.[11]  This mistake reveals the faulty foundation

that underlies the conclusions the defense would have this Court draw from the information it has

gathered.

Person 4 and TMF 1 are not the same person.  Person 4 is a percipient witness to acts of terror

committed by Ameen.  Person 4 is described and discussed only in the United States' search warrant

affidavit, which the United States made available to the defense, but is not a part of these extradition

proceedings.[12]  CR 135.  This witness has personal knowledge that directly contradicts Ameen's claim

---

[11] The government now understands that the defense has mistakenly assumed that Person 4 and TMF-1 are the same person.  The defense states that it determined they are the same person "from the information it possesses."  CR 216 pg. 8 n.9.  But they are not the same person, and the government has never said they are.

At the time the defense began using the term "Person 4," undersigned counsel believed the defense was using the phrase "Person 4" as an extension of the naming convention that had been used for the three FBI Special Agents, who had been referred to as Special Agents 1-3.  Precisely to avoid confusion, undersigned counsel introduced the term "TMF Member 1" in the Special Agents' affidavits to avoid mixing terminology with the witnesses who appear in the search warrant affidavit ("Persons 1-8").  The government has never used the term "Person 4" to refer to TMF Member 1.  Defense counsel did not ask until very recently whether they are the same person, and that inquiry was part of a 52-question interrogatory for the FBI Special Agents, which will need to be answered by affidavit of the agents.

It is unfortunate that a portion of the defense briefing is premised on this mistaken assumption, but it is not the result of the government misleading the defense in any way.  Rather, it is a small indicator that the conclusions the defense has drawn from its investigation of the Ameen case are not as air-tight as the defense would have the Court believe.

[12] Some of the observations by Person 4 were also noted in the United States' motion opposing release on bail, but that information does not form part of the extradition request and is not part of the

27

that he is a family man with no terrorist affiliations and no violent history.

TMF-1 is a background facilitator in the FBI's criminal investigation. The FBI's experience with TMF-1 is that he has provided reliable counterterrorism information for years, as indicated in the affidavit of FBI Special Agent Lopez-Fuentes. As an example, TMF-1 also identified to the FBI Persons 6 and 7, whose knowledge of Ameen appears in the search warrant affidavit.[13] The government is not aware of any connection or relationship between Person 4 and TMF-1.

The government disputes each of the many allegations Ameen has made about TMF-1. Specifically, the government asserts the following:

- TMF-1 has received no benefit at all from the FBI in connection with either the United States' criminal investigation or these extradition proceedings.

- Person 5 has received no benefit at all from the FBI in connection with either the United States' criminal investigation or these extradition proceedings.[14]

- There is no reason to believe the handwritten statements TMF-1 brought to the FBI are forgeries. The substance of the allegations in the handwritten statements is the same as the testimony given by Person 5 and Witness A. The signature markings on the handwritten statements may be different than what is in the extradition request, but further probing would be required to understand the reason for any different signature markings. Since the substance of the documents matches the substances of the sworn testimony, the conclusion that the documents are nevertheless a forgery seems far-fetched. In any event, these documents are not part of the extradition request, and this Court need not engage in the fact-finding that would be required to support this conclusion. The FBI took an image of the handwritten statements as part of its criminal

---

evidence submitted by the Republic of Iraq.

[13] Persons 6 and 7 do not have personal knowledge of the murder, undercutting the defense theory that TMF-1 brought witnesses to the FBI willing to manufacture evidence against Ameen. If that were the case, presumably Persons 6 and 7 would also have implicated Ameen in the murder. But that is not what happened. They made statements that incriminate Ameen in other matters, but their knowledge is different from that of Person 5 and bears no indicia of being coordinated or rehearsed.

[14] Person 5 confirms this fact in the call the defense placed to him, when he makes clear that he has not received any money or assistance from the United States. Defense Exhibit 90.

1    investigation and has no reason to doubt the authenticity of the documents.

2    • There is no foundation for the assertion that TMF-1 played a role in the Iraqi

3       investigation of Ameen.  The extradition request and supplement makes no mention of

4       TMF-1.  The names or signatures of the judicial investigators are contained in the

5       documents in the extradition request.  The affidavit of FBI Special Agent Butsch

6       establishes that TMF-1 was not present when Person 5 testified.

7    • There is no foundation for the assertion that TMF-1 coerced a statement from Person 5.

8       CR 216 pg. 35.  Ameen speculates that Person 5 is dependent on TMF-1, but even if that

9       were true, living arrangements are not evidence of coercion.  Coercion means persuading

10      someone to do something by force or threat.  There is no evidence at all that TMF-1

11      forced or threatened Person 5.  And again, it bears repeating that TMF-1 was not present

12      when Person 5 testified before the Iraqi judge, not present in the room when Person 5

13      was interviewed by the FBI, and there is no evidence that he was present when the

14      defense called Person 5 and asked about the murder.

15 Ameen may pursue one or all of his theories about TMF-1 as a defense at trial in Iraq.  The phone calls

16 with Person 5 and TMF-1 did not bear fruit that would obliterate probable cause, and that should end the

17 inquiry as far as these extradition proceedings.

18       An argument that the requesting country had a flawed method of conducting its investigation is

19 not properly made in these extradition proceedings.  *See Solis*, 402 F. Supp. 2d at 1131 ("Although

20 Salazar argues that his attack on the means by which the Mexican evidence was obtained constitutes a

21 permissible 'explanation' rather than a prohibited contradiction in the evidence, this is not the case.

22 Salazar, in fact, challenges the veracity and validity of Ontiveros's statements.  Because Salazar's

23 argument does not accept Mexico's evidence as true, it is contradictory rather than explanatory within

24 the meaning of extradition law.").  In any event, that a facilitator like TMF-1 brought the evidence

25 Person 5 had to the attention of law enforcement is not a reason for this Court to disregard the evidence

26 that otherwise bears indicia of reliability.  "[P]robable cause is a fluid concept—turning on the

27 assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat

28 set of legal rules.  Informants' tips doubtless come in many shapes and sizes from many different types

of persons." *Gates*, 462 U.S. at 232.  The totality of the evidence in the extradition request and

supplement establish the reliability of the sworn testimony of Person 5.

**B.**   **The Witness Statements and Corroborating Evidence Establish Probable Cause**

Prima facie evidence exists in the extradition request, on which this Court should certify Ameen

for extradition.  The three sworn witness statements, the local police investigation, the death certificate,

the social media post, the sketch of the crime scene, and the INSS intelligence report combine to cause a

person of ordinary prudence to entertain a reasonable belief of Ameen's guilt.

The evidence submitted by the Republic of Iraq is similar both in nature and in quantum to

evidence the Ninth Circuit has previously found to support a finding of probable cause in extradition

proceedings.  *See, e.g.*, *Bozilov v. Seifert*, 983 F.2d 140, 143 (9th Cir. 1992) ("Germany's evidence

justifies extradition.  The uncorroborated statements of Malocco, apart from the money transfer, are

sufficient to establish probable cause."); *In re Extradition of Sainez*, No. 07-MJ-177, 2008 WL 366135,

at *15 (S.D. Cal. Feb. 8, 2008) ("The Court finds that Sevillano's statements demonstrate probable cause

that Crotte committed the homicide of Sandoval.  Sevillano definitively identified Crotte as the person

who shot both him and Sandoval.  He made this identification within an hour of the shootings . . . .").

Ameen criticizes the INSS report, but hearsay evidence is precisely the type of evidence

typically relied upon in extradition proceedings.[15]  *See supra* at 5.  While probable cause in this case is

not centered on the INSS report, the document corroborates the allegation that Ameen was a part of an

ISIS caravan.

Person 5's sworn statement is grounded in personal knowledge, and is not the type of "casual

rumor circulating in the underworld or . . . accusation based merely on an individual's general

reputation" that the courts have frowned upon.  *See Spinelli v. United States*, 393 U.S. 410, 416 (1969),

*abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983).  It is corroborated by the sworn

statements of two other witnesses, who learned from Person 5 just after the murder that the murderer

---

[15] The fact that the defense FOIA request to the Defense Intelligence Agency resulted in no records produced to Ameen is no proof at all for the conclusion Ameen would have the Court reach, that he has no terrorist affiliations.  CR 216 pg. 16.  Ameen has not provided the Court with an explanation of how the FOIA process works and whether classified information would be given in response to such an inquiry.  None of the conclusions the defense reaches about Ameen's background or the risk posed to the United States by his presence are reliable.

1    was Ameen.  It is corroborated by the supporting documents that confirm the manner of death, the scene

2    of the crime, and Ameen's participation in terrorist organizations.  The totality of the evidence in the

3    extradition request establishes probable cause.

4    **C.**      **If a Trial is Needed to Resolve an Evidentiary Issue, that Inquiry Should Take Place in Iraq**

5

6    To the extent the defense has raised any non-speculative evidentiary issues, a trial would be

     required to resolve the questions raised, and this Court must certify the case for extradition.

7

> The decision of every court in the United States in every extradition case
8    > since the beginning of the Republic holds that a judge in an extradition
     > hearing cannot decide the truth or falsity of the evidence, as could be done
9    > in a trial, and that a defendant cannot contest truth . . . .

10   *Matter of Extradition of Burgos Noeller*, No. 17-cr-644, 2018 WL 1414128 *2 (N.D. Ill. Mar. 21, 2018),

11   *aff'd*, 922 F.3d 797 (7th Cir. 2019).

12   This Court should decline the defense's invitation to admit over 120 exhibits and weigh the

13   evidence as a finder of fact.  *Collins*, 259 U.S. at 316 (holding that evidence "related strictly to the

14   defense" was properly excluded, and that to hold otherwise would compel the requesting nation "to go

15   into a full trial on the merits in a foreign country," contravening "the intent and meaning of the

16   extradition treaties").  The extradition court's probable cause finding is not a finding that is the result of

17   weighing evidence, but rather is a prima facie analysis of the evidence in the extradition request.

18   "Because the magistrate's probable cause finding is thus not a finding of fact in the sense that the court

19   has weighed the evidence and resolved disputed factual issues, it must be upheld if there is any

20   competent evidence in the record to support it."  *Quinn*, 783 F.2d at 791 (internal quotation marks and

21   citations omitted).  This Court is not in the position of having to resolve the disputed factual issues

22   between Iraq's evidence and the defense evidence.  *Caplan*, 649 F.2d at 1342.  Its inquiry "serve[s] only

23   the narrow function of indicating those items of submitted evidence on which the decision to certify

24   extraditability is based."  *Id*. at 1342 n.10.

25   The defense's contradictory evidence does not vitiate the probable cause established in the

26   extradition request.  Indeed, courts have routinely certified extraditions in the face of even more robust

27   showings made by fugitives than that made by Ameen.  For example, the Ninth Circuit in *Barapind*

28   considered the situation in which a police inspector stated that an eyewitness identified Barapind as one

31

of the shooters in a murder case.  400 F.3d at 752.  The defense submitted an affidavit from the

eyewitness himself, stating that he never identified any participants in a shootout.  *Id.*  The Ninth Circuit

affirmed the district court's decision that the eyewitness's affidavit was "insufficient to destroy probable

cause."  *Id*; *see also, e.g.*, *Noeller v. Wojdylo*, 922 F.3d 797, 807 (7th Cir. 2019) (holding that "[w]e

have no trouble here affirming the magistrate judge's conclusion that there was probable cause to

believe that [the fugitive] is guilty of the crime for which extradition is sought," despite his submission

of "eleven exhibits and testimony as to his innocence" and his arguments that certain statements "are

inconsistent, unreliable, and subject to undue influence from other family members who are biased

against him," *inter alia*); *Solis*, 402 F. Supp. 2d at 1132 (certifying for extradition and finding that the

veracity of the witness statements could not be determined without a trial); *In the Matter of the*

*Extradition of Acevedo*, No. 16-cv-1766, 2017 WL 3491749, at *11 (C.D. Cal. Aug. 11, 2017) ("[T]he

Court cannot determine the credibility of the evidence offered by Acevedo against the evidence offered

by the Mexican government.  That is a matter for trial in Mexico.").

       To the extent the Court does admit items of contradictory defense evidence, and those exhibits

raise questions about the accounts given in the extradition request, a trial is needed to resolve those

conflicts of evidence.  The precedent is clear that if a trial is needed to resolve an evidentiary matter, the

Court should certify for extradition and allow that inquiry to proceed overseas.

## IV.      NONE OF AMEEN'S OTHER DEFENSES TO EXTRADITION IS AVAILING

       In addition to challenging probable cause, Ameen also attempts to avoid the certification of his

extradition by arguing that (1) there is a likelihood he will be tortured in Iraq, (2) the ISIS murder for

which his extradition is sought is a non-extraditable political offense, and (3) there may be a pending

U.S. indictment against him.  None of these arguments has merit.

### A.      The Alleged Treatment Ameen Would Face Upon His Return to Iraq is Outside the Purview of the Court

       Despite the fact that the Secretary has not yet rendered (and is not yet in a position to render) a

decision on his extradition, Ameen alleges that he cannot be extradited because there is a "substantial

likelihood that he will be tortured and executed" if returned to Iraq.  CR 216 p. 48.  This claim fails *ab*

*initio* because it is not ripe for judicial review, given that the Secretary has not decided to extradite

1   Ameen to Iraq. *See, e.g.*, *Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1356 (11th Cir. 2012) ("There is

2   nothing in the record to suggest that the Secretary has decided whether to surrender Yacaman.

3   Yacaman's claim about torture is not ripe."); *Hoxha v. Levi*, 465 F.3d 554, 565 (3d Cir. 2006) ("We do

4   not address Petitioner's . . . assertion that, should the Secretary of State decide to extradite Petitioner, we

5   would have jurisdiction to review that decision [for compliance with the FARR Act] under the

6   [Administrative Procedure Act]."). [16]

7           Even if the claim were ripe, as the government has explained previously, CR 140 pg. 12-14 &

8   CR 151 pg. 8-9, the question of whether an extradition request should be denied on humanitarian

9   grounds is reserved solely for the Secretary of State pursuant to the rule of non-inquiry. *See, e.g.*,

10  *Quinn*, 783 F.2d at 789-90 (the Secretary of State has "sole discretion . . . to refuse extradition on

11  humanitarian grounds because of the procedures or treatment that await a surrendered fugitive"); *United

12  States v. Perez*, No. 1:15-MJ-0074 SKO, 2016 WL 931041, at *6 (E.D. Cal. Mar. 11, 2016) (certifying

13  fugitive's extradition, despite his CAT claim, because "[t]he rule of non-inquiry bars consideration of

14  [his] contentions regarding his treatment upon extradition"). Evaluation of any such claims falls outside

15  the Court's delegated role, which is limited to making the five findings required for certification. *See*

16  *Venckiene v. United States*, 328 F. Supp. 3d 845, 863 (N.D. Ill. 2018) (18 U.S.C. 3184 "provides only a

17  limited role for the magistrate court in the extradition process: to determine whether evidence sufficient

18  to sustain the charges exists and, if the [Court] finds that it is, to certify the finding to the Secretary of

19  State"); *see also* 18 U.S.C. 3184 ("If, on such hearing, [the Court] deems the evidence sufficient to

---

20          [16] Ameen also suggests that he is protected by the prohibition against refoulement set forth in the
21  Convention relating to the Status of Refugees ("1951 Convention"). CR 216 pg. 49; *see* 1951
    Convention, July 28, 1951, art. 33, 19 U.S.T. 6259 ("No Contracting State shall expel or return
22  ('refouler') a refugee in any manner whatsoever to the frontiers of territories [under certain
    circumstances].").  He is incorrect.  Although the United States is a  party to the 1967 Protocol relating
23  to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, which incorporated articles 2 to 34 of the 1951
    Convention, "the Protocol was not intended to be self-executing, and serves only as a useful guide in
24  determining congressional intent in enacting the Refugee Act." *Barapind*, 225 F.3d at 1107.  Thus,
    Ameen has no judicially enforceable rights under the 1951 Convention alone.  Moreover, as the
25  government has previously explained, courts have rejected claims that the 1951
    Convention provides fugitives with any special protection against extradition, CR 151 pg. 7-8, the
26  murder offense with which Ameen is charged clearly qualifies as a "serious non-political crime" that
    would disqualify him from any protection under the 1951 Convention, even assuming its applicability to
27  extradition matters, *id.*, and Ameen's removal proceedings have no bearing on these extradition
    proceedings, CR 140 pg. 14.
28          .

1  sustain the charge under the provisions of the proper treaty or convention . . . he shall certify the

2  same").  Ameen fails to explain—and cannot explain—why the rule of non-inquiry does not pose a bar

3  to the Court's consideration of the claim he makes pursuant to the Convention Against Torture and

4  Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), adopted Dec. 10, 1984, S.

5  Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85.

6        Indeed, the CAT did not alter the longstanding rule of non-inquiry.  As discussed below, the

7  treaty is not self-executing, and Congress has twice made clear that federal courts may not review CAT

8  claims other than in the immigration context.

9              1.      **The CAT is Not Self-Executing**

10        The CAT was adopted by the United Nations General Assembly in 1984.  Article 3 of the CAT

11  provides, in relevant part, that no state party shall "extradite a person to another State where there are

12  substantial grounds for believing that he would be in danger of being subjected to torture."[17]  That article

13  directs the "competent authorities" responsible for evaluating torture claims to "take into account all

14  relevant considerations including, where applicable, the existence in the State concerned of a consistent

15  pattern of gross, flagrant or mass violations of human rights."  CAT, Art. 3.

16        The Senate gave its advice and consent to the CAT subject to the declaration that "Articles 1

17  through 16 of the Convention are not self-executing."  136 Cong. Rec. 36,198.  Thus, "[t]he reference in

18  Article 3 to 'competent authorities' appropriately refers in the United States to the competent

19  administrative authorities who make the determination whether to extradite, expel, or return. . . .

20  Because the Convention is not self-executing, the determinations of these authorities will not be subject

21  to judicial review in domestic courts."  S. Exec. Rep. No. 101-30, at 17-18 (1990); *see Medellin v.*

22  *Texas*, 552 U.S. 491, 505 n.2 (2008) ("[A] 'non-self-executing' treaty does not by itself give rise to

23  domestically enforceable federal law.  Whether such a treaty has domestic effect depends upon

24  implementing legislation passed by Congress.").

25

26

27

---

28        [17] In providing its advice and consent, the Senate stated its understanding that this provision
means "if it is more likely than not that he would be tortured."  136 Cong. Rec. 36,198 (Oct. 27, 1990).

2.      **The FARR Act Does Not Provide for Substantive Judicial Review of CAT Claims in Extradition Cases**

Congress implemented Article 3 of the CAT by enacting Section 2242 of the FARR Act. Section 2242(a) states that it is the "policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."

Section 2242(b) of the FARR Act directs the "heads of the appropriate agencies" to prescribe regulations implementing Article 3 of the CAT.  The Secretary of State has promulgated regulations providing that, when appropriate, "the Department considers the question of whether a person facing extradition from the U.S. 'is more likely than not' to be tortured in the State requesting extradition."  22 C.F.R. § 95.2(b); *see also* 22 C.F.R. § 95.1(b) (defining torture).[18]  The regulations expressly state that the Secretary's surrender decisions are "matters of executive discretion not subject to judicial review."  22 C.F.R. § 95.4.  The regulations also make clear that the provisions in the FARR Act providing for judicial review in the context of immigration removal proceedings are "not applicable to extradition proceedings."  *Id.*

Critically, Section 2242(d) of the FARR Act clarifies that the statute does not confer courts with jurisdiction to review claims under the CAT outside the context of a final order of removal entered in an immigration case.  It states:

> Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), . . . . nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the [CAT] or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

FARR Act § 2242(d), 112 Stat. 2681-822 (8 U.S.C. § 1231 note).

---

[18] Ameen incorrectly states that "the 'appropriate agencies' have not prescribed regulations to address [the United States' obligation under the CAT] in the extradition context."  *Cf.* CR 216 pg. 48.

### 3. The REAL ID Act Makes Doubly Clear that Courts May Not Review CAT Claims in Extradition Cases

Congress again addressed judicial review of claims under the CAT when it enacted 8 U.S.C. § 1252(a)(4) as part of the REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a)(1)(B), 119 Stat. 231, 310. That provision states:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

8 U.S.C. § 1252(a)(4).

The CAT is therefore not self-executing, the FARR Act does not create jurisdiction for substantive judicial review of claims under the CAT except in certain immigration proceedings, and the REAL ID Act makes doubly clear that specified immigration proceedings "shall be the sole and exclusive means for judicial review of any cause or claim under the [CAT]." *See* FARR Act § 2242(d); 8 U.S.C. § 1252(a)(4).

### 4. The Ninth Circuit and Other Precedent Foreclose Ameen's Claim

The Ninth Circuit confirmed in *Trinidad y Garcia v. Thomas* that neither the CAT nor the FARR Act displaced the rule of non-inquiry. 683 F.3d 952 (9th Cir. 2012) (en banc) (per curiam). The Court concluded that, because the FARR Act and its implementing regulations require the Secretary of State to make a torture determination before surrendering a fugitive who makes a torture claim, those provisions create liberty interests cognizable under the Due Process Clause. *Id.* at 956. However, the Court determined, that interest is "narrow," requiring only "that the Secretary comply with her statutory and regulatory obligations" to "find it not 'more likely than not' that the extraditee will face torture before extradition can occur." *Id.* at 957 (quoting 22 C.F.R. § 95.2). The Court remanded the case to the district court to give the Secretary an opportunity to file a signed declaration stating that she had complied with her obligations. *Id.* Once the Secretary did so, the Court held that "the court's inquiry shall have reached its end and [the fugitive's] liberty interest shall be fully vindicated." *Id.*

36

Significantly, the Court determined that the "doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary's declaration." *Id.*; *see also, e.g.*, *Perez v. Mims*, No. 1:16-CV-01935-SKO HC, 2017 WL 374350, at *4 (E.D. Cal. Jan. 26, 2017) (rejecting fugitive's claim that he was entitled to habeas relief from the certification of his extradition because "the Secretary of State erred by failing to agree with petitioner's contention of his likely torture following extradition to Mexico").

Other case law likewise supports the conclusion that courts may not deny extradition based on a CAT claim, as follows:

- In *Hoxha*, the fugitive sought to block his extradition to Albania on the grounds that it would violate the CAT and the FARR Act. 465 F.3d at 564. The Third Circuit rejected the claim and held that the CAT is "not self-executing" and "therefore does not in itself create judicially enforceable rights." *Id.* at 564 n.15. The *Hoxha* court held that the CAT's implementing legislation, the FARR Act, "does not *create* court jurisdiction." *Id.* at 564 (emphasis in original). It also held that the rule of non-inquiry continued to apply and the district court "correctly declined to consider Petitioner's humanitarian claims." *Id.*

- In *Mironescu v. Costner*, the fugitive asserted a CAT claim in an effort to bar his extradition to Romania. 480 F.3d 664, 674 (4th Cir. 2007). The Fourth Circuit held that Section 2242(d) of the FARR Act "plainly conveys that although courts may consider or review CAT or FARR Act claims as part of their review of a final removal order, they are otherwise precluded from considering or reviewing such claims." *Id.*; *see also id.* at 677 ("Thus, in light of the absence of any other plausible reading, we interpret § 2242(d) as depriving the district court of jurisdiction to consider Mironescu's claims.").

- The D.C. Circuit reached the same conclusion in *Omar v. McHugh*, holding that "[b]y its terms, the FARR Act provides a right to judicial review of conditions in the receiving country only in the immigration context, for aliens seeking review of a final order of removal." 646 F.3d 13, 17 (D.C. Cir. 2011) (Kavanaugh, J.). The D.C. Circuit also noted that "[t]he REAL ID Act states that *only* immigration transferees have a right to judicial review of conditions in the receiving country, during a court's review of a final order of removal." *Id.* at 18 (emphasis added).

1   Thus, case law makes clear that the CAT did nothing to alter the historical rule of non-inquiry; if

2   anything, its implementing legislation cemented the fact that federal courts may not consider extradition

3   CAT claims.[19]

4                 **5.      The Cases Upon Which Ameen Relies Do Not Support His Claim**

5   Ameen cites to two unpublished, out-of-circuit cases in support of his argument that the United

6   States cannot extradite him given his alleged likelihood of being tortured in Iraq, neither of which is

7   rightly decided or applicable in this case.[20]  In both cases, courts failed properly to apply the law,

8   discussed above, which prohibits judicial consideration of torture claims in extradition

9   proceedings.  Moreover, in both cases, the fugitives had already been granted immigration relief in the

10  form of withholding of removal or asylum—a fact which was elemental to the courts' decisions and

11  which distinguishes them from this case.  Thus, neither case supports Ameen's CAT-based defense to

12  extradition.

13  *First*, in *Aguasvivas v. Pompeo*, the court granted the habeas petition filed by a fugitive who had

14  previously been certified as extraditable to the Dominican Republic, in part due to the fact that he had

15  been granted withholding of removal based on a CAT claim.  No. 19-123-JJM-PAS, 2019 WL 4456034,

16  at *12 (D.R.I. Sept. 18, 2019).[21]  The court concluded that (1) the fugitive's CAT claim was ripe for

17  judicial review because the Board of Immigration Appeals had already made "a final and conclusive

18  finding of likelihood of torture," *id.* at *7; (2) judicial review of the CAT claim did not implicate the rule

19  of non-inquiry because "the Executive Branch has already found that torture is probable," *id.* at *9; and

20  (3) "res judicata bar[red] reexamination of the BIA's binding resolution that [the fugitive] is likely to be

21  tortured upon extradition to the Dominican Republic," *id.* at *12.

22  *Second*, in *United States v. Porumb*, the court declined to certify a fugitive from Romania in part

23

24  [19] The above-described cases all arise in the context of individuals challenging the legality of their detention in U.S. custody through a petition for a writ of habeas corpus.  While 28 U.S.C. § 2241 authorizes courts to consider whether an individual is "in custody in violation of the Constitution or laws or treaties of the United States," there is no similar authority for courts presiding over extradition hearings pursuant to the limited mandate of 18 U.S.C. § 3184.

25

26  [20] Although Ameen claims that "two recent extradition courts have recognized the issue [related to CAT] and refused to certify extradition," CR 216 pg. 48, in fact, certification was denied in only one of the cases he cites, as discussed herein.

27

28  [21] The government's appeal of this case is currently pending before the First Circuit.

38

because he had been granted asylum.  No. 6:18-MJ-000106:18-CR-00035-01, 2019 WL 4694141, at *11

(W.D. La. Sept. 25, 2019).[22]  The court determined that it was "bound by" the decision granting the

fugitive asylum because, in its view, "the Government has already decided that [the fugitive] is non-

extraditable."  *Id.* at *7.  The court expressly distinguished previous cases that involved

"contemporaneously pending asylum and extradition proceedings," stating that "§ 1158(c) operates as

an absolute bar to extradition of an individual who has already been granted asylum.  *Pending*

*asylum* claims do not implicate § 1158(c)."  *Id.* at *6 (emphasis in original).

Thus, even if *Aguasvivas* and *Porumb* properly applied the law (which they do not), the

reasoning in those cases still does not apply to Ameen, who claims to be seeking, but does not claim to

have yet been granted, asylum.  Under the rule of non-inquiry, Ameen's allegation that he will be

tortured if surrendered to Iraq is not properly before this Court.  "It is not that questions about what

awaits [him] in [Iraq] are irrelevant to extradition; it is that there is another branch of government, which

has both final say and greater discretion in these proceedings, to whom these questions are more

properly addressed."  *Kin-Hong*, 110 F.3d at 109.  This Court should reject Ameen's invitation for it to

usurp the role of the Secretary of State in assessing his CAT claim.

### B.  The ISIS Murder for Which Ameen's Extradition is Sought is Not Barred Under the Political Offense Exception of the Treaty

Ameen has failed to meet his burden of establishing the political offense exception by a

preponderance of the evidence.  *See In re Extradition of Singh*, 170 F. Supp. 2d 982, 995 (E.D. Cal.

2001).  As the government has previously explained, CR 151 pg. 3-6, the Ninth Circuit unequivocally

stated in *Quinn v. Robinson* that the exception for political offenses in extradition treaties "simply does

not cover acts of international terrorism."  783 F.2d at 806.  To conclude otherwise would allow the

United States to "become a haven for international terrorists."  *Id.* at 808; *see also, e.g.*, *Ahmad v.*

*Wigen*, 726 F. Supp. 389, 403 (E.D.N.Y. 1989) ("Terrorism tears the ligaments of civility and security

that peacefully bind us together in our communal daily life.  Current United States policy on terrorism

cannot be ignored when courts define political offenses for extradition purposes.").

---

[22] The government is unable to appeal a court's decision to decline to certify an extradition.

In establishing this rule, the Ninth Circuit distinguished "acts of international terrorism" from "violent acts committed as a part of other nations' internal political struggles."[23]  *Quinn*, 783 F.2d at 805.  The murder at issue in this case falls within the former category.  Ameen is alleged to have murdered Ihsan as part of a terrorist invasion of Iraq (and Syria, among other countries), not as part of an internal Iraqi revolution against the existing government.  While Ameen is an Iraqi national, ISIS was founded by a Jordanian, Abu Musab al-Zarqawi; is composed of non-Iraqis and foreign-fighters; seeks to overthrow the governments not only of Iraq but also of other countries as well; operates globally; and proclaimed itself to be a worldwide caliphate as of June 2014.[24]  The murder of Ihsan occurred in conjunction with the ISIS takeover of Rawah.  By extraditing Ameen for that act, the United States would "not [be] interfering with any internal struggle; rather, it is [Ameen] who has interfered with the rights of others to exist peacefully under their chosen form of government."  *Quinn*, 783 F.2d at 806.

Contrary to Ameen's suggestion, CR 156 pg. 5-7, the *Quinn* Court did not conclude that violent acts committed by individuals in their home state cannot constitute "acts of international terrorism." Indeed, the Court noted that in cases of international terrorism, the requesting country is "frequently"— but not always—"not a government the accused has sought to change."  *Id.* at 806.  The Court did not, as Ameen contends, determine that bombings and the murder of a police constable in England fell outside the political offense exception simply because they occurred outside Northern Ireland, where the relevant uprising took place.  *Cf.* CR 156 pg. 5 (citing *Quinn*, 783 F.2d at 813).  Rather, the acts failed the requirement that they be "incidental to" a political uprising because there was no uprising in England.  *Quinn*, 783 F.2d at 813 ("We cannot conclude, however, that the uprising extended to England. . . .  [W]e do not believe it would be proper to stretch the term 'uprising' to include acts that took place in England as a part of a struggle by nationals of Northern Ireland to change the form of government in their own land.").[25]  Nothing in *Quinn*'s discussion would suggest that an ISIS offensive

[23] Indeed, the violence at issue in *Singh*, 170 F. Supp. 2d 982, upon which Ameen relies, CR 216 pg. 6, is an example of the type of domestic political struggle that the political offense exception is intended to cover.

[24] *See* "The Islamic State," http://web.stanford.edu/group/mappingmilitants/cgi-bin/groups/view/1.

[25] The Ninth Circuit applied this holding in *Vo v. Benov*, which involved a request by Thailand for the extradition of a member of the Government of Free Vietnam, a terrorist organization, who was alleged to have committed an attempted bombing in Thailand.  In that case, the Court concluded that

as part of efforts to establish an international caliphate would constitute "domestic political violence" that falls within the purview of the political offense exception.  *Cf.* 783 F.2d at 805.

The *Quinn* Court's discussion of *Eain*, 641 F.2d at 507, further clarifies that terrorist acts may be extraditable even when they occurred in the requesting state.  *Quinn*, 783 F.2d at 807.  In *Eain*, Israel sought the extradition of a member of the Palestine Liberation Organization, a terrorist organization, who was accused of committing a bombing in Israel.  641 F.2d at 507.  The *Quinn* Court agreed with the ultimate conclusion in *Eain* that the political offense exception did not apply, reasoning that "[w]hen PLO members enter Israel and commit unlawful acts, there is simply no uprising for the acts to be incidental to."  *Quinn*, 783 F.2d at 807.  The *Quinn* Court explained:

> The plain fact is that the Israelis are not engaged in revolutionary activity directed against their own government.  They are not seeking to change its form, structure, or composition through violent means.  That the PLO members who commit crimes are seeking to destroy Israel as a state does not help bring them within the political offense exception.  In the absence of an uprising, the violence engaged in by PLO members in Israel and elsewhere does not meet the incidence test and is not covered by the political offense exception.  To the contrary, the PLO's worldwide campaign of violence, including the crimes its members commit in the state of Israel, clearly constitutes "international terrorism."

*Id.*  The same reasoning applies to the act Ameen is alleged to have committed in Iraq.[26]

Furthermore, Ameen's contention that Ihsan's murder was part of ISIS's plan to establish "structure" in Iraq is contrary to the facts of this case.  *Cf.* CR 156 pg. 7-8.  The extradition request establishes that ISIS members entered Ihsan's home and proclaimed that "they just killed the apostate, the infidel . . . , the Agent for the Americans and the apostate government."  CR 137-1 pg. 43.  Such language indicates that Ameen's actions were driven by ideological and religious considerations, and not the motivation to establish a new government in Iraq.  Regardless, ISIS's actions in Iraq cannot be

"[b]ecause [the fugitive] committed the offense outside the territorial boundaries of the state in which the uprising was allegedly occurring, his conduct does not meet the geographic requirement of the incidence test's uprising prong, and therefore the crime does not qualify for the political offense exception."  447 F.3d 1235, 1245 (9th Cir. 2006).

[26] The view that the political offense exception does not have geographic limits has been incorporated into the European Convention on the Suppression of Terrorism, in which European countries have agreed to exclude certain terrorism-related offenses from the political offense exception in extradition treaties, without regard to where they are committed.  *See* Arts. 1 & 2, Jan. 27, 1977, 15 I.L.M. 1272, 1272-73 (1976).

1   divorced from its terrorist campaign elsewhere in the world, as Ameen suggests.  Ameen cannot

2   reasonably contend that the actions of which he is accused of committing, on behalf of a group that has

3   been internationally condemned as a terrorist organizations, do not constitute an act of international

4   terrorism.

5   **C.**      **Article VI of the Treaty Does Not Provide a Basis for the Court to Defer Extradition**

6   While Ameen also contends that this Court should defer his extradition pursuant to Article VI of

7   the Treaty to allow him to defend against a U.S. criminal case, Article VI is a discretionary provision,

8   the consideration of which is for the Secretary of State.  Article VI provides that the extradition of a

9   fugitive who is "actually under prosecution . . . for a crime committed in the [requested] country . . . *may*

10  be deferred until such proceedings be determined . . . ."  Treaty, Art. VI.  Thus, it provides a

11  discretionary basis on which to postpone extradition.  *See Vo v. Benov*, 447 F.3d 1235, 1246 n.13 (9th

12  Cir. 2006) ("The use of 'may' language in a treaty indicates a provision constitutes a discretionary

13  exception [to extradition]."); s*ee also, e.g.*, *Patterson v. Wagner*, 785 F.3d 1277, 1281 (9th Cir. 2015)

14  ("The normal reading of 'may' is permissive, not mandatory.").  Such discretionary exceptions "are

15  reserved to the executive branch of government."  *Trifonov v. Fox*, No. C14–0366JLR, 2014 WL

16  3735419, at *15 (W.D. Wash. July 28, 2014); *see Vo*, 447 F.3d at 1246 ("[A]n extradition court is

17  without authority to prevent an extradition on the basis of a discretionary exception and thus *cannot*

18  deny extradition on that basis.") (emphasis in original).  This is so because the Secretary of State is

19  uniquely positioned to exercise the discretion that provisions such as Article VI of the Treaty afford as

20  part of his overall foreign policy calculus.  *See Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000)

21  ("[T]he Secretary of State has sole discretion to weigh the political and other consequences of

22  extradition and to determine finally whether to extradite the fugitive.").  Thus, only the Secretary, and

23  not the Court, may decide whether or not to allow any U.S. criminal case to proceed against Ameen first

24  before surrendering him to Iraq.

25  Ameen cites to no law dictating otherwise—nor does any exist.  Rather, he simply seeks to use

26  Article VI as a fishing expedition into whether there are any U.S. criminal charges pending against him.

27  Any such charges, if they exist, would be irrelevant to the Court's consideration of whether to certify

28  Ameen's extradition on a charge of murder alleged to have been committed in Iraq.  And nowhere in its

text or spirit does Article VI entitle Ameen to use a foreign extradition request to obtain information about a U.S. case.  Accordingly, the Court should reject Ameen's request that this Court exceed its limited role established under 18 U.S.C. § 3184 and usurp the Secretary's role in making a decision on deferral, if one is necessary.  Otherwise, such "[u]nwarranted expansion of judicial oversight" would risk "interfer[ing] with foreign policy and threaten[ing] the ethos of the extradition system."  *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003).

## V.    CONCLUSION

Ameen begins his final argument to this Court by claiming that he has "powerful and uncontradicted evidence" of his innocence.  CR 216 pg. 1.  Ameen can only make that claim by ignoring the contents of the extradition request itself, which establish probable cause that he committed murder.  Three witnesses place Ameen in Rawah, Iraq, on June 22, 2014, taking part in the ISIS murder of Ihsan.

"The extradition proceeding . . . makes no determination of guilt or innocence.  It is designed only to trigger the start of criminal proceedings against an accused; guilt remains to be determined in the courts of the demanding country."  *Valencia v. Limbs*, 655 F.2d 195, 198 (9th Cir. 1981).  The evidence in the extradition request is more than adequate to trigger the commencement of criminal proceedings against the Ameen in the Republic of Iraq.  For these reasons, the United States requests that the Court certify the request for his extradition.

1

2

Dated:  November 25, 2019                          McGREGOR W. SCOTT
3                                                  United States Attorney

4
                                         By:  /s/ Audrey B. Hemesath
5                                             AUDREY B. HEMESATH
                                              HEIKO P. COPPOLA
6                                             Assistant United States Attorneys

7                                             CHRISTOPHER J. SMITH
                                              Associate Director
8                                             REBECCA A. HACISKI
                                              Trial Attorney
9                                             Office of International Affairs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28