HEATHER E. WILLIAMS, State Bar #122664
Federal Defender
BENJAMIN D. GALLOWAY, #214897
Chief Assistant Federal Defender
RACHELLE BARBOUR, #185395
Assistant Federal Defender
OFFICE OF THE FEDERAL DEFENDER
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax 916-498-5710
rachelle.barbour@fd.org

Attorneys for Defendant
OMAR ABDULSATTAR AMEEN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF OMAR ABDULSATTAR AMEEN TO THE REPUBLIC OF IRAQ, _____/ | Case No.  2:18-mj-152 EFB<br><br>SECOND SUPPLEMENTAL EXTRADITION HEARING BRIEF; EXHIBITS<br><br>Judge:  Hon. Edmund F. Brennan |

## I.    INTRODUCTION

As ordered by the Court on December 4, 2019, the defense hereby files its Second

Supplemental Extradition Hearing Brief and Exhibits.[1]  An updated Exhibit List is being filed

concurrently.  On January 28, 2020, the Court ordered the Defense to file a Status Report no later

than April 29, 2020, notifying the Court of the progress of the Letter Rogatories[2] for Mr.

Ameen's Turkish cell phone records.  The Defense confirms that on January 27, 2020, the

---

[1]    Courtesy hard copies of the Exhibits, including the videos and PowerPoint on a DVD, will be provided to the Court and Government tomorrow.  The Defense marks a sanitized copy of is PowerPoint from the December hearing as a demonstrative exhibit (Exh. 138).

[2]    Although the recent filings concern cell phone records held by Turkcell, the defense notified the Court in March 2019 that some of the relevant data might be held by the BTK, which is the Turkish technology agency.  Accordingly, on March 12, 2019, the Court also requested the records from BTK, to ensure that all relevant information would be captured.  (ECF Doc. 99.) The Defense never heard back from the Republic of Turkey and does not know if a response was, like the Turkcell response, mishandled by the U.S. Government.  Accordingly, the Defense has provided both Letter Rogatories to the Department of State for transmittal to the Turkish Government.

Defense provided the relevant unit at the Department of State with the Letter Rogatories and all supportive documentation for transmittal to Turkey.  On January 28, 2020, the Defense further corresponded with the Department of State regarding those requests.  In light of the Court's order, the Defense anticipates providing significant additional obliterative evidence to the Court.  Investigation and research continue, and every possible lead is being pursued.  The Defense will supplement the record with further Exhibits and analysis as they are received.

## II. PERSON 1'S STORY IS INSUFFICIENT TO SUPPORT PROBABLE CAUSE

### A. PERSON 1'S STORY IS INHERENTLY INCREDIBLE

#### 1. Person 1's Claim to Know Omar Ameen is Patently and Demonstrably False from His Own Statement to the FBI

Person 1 was born in March 1956, as demonstrated by the unredacted version of the FBI 302 that is at the center of the supplemental information submitted by the Government.  (Exh. 127 [unredacted]; Exh. 129 [redacted].)  As amply reflected in the Extradition Packet and every identity document filed with the Court, Omar Ameen was born in December 1973. That makes Person 1 over 17 years older than Mr. Ameen.  Yet, Person 1 lied to the FBI about knowing Omar.  In a statement recounting his biography, Person 1 stated to the FBI Special Agent:

> [Person 1] was born in Iraq and spent some of his childhood in Rawah.  As a child, [Person 1] knew Omar Ameen and would interact socially with him.  As an adult, [Person 1] joined the Iraqi military and served from [redacted] until [redacted].  [Person 1] fought against the Americans during the United States invasion of Iraq, until the Iraqi Army was disbanded by the United States in 2004.  [Redacted line recounting Person 1's involvement with U.S. agencies.][3]

There is no ambiguity to this statement.  Each sentence starts with Person 1 as the subject.  Each sentence recounts Person 1's biography chronologically.  Each sentence follows the other naturally – Person 1 "spent some of his childhood in Rawah."  Person 1 claims to know Omar

---

[3]   These redactions were made by the Government.  It is the defense position that as long as Person 1's name and exact birthdate remain redacted, there is no risk to addressing other aspects of his biography in the open record.  As discussed below, that biography is directly related to the inherent incredibility of this statement, and why the Court should reject it in its probable cause determination.  It also directly undermines any claims that the Government makes regarding Person 1's fear of retaliation.

Ameen from that time; that is why the fact that Person 1 was in Rawah as a child is important. The next sentence begins, "As an adult. . . ," clearly distinguishing what came before that sentence – a recounting of Person 1's childhood spent socializing with Omar Ameen in Rawah – with what comes after – a detailing of his military and work experience as an adult until the present.

Understandably, the Government is not thrilled with this very clear, yet impossible statement by Person 1.  The statement is recounted in a very comprehensive, chronological paragraph by the FBI Special Agent, who was a literature major in college.[4]  (Exh. 111, p. 1.) The Government resorted to claiming that it was an "imperfectly written 302 [FBI Report]" or a "translation issue," thereby undermining the reliability of the very document it has tried to insert back into the Iraqi Court case.  (Transcript, Dec. 4, 2019, p. 77.)   Yet, it somehow simultaneously argues that the twice-again translated[5] FBI 302 in the Iraqi submission at Document 237 is the "best information."  (Transcript, Dec. 4, 2019 hearing, p. 7.)

Faced with a clear, inherent, unbelievable inconsistency by its late-breaking witness, the Government tries to rewrite what everyone can read and understand.  Moreover, even the Government's attempted fix – that Person 1 must have really meant that he knew Omar Ameen when *Omar* was a child, even though Person 1 was not in Rawah at that time – is absolutely unreliable as well: the Court is expected to believe that Person 1 could recognize someone he knew when they were a child, over forty years later, in a vehicle streaming by in an ISIS convoy. That very Rawah convoy was captured by news cameras and videos and a photo from that day are attached here as Exhibit 130.[6]

---

[4]     The FBI Special Agent was a French literature major.  French follows the same rule of grammar in this respect as English.

[5]     The document was apparently mistranslated.  (ECF Doc. 237-1, p. 8 [replacement filing].)  The Defense also objects to the Court's consideration of this document (ECF Doc. 237-1), as the Government has failed to file the actual Iraqi document it claims is part of the Court record, relying instead of only an English translation of uncertain provenance.  (See ECF Doc. 237, p. 2 [striking the Arabic version from the docket].)

[6]     Pursuant to Eastern District of California Local Rule 138(l), all the videos and other multimedia in this case are being provided to the Court and Government on a DVD.  The attached exhibits contain the URL links to the videos discussed.

The Court can see with its own eyes that no one could have seen what Person 1 has claimed.  As the convoy drives by, it is impossible to see who is in the cars.  All the windows of the cars are tinted, including the windshield.

Multiple sources identify true commander of the ISIS takeover of Rawah: Abu Anas Al-Sammarai, who is captured in videos and photos taken that weekend, including giving an informal victory speech in Ana, the town across the river from Rawah that was taken over by the same ISIS group.  Abu Anas is the ISIS leader in the video at Exhibit 132, taken on a shaky cell phone by an audience member, and posted online.  In that video, Abu Anas tells the onlookers that ISIS has taken over, that ISIS will govern according to God's laws, not the Iraqi law, and that it will treat the people well.  Abu Anas also says that anyone from the Iraqi army, police, or politics, or anyone who supported the Sunni Awakening, will be treated fairly, *as long as they hand over their weapons*.[7]

Abu Anas, the Wali (Governor) of the region, also issued an official ISIS dictat within months, repeating his order that all remnants of the prior regime hand over their weapons.  (Exh. 133.)  According to the victim's entire family, Abu Anas is the person who called Jasim prior to his murder, to threaten him.  (Exhs. 84, 106, 107, 108; Exh. 80, Collated EP at 61, 65, 71 [Iraqi Court statements].)  Abu Anas was identified by a local police officer who texted the victim on June 21, 2014 at 9:40 p.m. to notify him of the events of the day.  (Exh. 136.)  Those events were captured by a local news crew and documented in two videos in Exhibit 130.  Further, Abu Anas was identified by the victim in a text earlier in the day, before his death.  (Exh. 125.)[8]  Moreover, Abu Anas's photo is on the Twitter page announcing the victim's death at the hands of ISIS. (Exh. 131.)

Photographs from Abu Anas's speech upon the takeover of Rawah and Ana persist online, even though most ISIS propaganda has been taken down.  One photograph, at Exhibit

---

[7]      The victim was warned of this by Abu Anas, failed to hand over his weapons, had a gun battle with ISIS, and was murdered, according to the family statements in the Iraqi extradition packet at Exh. 80.

[8]      The forensic expert has indicated that the true time of the text was 1:55 p.m. in Iraq, and that three hours should not be added.

134, is the clearer version of the photograph linked to the Twitter post announcing the victim's death. (Exh. 131.) It depicts Abu Anas in Ana that day. In another photograph from the same day, at Exhibit 135, Abu Anas stands next to a younger terrorist with a shorter beard and a scarf on his head. That terrorist is looking at a cell phone in the picture. That terrorist is Omar Adel Abd Al-Wahid, one of the terrorists identified by the victim as being in Rawah in the early afternoon, hours before the victim was murdered. (Exh. 135 <u>referencing</u> Exh. 125.)



As shown in the picture, ISIS terrorists have beards. The ISIS terrorists involved in taking over Rawah had beards. Person 5 describes the shooter of Jasim as having a beard and shoulder length hair. (Exh. 38.) In Abu Anas's speech on the day of the takeover, he and his cronies either have beards, or are completely masked. Omar Ameen is not there. The Court can view the video and see for itself.

If Person 1 was in Rawah (a claim that is completely undermined by evidence and common sense, as discussed below), and if Person 1 really stood outside his home idly watching an ISIS convoy speed by (even though Person 1 has been involved in the Iraqi military and the U.S. military since 1981), and if Person 1 really caught sight of the passenger in the convoy as it went by, that passenger, like the rest of the convoy, would have been bearded – just as Person 5 claimed. The possibility that Person 1 could recognize that bearded man in 2014, especially if he only knew that person when that person was a child in the 1970s, is inconceivable.

One further detail undermines the purported identification.  Person 1 claims that the person he saw in the ISIS convoy is wearing a "Shmagh."  (Exh. 129 [claiming that person is in "ISIS style clothes . . . wearing a black Shmagh"].)  A shmagh (or shemagh) is a length of fabric that is wrapped around the head, commonly worn in the Middle East to protect from the sun and sand. It has been adopted by military forces as a standard issue garment. https://www.instructables.com/id/How-to-tie-a-Shemagh/  The three masked fighters in the photo above, holding machine guns, are wearing shmaghs.  (Exhibits 134, 135.)  Person 1's identification is preposterous.

The true reason for Person 1's false "identification" of Omar Ameen?  The key "facilitator" (the Government's words) is TMF-1, who brought Person 5 to the FBI in October 2017, and then brought them Person 1 (likely because the FBI didn't believe Person 5).  TMF-1 – a Colonel in the same Tribal Mobilization Force as Person 1 – showed his witnesses in advance the publicly-available Facebook profile pictures that he had of Omar.  When the defense called TMF-1, the first thing he did was offer to show them pictures of Omar.  Those pictures?  The same ones that Person 5 and Person 1 supposedly identified for the FBI.  (Compare Exh. 104 [DMV, snow, and Utah road photographs texted by TMF-1 to Defense] with Exh. 38, p. 4 [snow photo of Omar in Utah used by FBI in Person 5 interview] and Exh. 139 [Cal. DMV photo used by FBI in person 1 interview – redacted by Govt].)

In fact, it is clear that the California DMV printout used by the FBI is exactly the one that TMF-1 texted to the defense.[9]  Person 1's claim is by no means a reliable identification.  Person 1 is by no means a reliable witness upon which the Court may certify extradition, or to attempt to corroborate Person 5's outrageous claims.

## 2.  The Murder Occurred Hours After Person 1 Claims to Have Seen the Convoy

---

[9]    It also undermines the Government's suggestion that TMF-1 could have gotten this photograph off the internet after Omar's arrest in August 2018.  The copy he has is a complete page printout, not a printout from the internet, and matches the one used by the FBI in January 2018.

1    In its PowerPoint presentation, the Government conceded that the times it provided for its

2    chain of events were "approximation[s]."  (Transcript, Dec. 4, 2019, pp. 20-23.)  However, its

3    attempt to present a coherent timeline by simply making up or approximating critical times, the

4    Government obscured the ways in which Person 1's statement conflicts with Person 5.

5    Person 1 claims that he saw the ISIS convoy come by in the late afternoon around the

6    time of the fall of Rawah.  (Exh. 127, p. 1.)  This is non-ambiguous and is in the FBI 302 report

7    and incorporated into the Iraqi Court's recitation of that 302.  (Exh. 127; ECF Doc. 238-1.)  It is

8    clear that Rawah fell, not on June 22, 2014 (the day of the murder), but at approximately 10:00

9    a.m. on June 21, 2014, the day before.  (See e.g., Exh. 136 [text received by victim warning him

10   of security forces withdrawing at 10:00 a.m. June 21, 2014].)

11   Even assuming that Person 1 was talking about the day after Rawah fell, he claims to have

12   to see the convoy "in the late afternoon."  (Exh. 127, 129.)  The murder occurred hours later, when

13   the family was preparing for dinner, and when the victim had to go fix the generator again

14   because it was dark outside.  Sunset in Iraq on June 22, 2014 was at 7:15 p.m.  It was twilight

15   until 7:43 p.m.  https://www.timeanddate.com/sun/iraq/baghdad?month=6&year=2014.  Person 5

16   told the Iraqi Court that the attack started around 7:00 p.m. and lasted over 10 minutes.  (Exh. 80,

17   Collated EP at 71.)  According to the Extradition Packet, the parents did as well.  (Exh. 80,

18   Collated EP at 61, 65 [the statements are nearly identical].)

19   More critically, hard evidence shows that the murder happened after 8:00 p.m.  (Exh. 149

20   [final text from victim].)   The victim's last outgoing text is at 8:03:38 p.m. that evening.[10]  Id.

21   The topic of this final text and identity of the recipient is extremely personal, and the Defense

22   has no desire to embarrass the victim or his family in this public setting, especially after the

23   family trusted the defense with the victim's cell phone.  Defense counsel affirms that the last text

24   from the victim's phone is clearly from the victim, and relates to a number of ongoing texts and

25   calls between the victim and the recipient during that weekend.  Should the Court want more

26   

27   [10]    The Defense has consulted with its forensic expert and determined that the times in the
     cell phone report are the Iraqi times that texts and calls were made and received, even though

28   they say "UTC+0," because the cell phone set to UTC upon forensic examination.  Accordingly,
     the text in Exhibit 125 was actually sent by the victim at 1:55:37 p.m. in Iraq on June 22, 2014.

information about this extremely personal matter, Defense counsel will file a declaration under seal explaining the communications between the victim and the recipient.  For now, counsel can affirm that the victim clearly sent his last text at 8:03 p.m. the night of the murder.  Accordingly, this corroborates his widow's statement that the murder occurred at approximately 8:30 p.m. on June 22, 2014.  (Exh. 84.)

This firmly undermines Person 1's account.  Rawah is not a big town, and Person 1's statement requires that he be within earshot of the victim's home, as he claims to hear the burst of gunfire that killed the victim shortly after the convoy passed by in the late afternoon.  It would not have taken hours for the convoy to arrive at Ihsan Jasim's home.  Even assuming the truth of Person 1's other statements, he could not have heard the gunfire that killed the victim, and therefore this was not the convoy responsible for Jasim's death.

### 3.  Person 1's Statement Contradicts Person 5's Statement in Critical Ways

Likewise, Person 1 contradicts Person 5's description of the convoy (although Person 5 has described it differently multiple times).   In his only statement in the case, to the FBI, Person 1 stated that it was "made up of 3 trucks, 2 tan in color and 1 white." (Exh. 127, 129.)  Person 5 told the FBI he saw "3 vehicles approach [redacted] including an AMRAP, a 2-cab Hilux, and a Humvee." (Exh. 38.)  He later told the Iraqi court there were "four vehicles, pickups." Exh. 80 (Collated EP), p. 71.

The Government has argued that these descriptions are consistent, but they are not. Person 5's most detailed description was in his October 23, 2017 statement to the FBI.  (Exh. 38.)  The HiLux he describes is a Toyota model pickup truck that is visible in the videos of the ISIS caravan.  (Exh 130.) However, an AMRAP (MRAP) is incredibly distinctive, and the presence of an MRAP would have been noted by a military commander like Person 1.  MRAP stands for a "Mine-Resistant Ambush Protected" military light tactical vehicle produced for the United States Department of Defense from 2007 to 2012 to protect troops against IEDs. https://archive.defense.gov/home/features/2007/mrap/  Here's a picture of one from the Marine

Corps Systems Command (https://www.marcorsyscom.marines.mil/News/News-Article-Display/Article/932752/mrap-program-celebrates-10-years-of-protecting-those-who-protect-us/):



An MRAP would never be confused for just a simple truck.  Even if Person 1 was in Rawah, even if Person 1 saw a convoy, that was not the convoy that killed Jasim.

Finally, Person 1 contradicts Person 5's description of the gunfire (although Person 5 has described it differently multiple times.)  Person 1 says that he heard a "burst of rifle fire" that  (Exh. 127, 129.)  Person 5 has given different statements.  In his statement to the FBI, he claimed "he heard gun shots." (Exh. 38.)  In the Iraqi court statement, he said "they started shooting heavily at

> our house. During that, [the victim] … went outside the house and returned fire at
> ISIS terrorists using his Kalashnikov rifle. The engagement continued with the terrorist
> elements for about 10 minutes. After they stopped shooting, I went outside the house and
> while I was standing in front of the outside door, I saw [the victim] on the ground and I
> saw the suspect (Omar Abdulsattar) standing over him and was holding a gun and fired at
> him while he was on the ground.

(Exh. 80 (Collated EP), p. 71.)    And to the defense, Person 5 said "So the vehicles came and they surrounded the house from the 4 directions. They came and said, "Are you Ihsan' He said, 'Yes. Ihsan'. They said, 'Come receive a weapon', and they advanced towards him and struck him. He fell. I went and got next to him. He fell in my arms.  Omar himself got down (out of his vehicle) towards him with a gun and continued the attack on him, in my arms … two shots, and

he shot him in his chest." (Exh. 90-3.) Since then, Person 5 has contacted the Defense multiple times claiming that the killing was committed with a Glock. (Exh. 148.) A Glock is not a rifle or a machine gun. The burst of rifle fire that Person 1 claims to have heard in the late afternoon, cannot have been responsible for the murder.

These positions cannot be squared. Person 1's unreliable statement cannot corroborate the unreliable statement of Person 5.

### 4. Person 1's Position in the Iraqi Military Makes His Claims in the FBI 302 Report Inherently Unbelievable

Person 1 recounts to the FBI a life spent in the service of the Iraqi Government. First, he was in military service under Saddam Hussein for 23 years. He fought against the Americans during the United States invasion, until 2004. He then worked for U.S. agencies in Iraq for 12 years. He now is a Colonel in the Iraqi Tribal Mobilization Force, the same militia in which TMF-1 is also an officer. (Exh. 127.)

Person 1 could *never* have stayed in Rawah during the invasion of ISIS. As noted by numerous witnesses below, he was a much bigger target for ISIS than Ihsan Jasim, who had been a local police officer. It is absolutely unbelievable that Person 1 would have been in Rawah at the time of the murder, much less that he would be standing outside his home watching an ISIS convoy go by, with at least 9 people in it, armed with rifles and a machine gun. (Exh. 127.)

Person 1's statement is inherently unbelievable. These details simply cannot be true. And, as discussed below, they are untrue because Person 1 was not in Rawah on the day of the murder.

### B. PERSON 1 WAS NOT IN RAWAH AT THE TIME OF THE MURDER

The Court indicated on December 4, 2019, that it would be very concerned if evidence showed Person 1 was not in Rawah on the day of the murder. In fact, he was not. The defense has received sworn declarations from six witnesses who confirm that Person 1 was not in Rawah, and could never have been in Rawah during ISIS's incursion. These witnesses are family members, friends, and coworkers of Person 1. They either were in Rawah themselves and attest that Person 1 was not there, or they were in Baghdad far from ISIS's attack, and attest the Person

1 was there at times in June 2014, safe from ISIS and far from Ihsan Jasim's murder. One
witness, the head of Rawah's Municipal Council (and therefore, the leader of Rawah today), is
friends with Person 1, and asked him where he was when Rawah took over ISIS. Person 1 stated
that he was in Tikrit. The June 2014 battles in Tikrit were ferocious, and unlike in Rawah, the
military fought until late June to try to subdue ISIS. Daragahi and Kerr, "Iraqi government
bombs ISIS-held city of Tikrit" Financial Times, June 22, 2014 available at
https://www.ft.com/content/24e3eaec-f9f0-11e3-bb9d-00144feab7de.

Person 1 has indicated that he was involved in that fighting. His friends and family
swear under oath that Person 1 was not in Rawah when ISIS took over. They explain that he
never could have stayed there and that he was not there for years prior and only returned after
ISIS had been definitively thrown out. The Defense refers the Court to the following sworn
declarations: Exhibits 141 (Declaration of Haqqi Rajab Yas, the current Head of the Rawah
Municipal Council), 142 (Supplemental Declaration of Ghassan Hameed Salman, close friend of
Person 1), 144 (Declaration of Mohammed Frah, close friend of Person 1 who lives in Baghdad
and saw him there around this time), 145 (Supplemental Declaration of Alaa Adnan Alrawi), 146
(Supplemental Declaration of Saba Ammari Qaddo), 147 (Second Supplemental Declaration of
Natiq Abduljaleel), 150 (Declaration of Zafir Kama Obayyid), and 151 (Supplemental
Declaration of Yasir Ahmed Abdulrazzaq). All of them establish that Person 1 was not in
Rawah at the relevant time.

## C. PERSON 1'S STORY ABOUT HIS COUSIN'S DEATH IS PATENTLY FALSE

Person 1 told the FBI Special Agent a ludicrous story about his supposed cousin, who he
identified as Abu Ians Al-Shami [sic]. (Exh. 127, 129.) This story is so bizarre that even a
minimum of FBI inquiry would have revealed it as a lie. First, "Ians" is not an Arabic name. As
stated by Professor Alexander Key, a tenured professor of Arabic at Stanford University, "Abu
Ians Al-Shami is not a correct rendering of an Arabic name. It is likely a misspelling or mis-
transliteration, and could conceivably reflect a dialect pronunciation recorded incorrectly by a

non-native speaker." (Exh. 140.)  Accordingly, either the Special Agent erred in writing it, or the translator erred in translating it.[11]

The only option in Arabic is "Abu Anas."  The "Al-Shami" part of the name makes it clear who Person 1 was talking about.  Abu Anas Al-Shami was an early ISIS leader along with Zarqawi.  Hamming, "The Hardline Stream of Global Jihad: Revisiting the Ideological Original of the Islamic State" CTC Sentinel, p. 1 (Jan. 2019) available at https://ctc.usma.edu/app/uploads/2019/01/CTC-SENTINEL-012019.pdf.   He was Zarqawi's first deputy and the head of his sharia committee. The name is a "kunya" in Arabic, or a nom de guerre adopted by a jihadi.  Abu means father.  The second name is usually the name of a son, but if a fighter does not have a son, it is usually his father's name.  The last part is the place of origin, the "nisbah" in Arabic.  Accordingly, for example, Al-Iraqi means from Iraq.  Al-Baghdadi means from Baghdad.

Al-Shami means from the Sham, in other words, from the Levant or greater Syria.  The original name of ISIS after Al-Qaeda in Iraq expanded into Syria was "ad-Dawlah al-Islāmiyah fī 'l-ʿIrāq wa-sh-Shām (والشام العراق في الإسلامية الدولة)."  Many, many militants have "al-Shami" as their nisbah.  The real Al-Shami

So in claiming that his cousin was Abu Anas Al-Shami, Person 1 is claiming a close connection with a jihadi from Syria.  Then he claims that Omar Ameen kidnapped and perhaps killed this jihadi.  None of this makes any sense.  None is believable.  (Abu Anas al-Shami was killed by American missiles on September 16, 2004 near Abu Ghraib.  Hamming, supra, at 4.  Yet the FBI either accepted this claim without question, or did vet this and has failed to provide the results of that investigation.

The Defense is filing affidavits from those who know Person 1 stating that he does not have a cousin with such a name, and he never had a cousin killed by Al Qaeda.  (Exhibits 141, 142, 144, 145, 146, 147.)  Person 1 is simply making this up.  This is consistent with all the Government witnesses in this case simply adding on other lies to try to make the lie about

---

[11]     The Government has conceded the possibility of writing and translation errors in this FBI 302.  (Transcript, Dec. 4, 2019, p. 77.)

Jasim's murder seem more believable.  Person 5 claimed that Omar participated in a kidnapping

of his uncles in Iraq in 2016, two years after Omar was settled in the United States.  Similarly,

Person 1 claims that Omar kidnapped his cousin, a jihadi.  Through it all, the U.S. Government

has tried to side-step these patent falsehoods, telling this Court that it must ignore everything that

undermines its thin narrative.

## D.  THE TOTALITY OF THE EVIDENCE CONCLUSIVELY OBLITERATES PROBABLE CAUSE

Wildly inconsistent statements, impossible timelines, and forgeries cannot support each

other to establish probable cause.  See In re Mazur, 2007 U.S. Dist. LEXIS 52551, at *57-85

(N.D. Ill. July 20, 2007)(extradition denied despite 5 volumes of Government evidence).  A

person of "ordinary prudence and caution" must be able to review the evidence and

"conscientiously entertain a reasonable belief in the guilt of the accused."  Mazur, at *60.  That

standard requires the application of common sense, an understanding of human nature, and the

ability to compare, contrast, and consider wildly inconsistent statements.  This analysis is not, as

the Government has argued, outside this proceeding: this analysis *is* the *heart* of the proceeding.

As in Mazur, all the evidence in this case must be considered in a totality to determine whether

there is probable cause sufficient to return Mr. Ameen to Iraq.[12]  See also, Republic of France v.

_____

[12]      The U.S. Government has studiously attempted to avoid a true evaluation of its evidence by selectively incorporating certain of its documents into this extradition and the Iraqi Court proceeding (including Person 1's FBI 302), while arguing that other documents (such as Person 5's FBI 302 Report from October 2017, and the forged documents the FBI received in September 2017), cannot be considered by the Court.  The Government's legal footwork attempts to evade Fifth Amendment Due Process protections. "It is well settled … that the United States government must, in carrying out its treaty obligations, conform its conduct to the requirements of the Constitution, and that treaty obligations cannot justify otherwise unconstitutional governmental conduct."  In re Extradition of Burt, 737 F.2d 1477, 1484 (7th Cir. 1984).  At this point, there can be no doubt that this is a "joint venture" between the U.S. Government and the Iraqi Republic.  United States v. Valdivia, 680 F.3d 33, 52 (1st Cir. 2012); United States v. Yousef, 327 F.3d 56, 145-46 (2d Cir. 2003) (adopting the joint venture doctrine in the Fifth Amendment context of suppressing statements elicited during overseas interrogations)/ United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987)(finding joint venture where U.S. participation in the investigation is "substantial"); see also United States v. Getto, 729 F.3d 221, 233 n.10 (2nd Cir. 2013)(noting that Due Process applies to foreign action under joint venture theory). The Court must consider all of the witnesses' statements in deciding whether they are so "wildly inconsistent" that they cannot support probable cause.

13

1  Moghadam, 617 F. Supp. 777, 784 (N.D. Cal. 1985)(rejecting the Government's attempt to

2  corroborate untrustworthy main witness).

### E.  PERSON 1 HAS REFUSED TO TESTIFY UNDER OATH DESPITE BEING A COLONEL IN THE IRAQI MILITARY

Claims of threats by this rogues gallery of witnesses are as incredible as their original

statements.  The defense must push back on the Government's drum beat of claims of threats to

witnesses.  These claims have let the Government dictate many of the terms of this litigation,

from the protective order, to the use of pseudonyms for witnesses, to repeated attempts to curtail

the defense investigation.  Meanwhile, 18 months later, the witnesses are still in Iraq unscathed.

Person 5 still texts and calls the defense regularly asking the defense to provide him money.

(Exh. 148.)  Witnesses A and B have completely and repeatedly disclaimed *under oath* any fear

of Omar Ameen or anyone connected to the defense, and indicated their fear of the Iraqi security

services (Exhs. 34, 35, 36, 70, 71, 72, 73, 74, 75, 76, 89), yet the Government continues to argue

with no support that they fear the Defense and has tried to curtail Defense.  TMF-1 (not a witness

in this case) has never claimed any danger or fear, and in fact, spoke to the defense at length.

(Exh. 92.)  Person 1 expressed no fear in January 2018, when he spoke to the FBI at Al-Assad

Airbase.  (Exh. 129.)  In fact, Person 1 indicated to a friend that he wanted to correct his

testimony, but was talked out of it by an Arabic interpreter at the Al-Assad base. (Exh. 141.)

The Court has never asked the Government to support these baseless claims.  Yet,

unsupported claims of a fear of reprisal are an easy way for the Government's witness to get out

of testifying under oath in Iraq, and for the Government to undermine the Defense in the United

States.  Perhaps, for Person 1, taking an oath is a bridge too far.  Perhaps he is unable to tell the

same story twice.  The FBI 302s reveal no downside for any witness to lie to the FBI.  It appears

that the witnesses were never advised that lying would bear any consequences for them.  Unlike

in the United States, lying to the FBI would bear no penalty for any Iraqi witness.  In fact, it does

not appear that the FBI notified these witnesses of any consequences for their lies.  Rather, for

these witnesses, there was an upside – at least one witness had obtained benefits in this case.

Person 5 is harassing the defense to try to obtain money.  In any case, Person 1's repeated refusal

to testify under oath in the Iraqi proceeding, which has led to the wholesale adoption of his prior FBI 302 in that case, counts against any finding of reliability in that statement.

The claims of fear are simply incredible, and the Court should no longer base any procedural or substantive decision on them.  The two Government witnesses, Person 1 and Person 5, are both members of the TMF, an Iraqi militia.  Person 1 is a Colonel in that force.  TMF-1, although not a witness in this case, is identically situated.  He also is a Colonel in the TMF.  They work on a military base and carry weapons.  Each of them wields power in Iraqi society, by measure of their positions and their connections with others in power.  Their claims of fear cannot be used to undermine a full and fair investigation or procedure in this case.  These soldiers (two of them high-ranking commanders) should not be allowed to hide behind false and unsupported claims of fear.

### III. OMAR IS NOT AN ISIS OR AQI MEMBER, MUCH LESS A COMMANDER, AND THE COURT <u>MUST</u> CONSIDER EVIDENCE OF HIS INNOCENCE OF TERRORISM IN DETERMINING WHETHER PROBABLE CAUSE EXISTS FOR THIS TERRORIST MURDER

The Iraqi offense requires that it be committed on behalf of a terrorist organization, yet the Court has excluded evidence that obliterates any claim that Omar acted on behalf of ISIS. (<u>See e.g.</u>, Collated EP at 28, 35, 37.)  The Defense attaches additional exhibits that definitively prove that Omar was not an ISIS member.  Even in 2014, when ISIS was ascendant in Iraq, and Omar was in Turkey, he posted online content critical of ISIS, and was criticized for that by fellow Sunnis.  (Exhs. 137, 143, 152.)   Starting in August 2014, Omar openly studied English on Facebook so that he could prepare to move to the United States.  (Exh. 152.) The Court should reconsider its previous Order excluding such evidence.  There is so much evidence of Omar's innocence of terrorism, that it obliterates probable cause.  The attached three exhibits add to that obliteration and must be considered.

As documented by Exhibits 137, 143, and 152, Mr. Ameen's social media use is entirely inconsistent with membership in, or even sympathy, towards any terrorist group.  A more probing look shows Mr. Ameen himself faced criticism for not being sufficiently devout that would have endangered him in ISIS-held territory.  For example, on June 21, 2015, Mr. Ameen

was one of three individuals to "like" a post showing an hour-long episode of "Al-Basheer Show" criticizing ISIS and its occupation of Mosul.  (Exh. 137.) Al-Basheer Show is an irreverent political satire—similar to The Daily Show—hosted by Iraqi comedian, Ahmed al-Basheer. At the time Mr. Ameen liked the video, the show had some 19 million viewers and al-Basheer was a household name in Iraq. The same week Mr. Ameen liked an episode, al-Basheer gave a BBC interview, saying all Iraqis have a duty to challenge ISIS and that, "[a]s a comedian, I have to fight them with humour."  *See* Rosie Thompson, "Meet the 'Iraqi Jon Stewart' Who Ridicules ISIS for a Living" VICE (May 5 2015) <u>available at</u> <u>www.vice.com</u>; BBC News, "Iraqi comedian Ahmed Albasheer 'fights extremism with humour'" (June 16 2015) available at <u>www.bbc.com</u>; Tina Rosenburg, You Are Killing Us, We Will Make You a Joke, <u>New York Times</u> (Dec. 26, 2019).  Accordingly, Mr. Basheer has faced death threats from extremist groups. The episode that Mr. Ameen "liked" specifically satirizes ISIS and its occupation of Mosul.

Omar "liked" a post celebrating Rawah's history of providing safe-haven to Armenian Christians on May 16, 2015. The post begins: "If you meet an Armenian with the last name Rawi, don't be surprised."  (Exh. 137.) The post's author goes on to explain how Armenians came to Rawah after "what happened to them" in 1915 (the Armenian Genocide), explaining how the Arabs of Rawah provided the newly-arrived Armenians charity. The comments on the post express Rawan pride at this history. Mr. Ameen's "liking" of the post evidence his open support of Rawah's pre-ISIS history as a refuge to Christian Armenians.  Similarly, Omar "liked" a post lauding European police and security officials on August 24, 2014. The post states: "When you pass by a police or security official in Europe, you feel a lingering sense of security and safety, while when you see police or security officers in some of our [Arab] countries you feel terror." (Exh. 137.) Again, this is extremely pro-Western.

As the Court can see from the exhibits, Mr. Ameen repeatedly liked posts that were tolerant of other religions, open to Western ideas, and accepting of Shia Muslims in Iraq.  (<u>See e.g.</u>, Exh, 152.)  He also worked hard on learning English in preparation for his move to the United States, commenting on thirty English-language learning posts from August 12, 2014 to September 24, 2014.  (Exh. 137.) These posts teach English by using common phrases that range

1   from earnest to comic and that quote authorities on the English language from Drake to Voltaire.

2   (Exh. 152.)

3        Moreover, Mr. Ameen does not share the views of ISIS or its predecessor, al-Qaeda in

4   Iraq. ISIS is a *takfiri* group that disavows even fellow Muslims who do not meet its rigid

5   standards for religious adherence. The group is vehemently sectarian; its extreme views on Shi'a

6   Muslims even drew criticism from al-Qaeda leader Aymann al-Zawahiri. *See* Letter from

7   Aymann al-Zawahiri to Musab al-Zarqawi, "The Rafidah: From Ibn Saba' to the Dajjal," Dabiq

8   Magazine, 13 (2016), 33, https://clarionproject.org/ factsheets-files/Issue-13-the-rafidah.pdf.

9   Translation of the original letter can be found at Combatting Terrorism Center,

10  https://ctc.usma.edu/posts/zawahirisletter-to-zarqawi-english-translation-2; see Daniel Byman,

11  ''Unlikely Alliance; Iran's secretive relationship with al-Qaeda,'' Brookings—IHS Defense,

12  Risk and Security Consulting, July 2012, https://www. brookings.edu/wp-

13  content/uploads/2016/06/iran-al-qaeda-byman.pdf, 31. In ISIS-held territory, even seemingly

14  minor infractions such as smoking cigarettes, cursing, or inadequate beard length were

15  considered would face corporal punishment, and, for repeat offenders, execution. *See* Bobak

16  Dehghasnpisheh, Michael Georgy, "Documents Show Islamic State Obsessions: Beards and

17  Concubines," Reuters, November 1, 2016, https://www.reuters.com/article/us-mideast-crisis-

18  mosul-islamicstate-idUSKBN12W4KR; Nabih Bulos, Islamic State: Smoking will kill you, one

19  way or another, February 12, 2015, https://www.latimes.com/world/middleeast/la-fg-islamic-

20  state-smoking-ban-20150212-story.html.  Mr. Ameen's tolerant and anti-extremist views would

21  never have been tolerated in ISIS territory.

22        Private messages tucked away in Mr. Ameen's 'filtered' message inbox indicate that

23  some fellow Sunnis believed Mr. Ameen did not met their standards of religious adherence.

24  (Exh. 143.)  During, the same August 2014 period when Mr. Ameen was studying English, he

25  received two separate private hate messages of this type from Sunnis.  These criticisms, from

26  fellow Sunni Muslims, are a serious attack on Mr. Ameen's faith and prove that he is not an ISIS

27  member.  Even in isolation, each of these interactions would raise serious doubt as to the charges

28  against Mr. Ameen, in aggregate, the evidence obliterates probable cause.

1
2

**IV.  THE U.S. GOVERNMENT'S EXTENSIVE AND PROVEN INVOLVEMENT IN
THE IRAQI PROCEEDING ENTITLES OMAR TO INCREASED DUE PROCESS
PROTECTIONS**

3

The U.S. Government filed the Second Supplemental Information on December 2, 2019.

4

Its Status Report states, "Because the second supplemental information has now been certified in

5

accordance with 18 U.S.C. § 3190, it *must be admitted* at the continued extradition hearing *and*

6

*considered* as part of the Court's probable cause assessment."  (ECF Doc. 240, p. 2 [emphasis

7

added].)  For months prior to December 2019, the Government told the Court that it could not

8

consider the alleged information from Person 1.  To defeat the Defense's Motion to Compel, the

9

Government repeatedly stated that the FBI investigation is outside the extradition case.  <u>See</u> ECF

10

Doc. 21, p. 2 (FBI criminal investigation is "not related to the murder" and nothing in the FBI's

11

investigation has "revealed any additional, admissible facts relating to the murder alleged in the

12

extradition request"); ECF Doc. 102, p. 1 (criminal investigation is "wholly separate from the

13

extradition proceeding").  In Document 102, the Government stated, "The United States has a

14

duty to protect the delineation between its own criminal investigation and these extradition

15

proceedings. . . ."  ECF Doc. 102, p. 4; <u>see also</u> p. 7 (opposing defense's attempt to "conflate

16

what are two separate and distinct legal matters.")

17

The Court discussed this issue in Document 135, the Order on the Defense Motion to

18

Compel.  At the time, it found that the Defense's arguments that the United States was a

19

protagonist of the Iraqi proceeding "serious and unproven."  ECF Doc. 135, p. 13.  It noted that

20

the usual role of the United States in an extradition is "ministerial": "it merely receive[s] factual

21

information developed by [foreign] authorities."  <u>In re Drayer</u>, 190 F.3d 410, 414 (6th Cir. 1999).

22

Disclosures by the Government over six months later, in the form of the FBI affidavits,

23

provided copious additional evidence in the record that the United States' role here is far from

24

ministerial.  For example, the FBI Legal Attaché, first "passed an investigative lead" regarding

25

the Jasim murder and the statements of Persons 1 and 5 to the INSS (Iraqi National Security

26

Service) in April 2018.  (Exh. 109; ECF Doc. 208-32, p. 3.)  The Attaché then sat in on the April

27

15, 2018 hearing where Person 5 testified with two other FBI staff members and provided

28

"frequent" assistance to the Iraqi Government in the preparation of the extradition request.  <u>Id.</u>,

p. 4.  The timeline shows the primacy of the FBI investigation: Person 1 was interviewed by the FBI in January 2018.  Person 5 was interviewed in October 2017.  The FBI only passed this onto the Iraqi Government in April 2018, and within a week or two the Iraqi Government had convened a court proceeding.

The new packet then exploded any delineation between the U.S. Government and the Republic of Iraq with respect to prosecuting this case.  The new "incorporation" by the Iraqi court of an FBI report, over 18 months after the warrant went out, is unusual to say the least.  The Defense has found no reported case involving such a procedure.  The new packet makes no pretense of the Iraqi Government's complete reliance on the FBI document.  In fact, that document – an English summary of an interview conducted with an FBI interpreter in Arabic – was translated into Arabic for incorporation by the Iraqi court, then apparently retranslated into English for attachment to the supplemental filing.  The Court cannot consider and condone such a procedure without rethinking the Government's consistent attempts to claim – in the face of what is its own incontrovertible filings – that the Iraqi Court proceeding is an independent one.

The Government may be able to force this Court to admit the document, although it stretches extradition law to the extreme to consider this a matter of sovereign comity to the Iraqi court.  However, the Court should not consider this document, or the greater question of whether to certify extradition, without also affording Ameen the heightened due process protections to which he is entitled in light of the U.S. Government's extensive and proven involvement in the Iraqi proceeding.  The fact that the U.S. Government initiated the investigation of Ameen by collecting witness statements in interviews arranged by an F.B.I. informant, delivered those statements to Iraqi investigators, then attended Iraqi judicial proceedings and helped Iraq prepare and execute its first extradition request in the history of the treaty establishes that this case is the product of U.S. Government action against Ameen.  That U.S. Government action sets this case apart from the ordinary extradition case, and it entitles Ameen to protection under the Due Process Clause.[13]

---

[13]     "[I]n the ordinary extradition case, the United States has no information other than what has been provided by the demanding state. Independent prosecution by the requested state is rare,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**V. DUE PROCESS AND THE PLAIN MEANING OF THE STATUTE ON WITHHOLDING OF REMOVAL REQUIRE THAT MR. AMEEN'S CLAIM TO PROTECTION AS A REFUGEE BE HEARD AND RESOLVED BEFORE EXTRADITION CAN BE CERTIFIED AND EXECUTED**

In its Trial Brief, the Defense argued that, as a Refugee, Mr. Ameen's is entitled to protection under the Due Process Clause from erroneous refoulement through extradition to Iraq. ECF Doc. 142, at 48-50.  In its Response, the government argued that there is no special protection for "fugitives" regardless of their refugee status.  ECF Doc. 151, at 8.  This argument ignores the plain language of the statute prohibiting refoulement, which has been in effect since Congress first incorporated the principle of *non-refoulement* of refugees into U.S. statutory law through the Refugee Act of 1980.  Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.  In enacting that legislation, "one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees."  INS v. Cardoza-Fonseca, 480 U.S. 421, 436 (1987).  The principle of *non-refoulement* is the cornerstone of the 1951 Refugee Convention, whose relevant provisions the 1967 Protocol incorporated.  Article 33(1) of the 1951 Convention provides that

> No Contracting State shall expel or return ("refouler") a refugee *in any manner whatsoever* to the frontiers or territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 (emphasis added).

The language of the withholding of removal statute is mandatory: subject to limited statutory exceptions, "the Attorney General may not remove an  alien  to a country  if the Attorney  General  decides that the alien's life or freedom would be threatened in that country because  of the alien's  race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3); see INS v. Aguirre-Aguirre, 526 U.S. 415,420 (1999)

and it appears that there are only two reported cases in American legal history in which such a prosecution has occurred." In re Extradition of Zhenly Ye Gon, 2010 U.S. Dist. LEXIS 1563, *8 [applying Due Process Clause to require Government to produce evidence "tends to negate probable cause"].

1   (in the absence of an exception, "withholding is mandatory").[14] The plain language of the statute,

2   whose language closely tracks the corresponding provision of the Convention, includes no

3   exception for persons also subject to extradition proceedings.

4         The plain language of § 1231(b)(3) establishes a right for aliens within the United States

5   to require the Attorney General to withhold removal to another country upon proof of certain

6   facts. See Nken v. Holder, 556 U.S. 418, 426 (2009) ("[S]tatutory interpretation turns on 'the

7   language itself, the specific context in which that language is used, and the broader context of the

8   statute as a whole.'") (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)). Mr. Ameen

9   is a "person" protected under the Due Process Clause during deportation proceedings.  Demore v.

10   Kim, 538 U.S. 510, 523 (2003).

11         Extradition prior to the opportunity to be heard on his attempt to invoke immigration

12   statutes would render them a nullity. See Corley v. United States, 556 U.S. 303, 314 (2009) ("A

13   statute should be construed so that effect is given to all its provisions, so that no part will be

14   inoperative or superfluous, void or insignificant.") quoting Hibbs v. Winn, 542 U.S. 88, 101

15   (2004)). Statutory rights conferred by Congress on aliens may implicate rights of equal or even

16   greater value than those protected under the criminal laws. Sessions v. Dimaya, 138 S. Ct. 1204,

17   1230 (2018) (Gorsuch, J., concurring) ("Congress is surely free to extend existing forms of

18   liberty to new classes of persons-liberty that the government may then take only after affording

19   due process.") citing Sandin v. Conner, 515 U.S. 472, 477-478 (1995)).

20         In 18 U.S.C. § 3184, Congress provided limited procedures for implementing extradition

21   treaties, after which the district judge or magistrate  judge, "upon the requisition of the proper

22   authorities of such foreign government," shall issue "[a] warrant for the commitment of the

23   person so charged to the proper jail, there to remain until such surrender shall be made." Nothing

24   in the pre-existing extradition statute purports to supplant or negate the statutory rights created

25   by Congress. And in this case, the later-enacted human rights protections govern because, when

---

[14]      The original text of this provision stated that "the Attorney General shall not deport or
return any alien . . . to a country if the Attorney General determines that such alien's life or
freedom would be threatened. . . ."  Refugee Act of 1980, § 203(e).

two statutes conflict, the later enacted and more specific statute should generally govern over an earlier, more general statute.  Smith v. Robinson, 468 U.S. 992, 1024 (1984); see also Busic v. United States, 446 U.S. 398 (1980) ("a more specific statute ... will be given precedence over a more general one"). The later and more specific prohibitions on refoulement govern over the general language of the extradition statute.

In contrast to mandatory non-refoulement, the very general language of the extradition statute in § 3184 only calls for "commitment to the proper jail, there to remain until such surrender is made," with no discussion of timing and intersection of extradition with affirmative statutory rights.  The term "proper" is vague and flexible enough to accommodate deferral of surrender until an alien's statutory rights under § 1231 have been determined. The plain language of the statute and its context foreclose execution of extradition in a manner that trumps asserted statutory protections against persecution.

If precedence is given to the extradition proceedings, Mr. Ameen's statutory rights would be rendered a nullity and leave the United States as the only country that prioritizes foreign extradition requests over domestic treaty-based laws protecting against refoulement. See Sibylle Kapferer, United Nations High Commissioner for Refugees, Department of International Protection, "The Interface between Extradition and Asylum," at 94-100 (November 2003) (UNHCR); UNHCR, Guidance Note on Extradition and International Refugee Protection (April 2008) at 17 (noting that the legal safeguards traditionally available in extradition proceedings, important though they are, "do not in themselves in the refugee context, offer refugees and asylum-seekers sufficient protection against return to a risk of persecution, torture or other irreparable harm," and that the requested State "remains bound to ensure that the surrender of the wanted person is consistent with its *non-refoulement* obligations.")  In most other countries the prohibition on refoulement is binding, whether or not explicitly provided in an extradition treaty or legislation, and is "progressively acquiring the character of a peremptory rule of international law." Id. at 80.

The perception that the United States allows extradition to trump non-refoulement obligations appears to be largely based on misinterpretation of Barapind v. Reno, 225 F.3d 1100

(9th Cir. 2000), which was the only case cited in the international survey just cited. UNHCR at

95.  The Court in Barapind quoted pre-§1231 BIA concerns that immigration proceedings should

not "complicate" the extradition proceedings, and administrative closing would assure "[o]rderly

procedure," since asylum proceedings "would actually have served no useful purpose." 225 F.3d

at 1107 quoting Matter of Perez-Jimenez, 10 I & N Dec. 309, 314 (BIA 1963)). But the Barapind

opinion explicitly left open the question presented in this case:

> We do not comment on the propriety of the BIA's determination that the issuance
> of an extradition warrant renders moot any pending asylum application because, as
> we state below, that issue is not properly before us. We note, however, that this
> rationale does not form the basis of our inquiry into the reasonableness of the BIA's
> decision to hold Barapind's asylum application in abeyance pending completion of
> his extradition case.

Barapind, 225 F.3d at 1114 n.7 (emphasis added).  This passage also emphasizes a critical

distinction between Barapind and the present case: Barapind was an appeal of the

administrative closing on the immigration side, not a challenge in extradition proceedings based

on the certification and execution of extradition irrevocably denying statutory non-refoulement

rights.  The plain language of the statute and basic procedural due process call for an answer

bringing the United States in line with the consistent international practice of providing priority

to asylum over extradition.

       This is of particularly obvious importance where the relator in the extradition proceeding

has been recognized as a refugee by the United States, as is the case with Mr. Ameen, and where

extradition is being sought by very country from which he was granted refugee protection.

Indeed, the Board of Immigration Appeals, in holding that a person admitted as a refugee and

later as a permanent resident may be placed in removal proceedings without first having his

refugee status terminated, has pointed to the "protections included in the context of removal

proceedings," and the availability of asylum and withholding of removal in those proceedings, as

ensuring the consistency of this scheme with U.S. obligations of *non-refoulement* under the 1967

Protocol.  Matter of Smriko, 23 I&N Dec. 836, 842 (BIA 2005).   Mr. Ameen is currently in

removal proceedings, with a hearing coming up on March 18, 2020 in San Francisco.

1        While the withholding statute's obligation of *non-refoulement,* consistently with the

2    Refugee Convention, recognizes exceptions where there are serious reasons to believe the

3    refugee committed a serious non-political crime outside the United States prior to arrival, or

4    where there are reasonable grounds to believe that he is a danger to the security of the United

5    States, assessment of the applicability of such exceptions under the withholding statute is subject

6    to substantive and procedural safeguards.  These provide the refugee with an opportunity to be

7    heard and to present evidence.  They also require the adjudicator to determine whether there is

8    probable cause for believing that the refugee *has in fact committed* a serious non-political crime,

9    or whether he *actually poses a danger to the United States.*  See, e.g., Go v. Holder, 640 F.3d

10   1047, 1052-53 (9th Cir. 2011); Yusupov v. AG of the United States, 518 F.3d. 185, 201 (3d Cir.

11   2008); Malkandi v. Holder, 576 F.3d 906, 914 (9th Cir. 2008) ("the bottom line in Yusupov,

12   which we adopt, is that 'reasonable grounds' should be evaluated against a reasonable person,

13   probable cause standard and that the alien must 'actually pose a danger' to United States

14   security").

15       It cannot be clearer that Omar Ameen will be tortured and executed if returned to Iraq.

16   This is clear from the conclusions of the U.S. State Department, multiple reputable human rights

17   organizations, Defense expert witnesses, and a new report from the UN Mission to Iraq, which

18   monitored Iraq criminal courts that handled ISIS-related cases.  (See Exh. 45 [Declaration of

19   Belkis Wille, Human Rights Watch, attaching State Department Amnesty International and

20   UNAMI reports from 2017 and 2018].)

21   Time has only strengthened those conclusions.  In May 2019, the UN High Commission for

22   Refugees issued a report counseling against the return of Iraqi refugees to Iraq.  UNHCR,

23   International Protection Considerations with Regard to People Fleeing the Republic of Iraq,

24   HCR/PC/IRA/2019/05_Rev.1 (May 2019) available at

25   https://www.refworld.org/pdfid/5cc9b20c4.pdf.  The 2020 Report by Human Rights Watch

26   found that "Iraqi forces arbitrarily detained ISIS suspects, many for months."  Human Rights

27   Watch, 2020 World Report: Iraq at 295 (Jan. 2020) available at https://www.hrw.org/world-

28   report/2020.  Likewise, "[a]uthorities systematically violated the due process rights of ISIS

suspects. . ." and there is "widespread use of torture . . . to extract confessions." Id at 295-96; see also Wille, "ISIS Suspect Transfers to Iraq Replete with Risks," Human Rights Watch (Oct. 31, 2019) available at www.justsecurity.org/66789/isis-suspect-transfers-to-iraq-replete-with-risks/.  And just yesterday, the United Nations Assistance Mission for Iraq issued its Report documenting its observations in Iraq terrorism courts and undermining any confidence in the ability of those courts to deliver anything close to approaching due process.  UNAMI, Human Rights in the Administration of Justice in Iraq: Trials under the anti-terrorism laws and implications for justice, accountability and social cohesion in the aftermath of ISIL (Jan. 2020) available at http://www.uniraq.org/index.php?lang=en.  That analysis showed "serious concerns that basic fair trial standards were not respected in terrorism-related trials." Id., at iv.  Hearings lacked every type of procedural right, but more importantly the UNAMI observers found an overreliance by Iraqi courts on confessions induced by torture or ill-treatment. Id.

In order to avoid conflict with the statutory and treaty obligations of the United States to protect refugees against forced return to persecution, Mr. Ameen must be allowed to pursue his asylum claim and have it heard and resolved before extradition can be certified and executed.

## VI. CONCLUSION

The Defense has clearly obliterated probable cause.  Mr. Ameen was not the murderer of Ihsan Jasim.  He was not in Rawah in June 2014.  He was never a member, much less a commander or founder of ISIS or Al Qaeda in Iraq.  The Government's case has fallen apart. The Defense pleads with the Court to deny extradition.

DATED: January 29, 2020                    Respectfully submitted,

                                           HEATHER E. WILLIAMS
                                           Federal Defender

                                           /s/ Benjamin D. Galloway
                                           BENJAMIN D. GALLOWAY
                                           Chief Assistant Federal Defender

                                           /s/ Rachelle Barbour
                                           RACHELLE BARBOUR
                                           Assistant Federal Defender
                                           Attorneys for OMAR AMEEN