McGREGOR W. SCOTT
United States Attorney
AUDREY B. HEMESATH
HEIKO P. COPPOLA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700

CHRISTOPHER J. SMITH
Associate Director
REBECCA A. HACISKI
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C. 20530
Telephone: (202) 514-0000

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE EXTRADITION
OF OMAR ABDULSATTAR AMEEN TO
THE REPUBLIC OF IRAQ

CASE NO.   2:18-MJ-152 EFB

REPLY TO DEFENSE SECOND SUPPLEMENTAL
EXTRADITION HEARING BRIEF

1

**TABLE OF CONTENTS**

I.    EXTRADITION LAW DEFERS ISSUES OF CREDIBILITY TO THE TIME OF

TRIAL IN THE REQUESTING COUNTRY ................................................................2

A.    The Court has already correctly held that credibility evidence is inadmissible
in extradition proceedings. ................................................................................3

B.    All Ameen's evidence relating to Person 1 is credibility evidence. ...................4

1.    Ameen's exhibits contradicting the statements in the second
supplement are inadmissible. .................................................................4

2.    The account of Person 1 in the second supplement is plausible and
consistent on its face. ..............................................................................6

C.    The time for Ameen to present his arguments relating to the statements of
Person 1 is at trial, overseas, as recognized by the Iraqi court. .........................8

II.   AMEEN IS NOT ENTITLED TO UNPRECEDENTED PROCESS BASED ON HIS

OBTAINMENT OF REFUGEE STATUS, ESPECIALLY WHERE HE LIED TO

OBTAIN THAT STATUS.........................................................................................8

A.    Ameen's argument that he is entitled additional due process as a refugee is
meritless. .........................................................................................................9

B.    Ameen lied in order to qualify as a refugee. ....................................................11

1.    Ameen lied about his father's death....................................................11

2.    Ameen lied about his brother Bilal. .....................................................16

C.    The truth about Ameen's history and associations would have disqualified him
from gaining admittance to the United States at all, let alone as a refugee. .....18

1.    Ameen misrepresented the nature of his family associations with
terrorist organizations. ........................................................................19

2.    Ameen concealed his ongoing contact with these affiliated individuals,
even after he came to the United States. ...............................................26

III.  IRAQ INDEPENDENTLY INVESTIGATED THE MURDER UNDERLYING ITS

EXTRADITION REQUEST, AND AMEEN IS ENTITLED TO NO MORE THAN

THE DUE PROCESS AVAILABLE TO ALL FUGITIVES.....................................29

IV.  AMEEN'S CLAIM THAT HE HAS NO TERRORIST AFFILIATION IS
     CONTRADICTORY AND INADMISSIBLE, OR ALTERNATIVELY REBUTTED
     BY THE EVIDENCE OF IRAQ AND THE UNITED STATES ...................................37

     A.  The extradition request contains evidence of Ameen's participation in terrorist
         organizations. ..........................................................................................38

     B.  Additional historic evidence from Iraq .....................................................38

     C.  Witnesses with personal knowledge of Ameen's terrorist actions ...................41

     D.  Ameen's social media activity ................................................................42

     E.  Search warrant evidence ......................................................................45

     F.  Witness safety ..................................................................................48

V.   THE EXTRADITION REQUEST AND ITS SUPPLEMENTS FROM IRAQ
     ESTABLISH PROBABLE CAUSE THAT AMEEN MURDERED IHSAN ...........................49

     A.  Statements of five witnesses support a finding of probable cause that Ameen
         committed the charged murder. ...............................................................49

     B.  Ameen has not established an alibi. ..........................................................51

VI.  CONCLUSION.............................................................................................52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arnbjornsdottir–Mendler v. United States*,
  721 F.2d 679 (9th Cir.1983) ............................................................ 29

*Barapind v. Enomoto*,
  400 F.3d 744 (9th Cir. 2005) ........................................................... 10

*Basic v. Steck*,
  819 F.3d 897 (6th Cir. 2016) ............................................................. 9

*Bisram v. United States*,
  777 F. App'x 563 (2d Cir. 2019) ........................................................ 3

*Bovio v. United States*,
  989 F.2d 255 (7th Cir. 1993) ............................................................. 3

*Eain v. Wilkes*,
  641 F.2d 504 (7th Cir. 1981) ......................................................... 3, 6

*Emami v. United States*,
  834 F.2d 1444 (9th Cir. 1987) ........................................................... 6

*Esposito v. Adams*,
  700 F. Supp. 1470 (N.D. Ill. 1988) .................................................... 4

*Extradition of Mainero*,
  990 F. Supp. 1208 (S.D. Cal. 1997) ................................................... 4

*Fejfar v. United States*
  724 F. App'x 621 (9th Cir. 2018) ................................................. 10, 22

*Glucksman v. Henkel*,
  221 U.S. 508 (1911) .......................................................... 30, 31, 32

*Hoxha v. Levi*,
  465 F.3d 554 (3d Cir. 2006) .............................................................. 3

*Illinois v. Gates*,
  462 U.S. 213 (1983) ......................................................................... 7

*In re Extradition of Grynsztein*,
  No. 15-mc-80918, 2015 WL 6039845 (S.D. Fla. Oct. 15, 2015) ............ 4

*In re Extradition of Jarosz*,
  800 F. Supp. 2d 935 (N.D. Ill. 2011) ................................................. 4

*In re Extradition of Martinelli Berrocal*,
  No. 17-cv-22197, 2017 WL 3776953 (S.D. Fla. Aug. 31, 2017) ......... 4, 8

*In re Extradition of Mironescu,*
   296 F. Supp. 2d 632 (M.D.N.C. 2003) ........................................................... 10

*In re Extradition of Nunez-Garrido,*
   829 F. Supp. 2d 1277 (S.D. Fla. 2011) ............................................................ 4

*In re Extradition of Pazienza,*
   619 F.Supp. 611 (S.D.N.Y. 1985)................................................................... 30

*In re Extradition of Schumann,*
   No. 18 CR 283, 2018 WL 4777562 (N.D. Ill. Oct. 3, 2018) ........................... 4

*In re Extradition of Shaw,*
   No. 14-cv-81475, 2015 WL 3442022 (S.D. Fla. May 28, 2015)....................... 4

*In re Perez-Jimenez,*
   10 I&N Dec. 309 (BIA 1963) ......................................................................... 10

*In re Requested Extradition of Smyth,*
   61 F.3d 711 (9th Cir.) ..................................................................................... 29

*INS v. Doherty,*
   502 U.S. 314 (1992).......................................................................................... 10

*Man–Seok Choe v. Torres,*
   525 F.3d 733 (9th Cir. 2008) ............................................................................ 3

*Martin v. Warden,*
   993 F.2d 824 (11th Cir. 1993) ........................................................................ 29

*McMullen v. IRS,*
   788 F.2d 591 (9th Cir. 1986) .......................................................................... 10

*Noeller v. Wojdylo,*
   922 F.3d 797 (7th Cir. 2019) ............................................................................ 3

*Santos v. Thomas,*
   830 F.3d 987 (9th Cir. 2016) .................................................................. passim

*Shapiro v. Ferrandina,*
   478 F.2d 894 (2d Cir. 1973)......................................................................... 3, 6

*United States v. Banks,*
   539 F.2d 14 (9th Cir. 1976) .............................................................................. 7

*United States v. Kin-Hong,*
   110 F.3d 103 (1st Cir. 1997)........................................................................... 29

1

## **Statutes**

2     8 U.S.C. § 1101(a)(42)................................................................................................ 11

3     8 U.S.C. § 1101(a)(42)(A) ..................................................................................... 16, 18

4     8 U.S.C. § 1158(b) ..................................................................................................... 11

5     8 U.S.C. § 1182 .......................................................................................................... 18

6     8 U.S.C. § 1182(a)(3)(B)(i)........................................................................................ 18

7     8 U.S.C. § 1361 .......................................................................................................... 11

8     18 U.S.C. § 3190 ........................................................................................................ 35

9     U.S.C. § 3190 ............................................................................................................. 30

10

## **Other Authorities**

11    *Sandhu v. Reno*, No. 96-5245,
12       1996 U.S. App. LEXIS 24130, at *2-4 (D.C. Cir. Aug. 9, 1996)........................... 10

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    At the December 4, 2019 hearing on the Republic of Iraq's request for Omar Ameen's

2    extradition, the Court cautioned Ameen against trying "to kick up a lot of dust about Person 1's

3    credibility," stating that such evidence would not be admissible. CR 247 Tr. 11-12. Ameen's most

4    recent filing does exactly that—attempts to kick up dust about Person 1's credibility. CR 258. The

5    additional declarations presented by Ameen in support of his filing, which are from individuals whose

6    identity, affiliations, and credibility cannot be tested in these proceedings, are inadmissible. Those

7    declarations call for a "mini-trial" on the issue of Person 1's credibility and the truthfulness of his

8    evidence, which must be deferred to the trial court in Iraq. *See Santos v. Thomas*, 830 F.3d 987, 1007

9    (9th Cir. 2016) (en banc).

10    Not only are the new defense declarations inadmissible and beyond the scope of the Court's

11    order on additional briefing, but they are also inaccurate. The great majority of the defense declarants

12    aver that Ameen has no terrorist ties, a claim that Ameen himself makes and demands that this Court

13    consider. This claim too falls squarely into the category of inadmissible contradictory evidence. But in

14    the event this Court gives any consideration to Ameen's claimed lack of terrorist affiliation, the United

15    States proffers the evidence in this pleading as a rebuttal to that claim. The reality is that Ameen has

16    been wanted on terrorism charges in Iraq since 2010, well before Ameen set in motion any of the steps

17    that would bring him to the United States, and well before the FBI began its investigation of Ameen in

18    March 2016. The evidence in the extradition request itself is evidence of Ameen's deep and long-

19    standing familial ties to terrorism. Ameen admitted to some of these terrorist associations upon his

20    arrest in this case, and some of his admissions are corroborated by Department of Defense records.

21    Ameen concealed these associations and lied about his background in order to exploit the United

22    States refugee program and enter the country under false pretenses. Those lies make his claim of

23    entitlement to additional due process as a refugee particularly untenable. The Court has already declined

24    to set aside the rule of non-contradiction in this case, holding that Ameen's refugee status touches on

25    humanitarian concerns that are weighed by the Secretary of State. Ameen should gain no benefit from

26    the refugee status that he gained by fabricating a narrative of past persecution and misrepresenting his

27    familial affiliations with terrorism in order to demonstrate his admissibility.

28    Ameen's alternative argument that he is entitled to additional due process because of the nature

1

1   of the investigations of two sovereigns into the serious criminal conduct of which he stands accused is

2   also meritless.  Iraq filed terrorism charges against Ameen well before the FBI's investigation began;

3   when the FBI's subsequent investigation revealed witnesses who stated that Ameen murdered an Iraqi

4   police officer in June 2014, the FBI passed a lead to authorities in Iraq to enable them to conduct an

5   investigation into the matter if they so chose.  The record establishes a level of international cooperation

6   that is desirable and necessary in transnational terrorism cases.  The extradition request establishes that

7   investigation by the Iraq National Security Service (INSS) and investigating Judge Dhiya was

8   independent and conducted pursuant to the requirements of Iraqi criminal procedure.  There is no basis

9   for abandoning established principles of extradition law because the Iraqi murder warrant is based in

10  part on shared information.

11          Ameen grasps for extraordinary process because he cannot otherwise prevail in these extradition

12  proceedings on the record before this Court.  None of the new defense credibility arguments obliterate

13  Person 1's identification of Ameen as part of an ISIS convoy in Rawah on the day of the victim's

14  murder.  That eyewitness identification, in combination with the statements of four other witnesses

15  placing Ameen in Rawah, constitutes ample probable cause that Ameen committed the murder alleged

16  in the extradition request.  Eighteen months of aggressive defense investigation has revealed no hard

17  alibi for Ameen in June 2014.  Rather, the investigation has only confirmed that there is a gap in time

18  where Ameen's whereabouts are unaccounted for, for six weeks between late May and early July 2014:

19  no immigration appointments, no employment, no photographs or videos, and no continuation of an

20  otherwise established pattern of usage of his electronic devices.

21          This Court should treat Ameen's latest credibility arguments as it has treated the previous

22  credibility arguments and exclude the additional defense exhibits from consideration as inadmissible

23  contradictory evidence.  Pending the status update relating to the Turkcell records, the Court should

24  certify Ameen's extradition.

25  **I.      EXTRADITION LAW DEFERS ISSUES OF CREDIBILITY TO THE TIME OF TRIAL
            IN THE REQUESTING COUNTRY**

26

27          The purpose of allowing Ameen additional supplemental briefing was narrow: to give Ameen a

28  limited opportunity to brief the issue of probable cause in light of the second supplement to the

extradition request.  CR 253 Tr. 95.  The additional briefing Ameen has provided on this topic falls entirely into the category of credibility evidence.  Ameen argues that the Court should not credit the statement of Person 1 because he is not credible.

As has been briefed many times and recognized by the Court: issues of witness credibility are deferred for trial overseas in the requesting country.  The additional defense exhibits on the subject of the credibility of Person 1 should be excluded.  Ameen has not identified any evidence that is admissible and would obliterate probable cause under the existing Ninth Circuit precedent.

### A.     The Court has already correctly held that credibility evidence is inadmissible in extradition proceedings.

This Court has held that, pursuant to Ninth Circuit precedent, "evidence attacking the credibility of government witnesses should be excluded."  CR 160 pg. 17; CR 45 Tr. 31 ("On the other hand, I am mindful of the fact that this extradition proceeding isn't a trial.  It's not the trial on the merits, it's not the forum to determine whether or not there's an affirmative defense that's been established.  It's a probable cause hearing.  And so to the extent that it would come down to assessing credibility of two conflicting witnesses, I don't think the extradition hearing is the time or the place for that.  That's what the trial would be about.").  Indeed, the Ninth Circuit has cautioned that a fugitive "may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government."  *Santos*, 830 F.3d at 993.[1]

---

[1] *See also Santos*, 830 F.3d at 992-93 ("We have also described 'contradictory' evidence as evidence "the credibility of which could not be assessed without a trial.'  In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof. . . .") (citations omitted); *Noeller v. Wojdylo*, 922 F.3d 797, 807 (7th Cir. 2019) ("Evidence that contradicts the demanding country's proof or poses questions of credibility—i.e., contradictory evidence—is off-limits."); *Man–Seok Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008) ("a witness-accomplice's "lack of credibility is merely a weakness in Korea's case; it does not completely obliterate the evidence of probable cause") (internal quotation marks and alteration omitted); *Hoxha v. Levi*, 465 F.3d 554, 562 n.10 (3d Cir. 2006) ("witness statements" that "contain certain inconsistencies" . . . "present credibility issues that should be addressed at trial" in requesting country); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) ("issues of credibility are to be determined at trial" and therefore the fugitive "has no right to attack the credibility of [witnesses] at this stage of the proceedings"); *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981) (affirming magistrate judge's refusal to admit statements in which two witnesses purportedly recanted their accusations because the "accused in an extradition hearing has no right to . . . pose questions of credibility as in an ordinary trial"); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) ("The judge's refusal to examine the credibility of the testimony and statements included in the translated material was clearly proper, since the declarants were not before him."); *Bisram v. United States*, 777 F. App'x 563, 567 (2d Cir. 2019) (a "credibility dispute [is] well suited for resolution in the extraditing

The Court anticipated exactly the scenario that has now transpired—the additional time for defense investigation resulted in the introduction of more credibility evidence.  CR 247 Tr. 11-12 ("That is a concern I have, Mr. Galloway.  It's one thing to do Internet-type research where you might come up with some sort of conclusive proof that Person 1 wasn't there on the day in question which would go to whether or not there really is probable cause.  But it's another to try to kick up a lot of dust about Person 1's credibility, and the latter type of evidence just wouldn't be admissible.").  The

new evidence Ameen has submitted pertaining to Person 1's credibility should be excluded, just as this Court has excluded analogous evidence pertaining to Person 5.

**B.   All Ameen's evidence relating to Person 1 is credibility evidence.**

    **1.   Ameen's exhibits contradicting the statements in the second supplement are inadmissible.**

Ameen seeks admission of a number of declarations of individuals located in Iraq who challenge the credibility of Person 1.  These exhibits should be excluded as contradictory evidence consistent with this Court's prior holdings and Ninth Circuit precedent on credibility in extradition proceedings:

---

country, but that does not undermine the extraditing country's threshold showing of probable cause"); *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1294-95 (S.D. Fla. 2011) (a credibility determination "should be made by the ultimate finder of fact after considering all of the available evidence and after assessing the demeanor and credibility of competing witnesses"); *In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 948 (N.D. Ill. 2011) ("[t]he credibility of witnesses is an issue not to be resolved here. . . . issues of credibility are to be determined at trial" in the requesting country); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1218 (S.D. Cal. 1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses."); *Esposito v. Adams*, 700 F. Supp. 1470, 1477 (N.D. Ill. 1988) ("questions of credibility are not properly raised in an extradition hearing"); *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *35 (S.D. Fla. Aug. 31, 2017) (extradition courts "must accept as true all of the statements and offers of proof by the demanding state, reserving the weighing of evidence and making of credibility determinations for the courts in the requesting country—which is where the determination of guilt will be made") (internal quotation marks and citation omitted); *In re Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562, at *4 (N.D. Ill. Oct. 3, 2018) ("because issues of credibility are to be determined at trial, the defendant in an extradition proceeding is not entitled to challenge the credibility of [] statements submitted by the requesting country"); *In re Extradition of Grynsztein*, No. 15-mc-80918, 2015 WL 6039845, at *4 (S.D. Fla. Oct. 15, 2015) ("[a]n extraditee is not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses"); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015) (same).

**Defense Exhibit 141,** [2] **142,** [3] **144, 145, 146, 147, 148,** [4] **150, 151.** [5]  The declarations come from individuals who are Ameen's relatives, the "tribal elder" who was previously been detained by U.S. forces in Iraq for his connections to the mujahidin and foreign fighter facilitation, and individuals who would state that Ameen has no ties to Al Qaeda in Iraq (AQI) or ISIS whatsoever.

Ameen discounts the statements made by Person 1 and Person 5 to the FBI, arguing that there was "no downside for any witness to lie to the FBI." CR 258 pg. 14.  This argument of course overlooks the fact that Person 5 and Witnesses A and B did give testimony under oath in the Iraqi court system, where the penalties for perjury did attach.  CR 194-1 pg. 12; CR 205 pg. 12.

Additional defense exhibits have no probative value and should be excluded as irrelevant, or alternatively, to the extent they do have probative value, are contradictory inadmissible evidence intended to undercut the account of Person 1:  **Defense Exhibit 130** (news footage of an ISIS caravan in

---

[2] This declaration makes reference to a statement Person 1 supposedly made to the declarant, that Person 1 stated that he could not change his testimony except after getting permission from the Americans.  Defense Exhibit 141 at ¶ 5.  The FBI does not control the content of witness statements, and the concept of seeking permission to change a statement is inapt.  Person 1 gave a statement to the FBI, which is summarized in the FBI 302 that Iraq has incorporated into its extradition request.  As indicated in the transmittal by Judge Dhiya, Person 1 will need to testify for his evidence to bear weight at trial.  The "Americans" will play no part in this process.

In these extradition proceedings, it is impossible to probe the questions raised by this declaration: did Person 1 actually make these recent statements to the declarant as described?  If he did, would Person 1 have had a reason to try to avoid being identified as a person who gave a statement against Ameen's interest, perhaps especially in light of ISIS's reported recent resurgence in Iraq?  If indeed this declarant spoke to Person 1 and an Arabic language interpreter, why did the Arabic language interpreter perceive the declarant to be "pressuring" Person 1?  These questions must be saved for the time of trial.

[3] One noteworthy aspect of this declaration is the declarant's statement that even though members of the ISIS caravan were masked, the declarant could still identify at least one member of the caravan whom he knew previously.  Defense Exhibit 142 ¶ 6.  This ability of the people of Rawah to identify known masked members of the caravan runs contrary to the defense's argument that Person 1 could not have identified Ameen in the caravan because the members of the caravan were masked.  CR 258 pg. 5.

[4] This declaration from the retired FBI agent hired by Ameen contains a summary of two additional witnesses who would contradict the credibility of Person 1, and also would state that Ameen has no terrorist affiliations, and as such, is inadmissible.  The allegations in this declaration about the motivations of Person 5 are also credibility evidence that must be excluded.

[5] In this declaration from the "tribal elder," discussed previously in these proceedings as a relative of Ameen's with a detention history of his own, reveals that he has "the power to interrogate and arrest people."  Defense exhibit 151 ¶ 1.  This revelation further adds to the potentially coercive nature of the visit to Witness A and B's home by the tribal elder and Ameen's Iraqi lawyer, and further renders their recantations suspect.

Rawah/Anah);[6] **Defense Exhibit 131** (alternative translation to the one in the extradition request);

**Defense Exhibit 132** (video of a speech by Abu Anas Al-Sammarai, when no witness alleges that

Ameen was present at the speech); **Defense Exhibit 133** (copy of an order given by Al-Sammarai with

no apparent relation to the murder); **Defense Exhibit 135** (additional photo of Al-Sammarai and another

fighter that does not purport to depict every member of the ISIS caravan, nor is it established that this

was the ISIS caravan that Person 1 and Person 5 saw); **Defense Exhibits 136, 149** (selected texts from

the victim's cell phone derived from defense forensic examination).[7]

As has been true throughout this case, Ameen has "no right . . . to pose questions of credibility as

in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Eain*, 641 F.2d at

511 (citing *Shapiro*, 478 F.2d at 905). None of the new defense exhibits explain or clarify Person 1's

evidence, and they should be excluded.

### 2. The account of Person 1 in the second supplement is plausible and consistent on its face.

A prima facie examination of the statement of Person 1 reveals no vagueness or implausibility

that would render it per se unreliable. CR 237-1 pg. 4; *see Emami v. United States*, 834 F.2d 1444, 1452

(9th Cir. 1987) ("An extradition proceeding is not a trial; the relevant determination is confined to

whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for

trial.").

The statement is based on first-hand knowledge. Person 1 is an eyewitness to Ameen's presence

in Rawah on the day of the murder. Person 1 had the opportunity to observe Ameen in the ISIS caravan

on the day of the murder. "Even if we entertain some doubt as to an informant's motives, his explicit

---

[6] Clicking on the link provided in this exhibit routes to a YouTube playlist entitled "Omar," which contains Arabic-language news footage from June 22, 2014 (last visited February 12, 2020). The "Omar" YouTube playlist also features Ameen's ABC-10 news interviews in which he maintains his innocence. The evidentiary value of the TV news footage is very limited. As the declarations of the defense witnesses themselves establish, there was more than one ISIS caravan in Rawah and neighboring town Anah on that day. Defense exhibit 145 ¶ 3; Defense exhibit 147 ¶ 6. The defense invites the Court to examine the video footage and hold that Ameen is not depicted, CR 258 pg. 5. But this exercise presumes that the ISIS caravan in the news footage is the same caravan that Persons 1 and 5 observed. This exercise also presumes that Person 1 would only have had the same vantage point as the news cameras, and not some better vantage point. Finally, the exercise presumes that the Court would have the same familiarity with Ameen as do the witnesses who have known Ameen for years.

[7] The United States does not oppose the admission of **Defense Exhibit 134** (higher quality version of the photo contained in the social media exhibit from the extradition request).

and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitled his tip to greater weight than might otherwise be the case." *Illinois v. Gates*, 462 U.S. 213, 234 (1983). Person 1 is not an informant, but rather a witness—another indicator of reliability.

Person 1 describes the caravan in detail. The level of detail provided by Person 1 is self-corroborating. *See United States v. Banks,* 539 F.2d 14, 17 (9th Cir. 1976) ("A detailed eye-witness report of a crime is self-corroborating: it supplies its own indicia of reliability."). Person 1 identifies two other members of the caravan, at least one of whom the defense seems to agree was a member of an ISIS caravan that day (Muhammad Abud). Defense exhibit 142 ¶ 6.

Person 1 knew who Ameen was before the murder.[8] Further confirming Person 1's preexisting knowledge of Ameen, Person 1 elaborates on other acts he describes having been perpetrated by Ameen, including planting IEDs to attack coalition forces and walking the streets of Rawah with a slung AK-47 style rifle. CR 237-1 ¶ 3.

Person 1 heard a burst of gunfire, which is consistent with Person 5's account of the firefight between the caravan members and the victim. Person 1 later learned through conversations that Ameen was the murderer.

Person 1's account does not suggest any hesitancy in the identification of Ameen or in the recounting of the events of June 22, 2014.

Further, the accounts of Person 1, Person 5, Witness A and Witness B are consistent. CR 137-1 pg. 38-44 (Person 5 and Witnesses A and B); 237-1 (Person 1). Person 1 saw Ameen in an ISIS caravan, which he described. He described the time he saw the caravan as being in the "late afternoon." CR 237-1. The defense argues that this time must be wrong, for it would not take long for the caravan to travel on to the site of the murder, which Person 5 testified occurred at 7 o'clock.[9] But the use of the phrase "late afternoon" could be a matter of semantics or translation, used to describe the same timeframe. Alternatively, the caravan may not have continued on directly to the house of the victim but

---

[8] Person 1's reference to knowing Ameen since childhood is very similar to how Witness A has described knowing Ameen since childhood. Defense exhibit 34 and 74.

[9] The defense states that its forensic analysis of the victim's cell phone indicates a last text sent at 8 o'clock. This extra hour makes no difference. There is no dispute among the parties that Person 5 was at the scene of the murder. The dispute is over whether he saw Ameen there, as he testified.

7

instead may have travelled around the towns of Rawah and Ana as described in the texts of the victim that the defense seeks to admit. It would be entirely reasonable for there to be a gap in time between when Person 1 saw the caravan and when the caravan arrived at Ihsan Jasim Abdulhafiz (Ihsan)'s house. Accordingly, there is not necessarily any inconsistency at all between the accounts of Person 1 and Person 5 at all, let alone one that would obliterate probable cause. *Berrocal*, 2017 WL 3776953 at *22 ("Because an extradition hearing is only preliminary in nature and not a determination of guilt or innocence, the resolution of any inconsistencies in the record is of no consequence as long as sufficient evidence of probable cause remains.").

C.   **The time for Ameen to present his arguments relating to the statements of Person 1 is at trial, overseas, as recognized by the Iraqi court.**

Judge Dhiya specifically states that the witness (Person 1) must be "brought before the court in order to complete the investigations in a proper way to get to the facts" at trial. CR 237-1 ¶ 6 (Second Supplemental Extradition Request). The Iraqi court has not accepted the out-of-court statement of Person 1 blind to the need to further probe the reliability of the statement.

In sum, while Ameen may have kicked up dust about the credibility of Person 1, his evidence cannot be fairly tested in this forum, where his witnesses are not present for examination, Person 1 is not present for examination, and any corroborating or refuting evidence is not available for consideration. The rule establishing the inadmissibility of contradictory credibility evidence applies in this case as in any other extradition case and mandates the exclusion of this evidence.

II.   **AMEEN IS NOT ENTITLED TO UNPRECEDENTED PROCESS BASED ON HIS OBTAINMENT OF REFUGEE STATUS, ESPECIALLY WHERE HE LIED TO OBTAIN THAT STATUS.**

The Court has already held that it would not set aside settled extradition law on the issue of noncontradiction based on Ameen's refugee status. CR 160 pg. 17 n.10 ("declin[ing] to set aside the rule of non-contradiction" because, *inter alia*, "even fugitives who are United States citizens – whom one might expect to possess additional safeguards – are bound by the rule of non-contradiction" and "Ameen's refugee status touches on humanitarian concerns that are more appropriately weighed by the Secretary of State"). The law is also clear that these extradition proceedings should continue without any delay based on Ameen's intent to seek relief in immigration court.

Ameen's claim to entitlement to additional due process based on his refugee status is particularly misplaced given that he has admitted that he lied about the fundamental narrative he told in order to gain that status in the first place. The United States first discussed the misrepresentations Ameen made in his immigration applications in its bail memorandum at the inception of this case. CR 6. The United States now proffers that evidence in rebuttal to Ameen's claim that he merits extraordinary consideration as a refugee and that he is innocent of any connection to terrorism.

Ameen lied repeatedly and profoundly in order to obtain refugee status and circumvent the admissibility laws of the United States. On the facts of this case in particular, Ameen should not be permitted to wield the status he obtained through misrepresentation to delay these extradition proceedings and gain an advantage unavailable to other fugitives.

A. **Ameen's argument that he is entitled additional due process as a refugee is meritless.**

This Court previously rejected Ameen's argument that his refugee status impacts these extradition proceedings. CR 160 pg. 17 n.10. Ameen has not cited any grounds for reconsideration of that order, nor do any exist. The Court should likewise reject the defense's assertion that these extradition proceedings should be deferred based on Ameen's pending removal proceedings, which involve the revocation of his refugee status. CR 258 pg. 20.

As the government previously explained, there is no authority nor reason for providing greater rights to non-citizen fugitives than to fugitives who are U.S. citizens. CR 151 pg. 7-8; *Basic v. Steck*, 819 F.3d 897 (6th Cir. 2016) (upholding extradition certification of Bosnian refugee). To the contrary, courts have rejected the notion that the 1951 Refugee Convention provides fugitives with any additional protection from extradition. CR 151 pg. 7-8 (citing cases); CR 229 pg. 42 n.33 (explaining that the Refugee Convention is non-self-executing). While, as the defense notes, the Refugee Act of 1980 prohibits "the Attorney General [from] remov[ing] an alien" to another country under certain circumstances, CR 258 pg. 20-21, it notably places no restriction on the Secretary of State from extraditing a fugitive. The Refugee Act thus poses no bar to, or limitation on, extradition.

Indeed, as the Supreme Court, the Ninth Circuit, and other courts have recognized, extradition proceedings and immigration proceedings are separate and independent from one another. *See* CR 140

pg. 20 (citing cases).  Findings in immigration proceedings have no preclusive effect on extradition proceedings.  *See, e.g.*, *McMullen v. IRS*, 788 F.2d 591, 597 (9th Cir. 1986), *overruled in part on other grounds by Barapind v. Enomoto*, 400 F.3d 744, 751 n.7 (9th Cir. 2005) (en banc); *In re Extradition of Mironescu*, 296 F. Supp. 2d 632, 639 n.6 (M.D.N.C. 2003) ("The granting of asylum does not preclude extradition."); *Sandhu v. Reno*, No. 96-5245, 1996 U.S. App. LEXIS 24130, at *2-4 (D.C. Cir. Aug. 9, 1996) (denying fugitive's emergency motion to stay extradition to India because "there is legal precedent for the government's claim that . . . aliens who are properly certified for extradition can be extradited regardless of their claims to [sic] asylum and withholding of deportation").  Therefore, the extradition process is generally given precedence over immigration proceedings.  *See In re Perez-Jimenez*, 10 I&N Dec. 309, 311-12, 315 (BIA 1963); *see also INS v. Doherty*, 502 U.S. 314, 318-19 (1992) (giving extradition proceeding precedence over immigration proceeding).

Moreover, neither extradition nor immigration laws allow the enjoining of extradition proceedings in favor of immigration proceedings.  *See, e.g.*, *Masopust v. Fitzgerald*, No. 2:09–cv–1495–ARH, 2010 U.S. Dist. LEXIS 5414, at *6-13 (W.D. Pa. Jan. 21, 2010) (denying fugitive's request that extradition proceeding be stayed until claims under the CAT were adjudicated in the course of removal proceedings, and noting that "the Petitioner has not cited—and the Court has not found—any authority for the proposition that this Court may order a halt to an ongoing extradition proceeding in order to accommodate the Petitioner's preference that his CAT claim be adjudicated by the Immigration Court").  Indeed, a panel of the Ninth Circuit in *Fejfar v. United States* recently upheld the district court's refusal to stay extradition proceedings to allow a fugitive to pursue pending asylum proceedings in the United States.  724 F. App'x 621, 622 (9th Cir. 2018), cert. denied, No. 18-5642, 2018 WL 3972821 (U.S. Oct. 1, 2018) (stating that "the BIA's decision to administratively close the [fugitive's] immigration case pending the outcome of his extradition proceedings does not violate [fugitive's] due process or First Amendment rights").  This Court should likewise refuse to delay these extradition proceedings to allow Ameen to pursue his immigration claims.[10]

_____

[10] The defense's conclusion that "[t]he perception that the United States allows extradition to trump non-refoulement obligations appears largely based on misinterpretation of *Barapind*" CR 258 pg. 22-23, is puzzling, given the case law cited above predating *Barapind* establishing that extradition proceedings are generally given precedence over immigration proceedings.  In any event, the defense's suggestion that *Barapind* should be disregarded because it is an immigration case is beside the point,

**B.      Ameen lied in order to qualify as a refugee.**

Even if a fugitive's status as a refugee could provide some protection against extradition, such protection would not be warranted here because Ameen's status as a refugee is premised on lies that go to the heart of his claimed need for protection.  A refugee is an individual who is unwilling or unable to return to their native country because of persecution or a well-founded fear of persecution.  8 U.S.C. § 1101(a)(42).  As the applicant, Ameen bore the burden of proving statutory eligibility for the refugee status he sought.  8 U.S.C. § 1361.  Ameen's refugee application was based wholly on his own account of the persecution he claimed his family endured in Iraq.  The credible testimony of such an applicant is critical to the successful establishment of a refugee claim where, as here, Ameen presented no corroboration of the claimed persecution.  8 U.S.C. § 1158(b) ("The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee.").

On at least seven separate occasions spanning at least five years, Ameen told a wholly fabricated story to authorities in order to qualify as a refugee and to attempt to procure a green card.  Ameen's account of past persecution was two-pronged, and both narratives were fabricated.  Ameen first told a false story that painted his father as a murder victim at the hands of Al Qaida; in reality, Ameen's father died of natural causes (a stroke), as Ameen was well-aware.  Second, Ameen told a story that his brother, Bilal Abdulsattar Ameen, was the victim of a kidnapping and disappearance by a pro-Shiite militia group; but even after Ameen gained an understanding that in fact his brother was arrested by law enforcement, not kidnapped, and knew that his brother had been released and was alive and well when he visited Ameen in Turkey in 2014, Ameen persisted in telling the kidnapping story to claim refugee status.

**1.      Ameen lied about his father's death.**

Ameen first told a false account that his father had been murdered by Al Qaeda.  It was this story that principally allowed him to gain refugee status, and he has admitted it is a complete fiction.

---

given that other case law, such as *Fejfar*, has adopted its reasoning specifically in the extradition context.

Ameen first told the story in November 2013 to the United Nations High Commissioner for

Refugees:

> While living in Rawa and before moving to Baghdad the Applicant's father was killed in a nearby village named Amariya in 2010. The Applicant stated that his father was killed by unknown persons. The Applicant's father was transporting housing materials to an army base at the time of his killing. The Applicant stated that his father's killing was reported to the authorities. The Applicant believes that his father was killed on purpose because he had been making business with the Americans. The Applicant stated that Anbar is controlled by Al Qaeda. Following his father's killing the Applicant felt that he could no longer live in Rawa and moved to Baghdad.

In large part on the basis of this narrative, the UNHCR interviewer concluded "[d]ue to the life

threatening experiences and killing incidents of his family members in his home country, the

Applicant's file is under submission consideration by UNHCR Turkey."

Ameen next submitted a written sworn statement to USCIS in February 2014, repeating the same

story:

> PA [Primary Applicant]'s father was killed because he accepted to carry portable houses belong[ing] to Iraqi military. PA's father had his articulated flat truck so he carried the portable houses as he was asked to by the Iraqi military. The portable houses were moved from a point to another within the Anbar province. One month after his deal with the Iraqi military, PA's father was approached by unknown gunmen at his land and he was killed there. PA says the perpetrators of the killing of his father never [have] been identified or apprehended. PA says that he believes his father was killed by armed men who opposed PA's father's collaboration with the authorities. Many others who accepted to serve the authorities were similarly killed by armed men, says the PA. After the killing of his father, the PA decided to move his house into Baghdad.

Ameen told the story verbally, under oath, on May 22, 2014, to the refugee officer for United

States Citizenship and Immigration Services in Turkey: "How did your [father] pass away? He had a

contract to transport caravans for the [Iraqi] army. He had a contract. After a month, he was shot dead

. . . . Who shot him? In our area Al Qaeda was active. Anyone who works with Army or Americans can

consider that their life is in danger."

Ameen told the story again in Sacramento in May 2016 when he applied for a green card. He

was again placed under oath and cautioned that was a crime not to tell the truth:

//

//

12

Q:      Where did your father pass away?
A:      Uhhh…an incident took place [pauses]…[breathing]…uhhh…incident
         happened…he was killed in the farm…
Q:      In Iraq?
A:      Yeah

Ameen was also asked if he had given any false testimony to enter the United States.  Ameen answered

no.  Ameen was asked if he had given any false testimony in his refugee interview.  Ameen answered

no.  Ameen was asked to review his application and confirm everything on the application was correct;

Ameen did so.

Ameen told the story one more time—this time in significantly greater detail and with

manufactured emotion—to an FBI Special Agent in August 2018 when he was arrested on the

extradition warrant in this case.[11]  He told an elaborate story, in which his neighbors heard gunshots, and

then he and his brother found the father's body in a muddy field with a bullet in his head:

Question [Special Agent]:  Which year was your father killed?
Answer [Ameen]:  2010
        Q:      Two thousand ten okay. So I know this is a difficult subject for you
                uh--but I need to ask some questions about it.
 Translator  [Tr]:      We know this subject is difficult for you, because it is your father,
                but I need to ask you, it is routine.
        Q:      So, you said that your father was killed by al-Qaida.
        Tr:     You said that your father was killed by al-Qaida.
        A:      Yes.
        Tr:     Yes
        Q:      So, explain to me what happened?
        Tr:     Tell--tell us what happened--regarding his murder? I mean--How
                did he get killed?,
        A:      uh--uh--I mean--In the village, and we have a village, and I told
                you- that village which three kilometers [1.8 mile] away from us.
                He goes to the farm, he goes there daily and there the--uh--uh--the
                incident took place
        . . .
        Q:      Okay so, he drives to the farm, and what happens?
        Tr.:    He drove to the farm, and then what happened?
        A:      This is what happen we got the news, that --uh--our father was
                killed.
        Tr:     He drove and we received the news, the father was killed?
        Q:      How did you receive the news?
        Tr:     Who told you? Who told all of you?

---

[11] A copy of the FBI's August 15, 2018 video-recorded interview was provided to the defense on
August 17, 2018.

13

| | | |
|---|---|---|
| 1 | A: | Our neighbors, next to us in the farm. |
| | Tr: | The neighbors they were next to their field- to their farm. |
| 2 | Q: | The neighbors they did what? |
| 3 | Tr: | What did they tell you, do they have a farm next to you? |
| | A: | Yeah there was gunfire and what-cha-call-it, and they told us. |
| 4 | Tr: | Yeah they heard gunshots and they came and told them, your father is killed. |
| 5 | Q: | They came in person. |
| 6 | Tr: | Did they personally come to the house? , or what. how--how did they tell you? |
| 7 | A: | They told us--they personally came to the house and we went to the farm to bring him and came back. |
| 8 | Tr: | First when they came to the house and we went to recover the body. |
| 9 | SA: | W-what did they say? [OV] [UI] |
| 10 | Tr: | What did the neighbors say? |
| | A: | They said that--uh-- your father has been killed. |
| 11 | Tr: | They didn't, see anything. |
| | A: | No, they didn't see anything, no. |
| 12 | Tr: | He said they didn't, see anything, but the father is killed. So they went and got the body. |
| 13 | Q: | Did you go? |
| 14 | Tr: | You went. Did you go to see him? |
| | A: | Yeah |
| 15 | Tr: | He said; yes. |
| | Q: | Who else went with you? |
| 16 | Tr: | Who went with you? |
| 17 | A: | It was me, and my brother Lu'ai |
| | Tr: | Him and his brother Lu'ai. |
| 18 | Q: | Okay. |
| | Tr: | Went and got the body and I asked if the neighbor seen anything, |
| 19 | | he said no. They just tell us our father is dead. |
| 20 | Q: | Okay, so you drove there? |
| | Tr: | You drove by car there? |
| 21 | A: | Yes. |
| | Q: | And what-what--what did you see when you arrived? |
| 22 | Tr: | What did you see there, when you arrived? |
| 23 | A: | There, when I went outside, what is this [UI] |
| | Tr: | Bullets in the head [lowers his voice] picked him up and took him home. |
| 24 | . . . . | |
| 25 | Q: | So was, he, was laying down face down, or face up? |
| | Tr: | He was laying on his face- |
| 26 | A: | On his face. |
| | Tr: | Yes, face down. |
| 27 | Q: | Face down, okay. You said; he's been shot in the head? |
| | Tr: | He was shot in his head. |
| 28 | A: | Yes. |

14

| | | |
|---|---|---|
| Tr: | Yes. | |
| Q: | Were there any other places he has been shot? | |
| Tr: | Was he shot in any other places or just his head? | |
| A: | No, just his head. | |
| Tr: | Just in the head. | |
| . . . . | | |
| Q: | He, was, just laying down there. | |
| Tr: | He was laying on his face. | |
| A: | Yes. | |
| Tr: | Yes. | |
| . . . . | | |
| Q: | Did and the neighbor didn't see anything else? | |
| Tr: | And the neighbor didn't see anything, those who– | |
| A: | No, It was only one neighbor--uh--our neighbor--I mean--uh--he has sheep, and what--cha--ma--call--it Just heard the gunfire and saw him.--he heard the gunfire and--uh--uh and saw him. | |
| Tr: | He said; It was only one neighbor that we have. He used to take his sheep out. Then when he heard the bullets, and after that, he came, saw his father was laying down dead. | |
| Q: | Okay, so, you pick him up, and bring him back to Rawa. | |
| Tr: | You took the body to Rawa. | |
| A: | Yes | |
| Q: | Did you bring back, to his house? Or you, took him – | |
| Tr: | To the house or--uh--? | |
| A: | Yeah, we took him to the house. Washed the body and buried him. | |
| Tr: | Washed the body and buried him. | |
| Q: | In Rawa. | |

But the story was a total fabrication.  In the confrontation phase of that same interview, Ameen admitted that it was a lie.

| | | |
|---|---|---|
| Q: | So, let's start with your father. | |
| Tr: | We will start with your father. | |
| Q: | Your father was not killed by al-Qaida. | |
| Tr: | Your father was not killed by al-Qaida. | |
| Q: | Right? | |
| Tr: | Al-Qaida did not kill your father. | |
| Q: | He died in natural causes… Be honest. | |
| A: | Yeah. | |
| Q: | OK? | |
| A: | OK, sir. | |
| Q: | We need to start fresh. Now, your father was not killed by al-Qaida. | |
| Tr: | He says; we'll start from the beginning. Your father was not killed by al-Qaida, but he died from natural causes, right? | |
| Q: | He died in 2010, of natural causes, right? | |
| Tr: | In 2010, he died of natural causes. | |

```
A:    Eh …
Q:    Omar.
A:    Yes.
Q:    That's how he died. He died of a stroke?
Tr:   He died of stroke, his heart stopped.
A:    Yes.
Q:    So your father died of a stroke.
Tr:   Your father died of a stroke.
Q:    Not, not by al-Qaida.
Tr:   Al-Qaida did not kill your father.
Q:    Right?
Tr:   Right?
A:    Yes.
```

The death of Ameen's father from natural causes is documented by a death certificate obtained from the Rawah hospital. Ameen's admission that his father died of a stroke and not at the hand of Al Qaeda assassins means that the core of his refugee story is false. He did not move to Baghdad and go on to flee Iraq because his father was shot. Indeed, the audacity of the lie is put into greater relief when viewed in the context of his family's deep Al Qaeda connections, as discussed below. Without that core aspect of his refugee claim, he would not have been able to establish the past persecution that formed the basis for a finding of a well-founded fear of future persecution on account of a statutorily protected ground. 8 U.S.C. § 1101(a)(42)(A).

### 2.     Ameen lied about his brother Bilal.

The second component of Ameen's persecution claim was also a lie. Ameen claimed that he was with his brother Bilal in Baghdad after his father's death, when masked men entered their apartment and kidnapped Bilal. Ameen claimed Bilal was never heard from again. In 2013, Ameen told the UNHCR: "The Applicant stated that his brother Bilal is still missing. The Applicant speculates that the Al Mahdi[12] army was behind this attack and abduction." In 2014, Ameen told the USCIS officer screening his refugee application that Bilal had disappeared: "Ever hear any update on Bilal? No, we looked for him everywhere, in police stations, but we didn't find him."

But, as Ameen was well aware, this was not true. By in or about July 2013, Bilal had been

---

[12] As explained in the United States' bail memorandum, Jaish Al Mahdi is a militant group formed by Muqtada al-Sadr in June 2003 in response to the U.S. invasion of Iraq, with the goal of establishing an Iraqi Shiite government. Ameen's refugee claim was that he was targeted by Jaish Al Mahdi because of his Sunni background. CR 6 pg. 18 n.7.

released, and Ameen had knowledge of that release as evident in a Facebook[13] exchange with his nephew:  the nephew informed Ameen that Bilal was going to drive to Erbil the following day in a vehicle belonging to Ameen's other brother Udai.  Bilal's ability to drive to Erbil in the summer of 2013 shows he was not disappeared or kidnapped at that time.  And in 2014, just three weeks before his under-oath interview with USCIS in May in Turkey, a photo of Ameen together with Bilal in Turkey was posted on Ameen's Facebook account.  The defense has previously shown this photo to the Court.  Defense exhibit 138 (Defense PowerPoint Presentation pg. 24).  The defense confirmed at the continued extradition hearing that the photo is of Ameen and Bilal in May 2014.  CR 253 Tr. 39.  Thus, Ameen knew that Bilal was alive and well, and not the victim of a disappearance by a Shia army, as Ameen claimed just weeks later, under oath.

Ameen discussed the alleged kidnapping of Bilal again when he was interviewed for his green card by USCIS in May 2016.  Ameen was asked when the last time was that he saw Bilal, and Ameen answered, "Last time I saw him  . . . in 2012."  But this statement was not true—the photographic evidence Ameen has submitted to this Court demonstrates that Bilal and Ameen were sightseeing together in Turkey in 2014.  Defense exhibit 138 (Defense PowerPoint Presentation p. 24).

Also at his USCIS green card interview, in 2016, Ameen stated that Bilal was living in Rawah, which appeared to surprise the USCIS interviewer, who clarified, "now he is safe, alive, and lives in Rawa, right?" to which Ameen responded "Yes."  That Bilal was safe and alive in Rawah in 2016 would be consistent with the notion that the extended Ameen family is AQI- and ISIS-affiliated, for in 2016 Rawah was still under ISIS control.

Finally, at his green card interview, Ameen clarified the 2012 disappearance of Bilal was actually an "arrest" rather than a kidnapping.  Ameen appears to have known that the Bilal incident was an arrest rather than a kidnapping since at least November 2012, when he exchanged a Facebook message with his nephew (Bilal's son) in which the two discussed Bilal's legal proceedings, the need for a judge to sign a document, and wished for his release.

---

[13] The United States previously shared the Facebook search warrant returns with the defense. Any reference to the Ameen Facebook account in this pleading is a reference to results obtained from that search.

In his 2018 interview with the FBI, Ameen confirmed that the Bilal incident was an arrest by the government rather than a kidnapping ("Q:  But later on, after he was released, it turned out that the government had taken him.   Tr:  So, it was not Jaish al-Mahdi?  A:  No.").  An arrest by law enforcement is, of course, not the same as a kidnapping and disappearance by masked intruders, and the arrest of a relative, without more, would not support a refugee claim.  8 U.S.C. § 1101(a)(42)(A).

Without the story of Bilal's "kidnapping," or that of his father's "murder," in his past, Ameen had no basis to claim a well-founded fear of future persecution, and thus was not a refugee seeking protection from persecution in his country of origin.  8 U.S.C. § 1101(a)(42)(A).  Indeed, had Ameen been forthcoming, it may have been much more readily apparent to the interviewing authorities that he was in fact fleeing prosecution as a fugitive.[14]

## C.    The truth about Ameen's history and associations would have disqualified him from gaining admittance to the United States at all, let alone as a refugee.

Ameen not only lacks a basis for claiming refugee status; he also misrepresented critical information that would have been central to the immigration authorities' assessment of his admissibility to the United States.  To qualify as a refugee, applicants must also demonstrate admissibility to the United States.  8 U.S.C. § 1182.  Grounds of inadmissibility include engaging in terrorist activity (including providing material support to members of a terrorist organization), being a member of a terrorist organization, and espousing terrorist activity.  8 U.S.C. § 1182(a)(3)(B)(i).  The United States has previously proffered evidence that Ameen concealed his familial affiliations to Al Qaida and ISIS.  CR 6 pg. 11-24.  The United States now proffers additional evidence in rebuttal to Ameen's assertion that he should receive additional process, as a refugee innocent of any affiliation with terrorism.  Ameen has admitted the terrorist affiliation of a number of his family members.  He concealed from immigration authorities not only the fact of those affiliations, but also the fact that he maintained contact with these affiliated relatives over the years he was seeking refugee status and then applying for a green

---

[14] Ameen was informed at the commencement of the FBI interview that the Republic of Iraq was accusing him of murdering a police colonel.  At the conclusion of the interview, when asked if he had anything else he wished to say, Ameen did not deny the allegation or claim his innocence, but rather, volunteered a syllogism: why would "they" let him leave; "how can I cross the borders," if the allegation were true?

card in the United States.

> ### 1. Ameen misrepresented the nature of his family associations with terrorist organizations.

Ameen was required to answer standard screening questions intended to assist immigration authorities with assessing whether he met the admissibility requirements for entry into the United States. Versions of these questions were asked at multiple points in the refugee process. Specifically, in 2014, Ameen completed a written form in which he stated that he had never engaged in any form of terrorist activity, had never provided support for any person or organization that has ever engaged in any form of terrorist activity, and had never been a member of a terrorist organization or a group which endorses terrorist activity. At his 2014 USCIS refugee interview, Ameen verbally answered under oath "no" to the question, "have you ever interacted with, had involvement with, or known any members of . . . Al Qaeda in Iraq . . . the Islamic State of Iraq . . . or any other armed group or militia?"

When he immigrated to the United States and applied for a green card, Ameen was again screened for admissibility. Ameen answered "no" to the question, "are you currently in contact with anyone who is involved in terrorist organizations?" He also affirmed that everything in his refugee interview was true, *i.e.*, that he had never known or had any contact with AQI members.

Initially, in his interview with the FBI in 2018, Ameen maintained the same position—he claimed that he had no relation to Al Qaeda, nor did he know anyone with any relation to Al Qaeda:

> Q:    Have you ever interacted with, had any involvement with, or known any members of al-Qaida in Iraq?
> Tr:    Have you ever –
> Q:    [low voice] interacted with, involvement with, or know any members.
> Tr:    Do you have any relation to al-Qaida? Or, do you know anyone that are members of or have any relation to al-Qaida?
> A:    No.

The Special Agent pressed further on the question of whether Ameen knew anyone affiliated with ISIS, and Ameen maintained his denial:

> Q:    What about the Islamic State of Iraq? Or ISIS?
> Tr:    What about ISIS? Do you any relation to ISIS or do you know people who are members of ISIS? The organization, you know ISIS.
> A:    ISIS?
> Tr:    ISIS, that …
> Q:    DA'ISH

| | |
|---|---|
| Tr: | DA'ISH |
| A: | Ah, no. |
| Tr: | DA'ISH in Iraq, not the one in Syria. We are talking about Iraq. |
| A: | Eh, no, I, left in 2012, before all of these events took place. Meaning, meaning in 2012, before DA'ISH existed and what you may call it. |

The Special Agent pressed for more clarity, confirming Ameen's answer in the most straight-forward terms possible:

| | |
|---|---|
| Q: | So, no? |
| Tr: | You do not know anyone? |
| A: | No. No. |
| Q: | You've never known anyone from al-Qaida in Iraq? |
| Tr: | You do not know anyone from al-Qaida in Iraq? |
| A: | No. |
| Tr: | No. |
| Q: | Or any Mujahidin group. |
| Tr: | Or anyone from Mujahidin. |
| A: | No. |

However, when asked a fourth time about his family members, Ameen volunteered for the first time the affiliation of his cousin Ghassan:

| | |
|---|---|
| Q: | Is any of your family members, eh, members of a terrorist organization? |
| Tr: | Any of your family members, your cousins, and your brothers have any relations to terrorist organization? |
| A: | I told you, what's, its name, eh, eh, I told you we only have; Ghassan, I told you, my cousin. I told you we used to call him crazy; he is with al-Qaida and he is in jail, people say. |

Eventually, over the course of the full interview, Ameen went on to name six relatives who he conceded had AQI or ISIS affiliations or fought against the Americans, and an additional four relatives who were detained by the Americans for such conduct:

• **Ghassan** Mohammad Amin was the most obvious relative to begin with, and was Ameen's first admission, as Ameen likely believed that the FBI would have some familiarity with his history. Ameen's admission about Ghassan's AQI activity and imprisonment is corroborated by the Department of Defense, as the government has previously noted. CR 6 pg. 13; *see also Coalition Announces Capture of Zarqawi 'Key Associate,'* http://archive.defense.gov/news/newsarticle.aspx?id=31713 (last accessed February 6, 2020).  Ghassan's terrorist affiliation was also noted by witnesses interviewed by the FBI, as discussed by the United States in its bail memorandum. CR 6 pg. 13.  Ghassan was arrested

on his farm in Rawah in 2005 by U.S. Army Delta Force operators.  An account of Ghassan's arrest appears in the book *Relentless Strike: The Secret History of Joint Special Operations Command*, Sean Naylor (St. Marten's Press 2015).  The book describes Ghassan as a top lieutenant for AQI leader Abu Musab al-Zarqawi, close enough to host al-Zarqawi for five days.  Ghassan is stated to be al-Zarqawi's chief enforcer in Rawah.  Ghassan's forces had destroyed the Rawah police station (a prominent member of which was the victim in the case that is the subject of these extradition proceedings). [15] Ghassan was reported to have executed one person per week in the market to maintain control.



Initially in his FBI interview, Ameen was unwilling to admit that there were any other AQI-affiliated individuals in his family other than Ghassan.  Asked if any other family members were ever accused of being with Al Qaeda, Ameen was clear: only Ghassan.  At that juncture, the interview progressed into the confrontation phase, and Ameen revealed that the narrative of his father's death had been a complete fiction.  The interviewing Special Agent then circled back to ask a sixth time about affiliated family members, Ameen began to soften his previously categorical answer of "no:"

> Q:     Yea, okay, ah, which of your family members, right now, are members of a terrorist organization?
> Tr:    Which one in your family, your brothers, or your cousins, anyone of your family, is a member of a terrorist organization, which you are aware of?
> A:     Currently?

Ameen's response back of "currently?" of course implies that there was a point in time when Ameen had family members who were members of a terrorist organization.

Ameen then conceded that a number of his other relatives were affiliated with AQI, ISIS, or

---

[15] The photographs of Ameen's detained relatives included in this pleading were obtained by the Department of Defense during Operation Iraqi Freedom, typically in connection with biometric enrollment when an individual was detained.

fighting against the Americans:

- Ameen stated that he knew his brother **Qutaiba** Abdulsattar Ameen fought against the Americans and was with Ghassan's group (AQI).  Ameen also admitted knowledge that Qutaiba was arrested by the Americans.  Later in the interview, Ameen reiterated that Qutaiba was with Al Qaeda, though he claimed he was not also with Da'ish.  Notably, Qutaiba is one of Ameen's primary alibi witnesses in these extradition proceedings, stating in a declaration that "I talked with him on the telephone during 2012 through 2014 when he was in Turkey."  Defense exhibit 39.  Ameen, of course, never disclosed to USCIS that he had a brother with AQI affiliation, never disclosed that this brother was arrested for fighting against American forces, and never disclosed that he maintained regular contact with this brother during the time period of the refugee screening process.  Department of Defense records indicate that Qutaiba was detained by U.S. forces in 2005, as the United States discussed in its bail memorandum.  CR 6 pg. 14.  Qutaiba was taken into custody during a vehicle stop



in Rawah in 2005.  In his possession were two AK-47 rifles, two 9mm pistols, and an M21 Anti-Tank mine.  Qutaiba admitted to owning the weapons, and also admitted that he was on a mission to blow up the house of a family of a suspected Coalition Forces collaborator—specifically that he planned to toss a medium-sized IED at the home of the family.  Qutaiba described his role as providing support for his cousin Ghassan, who he described as a Mujahidist.  Charges against Qutaiba were eventually dismissed in 2006.  *Id.*  Ameen revealed knowledge of the incident for which Qutaiba was arrested during his FBI interview, corroborating the gist of the incident.  Ameen distanced himself from the event itself, saying

1   that he was in Syria, but admitting that at a minimum he had knowledge of Qutaiba's arrest on these

2   charges from watching the news.

3   • Ameen was asked if his brother **Mustafa** [Abdulsattar Ameen] was Da'ish, and Ameen stated

4   "yea."

5   • Ameen was asked whether "**Muthanna** [Mohammad Amin] is a member of Da'ish, right?"

6   Ameen answered "Right."  Muthanna is also Ameen's paternal cousin.



13   • Ameen stated that another paternal cousin, **Adnan** [Mohammad Amin], was a member of Da'ish,

14   but he claimed that he had left the organization to live in Syria.  Ameen agreed that no one told him that

15   Adnan left Da'ish, but he opined that since Adnan left Rawah, he also left Da'ish.  When asked if Adnan



23   was originally AQI and then became Da'ish, Ameen stated "yea."  Consistent with Ameen's admission

24   about his cousin Adnan, it should be noted that the Republic of Iraq, Higher Judicial Court of

25   Investigation, Central Investigative Court in Al-Karkh, Counterterrorism Service issued a warrant for the

26   arrest of Adnan—along with Ameen, his brother Ayman, and his other cousin Muhannad (Adnan's

27   brother)—for violation of Iraqi Penal Code 406[1]/A, Murder.  The warrant was issued on October 16,

28

23

2011.[16]

- Ameen stated that his paternal cousin **Radwan** Mohammad Amin was not with AQI; instead, he fought against the Americans "by himself" in Baghdad, and that he had been arrested by the government of Iraq.



The FBI Arabic linguist told Ameen during the interview, "You have to know from my perspective, that I know you have people with Da'ish and Al-Qaeda in your family."  Ameen responded "yea."

Ameen also made admissions about his knowledge that five of his brothers and three of his cousins had been arrested by the Americans and/or the government of Iraq.  In addition to Qutaiba, discussed above, Ameen readily admitted knowledge of the arrest of the following relatives:

- Ameen stated that the Americans arrested his brother **Ayman**.  The photo provided by the Department of Defense is corroboration of that admission.  In addition, a historic arrest warrant from the



Republic of Iraq charges Ayman, along with Ameen, and their brothers Bilal and Suhaib, for committing

---

[16] The United States discussed this and other historic warrants for the arrest of Ameen and his relatives in its memorandum in opposition to bail.  CR 6 pg. 15.  The FBI is not in possession of any of the supporting information or documentation from the Republic of Iraq behind these historic warrants.

terrorist acts in violation of Article 4/1 of the Iraqi Counterterrorism Law.  The warrant was issued on December 26, 2010, by the Higher Judicial Court of Investigation, Central Investigative Court in Al-Karkh, Counterterrorism Service.  Ayman was charged alongside Ameen a second time, on October 16, 2011, in the murder warrant in which cousins Adnan and Muhannad were also named.[17]

- Ameen stated in his FBI interview that he thought his brother **Suhaib** Abdulsattar Ameen was



arrested by the Americans.  Ameen also stated that Suhaib was arrested for being an alleged member of Al Qaeda by the government of Iraq's Golden Team.[18]  Suhaib is also named in the 2010 Iraqi terrorism warrant, along with Ameen.

---

[17] Ameen's other brother Hudayfah was also charged on the same day as Ameen, October 16, 2011, in another murder warrant from the Republic of Iraq.  Ameen did not make any admissions relating to Hudayfah's affiliation or arrest history in his interview with the FBI.  Still, Hudayfah is one of Ameen's alibi witnesses.  Defense exhibit 9.  That Hudayfah was also implicated in a historic murder charge at the same time as Ameen and his other brother and cousin is potentially relevant rebuttal evidence to that declaration.  Hudayfah's declaration is also noteworthy because he states that he requested a copy of his cell phone information from Turkcell to attempt to corroborate his claimed contact with Ameen, but Turkcell indicated that because two years had passed, it would not give him the records.  Defense exhibit 9 ¶ 3.

[18] The Iraqi Special Operations Forces (ISOF), commonly known as the Golden Division, are Iraqi special forces units created by coalition forces after the 2003 invasion.

- Ameen admitted in the FBI interview that his brother **Udai** Abdulsattar Ameen was arrested by the Americans.



- Finally, Ameen admitted knowledge in his FBI interview that his brother **Bilal** Abdulsattar Ameen—the same brother who formed the basis of his persecution story—was arrested by the Americans. Bilal is also one of the four brothers, including Ameen, named in the Iraqi 2010 terrorism warrant.



    **2.**    **Ameen concealed his ongoing contact with these affiliated individuals, even after he came to the United States.**

Ameen attempted to outwardly distance himself from these relatives by telling the FBI in his 2018 interview that since he has entered the United States, he has not had contact with any of these AQI or ISIS-affiliated individuals.

Ameen made a similar claim before USCIS during his green card interview. The USCIS interviewer asked him:

    Interviewer:    Are you currently in contact with anyone who is involved in terrorist activity?
    Interpreter:    Are you currently in contact with anyone who is involved in terrorist

26

organizations?  Yes or no?

A:            No ...

Interviewer:  Are you currently in contact with anybody who is a member of a terrorist group?

Interpreter:  Are you currently in contact with anybody who is a member of a terrorist organization?  Yes or no?

A:            No ....

However, an FBI search of sixteen devices that were seized from Ameen's residence on August 15, 2018,[19] revealed that Ameen continued contact with at least some of these family members, both during the refugee screening period while he was in Turkey, and after he arrived in the United States.

First, forensic review revealed Viber, IMO, and WhatsApp contact with Ameen's brother, **Qutaiba,** over a two year period from August 2016 through August 2018.  On July 24, 2018, a number believed to be Qutaiba's sent Ameen three photos over encrypted WhatsApp, without any accompanying explanation.[20]  The photos appear to depict Honeywell Basic Snap Action Switches.  While the switches are common components of commercially-available electronics, the FBI indicates that they are also common components of IEDs.

  

Qutaiba is the same brother who previously stated to the Department of Defense that he planned to toss a medium-sized IED at the home of an Iraqi family of a suspected Coalition Forces collaborator, and Ameen admitted in his FBI interview knowledge of the basic aspects of that incident involving his brother.

Second, forensic review of the devices revealed contact information assessed to belong to Ameen's brother **Mustafa** (one of the brothers Ameen admitted is affiliated with ISIS (Da'ish)) on nine

_____

[19] The United States made these devices and other items seized from the search available to the defense, and the defense came to the FBI to review the items on at least one occasion.  The FBI also made copies of devices for defense review as requested.

[20] The telephone number that sent these photos is listed in a contact list on a device recovered from Ameen's home as Qutaiba Alrawi, and also as Al-Rifai for Trading Electric Materials (Arabic).

of the devices.  The contact entry on one of the devices is "my brother Mustafa."  Review of the devices reveals Viber and WhatsApp contact with the Mustafa contact numbers from October 2015 through February 2018.

Third, Ameen's cousin **Muthanna** Amin (who Ameen admitted is ISIS-affiliated in the FBI interview) is listed in the contact list of two of the devices recovered from his house, including the device it appears Ameen was primarily using at the time of the search.

Fourth, Ameen's cousin **Adnan** (who Ameen admitted was AQI and then ISIS, but claimed he left ISIS to move to Syria) is depicted in a series of photos posted on Adnan's publicly-available Facebook page in or around September and October 2012.  The photos depict Adnan and Ameen together at the beach and at the Sultan Ahmed Mosque, commonly referred to as Istanbul's Blue Mosque.  Then in August 2013, Ameen posted on his own Facebook page photos of himself, Adnan, and



**Ayman** (Ameen's brother, Adnan's cousin) seemingly posing as tourists in Turkey, at Emirgan Park and again at the Blue Mosque in Istanbul.[21]  Ameen, Adnan and Ayman are also three of the individuals named in Iraq's 2011 murder warrant.  Ameen did not mention any of this contact with his affiliated

---

[21] It should be noted that Istanbul is approximately 590 miles from Mersin, Turkey—about as far as Rawah, Iraq is from Mersin, but in the opposite direction.  That Ameen appears to have travelled to the Blue Mosque in Istanbul at least twice during his time in Turkey, plus a third trip to Istanbul for his Department of State medical appointment and cultural orientation in July 2014, would belie some of the claims of his alibi witnesses who claimed they were continually with Ameen so as to be able to account for his presence or absence over the years he lived in Turkey.

cousin Adnan or his brother Ayman to USCIS even though those visits happened while Ameen was going through the refugee screening process in Turkey.

Misrepresentations about the terrorist affiliations of immediate relatives are misrepresentations that go to the heart of the immigration authorities' assessment of whether the applicant is also a member of or supporter of a terrorist organization, and therefore, inadmissible to the United States.  Ameen's dishonesty about his family ties to Al Qaeda and ISIS should have been a bar to his entry to the United States in the first place.  He should not now be allowed to use the refugee status he obtained only as a result of his own deception as a shield from extradition.

### III.   IRAQ INDEPENDENTLY INVESTIGATED THE MURDER UNDERLYING ITS EXTRADITION REQUEST, AND AMEEN IS ENTITLED TO NO MORE THAN THE DUE PROCESS AVAILABLE TO ALL FUGITIVES.

The existence of international law enforcement cooperation and information-sharing is desirable and necessary when an individual such as Ameen, with longstanding allegations of terrorist acts and affiliations in his home country, flees across borders before taking up residence in the United States under false pretenses.  Such international law enforcement collaboration in this case does not render the Iraqi investigation anything less than an independent criminal investigation by a foreign sovereign.

Iraq's procedures are entitled to deference in extradition proceedings—this is fundamental to the rule of non-inquiry.  "More than just a principle of treaty construction, the rule of non-inquiry tightly limits the appropriate scope of judicial analysis in an extradition proceeding.  Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system . . . ." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (*citing Arnbjornsdottir–Mendler v. United States*, 721 F.2d 679, 683 (9th Cir.1983)); *see also In re Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir.), amended sub. nom. *Matter of Smyth*, 73 F.3d 887 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); *Martin v. Warden*, 993 F.2d 824, 829 (11th Cir. 1993) (declining to recognize a Fifth Amendment right to a speedy extradition: "the rule of non-inquiry . . . precludes extradition magistrates from assessing the investigative, judicial, and penal systems of foreign nations

when reviewing an extradition request."); *In re Extradition of Pazienza*, 619 F.Supp. 611, 620 (S.D.N.Y. 1985) (rejecting a speculative argument that an Italian prosecution was for an improper political purpose: "we should proceed upon the rebuttable presumption of regularity on the part of the Government of Italy in the enforcement of its criminal laws, until proof appears to the contrary."); *see also Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair.").

Moreover, Iraq's decision to seek Ameen's extradition, exercising its right under its extradition treaty with the United States, is a sovereign act. CR 137-1 pg. 2-3 (Extradition Request, Declaration of Tom Heinemann). What is contained in the extradition request and its two supplements demonstrate the independence of the Iraqi investigation into the murder at issue. The documents reference aspects of Iraqi law and procedure that were followed in order to issue the arrest warrant and transmit the extradition request, and they detail the role of the Iraqi investigating judge, the judicial investigator, and the investigating agency in carrying out the Iraqi investigation.

The documents in support of the extradition request were certified by the United States Ambassador in accordance with the statute, 18 U.S.C. § 3190. CR 137-1 at 14. This certification states that Iraq's supporting documents—i.e., the documents from its investigation into the murder—were "properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Republic of Iraq." *Id.* Iraq's Extradition Section of the Higher Judicial Council described receiving the case file from the Al-Karkh Inquiry Court. CR 137-1 pg. 15. That letter is copied to the Ministry of the Interior/Arab and International Police Directorate, with instructions to those agencies to prosecute Ameen for the charge against him in accordance with the provisions of the Iraqi statute, Article 406[1]/A. *Id.* ("We kindly request that you confirm receipt and inform us in case he is arrested, so we are able to direct our procedures in accordance with the law."). The extradition request contains a letter from the Iraqi Chief Public Prosecutor, directed to the President of the High Judicial Council, requesting certification of a judicial order "for the purpose of submitting it to the American judicial authorities by way of diplomatic channels to consider the matter of extraditing him to our authorities on the basis of the case in the request, which is in accordance with the provisions of article 406/1/A in the Iraqi Statute." CR 173-1 pg. 17-18. The extradition request contains the Arrest

30

Warrant and Inquiry, signed by the investigating judge, Judge Dhiya of the Al-Karkh Inquiry Court.  CR
137-1 pg. 20.  This charging document names Ameen, his passport number, and cites the murder statute,
406/1/A.  *Id.*  The warrant also includes Ameen's identifying information, a list of accomplices, the
investigating agency (the INSS), the maximum penalty, and the murder method (organized killing by an
armed group).  CR 137-1 pg. 21.  Judge Dhiya summarizes the evidence against Ameen, which includes
the information provided in the statements of Person 5 and Witnesses A and B, as well as "intelligence
reports and the investigative record" in which the INSS presented "the same information."  CR 137-1
pg. 23.  Judge Dhiya referenced additional investigative steps taken by the INSS, including an inspection
report, a sketch of the crime scene, the ISIS social media posting, and the INSS intelligence report.  *Id.*

The supporting documents for the arrest warrant contained in the extradition request contain a
document entitled "Opening the Record," in which the judicial investigator for the Al-Karkh Inquiry
Court describes receiving an intelligence report from the INSS about the murder of Ihsan by an armed
terrorist group.  CR 137-1 pg. 36.  The judicial investigator states, "[b]ased on this [report], a record has
been opened *to start a proper investigation.*" *Id.* (emphasis added).

The extradition request then contains all of the investigative steps taken by Judge Dhiya,
including: (1) in-person, under oath testimony by the eyewitness to the murder (Person 5); (2) in-person,
under oath testimony by two other percipient witnesses (Witnesses A and B); (3) a site-visit by
investigators with sketches and photos; (4) documentation of a photo identification procedure conducted
with Person 5; and (5) review of an intelligence report by the INSS.  CR 137-1 pg. 38-71.  The
extradition request includes additional documentation of the procedures Judge Dhiya used to conduce
the witness testimony.  CR 137-1 pg. 75.  The order of Judge Dhiya at the conclusion of all of the
witness testimony includes directions to the INSS to conduct further inquiry about the additional names,
other than Omar Ameen, provided in the complaint of Witnesses A and B.  CR 137-1 pg. 76.  The
extradition request includes documentation from Judge Dhiya of the items of evidence he used to
prompt his decision to issue a "warrant and inquiry" again Ameen and three other individuals in
connection with the murder of Ihsan.  CR 137-1 pg. 78.  The investigating judge provided identification
documents for Ameen.  CR 137-1 pg. 89-92.

In the supplement to the extradition request, the Department of State again affirmed that the

extradition treaty is in full force and effect and that the supplemental documents were certified by the United States Consul General in Iraq.  CR 194-1 pg. 1-3.  The Iraq Ministry of Foreign Affairs stated that it was transmitting a response from the Office of the President of the Supreme Judicial Council regarding the United States' inquiry about the photo identification procedures used and the level of knowledge of Witnesses A and B.  CR 194-1 pg. 9.  The President of the Supreme Judicial Council responded, detailing the steps taken by Judge Dhiya to conduct his in-court proceedings.  *Id.*  The letter included a statement of ongoing investigation: "In the meantime, the National Security Service will continue with its investigation into the murder of the victim and in particular the investigation is meant to reveal the availability of additional witnesses who have statements against Omar Abdulsattar Ameen, but they fear being killed if they make those statements.  The National Security Service is working on persuading the witnesses to make their statements.  In return, they will be provided with appropriate legal protection."  CR 194-1 pg. 14.   This paragraph establishes that Iraq's investigation into the murder of Ihsan remains ongoing, and that additional witnesses to the murder may become available, but that they fear being killed for their participation in the investigation.

Again in the second supplement to the extradition request, the Department of State certified that the submission met the requirement of the extradition treaty.  CR 237-1.  Judge Dhiya indicated in letter form that he learned from the FBI's Legal Attaché that Person 1 appeared before the FBI and gave an eyewitness account.  CR 237-1 ¶3.  Judge Dhiya understood from the FBI that Person 1 had been interviewed for the purpose of investigating Ameen's terrorist activities.  *Id.* ¶ 4.  Judge Dhiya indicated that he received a copy of the statement Person 1 gave to the FBI, and that the statement can be used in Iraqi criminal proceedings, citing the Iraq Code of Criminal Procedure.  *Id.* ¶ 6.  Judge Dhiya stated that he decided to consider the Person 1 statement as part of the evidence, but adding critically that he would "ensure that the witness is brought before the court in order to complete the investigations the proper way to get to the facts."  *Id.* ¶ 6.  Judge Dhiya then attaches the memorandum of the statement of Person 1 and asks that it be transmitted to the United States through diplomatic channels.  *Id.*

This type of circumspect treatment of evidence—specifically the statement of Person 1—by the investigating judge also runs counter to the narrative that Ameen continues to advance that "[i]t cannot be clearer that Omar Ameen will be tortured and executed if returned to Iraq."  CR 258 pg. 24.  Ameen

ignores this Court's recognition that this is the wrong forum for such arguments. CR 160 pg. 17 n. 10. Ameen advances his torture narrative based not on any proof, but rather on speculation that the United States has engaged in a deep bilateral conspiracy to target Ameen specifically and return him to a horrible fate. While the United States wholly rejects this conspiracy narrative, Ameen may direct any such arguments to the Department of State. The facts in the record before this Court are more than sufficient to support the proper application of the rule of non-inquiry.

The declaration of the Assistant Legal Attaché, Special Agent J.P. Butsch, reinforces the degree of independence that is apparent in the extradition request itself. Special Agent Butsch sets forth an important chronology: first, SA Butsch became aware that Ameen was already known to the INSS, and that historical Iraqi warrants existed for Ameen and his brothers. CR 206-1 ¶ 17. Second, SA Butsch understood that the INSS was interested in investigating any possible crimes attributable to Ameen. CR 206-1 ¶ 18. Third, and in accordance with this understanding, SA Butsch passed an investigative lead during a liaison meeting in early April 2018. CR 206-1 ¶ 18, CR 231-1 ¶ 22. The agents passing the lead explained that "through the course of the FBI's investigation into the activities of Ameen, the FBI had interviewed two eye witnesses who stated that Ameen was directly involved in the murder of Ihsan." CR 206-1 ¶ 18. The reaction of the INSS itself wholly defeats Ameen's claim of a lack of independence between the FBI investigation and the Iraqi investigation:

> The INSS explained that they could accept our information as an investigative lead, however *prior to initiating any warrant or seeking extradition related to the murder they would need to conduct their own, independent investigation.* They indicated that they were going to independently interview the witnesses, conduct on-scene investigations, and seek corroborating documentation. FBI agents vocalized their agreement with and encouraged independent investigation on the part of the Iraqi government.

CR 206-1 ¶ 19 (emphasis added).

Fourth, the declaration of SA Butsch described being invited as an observer to—but not an active participant in—portions of the Iraqi investigation. He was invited to witness the testimony of Person 5, and he described the precautions the investigating judge took before the testimony began:

> Prior to the witness entering the room, the Judge spoke to us, the observers, directly and stated that this was his inquiry and we were welcome to watch, but that we should not speak or involve ourselves in

the process.  We heeded this admonishment.

CR 206-1 ¶ 25.

Fifth, SA Butsch generally described his role in facilitating the Iraqi extradition request, but only after "the INSS communicated its intention to issue a warrant for Ameen's involvement in the murder of Ihsan."  CR 206-1 ¶ 40.  SA Butsch explained that the honorable Faiq Zaidan, the Chief Judge of the highest judicial body in the country of Iraq, maintained direct oversight of the investigation of Judge Dhiya, and approved submission of all of the documents contained within the Republic of Iraq's extradition request.  CR 231-1 pg. 2.

Each of these accounts also supports the notion of an independent Iraqi investigation into the murder of Ihsan.  There was appropriate law enforcement sharing of a lead regarding the murder, and appropriate interaction between the FBI's Assistant Legal Attaché and his Iraqi counterparts in facilitating the extradition request, some of which is specifically documented in the Special Agent declarations.  Ameen would paint a nefarious picture about such law enforcement-to-law enforcement cooperation, but just the opposite is true.  International law enforcement cooperation is a foundation of the United States' counterterrorism efforts; it is the purpose for which the FBI has an overseas presence such as the legal attaché.

The United States notes that the defense had the opportunity to ask SA Butch and the other FBI Special Agents in this case further questions.  The defense took advantage of that opportunity and posed written questions, some specifically about the interactions between the FBI and the Republic of Iraq, which the Special Agents answered in supplemental declarations.  CR 231-1, 231-2, 231-3.  All four of the FBI Special Agents who have provided affidavits—SA Butsch, SA Coonfield, SA Lopez-Fuentes, and SA Buckmiller—in this case were in attendance at the continued extradition hearing on December 4, 2019, and the United States had indicated that these agents would be available for any questioning.  CR 231 pg. 2.  Ameen's argument now that he should be entitled to additional process because of his allegation that the two investigations were impermissibly intertwined makes no sense in light of his earlier litigation decisions.

The extradition request itself, together with its two supplements and the affidavit of Special

1  Agent Butsch, demonstrates the independence between the United States' criminal investigation and the

2  Iraqi murder investigation.  The defense arguments to the contrary are based only on argument, and not

3  on any fact contained within the record.

4      The defense grossly misquotes the United States when it states that the government represented

5  that "FBI criminal investigation is 'not related to the murder' and nothing in the FBI's investigation has

6  "revealed any additional, admissible facts relating to the murder alleged in the extradition request."  CR

7  258 pg. 18.  In fact, the full quoted sentence is "[n]evertheless, as a courtesy given the unique

8  circumstances of this case involving a criminal investigation into Ameen, the United States has also

9  provided copies of certain materials in the possession of the United States government not related to the

10  murder, but requested by the defense."  CR 21 pg. 2.  The United States very clearly did not state that its

11  investigation was not related to the murder, but rather described that it had provided to the defense some

12  additional materials in its possession that did not relate to the murder.  The Court addressed Ameen's

13  motion to compel discovery in a subsequent order.  CR 135; 173 pg. n.4.

14      The United States disclosed that a portion of its own criminal investigation that overlapped with

15  that of the Republic of Iraq's investigation at the very the inception of this case.  Both the bail

16  memorandum and the search warrant affidavit discuss the FBI interviews of Person 1 and Person 5.  CR

17  6.  The existence of overlapping portions of two investigations conducted by two sovereigns does not

18  diminish the independent nature of those investigations. [22]

19      [22] Ameen cites a number of cases discussing the concept of a joint venture in the criminal

20  context.  CR 258 pg. 13 n. 12.  But the defense cites no precedent for importing the concept of a joint
   venture in a criminal case into the extradition context.  The extradition statute, 18 U.S.C. § 3190,

21  governs the admissibility of evidence in an extradition case.  Under that statute, the statements of Person
   1 as submitted by the Republic of Iraq must be admitted.  This Court then may decide to what extent to

22  rely upon those statements when determining whether there is probable cause of the offense underlying
   the extradition request.  The admission of evidence outside the extradition request is governed by case

23  law—specifically the case law that establishes that contradictory evidence that is not obliterating is
   deferred to the time of trial in the requesting country.  *See, e.g.*, *Santos*, 830 F.3d at 992-93.

24      The defense's argument that the United States is "selectively incorporating certain of its
   documents" is factually inaccurate.  CR 258 pg. 13 n.12.  It is the Republic of Iraq as the requesting

25  country that selected what evidence to advance in its extradition request and in what format.  The
   original extradition request does not contain any documents from the United States—rather, it contains

26  under-oath testimony of three witnesses who came to court in Iraq and gave their accounts of the
   murder.  Iraq identified these witnesses due to an investigative lead that was passed by the United States.

27  CR 206.

28      As these extradition proceedings progressed, the Republic of Iraq submitted its first supplement,
   in which it indicated that it would continue its investigation into the murder, including attempting to

35

1    Ameen refers to this Court's order of May 6, 2019, in which the Court acknowledged Ameen's

2    allegations that the United States was a protagonist in the Republic of Iraq's extradition proceedings.

3    CR 135 pg. 13.  But the scenario the Court found potentially troubling was not one in which ordinary

4    channels of transnational law enforcement communication were engaged to facilitate an extradition

5    request.  Rather, the specific scenario Ameen had advanced was the unproven allegation that the United

6    States was "laundering" its own evidence through the extradition process.  CR 135 pg. 16 n.23.

7    "Laundering" evidence implies some nefarious conduct—as the Court described it, some "illicit action."

8    CR 135 pg. 13.  At the time, Ameen was alleging, based only on speculation, that the United States held

9    undisclosed evidence "that shows that Mr. Ameen was in Turkey at the time of the offense"—

10   specifically, that the United States held video evidence proving Ameen's location in Turkey.  *Id.*  The

11   United States has been clear throughout these proceedings—it is in possession of no video or any other

12   evidence that would dispositively prove that Ameen was in Turkey at the time of the offense.

13        The facts of this case are nothing like the defense's unfounded allegation that the Court

14   discussed in its order.  The FBI passed an investigative lead to its law enforcement counterparts in a

15   country with which the United States has a valid extradition treaty.  The executive branch engaged in

16   diplomatic exchanges to facilitate the submission of an extradition request that would meet the

17   requirements of that treaty.  Many of those specific steps and actions have been discussed now in

18   publicly-filed pleadings.  There was no "laundering" of evidence.  There was no "illicit" coordination.

19   Furthermore, the Court's May 6, 2019 order was about the defense's motion for additional discovery in

20   _____

21   persuade additional witnesses to come forward.  CR 194-1 pg. 14 ¶10.  In its second supplement, the
     Republic of Iraq communicated back to the United States its understanding that this Court "inquired

22   about our procedures regarding the availability of additional witnesses who have statements against the
     accused."  CR 237-1 ¶ 1.  The investigating judge in Iraq specifically discussed Person 1 and the safety

23   concerns surrounding his testimony.  CR 237-1 ¶ 2-4.  The investigating judge explained, "I requested
     that the representatives at the Legal Attaché to provide me with a copy of the statement [of Person 1]."

24   The United States complied with that request.  But the investigating judge cautioned that at trial, Person
     1 would have to testify; the written summary of his statement would not suffice.  CR 237-1 ¶6.

25        From these facts, it is clear that it is the Republic of Iraq that is the protagonist of its own
     extradition request.  The statements of Person 5 and Witnesses A and B were obtained through formal

26   court procedures in Iraq.  The statement of Person 1 was added to the quantum of proof in these
     extradition proceedings in the discretion of the investigating judge.  CR 237-1 ¶ 6 ("the court decided to

27   consider it part of the evidence in the case").  There is no basis for a finding of any Fifth Amendment
     violation on this set of facts, and no basis for abandonment of the precedent on the admissibility of

28   evidence in extradition proceedings.

1    this case.  But since the time of that order, the defense has had ample opportunity to directly question

2    FBI Special Agents involved in the Ameen case overseas.  Four Special Agents have submitted

3    declarations detailing their knowledge of or roles in interviewing the witnesses that formed the basis of

4    the law enforcement lead, in passing that lead to the INSS, and in observing portions of the Iraqi judicial

5    proceedings.  CR 206.  The defense posed written follow-up questions to those Special Agents, which

6    the Special Agents answered in filed supplemental declarations.  CR 231.  The United States indicated

7    that the Special Agents would attend December 4, 2019 extradition hearing and be available for any

8    questioning, and the Special Agents did attend that hearing.  The defense has had a robust opportunity to

9    probe any additional aspects of the nature of the cooperation between the United States and the Republic

10   of Iraq in this case.  Any request for heightened standards or judicial action based on the defense's

11   unfounded allegations should be denied.

12
13
## IV.  AMEEN'S CLAIM THAT HE HAS NO TERRORIST AFFILIATION IS CONTRADICTORY AND INADMISSIBLE, OR ALTERNATIVELY REBUTTED BY THE EVIDENCE OF IRAQ AND THE UNITED STATES

14           Ameen argues that he is innocent not just of the alleged murder, but also of being affiliated in

15   any way with AQI or ISIS.  CR 258 pg. 15.  Ameen urges that this Court "must" consider evidence of

16   terrorist affiliations (or as he posits, a lack of evidence) in its probable cause assessment.[23]  *Id.*  But the

17   extradition request itself is evidence of Ameen's participation in terrorist organizations.  Ameen's

18   evidence to the contrary is inadmissible contradictory evidence and should be excluded.  *See, e.g.*,

19   *Santos*, 830 F.3d at 992-93.

20           If, however, the Court considers Ameen's evidence, it should also consider strong rebuttal

21   evidence both from Iraq and from the United States' own criminal investigation, as proffered below.

22   The government agrees with Ameen that if he is not involved in any terrorist organization, it would

23   make it less likely that he was involved in an ISIS murder.  But the converse is also true.  Ameen's

24   apparent longstanding involvement with terrorist organizations makes it more likely that the eyewitness

25           ─────────────

26           [23] Ameen also argues in his brief that the ISIS nature of the murder is an element of the crime
     that Iraq must also prove, but that is incorrect.  The statute that Ameen is charged with penalizes "any
     person who willfully kills another is punishable by death in the following circumstances:  (a) if such

27   killing is premeditated."  Iraqi Legal Code 406[1]A.  The allegations of the facts of the murder would
     certainly support the finding that the murder was an ISIS murder, but that is not a required element of

28   the crime.

1   identification of him participating in a terrorist murder was accurate.

2   **A.    The extradition request contains evidence of Ameen's participation in terrorist**
3        **organizations.**

4        The primary source of information about Ameen's terrorist affiliations and history is contained

5   in the extradition request—evidence which the Court has already admitted.  CR 137-1 pg. 71; CR 171

6   Tr. 15.  The extradition request contains an intelligence report prepared by the INSS, which states that

7   Ameen worked with terrorist cells and was one of the founders of al-Tawhid Wa al-Jihad (Al-Qa'ida

8   Organization).  CR 137-1 pg. 71.  The report describes him as a close associate of al-Zarqawi.  The

9   INSS states that Ameen "committed the most heinous crimes against the citizens and the security

10  forces" during the AQI timeframe, 2006 to 2007.  The report details two armed attacks on army

11  headquarters.  The report also confirms Ameen's familial ties to terrorism, beginning with his cousin

12  Ghassan, and corroborates the participation of Ameen's brothers, stating "[a]ll of his brothers followed

13  him without exception," including his brother Bilal, who is described in the report as the most "brutal."

14  *Id.*  While the Court has previously stated that the INSS intelligence report is "essentially the Iraqi

15  government's characterization of their case," CR 171 pg. 14, it corroborates the central allegation in the

16  extradition request, that this was an ISIS murder, which the Court must take as true.  *See* CR 140 pg. 11

17  n.1 (citing cases establishing that an extradition court should treat the evidence submitted in support of

18  an extradition request as true for purposes of its probable cause determination).

19  **B.    Additional historic evidence from Iraq**

20       To further rebut Ameen's proffer of evidence of his innocence of any terrorist affiliation, the

21  United States also proffers the following evidence that the Court should consider only for the limited

22  purpose of rebutting the admitted defense evidence, if admitted.  This evidence is not offered as

23  evidence of probable cause, for that evidence is found within the four corners of the extradition request

24  and its two supplements.

25       In its bail memorandum, the United States referenced certified copies of historic warrants it had

26  received from the Republic of Iraq.  CR 6.  These outstanding arrest warrants, which are in addition to

27  the murder warrant that is the subject of these extradition proceedings, include:

28       (1) a warrant dated December 26, 2010, issued by the Republic of Iraq, Higher Judicial Court of

38

1   Investigation, Central Investigative Court in Al-Karkh, Counterterrorism Services, charging Ameen,

2   along with his brothers Ayman Abdulsattar Ameen, Bilal Abdulsattar Ameen, and Suhaib Abdulsattar

3   Ameen, with violation of Article 4/1 of the Counterterrorism Law;

4          (2) a warrant dated October 16, 2011, issued by the Republic of Iraq, Higher Judicial Court of

5   Investigation, Central Investigative Court in Al-Karkh, Counterterrorism Service, charging Ameen, his

6   brother Ayman Abdulsattar Ameen, his cousins Adnan Mohammed Amin, Muhannad Mohammad

7   Amin, and two other individuals with violation of Iraqi Penal Code 406[1]/A, Murder; and

8          (3) a warrant dated December 24, 2017, issued by the Chiefship of the Federal Appellate Court

9   of al-Anbar, Hit Inquiry Court, charging Ameen with violation of Article 4/1 of the Counterterrorism

10  Law.

11         In its bail memorandum, the United States also referred to a letter received from the Republic of

12  Iraq documenting the Ameen family terrorism affiliations.  CR 6 pg. 20.  In 2017, in the phase of the

13  United States' criminal investigation that preceded the discovery of Ameen's alleged involvement in the

14  murder that is the subject of these extradition proceedings, the United States sent an inquiry letter to the

15  Republic of Iraq, and three months later, Iraq sent the following intelligence assessment of Ameen and

16

17

18

19

20

21

22

23

24

25

26

27

28

his family:

To / Embassy of the United States of America– Office of the Legal Attaché

M [Subject] / validation of information

Our center offers you the best regards

Your numbered letter 17-98 in 10/02/2017, in this regard, we would like to inform you that the information contained in your above letter has been checked with all the Iraqi security and intelligence services. We include what has been reached at the present time.

1- The National Security Service informed us that the above-mentioned in your letter, and all members of his family are elements of Daesh [ISIS] terrorist gangs.

2- The Directorate of Military Intelligence informed us that Muhammad Abd-Al-Sattar Amin Al-Rawi is an element affiliated with terrorist organizations, and his brother Qusay Abd-Al-Sattar Muhammad Al-Rawi is an element of the terrorists Daesh in Nineveh Province, Tal `Afar district, so is his brothers; Lu`ai, Muhammad, and Mustafa and they are elements of Daesh terrorist organization.

3- Any further information will be provided to you later.

…with ample appreciation

[This letter has been stamped by the National Operations Center,
And signed by Abd-Al-Amir Muhammad Ali,
The Director General of the National Operations Center
/1/2018]

This document provides a critical rebuttal to Ameen's arguments in three respects:  (1) it is a response to a letter from the United States sent in October 2017, confirming that both Iraq and the United States assessed Ameen to be involved in terrorism well before the specific murder allegation at issue here came to light; (2) it establishes that the INSS assessed "all members" of Ameen's family to be elements of ISIS; and (3) it establishes that a different Iraqi intelligence agency, the Directorate of Military Intelligence, also reported derogatory information on Ameen's brothers Qusay, Luai, Mustafa and Muhammad.  Mustafa is one of the brothers Ameen admitted is Da'ish.

These documents from Iraq rebut Ameen's claim that he has no involvement with terrorist organizations.  Although the documents are allegations and not themselves dispositive proof of Ameen's affiliation, their probative value increases against the backdrop of Ameen's repeated denial of any affiliation with any terrorist organization, any knowledge of any members of any terrorist organization, or any contact with any members of any terrorist organization.  They also rebut Ameen's claim that Iraq is not the protagonist of its own extradition request.

40

C.      **Witnesses with personal knowledge of Ameen's terrorist actions**

The Court has previously reviewed the United States' search warrant affidavit in conjunction with the FBI's criminal investigation of Ameen. The Court has incorporated several paragraphs from that search warrant into the probable cause analysis in this case. CR 253 Tr. 94. The United States set forth much of the content of that search warrant affidavit in its bail memorandum, albeit without any identifying information for the witnesses. CR 6.

That evidence serves to rebut the defense's broad proposition that there is no evidence of Ameen's own involvement in terrorist organizations. To the extent the Court admits and gives weight to any of Ameen's exhibits and arguments that he is not in any way affiliated with AQI or ISIS, the United States proffers the following as rebuttal evidence.

In summary form, eight witnesses gave statements to the FBI that set forth their knowledge of Ameen's involvement in AQI and ISIS. Ameen's hometown of Rawah was selected as a base of operations in the Euphrates River Valley by Al Qaeda beginning in 2004. According to witnesses interviewed by the FBI who resided in Rawah at the time, the Ameen family assisted in the installation of Al Qaeda in Rawah. Ameen's father is said by one witness to have supported Abu Musab al-Zarqawi in founding AQI in Rawah. This reference to a connection to al-Zarqawi is also seen in the intelligence report included in the extradition request. CR 237-1 pg. 71. The Ameen family is described as being one of five families that founded AQI in the region, and that Ameen's father hosted AQI meetings at the guesthouse on the family property. The Ameen family was relatively wealthy, and the family wealth was used to provide financial support to AQI. Witnesses describe the Ameen family involvement in AQI and ISIS as common knowledge in the town of Rawah.

Witnesses interviewed by the FBI state personal knowledge of Ameen's acts in support of AQI. One witness described Ameen's personal vehicle in 2005 as a Kia Sportage with a cut-out roof and a PKC machine gun mounted on the rear. This witness (who has no known affiliation or association with the individual referred to in these proceedings as TMF1), recognized the passengers in the vehicle to be mujahidin fighters because they carried black M-16 style guns. Ameen's vehicle carried a black AQI flag and was emblazoned with other AQI signage. A different witness described seeing Ameen walk the streets of Rawah with a slung AK-47 style rifle. A third witness stated that Ameen assisted in burying

weapons caches on the family land—a claim that appears to be corroborated by Ameen's admission that he once buried a Kalashnikov rifle.[24]

Three witnesses interviewed by the FBI indicated Ameen's involvement with the placement of IEDs. Two witnesses gave eyewitness accounts to the FBI of seeing Ameen involved in the placement of IEDs. The third witness had general knowledge that Ameen was known for placing IEDs.

One witness described witnessing Ameen's work with his cousin Ghassan. He stated that he observed Ameen acting as a guard for Ghassan in a vehicle convoy on more than one occasion. Ghassan, Ameen, and other members of the convoy were armed with shoulder-carried automatic rifles.[25] He stated that he also personally observed Ameen with Ghassan collecting money for AQI.

A different witness stated that Ameen financed AQI by conducting highway robbery and kidnapping operations along the highways between Iraq and Jordan.

Ameen has found witnesses who say that he has no terrorist affiliation, that he is unlike his cousin Ghassan. But Ameen did not even bring up his cousin Ghassan to immigration authorities when he was legally obligated to do so. The time and place for robust examination of Ameen's personal involvement in and family connections to AQI and ISIS was when he was being screened for admissibility overseas—not now when he was admitted under false pretenses and the nature and circumstances of the overseas witness statements to Ameen's defense team cannot easily be probed or disputed. There is evidence in the record already before the Court—the evidence in the extradition request itself—that Ameen has terrorist associations. There is corroborating evidence available outside the extradition request to rebut the defense's claim that Ameen is innocent of any aspect of terrorism. Should the Court admit the defense's evidence of such "innocence," the United States proffers that evidence in rebuttal.

**D.**   **Ameen's social media activity**

Ameen's social media postings do not by themselves prove his AQI and ISIS affiliations. But

---

[24] Ameen initially denied ever owning or using a Kalashnikov in his interview with the FBI, but later changed his answer to an admission that he had owned a Kalashnikov and buried it, claiming that it was later "gone."

[25] Ameen denied he had any weapons training in his refugee interview, cutting off another line of inquiry for immigration authorities.

1  the defense has misleadingly selected only portions of Ameen's online presence to paint a picture of a

2  tolerant, peace-loving person.  CR 258 pg. 15-17.  In actuality, Ameen's social media is filled with

3  interactions in which he curses Shiite Muslims, refers to Shiite Muslims as dogs and slaves, and tells

4  Shiite users to go to hell.  A summary translation of a broader selection of Ameen's Facebook postings

5  from 2013 and 2014—the months before and after the alleged murder—may offer a window into

6  Ameen's mentality at the relevant time.[26]

7       On July 31, 2013, Ameen commented on a post, reciting a supplication so that the jihadists are

8  victorious over the infidels:  "O' God, May they hit their targets, and strengthen their foothold and make

9  them victorious upon the infidels."  On that same day, Ameen cursed an unidentified user, apparently for

10  being too cowardly to use violence:  "If you are a man, which I doubt, fire a bullet at your masters in

11  Israel, you traitor."  Days before, he commented on another post, praying that the killed from his side to

12  be in paradise, but the killed from their Shiite side to be in hell: "To hell, our dead are in paradise and

13  their dead are in hell."

14       Ameen frequently used the phrase "sons of pleasure," a derogatory reference to the Shiite

15  Muslims.  One example is this comment from July 27, 2013:

16       May Allah accept all of them and place them in His vast paradise.  I say to
       the dogs of SWAT that your asses are targeted, the slaughterers will be
17       coming tomorrow, so get your asses ready, O sons of pleasure.

18       On January 29, 2014, he cursed a TV channel, referring to it as an apostate channel, for

19  apparently underestimating the staying power of ISIS:

20       God damn this apostate channel. From the beginning of the events they
       talked about ISIS, thinking that the events will end in a day or two; now
21

22       [26] Of course, it is possible that someone other than Ameen was using his Facebook account on
some or even all of these occasions.  As the government has pointed out previously, use of social media
23  or electronic devices cannot necessarily be attributed to the nominal owner.  CR 256 pg. 5; CR 69 Tr.
29-20.

24       Ameen had pointed to the Facebook "like" made from his account on the day of the murder as
25  alibi evidence, but that argument presumes that Ameen had exclusive access to his social media account
and could only access it from Turkey.  The government concedes neither assumption.

26       The purpose of highlighting the social media posts from the Omar Ameen Facebook account is
not offered as a concession that Ameen was the exclusive user of the account, but that, at a minimum, he
27  allowed these comments to exist in his name—he did not delete them, did not disavow them, and has
offered no explanation for them whatsoever in his attempt to portray himself as tolerant and an
28  enthusiast of Western culture before this Court.

they are preaching to the choir but they realized that they are not going to achieve any progress, so they said: "Let us slander their women."

On February 17, 2014, he cursed Shiite Muslims and their religion: "By God, shit on your religion, you sons of sinners. A religion based on prostitution." Two weeks after that, on March 3, 2014, he cursed the Shiite sect again, saying they are children of adultery.

On May 5, 2014, just before his refugee interview with USCIS, Ameen told a Shiite user that Ameen's people are better than his people; that Ameen's people were always the masters: "We are better than you and others; before you become anything, we are your masters." On June 12, 2014, another curse of the Shiite sect: "God damn those who damned Mu'awiyah."

Approximately one day before the murder, June 21, 2014, the post on Ameen's Facebook account was "This one was killed and this happened, what if he was the killer?" On July 22, 2014, the post was a prayer to make the Sunni Muslims victorious in their fight with sons of pleasure, a reference to Shiite Muslims: "God, grant them victory over those sons of sinners."

On August 14, 2014, Ameen warned in response to a post: "Didn't we tell you not to provoke your masters the Sunnis, but to no avail with you." On August 22, 2014, Ameen again cursed the Shiite sect, saying the Sunni are the masters and the Shiite are their slaves:

> Shit on the degenerate Marji'iyyah [Shiite religious leadership]; shit on Al-Sistani; shit on the damned Al-Hakim; shit on the first Al-Sadr and shit on the filthy and the filthiest. Shit on the degenerate Karbala'; shit on the damned Al-Khomeini; shit on Qum, shit on every one of you who is a son of sinners, you sons of adultery.

He repeats the slave slur on that same day in a different post: "God damn you, you sons of sinners. Your blood compared with our blood is like comparing the master with the slave."

That same month, on August 19, 2014, he refers to the Yazidi Christians as "devil worshipers." He commented to another Facebook user on August 15, 2014, "Hey, didn't we tell you not to provoke your masters, the Sunnis? You have not left anyone without begging them, starting with Iran then Russia and then the United States, and it was not even useful." He replied to another post on August 14, 2014, again referring to the Sunni sect as the masters: "Didn't we tell you not to provoke your masters the Sunnis, but to no avail with you." On August 23, 2014, he refers to the entire Shiite sect as dogs, and curses members of the faith as sons of pleasure, referring to it as a religion based on prostitution:

> You are right, Shaykh, they are dogs and their biggest dog, the dumb al-Sistani, who, when he utters, utters disbelief.  May Allah curse you O sons of pleasure. A faith that is based on prostitution.

On that same day, he curses the Shiite government of Iraq and anyone who is a lackey for that government:

> To Allah we belong and to Him is our return. May Allah curse anyone that takes part in the government of the sons of pleasure and everyone who is a lackey for them.

Ameen claims in his brief that he "does not share the views of ISIS or its predecessor, al-Qaeda in Iraq."  CR 258 pg. 17.  Ameen's strategy of using a handful of social media postings to instead speak on his behalf should fail, where a substantial part of his social media activity instead shows an individual with active hatred toward Shiite Muslims and other religions.  The charged language in the Ameen Facebook account—of masters and slaves, dogs, whores, dirty people, infidels, and hell—is reminiscent of the language Person 5 testified that he heard the ISIS members exclaim just after murdering his relative.  CR 137-1 pg. 38 ("ISIS members came inside the house and started to shout, Allah Akbar, while exclaiming they just killed the apostate, the infidel (Ihsan), the Agent for the Americans, and the apostate government.").  This fuller picture of Ameen's online persona is entirely consistent with the allegation that Ameen is AQI and ISIS affiliated.

The United States objects to the admission of the following defense exhibits, which are intended to demonstrate that Ameen is a tolerant and non-sectarian person, contradicting the allegation in the extradition request that Ameen is a member of AQI and ISIS:[27]  **Defense Exhibit 137**; **Defense Exhibit 143**; and **Defense Exhibit 152**.  Only to the extent the Court would admit those exhibits does the United States offer this additional evidence of Ameen's social media postings in rebuttal.

### E.    Search warrant evidence

Finally, forensic review of devices taken during a search of Ameen's Sacramento apartment

---

[27] The defense has also marked as an exhibit (**Defense Exhibit 138**) its PowerPoint presentation, which is not evidence, but rather argument.  The United States objects to the admission of the PowerPoint.  The Court should separately analyze the admissibility of each exhibit referenced in the PowerPoint, not permit the defense to circumvent that analysis by offering the entire presentation as one exhibit.

The United States does not object to the admission of **Defense Exhibit 139** (photograph of Ameen) or **Defense Exhibit 140** (opinion of Stanford Arabic language professor).

1  revealed ISIS or radical jihadi images on one of those devices, and evidence of an ISIS-themed Google

2  and YouTube browsing session the day before Ameen immigrated to the United States on another.






      The images recovered from one device were of the ISIS flag, an image of the Bird of Jannah,[28]

and an image of weaponry.  This imagery may not be dispositive proof of Ameen's own affiliation or

contact with affiliated individuals, but the presence of these photos on devices taken from Ameen's

home is some evidence counter to his narrative that he has no ties whatsoever to terrorism and is a

tolerant anti-extremist.  CR 258 pg. 17.

      Forensic review of the laptop computer recovered in the search of Ameen's apartment in

Sacramento revealed internet browsing of Jihadi sites on YouTube and Google, all on November 3,

2014—the day before Ameen and his family came to the United States.  The search included songs

about Da'ish, Islamic State news, the speech of Sheik al-Baghdadi to the Free Army, a YouTube

---

[28] The "Bird of Jannah" is a term used by ISIS recruiters to target women.  Translated specifically as "Birds of Paradise," the term has been used by ISIS recruiters as a term of honor for those women who have lost their husbands to martyrdom.

compilation of "the most beautiful and most zealous Islamic jihadist songs 2014," a video series entitled

"Very dangerous: A military expert reveals the secret behind the strength of the Islamic State and the

secret of fear of all of the coalition countries from it," among others.  In total, 63 videos on YouTube or

Google—all jihadi, ISIS, or extremist-related—were opened in a brief eight minute browsing session.

Some examples include:

| | | |
|---|---|---|
| 11/3/2014 8:57:42 AM +0000 | https://www.google.com.tr/webhp?sourceid=chrome-instant&ion=1&espv=2&ie=UTF-8#q=أغاني العراق على داعش | Iraqi songs about Daesh. |
| 11/3/2014 8:57:47 AM +0000 | http://www.youtube.com/watch?v=Vvxkg6p6oAs | A song about Daesh by Mihsin al-Rubay`ai. Iraqi army songs released by Iraqi army |
| 11/3/2014 8:57:48 AM +0000 | http://www.youtube.com/watch?v=Vvxkg6p6oAs | A song about Daesh by Mihsin al-Rubay`ai. Iraqi army songs released by Iraqi army |
| 11/3/2014 8:57:53 AM +0000 | https://www.google.com.tr/webhp?sourceid=chrome-instant&ion=1&espv=2&ie=UTF-8#q=أغاني العراق على داعش | Iraqi songs about Daesh. |
| 11/3/2014 8:58:44 AM +0000 | https://www.google.com.tr/webhp?sourceid=chrome-instant&ion=1&espv=2&ie=UTF-8#q=الانشيد داعش الجهادية | Daesh jihadist songs. |
| 11/3/2014 8:58:48 AM +0000 | http://www.youtube.com/watch?v=wrDupkoQPJI | Tarjuman al-Shami [Syrian translation] for media production presents: Islamic State news + weather news + Al-Wilayat [States] news. |
| 11/3/2014 8:58:49 AM +0000 | http://www.youtube.com/watch?v=wrDupkoQPJI | Tarjuman al-Shami [Syrian translation] for media production presents: Islamic State news + weather news + Al-Wilayat [States] news. |
| 11/3/2014 8:59:17 AM +0000 | http://www.youtube.com/watch?v=YlNL4x3JNTU | New: The speech of al-Sheikh al-Baghdadi to the Free Army and who follows him [IL]. |
| 11/3/2014 8:59:21 AM +0000 | http://www.youtube.com/watch?v=wrDupkoQPJI | Tarjuman al-Shami [Syrian translation] for media production presents: Islamic State news + weather news + Al-Wilayat [States] news. |
| 11/3/2014 8:59:33 AM +0000 | http://www.youtube.com/watch?v=yG5jDfmcOBk | Hanan al-Fatlawi overthrows a Saudi political analyst. |
| 11/3/2014 8:59:43 AM +0000 | http://www.youtube.com/watch?v=wrDupkoQPJI | Tarjuman al-Shami [Syrian translation] for media production presents: Islamic State news + weather news + Al-Wilayat [States] news. |

| | | |
|---|---|---|
| 11/3/2014 8:59:46 AM +0000 | http://www.youtube.com/watch?v=qnf57wSsabE | The most beautiful and best zealous Islamic jihadist songs 2014-part 3 |
| 11/3/2014 8:59:52 AM +0000 | http://www.youtube.com/watch?v=rsDO6MvdNxw | New Ajnad Foundation: a song " al-Maliki will be defeated tomorrow". |
| 11/3/2014 8:59:56 AM +0000 | http://www.youtube.com/watch?v=29WFIX95JDg | Never, we will not  turn away. |
| 11/3/2014 9:00:05 AM +0000 | http://www.youtube.com/watch?v=4YZ6zsnWCaU | New: a song  " Islam brother" by Khulan. |
| 11/3/2014 9:00:13 AM +0000 | http://www.youtube.com/watch?v=4DuZJz3IIIA | The Islamic Al- Khilafah is coming- what is the sign  that he is al-Mahdi. |
| 11/3/2014 9:00:21 AM +0000 | http://www.youtube.com/watch?v=4YZ6zsnWCaU | New: a song  " Islam brother" by Khulan. |
| 11/3/2014 9:00:29 AM +0000 | http://www.youtube.com/watch?v=RHhmAyn4Zwl | Never, we will not  turn away. |
| 11/3/2014 9:00:52 AM +0000 | http://www.youtube.com/watch?v=PYIhxWSMQmU | Song " Stand up, the proud Sunni youth". |
| 11/3/2014 9:00:57 AM +0000 | http://www.youtube.com/watch?v=g8aP66Ui3Gw | The strength of the Islamic State |
| 11/3/2014 9:01:04 AM +0000 | http://www.youtube.com/watch?v=PYIhxWSMQmU | Song " Stand up, the proud Sunni youth". |
| 11/3/2014 9:01:07 AM +0000 | http://www.youtube.com/watch?v=WbTC0lOLLP8 | New Ajnad Foundation: a song " al-Maliki will be defeated tomorrow". |
| 11/3/2014 9:01:17 AM +0000 | http://www.youtube.com/watch?v=PYIhxWSMQmU | Song " Stand up, the proud Sunni youth". |
| 11/3/2014 9:01:30 AM +0000 | http://www.youtube.com/watch?v=C2P-l1kQnCU | Here is Ansar al-Shari`a in al-`Awali || the most strongest and imressive zealous songs. |
| 11/3/2014 9:01:37 AM +0000 | http://www.youtube.com/watch?v=PYIhxWSMQmU | Song " Stand up, the proud Sunni youth". |
| 11/3/2014 9:01:38 AM +0000 | http://www.youtube.com/watch?v=RHhmAyn4Zwl | Never, we will not  turn away. |
| 11/3/2014 9:01:43 AM +0000 | http://www.youtube.com/watch?v=PYIhxWSMQmU | Song " Stand up, the proud Sunni youth". |
| 11/3/2014 9:01:50 AM +0000 | http://www.youtube.com/watch?v=RHhmAyn4Zwl | Never, we will not  turn away. |
| 11/3/2014 9:01:50 AM +0000 | http://www.youtube.com/watch?v=RHhmAyn4Zwl&spfreload=1 | New: a song  " Islam brother" by Khulan. |
| 11/3/2014 9:01:51 AM +0000 | http://www.youtube.com/watch?v=RHhmAyn4Zwl&spfreload=1 | New: a song  " Islam brother" by Khulan. |

By concealing that either he or some user of the devices recovered from his home appears to

have had a proclivity for ISIS propaganda, at least at some point in time, Ameen cut off a line of inquiry

for immigration authorities into his own affiliations with terrorist organizations.  Ameen's persistence in

the claim that he has no terrorist connections and is a tolerant anti-extremist should be excluded as

contradictory evidence, or rejected as contrary to his own admissions and the corroborating information

discussed herein.

F.    **Witness safety**

Ameen alleges that the concerns the United States has raised throughout this case relating to witness safety are unfounded.  However, ample evidence in the existing record supports the relatively mild measures the United States has asked the Court to take to ensure witness safety.

The best source of information on witness safety comes from the Republic of Iraq itself.  In the first supplement to the extradition request, the President of the Supreme Judicial Council—the highest member of the judiciary in the Republic of Iraq—communicated to this Court that "[t]he National Security Service, per the report presented to the court, revealed pressures made on the part of Omar Abdulsattar Ameen's family to drop the charges."  CR 194-1 pg. 11 ¶ 3.  This letter also conveyed that the manner in which Ameen's Iraqi lawyer obtained the recanting statements was irregular and contrary to Iraqi legal procedure.  The letter again raises the issue of witness safety in Rawah:  "We clarify that the National Security Service is aware of the situation in Rawa and take into consideration the witnesses' safety."  CR 194-1 pg. 12 ¶ 5.  The letter raises the issue a third time:  "investigation is meant to reveal the availability of additional witnesses who have statements against Omar Abdulsattar Ameen, but they fear being killed if they make those statements."  CR 194-1 pg. 14 ¶ 10.  Then in the second supplement to the extradition request, Judge Dhiya again articulates the witness safety concern—specifically with regard to Person 1, "information indicates that he was threatened with death if he testifies before the court."  CR 237-1 pg. 1 ¶ 2.

These statements from the Supreme Judicial Council in Iraq should alone be enough to support the relatively mild safety measures implemented in this case.  A foreign sovereign has communicated to this Court its conclusion that there are witness safety issues in this case, based on the reports of its own intelligence service.  That conclusion can be accepted on its own in these extradition proceedings, for the information and witnesses being protected by this Court's protective order and limited redactions are the information and witnesses of the Republic of Iraq.  Iraq is best situated to assess the safety risk posed to its own witnesses.

Further, the United States also assesses security risk to witnesses in this case.  As explained by SA Butsch, "I was also informed that Witnesses A and B were afraid for their lives.  Witnesses A and B told Iraqi authorities that they had been threatened months ago by unnamed individuals if their provided

48

statements regarding Ihsan's death." CR 206-1 ¶ 38.  This assessment should hardly be surprising, given that the allegation that this is an ISIS murder—the potential for a threat to witness safety stemming from that same terrorist organization, in a foreign country, where ordinary protective measures that the FBI or other law enforcement agencies may take are unavailable, and where this Court has no enforcement authority.  The simple steps of using a protective order and redactions to keep names of foreign nationals off of the public docket are reasonable measures in recognition of these risks.  These limited measures have not impeded the defense investigation, for the defense has now made contact with and obtained statements from each of the three witnesses in the original extradition request.  The defense has also obtained statements from individuals who claim to know the fourth witness (Person 1).  That no witness has yet been killed should hardly be the metric against which this Court assesses a concern with witness safety.

Ameen claims that the United States has attempted to "curtail" his investigation with these protective measures, but does not elaborate on an investigative step he has been hindered from taking or ask for a specific remedy from the Court.  CR 258 pg. 14.  The United States has been mindful of the witness safety concerns in this, an ISIS murder case, while at the same time acknowledging that the defense "may undertake any investigation it chooses." CR 21 pg. 8.  But that investigation should be focused on the generation of admissible evidence in these extradition proceedings, which the continued focus on witness credibility is not.  CR 247 Tr. 11-12 (granting the defense time for additional investigation into any possibly "conclusive proof," as opposed to credibility evidence).

## V.  THE EXTRADITION REQUEST AND ITS SUPPLEMENTS FROM IRAQ ESTABLISH PROBABLE CAUSE THAT AMEEN MURDERED IHSAN

The defense's most recent investigation into the credibility of Person 1 is irrelevant, given that the original extradition request and its first supplement amply establish probable cause on their own. *See* CR 205.  However, the evidence from Person 1 only further bolsters the existence of probable cause, as Person 1 serves as a fifth witness supporting a finding of a fair probability that the ISIS murder of Ihsan occurred on June 22, 2014, and that Ameen committed it.

### A.  Statements of five witnesses support a finding of probable cause that Ameen committed the charged murder.

There are now four witnesses in the admitted evidence before the Court—Person 5, Witness A,

Witness B, Person 1—who have given statements implicating Ameen in the murder of Ihsan.  An

additional witness—Person 7—placed Ameen in Rawah in or about the time of the fall of Rawah.  The

evidence includes two percipient witnesses who saw Ameen with the ISIS caravan on the day of Ihsan's

murder (Person 5 and Person 1).  Witnesses A and B named Ameen as responsible for the murder of

Ihsan, based on the statement of Person 5 to them just after the murder.

       The testimony of Witnesses A and B is critical because it locks in the account of Person 5 that

Ameen was the murderer in 2014.  CR 194-1 pg. 12 ¶ 8.  Person 5 would not have had time to formulate

an elaborate plan to extract money or seek any other personal benefit at the time of the emergency of the

murder.  That is why present sense impressions and excited utterances are admissible in our own legal

system—because they are reliable.

       Person 1 is an additional percipient witness who saw Ameen in Rawah, travelling with the ISIS

caravan.  Person 1 heard the burst of gunfire.  Person 1 at some point learned through conversation that

Ameen was the person responsible for Ihsan's death, though it is not clear from the record when he

learned that.  CR 237-1.

       Person 7 stated no knowledge of the murder but placed Ameen in Rawah at or around the time of

the fall of Rawah.  CR 253 pg. 94 (incorporating search warrant affidavit).

       Only by ignoring this critical timeline does that defense advance a narrative of fabricated

testimony.  Ameen was identified by Person 5 as the murderer in 2014, at the time of the murder.  At

that moment in time, there was no FBI investigation into Ameen; there was no way to foresee that

Ameen would flee and become the subject of these extradition proceedings.  That real-time

identification of Ameen bears indicia of reliability and should be credited.[29]

---

[29] Ameen continues to criticize Person 5 for allegedly requesting money from the retired FBI
Special Agent who is part of Ameen's defense team.  But the Court does not have adequate information
to assess the nature of these alleged requests for money.  Person 5 could be requesting money because
he genuinely believed the retired agent was offering him money in their initial conversation.  Indeed, the
partial transcript of that conversation that Ameen has filed may be understood in this way.  Person 5
could be persisting in following up because the retired agent was not sufficiently clear about identifying
himself or who he was working for.  In any event, the characterization of Person 5 as money-seeking is
an allegation of bias, which goes to credibility and should be deferred until time of trial.

       Ameen also calls into question the account of the murder by Person 5 based on the type of gun
Person 5 supposedly discussed in his conversation with the retired FBI agent.  The extradition request

1   Two additional witnesses made statements to the FBI that Ameen was present in Rawah in and

2   around the time of the murder.  The statement of Person 1 has been incorporated into Iraq's request and

3   is discussed throughout this pleading.

4   The statement of Person 7 was also incorporated by the Court for consideration in its probable

5   cause analysis.  CR 253 pg. 94.  The defense has not addressed the statement of Person 7 at all, but that

6   statement is further confirmation that Ameen has no alibi—and that he was in Rawah at the time of the

7   murder just as the percipient witnesses indicated he was.

8   **B.     Ameen has not established an alibi.**

9   Amen has not established an alibi that would obliterate the probable cause established in the

10   extradition request.  Rather, eighteen months of defense investigation appears to have confirmed that the

11   same gap in time that the United States identified at the inception of this case still remains.  Ameen's

12   whereabouts between May 22, 2014 (after his USCIS interview) and July 7, 2014 (his medical

13   appointment in Turkey) are unaccounted for by any incontrovertible evidence.  Ameen had no

14   immigration appointments in this gap, and the sign-in logs Ameen acquired from the refugee office in

15   Turkey are undated.  Review of the devices Ameen had access to during this time reveals a break in an

16   otherwise established pattern of usage (though Facebook use on the Ameen account did continue, as

17   discussed above), and data from these devices could not account for Ameen's location.  CR 120 pg. 14-

18

19

20

_____

21   does not specify the type of firearm Ameen is alleged to have used; the testimony of Person 5 provided
22   that, "During that, [the victim] … went outside the house and returned fire at ISIS terrorists using his
     Kalashnikov rifle. The engagement continued with the terrorist elements for about 10 minutes. After
23   they stopped shooting, I went outside the house and while I was standing in front of the outside door, I
     saw [the victim] on the ground and I saw the suspect (Omar Abdulsattar) standing over him and was
24   holding a gun and fired at him while he was on the ground."  CR 237-1.  That description of a firefight
     would be consistent with the description of Person 1 having heard a "burst of rifle fire."  CR 237-1.
25   That Person 5 may later have provided more detail to the retired FBI agent about the use of a Glock in
     no way discredits Person 5's testimony or Person 1's statement.  Ameen could have easily carried both a
26   Glock and a Kalashnikov rifle.  Ameen could have used one and then the other.  Ameen could have used
     just a Glock and the other terrorists Kalashnikovs.  These are clarifying questions that can be asked at
27   the time of trial.  Based on Ameen's own admission that he used to own a Kalashnikov rifle that he
     buried, it is not far-fetched that Ameen would have had access to the weapon needed to commit this
28   crime.

15.  Ameen's employment on his resume ends in May 2014 and resumes only after he entered United States under false pretenses, as noted in the bail memorandum.  CR 6.  Ameen has not uncovered any



photographs or video from this timeframe that would account for his presence.

In the end, it is the witness statements in the extradition request that place Ameen in Rawah at the time of the murder, and the only evidence Ameen has uncovered to rebut that evidence is other, contradictory witness statements.  Under established, core principles of extradition law, the fulsome testing of the reliability of each of those witness statements must await Ameen's trial in Iraq.  Ameen has failed to establish an alibi that obliterates probable cause.

## VI.   CONCLUSION

Pending a status update on the Turkcell records, this Court should certify Omar Ameen's extradition.  Ameen seeks additional process from this Court, perhaps in recognition that he has not obliterated probable cause under the prevailing standard.  He should not be permitted to use the refugee status that he improperly obtained to demand due process rights beyond what any other fugitive would receive.

Dated:  February 12, 2020

McGREGOR W. SCOTT
United States Attorney

By: _/s/ Audrey B. Hemesath_
AUDREY B. HEMESATH
HEIKO P. COPPOLA
Assistant United States Attorneys

CHRISTOPHER J. SMITH
Associate Director
REBECCA A. HACISKI
Trial Attorney
Office of International Affairs