1
2
3
4
5                   UNITED STATES DISTRICT COURT
6            FOR THE EASTERN DISTRICT OF CALIFORNIA
7
8    IN THE MATTER OF THE                    No.  2:18-mj-152-EFB
9    EXTRADITION OF OMAR
     ABDULSATAR AMEEN TO THE
10   REPUBLIC OF IRAQ                         MEMORANDUM AND ORDER DECLINING
                                              TO CERTIFY EXTRADITION
11
12
13          The Republic of Iraq has charged Mr. Omar Abdulsatar Ameen ("Ameen") with

14   premeditated murder and seeks his extradition.  ECF No. 137-1 at 20-21.  A judge in the Baghdad

15   Federal Al-Karkh Appellate Court issued a warrant for Ameen's arrest in connection with a

16   murder that occurred on June 22, 2014 in Rawah, Iraq.  *Id.* at 21.  After more than two years of

17   proceedings and two extradition hearings, this court finds, for the reasons stated hereafter, that the

18   Government has failed to satisfy its burden under 18 U.S.C. §§ 3184, *et seq.*  Thus, it declines to

19   certify Ameen's extraditability.

20                              **Admission of Evidence**

21          Prior to discussing the background and arguments of the parties, the court finds it

22   necessary to set the contours of the case by ruling on the admissibility of all exhibits offered by

23   the defense.

24          The Federal Rules of Evidence do not apply in extradition hearings.  *See Then v.*

25   *Melendez*, 92 F.3d 851, 855 (9th Cir. 1996).  Whether to admit evidence in an extradition

26   proceeding lies within the court's discretion.  *In re Extradition of Kraiselburd*, 786 F.2d 1395,

27   1399 (9th Cir. 1986).  Under general United States extradition law, authentication is the only

28   prerequisite for admissibility of evidence.  *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406 (9th

                                              1

Cir. 1988).  The court should look to the relevant extradition treaty to determine if any special provisions on the admissibility of evidence apply.  *See Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450 (9th Cir. 1987) (admissibility of evidence governed by "the general extradition law of the United States and the provisions of the [Extradition] Treaty . . . .").  Here, the treaty provides only that:

> If, however, the fugitive criminal is merely charged with crime, a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and copies of the depositions upon which such warrant may have been issued, shall be produced with such other evidence or proof as may be deemed competent in the case.

ECF No. 137-1 at 10 (Treaty Between the United States of America and Iraq, Article XI).  For his part, the fugitive may introduce only evidence that "tends to explain the government's case of probable cause."  *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978).  Put another way, the fugitive may introduce explanatory evidence, but not contradictory evidence.  The distinction between the two types of evidence is often hazy.  The U.S. Court of Appeals for the Ninth Circuit has drawn the following distinction:

> [W]e have generally settled on the principle that 'explanatory' evidence is evidence that 'explains away or completely obliterates probable cause,' whereas contradictory evidence is that which 'merely controverts the existence of probable cause, or raises a defense.'

*Santos v. Thomas*, 830 F.3d 987, 992-93 (9th Cir. 2016).  As discussed in detail below, however, several courts have held that evidence of an alibi defense is admissible if it negates or obliterates probable cause.  *See infra* at 16.

The most recent list provided by the defense accounts for one-hundred and eighty-four exhibits.  ECF No. 296.  The court has, as the list notes, previously ruled on the admissibility of seventy-six of these exhibits.  Of those seventy-six, all have been admitted save those listed in the following table:

/////

/////

/////

2

| Exhibit Number | Description | Admission Status |
|---|---|---|
| 3 | Declaration of Abdelsalem Altaab | Withdrawn by Defense |
| 18 | Declaration of Linda Humble re: Musab Basil | Excluded |
| 19 | Declaration of Linda Humble re: Neder Abdulhameed | Excluded |
| 19.1 | Supplemental Declaration of Omar Hamid | Excluded in part. Admitted the portions of the affidavit attesting to Ameen's presence in Turkey in 2014. Excluded the portions of the affidavit attesting to Ameen's tolerance of other religions and the length of his hair. |
| 19.2 | Declaration of Linda Humble re: Uday Salih | Excluded |
| 28 | Certification of No Criminal History in Turkey with Apostille | Excluded |
| 29 | Declaration of Radhya Hamed | Excluded in part. Admitted the portions of the affidavit attesting to Ameen's presence in Turkey in 2014. Excluded the portions of the affidavit stating that Ameen and family were "nice people." |
| 30 | U.S. Tax Documents | Excluded |
| 31 | American River College Transcript | Excluded |
| 32 | Correspondence with Congressperson Ami Bera | Excluded |
| 33 | Declaration of Rifaat Ammar | Excluded |

3

| 33.1 | Declaration of Tala Najem | Excluded |
|---|---|---|
| 37 | Declaration of Linda Humble re: Interview of Witness C | Excluded |
| 38 | October 23, 2017, FBI Statement by Person 5 | Excluded in part. Admitted for the purpose of demonstrating that Person 5's statement in the extradition request is forged or inauthentic. This exhibit's admission is discussed in greater detail below. |
| 39 | Declaration of Quetaiba Al-Rawi | Excluded in part. *See* description of Exhibit 38. |
| 41.1 | Photographs of Omar Ameen | Excluded in part. *See* description of Exhibit 38. |
| 42 | September 21, 2017, Person 5's Purported Handwritten Statement (Sealed) | Excluded in part. *See* description of Exhibit 38. |
| 44 | May 24, 2018, FBI 302 Re: Person 5's October 23, 2017 Statement | Excluded in part. *See* description of Exhibit 38. |
| 45 | Declaration of Belkis Wille | Excluded in part. *See* description of Exhibit 38. |
| 46 | Supplemental Declaration of Natiq Abduljaleel | Excluded in part. *See* description of Exhibit 38. |
| 47 | October 23, 2017, FBI 302 on Person 7 | Excluded in part. *See* description of Exhibit 38. |
| 58 | Declaration of Omar Salih Rasheed (with Certified English Translation) | Excluded at May 28, 2019 hearing.  ECF No. 171 at 93-95 |

| 62 | Declaration of Zayed Tarek Sadallah (with Certified English Translation) | Excluded at May 28, 2019 hearing.  ECF No. 171 at 94-95. |
|---|---|---|

With respect to the exhibits that have not yet been ruled on, the court finds:

- **Exhibit 49** contains internet protocol information that was returned from Facebook.  ECF No. 217-1.  The information appears to bear on Ameen's claim that he was in Turkey at the time of the murder.  This exhibit is admitted.

- **Exhibit 78** contains signature samples from Judge Jafaar from the extradition packet. ECF No. 208-2.  The court previously admitted exhibits which bore on the question of whether signatures in the extradition packet were forged.  This exhibit is admitted on that basis.

- **Exhibit 79** contains a declaration from Iraqi lawyer Layth Madab.  ECF No. 208-3.  It describes his interactions with Witnesses A and B.  It also describes Witnesses A and B's attempt to withdraw their accusations against Ameen.  As discussed below in the analysis section, the parties dispute whether Witnesses A and B sought to withdraw their accusations because they genuinely believe Ameen to be innocent or because they are being coerced.  The court finds it unnecessary and inappropriate to resolve this factual dispute.  Exhibit 79 is excluded for want of relevance.

- **Exhibit 80** is a sealed copy of the collated and numbered Arabic/English extradition packet.  ECF No. 208-4.  This exhibit is admitted.

- **Exhibit 81** contains United Nations High Commissioner for Refugees ("UNHCR") documents relevant to Ameen's refugee status in Turkey.  ECF No. 208-5.  The court has admitted similar documents.  These are admitted as well.  For the same reason, **Exhibit 105** is also admitted.

- **Exhibit 82** is a declaration from defense counsel Rachelle Barbour which describes the process and results of the defense's subpoena of Facebook.  ECF No. 208-6.  This exhibit is admitted.

5

1    • **Exhibit 83** is a declaration from defense counsel Rachelle Barbour that summarizes FBI

2       documents that the government permitted her to view.  ECF No. 208-7.  It bears on

3       Exhibit 38 which was admitted in part.  This exhibit is admitted.

4    • **Exhibit 84** is a declaration from Samar Qasim, the victim's widow.  ECF No. 208-8.  It

5       describes the day the victim was murdered and contradicts the account offered by Person

6       5.  This exhibit is excluded as contradictory evidence.  *See* ECF No. 160 at 17.

7    • **Exhibit 85** is a declaration from Zayed Tarek Sadallah.  ECF No. 208-9.  Sadallah claims

8       that Ameen was not in Rawah in 2014.  This exhibit bears on Ameen's alibi that he was in

9       Turkey at the time of the murder and is admitted.[1]

10   • **Exhibit 86** is a letter from the Defense Intelligence Agency ("DIA") that responds to

11      Privacy Act and Freedom of Information Act requests made by Ameen.  ECF No. 208-10.

12      It states that no responsive documents were found and appears to confirm that the DIA has

13      never identified Ameen as a known terrorist or Islamic State in Iraq and Syria ("ISIS")

14      asset.  The court has previously excluded evidence that did not bear on the specific

15      question of whether Ameen committed the murder at issue in these proceedings.  This

16      exhibit is excluded on that basis.

17   • **Exhibit 87** is a sealed exhibit that is viewable in person at the Clerk's Office.  ECF No.

18      208-11.  It contains verified signatures from Person 5.[2]  The court has previously admitted

19      exhibits which bear on the veracity of the signatures in the extradition packet.  This

20      exhibit is admitted as well.

21   /////

22

23      [1] The court notes that the alibi evidence it has admitted may be divided into two
     categories.  Some of the evidence puts him in Turkey at the time of the murder.  Other evidence
24   simply states that he was not in Rawah at the time of the murder.  The court has previously
     deemed both categories of alibi evidence admissible.  *See*, *e.g.*, ECF No. 142-1 at 24 (Previously
25   Admitted Declaration of Hudhayfah Al-Rawi stating that Ameen was in Turkey in 2014); ECF
     No. 142-1 at 21 (Previously Admitted Declaration of B.I. stating that Ameen was not in Rawah in
26   2014).

27      [2] Person 5, as discussed in greater detail below, is the extradition packet's lone eye-
28   witness to the murder.

6

- **Exhibit 88** contains verified signatures from Witness A.  ECF No. 208-12.  This exhibit is admitted for the same reasons described above in the discussion of Exhibit 87.

- **Exhibit 89** is a declaration from defense investigator Gamal Abdel-Hafiz.  ECF No. 208-13.  It relates to Witness A and B's desire to withdraw their accusations against Ameen.  Witnesses A and B also related an account of the murder to Abdel-Hafiz that contradicts Person 5's account and their own previous statements in the extradition packet.  This exhibit is excluded for the reasons stated in the discussion of Exhibit 79 and as contradictory evidence.

- **Exhibit 90** is a redacted transcript of an interview between defense investigator Abdel-Hafiz and Person 5.  ECF No. 208-14.  The transcript is offered to contradict Person 5's account of the murder in the extradition packet and to call his credibility into question.  The court previously ruled that evidence attacking witness credibility is not admissible.  ECF No. 160 at 17-18; *see also Santos v. Thomas*, 830 F.3d at 993 (holding that the accused "may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government.").  This exhibit is excluded on that basis.  For the same reasons, **Exhibits 93**, **94**, **96**, **97**, **98**, **99**, **103**, and **115** are excluded.  ECF Nos. 208-17, 208-18, 217-2, 217-3, 217-4, 208-20, 208-24, 208-36.

- **Exhibit 91** is an identification card for Person 5.  ECF No. 208-15.  This exhibit is admitted to the extent it is relevant to the legitimacy of Person 5's signature(s) in the extradition packet.

- **Exhibit 92** is a transcript of an interview between defense investigator Abdel-Hafiz and an individual identified as TMF-1.  ECF No. 208-16.  TMF-1 is an Iraqi militia colonel whom the defense has identified as bearing a grudge against Ameen.  ECF No. 258 at 6.  The defense also states that he is the moving force behind Person 5's accusations against Ameen.  *Id.*  The transcript, like all of the evidence regarding TMF-1, is introduced in order to undermine Person 5's credibility.  It suggests that Person 5 did not actually witness the murder and has ulterior motives for accusing Ameen.  Thus, it is clearly evidence that is contradictory and the court cannot admit it.  For the same reasons,

7

1         **Exhibits 95**, **100**, **104**, and **113** are also excluded.  ECF Nos. 208-19, 208-21, 208-25,

2         208-34.

3     •   **Exhibit 101** is a California Department of Motor Vehicles photograph of Ameen.  ECF

4         No. 208-22.  This exhibit is excluded as irrelevant.

5     •   **Exhibit 102** is an Iraqi court document that details the release of another suspect in the

6         victim's murder.  ECF No. 208-23.  This exhibit is excluded as irrelevant.

7     •   **Exhibits 106, 107, & 108** are word for word translations of the statements of Witness A,

8         Witness B, and Person 5 that are contained in the extradition request packet.  ECF Nos.

9         208-27, 208-28, & 208-29.  These exhibits are admitted.

10    •   **Exhibits 109, 110, & 111** are affidavits from FBI agents involved in the questioning of

11       Person 5 and Iraqi proceedings that developed the extradition request.  ECF Nos. 208-30,

12       208-31, & 208-32.  These exhibits are admitted insofar as they bear on the question of

13       whether documents in or related to the extradition packet were forged.  *See* ECF No. 160

14       at 21-22.  They are otherwise excluded.

15    •   **Exhibit 114** contains a government letter regarding witness Hamid.  ECF No. 208-35.

16       This exhibit is admitted as relevant to Ameen's alibi.

17    •   **Exhibit 116** contains photographs of the handwriting added after the signatures on Iraqi

18       court statements.  ECF No. 217-5.  This exhibit is admitted as relevant to the question of

19       whether any of the signatures in the extradition packet were forged.

20    •   **Exhibit 117** is a November 8, 2019 statement by Russell Travers who, at that time, was

21       the acting director of the National Counterterrorism Center.  ECF No. 217-6.  The

22       statement discusses the high level of security scrutiny to which refugees are subjected.  It

23       also notes that, in the past decade, only two refugees to the United States went on to

24       undertake attacks on the homeland.  Both were radicalized in this country.  This exhibit is

25       excluded as irrelevant.

26    •   **Exhibits 118, 119, 120, and 121** are FBI 302 interviews of witnesses who reject the

27       notion that Ameen was ever involved in terrorism.  ECF Nos. 217-7, 217-8, 217-9, 217-

28       10; *see also* ECF No. 216 at 47.  The interviews date from 2016 and 2018.  The court does

not find these exhibits especially helpful in adjudicating the ultimate question of probable cause.  Having considered their source, however, the exhibits are admitted.

- **Exhibit 123** is an affidavit from law professor Haider Ala Hamoudi.  ECF No. 220.  Together with attachments (ECF Nos. 220-1 & 220-2), the affidavit describes the "severe and obvious deficits" in the Iraqi justice system.  ECF No. 220 at 2.  The court has previously noted that it is not permitted to weigh the fairness of the requesting country's justice system.  *See Neely v. Henkel*, 180 U.S. 109, 123 (1901); *see also Leiva v. Warden*, 928 F.3d 1281, 1295 (11th Cir. 2019) ("We have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch.").  This exhibit is excluded.

- **Exhibit 124** is the report of document examiner Sean Espley.  ECF No. 226.  This exhibit and its attachments bear on the issue of possible forgeries in the extradition packet and is admitted.

- **Exhibit 125** is a text message from the victim to TMF-1 on the day of the murder.  ECF No. 239.  In it the victim identifies individuals affiliated with ISIS and who were in Rawah that day.  This exhibit is admitted.

- **Exhibits 126, 127, and 129** relate to Person 1, a witness who claims to have seen Ameen in Rawah on the day of the murder.  ECF Nos. 246-1, 250-5 (sealed), 249.  These exhibits are admitted for the purpose of offering greater context as to Person 1's claim.  They are excluded for the purpose of attacking Person 1's credibility.

- **Exhibit 130** consists of two videos of the ISIS convoy in Rawah.  ECF No. 258-1 (YouTube links in the exhibit description, videos provided to the court on a DVD).  This exhibit is admitted.

- **Exhibit 131** is the corrected translation of an Arabic Twitter post in the extradition packet.  ECF No. 258-2.  This exhibit is admitted.

/////

/////

9

- **Exhibits 132, 133, 134, and 135** are exhibits related to Abu Anas Al-Sammarai, an ISIS official, who issued statements and orders on behalf of the organization upon the takeover of Rawah.  ECF Nos. 258-3, 258-4, 258-5, & 258-6.  These exhibits are admitted.

- **Exhibit 136** is a text from a Rawah area police officer to the victim on June 21, 2014. ECF No. 258-7.  This exhibit is admitted.

- **Exhibit 137** is a Facebook post made by Ameen that the defense characterizes as "celebrating tolerance or challenging sectarianism."  ECF No. 258-8.  This exhibit is excluded for want of relevance.

- **Exhibit 138** is a copy of the defense PowerPoint presentation from the December 4, 2019 hearing.  ECF No. 258-9.  This exhibit is admitted.

- **Exhibit 139** is a copy of Ameen's DMV photograph that was used in a 2018 interview with Person 1.  ECF No. 258-10.  The defense argues that TMF-1 showed this photograph to Person 1 so that the latter would be able to falsely identify Ameen as the murderer. ECF No. 258 at 6.  This defense exhibit bears on Person 1's credibility and is excluded.

- **Exhibit 140** is a declaration of Alexander Key, a professor of Arabic and Comparative Literature at Stanford University.  ECF No. 258-11.  Professor Key states that the name "Abu Ians Al-Shami" is not a correct rendering of an Arabic name.  This name arises in a story Person 1 told an FBI Special Agent.  ECF No. 258 at 11.  Person 1 told the agent that "Abu Ians Al-Shami" was his cousin.  *Id.*  The defense argues that the obvious error in rendering this name is indicative of the story's falseness.  *Id.*  It states that the incorrectly rendered name is likely a reference to the ISIS leader Abu Anas Al-Shami.  *Id.* at 11-12.  This exhibit is offered to attack Person 1's credibility and is excluded.

- **Exhibit 141** is a declaration from Haqqi Rajab Yas, the head of the Rawah Municipal Council.  ECF No. 258-12.  It describes an exchange with Person 1 in which the witness admitted that they were not in Rawah on the date of the murder and, thus, could not have seen Ameen in a passing ISIS convoy.  *Id.* at 2.  The declaration is excluded for the purpose of undermining Person 1's credibility.  Yas also states that Ameen was not in Rawah in June of 2014 and the exhibit is admitted insofar as it relates to Ameen's alibi.

- **Exhibit 142** is a supplemental declaration from Ghassan Hameed Salman, one of Ameen's relatives.  ECF No. 258-13 at 1.  Salman states that Ameen was not in Rawah at the time of the murder and the exhibit is admitted insofar as it relates to the alibi.  The rest of the declaration is excluded insofar as it is related to attacking the credibility of Person 1.  **Exhibits 144**, **145, 146, 147, 150,** and **151** (ECF Nos. 258-15, 258-16, 258-17, 258-18, 258-21, 258-22) are also excluded as attacks on Person 1's credibility.

- **Exhibit 143** contains hate messages sent to Ameen by Sunni extremists.  ECF No. 258-14.  This exhibit is excluded for want of relevance.

- **Exhibit 148** is a supplemental declaration of defense investigator Abdel-Hafiz.  ECF No. 258-19.  This declaration is excluded because it relates to attacks on the credibility of Persons 1 and 5.

- **Exhibit 149** is an indicator that the victim's final text message was sent at 8:03 p.m. local Iraqi time.  ECF No. 258-20.  This exhibit is admitted.

- **Exhibit 152** contains Ameen's Facebook posts documenting his learning of English in Turkey.  ECF No. 258-23.  This exhibit is excluded for want of relevance.

- **Exhibits 153 through 157** are attached to the defense's brief (ECF No. 262) that refutes assertions about Ameen's terrorist affiliation made in the government's reply brief at ECF No. 261.  These exhibits are admitted for that purpose.

- **Exhibits 158 and 159** relate to a polygraph test that Ameen took and passed in March of 2020.  ECF Nos. 265-1 & 265-2.  Although the results, standing alone, add little, the exhibits are admitted to the extent they bear on Ameen's alibi.  *See In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1136-1137 (E.D. Cal. 2003) (Hollows, Mag. J.) (admitting polygraph evidence in an extradition hearing.)

The final exhibits (Nos. 160 through 184) pertain to Ameen's cell phone records.  The government argues that the records should not be considered because they are not authenticated.  ECF No. 294 at 6.  It points out that the records lack a signature, the name and title of the individual providing the records, and bear no stamp, seal, or other attestation.  *Id.*

/////

1    The court disagrees and finds them sufficiently authenticated.  As the defense argues in its

2    response, the records were obtained through a lengthy process involving the parties, the court, the

3    State Department, and elements of the Turkish government.  ECF No. 295 at 11-12.  Documents

4    from a Turkish court (ECF No. 295-8) and the Public Prosecutor's office in Ankara (ECF No.

5    295-9) corroborate the records' authenticity.  The records themselves state that the requesting

6    authority for the records was the Public Prosecutor of Ankara and that the records were prepared

7    "based on the data sent by the related operators to BTK[3] on the date of the process."  ECF No.

8    289-5 at 2.  Admission of evidence lies within the court's discretion, *Klein*, 573 F.2d at 1369, and

9    it finds that the records are sufficiently authenticated.

10          The government also argues that the cell records should not be admitted because they are

11   not obliterating evidence.  ECF No. 294 at 36.  It notes that the Ninth Circuit has defined

12   obliterating evidence as being "reasonably clear-cut" and "of limited scope" and argues that the

13   cell records are neither.  *Id.* (citing *Barapind v. Enomoto*, 400 F.3d 744, 750 (9th Cir. 2005)).

14   The court is unconvinced and the records are admitted.  The records together with the user

15   attribution evidence,[4] as discussed below, appear decisive on the most salient point:  Ameen was

16   in Turkey, not Iraq, on the day of the murder.  The records are admitted and discussed below.

17                                          **Background**

18          **I.      The Government Case**

19          The murder victim, Ihsan Abdulhafiz Jasim ("Jasim"), was a member of the Rawah

20   police who had previously undertaken anti-terrorism efforts on behalf of the Iraqi national

21   security forces.  ECF No. 137-1 at 43, 70.  The town of Rawah fell to ISIS on June 21, 2014.  *Id.*

22   at 38.  Immediately thereafter, Jasim received a threatening telephone call warning that he would

23   be killed and beheaded for his prior anti-terror efforts.  *Id.* at 43.

24   _____

25          [3] BTK refers to the Turkish Ministry of Communications and Communication
     Technology.  ECF No. 295 at 12.

26
27          [4] "User attribution evidence" refers to evidence that a particular person was the user of a
     device or media account, in this case a cell phone.  *See, e.g.*, *United States v. Bundy*, No. 3:16-cr-
     00051-BR, 2016 U.S. Dist. LEXIS 188523, *26-27 (D. Or. 2016) (discussing user attribution
28   evidence in the context of a Facebook account).

                                              12

1    The following day, June 22, 2014, a four-vehicle convoy loaded with ISIS fighters

2  approached Jasim's home in Rawah.  *Id.*  Upon arrival, the ISIS fighters began firing at the house.

3  *Id.*  Jasim exited his home with a rifle and returned fire.  *Id.*  The firefight lasted ten minutes and

4  ended with Jasim lying on the ground, alive but unable to continue fighting.  *Id.*  A person alleged

5  to be Ameen stood over Jasim and, after calling him an American agent and an apostate, executed

6  him with a firearm.  *Id.*  After the ISIS fighters left, Jasim was taken to an Iraqi hospital where a

7  death certificate was issued on June 23, 2014.  *Id.* at 102.

8    The extradition request is predicated on the statements of an individual claiming to have

9  witnessed the murder.  That lone eyewitness, referred to in the extradition packet as "Person 5,"

10  claimed that he saw Ameen commit the murder.[5]  *Id.*  He was present in Jasim's house during the

11  firefight and claimed that he went outside in time to see Ameen execute Jasim.  *Id.*  He would

12  later identify Ameen as the killer in photo lineups for both the FBI and the Iraqi court.  ECF Nos.

13  137-1 at 43, 206-1 at 5, 206-2 at 2, & 206-3 at 2.

14    There are three other witness statements in the extradition packet.  Jasim's parents,

15  referred to as "Person A" and "Person B," were in his home at the time of the murder.[6]  ECF No.

16  137-1 at 38-40.  They, at least initially, recounted an ISIS attack consistent with the one described

17  by Person 5 and confirmed that Jasim's body was taken to a hospital for the production of a death

18  certificate.  *Id.*  Both offered and signed written statements indicating their belief that Ameen

19  murdered their son in the manner described by Person 5.  *Id.*  However, unlike Person 5, they

20  were not outside the home to witness the killing of Jasim.  Instead, as indicated by Judge Dhiya,

21  the investigating judge overseeing Ameen's case in Iraq, their statements regarding the date and

22  manner of the ISIS attack are based on what Person 5 told them.  ECF No. 194-1 at 12.

23    Persons A and B have since indicated their intent to disavow their statements in the

24  extradition packet and withdraw their accusations against Ameen.  Indeed, they have offered an

25  alternate account of the murder that is inconsistent with their statements in the packet.  ECF Nos.

26    [5] Although the murder occurred on June 22, 2014, Person 5's statement was taken on
27  April 15, 2018.  ECF No. 137-1 at 43-44.

28    [6] These statements were also taken in April 2018.

13

142-17 at 5-7 (Exh. 36), 161-14 at 2 (Exh. 75) & 161-15 at 2 (Exh. 76).  There are questions, however, as to whether the renunciation of their original statements is motivated by a genuine belief that Ameen is innocent or, as the government suggests, they are being pressured in some way by individuals supportive of Ameen and/or ISIS.  Judge Dhiya, an Iraqi investigating authority, has authored an affidavit indicating that the statements of Persons A and B were: (1) given freely; (2) given in his presence; and (3) signed after both witnesses had been afforded a chance to review the transcriptions.  ECF No. 194-1 at 12.

In a third supplement to the official extradition packet, the Republic of Iraq has added testimony from another witness, "Person 1," who alleges that, on the day of the murder, he saw Ameen riding in an ISIS convoy as it made its way through Rawah.  ECF No. 235-3 at 4.  He subsequently heard gunshots and was told (at some later time) by an unidentified family member that Ameen had killed Jasim.  *Id.*

Finally, the government's briefs (ECF No. 261 at 56 & ECF No. 294 at 35) have alluded to a witness identified only as "Person 7" who also placed Ameen in Rawah at the time of the ISIS takeover.  This person's testimony was not part of any official extradition document submitted by Iraq.  Defense counsel expressed surprise in their reply brief and had difficulty determining who this witness was.  ECF No. 295 at 32 ("It is totally unclear where this fifth witness, Person 7, comes from.").  Person 7's testimony appears only in a search warrant that was provided to the court in conjunction with the search of Ameen's Sacramento apartment and vehicle.  The government's previous position was that the court could only find probable cause based on materials in the extradition packet and its official supplements.  ECF No. 204 at 3-5.  At a hearing held on January 6, 2020, the court indicated its intention to consider search warrant material concerning Person 1.  ECF No. 253 at 4 ("[M]y inclination was to consider the information about the statement made by Person 1, and I was first made aware of that statement when I issued the search warrant for the defendant's home and the vehicle.").  The government stated that the question of whether to look beyond the four-corners of the packet was moot because the same information had been submitted by Iraq through diplomatic channels.  *Id.* at 6.

/////

1    The court agrees.  By contrast, the testimony of Person 7 was not discussed at that hearing, save

2    at the end of the hearing when Ameen's counsel noted that the same search warrant documents

3    also identified Person 7 as a possible witness.  *Id.* at 95.

4          The government's witnesses and their reliability is discussed in greater detail in the

5    analysis to follow.

6          **II.      The Defense Case**

7          The defense argues that Ameen was in Turkey when the murder was committed.  It has

8    provided numerous declarations supporting that contention.  *See*, *e.g.*, ECF No. 142-1 at 10-12

9    (Exh. 4); ECF No. 142-14 at 1-3, 6-25 (Exhs. 12, 14-17).  The defense also relies on sign-in

10   sheets from the Mersin Immigration Office, where Ameen was required to sign in weekly to

11   preserve his refugee status.  ECF No. 142-12 at 20-23 (Exh. 11-T).  It has produced the results of

12   a polygraph test that Ameen passed in which he stated that he was not in Iraq on the day of the

13   murder.  ECF No. 265-2 at 12 (Exh. 159).  Finally, the defense has submitted Ameen's cell phone

14   records which, as discussed *infra*, show that his phone was in Turkey on the date of the murder.

15   ECF Nos. 289 & 295 (and attached exhibits).

16         Separately, the defense has offered evidence that the witnesses supporting extradition are

17   unreliable.  The court agrees, but for reasons that fall outside the defense's impeachment

18   evidence, which the court has already concluded that it cannot admit.  Thus, the court will forego

19   a detailed description of the impeachment arguments and evidence that will not be considered.

20                                        **Legal Standards**

21         The court's task in these proceedings is to determine: (1) whether the fugitive is accused

22   of an extraditable crime[7] and (2) whether there is probable cause to believe the fugitive

23   committed the crime he is charged with.  *Santos*, 830 F.3d at 991.  Probable cause has generally

24   been defined as sufficient evidence to convince a person "of prudence and caution" that a crime

25   was committed and that the accused committed it.  *See Carroll v. United States*, 267 U.S. 132,

26   160-61 (1925); *see also Illinois v. Gates*, 462 U.S. 213, 235 (1983) (holding that probable cause

27   ───────────────

28   [7] Murder is an extraditable crime under the extradition treaty between Iraq and the United States.  ECF No. 137-1 at 7.

entails a degree of certainty that is more likely than not).  The Supreme Court has compared an

extradition hearing to a grand jury investigation.  *Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913).

It follows that the extradition court is not tasked with determining the fugitive's guilt or

innocence.  *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981) ("It is fundamental that the person

whose extradition is sought is not entitled to a full trial at the magistrate's probable cause

hearing.").  Nonetheless, the extradition court is not to wield a "rubber stamp."  *Santos*, 830 F.3d

at 1006 (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)).

### Analysis

### I.    Ameen's Alibi

The court previously indicated its intent to allow Ameen to present alibi evidence in this

case.  ECF No. 160 at 14.  In so doing, the court distinguished between obliterative alibi evidence

and alibi evidence that is merely contradictory.  The court reasoned that the former should be

admissible and the latter excluded.  This court is not the first to draw this distinction.  *See In re*

*Extradition of Gonzalez*, 52 F. Supp. 2d 725, 739 (W.D. La. 1999) ("Evidence of an alibi defense

is therefore admissible if it negates or obliterates probable cause, but not if it merely controverts

the evidence of the requesting country."); *In re Extradition of Valles*, 268 F. Supp. 2d 758, 772

(S.D. Tex. 2003) ("Respondent's evidence of an alibi defense is therefore admissible if it negates

or obliterates probable cause."); *United States v. Andrade*, No. 06-MC-9039, 2006 U.S. Dist.

LEXIS 70040, at *10, 2006 WL 2729268 (D. Or. Sept. 25, 2006) (holding that "alibi evidence

may be admissible if it absolutely negates or obliterates probable cause.").  The court has not

been given reason to reconsider this position.  It now turns to the substantial evidence that Ameen

never left Turkey.

It cannot be disputed that, in the months prior to the murder, Ameen was living as a

refugee in Mersin, Turkey.  He had left Iraq for Turkey in 2012 (*see*, *e.g.*, ECF No. 142-1 at 2

(Ex. 2)) and he eagerly sought resettlement in the United States.  ECF No. 142-2 at 10-11 (Exh.

11, Declaration of Zaid Hydari) ("The rest of the contact log shows Mr. Ameen's cooperation

with the entire resettlement process.  All of the documentation I have reviewed shows that Mr.

Ameen readily answered calls and attended meetings with each agency involved in his case.").

1    But in the government's telling, Ameen travelled from Mersin to Rawah in the weeks or days

2    before the murder.  ECF No. 261 at 57 ("Ameen's whereabouts between May 22, 2014 (after his

3    USCIS interview) and July 7, 2014 (his medical appointment in Turkey) are unaccounted for by

4    any incontrovertible evidence.").  Between May 22, 2014 and July 7, 2014, he: (1) travelled the

5    six hundred miles[8] from Mersin to Rawah, crossing war-torn Syria; (2) joined ISIS fighters in or

6    near Rawah; (3) took on a leadership role;[9] (4) murdered Jasim (and perhaps conducted other

7    military or terrorist operations on behalf of ISIS); and (5) then promptly returned to his life as a

8    refugee in Turkey.  Considering the obliterative alibi evidence presented by the defense, this

9    series of events is simply not plausible.

10                      **A.      The Government's Dubious Account**

11           The government's version of events, standing alone, calls for some degree of skepticism.

12   The court does not claim any geo-political or military expertise, but Ameen's alleged return to

13   Rawah on behalf of ISIS makes little sense.  As discussed below, he and his family had long since

14   fled Iraq to Turkey and were awaiting a refugee resettlement process with which they had been

15   fully cooperative.  Presume that Ameen is a member of ISIS in 2014.  He has made his way to

16   Turkey masquerading as a refugee, has thus far maintained his cover, and is in the process of

17   using resettlement systems to reach the United States (or, failing that, perhaps some European

18   nation that ISIS views with disfavor).  Sometime between May 22, 2014 and June 22, 2014

19   Ameen decides — either on his own or at the direction of some higher authority within ISIS — to

20   undertake a trip back to Rawah.  In order to do so, he risks running afoul of Turkish authorities

21   who do not abide refugees moving freely in and out of the nation's borders.  ECF No. 142-2 at 5

22   /////

23   /////

24   _____

25           [8] The defense has requested that the court take judicial notice of the quickest route
     between the two areas.  ECF No. 142 at 10; *see also* ECF No. 142-1 at 1 (maps).  The court will

26   do so.

27           [9] Statements in the extradition packet characterize Ameen as "a prominent member" of
     ISIS in the Rawah district.  *See*, *e.g.*, ECF No. 137-1 at 40-41.  In the second supplement, Person

28   1 identifies Ameen as "an ISIS commander."  ECF No. 240-1 at 8.

(Exh. 11).[10]  He risks being captured or killed by forces unfriendly to ISIS that are participating in the Syrian civil war.  Once in Rawah, he participates in the murder of Jasim.  The accounts in the extradition packet paint the gun battle preceding the murder as a one-sided affair that Jasim could not have hoped to win.  *See*, *e.g.*, ECF No. 137-1 at 40 (describing four vehicles occupied by "large numbers of ISIS" and stating that the battle was over quickly "because of the large number of attackers and the intensity of the gunfire . . . .").  Ameen's presence can hardly be said to have been essential or necessary to the killing.[11]  Curiously, the extradition packet is silent as to other 2014 ISIS operations Ameen participated in during his time in Rawah.  Two witnesses, Person 1 and Person 7, purport to place him in Rawah at that time, true.  These accounts have little to offer, even through hearsay, about how else Ameen served ISIS in Rawah, however.  If Ameen was an ISIS commander as Person 1 attests, one would expect his involvement in the occupation of Rawah to be, if not obvious, at least capable of multiple forms of substantive corroboration.  Did Ameen return to Rawah, lead a coordinated assault on a lone, undefended victim, and then make the long, perilous trip back to Turkey?  A strange, borderline unbelievable decision, if so.  Perhaps the inability to identify other ISIS operations in which Ameen was involved is a consequence of witnesses being reluctant to speak about that period out of fear of reprisal.  Or, more likely based on compelling evidence before the court, it is a consequence of Ameen being in Turkey at the time of the murder.

/////

---

[10] The relevant portion of the affidavit:

> During this entire time, Mr. Ameen's Iraqi passport would have been surrendered by him to the Mersin Foreigner's Police, and would only have been provided to him for onward travel to the United States if he was in compliance with all of his obligations to that office in Mersin, Turkey. Refugees were not free to travel outside their satellite cities in Turkey at the time without permission from the Foreigner's Police.

ECF No. 142-2 at 5 (Exh. 11, Declaration of Zaid Hydari).

[11] The court recognizes, of course, that Ameen is alleged to have fired the fatal round. The point, however, is that Jasim's fate was sealed regardless of whether Ameen was present.

1      **B.      The Refugee Logbooks**

2            Turning to the evidence produced by the defense, there are physical logbooks establishing

3      that Ameen signed in, as Turkish authorities required of refugees,[12] at the Mersin immigration

4      office on June 19, 2014 and again on June 26, 2014.  ECF No. 142-12 at 20-23 (Exh. 11-T).

5      The logbooks are undated, but a defense investigator travelled to Turkey, to the Mersin

6      Immigration Office, and requested Ameen's sign-in logs for the June 2014.  *Id.* at 24.  The

7      investigator emphasized that the most relevant logs pertained to the sign-in dates immediately

8      before and immediately after the June 22, 2014 murder (June 19, 2014 and June 26, 2014).  *Id.*

9      Those logbooks were pulled by employees at the office and copies were given to the defense

10     team.  *Id.* at 24-25.  Ameen's sign-ins on June 19 and June 26 are further corroborated by a

11     notarized letter from the Provincial Directorate for Migration Management that attests that

12     Ameen remained compliant with all obligations during his stay, including completing required

13     sign-ins.  ECF No. 142-3 at 19-20 (Exh. E).  Thus, the court accepts that the provided sign-in logs

14     are for June 19, 2014 and June 26, 2014 and that they belong to Ameen.  Ameen had, at best,

15     seven days to make the perilous, six-hundred mile cross-borders trip from Mersin to Rawah, to

16     commit the murder on June 22, and to hurry back into Turkey for his June 26 sign-in—all the

17     while evading the Turkish authorities that had confiscated his passport.

18     **C.      Witness Declarations**

19           Numerous witnesses have provided declarations attesting to Ameen's presence in Turkey

20     (or absence from Rawah) at the time of the murder.  *See*, *e.g.*, ECF No. 142-1 at 2-3 (Exh. 2,

21     Declaration of Aous Mounir Saood), 10-11 (Exh. 4, Declaration of Omar Hamid), 16-17 (Exh. 6,

22     Declaration of Ahmed Azzam).  Witnesses testified that Rawah was a small town and comings

23     and goings were noted.  *See*, *e.g.*, ECF No. 142-14 at 2 (Exh. 12, Declaration of Mahdi Saleh

24     Othman) ("Rawah is so small that of course I would have known if Omar had come back to town

25     _____

               [12] "The Turkish Government required that Mr. Ameen carry out 'signature duty' on a
26     weekly basis whereby he would physically need to present himself to authorities and sign his
       name."  ECF No. 142-2 at 4 (Exh. 11, Declaration of Zaid Hydari).  Other declarations
27     corroborate the sign-in requirement.  *See*, *e.g.*, ECF No. 142-14 at 1 (Exh. 12, Declaration of
       Mahdi Saleh Othman) ("Omar mentioned that he had to sign in every Thursday at the police
28     office . . . .").

1   in June 2014 . . . .").  A text from Jasim, sent the day of the murder, lends additional credence to

2   these declarants.  Several ISIS threats are identified by name therein.  ECF No. 239 at 2.  Ameen

3   is not among them.

4                                    **D.    Polygraph Evidence**

5           Standing alone, the court would not put much emphasis on Ameen's polygraph test

6   results.  *See United States v. Scheffer*, 523 U.S. 303, 309 (1998) ("[T]here is simply no consensus

7   that polygraph evidence is reliable.").[13]  Even in conjunction with the other evidence, the court

8   does not lend it great weight.  The test results do, however, reinforce[14] the court's conclusion that

9   the defense has obliterated probable cause.  The test was conducted by Oded Gelfer, a certified

10  forensic law enforcement polygraph examiner who speaks Arabic.  ECF No. 265-1 at 1, 4.

11  Ameen passed the test after being asked whether he was in Rawah in June 2014 and whether he

12  shot Jasim.  ECF No. 265-2 at 2-5.

13                                   **E.    Ameen's Cell Records**

14          The final piece of evidence, Ameen's cell records, is the most critical.  Pursuant to Letters

15  Rogatory issued by the court, detailed cell phone records were produced by the Information and

16  Communications Technology Ministry of the Turkish Government.  EFC No. 289.  Those records

17  are referred to in the briefs as "Turkcell records."  On June 22, 2014, the day of the murder,

18  Ameen's cell phone received two calls that routed through a cell tower in Mersin, Turkey.  ECF

19  No. 289 at 7; ECF No. 289-7 at 1 (Exh. 164).  The government argues that this data shows only

20  that Ameen's cell phone was in Turkey; it does not establish the whereabouts of Ameen himself.

21  ECF No. 294 at 14 ("The two incoming calls only demonstrate that the -5280 phone was in

22  Mersin.").  In so doing, the government fails to account for the user attribution evidence.  As the

23

24          [13] The court recognizes that the Supreme Court drew this conclusion more than twenty-
    years ago.  The U.S. Court of Appeals for the Ninth Circuit has continued to cite this decision in
25  recent cases, however.  *See, e.g.*, *Shorb v. Nooth*, 727 F. App'x 442, 443 (9th Cir. 2018)
    (unpublished).
26

27          [14] The court's decision to deny certification would stand even if Ameen had never
    submitted to a polygraph test.  It only sees fit to mention the test as another point in the
28  constellation of overwhelming evidence that Ameen was not in Rawah in June 2014.

1    defense argues, the phone belonged to Ameen and the evidence shows that he, and not any other

2    member of his family, was its primary user.  *See* ECF No. 295 at 14-16.  In Turkey one must

3    present a government issued identification to obtain a phone.  Ameen obtained his in 2012 using

4    his Iraqi passport.[15]  Turkcell retained the passport information which was used to confirm that

5    the phone was issued to Ameen.[16]  And, as the defense points out, the Turkish cell data only

6    registers completed calls.  *Id.* at 17.  The extensive user attribution evidence detailed by the

7    defense indicates that Ameen repeatedly used the cell phone issued to him.  There is no user

8    attribution evidence presented that anyone else used it.  It is true that nothing in the record

9    eliminates the possibility, however improbable based on the evidence of record, that someone else

10    had the phone on June 22, 2014.  But that does not save the government's case for probable

11    cause.  The government is tasked with showing evidence that Ameen's involvement in the murder

12    is probable, not that some series of events, however unlikely, renders it theoretically possible.

13    Inversely, the defense's success rests on obliterating probable cause, not in disproving fringe

14    possibilities.

15           The government raises other arguments against the cell data.  All are unconvincing.  The

16    court will discuss them briefly.  First, the government argues that the defense's reliance on the

17    Supreme Court's decision in *Carpenter v. United States*, 138 S.Ct. 2206 (2018) is misplaced.  In

18    *Carpenter*, the Supreme Court described historical cell phone data as "near perfect surveillance,

19    /////

20    /////

21    /////

22    /////

23    ─────────────────

24           [15] Ameen's phone was seized from his apartment in August 2018 and the IMEI number confirms it was the phone issued to and regularly used by him in Turkey.  ECF No. 295-11.

25           [16] A separate phone was issued to and used by Ameen's wife, and their children were all

26    under 10 years of age. The cell phone records show that Ameen repeatedly used the phone issued to him to regularly communicate with his wife.  He also used it repeatedly to communicate with

27    his brother (ECF No. 142-1, at 24), a close friend (*id.,* at 11) and the United Nations High Commissioner for Refugees (UNHCR) (ECF No. 142-2, at 2-3), the International Catholic

28    Migration Commission (ICMC) and its Resettlement Support Center (RSC). *Id.* at 6-8.

as if [the government] had attached an ankle monitor to the phone's user."[17] *Id.* at 2218.  The

government distinguishes *Carpenter* by arguing that cell site location in that case was more

robust, consisting of "taps" on the wireless network multiple times in a single minute.  ECF No.

294 at 10.  By contrast, the cell data in this case provides the approximate location of the phone

only when there is a call or text.  *Id.*  This argument might be persuasive if Ameen were charged

with a murder occurring nearer his home in Mersin.  In that case, it might be worth delving into

these limitations.  But the distinctions drawn by the government are meaningless where the

alleged murder occurred approximately six-hundred miles from the cell tower.  The phone did not

travel to Rawah on June 22, 2014.

    The government argues that at least some of the phone records indicate that Ameen had a

relationship to an individual involved in terrorism.  ECF No. 294 at 26.  The relevancy of this

contention is strained at best.  The individual in question, Marwan Salih, was sanctioned in his

role as CEO of "Redin Exchange," an entity which the Treasury Department determined was

involved in fund transfers between Iran and Hamas.[18]  In a press release the Treasury Department

wrote that "Redin Exchange has materially assisted, sponsored, or provided financial, material, or

technological support for, or goods or services to, HAMAS."[19]  It made no mention of ISIS.

There is no indication that Hamas had any involvement in events relevant to this case.

    Finally, in an argument whose inclusion is perplexing, the government contends that the

phone records establish that Ameen could travel long distances quickly.  ECF No. 294 at 24.  The

government cites a trip Ameen took from Mersin to Istanbul and back in less than forty-eight

---

[17] The Supreme Court's belief in the ubiquity of cell phones and power of surveilling them did not begin with *Carpenter*.  In *Riley v. California*, the Supreme Court recognized that cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."  573 U.S. 373, 385 (2014).

[18] The Special Designation and Blocking Memorandum may be found at: https://www.federalregister.gov/documents/2019/09/17/2019-20003/special-designation-and-blocking-memorandum (last visited on 3/2/21).

[19] The Treasury Department press release may be found at: https://home.treasury.gov/news/press-releases/sm772 (last visited on 3/2/21).

1   hours and argues that "it would be in keeping with that transit time that Ameen could travel from

2   Mersin to Rawah with a relatively quick turnaround." *Id.*  But there can be no straight-faced

3   argument that a trip made within Turkish borders is equivalent to a cross-border trip across a

4   Syrian warzone (and then into an area of conflict in Iraq).

5   **II.      The Reliability of the Government's Witnesses**

6           In finding that Ameen's alibi evidence obliterates probable cause, the court necessarily

7   rejects witness accounts that place him in Rawah at the time of the murder.  Obviously, he could

8   not be present in Turkey and Iraq at the same time.  Obliterative evidence, as its name suggests,

9   does not exist in a vacuum.  It acts upon the evidence advanced by the requesting nation.  The

10   court previously identified the relationship between the parties' evidence as a kind of sliding

11   scale.[20]  Thus, it behooves the court to discuss the witness evidence offered in support of

12   extradition and, more specifically, its unreliability.  In so doing, the court recognizes that the body

13   of case law that cautions against weighing witness credibility in extradition hearings is

14   substantial.  The court has adhered to that precedent by excluding numerous documents the

15   defense has submitted for the purpose of undermining witness credibility.[21]  But, implicit in the

16   _____

17           [20] At the extradition hearing on December 4, 2019 the court stated:

18           [T]he more difficult it becomes geographically and physically for the
            defendant to have traveled from Mersin to Rawah to actually sign in the
19           Thursday before and arrive there in time to have committed the murder and
            then to travel back again and get back to Mersin on the Thursday after . . .
20           the more faith one has to have in the credibility of the people who say they
            saw him in Rawah.

21           ECF No. 253 at 85.

22           [21] The principle that an extradition court should not determine witness credibility is well-
23   intentioned.  It follows that the trial court in the requesting country will generally be better
     equipped to investigate and determine witness credibility.  The application of the principle in this
24   case, however, has been challenging.  While the court has considered contradictions in the
     statements contained in the evidence submitted by the requesting government in assessing their
25   reliability for purposes of determining probable cause, the court has been forced to exclude
     defense evidence that Person 1 had fled Rawah long before ISIS entered the city on June 21,
26   2014, and did not return until after ISIS was expelled (ECF No. 258, Exhs. 144, 145, 146, 147,
     150, and 151), and that Person 5 has subsequently given still more embellished and conflicting
27   accounts of the shooting, including an account that he cradled the victim in his arms when Ameen
     fired the killing shot.  ECF No. 208-14 at 4, Exh. 90.
28

purpose of these probable cause proceedings is the court's ability to reject witness testimony for want of reliability.  The court does not determine guilt or innocence, true, but it must assure itself that the standards for probable cause under United States law are satisfied.  If the evidence before the court shows it is more probable that Ameen was in Mersin, Turkey at the time of the murder, the court cannot also conclude that there is probable cause that he committed the murder that occurred in Rawah, Iraq.  Thus, there is some tension between the "accept as true" rule argued by the government (ECF No. 294 at 36, arguing that all of Person 5's statements must be accepted as true) [22] and the requirement that the requesting nation present evidence sufficient to satisfy the judicial standards for probable cause under United States law.  *See Santos,* 830 F.3d at 1006.

In analyzing the evidence here, the standards for determining whether probable cause exists to issue a search warrant is a helpful analogue.  To obtain a search warrant, law enforcement must show "by sworn evidence presented to a magistrate that probable cause exists to believe that an offense has been committed and that items related to that offense, such as fruits of the crime, will be found on the premises sought to be searched at the time the warrant is issued."  *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir. 1988) (internal citation and quotations omitted).  Where a court relies on statements of an informant to find probable cause, it must consider that person's reliability, and basis of knowledge.  *See Gates*, 462 U.S. at 230; *see also United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)("When a search warrant is based solely on an informant's tip, the proper analysis is whether probable cause exists from the totality of the circumstances to determine a sufficient level of reliability and basis of knowledge for the tip.").  Under United States law, in determining probable cause a witness's propensity to lie or to offer inconsistent accounts is part of the "totality of circumstances" to be evaluated and cannot be ignored.  *See United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997) ("If [the informant] was not worthy of belief, then this would not amount to probable cause.").

_____

[22] The government's argument of an "accept as true" rule strains the doctrine beyond any boundaries of logic.  As discussed below, all of the statements it submitted cannot be true.  By way of example, which of Person 5's statements are to be assumed accurate?  That Person 5 saw the victim being shot by Ameen (ECF No. 137-1 at 43), or, as indicated in the warrant application affidavit, that he did not (ECF Nos. 208-33 & 142-17).

24

1   The "totality of the circumstances" principle articulated in *Gates* has been applied in

2   extradition hearings.  *See*, *e.g.*, *In re Extradition of Howard*, No. 2:15-mj-00627-NJK, 2017 U.S.

3   Dist. LEXIS 103243, *20 (D. Nev. July 3, 2017); *In re Camelo-Grillo*, No. CV 16-9026 JVS

4   (SS), 2017 U.S. Dist. LEXIS 106389, *14 (C.D. Cal. Jul. 10, 2017).  And extradition courts have

5   weighed the reliability of witnesses in determining whether probable cause to certify exists.  *See*,

6   *e.g.*, *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986) ("The credibility of witnesses and the

7   weight to be accorded their testimony is solely within the province of the extradition

8   magistrate."); *In re Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987) ("[W]hen a court in

9   an extradition proceeding is presented with evidence through affidavits, the court may conclude,

10  on review of the affidavits submitted, that there are insufficient indicia of reliability or credibility

11  to establish probable cause."); *United States v. Lui Kin-Hong*, 110 F.3d 103, 120 (1st. Cir. 1997)

12  ("Inherent in the probable cause standard is the necessity of a determination that the evidence is

13  both sufficiently reliable and of sufficient weight to warrant the conclusion.").

14   The witnesses at issue, referred to as Persons 1, 5, and 7, were first brought to the court's

15  attention in an application for a search warrant of Ameen's apartment and vehicle.  The court

16  issued that warrant prior to the start of these proceedings based on statements primarily attributed

17  to Person 5 and, to a lesser extent, the statements attributed to the other two persons referenced in

18  the affidavit in support of the warrant.  But the search warrant was issued without the information

19  that has since been developed, including the evidence indicating that Ameen was in Turkey at the

20  time of the offense.  The warrant application was at one time included in the record of this case as

21  defense exhibit 112.  ECF Nos. 208 at 10, and 208-33.  That exhibit has since been withdrawn.

22  ECF No. 296 at 10.[23]  Nevertheless, the court has indicated its intent to consider the warrant

23  application in these proceedings.  ECF No. 253 at 93-94; *see also United States v. Amabile*, No.

24  14 M 1043 (VMS), 2015 U.S. Dist. LEXIS 96137, *8 n.6 (E.D.N.Y. Jul. 16, 2015) (collecting

25  cases that establish the proposition that extradition law does not preclude the court from

26  considering documentary evidence outside of the extradition request).  The government has itself

27

28   [23] Although the warrant application and its copy at exhibit 112 (ECF No. 208-33) remain
    under seal the parties have ready access to it.

1    relied upon these materials by referring to Person 7's warrant application testimony in its briefing.

2    ECF No. 261 at 56 ("An additional witness—Person 7—placed Ameen in Rawah in or about the

3    time of the fall of Rawah."); ECF No. 294 at 35 (referring to "the statement of Person 7, who had

4    no knowledge of the murder but placed Ameen in Rawah at or around the time of the fall of

5    Rawah.").  The warrant application, juxtaposed with the extradition request, casts serious doubt

6    on the reliability of Persons 1, 5, and 7.

7                                  **A.      Person 7**

8              In the warrant application, Person 7 alleges that Ameen was a prominent member of ISIS

9    and claims to have seen Ameen in Rawah before its fall to ISIS.  These statements are vague and

10   ultimately unreliable.  They do not offer a date, even an approximate one, on which Person 7

11   claims to have seen Ameen in Rawah.  "Before the fall of Rawah" is a time period so undefined

12   as to be practically useless.  Temporal questions aside, the unreliability of Person 7 is

13   compounded by want of other context, particularly in light of the evidence that has been

14   presented that Ameen was in Turkey at the time.  What was Ameen doing when Person 7 saw him

15   before Rawah's fall?  What identifiers made Person 7 certain that the individual observed was

16   Ameen?  Did Person 7 see him once or multiple times?  Finally, as noted above, this witness

17   claims no knowledge of the murder at issue.

18                                 **B.      Person 1**

19             Person 1's allegations as recited in the warrant application and extradition packet are

20   identical.[24]  Person 1 claims to have been in Rawah on the date of the murder.[25]  ECF No. 240-1

21   at 8.  In the late afternoon, Person 1 saw a three car ISIS convoy and claims that Ameen was

22   seated in the passenger seat of one of the cars.  *Id.*  Person 1 surmised, though does not say how,

23

24           [24] The statement in the extradition packet is the same as the one in warrant application.
     ECF No. 240-1 at 7.

25

26           [25] Person 1's statement is not dated.  This person's observation of Ameen is said to have
     occurred "on or about the time Rawah fell to ISIS."  ECF No. 240-1 at 8.  Nevertheless, the

27   person describes hearing the gunshots that killed Jasim.  *Id.*  Thus, the court presumes that the
     identification is purported to have occurred on June 22, 2014.

28

1    that Ameen was likely the convoy's commander.  *Id.*  The convoy continued past Person 1 and

2    stopped in front of Jasim's home.  *Id.*  Person 1 states that he heard a blast of rifle fire and fled the

3    area.  *Id.*  Person 1 was later told by family members that Ameen had killed Jasim with that burst

4    of rifle fire.  *Id.*

5          In assessing probable cause, the court must address the evidence as to the reliability of

6    Person 1's identification of Ameen.  First, the identification is based on a brief observation

7    through the window of a moving vehicle.  Second, the murder is alleged to have occurred at seven

8    o'clock in the evening.  ECF No. 137-1 at 43 (Statement of Person 5).  In reality, the murder

9    occurred later, at some time after 8 p.m.  *See* ECF No. 258-20 (Exh. 149) (Jasim's final outgoing

10   text occurred at 8:03 p.m. local Iraqi time on June 22, 2014).  Given that Person 1 alleges that the

11   murder occurred a short time after seeing the convoy pass, the claim that the identification was

12   made in "the late afternoon," ECF No. 240-1 at 8, is not plausible.  Perhaps more importantly,

13   Person 1's alleged identification of Ameen in a moving vehicle would have taken place with little

14   or no daylight.  *See* ECF No. 258 at 7 (defense brief indicating that, on June 22, 2014, sunset

15   occurred at approximately 7:15 p.m. Iraqi time).  Third, Person 1's claim of having heard a single

16   burst of rifle fire and subsequently learning that it was this burst that killed Jasim cannot be

17   reconciled with Person 5's statement in the extradition request packet that a prolonged, ten-

18   minute gun battle occurred between Jasim and his attackers.[26]  ECF No. 137-1 at 43 ("[Jasim]

19   went outside the house and returned fire at [the] ISIS terrorists using his Kalashnikov rifle.  The

20   engagement continued with the terrorist elements for about 10 minutes.").  Finally, the court notes

21   that Person 1's allegations are derived from summations of an FBI agent's interview notes rather

22   than Person 1's own words.[27]  The distinction is subtle, but meaningful.  A summation captures

23   /////

24

25          [26] The court is not positioned to say whether Person 1 or Person 5's account is closer to
     the truth.  But both statements are in the packet submitted in support of the extradition request.

26   Suffice it to say, their dissonance undermines the government's case for probable cause.

27          [27] Lest there be any doubt, Person 1's "statement" indicates that it is presented "as
     recorded by representatives of the Federal Bureau of Investigation."  ECF No. 240-1 at 7.  Person

28   1 is referred to entirely in the third person.

27

1  the fundamentals of a witness's claims, but it can omit nuance or important details that the

2  interviewing agent(s) might, at the time, have thought inconsequential.

3                    **C.    Person 5**

4          Person 5 is the government's most important witness because that person alone claims to

5  have witnessed Ameen kill Jasim.  A comparison of Person 5's statement in the extradition

6  request and Person 5's summarized account in the warrant application reveals several important

7  inconsistencies.[28]  In the extradition request, Person 5 states that he and Jasim were inside the

8  house when the ISIS convoy approached.  ECF No. 137-1 at 43.  When the ISIS fighters began to

9  fire at the house, Jasim went outside and returned fire.  *Id.*  After the shooting stopped, Person 5

10  went outside and saw Jasim on the ground and Ameen standing over him.  *Id.*  Person 5 then

11  claims to have seen Ameen shoot and kill Jasim at close range.  *Id.*

12          By contrast, Person 5's statements to the FBI in the warrant application make no mention

13  of a firefight.  Instead, he claims that the ISIS convoy arrived at the house and Ameen approached

14  Jasim, who was presumably already outside.  ECF No. 142-17 at 11.  Jasim told Person 5 to leave

15  and get some tools.  *Id.*  After Person 5 had left, Person 5 heard gunshots and ran back towards

16  Jasim.  *Id.*  Person 5 arrived to see Jasim crawling on the ground with gunshot wounds to his

17  arms, chest, and legs.  *Id.*  Jasim subsequently succumbed to his wounds, but Person 5 does not

18  allege that Ameen executed him with a final shot.  *Id.*  The court acknowledges that witnesses,

19  especially those that have lived through traumatic events, may change details of their account

20  over time.  Minor discrepancies should not automatically destroy witness credibility or imply

21  dishonesty.  Here, however, the inconsistencies are substantial and undermine reliability,

22  ───────────

23  [28] As stated above, the warrant application and its copy at ECF No. 208-33 are still under
seal.  However, exhibit 38— a record of an October 23, 2017, statement by Person 5 to the FBI—
mirrors the content of Person 5's allegations in the warrant application that are relevant here.
24  ECF No. 222-1 (unsealed redacted version of Exhibit 38); ECF No. 142-17 (sealed unredacted
version).  The court previously excluded Exhibit 38 for the purpose of attacking Person 5's
25  credibility.  ECF No. 160.  At that time, the court was unaware that the substance of Person 5's
allegations across Exhibit 38 and the warrant application was identical.  Accordingly, the court
26  will cite to Exhibit 38 when discussing Person 5's account of the murder in the warrant
application.  Given that the account recited in the warrant application was relied upon by the
27  government to obtain the warrant, that account will be considered in assessing whether Person 5
has provided the government consistent accounts of what he claims to have witnessed.
28
                              28

1   particularly when they are viewed in light of evidence showing that Ameen was not in Iraq at the

2   time.  Under Person 5's account did a ten-minute firefight between Jasim and his attackers occur?

3   Did Ameen execute Jasim or leave him to die from his wounds?  Did Person 5 see the shooting or

4   not?  These are key details that one would expect to remain constant.  But they do not.

5        Finally, Person 5's reliability is impacted by his having articulated allegations against

6   Ameen that are absurd on their face.  In the extradition request, he claims that Ameen was

7   responsible for a kidnapping that occurred in Iraq in 2016.  ECF No. 137-1 at 61, 99.  Ameen was

8   indisputably in the United States at that time.  In the warrant application, Person 5 told FBI

9   investigators that Ameen was a close associate of the leader of ISIS, Abu Bakr Al-Baghdadi.  He

10  claimed that he saw Ameen and Al-Baghdadi together in Rawah in the summer of 2014.  The

11  court finds it unnecessary to describe all the reasons why a close association between Ameen and

12  Al-Baghdadi is unlikely.  Suffice it to say, there is no corroborative evidence in the record that

13  Ameen occupied such a high-level leadership role in ISIS.

14        **D.    Witnesses A and B**

15        Witnesses A and B have offered statements that essentially recount Person 5's account of

16  the murder in the extradition request.  It is undisputed that neither saw the murder.  Nor did either

17  see Ameen in Rawah at or around the time of the murder.  Both A and B were in Jasim's house

18  when the killing occurred; their statements are based on what Person 5 told them after the fact.

19  ECF No. 194-1 at 12.  The value of their statements turns on the reliability of the information

20  relayed by Person 5 who, as stated above, has demonstrated that he/she is simply not a reliable

21  witness.

22        **III.    Conclusion**

23        The court concedes that it has been difficult to reconcile the restrictive body of extradition

24  case law with the applicable standards under United States federal case law for establishing

25  probable cause and the circumstances of this case.  It is regrettable that the case has taken more

26  than two years to litigate.[29]  Whatever procedural doubts precede it; the court is convinced that

27

28        [29] Not all of that time can be attributed to inherent delay in processing the letters rogatory
    to obtain the Turkcell records or to the defense's other discovery requests.  There was also delay

1   the decision not to certify Ameen's extradition is correct.  The evidence strongly supports that

2   Ameen never left Turkey in June 2014, and the record before the court, taken in its entirety, does

3   not establish probable cause that he was responsible for Jasim's murder.

4        Accordingly, the request for a certificate of extradition is denied.  Unless there are

5   pending domestic charges on which the government can justify Ameen's continued detention, it is

6   ORDERED that Omar Abdulsatar Ameen be immediately released from custody.  At the time of

7   writing, the court has not been made aware of any such pending charges.

8        So Ordered.

9   DATED:  April 21, 2021.

10                                      EDMUND F. BRENNAN
                                        UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   occasioned by litigation over the government's insistence early in the case that key documents be
     sealed not only from the public but from defense counsel.  Further, the delay in processing the

27   letters rogatory does not rest exclusively at the feet of the defense.  *See, e.g.*, ECF No. 257 at 2,
     Order of January 28, 2020 ("the delay in this instance is attributable to the government's own

28   bureaucratic mishandling of the Turkish letter.").

30